**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| LADDY CURTIS VALENTINE and<br>RICHARD ELVIN KING, individually and<br>on behalf of those similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>BRYAN COLLIER, in his official capacity,<br>ROBERT HERRERA, in his official capacity,<br>and TEXAS DEPARTMENT OF CRIMINAL<br>JUSTICE.<br><br>　　　　　Defendants. | )<br>)<br>)<br>)　Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OTHER INJUNCTIVE RELIEF

Plaintiffs Laddy Curtis Valentine and Richard Elvin King, on behalf of themselves and those similarly situated, bring this action to enjoin the above-named Defendants' willful and/or deliberately indifferent and discriminatory conduct in failing to protect inmates housed in the Wallace Pack Unit who face a high risk of severe illness from exposure to Coronavirus Disease 2019 or COVID-19.

### STATEMENT OF THE CASE

1.　　This case is about the Texas Department of Criminal Justice's ("TDCJ") failure to take proper measures to prevent transmission of COVID-19 to some of its most vulnerable inmates. The named Plaintiffs and the classes they seek to represent are currently incarcerated at TDCJ's Pack Unit in unincorporated Grimes County, Texas. Prisons are an ideal breeding ground for COVID-19. The Centers for Disease Control and Prevention warns that prisons are particularly susceptible to the spread of COVID-19 due to the high population density of inmates, and the tight, confined environment. While it has always been a matter of when, not if, COVID-19 hits the state's

prisons, that time is now. In the last week there have been multiple reported cases of COVID-19 in both the TDCJ system and the community surrounding the Pack Unit.

2.      Despite the ticking time bomb that COVID-19 represents, TDCJ has failed to implement necessary or even adequate policies and practices at the Pack Unit. Plaintiffs have been denied proper and equal access to vital preventative measures to avoid the transmission of COVID-19, in violation of federal law and the United States Constitution. While TDCJ adopted policies in response to this epidemic, they only encompass some of the guidance from the CDC and thus neglect critical measures for halting the spread of the disease. In practice the situation is even worse, as TDCJ has failed to implement many of its own policies, particularly at the Pack Unit. TDCJ's failure is especially harmful to Plaintiffs and the classes they seek to represent. As a Type-I Geriatric prison, the Pack Unit is home to a large population of inmates that are over 50, have serious pre-existing health conditions, or both. The CDC warns that these are precisely the type of people most at risk for serious illness, or even death, from COVID-19.

3.      TDCJ's failures don't just affect the inmates. Prison health is community health. An outbreak at the Pack Unit could easily spread to the surrounding communities, and vice versa. Time is running out for proper protections to be put into place. Plaintiffs seek immediate relief from this Court before it is too late.

<strong>JURISDICTION AND VENUE</strong>

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

2.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

### A.   Plaintiffs

3.    Laddy Curtis Valentine is 69 years old and currently incarcerated at the Pack Unit. He is not expected to be released from custody until 2036.

4.    Richard Elvin King is 73 years old and currently incarcerated at the Pack Unit. He is not expected to be released from custody.

### B.   Defendants

5.    Bryan Collier is the executive director of TDCJ. As such, Mr. Collier is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

6.    Robert Herrera is the warden of the TDCJ Pack Unit. At all times described herein, he was acting under color of state law. As the warden of the Pack Unit, he is responsible for ensuring the conditions of confinement at the Pack Unit are constitutional. He is sued in his official capacity for declaratory and injunctive relief.

7.    The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. Tex. Gov't Code § 493.004. TDCJ is a recipient of federal funds. At all relevant times, TDCJ operated the Pack Unit, a public facility with programs and services for which Plaintiffs and other prisoners with disabilities were otherwise qualified.

## FACTS

### A.    COVID-19 Is a Deadly Pandemic and a Public Health Emergency

8.    Since the end of 2019,[1] the Novel Coronavirus that causes Coronavirus Disease 2019 (or COVID-19)[2] has ravaged the world, country to country.[3] The extensive body of evidence regarding COVID-19 demonstrates that it is a highly communicable respiratory virus that spreads through close-contact and touching common surfaces containing the virus.

9.    On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "Public Health Emergency of International Concern" as cases had been "reported in five WHO regions in one month."[4] The next day, the U.S. Secretary of Health and Human Services declared under Section 319 of the Public Health Service Act (42 U.S.C. § 247d), that COVID-19 "present[ed] a Public Health Emergency in the United States."[5] "On March 11, 2020, the World

---

[1] World Health Organization, Pneumonia of Unknown Cause – China (Jan. 5, 2020), https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/ ("On 31 December 2019, the WHO China Country Office was informed of cases of pneumonia of unknown etiology (unknown cause) detected in Wuhan City, Hubei Province of China. As of 3 January 2020, a total of 44 patients with pneumonia of unknown etiology have been reported to WHO by the national authorities in China. Of the 44 cases reported, 11 are severely ill, while the remaining 33 patients are in stable condition.").

[2] The World Health Organization officially adopted the name COVID-19 for the novel coronavirus disease on February 11, 2020, WHO Twitter Post (Feb. 11, 2020), https://twitter.com/WHO/status/1227248333871173632?s=20.

[3] The first case of COVID-19 outside of China was reported by officials in Thailand on January 8, 2020. *See* WHO statement on novel coronavirus in Thailand, WHO (Jan. 13, 2020), https://www.who.int/news-room/detail/13-01-2020-who-statement-on-novel-coronavirus-in-thailand. Over the next several weeks, the outbreak spread to the Republic of Korea, Japan, and Singapore. *See* Statement on the meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV), WHO (Jan. 23, 2020) https://www.who.int/news-room/detail/23-01-2020-statement-on-the-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov). By January 21, 2020, the first case of COVID-19 in the United States was detected in Washington State. Washington State Department of Health, 2019 Novel Coronavirus Outbreak (COVID-19), https://www.doh.wa.gov/emergencies/coronavirus.

[4] Public Health Emergency of International Concern declared (Jan. 30, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (The WHO's Emergency Committee "noted that early detection, isolating and treating cases, contact tracing and social distancing measures – in line with the level of risk – can all work to interrupt virus spread").

[5] Secretary Azar Delivers Remarks on Declaration of Public Health Emergency for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/leadership/secretary/speeches/2020-speeches/secretary-azar-delivers-remarks-on-declaration-of-public-health-emergency-2019-novel-coronavirus.html; Secretary Azar Declares Public Health

Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States."[6]

10.     On March 13, 2020, Texas Governor Greg Abbott determined that "COVID-19 poses an imminent threat of disaster" and, under Section 418.014 of the Texas Government Code, declared "a state of disaster for all counties in Texas."[7] Subsequently, the Texas Department of State Health Services determined on March 19, 2020 that "COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code."[8] The same day, Gov. Abbott issued Executive Order GA08, which provides in part that "every person in Texas shall avoid social gatherings in groups of more than 10 people."[9]

11.     Similarly, on March 16, 2020, Grimes County (where the Pack Unit is located) found that "extraordinary measures must be taken to contain COVID-19 and prevent its spread

---

Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

[6] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/; *see also* WHO Director-General's opening remarks at the media briefing on COVID-19 (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 ("WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic. Pandemic is not a word to use lightly or carelessly. It is a word that, if misused, can cause unreasonable fear, or unjustified acceptance that the fight is over, leading to unnecessary suffering and death.").

