## DECLARATION OF ROBERT L. COHEN, M.D.

**I.**   **SUMMARY OF QUALIFICATIONS**

I am a board-certified medical doctor in the field of internal medicine and expert in the field of Correctional Medicine. My Curriculum Vitae is attached to this Report. I have 35 years of experience in correctional medicine. I have served as a federal and state court-appointed monitor in cases regarding the provision of medical care in prisons and jails in Washington, D.C., Philadelphia, Michigan, New York, Ohio, Connecticut, and Florida. I served as a member of the Board of the National Commission on Correctional Health Care for seventeen years, representing the American Public Health Association. I have served as an appointed member of the New York City Board of Corrections since 2009. The Board of Correction is a nine-member independent board which oversees the New York City Department of Correction and has rule making authority.  As Director of the Montefiore Medical Center for Rikers Island Health Services, I supervised and was responsible for the provision of medical and mental health services for more than 13,000 prisoners in the New York City jails, and oversaw a medical staff of approximately 500 physicians, mid-level practitioners, registered nurses, licensed practical nurses, psychiatrists, psychologists, social workers, pharmacists, laboratory technicians, administrative and clerical staff. I have published extensively on health care in corrections settings.

I served as the Vice President for Medical Operations of the New York City Health and Hospitals Corporation, reporting directly to the President with responsibility for clinical services,

Declaration of Robert L. Cohen, MD                                          Page 2

including nursing, physician care, ambulatory care, and quality assurance for New York City's eleven hospital public health care system. I served as Director of the AIDS Center of St. Vincent's Hospital, located in Greenwich Village, New York.

I retired from the clinical practice of Medicine in November 2016. I maintain by NYS License and Internal Medicine Board Certification.

All of my opinions expressed herein are opinions to a reasonable degree of medical certainty.

## II.    PAST TESTIMONY

During the past four years I have given testimony in the following matters:

a.  Parsons v. Ryan, 2:12-cv-00601 CV 12-00601-PHX-NVW (MEA)

b.  Graves v. Arpaio, 2:77-cv-00479-PHX-NVW

c.  Lin Li Qu, v. Cornell Companies, Inc. et al, USDC C.A. No. 09-53-S-DLM

d.  Baires v. USA; et al, Northern District of California, CV 09-5171 (CRB)

e.  Prasad v. County of Sutter, Eastern District of California, 2:12-CV-00592-TLN- CKD

f.  Hadix v. Caruso, U.S. District Court, Western District of Michigan, Court Appointed, Associate Monitor

g.  Milburn v. Coughlin, 79 Civ. 5077, Stipulation for Entry of Modified Final Judgment (S.D.N.Y. September, 1991), Court appointed Medical Auditor

h.  Doe v. Meachum, CIVIL NO. H-88-562(PCD), (JGM) Court Appointed -- Agreement Monitoring Panel.

i.  Zikianda v. County of Albany, et.al, USDC, NDNY, Civil Action No 12-1 194.

j.  Luann Gillespie Shultz vs. Allegheny County, USDC Western District Pennsylvania, 2: 1O-cv-01530

Declaration of Robert L. Cohen, MD                                                          Page 3
_____

    k.  Dang v. Eslinger, USDC Middle District of Florida, 6:14-cv-37-ORL-31TBS

    l.  Salcido v. Harris County, U.S. District Court, Southern District of Texas, 4:15-cv-02155

**III.**    MATERIALS RELIED UPON

I have reviewed the following documents in preparation of this declaration:

- Plaintiffs' complaint;

- CMHC Infection Control Manual No. B-14.52, "Coronavirus Disease 2019 (COVID-19)," and attachments, dated Mar. 20, 2020;

- CMHC Infection Control Manual No. B-14.52, "Coronavirus Disease 2019 (COVID-19)," dated Mar. 27, 2020;

- Centers for Disease Control, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," dated Mar. 23, 2020;

- Texas Department of Criminal Justice, "Correctional Managed Health Care Infection Control Policy Manual" (lasted visited Mar. 30, 2020) *available at* https://www.tdcj.texas.gov/divisions/cmhc/infection_control_policy_manual.html;

- TDCJ Pack Unit Diagrams (D.E. 922-9, *Cole v. Collier*);

- Pack Unit Profile;

- Declaration of Eldon Vail;

- Excerpts from the Deposition of L. Linthicum on behalf of TDCJ.

**IV.**    FACTUAL BACKGROUND

**A. The Novel Coronavirus 2019 (COVID-19) pandemic**

The novel coronavirus 2019, also known as SARS-CoV-2, causes a disease formally designated COVID-19. COVID-19 is a serious disease and has reached pandemic status. Over

_____

711,480 people around the world have received confirmed diagnoses of COVID-19 as of March 29, 2020, including nearly 136,000 people in the United States. At least 33,565 people have died globally as a result of COVID-19 as of March 29, 2020, including 2,391 in the United States, and 35 in the State of Texas. These numbers will increase, perhaps exponentially.

