UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LADDY CURTIS VALENTINE and RICHARD ELVIN KING, individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BRYAN COLLIER, in his official capacity, ROBERT HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE.<br><br>Defendants. | Case No. 4:20-cv-01115<br><br>Hon. Keith P Ellison |

**PLAINTIFFS' MEMORANDUM REGARDING
AUTHORITIES FOR REDUCTION OF INMATE POPULATION**

During the telephonic hearing held on April 13, 2020, the Court asked the Parties whether the Defendants or any other state entity had the ability to reduce the current inmate population at the Pack Unit in light of the need for social distancing, in order to reduce the risk that medically vulnerable inmates housed at the Pack Unit would become infected with COVID-19. Plaintiffs submit this memorandum identifying the statutory basis for authority that Defendants and other state actors have under state law to address the current emergency situation.

**I.      BACKGROUND**

The novel coronavirus outbreak has swept the globe, creating a worldwide pandemic, the likes of which have not been seen in the United States in more than a century. COVID-19 can have devastating effects on the health and well-being of a person who becomes infected, and in the most pernicious cases, COVID-19 can be deadly. The elderly and those with serious or chronic underlying health conditions—like diabetes, kidney disease, and asthma—are particularly

vulnerable to COVID-19, as are the elderly. This is particularly troubling for the Pack Unit, where one person has already died of the virus.

On March 13, 2020, Texas Governor Greg Abbott determined that "COVID-19 poses an imminent threat of disaster" and declared "a state of disaster for all counties in Texas" pursuant to Section 418.014 of the Texas Government Code."[1] Recognizing the current and continuing threat of COVID-19, Governor Abbott recently extended his disaster declaration for at least another 30 days on April 12, 2020.[2] Governor Abbott has also acknowledged that social distancing is the "best tool in the fight against COVID-19"[3] and has taken steps to limit all "gatherings in groups of more than 10 people."[4]

For inmates in Texas's prisons, however, adopting adequate social-distancing measures may be near to impossible and often will be insufficient. Prisons simply operate at too close to housing capacity for social-distancing measures to be fully effective in stopping the spread of COVID-19 inside the facility. As we learned yesterday, COVID-19 is already within the Pack Unit.[5] More generally, through the end of the day yesterday, 192 TDCJ inmates and 85 TDCJ employees and contractors have tested positive for COVID-19. And, regrettably, as confirmed by

---

[1] Proclamation, *Governor Abbott Declares State of Disaster In Texas Due To COVID-19* (Mar. 13, 2020), available at https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19.

[2] G. Abbott, *Proclamation by the Governor of the State of Texas* (Apr. 12, 2020), available at https://gov.texas.gov/uploads/files/press/DISASTER_renewing_covid19_disaster_proc_04-12-2020.pdf

[3] Press Release, *Governor Abbott Issues Executive Order, Implements Statewide Essential Services & Activities Protocols*, Office of the Texas Governor (Mar. 31, 2020), available at https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-implements-statewide-essential-services-and-activities-protocols.

[4] *Id.*

[5] Texas Department of Criminal Justice, *COVID-19 TDCJ Update*, (Apr. 14, 2020), available at https://www.tdcj.texas.gov/covid-19/index.html ("Early Saturday morning April 11, 2020, 62-year-old Leonard Clerkly had difficulty breathing and was transported by EMS to Grimes County Hospital where life saving measures continued. Clerkly was pronounced dead at 5:25 a.m. Preliminary autopsy results suggest a preliminary cause of death of viral pneumonia due to COVID-19 with other contributing factors.")

