# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| LADDY CURTIS VALENTINE and | § | |
| RICHARD ELVIN KING, individually and | § | |
| on behalf of those similarly situated, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-01115 |
| | § | |
| BRYAN COLLIER, in his official capacity, | § | |
| ROBERT HERRERA, in his official capacity, | § | |
| And TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, | § | |
| Defendants. | § | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

TO THE HONORABLE KEITH ELLISON:

Defendants Bryan Collier ("Collier"), Robert Herrera ("Herrera"), and the Texas Department of Criminal Justice ("TDCJ") (collectively, "Defendants"), through the Office of the Attorney General, file their Response in Opposition to Plaintiffs' Application for a Temporary Restraining Order. In support, Defendants offer the following:

## STATEMENT OF THE CASE

Plaintiffs Laddy Valentine ("Valentine") and Richard King ("King") (collectively, "Plaintiffs") are inmates currently confined at TDCJ's Pack Unit in Navasota, Texas. ECF 1 at 1. Plaintiffs contend that they suffer from disabilities that, according to the Center for Disease Control ("CDC"), place them at a higher risk of severe illness from COVID-19. *Id.* at 22, ¶ 51; 23, ¶ 57. Valentine is sixty-nine years old and suffers from hypertension and mobility problems resulting from a lumbar fusion in his back. *Id.* at 23, ¶ 58-59. King is seventy-three years old and

suffers from diabetes and kidney problems. *Id.* at 22, ¶ 51-56. Plaintiffs filed this putative class action suit on March 30, 2020, alleging that Defendants have failed to adequately protect them and other similarly situated inmates within the Pack Unit who are at high risk for severe illness should they become exposed to COVID-19. *Id.* at 1.

While Plaintiffs concede that TDCJ has implemented policies in response to the COVID-19 pandemic, they contend that those policies are "woefully inadequate." *Id.* at 15, ¶ 31. Plaintiffs allege that TDCJ's policies do not comport with the CDC's Guidance on Management of COVID-19 in Correctional Facilities. *Id.* Rather, Plaintiffs allege that TDCJ's policies only cite the CDC's guidelines pertaining to a healthcare setting and for clinical management of patients with confirmed disease. *Id.* Particularly concerning to Plaintiffs is the fact that TDCJ does not allow inmates to carry or utilize alcohol-based hand sanitizer. *Id.* at 15-16, ¶ 32. Plaintiffs further allege that TDCJ is not even adhering to its own purportedly inadequate polices. *Id.* at 20, ¶ 47. For example, Plaintiffs allege that TDCJ is not: (1) posting sings and warnings throughout the unit that provide education and guidance on COVID-19; (2) reducing social gatherings to minimize inmate contact; (3) educating inmates on the signs and symptoms of COVID-19 and how it is transmitted; (4) reducing and restricting inmate movement; and (5) reminding inmates of effective ways to stop transmission of COVID-19, such as proper handwashing methods. *Id.*

Plaintiffs contend that Defendants' failure to implement adequate policies to protect their health and ensure their safety amounts to an Eighth Amendment violation. *Id.* at 28-29, ¶ 73-79. Plaintiffs also assert that TDCJ has intentionally discriminated against them by denying them reasonable accommodations recommended by the CDC, which they allege violates the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). *Id.* at 29, ¶ 81. For relief, Plaintiffs have requested a temporary restraining order ("TRO") requiring that Defendants:

- Provide them and the class members with unrestricted access to antibacterial hand soap and disposable hand towels to facilitate handwashing;

- Provide them and the class members with access to hand sanitizer that contains at least 60% alcohol;

- Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants in sufficient quantities to facilitate frequent cleaning;

- Require common surfaces in housing areas to be cleaned hourly with bleach-based cleaning agents, including table tops, telephones, door handles, and restroom fixtures;

- Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television remote controls, books, and gym and sports equipment;

- Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic (or in the alternative, test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available);

- Limit transportation of Pack Unit inmates out of the prison to transportation involving immediately necessary medical appointments and release from custody;

- For transportation necessary for prisoners to receive medical treatment or be released, social distancing requirements should be strictly enforced in TDCJ buses and vans;

- Implement and enforce strict social distancing measures requiring at least six feet of distance between all individuals in all locations where inmates are required to congregate, including, but not limited to, the cafeteria line, in the chow hall, in all recreation rooms, during required counting, and in the pill line;

- To the extent possible, use common areas like the gymnasium as temporary housing for inmates without disabilities to increase opportunities for social distancing; and

- Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic; (ii) the CDC's recommendations on "How to Protect Yourself" from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other

> locations, signage should be posted in every housing area, and above every
> sink.

*Id.* at 32-34, ¶ 96.

## ARGUMENT

### I.     Plaintiffs are not entitled to a TRO.

Plaintiffs characterize their demands as requests for "a temporary restraining order and injunctive relief . . . ." ECF 32, ¶ 96. To the extent Plaintiffs are seeking a TRO, however, they are not entitled to such relief. The purpose of a TRO pursuant to Federal Rule of Civil Procedure 65(b) is to preserve the status quo until there is an opportunity to hold a hearing on the plaintiff's application for a preliminary injunction. *See* FED. R. CIV. P. 65(b); 11A Wright & Miller,  Fed. Prac. & Proc. § 2951. As the Fifth Circuit has explained, "[a] temporary restraining order is a 'stay put,' equitable remedy that has as its essential purpose the preservation of the status quo while the merits of the case are explored through litigation." *Foreman v. Dallas Cnty., Tex.*, 193 F.3d 314, 323 (5th Cir. 1999).

Here, Plaintiffs do not seek to preserve the status quo. Rather, they seek to *change* the status quo by requiring Defendants to tailor their COVID-19 protocol at the Pack Unit to their wishes. Because Plaintiffs seek affirmative relief that would change—rather than preserve—the status quo, injunctive relief in the form of a TRO is inappropriate. *See Foreman*, 193 F.3d at 323; *Sosa v. Lantz*, 660 F. Supp. 2d 283, 290 (D. Conn. 2009) (explaining that a state prisoner was not entitled to a TRO when the relief he sought would change the status quo). Therefore, to the extent Plaintiffs seek a TRO, the Court should deny their request.

### II.    Plaintiffs are not entitled to a preliminary injunction.

Should the Court construe Plaintiffs' request for injunctive relief as a request for a preliminary injunction, Plaintiffs are not entitled to relief in that form, either. A party moving for

preliminary injunction must prove: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Cooper Lighting, LLC v. Kumar*, 4:13-CV-2640, 2013 WL 5775687, at *7 (S.D. Tex. Oct. 25, 2013). However, when the government is the nonmovant, the balance of hardships and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The applicant must clearly carry the burden of persuasion on all of the required elements. *See Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (internal marks omitted).

