United States District Court
Southern District of Texas
**ENTERED**
April 20, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **LADDY CURTIS VALENTINE,** *et al*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:20-CV-1115** |
| | § | |
| **BRYAN COLLIER,** *et al*, | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM AND ORDER</u>

Before the Court is Plaintiffs' Application for Temporary Restraining Order and Other Injunctive Relief. (Doc. No. 1). Plaintiffs Laddy Curtis Valentine and Richard Elvin King, both inmates at Wallace Pack Unit ("Pack Unit" or "the Unit"), a state geriatric prison, allege that Defendants have failed to reasonably protect the inmates of the Unit from the spread of the COVID-19 pandemic. In the face of a rapidly growing pandemic, the inmates of Pack Unit, who are disproportionately elderly and ill, fear the health repercussions if the virus made its way into the Unit. Plaintiffs accordingly request emergency injunctive relief, in the form of protective health measures that help prevent transmission of the coronavirus. After considering all motions and evidence submitted by parties, live testimony presented at the April 16, 2020 evidentiary hearing, and all relevant law, the Court granted Plaintiffs' application as a preliminary injunction. (Doc. No. 40). It now issues this accompanying Memorandum and Order to explain the legal and factual findings that underlie the Court's Preliminary Injunction Order.

## I.     <u>BACKGROUND</u>

### A. Procedural History

Plaintiffs Laddy Curtis Valentine and Richard Elvin King filed the present case on March 30, 2020. (Doc. No. 1). Plaintiffs are both inmates housed at Wallace Pack Unit, a state prison run by the Texas Department of Criminal Justice (TDCJ) in unincorporated Grimes County, Texas. *Id.* at 3. In their Complaint, Plaintiffs allege that Defendants TDCJ Executive Director Bryan Collier, Pack Unit Warden Robert Herrera, and TDCJ are not taking proper measures to prevent transmission of COVID-19 within Pack Unit. *Id.* at 1–2. Plaintiffs allege violations of their Eighth and Fourteenth Amendment rights, as well as the Americans with Disabilities Act (ADA), and seek injunctive relief on behalf of themselves and a proposed class of all inmates who currently are or who in the future will be incarcerated at Pack Unit. Plaintiffs included their Application for Temporary Restraining Order and Preliminary Injunction with their Complaint. *Id.* at 31–34.

The case was initially assigned to Judge Kenneth Hoyt, but by agreement of the judges, the case was transferred before this Court because Plaintiffs had marked the case as related to *Cole v. Collier*, No. 4:14-cv-1698, which this Court has presided over for the past six years. (Doc. No. 2). The case continues because defendants have, in material respects, not always been in compliance with the terms of the agreed settlement. Upon receipt of this case, the Court set a telephonic hearing for the afternoon of April 2, 2020. (Doc. No. 3). Before the hearing, Defendants filed a Motion to Transfer Case, arguing that the case should be transferred back to Judge Hoyt or placed back in the random assignment system because the present case is unrelated to *Cole*. (Doc. No. 17). At the telephonic hearing, the Court declined to hear any evidence or make any decisions while the Motion to Transfer remained pending. Plaintiffs agreed to file their response to Defendants'

Motion to Transfer the next day and, acknowledging the urgency of the situation, the Court agreed to rule on the Motion expeditiously.

On April 6, 2020, the Court denied Defendants' Motion to Transfer, finding that the present case is related to *Cole* based on similarities in parties, potential class members, relevant facts, and potential relief. (Doc. No. 20). The Court also ordered a telephonic conference for later that afternoon. (Doc. No. 21). At the telephonic conference, parties reported that they had discussed potential resolutions and were continuing such discussions. The Court set a follow-up telephonic conference for Tuesday, April 13, 2020. (Doc. No. 22). At the April 13th conference, Plaintiffs reported that discussions had not been successful and that Defendants had refused to implement most measures that Plaintiffs considered essential. The Court requested that Plaintiffs file an updated proposed Temporary Restraining Order, specifying the measures on which they still seek relief. Defendants also alleged that, as of April 13th, there were no cases of COVID-19 in Pack Unit. Defendants reported that ten inmates and three staff members at Pack Unit had been tested for COVID-19; all had received negative results. Defendants did not have a plan for systematic testing of inmates; rather, individuals who were tested at that point had gone to the hospital for unrelated medical treatment and the hospital had determined that they should be tested.

The next day, Tuesday, April 14, 2020, at 2:18 PM, the Court received an email from Defendants requesting a telephonic conference with the Court that afternoon. The Court set a hearing for 3:30 PM. At the hearing, Defendants reported that an inmate at Pack Unit, Leonard Clerkly, had been transported to the hospital in the early morning hours of Saturday, April 11, 2020 for emergency care and passed away hours later. Preliminary autopsy results showed that he tested positive for COVID-19. A press release by TDCJ later that day noted that Mr. Clerkly was 62 years old and was transported to the hospital because he had difficulty breathing. *COVID-19*

*Updates*, TDCJ (Apr. 14, 2020), https://www.tdcj.texas.gov/covid-19/index2.html.  Defendants reported that Pack Unit had been placed on precautionary lockdown on April 14th, and Mr. Clerkly's dorm was now on medical restriction. All inmates in Mr. Clerkly's dorm and all inmates at Pack who are 65 years old or older were given masks to wear. Defendants' counsel was unaware of any plans to provide masks to any other inmates. The University of Texas Medical Branch (UTMB) agreed to test the fifty-three inmates who were housed in the same dorm as Mr. Clerkly, but there were no plans to test the other inmates at Pack Unit. The Court ordered an evidentiary hearing for Thursday, April 16, 2020, at 1:30 PM.

### B. Evidentiary Hearing

Prior to the hearing, Defendants notified the Court that they would not present any live testimony at the evidentiary hearing. Defendants instead rely on their response in opposition to Plaintiffs' requested relief and accompanying exhibits, which they submitted on the evening of April 15, 2020. (Doc. Nos. 35, 36). Defendants filed evidence of new measures taken at Pack Unit, most of which were put in place on April 14th and 15th. Defendants' exhibits included declarations by TDCJ Deputy Executive Director Oscar Mendoza, Pack Unit Senior Warden Robert Herrera, and Director of Health Services at TDCJ Dr. Lannette Linthicum, as well as a declaration on the status of Plaintiffs' Step One grievances. Defendants also filed copies of TDCJ's Correctional Managed Health Care (CMHC) Infection Control Policy B-14.52, which outlines management and control measures in response to the spread of COVID-19; photos of Pack Unit; and a copy of the CDC's guidelines for correction and detention facilities. Plaintiffs had previously filed declarations for all witnesses who would testify at the evidentiary hearing, described *infra*, as well as a declaration by Dr. Robert Cohen, a physician and expert on correctional medicine.

The evidentiary hearing took place telephonically on April 16, 2020. Counsel for both parties were present. Plaintiffs presented three expert witnesses and both Plaintiffs for live testimony.