[7] Governor Abbott Declares State of Disaster In Texas Due To COVID-19 (Mar. 13, 2020), https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19.

[8] *See* Executive Order GA 08 (Relating to COVID-19 preparedness and mitigation), Mar. 19, 2020, https://www.grimescountytexas.gov/page/open/2263/0/20200319%20Governor%20Abbott%20Executive%20Order%20GA-08.pdf.

[9] *Id.*

-5-

throughout Grimes County," and declared a local state of disaster pursuant to Section 418.108(a) of the Texas Government Code.[10]

12.     In only a few months, over 600,000 people worldwide have been diagnosed with COVID-19, and almost 30,000 of those people have died.[11] As of the date of this complaint, over 100,000 Americans have tested positive for COVID-19, while the number of deaths has risen to at least 1,668.[12] Those numbers are growing rapidly every day. There is no vaccine or cure for COVID-19. No one is immune.

**B.      COVID-19 Is Easily Transmissible and Will Spread Rapidly in a Prison Environment**

13.     The number of COVID-19 cases is growing exponentially. Nationally, projections by the CDC indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the pandemic without effective public health intervention, with as many as 1.7 million deaths in the most severe projections.[13]

14.     COVID-19 is a particularly contagious disease. A recent study showed that the virus could survive for up to three hours in the air, four hours on copper, twenty-four hours on cardboard, and two to three days on plastic and stainless steel—the same type of surfaces prisoners

---

[10]     Declaration of Local Disaster for Public Health Emergency, Mar. 16, 2020, https://www.grimescountytexas.gov/page/open/2263/0/MARCH%2016%202020%20GRIMES%20COUNTY%20SIGNED%20DECLARATION%20OF%20LOCAL%20DISASTER%20COVID%2019.pdf; Extended Declaration of Local Disaster for Public Health Emergency, Mar. 23, 2020, https://www.grimescountytexas.gov/page/open/2263/0/03232020%20EXTENDED %20MARCH%2016%202020%20GRIMES%20COUNTY%20DECLARATION%20OF%20LOCAL%20DISASTER%20COVID%2019.pdf.

[11] World Health Organization, *Corona Virus disease 2019 (COVID-19) Situation Report – 69*, (Mar. 29, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200329-sitrep-69-covid-19.pdf?sfvrsn=8d6620fa_2.

[12] *Id.*

[13] Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Mag. (Mar. 13, 2020), https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7m-dead.html.

come into contact every day at the Pack Unit.[14] Another study of an early cluster of COVID-19 cases in Wuhan, China, revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces—in the study, it was a communal restroom, like the restrooms Pack Unit prisoners use.[15]

15.     New research also shows that controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—infection transmission by people who are contagious but exhibit limited or no symptoms, rendering any screening tools dependent on identifying symptomatic behavior ineffective.[16]

16.     COVID-19 has been especially dangerous in areas of close confinement, such as cruise ships and assisted living facilities. It follows that jails and prisons are particularly vulnerable to an outbreak. In fact, jails and prisons are at an even greater risk because of their close quarters and communal living spaces.[17]

17.     Experts predict that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[18]

---

[14] Marilynn Marchione/AP, *Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show*. TIME, (Mar. 11, 2020),https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/.

[15] Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020*. 26 Emerg Infect Dis. 6, (2020) https://doi.org/10.3201/eid2606.200412.

[16] Chelsea Ritschel, *Coronavirus: Are People Who Are Asymptomatic Still Capable of Spreading COVID-19?* Independent (Mar. 15, 2020), https://www.independent.co.uk/life-style/health-and-families/coronavirus-symptomsasymptomatic-covid-19spread-virus-a9403311.html.

[17] Evelyn Cheng and Huileng Tan, *China Says More than 500 Cases of the New Coronavirus Stemmed from Prisons*, CNBC, (Feb. 20, 2020), https://www.cnbc.com/2020/02/21/coronavirus-china-says-two-prisons-reported-nearly-250-cases.html.

[18] *See* Nicole Wetsman, *Prisons and jails are vulnerable to COVID-19 outbreaks*, The Verge (Mar. 7, 2020), https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

18.     Many jails throughout Texas, all over the country, and around the world are releasing people with the aim of preventing massive outbreaks of severe illness and death from COVID-19.[19] States, counties, and jails that have announced or planning the release of some inmates in their custody, include, but are not limited to: Harris County,[20] Texas; Jefferson County, Texas;[21] Hillsborough County, Florida;[22] Mobile County Metro Jail[23] and three other counties in Alabama;[24] Spokane in Washington;[25] Mercer County, Ohio;[26] Mecklenburg County, North

---

[19]  BBC, *US jails begin releasing prisoners to stem Covid-19 infections*, (Mar. 19, 2020), https://www.bbc.com/news/world-us-canada-51947802 (discussing that some US cities have released hundreds of people from their jails and that Iran has released over 85,000 people to combat the pandemic).

[20] Jonathan Martinez, *Harris County Sheriff suggests releasing inmates to reduce the spread of coronavirus at county jails*, Click2Houston (Mar. 18, 2020), https://www.click2houston.com/news/local/2020/03/19/harris-county-sheriff-suggests-releasing-inmates-to-reduce-the-spread-of-coronavirus-at-county-jails/.

[21] Kierra Sam & Jordan James, *Jefferson County jail cancels visitation, releases some inmates amid coronavirus concerns*, 12 News (Mar. 18, 2020), https://www.12newsnow.com/article/news/local/jefferson-county-jail-cancels-visitation-releases-someinmates-amid-coronavirus-concerns/502-f7e9e268-e131-46af-a478-95553f309bf8   (Taking steps to reduce the jail population from 800 to 600 in the next few weeks, having already released some people held on misdemeanors or unpaid traffic citations, some who have health issues, and some not considered a flight risk).

[22] Tony Marrero, *Hillsborough sheriff releases 164 county jail inmates to reduce coronavirus risk*, Tampa Bay Times (Mar. 19, 2020), https://www.tampabay.com/news/hillsborough/2020/03/19/hillsborough-sheriff-releases-164-county-jail-inmates-to-reduce-coronavirus-risk/.

[23] Chris Best, *Some inmates to be released from Metro Jail due to coronavirus*, WKRG News (Mar. 18, 2020), https://www.wkrg.com/health/coronavirus/some-inmates-over-65-to-be-released-from-metro-jail-due-to-coronavirus/ (Releasing people over 65 years old who are charged with non-violent misdemeanors).

[24] Marty Roney, *Coronavirus: County jail inmates ordered released in Autauga, Elmore, Chilton counties*, Montgomery Advertiser, (Mar. 18,2020), https://www.montgomeryadvertiser.com/story/news/crime/2020/03/18/county-jail-inmates-ordered-released-autauga-elmore-chilton-counties/2871087001/ (Sheriff ordered to release inmates based on a person's risk to the public).

[25] Chad Sokol, *Dozens released from Spokane County custody following Municipal Court emergency order*, The Spokemsan-Review (Mar. 17, 2020), https://www.spokesman.com/stories/2020/mar/17/dozens-released-from-spokane-county-custody-follow/.