Current evidence shows that coughing and sneezing are most likely to transmit the virus, which appears to pass mostly via infected respiratory droplets. There is also evidence that common surfaces—fomites such as doorknobs, tables, and especially other hard surfaces—can transmit the disease. In China, where COVID-19 originated, the average infected person passed the virus on to 2–3 other people, with transmission occurring at a distance of 3–6 feet. Everyone is at risk because no person's immune system has prior exposure to this virus.

COVID-19 can cause symptoms within two days of exposure, and those symptoms can become serious is as little as five days—for others, however, symptoms may never present or may take up to two weeks. This means that some people are particularly likely to suffer serious injury very quickly, while other people may not even realize they are infected, causing them to be more likely to transmit the virus to others.

While vaccines are being developed, most estimates state that one will not be widely available for at least another year. Treatments are in testing, but none have been FDA-approved. Some medications in testing, such as remdesivir, are only available as part of a clinical trial through the manufacturer or National Institutes of Health (NIH). Others are only available off-label use of unproven therapies such as chloroquine or hydroxychloroquine. Novel health strategies are unlikely to be deployed in the correctional context due to cost and ethical restrictions in the United States.

Declaration of Robert L. Cohen, MD                                          Page 5
_____

Most people infected with COVID-19 become mildly sick with flu-like symptoms from a mild upper respiratory infection. About 16% of people become seriously ill, which the CDC defines to mean requiring intubation or mechanical ventilation or causing death.[1] UpToDate reports an overall case mortality rate from the disease of 2.3%. The people most at risk of serious complications are the elderly and patients with underlying health conditions, such as diabetes, heart disease, lung disease, and liver disease.[2] Deaths typically occur from pneumonia complicated by acute respiratory distress syndrome (ARDS) and/or sepsis. The risk of death or serious illness is heightened for people who have not received the influenza and/or pneumonia vaccine as these co-infections can occur, increasing the risk of poor outcomes.

Treatment of individuals infected with COVID-19 varies based on the severity of illness. Individuals with mild symptoms may be treated at home without the need for hospitalization. Those with moderate and severe symptoms, however, likely require hospitalization for supportive care (such as intravenous fluids and supplemental oxygen) or for more intensive care (such as ventilation and intravenous antimicrobials). Doctors, infectious disease specialists, and public health officials anticipate that hospitals are likely to be overwhelmed and beyond capacity to provide the required intensive care as COVID-19 becomes more widespread across the United States. China and Italy

_____

[1] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[2] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study*, The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext

have already suffered this same overcrowding crisis in connection with treatment of individuals with COVID-19. New York City is in the midst of overcrowding at hospitals now.

**B. Infectious diseases and their communication to correctional environments**

Prisons and other correctional facilities are at greater risk from infectious diseases than the general community, both in terms of risk of transmission and the level of harm to individuals who become infected, for at least three broad reasons. First, correctional facilities are often poorly equipped to diagnose, treat, and manage infectious disease outbreaks due to lack of resources and medical providers. Second, correctional facilities in general congregate large numbers of people in a small space, causing additional challenges to infection control for respiratorally transmitted contagious diseases that spread from person to person through infected droplets. Third, prisoners often have underlying characteristics or conditions that may predispose them to an increased risk of morbidity and mortality from infectious diseases.

Closed detention settings suffer more outbreaks of contagious droplet borne diseases than in non-correctional communities, and they can put the outside world at greater risk. Correctional facilities are not isolated from their surrounding communities—visitors, contractors, and staff can and do communicate diseases between a prison or jail and the outside world. These outsiders often have a high turnover, as prison jobs are not typically in high demand. Moreover, prisoners themselves may be communicating with the outside world—prisoners attend court, are shipped to doctor's appointments, or are simply transferred to or from another facility. The incarcerated are an at-risk population, and their contagious conditions also put communities at risk. Accordingly, prison health is a vital component of public health.

In fact, prisons and jails are communal in nature, creating an ideal environment for the rapid spread of infectious diseases that can spread from person-to-person, particularly if they can be transmitted by respiratory droplets, aerosols, direct contact, or fomites (objects or materials likely to harbor infectious pathogens, such as clothes, utensils, and furniture). People can transmit diseases by sharing dining space, living quarters, bathrooms, showers, and other common areas.