Defendants' counsel in a telephonic hearing before the Court on April 14, 2020, one Pack Unit inmate has already perished from suspected complications from COVID-19. The Court has recognized that reducing the population of inmates at the Pack Unit will be the best and most efficient tool to slow or stop the further spread of COVID-19 in the facility and to protect the Unit's population—particularly those inmates who are elderly and who suffer from serious underlying health conditions—from the contracting the virus.[6]

## II. RELEVANT INMATES

Plaintiffs' action seeks emergency relief on behalf all similarly situated inmates within the Pack Unit. However, there is also a subset of that population for whom transfer or release remedies may be desirable to reduce the Pack Unit population, which will allow for more social distancing and protect not just the class members, but prison staff and surrounding communities as well. For purposes of this memorandum, we have focused our analysis on two categories of inmates currently housed in the Pack Unit:

1. Inmates who were convicted of non-violent crimes and who are eligible for parole or are within one year of the end of their sentences; and

2. Inmates who have been granted parole, but who have not yet completed certain pre-release programs required for release.

Plaintiffs' counsel does not have current data for the entire Pack Unit. But, according to publicly available information in another case involving the Pack Unit, *Cole v. Collier*, No. 4:14-cv-1698 (S.D. Tex.), of the class members identified in that litigation, who represent 622 inmates presently

---

[6] Texas Department of Criminal Justice, *COVID-19 Medical Action Center—Offender Population* (Apr. 14, 2020), available at https://www.tdcj.texas.gov/covid-19/offender_mac.html.

at the Pack Unit, 55 have been convicted of non-violent crimes. 149 *Cole* class members presently at the prison are over the age of 65.[7]

## III. DEFENDANTS' AND OTHER STATE OFFICIALS' AUTHORITIES

Ultimately, the Court need not order the Defendants or other state actors to take any specific action under these authorities set forth below; rather, the Defendants should address the underlying problem using any authority granted to them. The authority discussed below is based on Plaintiffs' research to date and identifies options Defendants and other state actors have under state law to address the current emergency situation.

### A. TDCJ May Grant an Emergency Absence

Contrary to its assertions made during recent telephonic hearings, TDCJ has authority under state law to limit the Pack Unit population by granting emergency absences pursuant to Section 502.006 of the Texas Government Code.[8] An "emergency absence" can be granted "so that the inmate may: (1) obtain a medical diagnosis or medical treatment; (2) obtain treatment and supervision at a Texas Department of Mental Health and Mental Retardation facility; or (3) attend a funeral or visit a critically ill relative."[9] This is not a "release" of the inmate, as they are "considered to be in the custody of the institutional division, and the inmate must be under physical guard while absent."[10]

---

[7] This data regarding the *Cole* class members is available through the public filings in that case, and the information available on TDCJ's website. Due to the protective order in *Cole*, Plaintiffs' counsel is conferring with Defendants' counsel to facilitate providing the Court with additional information about the number of inmates at the Pack Unit at risk of serious complications from COVID-19. Notably, only 622 of the 1,478 inmates presently at the Pack Unit are *Cole* class members, principally due to the release of over half of the *Cole* settlement class. As the *Cole* class members who have been released are more likely to have been serving shorter sentences, it is likely that a higher number of present Pack Unit inmates are serving time for non-violent offenses.

[8] Tex. Gov't Code § 501.006(a).

[9] *Id.*

[10] Tex. Gov't Code § 501.006(c).

TDCJ could grant an emergency absence for its most vulnerable inmates at the Pack Unit using the "medical treatment" exception. Removing them from the imminent danger of COVID-19, particularly when the virus has infiltrated the Unit, is the only effective medical treatment for high-risk individuals, such as many of the class members at the Pack Unit. The inmate would remain in TDCJ's "custody," and could be returned to prison once the pandemic subsides and the risk of infection abates. The statute does not define "escort" or "physical guard," leaving it for the agency (TDCJ) to interpret.[11] The escort or physical guard could be accomplished using other means that allow for monitoring of the inmate, such as electronic monitoring. Other state statutes provide authority for substituting "electronic monitoring" in place of confinement, supporting such an interpretation.[12] Additionally, as discussed below, Governor Abbott has the power to waive rules for state agencies, like TDCJ, when, as here, a state of emergency has been declared.[13] While it should not be necessary given other alternatives, Governor Abbott could temporarily waive these requirements if TDCJ cannot make alternative measures workable.