Plaintiffs cannot carry their burden of persuasion on *any* of the required elements for a preliminary injunction. Therefore, to the extent Plaintiffs seek preliminary injunctive relief, that request should be denied.

### A. Plaintiffs cannot show a substantial likelihood of success on the merits of their claims.

#### 1. Plaintiffs did not properly exhaust their administrative remedies.

As a threshold matter, Plaintiffs did not properly exhaust their administrative remedies as required by the Prison Litigation Reform Act ("PLRA").

The PLRA imposes a strict exhaustion requirement: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The purpose of this exhaustion requirement is to "give an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court"

and to allow for claim resolution in proceedings before an agency because it is faster and more economical than litigation in federal court. *Woodford v. Ngo,* 548 U.S. 81, 89 (2006). "Requests for injunctive relief are not exempt from the exhaustion requirement, and failure to completely exhaust prior to filing suit cannot be excused." *McMillan v. Dir., Texas Dept. of Criminal Justice, Corr. Institutions Div.*, 540 Fed. Appx. 358, 359 (5th Cir. 2013) (citing *Gonzalez v. Seal,* 702 F.3d 785, 788 (5th Cir. 2012)).

The Fifth Circuit requires an offender's strict adherence to TDCJ grievance procedures before a claim may be deemed properly exhausted. *See Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("Under our *strict approach*, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly."). TDCJ's grievance procedure requires an offender to file both a Step One and Step Two grievance and receive a response from the highest authority–which is the Step Two grievance investigator–prior to filing his lawsuit. Tex. Gov't Code § 501.008(d). If an inmate fails to properly exhaust, his suit must be dismissed pursuant to section 1997e. *See Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 788 (5th Cir. 2012) ("District courts have no discretion to waive the PLRA's pre-filing exhaustion requirement"); *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004) ("[A] prisoner must pursue a grievance through both steps for it to be considered exhausted.").

Mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. *Ross v. Blake*, 136 S. Ct. 1850, 1862, 195 L. Ed. 2d 117 (2016) (citing *McNeil v. United States,* 508 U.S. 106, 111 (1993) ("We are not free to rewrite the statutory text" when Congress has strictly "bar[red] claimants from bringing suit in federal court until they have exhausted their administrative remedies")). Therefore, courts may not engraft an

6

unwritten "special circumstances" exception onto the PLRA's exhaustion requirement. *Id.* "The only limit to § 1997e(a)'s mandate is the one baked into its text: [a]n inmate need exhaust only such administrative remedies as are 'available.'" *Id.*

Here, Plaintiffs have not exhausted their remedies with respect to any of their claims; nor have they shown that TDCJ's administrative remedies are or were unavailable to them. As recently as April 1, 2020—two days after this lawsuit was filed—Plaintiff Valentine filed a Step One grievance complaining of lack of hand sanitation and cleaning supplies. Exhibit A. TDCJ's deadline to respond to offender Valentine is May 11, 2020, unless it seeks an extension as permitted by the Offender Grievance Operations Manual. Exhibit A. On April 2, 2020, Plaintiff King filed a Step One grievance claiming that Classification continues to move offenders from other units to the Pack Unit during the coronavirus pandemic. Exhibit A. TDCJ's deadline to respond to offender King is May 12, 2020, unless it seeks an extension as permitted by the Offender Grievance Operations Manual. Exhibit A. Because neither Plaintiff exhausted his administrative remedies prior to filing suit, their claims are barred and must be dismissed.

### 2. Plaintiffs cannot prevail on the merits of their Eighth Amendment failure-to-protect claim.

Notwithstanding their failure to exhaust, Plaintiffs cannot show a substantial likelihood of success on the merits of their Eighth Amendment failure-to-protect claim because they cannot show that Defendants have been deliberately indifferent to their health or safety.

To establish an Eighth Amendment violation, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference under the Eighth Amendment requires a showing of "subjective recklessness" as used in criminal law. *Id.* at 839. Under the deliberate-indifference

standard, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. "[D]eliberate indifference 'is a stringent standard of fault, requiring proof that a [defendant] disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also Easter v. Powell*, 467 F.3d 459, 463 (5th Cir.2006) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). This is "an extremely high standard to meet," *Domino v. TDCJ*, 239 F.3d 752, 756 (5th Cir. 2001), and it "exists wholly independent of an optimal standard of care." *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006).

A prison official's failure to avoid harm or eliminate a risk does not violate the Eighth Amendment. To be liable for deliberate indifference, the official must "*know of* and *disregard* an excessive risk to inmate health and safety." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)) (emphasis added). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Actions and decisions that are merely inept, ineffective, or negligent do not constitute deliberate indifference. *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 458-59 (5th Cir. 2001) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."). And complaints that policies or practices were inadequate to prevent harm— even if true—are not sufficient for liability. *See, e.g.*, *Brumfield v. Hollins*, 551 F.3d 322, 328 (5th

Cir. 2008) (while jail's policies "lacked the specific directives Brumfield would have preferred to have been in place, policies nonetheless existed"); *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) ("mere disagreement with one's medical treatment is insufficient to show deliberate indifference"). Even if the threatened harm is not averted, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 845; *see also David v. Hill*, 401 F. Supp. 2d 749, 759 (S.D. Tex. 2005).

Here, to the extent that TDCJ officials have inferred a substantial risk to offender safety, TDCJ has implemented Correctional Managed Health Care (CMHC) Policy B-14.52 which is specifically targeted at preventing the introduction and spread of COVID-19 within the prison system—including at the Pack Unit. Exhibit B (CMHC B-14.52); see also Exhibit C (Declaration of Dr. Lannette Linthicum). Even before CMHC B-14.52 was implemented and before there was any indication of COVID-19 directly affecting TDCJ facilities or its employees, TDCJ took precautionary steps with respect to the operation of TDCJ units. *See* Exhibit D (Declaration of TDCJ Deputy Executive Director Oscar Mendoza). These measures included the following:

- On or about, March 13, 2020, TDCJ management began maintaining regular communication with the CDC, the Texas Division of Emergency Management, the Texas Department of State Health Services, TDCJ's Health Services Division (which maintains contact with the Office of Professional Services), and its university healthcare providers to monitor developments associated with the spread of COVID-19.   The university health care providers (UTMB and Texas Tech), administrative medical staff (regional and at unit level) and TDCJ Health Services Director also held daily conference calls.

- Effective March 16, 2020, TDCJ activated the Command Center located at the TDCJ Administrative Headquarters Building, 861-A IH 45-N, Huntsville. The location is staffed

by various agency leaders Monday – Friday, 7:00 a.m. – 6:00 p.m. and Saturday and Sunday, 10:00 a.m. – 4:00 p.m. TDCJ conducts a daily briefing conference call with agency leadership.  After the conference call, the TDCJ website is updated.