- **Dr. Joseph Gathe** is a physician and infectious disease specialist practicing in Houston, Texas. He is board-certified in internal medicine and infectious diseases. He has been diagnosing and treating patients exposed to COVID-19. He was accepted as an expert in infectious diseases without objection. His testimony focused on how quickly COVID-19 can spread in confined spaces like prisons, and the measures that needed to be implemented at Pack Unit to keep inmates safe and healthy.

- **Dr. Eldon Vail** is the former Secretary of the Washington State Department of Corrections (WDOC). He has almost thirty-five years of experience as a corrections administrator, and over a decade experience as the Secretary and Deputy Secretary of the WDOC. He oversaw a severe flu epidemic at a Washington state prison while he was overseeing the WDOC. He also consulted the WDOC in its COVID command center a week before the hearing. He was accepted as an expert without objection. His testimony focused on the necessity and feasibility of various measures that Pack Unit should take in the face of the pandemic, given his previous experience managing a similarly contagious outbreak. Dr. Vail had previously visited Pack Unit, and so, he was able to testify on measures Pack Unit specifically could and should take.

- **Dr. Jeremy Young** is a physician and associate professor of practicing and teaching at Ohio State University. He is board-certified in internal medicine and infectious diseases. He also holds a Master of Public Health. Before returning to Ohio State in 2019, Dr. Young worked on controlling the spread of infectious diseases such as HIV and hepatitis C in the

Illinois state prison system for approximately ten years. He was accepted as an expert without objection. Dr. Young's testimony focused on the threat that COVID-19 poses to prisons in particular and the necessity of certain measures to keep inmates safe and healthy. Defendants chose not to cross-examine Dr. Young.

- **Laddy Curtis Valentine and Richard Elvin King** are Plaintiffs in this case. They have been living in Pack Unit for about six and nine years, respectively. Both are over 65 years old and have chronic medical conditions that make them more vulnerable to severe illness or death if they are infected with COVID-19. Both testified to the current conditions at Pack Unit, both before and after the recent death of Mr. Clerkly, as well as what concerned them about TDCJ's response to the ongoing pandemic. Defendants chose not to cross-examine either Mr. Valentine or Mr. King.

Defendants did not present any live testimony; none of their declarants were made available for cross-examination by Plaintiffs. Both parties were given the opportunity to present oral argument after close of evidence.

The Court issued a Preliminary Injunction Order that evening. (Doc. No. 40). In its Order, the Court stated that it would publish shortly a memorandum and order, explaining its reasoning. Accordingly, the Court explains the factual and legal basis for issuing its Preliminary Injunction Order here.

Prior to the issuance of this Memorandum and Order, Defendants filed an appeal of the Court's Preliminary Injunction Order with the Fifth Circuit. (Doc. No. 45). Defendants also filed an Emergency Motion to Stay before this Court, asking that it stay the effect of its Preliminary Injunction Order pending appeal. (Doc. No. 46). This Court granted a five-day stay, staying the

Preliminary Injunction Order until Wednesday, April 22, 2020, at 5 PM. (Doc. No. 47). In the Order, the Court also informed the parties that they could apply for an extension of the stay. *Id.*

## II.   **FINDINGS OF FACT**

After reviewing the exhibits submitted by both parties and considering the live testimony of witnesses at the evidentiary hearing, the Court makes the following findings of fact. Where Defendants have not challenged or refuted a fact presented by Plaintiffs, the Court accepts that fact as true.

1. Pack Unit is a Type I Geriatric Facility, which houses a high number of elderly and disabled prisoners. (Doc. No. 14 ¶ 10). The Unit currently houses 1,248 offenders, 827 of whom are 65 years old or older. (Doc. No. 35-4, at 3). As the Court knows from its own visit to the Pack Unit, the Unit is a dormitory-style prison, where each inmate has a small cubicle, built with a half-wall. (Doc. No. 14 ¶ 12; Doc. No. 35-4, at 3). Each dorm holds between 54 and 107 inmates, except the two wheelchair dorms, which house 30 inmates each. (Doc. No. 35-4, at 3). Pack Unit has a medical infirmary that is always available to inmates. *Id.* The infirmary has twelve beds and a small medical staff, but no physicians. *Id.*

2. It is undisputed that Pack Unit has a population that is predominantly and disproportionately elderly and ill.

3. The COVID-19 pandemic has presented a serious public health emergency to the United States. (Tr. 10:18–24).[1] COVID-19 is a respiratory illness that primarily spreads between people who come within approximately six feet of each other. (Doc. No. 36-3, at 2). It can also infect a person who touches a contaminated surface and then touches his own nose,

---

[1] All citations to the transcript of the April 16, 2020 evidentiary hearing are designated (Tr. XX:XX).

eyes, or mouth. *Id.* Those who become infected can become seriously ill and die from the disease. *Id.* Those over the age of 65 and with comorbid conditions, like lung disease, chronic obstructive pulmonary disease (COPD), heart disease, hypertension, diabetes, cancer, or a weakened immune system are at higher risk of serious illness or death. *Id.*; (Doc. No. 12 ¶¶ 17, 19–21; Doc. No. 13, at 10–11; Tr. 13:14–22).

4. There are currently no vaccines or FDA-approved cures for COVID-19. (Doc. No. 12 ¶ 16). Those who develop moderate or severe symptoms require hospitalization. *Id.* ¶ 18. Those who become seriously ill may need intubation and mechanical ventilation. *Id.* ¶ 17. Pack Unit does not have a hospital on site and must transfer patients to local hospitals for this type of care. (Doc. No. 35–4, at 3; Doc. No. 13, at 13–14).

5. Communicable diseases are more easily transmitted in prison population. This is because of the congregate nature of prisons. (Doc. No. 12 ¶ 23; Doc. No. 13, at 6–7; Tr. 84:23–85:8). Similarly, other densely packed environments, like nursing homes and cruise ships, are also highly conducive to rapid spread of disease. (Doc. No. 12 ¶ 23; Tr. 95:14–10). This is especially true in environments with dorm-style living arrangements, where many individuals share the same, open sleeping space and bathroom. (Doc. No. 12 ¶ 23; Tr. 33:1–12). Additionally, prisons tend to lack resources to treat and control spread once a disease has been introduced into the population. (Doc. No. 13, at 7–8; Tr. 84:23–85:8). Prison populations also tend to consist of people who are more likely to have underlying comorbidities. (Tr. 84:23–85:19).

6. COVID-19 is no different in this respect, and spreads easily through prison environments. In fact, COVID-19 is even more easily spread than some diseases because of its long incubation period and asymptomatic presentation in some people. (Doc. No. 12 ¶ 14; Tr.

94:4–13). Additionally, some individuals who are symptomatic and in close quarters with other people can become "superspreaders," and spread COVID-19 to many others. (Tr. 86:3–19, 95:21–10).