[26] *Mercer County Jail releases low-level inmates amid coronavirus pandemic*, WFMJ 21 (Mar. 18, 2020), https://www.wfmj.com/story/41912067/mercer-co-jail-releases-low-level-inmates-to-make-room-for-medicalisolation-cells-amid-coronavirus-pandemic (Granted early release to around 50 people held on low-level charges).

Carolina;[27] Cook County Jail in Illinois;[28] Sacramento, California;[29] Alameda County, California;[30] New York City;[31] Lexington County, South Carolina;[32] Jefferson County Jail in Kentucky;[33] New Jersey; and Washington County, Oregon.[34]

19.     The Texas Department of State Health Services maintains a map and count of all COVID-19 cases, updating daily.[35] As of March 29, 2020, Texas had reported 2,552 cases of

---

[27] Michael Gordon & Ames Alexander, *Mecklenburg begins releasing jail inmates to avoid cellblock outbreak of COVID-19*, The Charlotte Observer (Mar. 18, 2020), https://www.charlotteobserver.com/news/coronavirus/article241279836.html (Nearly 50 people scheduled for release).

[28] David Struett, *Cook County Jail releases several detainees who are 'highly vulnerable' to coronavirus*, Chicago Sun Times, (Mar 17, 2020), available at https://chicago.suntimes.com/coronavirus/2020/3/17/21183289/cook-county-jail-coronavirus-vulnerable-detaineesreleased-covid-19 (Released several detainees who are highly vulnerable to coronavirus who had been held on low-level, non-violent charges).

[29] Kristopher Hooks & Ja'Nel Johnson, *Some non-violent, low-level inmates being released from Sacramento jails amid coronavirus pandemic*, ABC10, (Mar. 18, 2020), https://www.abc10.com/article/news/health/coronavirus/sacramento-inmates-beingreleased-from-amid-coronavirus-pandemic/103-d10ab80d-81d6-41e1-bc47-e6643e1e0d7e (some low-level, non-violent inmates are being released following a court order).

[30] Clara Rodas, *Alameda County Superior Court releases 247 inmates in light of COVID-19*, The Daily Californian (Mar. 19, 2020), https://www.dailycal.org/2020/03/19/alameda-county-superior-court-releases-247-inmates-in-light-of-covid-19/ (247 inmates have been approved for sentence modification and early release, and another 67 inmates had already been released).

[31] Mayor announced plans to release "vulnerable" people from city jails. Julia Marsh & Ben Feuerherd, *NYC to begin releasing inmates amid coronavirus outbreak*, N.Y. Post (Mar. 18, 2020), https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/.

[32] Releasing people under a state Supreme Court directive to release anyone facing non-capital charges who is not a danger to the community or an extreme flight risk. Meera Bhonsle, *Jail numbers affected by judicial coronavirus directives*, Cola Daily (Mar. 19, 2020), https://www.coladaily.com/communities/lexington/jail-numbersaffected-by-judicial-coronavirus-directives/article_bb2df04e-6a22-11ea-a187-f3aec5c6ac7d.html.

[33] More than 100 pretrial defendants are being released. Andrew Wolfson, *More than 100 pretrial defendants to be released from jail to avoid coronavirus spread*, Louisville Courier Journal (Mar. 17, 2020), https://www.courierjournal.com/story/news/2020/03/17/kentucky-releasing-some-pretrial-defendants-due-coronavirus/5074206002/.

[34] Released 60 inmates to allow for appropriate social distancing. Noelle Crombie, *Oregon courts, jails respond to coronavirus: Washington County jail to release 60 inmates; court hearings see widespread delays*, The Oregonian (March 16, 2020), https://www.oregonlive.com/coronavirus/2020/03/oregon-courts-jails-respond-to-coronaviruswashington-county-jail-to-release-60-inmates-court-hearings-see-widespread-delays.html

[35] Texas Case Counts, COVID-19, Texas Department of State and Health Services, https://dshs.texas.gov/coronavirus/cases/ (last visited Mar. 30, 2020).

COVID-19, with 34 deaths. Harris County alone has 240 confirmed cases,[36] one of which was an inmate in the Harris County jail.[37] However, only 25,483 tests have been conducted in Texas as testing for COVID-19 remains limited, meaning the number of confirmed cases likely vastly understates the problem. The total Texas population is estimated to be around 29 million people.[38] The Governor of Texas declared COVID-19 a statewide public health disaster.[39]

20.     The CDC recommends the following for virus transmission prevention:

- Wash your hands often with soap and water for at least 20 seconds especially after you have been in a public place, or after blowing your nose, coughing, or sneezing.

- If soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol. Cover all surfaces of your hands and rub them together until they feel dry.

- Stay home if you are sick, except to get medical care.

- After coughing or sneezing, immediately wash your hands with soap and water for at least 20 seconds. If soap and water are not readily available, clean your hands with a hand sanitizer that contains at least 60% alcohol.

---

[36] Harris County COVID-19 Confirmed Cases, Harris County Public Health, http://publichealth.harriscountytx.gov/Resources/2019-Novel-Coronavirus/Harris-County-COVID-19-Confirmed-Cases (last visited Mar. 30, 2020).

[37] Coronavirus in Greater Houston: Live Updates, Houston Public Media, https://www.houstonpublicmedia.org/articles/news/health-science/coronavirus/2020/03/23/364988/coronavirus-in-greater-houston-live-updates/ (last visited Mar. 30, 2020) ("The first Harris County inmate has tested positive for COVID-19, according to a release from the Harris County Sheriff's Office.").

[38] QuickFacts: Texas, U.S. Census Bureau, https://www.census.gov/quickfacts/TX (last visited Mar. 27, 2020).

[39] Edgar Walters, *Texas governor declares statewide emergency, says state will soon be able to test thousands*, Texas Tribune (Mar. 13, 2020), https://www.texastribune.org/2020/03/13/texas-coronavirus-cases-state-emergency-greg-abbott/.

- Clean and disinfect frequently touched surfaces daily.[40]

21.     Many of these recommendations—like staying home if sick—are simply not feasible in a prison. That is all the more reason it is important to take the proper precautions that can be taken.

**C.    COVID-19 Poses a High Risk of Serious Illness and Death to Older Adults and Adults with Underlying Medical Conditions.**

22.     COVID-19 is more likely to cause serious illness and death for older adults and those with certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke developmental delay, and pregnancy. These underlying medical conditions increase the risk of serious COVID-19 disease for people of any age. For people over the age of 50 or with medical conditions that increase the risk of serious COVID-19 infection, symptoms such as fever, coughing, and shortness of breath can be especially severe. Plaintiffs and the majority of putative class members fall into one or both of these categories of heightened vulnerability.[41]

23.     The COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs, including

---

[40] How to Protect Yourself–Coronavirus Disease 2019 (COVID-19), CDC (Mar. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last visited Mar. 30, 2020).