With highly contagious person-to-person diseases, the best initial strategies to help combat the spread of the infectious diseases are to perform frequent hand hygiene, clean and disinfect potential fomites, and maintain physical distancing of at least six feet. Prisoners, however, may not be free to practice all of these steps—particularly physical distancing. Spaces within prisons and other correctional facilities also tend to be poorly ventilated, which promotes highly efficient spread of infectious diseases through droplets. In short, prisoners cannot protect themselves from exposure to infectious diseases to the same degree members of the general community can, and communicable diseases spread more rapidly among them

In the free world, people can protect themselves from infectious diseases with basic hand hygiene, frequent vigorous hand washing for at least twenty seconds, either with soap and water or alcohol-based hand sanitizers. However, prisons and jails often do not supply enough soap or hand sanitizer—or may even forbid hand sanitizer—for prisoners to practice safe hand hygiene measures. Furthermore, in the free world, high-traffic fomites such as doorknobs, light switches, tables, and counters should also be cleaned and disinfected regularly with bleach-based solutions to prevent the spread of virus. Prisons and jails often fall short here as well; even as common surfaces are used as a matter of literal routine, correctional facilities often have limited cleaning supplies and

manpower to perform the necessary cleaning and disinfecting procedures. Prisons and jails also often mandate additional group activities compared to the free world such as searches of persons, searches of a person's belongings, searches of a person's living area, group meals, work assignments, submitting paperwork in person, and dispensing medications by each dose that require prisoners to come into additional personal contact with one another and staff.

Correctional facilities are also often ill-equipped to provide sufficient resources, including personal protective equipment (PPE) for people who are incarcerated and associated caregiving staff. Moreover, prisons and jails usually keep their isolation space near capacity already, so isolating symptomatic inmates quickly exhausts that capacity. In contrast, free world containment strategies require people who are symptomatic and may be infected to be isolated, while their caregivers, treating physicians, and nurses should use PPE, including gloves, masks, gowns, and eye protection (goggles or face shield). The comparative lack of resources inside a prison or jail increases the risk to the broader prison population (including inmates as well as those entering the prison for other reasons) of a widespread outbreak.

Likewise, prisons and jails often have fewer medical staff per person compared to the community at large—meaning that in an emergency, and certainly in a large outbreak, correctional facilities rely on medical services in the community at large. During a pandemic, however, those outside resources may be overcapacity or unavailable.

The CDC has issued guidance for correctional and detention facilities to prepare and protect inmates and employees from the spread of COVID-19. Specifically, the CDC recommends the following measures:

a.  The availability of sufficient hand hygiene supplies, cleaning supplies, PPE, and medical supplies, including, but not limited to, liquid soap, alcohol-based hand sanitizers with at least 60% alcohol, facemasks, face shields, goggles, gloves, and testing supplies such as swabs and viral transport media.

b.  Provide a no-cost supply of soap to incarcerated/detained persons and employees, sufficient to allow frequent handwashing.

c.  Provide easy access to alcohol-based hand sanitizer containing at least 60% alcohol.

d.  Adhere to CDC recommendations for cleaning and disinfection during the COVID19 response, including cleaning and disinfecting frequently touched surfaces several times per day.

e.  Post signage throughout the facility and communicating the information verbally on a regular basis.

f.  Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally at least 6 feet), including in holding cells and waiting areas, and by staggering time in recreation spaces, staggering meals and rearranging seating in the dining hall to increase space between individuals, limiting the size of group activities, and rearranging housing spaces to increase space between individuals.

g.  Provide inmates with information and consistent updates about COVID-19 and its symptoms.

Implementing these procedures for the prisoners would also promote public health and public safety for not only the prison, but also the surrounding community. Increased social distancing will reduce the chance of spread of the virus if it is introduced; increased preventative measures such as handwashing, cleaning supplies for surfaces, etc. helps further restrict the spread of the virus and will help inmates protect themselves and others. These measures will, in turn, also reduce the burden on prison staff and local hospital and emergency room medical staff by reducing

the number of people who will become sick and require hospitalization. This, in turn, helps to reduce the health and economic burden to the local community at large.

**C. The risk posed by COVID-19 to the inhabitants of the Wallace Pack Unit prison**

The COVID-19 pandemic at the Pack Unit, according to the information available to me today, exemplifies the vulnerability of incarcerated persons to a disease outbreak, so the CDC guidance is the bare minimum that Pack should be implementing, for at least six reasons.

First, as discussed above, certain individuals are far more vulnerable to COVID-19 and the Pack Unit has concentrated a population of those meeting this threshold.

An individual's immune system is one of the primary defenses against COVID-19. As a result, people over 65 years of age, people with certain underlying medical conditions, and persons with impaired immunity more likely to be seriously injured or die if they are infected. The older a person is, the higher likelihood of death; this is thought to be due to impaired immunity with aging and the likely presence of compromised major organs, particularly the heart and lungs. Persons with severe mental illness in jails and prisons are also at increased risk of acquiring and transmitting infection because they may be unable to communicate symptoms appropriately.

Immune systems can be compromised by chemotherapy for the treatment of malignancies, HIV/AIDS, hepatitis C, immunosuppressive medications, and other reasons. All of these conditions make individuals more susceptible to poor outcomes associated with COVID-19.