### B. TDCJ Can Divert Inmates to Halfway Houses and Contract for New Halfway Houses if Additional Capacity Is Needed

Another option for TDCJ to reduce the inmate population at the Pack Unit is to make use of halfway houses for appropriate inmates. The pardons and paroles division has a legal mandate to "use halfway houses to divert from housing in regular units of the institutional division suitable low-risk inmates and other inmates who would benefit from a smoother transition from incarceration to supervised release."[14] Halfway houses include "residential correctional facility

---

[11] *See* Tex. Gov't Code § 491.001

[12] Tex. Code of Crim. Proc. § 42.035.

[13] Tex. Gov't Code § 418.016(a).

[14] Tex. Gov't Code § 508.118(a).

operated by or under contract with the department to provide housing, supervision, and programmatic support to individuals released on parole."[15]

Moving inmates to halfway housing is a viable alternative to housing them at the Pack Unit. Notably, TDCJ's authority to transfer inmates to halfway housing is broad—it can move any "low-risk inmate" or "other individual" who would benefit from a smoother transition from incarceration—which would include many of the inmates at the Pack Unit who are minimum security prisoners.[16] Notably, over 300 Pack Unit inmates already reside in the prison's Trusty Camp, which is outside the prison's perimeter fence. The statute also does not state a minimum amount of time remaining on a sentence for a prisoner to be moved to halfway housing. While some prisoners may be high risk, or ineligible for release at any point, there are likely many that would be qualified candidates for TDCJ to move to existing halfway housing. As Plaintiffs have noted during the telephonic hearings in this case, Defendants possess the necessary information to determine who is eligible for this relief. Plaintiffs have requested Defendants provide the information so Plaintiffs can also review it to determine those eligible for this relief. If needed, TDCJ could also contract with private entities for additional halfway housing capacity.[17]

---

[15] Tex. Gov't Code § 508.157(a–1).

[16] Tex. Gov't Code § 508.118(a).

[17] TDCJ already contracts with the two largest private prison companies to provide "Residential Reentry Centers." *See* Texas Department of Criminal Justice, *Private Facility Contract Monitoring/Oversight Division*, *Contracted Facilities* (Dec. 23, 2019), available at https://www.tdcj.texas.gov/divisions/pf/pf_unit_list.html#halfway (contracting with GEO and CoreCivic).

### C. The Texas Governor Has Broad Powers to Grant Emergency Absence, Transfer, Pardons, and/or Reprieve for the Pack Unit Inmates.

The Texas Governor "is responsible for meeting the dangers to the state and people presented by disasters."[18] During a state of disaster, which Governor Abbott has already declared,[19] the governor is the commander in chief of state agencies, boards, and commissions having emergency responsibilities."[20] Thus, Governor Abbott has effectively asserted emergency control of TDCJ and the Board of Pardons and Paroles (the "Board"). To fulfill his responsibility, Governor Abbott:

- "may issue executive orders, proclamations, and regulations and amend or rescind them"[21];

- "may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster"[22];

- "may use all available resources of state government and of political subdivisions that are reasonably necessary to cope with a disaster"[23];

- "may recommend the evacuation of all or part of the population from a stricken or threatened area in the state if the governor considers the action necessary for the preservation of life or other disaster mitigation, response, or recovery"[24];

- "may control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area."[25]; and

---

[18] Tex. Gov't Code. § 418.011.

[19] Gov. Greg Abbott, *Proclamation by the Governor of the State of Texas* (Mar. 13, 2020), available at https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_03-13-2020.pdf.

[20] Tex. Gov't Code. § 418.015(b).

[21] Tex. Gov't Code. § 418.012.

[22] Tex. Gov't Code. § 418.016(a).