- TDCJ began providing COVID-19 specific updates on its website on March 11, 2020. The website can be accessed at www.tdcj.texas.gov.  TDCJ also implemented an Ombudsman Family Hotline for offender families and the public.

- Effective March 20, 2020, pursuant to the Governor's Executive Order, all offender medical copays have been waived and continue to be waived as of this date.

- With respect to travel, TDCJ management asked staff to limit any unnecessary domestic traveling; limited agency travel to travel that was a necessity; limited international travel; and instituted telework on a case-by-case basis.

- With respect to employees and illness, TDCJ management advised employees who felt ill or who were running a fever to stay at home; began implementing COVID-19 screenings for employees who felt ill at work and who worked in parts of the state in which the presence of the coronavirus had been confirmed; and required a physician's note stating that an employee who appeared to be ill was clear of any symptoms of COVID-19 as a condition of returning to work.

- Effective March 24, 2020, TDCJ minimized transfers between units based upon agency needs on a case by case basis.  Currently, for all units on precautionary lockdown, there are no transfers in and out of the units, except for necessary medical needs or emergencies. If a unit is not on precautionary lockdown, agency needed transfers have been authorized for offenders that were releasing (to be near home), for medical appointments, or necessary transfers due to classification.  For transfers based upon agency needs, TDCJ

implemented screening processes on every facility before the offender departed and upon arrival to the new unit which included temperature screening and interviews by staff regarding fever and other symptoms such as shortness of breath.   The screening is conducted before the offender enters a vehicle and when they exit the vehicle upon arrival at the unit to which they transferred.   During offender transportation, offenders are seated in every other seat if in a bus.   In other instances, only one offender is transported in a van instead of two offenders per van as was done prior to the implementation of COVID-19 protocols.   Buses and vans are disinfected before and after each use.

- TDCJ has manufactured COVID-19 related signs, an offender pamphlet, and an offender pocket card.   The informational pamphlet and pocket cards are distributed to offenders at the unit. In general, units post the signs in high traffic areas and other locations as determined by unit warden.

- With respect to visitation, TDCJ management first instituted screening procedures for offender visitation (as early as March 11, 2020) and later (effective March 13, 2020) suspended all offender visitation in accordance with a declaration from the Governor of Texas; and eliminated all other visitors to units to include volunteer assemblies, routine audits, vendors, outside contractors, tours, and training sessions.

- TDCJ inventoried existing stock of personal protective equipment ("PPE") and began to acquire additional PPE for TDCJ units.

- TDCJ increased distribution of hand sanitizer at all TDCJ units and departments.

- TDCJ began manufacturing cloth masks, face shields, and plastic gowns as supplemental PPE at TDCJ factories equipped to manufacture such for use by TDCJ offenders and staff.

- TDCJ produces hand soap which is issued to offenders in all facilities.  Staff and offenders are encouraged to follow CDC guidelines on frequent handwashing.  Each unit has been provided adequate supplies of hand soap for use by offenders and staff.

- As a general practice, TDCJ already had in place cleaning guidelines for its facilities and maintains a high standard of cleanliness.  As part of its implementation measures for COVID-19, TDCJ ordered enhanced cleaning and disinfection of its facilities.  TDCJ facilities are following the COVID-19 policy to disinfect surfaces with bleach solution sprayed on and allowed to air dry for 10 minutes.  The bleach solution is a mixture of powdered bleach manufactured by TDCJ that is mixed with water.  TDCJ also manufactures and distributes "DD" cleaner which is equivalent to Pine Sol and "Bippy" which is equivalent to Comet.  In addition, facilities have an adequate supply of laundry bleach which also is used in mixtures for disinfecting and as a multipurpose type product.  Heightened disinfection of areas with a positive COVID-19 test also is required in each facility.

Exhibit D at 3-7.

In accordance with CDC guidelines, based on unit configuration, TDCJ has initiated social distancing measures as much as operationally possible in a correctional environment.  As stated in CDC guidelines, not all strategies will be feasible in all facilities.

Contrary to Plaintiffs' assertions, the policies included in CMHC B-14.52 are substantially similar to those recommended by the CDC in the context of correctional facilities. See generally Exhibit E (CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities).

Plaintiffs request injunctive relief that goes beyond the CDC recommendations for correctional and detention facilities. TDCJ has implemented policies that are in accordance with CDC guidelines, and they have been careful to ensure that those policies are being followed at the Pack Unit. These policies are a reasonable response to the threat posed by COVID-19. *See David*, 401 F.Supp.2d at 759. Exhibit B*; see* also Exhibit D.

The Pack Unit is complying with CDC recommendations to the extent possible based on the Unit's physical space, staffing, population, population's medical restrictions, security and operational concerns. The following paragraphs set out (a) the relief Plaintiffs' request, (b) what the CDC recommends regarding the issue, and (c) the precautions Pack is taking in accordance with CDC regulations regarding the issue, or why it is reasonable for Pack not to implement those recommendations:

1. **Soap and towels:**

   a) Requested Relief: Provide Plaintiffs and the class members with unrestricted access  to antibacterial hand soap and disposable hand towels to facilitate handwashing (ECF 1 at 32, ¶ 96)
   b) CDC Recommendation: Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing (Exhibit E at 7).
   c) Pack Precautions: Offenders are given five bars of soap per week and can receive extra soap upon request, at no cost to them, as needed to facilitate frequent handwashing.  Before the Precautionary Lockdown (April 14, 2020), offenders had daily access to clean face towels. Since the Pack Unit has been placed on Precautionary Lockdown, offenders have an opportunity to shower three times per week and receive a clean bath towel for each shower. During the Precautionary Lockdown, there will continue to be a daily exchange of clean face towels. Exhibit F at 2.

2. **Hand sanitizer:**
   a) Requested Relief: Provide Plaintiffs and the class members with access to hand sanitizer that contains at least 60% alcohol.
   b) Consider allowing staff to carry individual sized bottles to maintain hand hygiene. Exhibit E at 10.
   c) Pack Precautions: Alcohol-based hand sanitizer is considered contraband when possessed by an offender housed at the Pack Unit. During the COVID-19 health crisis, correctional staff are permitted to carry it for personal use. Offenders are

not permitted to use hand sanitizer because it is flammable and can be ingested, which can cause intoxication and/or alcohol poisoning. Further, soap and water are available to offenders in their housing areas as well as within approximately 20-30 yards from the dining hall. Exhibit F at 3, Exhibit D at 8.