7. The CMHC created a coronavirus policy, B-14.52, Coronavirus Disease 2019 (COVID-19) on March 20, 2020. (Doc. No. 36-9 ¶ 4). The policy was updated on March 27, 2020, after the Center for Disease Control (CDC) issued its guidance to correctional institutions on March 23, 2020. *Id.* ¶ 6. It was updated again on April 2, 2020, then once more, after an inmate died at Pack Unit, on April 15, 2020. *Id.* ¶ 7–8. These policies are equally applicable to all TDCJ facilities and do not include additional or tailored requirements for Pack Unit or units that have particularly vulnerable populations. (Doc. Nos. 36-3, 36-5, 36-6).

8. On April 11, 2020, Leonard Clerkly, an inmate at Pack Unit, was transferred to the hospital because of difficulty breathing. He was pronounced dead at 5:25 AM. Preliminary autopsy results indicate that he died because of viral pneumonia due to COVID-19. *COVID-19 TDCJ Update*, TDCJ (Apr. 14, 2020), https://www.tdcj.texas.gov/covid-19/index2.html. TDCJ was informed of Mr. Clerkly's positive test result around 5:30 PM on April 13, 2020. (Doc. No. 36-9 ¶ 11).

9. On April 14, 2020, Pack Unit was placed on precautionary lockdown. (Doc. No. 35-4, at 4). Pursuant to the lockdown, all transfers to and from the Unit, other than those that are medically necessary, have stopped. Inmates are confined to their dorms other than for medical care and scheduled showers. Those inmates in Mr. Clerkly's dorm are placed on medical restriction, and thus, have their temperatures taken twice a day. *Id.* at 4–5. On April 15, 2020, TDCJ began giving all inmates cloth masks, which could be switched out once a day to be laundered. *Id.* at 5. If no other COVID-19 cases are confirmed in the Unit, the

lockdown will be lifted on April 25, 2020. Otherwise, Pack Unit will continue to be locked down for an additional fourteen days from the last known symptom. *Id.* at 5.

10. Beginning April 6, 2020, inmates could request additional soap at no cost. (Doc. No. 35-4, at 3).

11. However, TDCJ has refused to give inmates alcohol-based hand sanitizer or disposable paper towels, citing that they are both flammable, hand sanitizer can be ingested, and paper towels can be hoarded or used to damage the plumbing system. (Doc. No. 35-4, at 3–4). Inmates have always had access to items like paper, books, cotton clothing, and towels, which are all flammable and can be used to damage plumbing. (Tr. 66:13–18). Neither party was able to name a single example of inmates drinking or setting fire to hand sanitizer, or misusing paper towels in the past, even when these items were made available to inmates outside of Texas. (Tr. 24:14–25:3, 29:6–16, 30:10–18, 41:21–42:5, 45:6–21, 49:15–50:5, 66:6–12). TDCJ also refuses to give inmates facial tissue or additional toilet paper. (Tr. 65:10–12). Despite these policies, TDCJ posters and pamphlets instruct inmates to use alcohol-based hand sanitizer and facial tissues when practicing good hygiene. (Doc. No. 35-3; Tr. 65:13–22). Until April 2, 2020, TDCJ's official policy also recommend that staff and inmates use hand sanitizer with at least 60% alcohol and tissues to prevent transmission. (Doc. No. 36-3, at 3; Doc. No. 36-5, at 4; Doc. No. 36-6, at 4). TDCJ staff are instructed to carry alcohol-based hand sanitizer for their own use. (Doc. No. 36-6, at 13).

12. Hand sanitizer is an important part of preventing transmission. (Doc. No. 12 ¶ 30). Studies have shown that access to hand sanitizer improves hand hygiene, because it is easier to access than soap and water. (Tr. 91:22–92:21). Accordingly, the CDC also recommends use of alcohol-based hand sanitizers and instructs prisons to consider allowing access to

inmates. (Doc. No. 36-10, at 9). Other state prisons outside of Texas have lifted the ban on alcohol-based sanitizers, both in response to previous outbreaks of communicable diseases and in response to the present COVID-19 pandemic. (Tr. 45:9–21, 49:4–7, 49:18–50:5).

13. On April 15, 2020, TDCJ began providing its inmate janitors clean masks and gloves at the beginning of each twelve-hour shift. (Doc. No. 35-4, at 4). However, at Pack Unit, when inmate janitors work in pairs, each pair of janitors is given only one set of gloves to share for the duration of the shift. (Tr. 80:2–14). For gloves to be effective in protecting the wearer and preventing transfer of the virus between surfaces, they need to be changed out for clean gloves whenever soiled. (Tr. 37:22–9, 93:12–25). Additionally, while TDCJ does provide inmate janitors with CDC-approved cleaning supplies, (Doc. No. 35-4, at 4), they fail to provide janitors with enough product to sustain any amount of repetitive cleaning throughout a twelve-hour shift, (Tr. 78:5–79:8). TDCJ has not increased the number of inmate janitors since the onset of the pandemic. (Tr. 78:2–4). It is necessary to clean high-touch areas frequently, multiple times a day, to prevent transmission. (Tr. 37:5–21, 92:22–93:12). The CDC guidelines accordingly instruct prisons to clean and disinfect frequently touched areas several times a day, with appropriate cleaners. (Doc. No. 36-10, at 10).

14. Each inmate is responsible for cleaning his own cubicle. Once a day, a TDCJ officer sprays a bleach solution into each cubicle. (Doc. No. 35-4, at 4; Tr. 79:16–80:1). A spray bottle of disinfectant cleaner is also available in the dorm for inmates to use. (Doc. No. 35-4, at 4).

15. TDCJ has put up posters with information about COVID-19, how to prevent transmission, and notice that they had waived all medical copays for the duration of the pandemic. (Doc.

No. 35-4, at 6; Doc. No. 36-9, at 5; Tr. 80:15–20). However, TDCJ has not communicated orally to the inmates any of this information, through live or video presentations, nor have they invited inmates to ask questions about the disease or its prevention. (Tr. 67:11–21, 80:21–24). Signs are not sufficient for inmate education, as inmates who cannot read, cannot read well, or cannot understand English will not receive information in this way. (Tr. 35:1–36:4, 94:14–95:5). There are inmates at Pack Unit who are illiterate or cannot read English; the current signs are not accessible to them. (Tr. 68:18–69:6). Presumably for this reason, TDCJ presents educational videos on protection from excessive heat and cold twice a week to all inmates. (Tr. 36:22–37:4, 67:22–68:17). The CDC guidelines require educational materials to be accessible by non-English speakers, those with low-literacy, and those with disabilities. (Doc. No. 36-10, at 11).