[41] Medical information in this and the paragraphs that follow are drawn from the expert testimony of two medical professionals filed in a recent filed federal case in Washington State, as well the website of the Harvard Medical School. *See* Expert Declaration of Dr. Marc Stern, *Dawson v. Asher,* No. 20-0409 (W.D. Wa. *filed* Mar. 16, 2020), ECF No. 6, https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-marc-stern; Expert Declaration of Dr. Robert Greifinger, *Dawson v. Asher,* No. 20-0409 (W.D. Wa. *filed* Mar. 16, 2020), ECF No. 4, https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-robert-greifinger; Expert Declaration of Dr. Jonathan Golob, *Dawson v. Asher,* No. 20-0409 (W.D. Wa. *filed* Mar. 16, 2020), ECF No. 5, https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-jonathan-golob; Coronavirus Resource Center, Harvard Health Publishing, Harvard Medical School (Mar. 27, 2020), https://www.health.harvard.edu/diseases-andconditions/coronavirus-resource-center.

the heart and liver. Patients with serious cases of COVID-19 require advanced medical support, including negative pressure ventilation and extracorporeal mechanical oxygenation in intensive care. Patients not killed by serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.

24.     Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

25.     Many people infected with the virus, however, are completely asymptomatic carriers. People can be infected with the virus and not display any symptoms, or only have very mild symptoms, but still spread the disease to others who may not be as lucky.

26.     Most people in high-risk categories who develop serious symptoms will need advanced supportive care requiring highly specialized equipment that is in limited supply, such as ventilator assistance, and a team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. That level of support can quickly exceed local health care resources.

27.     High-risk patients should expect a prolonged recovery, including the need for extensive rehabilitation to accommodate profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.

28.     The need for care—including intensive care—and the likelihood of death is much higher from COVID-19 than from influenza. According to recent estimates, the fatality rate of

people infected with COVID-19 is about ten times higher than that of a severe seasonal influenza, even in advanced countries with highly effective health care systems. According to preliminary data from China, a much greater percentage of people in high-risk categories who contracted COVID-19 died than those who were not in high-risk categories.[42]

29.    The only known, effective measures to reduce the risk for vulnerable people of serious illness or death caused by COVID-19 are aggressive social distancing and heightened attention to hygiene and disinfection—measures that TDCJ is making impossible at the Pack Unit.

**D.    CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities**

30.    Because of this looming disaster, the CDC has published guidance for correctional and detention facilities to prepare and protect inmates and personnel from the COVID-19 pandemic.[43] The CDC's guidance includes the following advice for preventing the spread of COVID-19 in a correctional or detention facility:

---

[42] World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019* (COVID-19), at 12 (Feb. 28, 2020), https://www.who.int/publications-detail/report-of-the-who-china-joint-mission-on-coronavirus-disease-2019-(covid-19) (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv, (Feb. 27, 2020) at 5, https://www.medrxiv.org/content/10.1101/2020.02.25.20027664v1.full.pdf (finding that even after adjusting for age and smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, the number for two comorbidities was 2.59); Fei Zhou et al., *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, Lancet (March 11, 2020), tb. 1, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext (finding that among hospital patients, who tended to be older, of those who had COVID-19 and died, 48% had hypertension, 31% had diabetes, and 24% had coronary heart disease).

[43] CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Mar. 30, 2020).

- Facilities should ensure availability of sufficient stocks of hygiene supplies, cleaning supplies, personal protective equipment ("PPE"), and medical supplies (consistent with the healthcare capabilities of the facility).
  - This includes liquid soap, alcohol-based hand sanitizer containing at least 60% alcohol, recommended PPE including facemasks and gloves, and supplies for testing, such as sterile viral transport media and sterile swabs.
- Facilities should make contingency plans in the event of PPE shortages.
- Facilities should provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.
- Facilities should provide alcohol-based hand sanitizer containing at least 60% alcohol.
- Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response, including cleaning and disinfecting frequently touched surfaces several times per day.
- Facilities should encourage all persons in the facility to protect themselves by practicing good cough etiquette and good hand hygiene and avoiding touching of the eyes, nose, or mouth.
- Facilities should encourage these behaviors by posting signage throughout the facility and communicating the information verbally on a regular basis.
- Facilities should implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).

o This should include enforcing increased space between individuals in holding cells and waiting areas, staggering time in recreation spaces, staggering meals and rearranging seating in the dining hall to increase space between individuals, liming the size of group activities, and rearranging housing spaces to increase space between individuals.

- Facilities should be providing inmates with information and consistent updates about COVID-19 and its symptoms.

**E.     TDCJ Has Adopted Grossly Inadequate Polices in Response to the COVID-19 Pandemic**

31.     While TDCJ has implemented policies in response to the COVID-19 pandemic, these procedures are woefully inadequate and do not comport with many of the CDC's recommendations. Indeed, although the CDC has issued a specific Guidance on Management of COVID-19 in Correctional Facilities, TDCJ's policy does not directly cite this Guidance in its references section, only the CDC Guidance for the healthcare setting and for clinical management of patients with confirmed disease.

32.     For example, the CDC recommends considering "relaxing restrictions on allowing alcohol-based sanitizer in the secure setting where security concerns allow."[44] TDCJ's policy acknowledges that hand sanitizer is a method "used to prevent the spread of any respiratory virus" and that it should be carried by staff "and used whenever there is concern that hands have been contaminated."[45] However, TDCJ still mandates that inmates—even those performing the same

---

[44] CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Mar. 30, 2020).

[45] TDCJ Infection Control Manual, No. 5-14.52, Corona Virus Disease 2019 (COVID-19) (Mar. 27, 2020), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection_control_policy_manual/B-14.52.pdf (last visited Mar. 30, 2020).

duties as staff that need PPE and alcohol-based hand rub—"must not have access to the waterless hand rub but must wash hands with soap and water instead."[46] But as TDCJ's own policies acknowledge, this is not always practical, and thus inmates are at an increased risk of contracting and spreading COVID-19.

33.     And, ironically, TDCJ inmates have been pressed into manufacturing alcohol-based hand sanitizer at the Roach Unit. Thus, TDCJ is forcing inmates to manufacture a necessary preventative measure they are prohibited from using themselves.

34.     Inmates in other states have also been required to manufacture additional hand sanitizer.[47]

35.     The CDC also recommends correctional facilities "[r]estrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding."[48] In contrast to this specific instruction to restrict transfers, except in limited circumstances where it is absolutely necessary, TDCJ's policy only requires facilities to "[m]inimize transfer of offenders between units."[49] This general guideline is insufficient to properly reduce the risk to the inmate population.

---

[46] *Id.*

[47] Christina Carrega, *Nearly 100 prison inmates in NY to produce 100K gallons of hand sanitizer weekly*, ABC News (Mar. 10, 2020), https://abcnews.go.com/Health/prison-inmates-ny-produce-100k-gallons-hand-sanitizer/story?id=69501815.

[48] CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Mar. 30, 2020).

[49] TDCJ Infection Control Manual, No. 5-14.52, Corona Virus Disease 2019 (COVID-19) (Mar. 27, 2020), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection_control_policy_manual/B-14.52.pdf (last visited Mar. 30, 2020).

36.     While moving TDCJ inmates between prisons is exceptionally risky, however, TDCJ is also still accepting new inmates from county jails, without any mechanism to test these newly introduced inmates for COVID-19.