People with impaired cardiovascular and other bodily systems are also more vulnerable to serious complications. Specifically, evidence shows that people with diabetes mellitus, serious heart disease, chronic lung diseases—such as asthma—severe obesity, chronic kidney disease, and

chronic liver disease are more likely to die or be seriously injured by COVID-19, especially if these underlying medical conditions are not well controlled.[3]

Serious complications from COVID-19 which are more likely for vulnerable people include severe respiratory illness and damage to major organs from ARDS, myocarditis, septic shock, among others. Supporting these cases requires significant resources, including clinicians, proper PPE, intensive care units, nursing support, and ventilators.

Based on TDCJ records, I understand the Pack Unit is a Type-I Geriatric prison within the Texas Department of Criminal Justice system. TDCJ has previously testified that a large number of inmates at the Pack Unit are over the age of 50, face significant underlying health issues meeting CDC criteria, or both. These inmates are at very high risk of serious illness and death should they contract the COVID-19 virus. This reason alone makes it extremely important for the Pack Unit to implement all CDC recommended practices, including the strategies outlined above, to mitigate the risk of contraction and spread of the virus within the Pack Unit. In addition, implementation of these practices for other, lower-risk prisoners housed in the Pack Unit would reduce the total risk to all inmates in the Unit.

Second, based on my understanding of the Wallace Pack Unit, my review of relevant materials, my experience working on public health in prisons and other correctional facilities, and

_____

[3] Centers for Disease Control, *People who are at higher risk for severe illness* (last visited Mar. 31, 2020) *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-at-higherrisk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019ncov%2Fspecific-groups%2Fhigh-risk-complications.html.

my review of the relevant literature, it is my opinion that the Wallace Pack Unit has failed to implement sufficient infection control procedures to prevent and manage a COVID-19 outbreak. The current infection control measures in place to reduce the spread of COVID-19 at the Wallace Pack Unit are grossly inadequate. In reasonable medical probability this will lead to transmission of the coronavirus and resulting serious health effects to detained individuals at the Pack Unit, prison staff, and the broader community.

The Wallace Pack Unit is a dormitory environment that, like many prisons and jails, congregates where people live, sleep, eat, launder clothes, and work in close proximity. My understanding is that Pack Unit inmates almost all attend meals in the same room. Pack inmates primarily live in large dormitories with only unsealed cubicle walls between their beds. Each dormitory has a communal bathroom and sinks, as well as a communal dayroom area with benches and televisions. Inmates' clothes are laundered by a communal laundry room used by the entire facility, with those clothes being collected and distributed by other inmates. In an environment like this, COVID-19 is more likely to spread. Because the Wallace Pack Unit houses prisoners in close quarters, unable to maintain a six-foot distance from others, and unable to avoid sharing or touching objects used by others, the risks of spread are greatly, if not exponentially, increased as already evidenced by spread of COVID-19 in another congregate environment: nursing homes and cruise ships.

Third, the Pack Unit is located in a small community with limited resources that already has COVID-19 cases. This means that guards or contractors who enter the facility are likely sources or victims to communicate the disease.

_____

Fourth, TDCJ has confirmed at least one case of an inmate with COVID-19 and many cases of employees and contractors with the disease. This means that transfers between the Pack Unit and the wider TDCJ system are potential conduits for COVID-19 transmission.

Fifth, county jails including the massive Dallas[4] and Harris County[5] jail systems have confirmed COVID-19 cases, meaning that new inmate assignments from outside the TDCJ system are potential avenues for COVID-19 transmission. Although TDCJ reportedly stopped taking new inmates from Dallas recently, it is unclear whether this stopped for Harris—or if TDCJ has done anything about those potentially infected inmates already in circulation from those locales.

Sixth, the Pack Unit routinely relies on private hospitals for emergency care. But the nearby town, as discussed above, already has its own COVID-19 cases and the large urban hospital system nearby the Pack Unit in Harris County is located amidst a community which already has over 250 confirmed COVID-19 cases.[5] This means that the private medical system is already under strain from the wider pandemic, so an outbreak at the Pack Unit is unlikely to be able to rely on private healthcare resources. Indeed, there is pervasive news coverage reflecting that the healthcare

_____

[4] Jozelyn Escbedo, ABC 8, *COVID-19 cases in Dallas County jail reaches 17, report shows* (Mar. 31, 2020) *available at* https://www.wfaa.com/article/news/health/coronavirus/covid-19-cases-indallas-county-jail-reaches-17-report-shows/287-0542cb9d-bd5f-41ed-bc87-f796cf92354f.          [5] ABC 13, *Harris Co. reports 1st inmate to test positive for COVID-19* (Mar. 29, 2020) *available at* https://abc13.com/coronavrius-harris-county-inmate-jail-covid19-strain/6060823/.
[5] Harris County Department of Public Health, *Harris County COVID-19 Confirmed Cases* (last viewed Mar. 31, 2020) *available at* http://publichealth.harriscountytx.gov/Resources/2019Novel-Coronavirus/Harris-County-COVID-19-Confirmed-Cases.

system, including both nationally and in Harris County, is already straining to acquire sufficient personal protective equipment to handle COVID-19 cases.[6]

As the Pack Unit is exemplifies typical at-risk, communal environment with limited health resources anticipated by the CDC guidance, TDCJ should stringently follow that guidance to reduce the risk of transmission and harm to inmates. TDCJ's lack of diligence on following these guidelines makes action now far more urgent, because it is far more likely that inmates are already infected, unbeknownst to the agency, and freely transmitting the disease.