[23] Tex. Gov't Code. § 418.017(a).

[24] Tex. Gov't Code. § 418.018(a).

[25] Tex. Gov't Code. § 418.018(c).

- "may grant a full pardon upon the recommendation and advice of a majority of the [Texas] Board [of Pardons and Paroles]."[26]

Governor Abbott has already used many of these powers in the name of addressing the COVID-19 pandemic.[27]

Additional steps Governor Abbot could take include suspending provisions related to granting emergency absences for inmates, if strict adherence to these provisions "would ***in any way prevent, hinder, or delay necessary action in coping with a disaster.***"[28] Governor Abbott could also use his power to control ingress and egress to recommend, or even order, the Pack Unit to evacuate or transfer certain inmates, and also restrict the transfer in of inmates.[29] Governor Abbot has used this power already to control the release of certain pretrial detainees on personal bonds.[30] Unlike this order, which is being challenged in several lawsuits,[31] there are no potential constitutional issues with transferring or releasing inmates as needed to protect both the Pack Unit population and the surrounding communities from the risk of COVID-19. Governor Abbott can also grant a pardon or a reprieve to inmates with the recommendation of the Board.[32] This is in addition to any powers reserved to him as the executive of the Board, given his declaration of a state of emergency.

---

[26] 37 Tex. Admin. Code § 143.1; *see also Id.* § 143.31.

[27] Edgar Walters, *Texas governor declares statewide emergency, says state will soon be able to test thousands*, Texas Tribune (Mar. 13, 2020), available at https://www.texastribune.org/2020/03/13/texas-coronavirus-cases-state-emergency-greg-abbott/.

[28] *See* Tex. Gov't Code § 418.016(a) (emphasis added).

[29] *See* Tex. Gov't Code. § 418.018.

[30] Exec. Order GA 13 (Mar. 29, 2020), available at https://gov.texas.gov/uploads/files/press/EO-GA-13_jails_and_bail_for_COVID-19_IMAGE_03-29-2020.pdf

[31] Jolie Mccullough, *Harris County judges, ACLU sue Greg Abbott over order limiting jail releases during pandemic*, Texas Tribune (Apr. 8, 2020), https://www.texastribune.org/2020/04/08/greg-abbott-coronavirus-jail-order-sued-harris-county-judges-aclu/; Exec. Order GA 13 (Mar. 29, 2020), available at https://www.texastribune.org/2020/04/01/jail-inmate-attorneys-challenge-greg-abbott-bail-order/.

[32] 37 Tex. Admin. Code § 143.1, 31.

### D. The Board Has Powers to Grant Emergency Medical Reprieve and/or Early Release of Certain Pack Unit Inmates.

Finally, as has been discussed during the telephonic hearings, the Board is empowered to "consider a written application for an indefinite medical emergency reprieve in instances such as terminal illness or total disability."[33] However, the Board may also authorize release of offenders by referrals if they are: (1) elderly (sixty-five (65) years of age or older), (2) physically handicapped, (3) mentally ill, (4) terminally ill, (5) mentally retarded, or (6) having a condition requiring long term care.[34] The referrals for this limited authorized release can come from either (1) the medical or mental health staff of TDCJ, (2) the offender, or (3) an external source.[35] Given the medically vulnerable and aged population of the Pack Unit, there are likely many inmates that would qualify under one or *both* of the first two prongs, if not others. Again, this information is in the possession of Defendants, but Plaintiffs have requested it.

### E. The Board Can Allow Inmates Already Granted Parole to Complete Any Remaining Prerequisites Outside of the Pack Unit.

The Board has another, and straight-forward, option to reduce the Pack Unity population, which does not require the release of any inmate who has not already been granted parole.[36] Despite being granted parole, many inmates must first complete certain educational or treatment programs before they will be released from custody.[37] Plaintiffs' counsel knows of at least ten

---

[33] 37 Tex. Admin. Code § 143.34.