3. **Cleaning supplies:**

   a) Requested Relief: Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants in sufficient quantities to facilitate frequent cleaning, including in quantities sufficient for each inmate to clean his own housing cubicle.

   b) CDC Recommendation: Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants. Exhibit E at 9.

   c) Pack Precautions: Offender janitors are given the necessary cleaning supplies, which consist of bleach-solution, Double D cleaner, as well as brooms, mops, and other necessary items. In the dorms, each offender cleans his own personal housing area, or cubicle, once per day with a bleach-based cleaning solution. In addition, there is a spray bottle of a disinfectant cleaner available for offenders to use if they wish to clean their housing area more frequently. Exhibit F at 3.

   TDCJ facilities are following the COVID-19 policy to disinfect surfaces with bleach solution sprayed on and allowed to air dry for 10 minutes. The bleach solution is a mixture of powdered bleach manufactured by TDCJ that is mixed with water. TDCJ also manufactures and distributes "DD" cleaner which is equivalent to Pine Sol and "Bippy" which is equivalent to Comet. In addition, facilities have an adequate supply of laundry bleach which also is used in mixtures for disinfecting and as a multipurpose type product. Heightened disinfection of areas with a positive COVID-19 test also is required in each facility. Exhibit D at 6.

4. **Cleaning of common areas:**

   a) Requested Relief: Require common surfaces in housing areas to be cleaned hourly with bleach-based cleaning agents, including table tops, telephones, door handles, and restroom fixtures; Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television controls, books, and gym and sports equipment.

   b) CDC Recommendation: Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures… Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones. Exhibit E at 9.

14

c) Pack Precautions: There is at least one inmate janitor assigned to clean each common area, including each dorm, the kitchen, laundry room, law library, dining hall, recreation yard, bathrooms, showers, the main hallway, and the gym.  There are at least four janitors assigned to E-Dorm (with more than one janitor for 19 and 20 dorms in E) and at least three janitors assigned to the trusty camps.  Also, there are additional janitors assigned to the infirmary, laundry and kitchen. All janitors are assigned to work 12-hour shifts, during which they are continually cleaning their assigned area (aside from breaks). As part of their duties, the correctional officers assigned to each area of the Pack Unit monitor and observe the janitors' cleaning to ensure that cleaning is happening on a consistent basis throughout each janitor's shift. Exhibit F at 3.

### 5. Offender transfers to Pack

a) Requested Relief: Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic (or in the alternative, test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available) (ECF 1 at 33);

b) CDC Recommendation: Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding. Strongly consider postponing non-urgent outside medical visits. If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. Exhibit E at 9.

c) Pack Precautions: On April 14, the Pack Unit was placed on precautionary lockdown, which means that all transfers to and from the Unit have stopped unless it is a medical necessity. Substantially all offender movement within the Unit has stopped. The only offender movement currently permitted is for medical emergencies and scheduled showers. Otherwise, offenders remain in their housing areas during precautionary lockdown. If no other COVID-19 cases are confirmed on the Pack Unit, this Precautionary Lockdown is expected to last through at least April 25. If other offenders show symptoms, then Pack will be on Precautionary Lockdown an additional 14 days from the last known symptom. In addition to the Precautionary Lockdown, dorms in which any COVID-19 positive offender lived will be placed under medical restriction.  Medical restriction is used to separate and restrict the movement of well persons who may have been exposed to a communicable disease to see if they become ill.  The offenders housed in the area will have their temperatures checked twice per day by medical staff and will be given masks to wear. Exhibit F at 3-4.

COVID-19 tests are determined by TDCJ-Pack Unit's medical provider, UTMB, not by TDCJ. Exhibit D at 8.

### 6. Limit transportation of Pack Offenders

a) Requested Relief: Limit transportation of Pack Unit inmates out of the prison to transportation involving immediately necessary medical appointments and release from custody. ECF 1 at 33.

b) CDC Recommendation: Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding. Strongly consider postponing non-urgent outside medical visits. If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. Exhibit E at 9.

c) Pack Precautions: While the Pack Unit is on Precautionary Lockdown, there is no transportation of offenders to or from the Pack Unit unless an offender is being transferred off the Unit for a medical emergency or returns to the Unit after a medical emergency. Prior to Precautionary Lockdown, transportation from the Pack Unit was limited to that necessary for offender medical needs available only at the Pack Unit, medical emergencies, and security reasons. Except in cases of medical emergencies, all offenders transported from or to the Pack Unit–are verbally screened and have their temperature taken before departure and upon arrival accordance with CDC guidance. Exhibit F at 4

Currently, for all units on precautionary lockdown, there are no transfers in and out of the units, except for necessary medical needs or emergencies. Exhibit D at 5.

## 7. Social distancing during transport

a) Requested Relief: For transportation necessary for prisoners to receive medical treatment or be released, CDC-recommended social distancing requirements should be strictly enforced in TDCJ buses and vans. ECF 1 at 33.

b) CDC Recommendation: None found regarding social distancing during transportation.

c) Pack Precautions: For transfers based upon agency needs, TDCJ implemented screening processes on every facility before the offender departed and upon arrival to the new unit which included temperature screening and interviews by staff regarding fever and other symptoms such as shortness of breath. The screening is conducted before the offender enters a vehicle and when they exit the vehicle upon arrival at the unit to which they transferred. During offender transportation, offenders are seated in every other seat if in a bus. In other instances, only one offender is transported in a van instead of two offenders per van as was done prior to the implementation of COVID-19 protocols. Buses and vans are disinfected before and after each use. Exhibit D at 5.

## 8. Social distancing on the Unit

16

a) Requested Relief: Implement and enforce strict social-distancing measures requiring at least six feet of distance between all individuals in all locations where inmates are required to congregate including, but not limited to, the cafeteria line, in the chow hall, in all recreation rooms, during required counting, and in the pill line. ECF 1 at 33-34.

b) CDC Recommendation: **Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

o **Common areas:**
  ▪ Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)

o **Recreation:**
  ▪ Choose recreation spaces where individuals can spread out
  ▪ Stagger time in recreation spaces
  ▪ Restrict recreation space usage to a single housing unit per space (where feasible)

o **Meals:**
  ▪ Stagger meals
  ▪ Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
  ▪ Provide meals inside housing units or cells

o **Group activities:**
  ▪ Limit the size of group activities
  ▪ Increase space between individuals during group activities
  ▪ Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
  ▪ Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out

o **Housing:**
  ▪ If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)

- ▪ Arrange bunks so that individuals sleep head to foot to increase the distance between them
- ▪ Rearrange scheduled movements to minimize mixing of individuals from different housing areas
- o **Medical:**
  - ▪ If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.
  - ▪ Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

Exhibit E at 11.

c) Pack's Precautions: TDCJ, including the Pack Unit, enforces social distancing as a matter of correctional practice. Since the Governor issued a statewide disaster declaration on March 13, 2020, regarding COVID-19, offenders have been told to keep at least 6 feet of distance between themselves and any other person in open areas like hallways, rec yards, the gym, pill window line, commissary line, and other areas where feasible.