16. Pack Unit has tested the 53 inmates housed in Mr. Clerkly's former dorm. As of April 16, 2020, a total of 64 inmates from Pack Unit have been tested. (Tr. 126:14–24). There is no plan or intent to test the remaining Pack Unit population. (Doc. No. 36-9 ¶ 13). There is no evidence that TDCJ intends to trace Mr. Clerkly's contacts and test those individuals. Where there is no contact tracing and where COVID-19 has already been inside Pack Unit, blanket testing is necessary to contain an outbreak, because COVID-19 can spread even when those infected are asymptomatic or have mild symptoms. (Tr. 14:2–16:9, 91:7–21).

17. Inmates are not six feet apart from each other when they are in their dorms. (Doc. No. 35-4, at 6; Tr. 63:1–7). The cubicles cannot be easily altered. (Doc. No. 35-4, at 6). There is a dorm in the E building that is currently unused, although there is no apparent or presented reason why it cannot be used to spread out inmates from other dorms. (Tr. 75:17–76:13).

The gymnasium cannot be used as living quarters because it is not air-conditioned. (Doc. No. 35-4, at 6).

18. Prior to the precautionary lockdown, only two dorms were allowed in the dining hall at a given time. This lowered the density of inmates in the dining hall, but still did not allow for strict social distancing of six feet. (Doc. No. 35-4, at 6; Tr. 70:1–4). Feeding inmates with strict social distancing enforcement would require about fourteen hours of feeding every day. (Doc. No. 35-4, at 6). Currently, while inmates are on precautionary lockdown, they are fed in their housing areas. *Id.* at 5.

19. Prior to the precautionary lockdown, inmates were told to keep six feet of distance between themselves and others in open, common areas, "where feasible." *Id.* at 5–6. However, TDCJ has no policies that call for enforcement of this distance, even where possible. Inmates are often within six feet of each other, even when it is possible to socially distance. (Tr. 63:5–7, 69:7–70:4, 70:18–24).

20. Prior to the precautionary lockdown, transfers between units were minimized, but still allowed upon agency or medical needs, as determined on a case-by-case basis. (Doc. No. 36-9, at 5). Individuals being transferred were screened only for visible symptoms or fevers before being integrated with the general population. *Id.* Individuals were seated in every other seat if transferred in a bus; only one inmate was transferred at a time in a van. *Id.* The CDC guidelines instruct prisons to restrict transfers to those that are "absolutely necessary." (Doc. No. 36-10, at 10).

21. Defendants did not present any evidence on the medical adequacy of their current policies or their implementation of those policies. Plaintiffs' medical experts both evaluated measures taken in Pack Unit and found them to be deeply inadequate to care for the Unit's

inmate population. (Doc. No. 12 ¶ 22; Doc. No. 13, at 11–12 (finding measures to be "grossly inadequate"); Tr. 18:3–16; 95:6–10 (finding measures to be "woefully inadequate")).

22. Defendants did not present any evidence of cost or budgetary impact of various measures.

23. Defendants did not present any plans or intent to create plans for reevaluating the need for hand sanitizer and paper towels, or an ability to provide comparable alternatives. Defendants did not present any plans or intent to design plans for expanding testing, triaging available tests, coordinating early release to reduce prison populations, or enacting new measures after precautionary lockdown is lifted.

## III.   PRELIMINARY INJUNCTION ANALYSIS

Plaintiffs challenge the constitutionality of the conditions of their confinement in Pack Unit during the COVID-19 pandemic. Plaintiffs seek preliminary injunctive relief under 42 U.S.C. § 1983 to protect the health and safety of inmates housed in the Unit.

To receive injunctive relief, Plaintiffs must show: "(1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the [] injunction will not disserve the public interest." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974)); *see Parker v. Ryan*, 960 F.2d 543, 545 (5th Cir. 1992) ("[T]he requirements of [R]ule 65 apply to all injunctions.").

### A.  Substantial Likelihood of Success on the Merits

Plaintiffs allege that Defendants' failure to implement adequate protections against COVID-19 transmission in Pack Unit constitutes cruel and unusual punishment in violation of the

Eighth and Fourteenth Amendments. Defendants argue that Plaintiffs cannot show a substantial likelihood of success on this claim because (i) Plaintiffs did not properly exhaust their administrative remedies as required by the Prison Litigation Reform Act of 1995 (the "PLRA"), and (ii) Plaintiffs cannot prevail on the merits of their constitutional and ADA claims. Because the Court concludes that Plaintiffs are substantially likely to prevail on their Eighth Amendment claim, the Court does not address Plaintiffs' claims under the ADA. The Court will examine the exhaustion issue before proceeding to the substance of Plaintiffs' constitutional claim.

*i. Plaintiffs' claims are not barred by the PLRA's exhaustion requirement.*

Defendants contend that Plaintiffs cannot establish a substantial likelihood of success on the merits because, as a threshold matter, they did not properly exhaust their administrative remedies as required by the PLRA. The parties do not dispute that Plaintiffs have not fully exhausted TDCJ's administrative process. However, because no administrative remedy was available, the Court concludes that Plaintiffs were not obligated to exhaust prior to bringing this action.

The PLRA mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). The benefit of the PLRA's exhaustion requirement is to "allow[] a prison to address complaints about the program it administers before being subjected to suit, reduc[e] litigation to the extent complaints are satisfactorily resolved, and improv[e] litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007). The exhaustion requirement is "mandatory," *Woodford v. Ngo*, 548 U.S. 81, 85 (2006), and courts may not excuse an inmate's failure to exhaust because of "special circumstances," *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016).

However, the PLRA has a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. The exhaustion requirement in this way "hinges on the 'availab[ility]' of administrative remedies." *Id.* at 1858. The Supreme Court has explained that the ordinary meaning of "available" is "capable of use for the accomplishment of a purpose." *Id.* at 1858 (quoting *Booth v. Churner*, 532 U.S. 731, 737 (2001)). Accordingly, an inmate is required to exhaust only those grievance procedures that are "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738). The Supreme Court identified three examples of circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief": (1) when the procedure "operates as a simple dead end," such that the procedure is not "'capable of use' for the pertinent purpose," (2) when the procedure is "so opaque that it becomes, practically speaking, incapable of use," and (3) when prison administrators thwart the use of the procedure "through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

In light of the alarming speed with which COVID-19 has ravaged our country and prisons, TDCJ's administrative remedy is not "capable of use" to obtain the relief Plaintiffs seek. TDCJ's grievance procedures require that inmates complete a lengthy two-step grievance process before their claim is considered exhausted. *Rosa v. Littles*, 336 F. App'x 424, 428 (5th Cir. 2009) (citing *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004)). Inmates must first file a Step One grievance within fifteen days of the alleged incident. *Rosa v. Littles*, 336 F. App'x 424, 428 (5th Cir. 2009) (citing Grievance Manual, ch. III, p.11). Inmates may then appeal the Warden's decision on the Step One grievance by filing a Step Two grievance. *Id.* (citing Grievance Manual, ch. V, p.1).