37.     In addition to being inadequate, some of TDCJ's policies are impossibly vague, further preventing proper precautions from taking place. For example, the CDC guidance explains that, while difficult, social distancing "is a cornerstone to reducing transmission of respiratory diseases such as COVID-19."[50] The CDC then provides examples of steps that can be taken in prisons and jails.[51] TDCJ's policy, in contrast, states only that units should "[p]ractice social distancing and avoid gatherings and meetings."[52] TDCJ's further reference to "teleconference or video conference" implies this policy is aimed more at reducing risk to prison staff, not prisoners directly.[53]

38.     Correctional facilities across the country are now seeing the ramifications from an inadequate response.

39.     As of March 25, 2020, Rikers Island in New York, New York had 52 confirmed cases of COVID-19 in the inmate population, with another 96 people under observation awaiting test results.[54] The Manhattan Supreme Court found this was a due process problem, and released

---

[50] CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Mar. 30, 2020).

[51] *Id.*

[52] TDCJ Infection Control Manual, No. 5-14.52, Corona Virus Disease 2019 (COVID-19) (Mar. 27, 2020), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection_control_policy_manual/B-14.52.pdf (last visited Mar. 30, 2020).

[53] *Id.*

[54] Julia Crave, *Rikers Island Has 52 Confirmed Covid-19 Cases*, Slate (Mar. 25, 2020), https://slate.com/news-and-politics/2020/03/coronavirus-is-spreading-on-rikers-island.html.

16 inmates that were pretrial detainees or incarcerated for parole violations.[55] The infection rate in Rikers is now 87 times higher than the overall U.S. rate.[56] Rikers is not an anomaly – it is the canary in the coal mine.

40.     As another example, Cook County Jail in Chicago, Illinois now has 89 detainees that have tested positive for COVID-19, which is an increase of 51 cases from the day before.[57] In addition, 12 Cook County Sheriff's Office employees at the jail have also tested positive for COVID-19.[58] The outbreak at the Cook County Jail happened in less than a week—the first reported case at the jail, a correctional officer, was confirmed last Sunday and the first two cases among inmates were announced last Monday.[59]

41.     Prisons across the country are bracing for COVID-19, with some already reporting confirmed cases and even deaths.[60]

---

[55] David Brand, *Manhattan judge orders release of 16 Rikers inmates, ruling COVID-19 violates due process rights*, Queens Daily Eagle (Mar. 26, 2020), https://queenseagle.com/all/manhattan-judge-orders-release-16-rikers-inmates-covid19-due-process.

[56] Jessica Schulberg & Angelina Chapin , *Prisoners at Rikers Say It's Like a 'Death Sentence' as Coronavirus Spreads*, Huffington Post (Mar. 28, 2020), https://www.huffpost.com/entry/rikers-prisoners-coronavirus_n_5e7e705ec5b6256a7a2a995d.

[57] Sam Kelly, *Sheriff announces 51 new coronavirus cases at Cook County Jail, raising total to 89*, Chicago Sun Times, Mar. 28. 2020, https://chicago.suntimes.com/coronavirus/2020/3/28/21198407/cook-county-jail-coronavirus-covid-19-cases-inmates-89 (noting that "92 are still awaiting results of the test").

[58] *Id.*

[59] *Id.*; CBS Chicago, *Coronavirus In Chicago: 89 Inmates, 12 Staff At Cook County Jail Test Positive For COVID-19* (Mar. 28, 2020), https://chicago.cbslocal.com/2020/03/28/coronavirus-cook-county-jail-inmates-staff-covid-19-saturday-march-28/.

[60] Joshua Sharpe & Christian Boone, *Georgia inmate dies from COVID-19 as virus hits more prisons, The Atlanta Journal-Constitution* (Mar. 27, 2020), https://www.ajc.com/news/local/breaking-inmate-dies-from-covid-outbreak-worsens-prison/TzQZL4uXfK4GzH9ebSFNQN/; Sarah N. Lynch, *Prisoner serving time for drug charge is first U.S. inmate to die from COVID-19*, Reuters (Mar. 28, 2020), https://www.reuters.com/article/us-heath-coronavirus-prison-death/federal-inmate-serving-time-for-drug-charge-is-first-inmate-to-die-from-covid-19-idUSKBN21G04T ("[A] 49-year-old prisoner in Louisiana who was serving a 27-year prison term for a drug charge, became the first federal inmate to die from COVID-19, the federal Bureau of Prisons (BOP) announced late on Saturday.").

42.     Unfortunately, a similar outbreak appears to be on the horizon for TDCJ facilities. In the last week, multiple individuals working for TDCJ or within its facilities have tested positive for COVID-19. First, a contract employee at TDCJ's Management and Training Corporation tested positive on March 23, 2020 at the Jester I Unit.[61] The next day, a TDCJ inmate at the Lychner State Jail who had suffered shortness of breath and coughing, tested positive for COVID-19.[62] And the next day, a TDCJ staff member in Huntsville, Texas notified the agency of a positive COVID-19 test a week after having symptoms and interacting with staff and prisoners.[63] If TDCJ's inadequate response continues, there is a risk that COVID-19 will spread unhindered through its facilities, which will inflict particularly serious harm on Plaintiffs.

43.     There have already been at least 2 confirmed cases of COVID-19 in Grimes County where the Pack Unit is located.[64] The two neighboring counties, Brazos and Washington, where many of the Pack Unit's employees likely live, also have confirmed cases of COVID-19. As of March 29, 2020, Brazos County had 44 confirmed cases[65] and Washington County had 6 confirmed cases.[66] Harris County, just an hour away, has 240 confirmed cases.[67] COVID-19 has

---

[61] *TDCJ COVID-19 Updates*, TDCJ (Mar. 27, 2020), https://www.tdcj.texas.gov/covid-19/index2.html (last visited Mar. 30, 2020).

[62] *Id.*

[63] *Id.*

[64] *Grimes County's second confirmed COVID-19 case is a close contact of first patient*, KBTX (Mar 21, 2020), https://www.kbtx.com/content/news/Grimes-Countys-second-COVID-19-case-is-a-close-contact-of-the-first-patient-568993931.html.

[65] *Two Brazos County Deaths From Coronavirus And 44 Positive Cases As Of Sunday Afternoon*, WTAW (Mar. 29, 2020), http://wtaw.com/31-coronavirus-cases-brazos-county-friday/.

[66] *UPDATE: Six cases of coronavirus confirmed in Washington County*, KAGS (Mar. 28, 2020), https://www.kagstv.com/article/news/local/washington-county-in-texas-confirms-first-case-of-coronavirus/499-1599dc46-6e8d-4d4e-9012-5bc82d7bc608. As of March 29, 2020, there were at least 59 confirmed cases of COVID-19 across the Brazos Valley.  *See Brazos Valley Confirmed COVID-19 Cases*, KBTX, https://www.kbtx.com/covid19.

[67] *Harris County COVID-19 Confirmed Cases*, Harris County Public Health, http://publichealth.harriscountytx.gov/Resources/2019-Novel-Coronavirus/Harris-County-COVID-19-Confirmed-Cases (last visited Mar. 30, 2020).

spread to all areas surrounding the Pack Unit. Without swift intervention, it will undoubtedly run rampant through the halls of the prison.