## V.   CONCLUSIONS

A study of a cruise ship demonstrated that about 17% of persons infected with COVID-19 had no symptoms.[7] However, infected individuals become symptomatic in a range of 2.5 to 11.5 days with 97.5% of infected individuals becoming symptomatic within 11.5 days. The total incubation period is thought to extend up to 14 days. Thus, persons coming into jails or prisons such as the Pack Unit can be asymptomatic at intake screening only to become symptomatic later during incarceration. At the same time, screening every inmate daily for cough, shortness of breath, or fever daily would be a logistically daunting task that may not be fully effective in an institution such as the Pack Unit. Because testing kits are not currently available in the volume

---

[6] For example: Emma Platoff, Texas Tribune, *Texas hospitals brace for coronavirus surge with uncertain stocks of protective gear* (Mar. 25, 2020) *available at* https://www.texastribune.org/2020/03/25/texas-hospitals-coronavirus-personal-protectiveequipment/.

[7] Kenji Mizumoto, Kayaya Katsushi, Alexander Zarebski, Gerardo Chowll; *Estimating the asymptomatic proportion of coronavirus disease 2019 (COVID-19) cases on board the Diamond Princess cruise ship, Yokohama, Japan, 2020*, EUROSURVEILLANCE (Mar. 12, 2020), https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2020.25.10.2000180.

necessary to screen all inmates, and because the range of symptom acquisition ranges from 2 to 11 days, symptom screening at booking alone will not identify all persons who are infected with the virus.

The individuals in the Pack Unit are at a significantly higher risk of infection with COVID19 because of the conditions in which they are confined, as compared with the population at large and are at a significantly higher risk of harm if they do become infected because of their compromised health status. These harms include serious illness and high risk of death.

As discussed above, the Pack Unit is also a communal environment exemplifying the exact worst-case scenario anticipated by the expertise of the CDC.

TDCJ should implement, strictly adhere to, and enforce all of the CDC guidelines listed above. Moreover, the CDC recommends that transportation and movement of incarcerated persons between Units be limited. If transfer or movement into the Pack Unit occurs, those individuals should be tested for COVID-19 or placed in a 14-day quarantine before being released into the general population of the Pack Unit.

TDCJ's current policy regarding the coronavirus and COVID-19 disease, policy number B-14.52 (effective March 27, 2020), is egregiously deficient in comparison with the CDC standard. Continuing to only use this policy poses a substantial risk of an outbreak of COVID-19 at the Pack Unit, which would then cause grave risks to the health of inmates—particularly the vulnerable population—including the risk of death. The deficiencies in TDCJ's policy include the following items:

a.  Forbidding inmates from using hand sanitizer, despite the fact that staff are required to carry and use it when needed. (TDCJ Policy, p. 9, II.B.) By contrast, the CDC recommends "relaxing restrictions on allowing alcohol-based sanitizer in the secure setting where security concerns allow."

b.  With respect to the transfer of inmates, TDCJ's policy only suggests facilities "[m]inimize transfer of offenders between units" unless they are already medically restricted. (TDCJ Policy, p. 3, I.E.5)  By contrast, the CDC Guidance recommends correctional facilities "[r]estrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding."

c.  To the extent TDCJ cannot avoid transfers of inmates to the Pack Unit, the newly arrived inmates should either be tested for the virus, or quarantined for 14 days. TDCJ's policy is also seriously deficient for failing to require these measures to prevent an infected inmate from being transferred into the Pack Unit and instead limits the measures to cases of suspected COVID infection.

d.  With respect to social distancing, TDCJ's policy states only that units should "encourage self-monitoring & social distancing" absent suspicion of exposure.[8] By contrast, the CDC policy recommends several specific social distancing steps, including a recommended distance of 6 feet, and the following: enforcing increased space between individuals in holding cells and waiting areas, staggering time in recreation spaces, staggering meals and rearranging seating in the dining hall to increase space between individuals, limiting the size of group activities, and rearranging housing spaces to increase space between individuals. Again, TDCJ waits until an inmate is suspected to have the virus before deploying these steps.

e.  I also understand that, based on inmate reports, the Pack Unit is not even following the following provisions of TDCJ's policy:

    i.  Posting the signs and warnings attached to TDCJ's guidance, including attachments providing guidance and education on COVID-19 symptoms and best methods for preventing transmission