[34] Texas Department of Criminal Justice, *Program Guidelines and Processes for Medically Recomm'd Intensive Supervision (MRIS)* (May 1, 2014), available at https://www.tdcj.texas.gov/documents/rid/TCOOMMI_PGP_0104_MRIS.pdf.

[35] *Id.* at 2.

[36] *See* J. Mccullough, Many Texas prisoners have been approved for parole but can't walk free yet. Advocates say coronavirus should change that. (Apr. 14, 2020), available at https://www.texastribune.org/2020/04/14/coronavirus-alters-texas-prisoners-parole-programs-required-release/.

[37] The Texas Board of Pardons and Paroles, Annual Statistical Report FY 2018, available at https://www.tdcj.texas.gov/bpp/publications/FY%202018%20AnnualStatistical%20Report.pdf.

inmates currently residing at the Pack Unit that fall within this category, but believes there are likely many more. Plaintiffs have requested this non-public information from Defendants. Plaintiffs are not aware of any statutory requirement that these be completed *within* the facility, just that they be completed. To the extent the Board has interpreted there to be such a requirement, the Board and/or Governor Abbott can waive it given the ongoing emergency.[38] Indeed, many of these programs are likely delayed because they require group classes, which are on hold because of the COVID-19 pandemic. The Board could simply allow inmates to complete their requirements after release, instead of before, and if the inmate fails to complete the required programming, they could be returned to prison after the pandemic subsides, just as if they violated any other condition of their parole. This would speed up the reduction of the inmate population without releasing any inmate that was not already conditionally approved for release on parole.

### IV. CONCLUSION

As shown above, Defendants have the authority to take steps to reduce the inmate population in the Pack Unit. Other state actors, which Plaintiffs can add as parties, also have the power to remedy the current situation or facilitate Defendants' remedies. Accordingly, there are measures that can be taken to facilitate better life-saving social distancing once the Court finds Defendants are committing constitutional and statutory violations. Parole or "emergency absence" for any inmate—even those whose general good health does not put them at "serious risk" of COVID-19 symptoms—would enable the remaining inmates to have additional space for necessary social distancing.

---

[38] Tex. Gov't Code Ann. § 418.016(a).

Dated: April 15, 2020                               Respectfully Submitted,

                                                      **WINSTON & STRAWN LLP**

By: /s/ John R. Keville
John R. Keville
*Attorney-in-Charge*
Texas State Bar No. 00794085
S.D. Tex. ID No. 20922
jkeville@winston.com
Denise Scofield
Texas Bar No. 00784934
S.D. Tex. ID No. 1529
dscofield@winston.com
Michael T. Murphy
Texas Bar No.
S.D. Tex. ID No.
MTMurphy@winston.com
Brandon W. Duke
Texas Bar No. 240994476
S.D. Tex. ID No. 2857734
bduke@winston.com
Benjamin D. Williams
Texas Bar No. 24072517
S.D. Tex. ID No. 1447500
bwilliams@winston.com
Robert L. Green
Texas Bar No. 24087625
S.D. Tex. ID No. 2535614
RLGreen@winston.com
Corinne Stone Hockman
Texas Bar No. 24102541
S.D. Tex. ID No. 3019917
CHockman@winston.com
**WINSTON & STRAWN LLP**
800 Capital Street, Suite 2400
Houston, Texas 77002
Tel. (713) 651-2600
Fax (713) 651-2700

Jeff Edwards
State Bar No. 24014406
Scott Medlock
State Bar No. 24044783
Michael Singley
State Bar No. 00794642
David James
State Bar No. 24092572
Federal ID No. 2496580
**THE EDWARDS LAW FIRM**
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
Tel. (512) 623-7727
Fax. (512) 623-7729

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that a true and correct copy of the above document has been served on April 15, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per the Local Rules.

              */s/ Brandon W. Duke*