The dining hall was limited to two dorms eating at a time: one dorm on each side of the dining hall. This measure caused meal serving times to extend from taking approximately two hours per meal to feed the Unit (before the pandemic), to taking four to five hours to serve each meal. According to TDCJ policy, offenders must be allowed at least 20 minutes to eat, and it takes approximately 15 minutes to clean and sanitize the dining hall in between groups of offenders.

There are 50 tables in the dining hall and four seats per table. To enforce strict social distancing, requiring at least six feet of distance between all individuals in all locations where inmates are required to congregate, as Plaintiffs request, would only allow one inmate to sit per table; with 50 inmates eating at one time. *See* Attachment 1 at 7-9. To accomplish this would take approximately five to six hours per meal (three times per day)—approximately 14 or more hours in one day. It is simply not feasible to dedicate this amount of time to feeding, as there are many other essential functions that need to be performed. However, currently, no offenders are going to the dining hall due to Precautionary Lockdown.

Also, before the Pack Unit went on Precautionary Lockdown, only two dorms were permitted to go to the recreation yard at a time. In practice, this usually resulted in 10-15 offenders being on the yard at a time. *See* Attachment 1 at 2-5. Sports equipment (basketballs, volleyballs, handballs) were removed from the

recreation yard to eliminate any risk of transmission and to prevent offenders from being in close proximity to one another when playing sports. However, currently, no offenders are going to the recreation yard due to Precautionary Lockdown.

Exhibit F at 4-5.

9. **Alternate housing**

a) Requested Relief: To the extent possible, use common areas like the gymnasium, library, law library, and class rooms as temporary housing for inmates without disabilities to increase opportunities for social distancing. ECT 1 at 34.

b) CDC Recommendations: If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. Exhibit E at 11.

c) Pack's Precautions: The dorms at the Pack Unit cannot easily be altered to enforce "strict social distancing." The dorm cubicles are bolted to the ground and cannot be moved. Furthermore, even if the dorm cubicles could be moved, the physical layout of the dorms would not allow the cubicles to be spread out any more. Attachment 1 at 10-11. It is not feasible to use the gymnasium as alternate living quarters as it is not air conditioned. Because the Pack Unit is a medical facility with various offender medical needs including many wheelchair-bound offenders, using other areas of the Pack Unit, such as education rooms, for alternate housing space could create ADA violations. Exhibit F at 5.

10. **Signage**

a) Requested Relief: Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic, including, but not limited to, the CDC's "Stop the Spread of Germs" poster already in TDCJ's possession; (ii) the CDC's recommendations on "How To Protect Yourself" from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, all signage must be posted in every housing area, and (iii) must be posted above every sink.

b) CDC Recommendations: Post signage throughout the facility communicating the following: For all: symptoms of COVID-19 and hand hygiene instructions; For incarcerated/detained persons: report symptoms to staff. Exhibit E at 6.

c) Pack's Precautions: Several posters have been hung throughout the Pack Unit to educate and remind offenders to look out for symptoms of COVID-19, to wash their hands frequently, and to clean and disinfect frequently. Specifically, Pack has posted the CDC poster, "Stop Germs! Wash Your Hands" in the main hallways, in high traffic areas between the commissary and infirmary and front office (Attachment 2 at 8). A TDCJ pamphlet, "COVID—What to do," has also been posted throughout the main building, in the trusty camp, and by all sinks. TDCJ also has provided this pamphlet to every offender, and offenders have also

19

received this information in the form of a pocket card to carry with them. TDCJ has posted a sign that reads, "How are you feeling? Cough, fever, shortness of breath. Contact your supervisor," throughout the main building and in the trusty camp. Exhibit F at 5, Exhibit D at 5.

TDCJ, and specifically, the Pack Unit are taking copious measures in response to the COVID-19 pandemic. Because the implementation of these policies and practices is a reasonable response to the threat posed by COVID-19, Plaintiffs have failed to show a substantial likelihood of success on the merits of their deliberate indifference claims under the Eighth Amendment.

### 3. Plaintiffs cannot prevail on the merits of their ADA claim.

Defendants are likely to prevail on Plaintiffs' ADA claim[1] because the ADA does not apply in the exigent circumstances, Defendants are not discriminating against Plaintiffs—all offenders (and all Texans for that matter) face the real risk of illness and death from COVID-19—and, in any event, the ADA does not require the modifications Plaintiffs seek.

**a.** "A prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated. He thus loses those rights that are necessarily sacrificed to legitimate penological needs." *Elliott v. Lynn*, 38 F.3d 188, 190-91 (5th Cir. 1994). Plaintiffs' ADA claim fails at the outset because the Fifth Circuit has held that an ADA "claim is not available under Title II under" "exigent circumstances." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *accord Wilson v. City of Southlake*, 936 F.3d 326, 331 (5th Cir. 2019) ("[O]fficers do not first have to consider whether their actions will comply with the ADA . . . when they are reacting 'to potentially life-threatening situations.'"). *Hainze* requires the rejection of Plaintiffs' ADA claim.

---

[1] Plaintiffs have pleaded this claim under both the ADA and RA. The same legal standards apply to both. *See Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). So Defendants will refer to this claim simply as the ADA claim.

None can dispute that the COVID-19 pandemic has created exigent circumstances in every area of life and government. *See, e.g.*, Special Order H-2020-09, *In re Court Operations in the Houston and Galveston Divisions Under the Exigent Circumstances Created by the Covid-19 Pandemic* (S.D. Tex. Apr. 3, 2020); General Order 20-03: Court Operations Under Exigent Circumstances Created by the Covid-19 Pandemic (E.D. Tex. Mar. 16, 2020); Order Regarding Court Operations Under the Exigent Circumstances Created by the Covid-19 Pandemic (W.D. Tex. Mar. 13, 2020). Plaintiffs themselves recognize the immense scale of the risk to everyone posed by the COVID-19. Comp. ¶ 13.

Courts "are required, as a matter of both common sense and law, to accord prison administrators great deference and flexibility in carrying out their responsibilities to the public and to the inmates under their control, including deference to the authorities' determination of the 'reasonableness of the scope, the manner, the place and the justification for a particular policy.'" *Elliott*, 38 F.3d at 191 (5th Cir. 1994) (holding that prisoners' Fourth-Amendment rights gave way during prison emergency). The exigency created by the COVID-19 crisis leaves no room for courts, under the guise of the ADA, to micromanage the State's response "in a continuously evolving environment." *Roell v. Hamilton County*, 870 F.3d 471, 489 (6th Cir. 2017) (citing *Hainze*).