In this case, Plaintiffs filed Step One grievances on April 1 and April 2, 2020. (Doc. No. 36-1). Under TDCJ's grievance procedures, however, TDCJ is not required to respond to the Step One grievances until May 11 and May 12, 2020, respectively, *at the earliest*—as Defendants emphasized in their filings, TDCJ may seek an extension under the Offender Grievance Operations Manual. (Doc. No. 36, at 7; Doc. No. 36-1, at 2). Upon receiving the Warden's decision, Plaintiffs would then need to file Step Two grievances, which would delay any form of relief even further. Such delay, however, precludes any relief to Plaintiffs given how rapidly COVID-19 spreads. The experience of detention facilities across the nation presents alarming examples. At Rikers Island jail in New York City, the number of confirmed cases soared from one to nearly 200 in just twelve days. *See* Miranda Bryant, *Coronavirus Spread at Rikers Is a "Public Health Disaster," Says Jail's Top Doctor*, The Guardian (Apr. 1, 2020), https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster. At the Cook County jail in Chicago, the number of confirmed cases went from two to 101 inmates and a dozen employees in a single week. *See* Timothy Williams et al., *As Coronavirus Spreads Behind Bars, Should Inmates Get Out?*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html. Indeed, the coronavirus has spread quickly through TDCJ facilities: over the past six days, the number of infected TDCJ employees and staff rose from 72 to 183, and the number of infected inmates rose from 167 to 376. *See COVID-19 Updates*, TDCJ (Apr. 11, 2020), https://www.tdcj.texas.gov/covid-19/index2.html; *COVID-19 Updates*, TDCJ (Apr. 18, 2020), https://www.tdcj.texas.gov/covid-19/index.html. Pack Unit itself has already had one inmate die because of COVID-19, before TDCJ confirmed a single case in the Unit.

Where, as here, the circumstances present an imminent danger, TDCJ's lengthy administrative procedure, which TDCJ may choose to extend at will, presents no "possibility of

17

some relief." *Ross*, 136 S. Ct. at 1859. Indeed, the Seventh Circuit has opined that "there is no duty to exhaust, in a situation of imminent danger, if there are no administrative remedies for warding off such a danger." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010).[2] Such imminent danger is present here. Under TDCJ's grievance procedure, TDCJ is not required to respond to Plaintiffs' *first* grievances for at least another three weeks—during which time COVID-19 may have spread throughout Pack Unit, as it has done in several facilities across the country, rendering Plaintiffs' grievances moot. And TDCJ has pointed to no emergency procedures that Plaintiffs could avail themselves of that would expedite its review of either Step One or Step Two grievances. *Cf. id.* at 1174 (finding an available remedy where Illinois had created an emergency grievance procedure that expedited review of certain urgent medical complaints). Under these circumstances, the Court concludes that there is no available remedy and thus, Plaintiffs were not obligated to exhaust prior to bringing this action.

> ii. *Plaintiffs have established a substantial likelihood of success on their Eighth Amendment conditions-of-confinement claim.*

The government has a constitutional duty to protect those it detains from conditions of confinement that create "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This duty extends to providing "adequate . . . medical care" and "tak[ing] reasonable measures to guarantee the safety of the inmates." *Id*. at 832.

However, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Thus,

---

[2] Although *Fletcher* was decided before *Ross*, *Fletcher*'s reasoning that administrative remedies may offer no remedy at all in situations of imminent danger is consistent with *Ross*'s holding that the PLRA's exhaustion requirement is exempted when there are no *available* remedies.

to establish an Eighth Amendment violation based on a failure to prevent harm, an inmate must show both that "he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials' failure to act manifests "deliberate indifference" toward that risk. *Id.* at 834.

Defendants do not dispute that COVID-19 poses a substantial risk of serious harm to Plaintiffs. Prisons are highly conducive to the spread of COVID-19 and Pack Unit has already reported one confirmed case of COVID-19, which resulted in the death of 62-year-old inmate Leonard Clerkly. Because Mr. Clerkly had not been recently transported, he must have contracted COVID-19 while he was in Pack Unit. As Dr. Young summarized at the evidentiary hearing, Pack Unit is a "tinderbox" and "the spark has been lit." (Tr. 93:14–17, 95:14–21). Moreover, Mr. Clerkly was not an outlier in his vulnerability. As a Type I Geriatric prison, Pack Unit is home to a large population of inmates that are over fifty years old, have serious pre-existing health conditions, or both. The CDC warns that these are precisely the type of people most at risk for serious illness from COVID-19. The current pandemic presents a substantial risk of serious harm and death to Pack Unit's current residents.

Defendants argue, however, that Plaintiffs cannot establish that TDCJ has responded to this substantial risk of death and serious harm with deliberate indifference. A prison official acts with deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Because deliberate indifference requires knowledge of the risk, "mere negligence" does not satisfy the deliberate indifference standard. *Wilson v. Seiter*, 501 U.S. 294, 305 (1991). An official demonstrates disregard of a known risk by "failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Accordingly, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845. Only officials that "recklessly" or "consciously" disregard a known substantial risk of serious harm

act with deliberate indifference. *Id.* at 836. Whether an official is acting recklessly "should be determined in light of the prison authorities' current attitudes and conduct," both "at the time suit is brought and persisting thereafter." *Id.* at 845 (internal citation omitted). Past actions and conduct are relevant as well. Defendants' conduct must be viewed in conjunction with Defendants' failure to live up to the commitments they voluntarily assumed in the settlement of the related case of *Cole v. Collier.*

Defendants cannot, and do not, dispute that they have knowledge of the substantial risk that COVID-19 poses to the men of Pack Unit. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. The risk of COVID-19 is obvious. One person incarcerated at Pack Unit has died from COVID-19 and we are seeing COVID-19 spread like wildfire in prisons, jails, and detention facilities within TDCJ's system, the country, and the world.

Instead, Defendants argue that Plaintiffs cannot demonstrate deliberate indifference because "TDCJ, and specifically, the Pack Unit are taking copious measures in response to the COVID-19 pandemic." (Doc. No. 36, at 20). The question before the Court is not, however, whether Defendants' measures are copious, but whether they reasonably abate the risk of COVID-19 transmission.

As discussed in detail above, Defendants claim to have adopted various TDCJ-wide measures before the first positive test at Pack Unit. *See supra* at 9–13. Mr. Clerkly died on April 11, 2020. Beginning on April 14, 2020, Pack Unit was placed on lockdown and the fifty-three men in Mr. Clerkly's dorm were placed in medical restriction. Defendants also claim that, beginning April 15, 2020, all inmates have been given cloth masks and janitors are given clean gloves and masks for each twelve-hour shift. Sixty-four total inmates at Pack Unit have also been tested for

20

COVID-19, including the fifty-three people in Mr. Clerkly's dorm. The Court has not been notified of any results of those tests.