**F.      The Pack Unit Houses Sick, Elderly Prisoners in Conditions Likely to Spread the Virus**

44.     As Judge Keith Ellison noted in his 2017 preliminary injunction order, the Pack Unit is a Type-I Geriatric prison in the TDCJ system.[68] A large number of inmates at the Pack Unit face significant health issues, are over the age of 50, or both. As of September 2014, the Pack Unit contained 728 men with high blood pressure, 212 men with diabetes, 142 men with coronary artery disease, and 188 men over the age of 65.[69] Defendants agree that these numbers are typical for the Pack Unit.[70]

45.     Pack Unit inmates primarily live in cubicles in a dormitory setting. Each inmate has his own bunk, separated from his neighbor only by a waist-high wall. It is impossible for inmates at the Pack Unit, in their existing bunks, to sleep more than six-feet apart (as the CDC recommends for proper social distancing).

46.     The Pack Unit has communal restrooms, where a significant number of inmates share toilets, sinks, and other fixtures.

**G.      Despite the Exceptionally High Risk its Inmates Face, the Pack Unit Is Not Meeting Even the TDCJ's Inadequate Policies**

47.     In addition to its policies being inadequate to combat the COVID-19 threat, TDCJ is neglecting to even follow many of its own policies. Plaintiffs observe that, despite committing to do so, TDCJ is **not**:

---

[68] *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *4 (S.D. Tex. July 19, 2017).

[69] *Id.*, at *5.

[70] *Id.*, at *5 n.5.

- Posting the signs and warnings attached to TDCJ's guidance throughout the prison, including attachments providing guidance and education on COVID-19 symptoms and best methods for preventing transmission;

- Reducing social gatherings or taking other precautions to reduce inmate contact;

- Educating inmates on how COVID-19 is transmitted, signs and symptoms, and prevention of transmission;

- Reducing and restricting inmate movement; and/or

- Reminding inmates of effective measures to prevent transmission, such as washing hands with soap for at least 20 seconds.

48.     TDCJ's failure to implement these policies puts Plaintiffs at further risk of extreme harm. Because Plaintiffs are particularly at risk of severe illness or even death should they contract COVID-19, they must be provided the adequate care and safeguards recommended by the CDC and health experts. TDCJ is not meeting those standards.

## H.     The Pack Unit Has a History of Litigation Stemming from Poor Treatment of Inmates

49.     The Pack Unit has a long history of litigation stemming from its poor treatment of inmates.[71] In 2014, inmates at the Pack Unit filed a lawsuit seeking relief in the form of adequate temperature control due to the Pack Unit's lack of air conditioning in living quarters.[72] Temperatures recorded during the summer of 2016 showed that the heat index at the unit exceeded

---

[71]     Emanuella Grinberg, *Texas judge orders prison to cool down*, CNN (July 7, 2019), https://www.cnn.com/2017/07/19/us/texas-prison-heat-lawsuit/index.html.

[72] *Id.*

100 degrees on 13 days and reached into the 90-99 degree range on 55 days.[73] In 2017, Judge Ellison ordered officials overseeing the Pack Unit to move 500 "heat-sensitive" inmates to living quarters exceeding no more than 88 degrees.[74] In a temporary solution, the "heat-sensitive" inmates were moved to air conditioned units. The Pack Unit continued to be without air conditioning in its living quarters.[75]

50.   A year later, in 2018, Judge Ellison approved a settlement agreement in which TDCJ would provide air conditioning for the entirety of the Pack Unit.[76]

**I.   Plaintiffs Are at a Serious of Risk of Infection**

*1.   Plaintiff Richard King Faces Increased Risk from COVID-19 Due to his Disabilities*

51.   Plaintiff Richard King suffers from disabilities that, according to the CDC, place him "at higher risk of severe illness from COVID-19."[77]

52.   Mr. King suffers from diabetes (and has diabetic neuropathy).

53.   Mr. King's diabetes substantially limits several of his major life activities, including his ability to eat, and to digest food.

54.   Mr. King's diabetes also substantially impairs the operation of several major bodily systems, including his digestive, neurological, circulatory, and endocrine systems.

---

[73] *Id.*

[74] *Id.*

[75] Jolie McCullough, *Judge approves settlement mandating air conditioning at hot Texas prison*, The Texas Tribune (May 8, 2018), https://www.texastribune.org/2018/05/08/settlement-air-condition-hot-texas-prison-gets-final-judicial-approval/.

[76] *Id.*

[77] *People who are at higher risk for severe illness–Coronavirus Disease 2019 (COVID-19)*, CDC (Mar. 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Mar. 30, 2020).

55.     Mr. King was recently diagnosed with kidney problems, and had a follow-up appointment scheduled to evaluate the function of his kidneys before the pandemic. His doctors told him his kidneys are "not doing well."

56.     Mr. King is 73 years old. While his advanced age is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19," according to the CDC.[78]

### 2.  *Plaintiff Laddy Valentine Faces Increased Risk from COVID-19 Due to his Disabilities*

57.     Mr. Valentine suffers from disabilities that, according to the CDC, place him "at higher risk of severe illness from COVID-19."

58.     Mr. Valentine suffers from hypertension, which has substantially impaired the operation of his circulatory system. Mr. Valentine suffered a stroke in the past due to the impairment of his circulatory system. Mr. Valentine's hypertension is a "serious heart condition" which places him at increased risk of severe complications from COVID-19.

59.     Mr. Valentine has also had a lumbar fusion in his back, and uses a walker for mobility. During the pandemic, his limited mobility impairs his ability to do things necessary to care for himself – such as aggressively wash his hands, and, where possible in the prison context, maintain a safe social distance.

60.     Mr. Valentine is 69 years old. While his advanced age is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19," according to the CDC.[79]

---

[78] *Id.*

[79] *Id.*

## CLASS ACTION

61.     Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

62.     Plaintiffs propose to represent a class composed of all inmates who currently are, or who in the future will be, incarcerated at the Pack Unit, and who are subjected to the TDCJ's policies and practices regarding COVID-19 ("Class").

63.     Plaintiffs also seek to represent two subclasses of Pack inmates:

- **High-Risk Subclass:** those who are, according to the CDC, most at risk of severe illness from COVID-19, including death—these high-risk conditions include:

    o People aged 65 or older;

    o People with chronic lung disease or moderate to severe asthma;

    o People who have serious heart conditions;

    o People who are immunocompromised including cancer treatment; and

    o People of any age with severe obesity (body mass index [BMI] >40) or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, renal failure, or liver disease might also be at risk; or

- **Disability Subclass:** those who suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or any medical treatment necessary to treat their disability.

64.     Plaintiffs King and Valentine are typical members of the Class, as well as the High-Risk Subclass and the Disability Subclass.