---

[8] TDCJ Infection Control Manual, No. 5-14.52, Corona Virus Disease 2019 (COVID-19), available at https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection_control_policy_manual/B14.52.pdf.

ii.   Reducing social gatherings or taking other precautions to reduce inmate contact

iii.  Educating inmates on how COVID-19 is transmitted, signs and symptoms, and prevention of transmission

iv.   Reducing and restricting inmate movement

v.    Reminding inmates of effective measures to prevent transmission, such as washing hands with soap for at least 20 seconds

In light of the foregoing, TDCJ and the Pack Unit also needs to take the following steps:

- All persons with any symptom consistent with COVID-19 or with fever should be placed in respiratory isolation and tested for COVID-19.

- All inmates over 65, all persons with severe mental illness, all persons with immune disorders or with serious cardiac or pulmonary disease, and all persons with any cognitive disorder should have a daily symptom and temperature screening. Any positive symptom or temperature should require respiratory isolation and testing for COVID-19.

- All inmates coming into the prison on any day be housed in separate housing (quarantined). Pending release from quarantine, all individuals in such housing should have a symptom and temperature screening daily. The CDC recommends a 14-day isolation and this should be enforced.

- Ensure all custodial and medical staff are appropriately equipped with personal protective equipment when required.  Adequate training should be provided on the appropriate procedures to don, operate, and remove personal protective equipment.

- If and when COVID-19 testing becomes widely and readily available, all inmates coming into the Pack Unit should be tested for COVID-19 prior to congregate housing. This is my opinion because inmates will be forced to live with one another with the uncertain risk that one of them is infected. Inmates cannot engage in social distancing. In my experience, spread of contagious respiratory disease can be prevented by screening and cohorting, placing together, groups of infected individuals, Also, intake symptom screening alone will not identify all inmates who may have disease but are not yet symptomatic.

- Provide hand sanitizer and additional soap for inmates to practice necessary hand hygiene.

- Reduce transfers of inmates to those absolutely necessary, and subject to the foregoing safety measures.

- Adhere to the detailed social distancing measures for prisoners in the CDC guidelines.

- Post signs and providing inmate training on hygiene, social distancing, and symptoms.

- Provide ongoing health education about developing information about the pandemic to residents of the Unit.  This information should be provided by health educations or clinicians, not TDOC staff.

- Reduce and restrict group activities so that inmates can maintain social distancing without unduly eliminating privileges such as recreation.

- Suspend co-pays, with a wide announcement to inmates of the suspension, to avoid deterring prisoners from seeking medical care. (The current policy is to only "consider" suspending them. TDCJ Policy, p. 3, I.II.)

- Reduce staff presence and have staff, such as parole officers, work from home as much as possible.

- Coordinate with local partners, particularly healthcare providers, to plan for emergency care.

- Develop a written operational plan to address the above issues and to update the operational emergency plan for the Pack Unit.

- For the men who live at Pack, generally older men with severe chronic disease, the conditions in which the live pose an enormous risk of serious and life-threatening disease.  The virus will be brought into the facility, if it is not already there. Infection will spread rapidly, because of the physical plant, the human density, and the structure of daily life.   TDC, as part of its plan for management of COVID-19 should add a component which encourages release of patients at high risk of dying and who are eligible for parole, or near the end of their sentence, and anyone else that it determines can be safely released into the community.  Release must be supported by necessary and appropriate discharge planning.

These steps are both necessary and urgent. The Pack Unit could already be exposed, or could be exposed within days, to COVID-19. If these measures are not implemented *before* a case

Declaration of Robert L. Cohen, MD                                    Page 19

of COVID-19 is identified in the Pack Unit, it will likely be too late to prevent a widespread outbreak.

In summary, in my opinion to a reasonable degree of medical certainty, TDCJ's policy and practices at the Pack Unit regarding COVID-19 are egregiously inadequate, and pose significant risks to the Pack Unit inmates of transmissions of the virus and resulting serious health risks. Any competent physician in correctional care would recognize both 1) the serious deficiencies in TDCJ's policies and practices with respect to protecting inmates from the virus, and 2) the serious health risks posed by the virus, particularly to a geriatric population like that at the Pack Unit.