**b.**   Plaintiffs' ADA claim also fails because "[n]o discrimination is alleged"; Plaintiffs were "not treated worse because [they were] disabled." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). Plaintiffs do not allege that Defendants have denied them "participation in or . . . the benefits of the services, programs, or activities of a public entity" because of their disability or discriminated against them in any other way. 42 U.S.C. § 12132; *Providence Behavioral Health v. Grant Rd. Public Util. Dist.*, 902 F.3d 448, 459 (5th Cir. 2018).

To allege a prima facie claim under the ADA, a plaintiff must allege facts plausibly suggesting that "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). Plaintiffs' allegations fail to satisfy the second and third elements of an ADA claim.

Plaintiffs have not, for example, alleged or shown that Defendants have denied them meaningful access to or benefits from any services, programs, or activities at the Pack Unit, let alone that any denial was because of their disability. *See Hainze*, 207 F.3d at 801 ("A necessary prerequisite to a successful claim under Title II is that a disabled person be denied the benefits of a service, program or activity by the public entity that provides such service, program or activity."); *see also Hay v. Thaler*, 470 F. App'x 411, 418 (5th Cir. 2012). Because "the plain language of" the controlling regulation "makes clear that an accommodation only is required when *necessary* to avoid discrimination *on the basis* of a disability," *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir.2006) (en banc) (citing 28 C.F.R. § 35.130(b)(7)), none of the modifications demanded by Plaintiffs or ordered by the district court can be justified under the ADA.

Similarly, Plaintiffs have not alleged or shown that they are being discriminatorily denied the various modifications to prison life that they request. TDCJ has adopted a state-wide protocol for addressing COVID-19 concerns based on the CDC's recommendations for correctional facilities. Those protocols are implemented at the Pack Unit as well as the other units in Texas. Since Plaintiffs are subject to the same conditions as other non-disabled inmates across Texas, they cannot show that they are being discriminated against, or that any discrimination is "by

reason of" their disabilities. *See Tuft v. Tex.*, 410 F. App'x 770, 775 (5th Cir. 2011) (disabled inmate-plaintiff failed to show "by reason of" discrimination in claim regarding overcrowding in the showers where all inmates were subjected to the same conditions). Plaintiffs are not asking to be treated the same as other, non-disabled inmates—rather, they wish to be treated *differently*. But Texas is "not obligated to alter its" administration of the Pack Unit "by creating a new benefit previously unavailable to any" other prisoner. *Taylor v. Colo. Dept. of Health Care Policy & Fin.*, 811 F.3d 1230, 1236 (10th Cir. 2016); *accord Providence Behavioral Health*, 902 F.3d at 459 (holding that ADA was not implicated where the denial of an accommodation "did not create a situation where disabled individuals had an unequal ability to use and enjoy the facility compared to individuals who do not have a disability").

**c.** Even if one assumes that the ADA applies, and that Plaintiffs are suffering some sort of discrimination, the accommodation they seek—judicial micromanagement of a prison during an emergency—is not reasonable. On top of that, the modifications they seek will "fundamentally alter" the State's operation of the Pack Unit, undermine the safety of Pack Unit offenders, and "impose an undue financial or administrative burden." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). To be clear, Defendants and others may make and have made fundamental changes to prison life to combat COVID-19 as they determine that such fundamental changes are necessary and achievable. But those decisions should and must be left to the informed discretion of the State's elected leaders and agency officials.

Plaintiffs "bear[] the burden of showing that [they] requested a modification and that it was reasonable." *Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613 (5th Cir. 2020). As set above, under the Fifth Circuit's precedent, the ADA does not apply to exigent circumstances like these. But even courts that apply the ADA to exigent circumstances recognize that any exigency greatly

limits what accommodations are reasonable. *See, e.g.*, *Seremeth v. Bd. of Cty. Comm'rs*, 673 F.3d 333, 341 (4th Cir. 2012); *Loye v. County of Dakota*, 625 F.3d 494, 498 (8th Cir. 2010); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1086 (11th Cir. 2007). And in the prison setting specifically, deference to the judgment of officials on the ground is necessary. *See Cadena v. El Paso County*, 946 F.3d 717, 725 (5th Cir. 2020); *Wells v. Thaler*, 460 F. App'x 303, 313 (5th Cir. 2012). "The difficulties of operating a detention center must not be underestimated by the courts." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012). "Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id*. Because operating a prison "call[s] for the exercise of significant judgment and discretion," courts "will not second guess those judgments, where, as here, [officials are] presented with exigent or unexpected circumstances." *Bahl*, 695 F.3d at 785. Because "[t]he judiciary is ill-equipped to manage decisions about how best to manage any inmate population" and "the concern about institutional competence is especially great where, as here, there is an ongoing, fast-moving public health emergency," *Money*, 2020 WL 1820660, at *16, it is not reasonable to tie the hands of prison officials.

Even apart from exigent circumstances, Plaintiffs' requested modifications "must be judged in light of the overall institutional requirements, including security concerns, safety concerns, and administrative exigencies." 1 Thomas R. Trenkner, Americans with Disabilities: Practice & Compliance Manual § 2:92. Thus, any requested modification to prison life must be judged against a State's "penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Among the factors considered when a prisoner claims a right to some policy change are (1) whether there is a 'valid, rational connection' between the prison regulation and the legitimate governmental

interest put forward to justify it"; (2) whether the prisoner has "alternative means" of exercising some right; (3) "the impact accommodation of the asserted . . . right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." *Id.* at 90-91. The State's penological interests defeat Plaintiffs' plea for judicial micromanagement of the State's Covid-19 response.

Plaintiffs do not even suggest that TDCJ's current policies lack any rational connection to penological interests. The accommodations Plaintiffs seek, but are allegedly being denied, include: (1) access to alcohol-based sanitizer; (2) provision of cleaning supplies for each housing area, including cleaning agents containing bleach; (3) access to antibacterial soap and hand towels to facilitate handwashing; (4) a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic (or in the alternative, a requirement to test all new prisoners entering the Pack Unit for COVID-19 or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available); and (5) social distancing measures in the cafeteria, pill line, and other locations where prisoners are required to congregate. For example, offenders "are not permitted to use hand sanitizer because it is flammable and can be ingested, which can cause intoxication and/or alcohol poisoning." Exhibit F at 3. Bleach is also a dangerous chemical that offenders are generally not allowed to possess. The prohibition on contraband is a "legitimate safety requirement[] necessary for the safe operation of its services, programs, or activities," which respond to "actual risks" posed by offenders. 28 C.F.R. § 35.130(h) (limiting accommodations that pose a safety risk). According to the FDA, "Antibacterial soap," meanwhile, provides no benefit compared to regular soap and water Plaintiffs already have access to, because COVID-19 is caused by a virus, not bacteria. *See "*Antibacterial Soap? You Can Skip It, Use Plain Soap and

Water, FDA, U.S. Food & Drug Administration," https://www.fda.gov/consumers/consumer-updates/antibacterial-soap-you-can-skip-it-use-plain-soap-and-water (last visited Apr. 15, 2020)).