Some of these measures adopted by TDCJ are so essential that they have become ubiquitous. Employee screenings, copay waivers, visit suspensions, masks for staff, and unlimited soap access are becoming the norm in prisons across the country. But it would not be reasonable to stop with those measures given the nature and magnitude of this pandemic, as TDCJ has effectively acknowledged by developing CMHC Policy B-14.52. The Court notes that many of the measures set out in this policy were not implemented under after the commencement of this lawsuit, and some were not adopted until the day before this Court's evidentiary hearing. Even so, Defendant's actions fall short of their own policy and do not reasonably abate the extremely high risks facing the inmates in Pack Unit.

Consider cleanliness. Defendants claim to have "ordered enhanced cleaning and disinfection of its facilities." (Doc. No. 36, at 12). Plaintiffs, however, presented unrebutted evidence at the evidentiary hearing that Pack Unit's post-pandemic procedures for cleaning common areas resemble their pre-pandemic procedures. Defendants have not increased the number of inmate janitors or increased their access to cleaning solutions. Plaintiff King, who is a janitor at Pack Unit, testified at the hearing that all inmate janitors perform twelve-hour shifts, that the cleaning solutions provided are used up largely on the initial morning cleaning and are almost depleted by mid-afternoon, and that only one pair of gloves is provided daily for him and his co-janitor to share—an arrangement Plaintiffs' medical experts described as being as effective as no gloves at all. (Tr. 91:12–14). Plaintiff Valentine also testified regarding his concern about sanitizing of the mess hall where meals are served, having observed that the same rag is used "without cleaning it, or without rinsing it" to wipe ten or more tables at a time. (Tr. 70:12–13). As

for personal spaces, Defendants spray each inmate's cubicle daily with diluted bleach, and otherwise provide a shared bottle of disinfectant spray for common use. Defendants do not provide access to disposable towels or additional tissues. These inadequate sanitizing and disinfecting measures, at a time when hygiene is a life or death matter, reflect a deliberate indifference toward the safety of Pack Unit inmates.

The Court is further concerned by Defendants' purported reasons for refusing to provide paper towels and hand sanitizer to Pack Unit members. Given that Plaintiffs routinely use a variety of other paper and cloth items without incident, the argument that disposable towels could be used to start fires or clog toilets falls flat. The same holds for Defendants' argument that alcohol-based hand sanitizer could be ingested. As testimony by Dr. Vail at the hearing revealed, hand sanitizer that is normally contraband has been used without incident in other prisons during other outbreaks. Indeed, the Court understands that prisoners have been entrusted with manufacturing hand sanitizer at another TDCJ facility. Denying Plaintiffs these potentially life-saving tools under such dire circumstances for such remote reasons evinces a disregard for the health and safety of the men at Pack Unit.

Mr. Clerkly's death also suggests a conscious disregard of substantial risk. Defendants' own policies provide that inmates complaining of symptoms consistent with COVID-19 "should be triaged as soon as possible" and "placed in medical isolation" and that all areas where the symptomatic inmate spent time should be "thoroughly clean[ed] and disinfect[ed]." (Doc. No. 36-5, at 5). Mr. Clerkly displayed difficulty breathing and quickly died from viral pneumonia soon after he was transported to the hospital. However, Defendants made no representations to the Court that they identified Mr. Clerkly as symptomatic, evaluated him for potential COVID-19 infection, or isolated or treated him for COVID-19 at any point before his transport to the hospital on the day

of his death. What is clear is that Pack Unit did not implement further precautionary measures until three days after Mr. Clerkly's death, when his COVID-19 test came back positive. In the meantime, countless inmates were knowingly exposed to a serious substantial risk of harm.

Defendants argue that they cannot possibly be acting with deliberate indifference because "TDCJ has implemented policies that are in accordance with CDC guidelines, and they have been careful to ensure that those policies are being followed at the Pack Unit." (Doc. No. 36, at 13). It is true that official policies "bear heavily on the inquiry into deliberate indifference." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). But it also matters whether and how the policy is being administered. As discussed, Mr. Clerkly's death has cast doubt on the policy's implementation at Pack Unit. So does unrefuted testimony at the hearing. For instance, the Court heard testimony from Plaintiff King that an inmate janitor receives "maybe a quarter cup of powdered bleach" for a multi-gallon mop bucket. (Tr. 78:8–9). TDCJ's own policy requires a significantly higher concentration: 8 ounces of powdered bleach to 1 gallon of water. (Doc. No. 36-6, at 4). Moreover, the TDCJ cleaning guidance to which the policy refers states that common areas "should be disinfected at least twice a day," that "continuous (i.e., finish and then promptly begin again) disinfection" of hand-contact areas is recommended, and that the mess hall "must be disinfected between the feeding of groups." *See* CMHC Infection Control Policy B-14.26, *Gastrointestinal Illness*, at 7 (Aug. 2019), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection_control_policy_manual/B-14.26.pdf; (Doc. No. 36-6, at 4 (citing CMHC Policy B-14.26 for cleaning recommendations)). As discussed *supra*, these policies are not being adequately implemented.

Indeed, many of the measures ordered in the preliminary injunction largely overlap with TDCJ's COVID-19 policy requirements and recommendations. These include the Court's orders

concerning access to soap, tissues, gloves, masks, regular cleaning, signage and education, quarantine of new prisoners, and social distancing during transport. The current version of TDCJ Policy CMHC B-14.52, effective April 15, 2020, advises that "in settings where social distancing measures are difficult to maintain or in areas of significant community-based transmission," "cloth face coverings" may be used and "should be worn at all times." (Doc. No. 36-6, at 2, 5). It also states that officials should inform inmates of the suspension of copays, emphasize "handwashing and cough etiquette with offenders," including "cover[ing] coughs or sneezes with a tissue, then throw[ing] the tissue in the trash," and place posters with COVID-19 information at "strategic places." (Doc. No. 36-6, at 4, 34). The CMHC policy also requires, in addition to the cleaning measures discussed above, that inmates or staff "thoroughly clean and disinfect all areas where suspected or confirmed COVID-19 cases spent time" while using "gloves and a gown." (Doc. No. 36-6, at 6). The policy's transportation provisions provide that "offender transportation must be curtailed, except for movement that is absolutely required," and requires that when inmates are transported "they must be seated at least 3 feet apart." (Doc. No. 36-6, at 12). The policy also recommends "implementing routine intake quarantine for all new intakes for 14 days before they enter the facility's general population." (Doc. No. 36-6, at 5).

The Court's injunctive relief aims to promote compliance with TDCJ and CDC guidelines, which Defendants themselves treat as the yardstick for reasonableness, based on a record that reflects numerous failures on Defendants' part to meet those guidelines. For instance, the Court's order that inmates be given access to tissue or additional toilet paper is intended to allow compliance with the TDCJ policy that offenders should cough or sneeze into disposable tissues. Currently, inmates at Pack Unit receive no tissues and only one roll of toilet paper each week, leaving them to cough or sneeze into their hands when they run out. (Tr. 65:18–24). Similarly, the

CDC directs that prisons should ensure that "signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision." (Doc. No. 36-8, at 6). The Court heard testimony that an illiterate inmate had asked Plaintiff Valentine to explain the COVID-19 posters to him. (Tr. 68:18–69:6). Inmates who do not take protective measures for lack of understanding present a known substantial risk of serious harm to Pack Unit. The Court's order that Pack Unit staff "give an oral presentation or show an educational video" provides a reasonable measure to abate that risk, where Pack Unit officials so far have taken none. (Doc. No. 40).