65.     This action has been brought and may properly be maintained as a class action under Federal law and satisfies numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

66.     **Numerosity:** The joinder of each class member would be impracticable because each class is so numerous. The approximate number of Class members exceeds 1,400 as the Pack Unit houses over 1,400 inmates and many other inmates could potentially be housed at the Pack Unit over the course of this litigation, or in the future. Joining all members of the Class is impracticable due to the minimum 1,400-person size and the fluctuating population of the Pack Unit. Approximately 200 prisoners over age 65 live at the Pack Unit. Joining all 200 prisoners over age 65 would be impracticable. In addition, the Pack Unit is a "Chronic Care I" facility; more than 700 inmates incarcerated there suffer from at least one medical condition or disability that would make them a class member. Identifying every inmate at the Pack Unit who is a member of the Class would require interviewing hundreds of prisoners and reviewing each of their medical records. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

67.     **Commonality:** Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, in that they all have a right to be administered COVID-19 prevention, testing, and treatment measures.

- The common questions of law and fact for the proposed Class include:
  - Whether Defendants Collier and Herrera adequately protect the Class from the immediate threat of COVID-19;

- o   Whether the Class's Eighth and Fourteenth Amendment rights are being violated by Defendants Collier and Herrera's failure to implement adequate procedures and practices to protect the class from COVID-19;

- o   Whether Defendants Collier and Herrera's failure to implement adequate procedures and practices constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments; and

- o   What practices Defendants are actually implementing with respect to COVID-19 at the Pack Unit.

- The common questions of law and fact for the proposed High Risk Subclass include:

  - o Whether the members of the proposed High Risk subclass are at heightened health risk from COVID-19; and

  - o Whether the members of the proposed High Risk subclass require heighted measures to protect them from COVID-19 infection;

- The common questions of law and fact for the proposed Disability Subclass include:

  - o   Whether members of the Disability Subclass are qualifying individuals with a disability under the meaning of the ADA and Rehabilitation Act;

  - o   Whether TDCJ's policies and procedures are adequate to protect the Disability Class from the immediate threat of COVID-19;

  - o   Whether the Disability Class's rights under the ADA are violated by TDCJ's policies and practices;

- o Whether the Disabilities Class's rights under the Rehabilitation Act are violated by TDCJ's policies and procedures; and

- o Whether TDCJ illegally discriminated against the Disability Class by denying the Disability Class reasonable accommodations recommended by the CDC, both in policy and practice.

68. **Typicality:** Plaintiffs' claims are typical and representative of each class and subclass member's claims against Defendants, as identified above. The claims of Plaintiffs and the Class all arise from the same conduct by Defendants and are based not only on identical legal theories, but also seek identical relief. All members of the Class are similarly injured by Defendants' wrongful conduct and the harms Plaintiffs suffer are typical of the harms suffered by the Class.

69. **Adequacy of Class Counsel:** Plaintiffs and their counsel will fairly and adequately represent the interests of the class. Plaintiffs have no interests contrary to those of class members. Plaintiffs' class counsel, Winston & Strawn, LLP and Edwards Law, have litigated complex commercial and civil rights cases, including class actions against governmental entities. Edwards Law, in particular, has extensive experience with class action litigation against TDCJ.

70. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all Class members is impracticable.

71. Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating this case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct.

72. Plaintiffs do not seek monetary damages, except as may be incidental to declaratory or injunctive relief.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS:
### UNLAWFUL CONDITIONS OF CONFINEMENT
(Against Defendants Collier and Herrera in their Official Capacities)

73.     Plaintiffs incorporate the previous paragraphs as if alleged herein.

74.     The U.S. Constitution's Eighth Amendment, as incorporated against the States through the Fourteenth Amendment, protects prison inmates from cruel and unusual punishment by State actors and requires State actors to provide adequate healthcare to prison inmates. The State actors violate this right when they subject prison inmates to cruel treatment and conditions of confinement that amount to punishment or that do not ensure those inmates' safety and health.

75.     In accordance with 42 U.S.C. § 1983, Defendants Collier and Herrera, in their official capacities, act with deliberate indifference to the serious risk COVID-19 poses to the inmates in their custody and care, including the numerous medically vulnerable individuals currently in confinement, without regard to their safety and health.

76.     The Pack Unit presently does not comply with all CDC guidelines to prevent an outbreak of COVID-19 and cannot protect the health or safety of Plaintiffs and the class members, many of whom, because of their medical vulnerabilities, remain particularly susceptible to the most devastating health effects wrought by COVID-19.

77.     Collier and Herrera, in their respective positions as executive director of TDCJ and warden of the Pack Unit, are aware of the COVID-19 pandemic, its rising spread throughout the nation (including in other facilities operated by TDCJ), and the deleterious threat to health that COVID-19 poses, particularly to the medically vulnerable—including Plaintiffs and the class members.

78.     Collier's and Herrera's actions and inactions result in the confinement of Plaintiffs and the class members in conditions grossly inadequate to prevent COVID-19 outbreaks and the spread of the virus to Plaintiffs and the class members, which is a violation of their constitutional rights.

79.     By operating the Pack Unit without the adequate conditions and practices to protect against COVID-19 transmission or a COVID-19 outbreak, Defendants Collier and Herrera, as supervisors, direct participants, and the ultimate policy makers for the Unit, have violated and continue to violate Plaintiffs' and the class member's Eighth Amendment rights.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**AND THE REHABILITATION ACT OF 1973**
(Against Defendant TDCJ)

80.     Plaintiffs and the class members incorporate the previous paragraphs as if alleged herein.

81.     Defendants intentionally discriminate against prisoners with disabilities, like Plaintiffs King and Valentine and numerous class members, by intentionally denying them reasonable accommodations recommended by the CDC and necessary to protect themselves from COVID-19.

82.     Reasonable accommodations recommended by the CDC and necessary to protect inmates with disabilities include, but are not limited to:

    a.     Access to alcohol-based hand sanitizer;

    b.     Provision of cleaning supplies for each housing area, including cleaning agents containing bleach;

    c.     Access to antibacterial hand soap and hand towels to facilitate handwashing;

d.      A prohibition on new prisoners entering the Pack Unit for the duration of the pandemic (or in the alternative, a requirement to test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available); and

e.      Social distancing measures in the cafeteria, pill line, and other locations where prisoners are required to congregate.

83.     Failing to provide these reasonable accommodations is illegal discrimination under the Acts, entitling Plaintiffs to injunctive and declaratory relief.

84.     Title II of the ADA and Section 504 of the Rehabilitation Act require public entities, like TDCJ, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified. Because failing to provide adequate medical care and safe conditions of confinement to inmates also violates the Eighth Amendment, TDCJ's immunity from suit is waived by Congress's power to enforce the Fourteenth Amendment.

85.     The Rehabilitation Act also requires federal funds recipients to reasonably accommodate persons with disabilities in their programs and services. As TDCJ is a federal funds recipient, its sovereign immunity from suit is waived by Congress's spending power under the Rehabilitation Act.

86.     The Pack Unit is a facility, and its operation comprises a program and service, for ADA and Rehabilitation Act purposes.

87.     Medical treatment and safe conditions of confinement are programs or services that TDCJ provides to prisoners for purposes of the ADA and Rehabilitation Act.

88.     Plaintiffs King and Valentine, and other members of the Class, are qualified individuals with a disability under the meaning of both the ADA and the Rehabilitation Act.