Health in prisons and correctional facilities impacts community health. Protecting the health of individuals who are detained and work in these facilities is vital. TDCJ and the Pack Unit should adjust their policies and procedures immediately to protect them.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_Robert Cohen_                           _April 1, 2020_
_____         _____
Robert L. Cohen, MD                      Date

# EXHIBIT

# Robert L. Cohen, MD

130 Barrow Street
New York, NY 10014
BobbyCohen@aol.com

A.B., Princeton University, 1970
M.D., Rush Medical College, 1975

**POSTGRADUATE TRAINING**

Residency, Medicine, Cook County Hospital, 1978
Chief Residency, Cook County Hospital, 1979
Board Certification, Internal Medicine - 1978

**PROFESSIONAL EMPLOYMENT**

Clinical Practice in General Internal Medicine
New York City, 1988 – 2016

Medical Director
CAI
New York, NY, 2007 --

Attending Physician
Department of Medicine
Langone Medical Center, NYU 2010 - 2017

Attending Physician
St. Vincent's Hospital and Medical Center
New York, NY 1988-2010

Medical Director
AIDS Center
St. Vincent's Hospital and Medical Center, NYC
January 1989 - October 1990

Vice President for Medical Operations
New York City Health and Hospitals Corporation
1986-1988

Director
Montefiore Medical Center
Rikers Island Health Services
1982 - 1986

Associate Medical Director
Montefiore Medical Center
Rikers Island Health Services
1981 - 1982

Attending Physician
Department of Medicine Cook
County Hospital
1979 - 1981

**FACULTY APPOINTMENTS**

Clinical Assistant Professor
Department of Social Medicine and Clinical Epidemiology Albert
Einstein College of Medicine
1985 – 2008

Clinical Instructor Department
of Medicine
New York University School of Medicine
2010 –  2017

**BOARD MEMBERSHIP**

Member
NYC Board of Correction 2009 –

Member
Institutional Review Board
 City  University  of  New  York
2000 – 2014, 2017 --

Member, National Commission for Correctional Health Care
Representing the American Public Health Association
1994-2011

**MEDICAL EXPERT -- PRISON HEALTH**

**Federal Court Appointed Monitoring of Health Care in Prisons and
Jails**

Michigan, *Hadix v. Johnson*, 2003 – 2013
Court Appointed monitor for oversight of medical care of in Jackson Prison

Ohio, *Austin v. Wilkinson*, 2002 -- 2005
Member of two-person Medical Monitoring Team to monitor compliance with
settlement agreement regarding medical care in Ohio State Penitentiary

Connecticut, *Doe v. Meachum*, 1990 -- present
Medical expert at trial and court appointed monitor of compliance with settlement
agreement covering care of all HIV infected prisoners in Connecticut.

New York State, *Milburn v. Coughlin*, 1989 -- 2014
Continuing review of compliance with health care consent agreement

Washington, D.C. 1986 - 2000
Court appointed medical expert involved in monitoring consent agreements regarding medical
care at the DC Jail as well as DC prisons at Lorton *(VA)*

Florida, *Costello v. Wainwright*, 1983 through 1988
Review of compliance with settlement agreement in all Florida Prisons State Court
Appointed Monitor

Philadelphia, PA, *Jackson v. Hendricks*, 1991 -- 1999
Review of compliance with consent agreement on medical care in Philadelphia jails
State Court Appointed Monitor


**US Department of Justice Appointed Medical Expert**

Cook County Jail, 1982 (Chicago, IL)

Essex County Youth House (NJ), 1995–99

Hampton Roads Regional Jail, (VA) 2017 -

San Luis Obispo Jail (CA) 2018 -

**RECENT PRESENTATIONS**

"Health and Justice Sectors Acting Together on Prisons Health:  Good National
Practices"
WHO Health in Prisons Project
Helsinki, Finland
March 27, 2019


Update on Deaths in Custody – USA
WHO Health in Prisons Program Regional Meeting
Copenhagen, Denmark
November 4, 2016

"Targeted Oversight of Correctional Health Care"
Out of the Shadows:  The Promise of Independent Prison Oversight
University of Texas, LBJ School of Public Affairs
November 17-19, 2016

"Medical Care"
2016 Prisoner's Advocates Conference
UCLA School of Law
Los Angeles,  California
September 24, 2016

"Prison Health Care"
National Student Conference Physicians for Human Rights
Columbia University Medical School
November 7, 2015


"Assuring Equitable Health Care in Prison"
Directorate General for Prison Administration
Rabat, Morocco
October 27, 2015

"Medical Consequences of Mass Incarceration: What Do We Do Now?" Grand
Rounds, Department of Family Medicine, Mt. Sinai School of Medicine June 24,
2014

"Inhumane and Ineffective: Solitary Confinement in Michigan and Beyond."
University of Michigan Journal of Race and Law, Ann Arbor, Michigan,
February 2, 2013

"The Impact of Solitary Confinement on Prisoner Health", WHO Health in Prison Project,
Copenhagen, Denmark, October 12, 2012

Dialogues on Detention: "Applying Lessons from Criminal Justice Reform to the Immigration
Detention System", Human Rights First, University of Texas, Austin, TX, September 12, 2012

"Health Care for Detained Immigrants US and Europe", Health in Prison and
Throughcare: Provision and continuity of care for those in the criminal Justice
System, Albano Terme - Italy, October 7, 2011

Prisoners' Human Rights and Day to Day Correctional Health, 4th Academic and
Health Policy Conference on Correctional Health, March 10, 2011, , Boston, MA