On top of this, Defendants have provided Plaintiffs with alternatives to their demands. In light of COVID-19, common surfaces are being cleaned (with bleach-based cleaning agents) with high frequency. Exhibit F at 3. Additionally, the Pack Unit has implemented social distancing measures to help prevent the spread of COVID-19. These include: limiting the number of offenders in the dining hall, pill window, recreation yard, in the dayroom, on transportation buses and vans, as well as enforcing social distances in hallways and other common areas. Exhibit F, generally. Finally, traffic in and out of the Pack Unit has been significantly reduced, and screening measures have been implemented so that inmates suffering from COVID-19 symptoms can be identified and isolated from the rest of the population. Exhibit F at 3-4. As of April 14, 2020, the Pack Unit has been placed on precautionary lockdown, which precludes any transfers to or from the unit and severely restricts all offender movement within the building. Exhibit F at 3-4. These policy choices reflect TDCJ's weighing of the impact various changes to daily life will have on correctional officers and staff, other inmates in the Texas prison system, and on the allocation of prison resources generally.

Additionally, because Plaintiffs cannot demonstrate likelihood of success as to their constitutional claim, Defendants are entitled to immunity as to Plaintiffs' ADA and RA claims. The ADA abrogates the States' Eleventh Amendment immunity to extent that the condition challenged is also a violation of the plaintiffs' constitutional rights. *United States v. Georgia*, 546 U.S. 151 (2006). Because the ADA was passed pursuant to Congress' remedial power under

Section 5 of the Fourteenth Amendment, the States' Eleventh Amendment immunity remains intact except where a constitutional violation has been shown. *Id*.

### 4.      Plaintiffs are not entitled to the injunctive relief they seek.

Plaintiffs have not shown a substantial likelihood of success on the merits of their Eighth Amendment failure-to-protect claim or their ADA/RA claims. Regarding preliminary injunctions, the Fifth Circuit has explained that there is no need to proceed to the other elements if a substantial likelihood of success on the merits is not proven. *See Walgreen Co. v. Hood*, 275 F.3d 475, 477 (5th Cir. 2001). The Court, therefore, should deny Plaintiffs' request for a preliminary injunction without proceeding further in its analysis. *See id.*

Even if Plaintiffs could show a substantial likelihood of success, however, injunctive relief is inappropriate because it would impermissibly interfere with Defendants' effort to manage the COVID-19 pandemic. The State's police powers are at their apex during a public-health emergency. The Supreme Court has thus recognized that "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905). And judicial authority to review claims alleging the denial of individual rights is restricted by the State's paramount interest in responding to the crisis. In a recent grant of mandamus relief, the Fifth Circuit explained that judicial review is available only "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has *no real or substantial relation to those objects*, or is, *beyond all question, a plain, palpable invasion of rights secured by the fundamental law*." *In re Abbott*, 2020 WL 1685929, at *1 (quoting *Jacobson*, 197 U.S. at 29). The Fifth Circuit emphasized that absent such a clear violation, "'[i]t is no part of the function of a court' to decide

which measures are 'likely to be the most effective for the protection of the public against disease.'" *Id.* (quoting *Jacobson*, 197 U.S. at 30).

Plaintiffs do not allege, and they could not possibly show, that Defendants' efforts to respond to the COVID-19 pandemic have "no real or substantial relation" to the goal of protecting inmates' health and safety, or that Defendants' policies are "beyond all question, a plain, palpable invasion" of their constitutional rights. *In re Abbott*, 2020 WL 1685929, at *1. Even if the Court agreed with Plaintiffs that alternative measures would be more effective, that would not justify the exercise of "judicial power to second-guess the state's policy choices in crafting emergency public health measures." *Id.* at *6.

It is not necessary to reach that question here because Plaintiffs have not shown a substantial likelihood of success on the merits. But the principle articulated by the Supreme Court in *Jacobson* creates an additional, independent barrier to injunctive relief, and it defeats any suggestion that a federal court's authority to intervene in the management of state prisons somehow increases during a pandemic. To the contrary, the current public health emergency further restricts any such authority. *See In re Abbott*, 2020 WL 1685929, at *1; *Money*, 2020 WL 1820660, at *16 ("The judiciary is ill-equipped to manage decisions about how best to manage any inmate population . . . . And the concern about institutional competence is especially great where, as here, there is an ongoing, fast-moving public health emergency.").

### B. Plaintiffs cannot show a substantial threat of irreparable injury if their request for injunctive relief is not granted.

Should the Court proceed to consider the irreparable-harm element, it will find that Plaintiffs cannot make their required showing. Showing irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A Wright & Miller,

Fed. Prac. & Proc. § 2948.1. Irreparable harm must be *likely*, not merely speculative. *See, e.g.*, *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

Determining whether injunctive relief is appropriate in light of COVID-19 calls for a fact-specific analysis. *See Sacal-Micha v. Longoria*, No. 1:20-CV-37, ---F.Supp.3d---, 2020 WL 1518861, at *5 (S.D. Tex. Mar. 27, 2020). In New York, for example, a federal judge ordered the release of immigration detainees held in facilities with confirmed cases of COVID-19. *See Basank v. Decker*, No. 20 Civ. 2518, ---F.Supp.3d---, 2020 WL 1481503, at *7 (S.D.N.Y. Mar. 26, 2020). Additionally, some courts have ordered the release of immigration detainees after finding a substantial likelihood that they would succeed on their constitutional claims. *See Castillo v. Barr*, No. 20-cv-0605, 2020 WL 1502864, at *6 (C.D. Cal, Mar. 26, 2020); *Coronel v. Decker*, No. 20-cv-2472, 2020 WL 148 7274, at *10 (S.D.N.Y. Mar. 27, 2020).

At least one court, however, has declined to release an immigration detainee due to COVID-19 concerns after finding that the plaintiff was not likely to succeed on the merits of his underlying deliberate indifference claim. *See Sacal-Micha*, 2020 WL 1518861, at *6 (explaining that "the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety does not amount to a violation of his constitutional rights and does not warrant his release"). Another court has declined to release an immigration detainee due to COVID-19 concerns in part because the plaintiff did not show irreparable harm. *See Dawson v. Asher*, No. C20-0409 JLR-MAT, 2020 WL 1304457, at *3 (W.D. Wash Mar. 19, 2020).