To the extent that the Court's order goes beyond TDCJ and CDC policies, it does so only with great care and out of great necessity. The CDC guidelines state, in bold, on the first page: "The guidelines may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." (Doc. No. 36-8, at 1). In Pack Unit, the population consists of geriatric prisoners suffering from comorbidities that render them particularly susceptible to COVID-19. The environment is a dormitory, making social distancing in the living quarters impossible. And the conditions are now exceptionally dire, in that COVID-19 is known to have already entered the facility. Defendants presented no evidence or testimony to suggest that the steps they have taken are sufficient to meet this conflux of challenges facing Pack Unit. In fact, counsel for Defendants agreed that steps beyond those proscribed by the CDC may be needed to adequately protect Pack Unit inmates. (Tr. 109:15–110:2). Plaintiffs' expert, Dr. Young, described the measures taken by Defendants so far as "woefully inadequate" given the special needs of the Unit. (Tr. 95:10).

The Court's order that TDCJ "provide the Plaintiffs and the Court with a detailed plan to test all Pack Unit inmates," (Doc. No. 40, at 4), is a direct and tailored response to the special

vulnerabilities of Pack Unit. Defendants are correct that "deliberate indifference exists wholly independent of an optimal standard of care." *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006). But the Court does not order widespread testing because it is "optimal." The Court orders it because it is necessary for abating a substantial risk of serious harm to Pack Unit inmates. Dr. Gathe testified that because of Pack Unit's high-risk population, the difficulty of social distancing in the dorms, lack of sterilization thus far, and the known introduction of COVID-19, testing of all Pack Unit inmates for the virus is "necessary" in order to (1) isolate infected inmates, (2) provide them timely treatment, and (3) prevent staff from bringing COVID-19 back out into the community. (Tr. 14:6–15:6). Defendants have recently tested some inmates, including the fifty-three people in Mr. Clerkly's dorm. But more testing is essential because, as Dr. Gathe testified: "The [CDC] recommendation [is] to test[] anyone that is at high risk of exposure, and my understanding with the structure and where we are with the Pack Unit, is that each and every person at that institution becomes, by definition, a high-risk person." (Tr. 16:5–9). Defendants know they are working with an extremely high-risk population. Their lack of willingness to take extra measures, including measures as basic as providing hand sanitizer and extra toilet paper, to protect them reflects a deliberate indifference toward their vulnerability.

The Court readily acknowledges that any deliberate indifference inquiry must be sensitive to the expertise and discretion of prison officials, the challenging nature of their jobs, and the "realities of prison administration." *Helling v. McKinney*, 509 U.S. 25, 37 (1993). Furthermore, in times of evolving crisis, officials' understanding of the risks involved will change, and what may seem like reasonable measures to abate the crisis one day, may be revealed as inadequate the next. For this reason, officials may not be held liable "if they responded reasonably to a known risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 826. But for all the deference

26

owed, prison officials must still take reasonable steps to abate known substantial risks of serious harm, especially during a crisis. *Id.* at 847. What is "reasonable" will depend on the crisis.

The day after this Court issued its preliminary injunction in this case, Judge Jon S. Tigar of the Northern District of California declined to issue injunctive relief in *Plata v. Newsom*, No. 4:01-cv-1351 (N.D. Cal. Apr. 17, 2020), citing the reasonable steps taken by the California Department of Corrections and Rehabilitation (CDCR) to prevent the spread of COVID-19 in California prisons. The contrast between that case and Plaintiffs' case is illuminating. The plaintiffs in *Plata* filed suit seeking an order directing the CDCR to develop a plan to prevent the spread of COVID-19 in California prisons. By the time of the preliminary injunction hearing, the CDCR had developed and begun to implement an extensive plan. The measures taken included accelerating the release of 3,500 inmates to reduce prison population, transferring 1,300 inmates out of dorm housing to increase physical separation, sharply reducing transfers between facilities, mass producing hand sanitizer and cloth masks (22,000 per day) for use by staff and inmates, developing detailed protocols for managing symptomatic inmates and staff, disinfecting commonly touched objects between each use, and adjusting inmate housing and activities to increase physical distancing. Order Denying Plaintiffs' Emergency Motion at 6–9, *Plata*, No. 4:01-cv-1351, ECF No. 3291.The plaintiffs' primary concern at the hearing appears to have been that the physical distance between plaintiffs still had not been adequately increased. *Id.* at 9. Judge Tigar held that the CDCR's extensive efforts constituted reasonable measures to abate the risk of COVID-19, though he observed that "no bright line divides a reasonable response from one that is deliberately indifferent in violation of the Eighth Amendment." *Id.* at 14.

Defendants' actions in this case fall on the other side of the line. Although Defendants have taken some steps to address the substantial risk of COVID-19 in Pack Unit, Plaintiffs have made

a showing that a large portion of those steps have fallen short and continue to fall short even of TDCJ and CDC guidelines. Defendants have also declined to provide basic tools to Plaintiffs that would help them keep themselves safer, including adequate cleaning supplies, hand sanitizer, extra toilet paper, and disposable towels. Finally, Defendants have provided no evidence that the steps they have taken are adequate to reasonably address the specific needs of Pack Unit's high-risk population. Testimony from Plaintiffs' medical experts and the fact that an inmate at Pack Unit has died speak to how inadequate those steps have been. The Court concludes that Plaintiffs are likely to establish that their conditions of confinement place them at substantial risk of harm from COVID-19, in violation of their Eighth and Fourteenth Amendment rights, and that Defendants are being deliberately indifferent to their obvious and serious medical and safety needs.

**B. Irreparable Harm**

Plaintiffs allege that they and their proposed class members face irreparable harm because there is a strong likelihood that they will be infected with COVID-19, especially now that COVID-19 has entered Pack Unit, and that because of their medical vulnerabilities, they face a heightened risk of dying or suffering from serious illness and long-term health consequences. Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A harm need not be inevitable or have already happened in order for it to be irreparable; rather, imminent harm is also cognizable harm to merit an injunction. *See Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. . . . [A] remedy for unsafe conditions need not await a tragic event.").