89.     TDCJ knows that Plaintiffs King and Valentine, and hundreds of other prisoners at the Pack Unit, including members of the Class, are qualified individuals with a disability. TDCJ knows that individuals with disabilities are in especially acute need of access to accommodations during the COVID-19 pandemic including hand sanitizer and the other items identified above, but deny these reasonable accommodations to Plaintiffs King and Valentine, and other members of the Class.

## TEMPORARY RESTRAINING ORDER, INJUNCTION, AND DECLARATORY RELIEF

90.     Plaintiffs and the class members incorporate all previous paragraphs as if alleged herein.

91.     Plaintiffs and the class members seek an immediate temporary restraining order under Federal Rule of Civil Procedure 65 to protect their health, safety, and well-being in accordance with their constitutionally guaranteed Eighth Amendment rights. Plaintiffs and the class members further seek preliminary and permanent injunctive relief against Defendants under 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act, for themselves and the class members.

92.     Without the temporary restraining order and injunctive relief Plaintiffs and the class members seek, Defendants will continue their same perilous practices and conduct, disregarding federal legal mandates and endangering the lives and the welfare of current and future prisoners at the Pack Unit. Without swift intervention by this Court, Plaintiffs and the class members face immediate and irreparable injury: they risk contracting COVID-19 and, because of their particular medical susceptibility, likely will sustain severe, potentially *life-threatening*, health complications.

93.     Plaintiffs and the class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

94.     Plaintiffs and the class members are likely to succeed on the merits of their claims because Defendants are constitutionally required to take measures to avoid jeopardizing the health and safety of Plaintiffs and the class in the face of the COVID-19 pandemic. Alternatively, Plaintiffs and the class members submit they are not required to demonstrate likelihood of success on the merits to secure a temporary restraining order because their feared injury—including contracting a potentially life-threatening illness—is so severe.

95.     Granting a temporary restraining order and injunctive relief also serves the public interest, because it will help guard against further community spread of COVID-19 in vulnerable populations and will help protect medically compromised individuals from contracting a potentially life-threatening virus. As an outbreak of COVID-19 at the prison would likely result in prison staff becoming infected and suffering as well, the public interest strongly favors granting immediate injunctive relief.

96.     To protect their health and safety, Plaintiffs and the class members are entitled to a temporary restraining order and injunctive relief requiring that Defendants immediately take the following actions:

- Provide Plaintiffs and the class members with unrestricted access to antibacterial hand soap and disposable hand towels to facilitate handwashing;

- Provide Plaintiffs and the class members with access to hand sanitizer that contains at least 60% alcohol;

- Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants in sufficient quantities to facilitate frequent cleaning;

- Require common surfaces in housing areas to be cleaned hourly with bleach-based cleaning agents, including table tops, telephones, door handles, and restroom fixtures;

- Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television remote controls, books, and gym and sports equipment;

- Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic (or in the alternative, test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available);

- Limit transportation of Pack Unit inmates out of the prison to transportation involving immediately necessary medical appointments and release from custody;

- For transportation necessary for prisoners to receive medical treatment or be released, social distancing requirements should be strictly enforced in TDCJ buses and vans;

- Implement and enforce strict social-distancing measures requiring at least six feet of distance between all individuals in all locations where inmates are required to congregate, including, but not limited to, the cafeteria line, in the chow hall, in all recreation rooms, during required counting, and in the pill line;

- To the extent possible, use common areas like the gymnasium as temporary housing for inmates without disabilities to increase opportunities for social distancing; and

- Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic; (ii) the CDC's recommendations on "How To Protect Yourself"[80] from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, signage should be posted in every housing area, and above every sink.

97.     Plaintiffs and the class members request an order declaring that the current conditions inside the Pack Unit are unconstitutional because those conditions are medically unsafe and dangerous to Plaintiffs and the class members, in violation of their Eighth Amendment rights.

98.     Plaintiffs request an order declaring that TDCJ violates the ADA and Rehabilitation Act by failing to reasonably accommodate inmates with disabilities.

99.     Plaintiffs and the class members are entitled to injunctive and declaratory relief to end this unlawful discrimination.

100.     Plaintiffs do not seek damages.

## ATTORNEY'S FEES

101.     Pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205 Plaintiffs are entitled to recover attorney's fees, litigation expenses, and court costs, including expert costs.

---

[80] *See How to Protect Yourself–Coronavirus Disease 2019 (COVID-19)*, CDC (Mar. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last visited Mar. 30, 2020).

**PRAYER FOR RELIEF**

THEREFORE, Plaintiffs respectfully request that the Court award the following relief:

- Certify this action as a class action, as described above;

- Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this Complaint, on behalf of the Plaintiffs, and the class;

- Issue a temporary restraining order, and a preliminary and permanent injunction, to abate the risk of serious harm described above by requiring Defendants to take the following health and safety measures:

  o Provide Plaintiffs and the class members with unrestricted access to antibacterial hand soap and disposable hand towels to facilitate handwashing;

  o Provide Plaintiffs and the class members with access to hand sanitizer that contains at least 60% alcohol;

  o Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants;

  o Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television remote controls, books, and gym and sports equipment;

  o Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic (or in the alternative, test all new prisoners entering the Pack Unit for COVID-19 or place all new

prisoners in quarantine for 14 days if no COVID-19 tests are available);

o   Implement and enforce strict social-distancing measures requiring at least six feet of distance between all individuals in all locations where inmates are required to congregate, including, but not limited to, the cafeteria line, in the chow hall, in all recreation rooms, during required counting, and in the pill line; and

o   Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic; (ii) the CDC's recommendations on "How To Protect Yourself"[81] from contracting COVID-19; and (iii) instructions on how to properly wash hands.

- Find that Plaintiffs are the prevailing parties in this case and award them attorney's fees, court costs, expert costs, and litigation expenses;

- Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

---

[81] *See id.*

Dated:  March 30, 2020

**WINSTON & STRAWN LLP**

By:  /s/ John R. Keville
John R. Keville
*Attorney-in-Charge*
Texas State Bar No. 00794085
S.D. Tex. ID No. 20922
jkeville@winston.com

Jeff Edwards
State Bar No. 24014406
Scott Medlock
State Bar No. 24044783
Michael Singley
State Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580
**THE EDWARDS LAW FIRM**
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
Tel. (512) 623-7727
Fax. (512) 623-7729

Denise Scofield
Texas Bar No. 00784934
S.D. Tex. ID No. 1529
dscofield@winston.com
Michael T. Murphy
Texas Bar No. 24051098
S.D. Tex. ID No. 621098
mtmurphy@winston.com
Brandon W. Duke
Texas Bar No. 240994476
S.D. Tex. ID No. 2857734
bduke@winston.com
Benjamin D. Williams
Texas Bar No. 24072517
S.D. Tex. ID No. 1447500
bwilliams@winston.com
Robert L. Green
Texas Bar No. 24087625
S.D. Tex. ID No. 2535614
RLGreen@winston.com
Corinne Stone Hockman
Texas Bar No. 24102541
S.D. Tex. ID No. 3019917
CHockman@winston.com
**WINSTON & STRAWN LLP**
800 Capital Street, Suite 2400
Houston, Texas 77002
Tel. (713) 651-2600
Fax (713) 651-2700

*Counsel for Plaintiffs*