Mass Incarceration and Correctional Medicine: The Dialectics of Caring for
Prisoners, Albert Einstein College of Medicine Social Medicine Lecture Series,
February 16, 2011

Strategies for assuring the civil rights of detained persons: U.S. andInternational
Perspectives; American Public Health Association, Denver, November 8, 2010

Why the United States Should Adopt the Optional Protocol to the Convention
Against Torture; International Conference on Prison Health Care/WHO Health in
Prison Project, Madrid, Spain, November, 2009

What is the Physician's Responsibility In an era of Mass Incarceration, Offender Health Research Network, Manchester, England, May 2009

Health Care for Immigration Detainees: What Should Be The Standard? Panel of the ABA Council on Immigration, American Bar Association February 13, 2009, Boston, MA

Medical Consequences of Mass Incarceration, 2ème Université d'Eté de Médecine en Milieu Pénitentiaire, Association of French Correctional Medicine Physicians, Perpignan France, May 21, 2008

American Exceptionalism: The Health Consequences of Mass Incarceration 2nd Annual Conference of the International Journal of Prison Health Care, Varna, Bulgaria, October 21, 2007

HIV/AIDS in Custody: Advocacy for Prevention, Care and Treatment In Correctional Settings and on Reentry, New York City Bar Association Wednesday, January 10, 2007

## PUBLICATIONS

Cohen-R, deLone-M, Dubler-N, "Health Care Issues of Prisoners" in *Encyclopedia of Bioethics,* 4th *Edition.* Edited by Bruce Jennings. Farmington Hills, MI: Macmillan Reference USA, 2014.
Cohen-R, deLone-M, Dubler-N, "Health Care Issues of Prisoners" in *Encyclopedia of Bioethics,* 4th *Edition*. Edited by Bruce Jennings. Farmington Hills, MI: Macmillan Reference USA, 2014.

Allen-S, Wakeman-S, Cohen-R, Rich-J, Doctors in US Prisons in the Era of Mass Incarceration, International Journal of Prisoner Health, 6(3):99–106, 2010

Cohen-R., "Health and Public Health Advocacy for Prisoners" in Puisis-M, et.al, *Clinical Practice in Correctional Medicine*, Elsevier, 2006.

deLone-M, Cohen-R, et.al, Standards for Health Services in Correctional Institutions, 3rd edition, American Public Heatlh Association 2003

Cohen-R., The Medical Intake Examination, in Puisis-M, Cohen-R, et al, *Textbook of Correctional Medicine, Mosby, St. Louis, 1998.*

Frickhofen-N, Abkowitz-JL, Safford-M, Berry-M, Antunez-De-Mayolo-J., Astrow-A, Cohen-RL, King-LN,et.al., Persistent B19 Parvovirus Infection in Patients Infected with HIV-1: A treatable cause of anemia in AIDS., Annals of Internal Medicine, Vol. 113, No. 12, 926-933, Dec. 15, 1990.

Laudicina, S., Goldfield, N., Cohen, R., Financing for AIDS Care, The Journal of Ambulatory Care Management,Vol. II, No. 2, 55-66, May 1988.

Selwyn, Peter A., Feiner, Cheryl, Cox, Charles P., Lipshutz, Carl & Cohen, Robert L., Knowledge about AIDS and High-Risk Behavior Among Intravenous Drug Users in New York City, AIDS, Vol. 1, No. 4, 247-254, 1987.

Cohen, Robert L., Case Studies: A Prisoner in Need of a Bone Marrow Transplant, Hastings Center Report, Vol. 17, No. 5, 26-27, 1987.

Bayer, Ronald, Carol Levine, Susan M. Wolf et. al. HIV Anti-body Screening: An Ethical Framework for Evaluating Proposed Programs. JAMA Vol. 256, No. 3: 1768-1774, 1986.

Cohen, Robert L., Oliver Dennis, Pollard-Sigwanz, Cathy, Leukopenia and Anergy as Predictors of AIDS, JAMA, Vol. 255, No. 10, 1289, 1986.

Whitman S, King L, and Cohen R, Epilepsy and Violence: A Scientific and Social Analysis. In: Whitman S, and Hermann B, ed. The Social Dimensions of Psycho pathology. Oxford University Press, 1986.

Cohen, R., AIDS: The Impending Quarantine, Bulletin of the Health Policy Advisory Committee, Vol. 17, No. 3, 9-14, 1985.

Whitman S, Coleman T, Patron C, Desi B, Cohen R, King L, Epilepsy in Prison: Elevated Prevalence and No Relationship to Violence. Neurology, Vol. 34, No. 6, June, 1984.

Cohen, Robert L., Imprisoned Plasma Donors: A Medical-Ethical Case and Comment, Journal of Prison & Jail Health, Vol. 2, No. 1, 41-46, 1982