Defendants are well aware of the threat COVID-19 poses to inmates—especially those of advanced age and those who suffer from underlying health conditions. The measures put in place by TDCJ and the Pack Unit follow CDC recommendations to the fullest extent possible within the confines of the Pack Unit. *See* Exhibits D and F, generally. Plaintiffs cannot show that those

measures are deliberately indifferent to the risk posed by COVID-19, let alone that their preferred measures would be more effective than the measures being implemented by TDCJ. At this point, any threat of harm to Plaintiffs from the lack of injunctive relief requiring TDCJ to implement their proposed measures is merely speculative. *Winter*, 555 U.S. at 22. This is not sufficient. Since Plaintiffs have not shown they are likely to suffer irreparable harm in the absence of an injunction that requires TDCJ to implement their proposed measures, the Court should deny their request for injunctive relief.

### C. The balance of equities and the public interest weigh against Plaintiffs.

Finally, Plaintiffs cannot show that the balance of equities and the public interest weigh in their favor. In the prison context, a request for injunctive relief must always be viewed with great caution because "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). And "where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Turner v. Safley*, 482 U.S. 78, 85 (1987).  The Supreme Court has explained that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973)). Plaintiffs invite the Court to ignore those interests entirely.

The injunctive relief requested by Plaintiffs would irreparably injure Defendants because it upends federalism principles, disregards the separation of powers, and thwarts the State's fundamental prerogative, and Defendants' basic duty as state officials, to maintain safety and

security in Texas prisons. A State suffers an "institutional injury" from the "inversion of . . . federalism principles." *Texas v. United States Envt'l Protection Agency*, 829 F.3d 405, 434 (5th Cir. 2016); *see Moore v. Tangipahoa Par. Sch. Bd*., 507 F. App'x 389, 399 (5th Cir. 2013) (per curiam) (finding that a State suffers irreparable harm when an injunction "would frustrate the State's program"); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (recognizing that "the inability to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State").

The Supreme Court has cautioned that federal courts must defer to prison officials' adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain internal security. *Block v. Rutherford*, 468 U.S. 576, 584–85 (1984). It has expressly recognized that the judiciary is ill-equipped to manage prisons:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner*, 482 U.S. at 84-85. And it has noted that the difficulties in managing prisons "are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (quoted in *Rhodes v. Chapman*, 452 U.S. 337, 351 n.16 (1981)). Consequently, the Court has noted that federal district courts are not to allow themselves to become "enmeshed in the minutiae of prison operations." *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (quoting *Bell v. Wolfish,* 441 U.S. 520, 562 (1979)).

Plaintiffs ask the Court to do exactly what the Supreme Court has warned against. They seek a mandatory injunction compelling Defendants to implement numerous detailed policies and procedures at the Pack Unit. These policies and procedures would include, for example, unlimited access to hand sanitizer; unlimited access to disposable towels; cleaning that is performed at specific time intervals, logged by prison officials, and submitted to the Court for the Court's approval. This is precisely the "enmesh[ment] in minutiae of prison operations" the Supreme Court has long condemned. *See Lewis*, 518 U.S. at 362.

Illustrating the dangers noted by the Supreme Court, Plaintiffs' request for relief ignores the practical considerations that Defendants must deal with in managing the unprecedented and ever-changing crisis presented by the COVID-19 pandemic. For instance, Plaintiffs ask for COVID-19 tests to be performed on all those who enter the Pack Unit, whether they are displaying symptoms of COVID-19 or not. ECF 1 at 33 and 35. But not even members of the general public can be tested for COVID-19 in the absence of symptoms. *See Criteria to Guide Evaluation and Laboratory Testing for COVID-19* (March 24, 2020), https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html ("Clinicians should use their judgment to determine if a patient has signs and symptoms compatible with COVID-19 and whether the patient should be tested. Most patients with confirmed COVID-19 have developed fever and/or symptoms of acute respiratory illness (e.g., cough, difficulty breathing)"). Among other reasons, that is because testing is not readily available, and someone who wishes to be tested must go through distinct procedures in order to obtain testing. *Id*. In fact, what Plaintiffs suggest is actually contrary to what the CDC recommends for COVID-19 testing. *See Testing for COVID-19: How to Decide If You Should Be Tested Or Seek Care* (April 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html ("Not everyone needs to be tested for COVID-19.").

If it were required that everyone that comes into or goes out of the Pack Unit be tested—even in the absence of symptoms—the medical providers would necessarily have to obtain testing equipment that could be diverted from other parts of the state where people who actually display symptoms are in need of testing. This would be an unwise use of resources that would disserve the public interest.

The extraordinary relief Plaintiffs seek would be unduly burdensome to Defendants, waste resources, and set a precedent for courts to micro-manage the operations of prisons during a pandemic. The benefit of these measures to Plaintiffs does not outweigh the burden it would impose on Defendants. Moreover, these measures would not serve the public interest. The Court, therefore, should deny Plaintiffs' request for injunctive relief.

## CONCLUSION

Plaintiffs are not entitled to a TRO because they are not seeking to preserve the status quo. Plaintiffs are also not entitled to a preliminary injunction, because they cannot show; (1) a substantial likelihood of success on the merits of their claims; (2) a threat of irreparable harm; or (3) that the balance of equities and the public interest weigh in their favor. The Court, therefore, should deny Plaintiffs' request for injunctive relief.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**RYAN L. BANGERT**
Deputy First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense Division

*/s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
*Attorney-in-Charge*
Texas State Bar No. 24074047
Federal Bar No. 1125898
Assistant Attorney General
Law Enforcement Defense Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4199
Facsimile: (512) 370-9996
Christin.Vasquez@oag.texas.gov


*/s/ Jeffrey E. Farrell*
**JEFFREY E. FARRELL**
*Of Counsel*
Texas State Bar No. 0787453
Federal Bar No. 16842
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-2120
Facsimile: (512) 320-0667
Jeffrey.Farrell@oag.texas.gov

**ATTORNEYS FOR TDCJ DEFENDANTS**


**<u>NOTICE OF ELECTRONIC FILING</u>**

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that I have electronically submitted a true and correct copy of the foregoing for filing in accordance with the Court's electronic filing system, on April 15, 2020.


*/ s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General


34

## **CERTIFICATE OF SERVICE**

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing *Defendants' Response in Opposition to Plaintiffs' Application for a Temporary Restraining Order* has been served electronically upon all counsel of record *via* the electronic filing system of the Southern District of Texas, on April 15, 2020.


*/ s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General