Plaintiffs' alleged harm is both imminent and irreparable. Since this suit was filed, an inmate at Pack Unit has already died from COVID-related causes. Plaintiffs' most serious alleged

28

harm has thus come to pass. There continues to be an imminent harm threatening the inmates at Pack Unit. Mr. Clerkly was living among other inmates at Pack Unit until the morning of his death, thus coming into contact with an unidentified portion of the Unit's population. Defendants have not identified those who came in contact with Mr. Clerkly in the days preceding his death, nor have they tested the Unit's population for COVID-19. Thus, they have no means of isolating those who can transmit the disease from those who have not yet been infected. Without further action to prevent transmission, Plaintiffs certainly face further infection. The population at Pack Unit, a geriatric unit, is overwhelmingly older and sicker than the prison population at large. Defendants have not contested this fact, nor do they contest that COVID-19 is more likely to result in serious illness or death in individuals who are older and have comorbidities. Given that the population at Pack Unit is particularly vulnerable if exposed to COVID-19, and given that COVID-19 has already entered the Unit, Plaintiffs face irreparable harm, in the form of serious illness or death.

An injunction is necessary to prevent these irreparable harms from befalling Defendants. Measures taken by Defendants to keep COVID-19 from spreading throughout Pack Unit would maintain the status quo of Plaintiffs and proposed class members remaining alive and free from serious illness stemming from COVID-19. Because the alleged harm is a high likelihood of serious illness or death, the Court finds that Plaintiffs have properly alleged irreparable harm.

### C. Balancing of Equities and Public Interest

The equities at issue and the public interest weigh in Plaintiffs' favor. Plaintiffs face serious irreparable harm—including severe illness, long-term health effects, and possibly death—if forced to remain in the current conditions at Pack Unit. As discussed *supra*, prisons are particularly susceptible to a rapid spread of the virus within their walls. And Plaintiffs and their proposed class members—many of whom are elderly individuals with co-morbidities—are especially vulnerable

to not only contracting the virus, but indeed having particularly severe cases that may result in death.

Defendant's countervailing contention is that they will suffer an institutional injury because an injunction would "upend[] federalism principles, disregard[] the separation of powers, and thwart[] the State's fundamental prerogative, and Defendants' basic duty as state officials, to maintain safety and security in Texas prisons." (Doc. No. 36, at 30–31). The Court recognizes that states have a strong interest in the administration of their prisons, which is "bound up with state laws, regulations, and procedures." *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)). The Court also appreciates deeply the difficulty of running a prison and that courts are "ill equipped" to undertake the task of prison administration, which is within the province of the legislative and executive branches of government. *Turner v. Safley*, 482 U.S. 78, 84–85 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974)). Courts accordingly should accord deference to prison authorities. *Id.*

Principles of federalism and deference, however, do not erode the core tenet that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. "Because prisoners retain these rights, '[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.'" *Id.* (quoting *Martinez*, 416 U.S. at 405–06). Thus where, as here, prisoners demonstrate a substantial likelihood of proving successfully that Defendants' response to the global pandemic is deliberately indifferent in violation of their constitutional rights, the balance of equities and public interest weigh in favor of granting an injunction to protect those rights. Deference to prison policies must not come at the expense of ensuring that inmates are

afforded a constitutional minimum standard of care, particularly in the face of a rapidly spreading and potentially deadly virus.[3]

Moreover, an injunction will not, as Defendants contend, be "unduly burdensome to Defendants, waste resources, and set a precedent for courts to micro-manage the operations of prisons during a pandemic." (Doc. No. 36, at 33). First, any burden Defendants incur from implementing reasonable measures in response to COVID-19 are outweighed by the significant and irreparable harm to Plaintiffs, particularly when the virus has already breached the prison's walls. *See Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D Ala. 2002) ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants."). This is particularly true where, as here, Defendants have failed to present to the Court any evidence of undue burden by an injunction. Second, Defendants point to no evidence that allows the Court to conclude that implementing reasonable measures to protect Plaintiffs' lives and constitutional rights will waste resources. Indeed, numerous provisions of the Court's injunction are measures that Defendants stated they had implemented but, in reality, have not— for instance, providing masks and gloves for each inmate during janitorial shifts. And to the extent Defendants contend that an injunction contravenes public interest because it would divert

---

[3] The Court notes that the Fifth Circuit recently affirmed the Supreme Court's holding in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), that, "when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *7 (5th Cir. Apr. 7, 2020) (quoting *Jacobson*, 197 U.S. at 31). The curtailment of constitutional rights permitted under *In re Abbott* and *Jacobson*, however, does not apply to the instant case. Critically, Plaintiffs claim not that the State is infringing upon their constitutional rights to combat a public health emergency, but rather that the State is infringing upon their constitutional rights precisely because it is *not* reasonably combatting a public health emergency within Pack Unit. Thus, Plaintiffs' constitutional rights remain protected under the Eighth Amendment's deliberate indifference standard.

resources away from medical professionals, their argument falls flat. Defendants have stated, for instance, that TDCJ is producing its own cloth masks for use by staff and inmates in TDCJ's manufacturing facilities.

Indeed, an injunction will help preserve resources and serve not only Plaintiffs' interests, but also the interests of TDCJ employees, medical staff, and healthcare workers in the community who would need to treat any infected inmates sent to nearby hospitals. Over the past six days, the number of TDCJ employees who have contracted the virus rose from 72 to 183. *See COVID-19 Updates*, TDCJ (Apr. 11, 2020), https://www.tdcj.texas.gov/covid-19/index2.html; *COVID-19 Updates*, TDCJ (Apr. 18, 2020), https://www.tdcj.texas.gov/covid-19/index.html. Failure to take reasonable measures exposes inmates and staff alike to the potentially deadly virus. Additionally, Pack Unit inmates who develop moderate to severe cases of COVID-19 are transported to local hospitals for more intensive care. *See COVID-19 Updates*, TDCJ (Apr. 14, 2020), https://www.tdcj.texas.gov/covid-19/index2.html. Implementing reasonable measures will also prevent an outbreak, which would strain resources at the local hospitals where sick inmates are sent for treatment.

Finally, an injunction will not encroach upon the administration of prisons. The Court deeply appreciates the inordinately difficult undertaking of running a prison and accordingly, the importance of deference to those with expertise in the task. The Court thus acknowledges that, in the face of a global pandemic the likes of which we have not seen in living memory, the response from our nation's leaders and prisons will change along with evolving guidance from medical experts—and so too may the Court's injunction. Recognizing Defendants' familiarity with the administration of Pack Unit in particular, the Court remains open to working with the parties to amend the injunction as the pandemic continues to evolve.

In the end, however, the irreparable harm to Plaintiffs and the public interest in protecting Plaintiffs' constitutional rights, as well as the safety of TDCJ staff and the broader community, tips the balance of equities and public interest decisively in favor of Plaintiffs. The Court thus concludes that the third and fourth factors weigh in favor of granting injunctive relief.

## IV.     <u>CONCLUSION</u>

For the above reasons, the Court finds that Plaintiffs have demonstrated the requirements for issuance of the Court's Preliminary Injunction Order (Doc. No. 40), dated April 16, 2020.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 20th day of April, 2020.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

33