# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| JOHN BALENTINE, TONY FORD, TRAVIS GREEN, RUBEN GUTIERREZ, JOE LUNA, and WILLIAM MASON, individually and on behalf of those similarly situated, <br><br> Plaintiffs, <br><br> BRYAN COLLIER, in his official capacity, LORIE DAVIS, in her official capacity, DANIEL DICKERSON, in his official capacity, and DEFENDANT TEXAS DEPARTMENT OF CRIMINAL JUSTICE, <br><br> Defendants. | Case No. _____ |

## CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs John Balentine, Tony Ford, Travis Green, Ruben Gutierrez, Joe Luna, and William Mason (collectively "Plaintiffs"), on behalf of a class of similarly situated death row prisoners, bring this action to enjoin policies and conduct that threaten their health and safety in violation of the United States Constitution. Plaintiffs are death row prisoners at the Allan B. Polunsky Unit (the "Polunsky Unit"), a facility operated by the Texas Department of Criminal Justice ("TDCJ"). TDCJ and the individual defendants are failing to undertake basic measures to protect the Plaintiffs from the risk of disease and death presented by the novel coronavirus known as SARS-CoV-2019. This failure amounts to deliberate indifference to their health and safety in violation of the Eighth and Fourteenth Amendments, and acute failures for Plaintiffs with disabilities in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. At the same time, TDCJ and the individual defendants are impeding Plaintiffs' ability to consult with legal counsel, imposing arbitrary restrictions on the only practical

means of communication between Plaintiffs and their lawyers.  These restrictions, interfering with the Plaintiffs' ability to communicate meaningfully with counsel, violate the Plaintiffs' rights under the First and Fourteenth Amendments to the Constitution.  Plaintiffs ask this Court to address these violations amid an unprecedented, ongoing threat to Plaintiffs' health and safety.

## STATEMENT OF THE CASE

1.      The spread of the novel coronavirus known as SARS-CoV-2019 presents an extraordinary threat to public health.  Across the world, governments have ordered dramatic measures to prevent the spread of the coronavirus and to address the effects of Coronavirus Disease 2019 ("COVID-19").  The governments have ordered these measures at enormous social and economic cost because these drastic measures are compelled by the contagious nature of the coronavirus and the lethal nature of COVID-19.  This is truly an unprecedented health crisis.

2.      The threat of COVID-19 poses special risks for the incarcerated.  Unlike the rest of society, prisoners like the Plaintiffs are unable to limit their exposure to COVID-19 by exercising social distancing, wearing face masks when social distancing is impossible, washing hands regularly with soap and water, using hand sanitizer when hand-washing is not possible, and systematically cleaning the areas they contact throughout the day.  Instead, Plaintiffs must rely on Defendants to develop and implement policies that will safeguard each of them individually from infectious disease.  At a time when the entire world is working to prevent the spread of the novel coronavirus, Plaintiffs are essentially at the mercy of corrections personnel to protect them from COVID-19.

3.      These risks are heightened for condemned prisoners at the Polunsky Unit.  A disproportionate number (approximately 35%) are over the age of 50.  Because of the conditions on death row, those who entered with physical ailments have only declined; those who entered

healthy are, by and large, no longer so. Moreover, there are a significant number of severely mentally ill and intellectually disabled prisoners, who are at particular risk because of their inability to understand signage, directions, or to maintain even the most basic self-care. This is the case for prisoners like Plaintiffs and similarly-situated condemned prisoners who are incarcerated in maximum-security conditions at the Polunsky Unit.

4.     TDCJ and other Defendants are failing to undertake the basic measures recommended by the CDC to protect the health of Plaintiffs. Defendants have not developed and do not adequately enforce policies that will prevent the spread of COVID-19 within the Polunsky Unit. Corrections officers and other personnel are not consistently using personal protective equipment ("PPE") in their interactions with Plaintiffs. Plaintiffs do not receive adequate supplies for personal hygiene in light of the heightened risk of disease. Nor do they receive adequate supplies for maintaining safe conditions in their cells. Defendants do not have a reasonable plan for addressing the treatment of Plaintiffs or any death row prisoners who contract COVID-19. Nor do Defendants have a plan for confining the disease in the event it infects the Polunsky Unit. Defendants are also failing to take reasonable measures to educate Plaintiffs about COVID-19 and how to mitigate the risk of contracting the disease. Defendants' failure to address the threat that SARS-CoV-2019 poses to Plaintiffs in this global health crisis falls short of basic, minimum standards. This failure amounts to deliberate indifference to the health and safety of the Plaintiffs in their custody.

5.     At the same time Defendants have failed to implement reasonable protections for Plaintiffs' health, Defendants have imposed highly restrictive and arbitrary policies governing communications with counsel. With the outbreak of COVID-19, it has become impossible for Plaintiffs to meet with their counsel. Rather than accommodating this problem, Defendants have

systematically restricted access to counsel for Plaintiffs by limiting the only current means of attorney-client communication (telephone calls) to "critical" circumstances, and then only to specific individuals on the legal team. The effect of Defendants' policies and their arbitrary implementation has been to impede Plaintiffs' access to counsel and counsel's access to their clients.

6. As a result of the foregoing actions and failures to act, Defendants have violated Plaintiffs' rights under the First, Eighth and Fourteenth Amendments to the United States Constitution and the Americans with Disabilities Act ("ADA").

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

8. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

### A. Plaintiffs

9. John Balentine is 51 years old and currently incarcerated at the Polunsky Unit, where he is at risk of death or serious injury if exposed to COVID-19.

10. Tony Ford is 46 years old and currently incarcerated at the Polunsky Unit, where he is at risk of death or serious injury if exposed to COVID-19.

11. Travis Green is 52 years old and currently incarcerated at the Polunsky Unit, where he is at risk of death or serious injury if exposed to COVID-19.

12. Ruben Gutierrez is 42 years old and currently incarcerated at the Polunsky Unit, where he is at risk of death or serious injury if exposed to COVID-19.

13.     Joe Luna is 40 years old and currently incarcerated at the Polunsky Unit, where he is at risk of death or serious injury if exposed to COVID-19.

14.     William Mason is 66 years old and currently incarcerated at the Polunsky Unit, where he is at risk of death or serious injury if exposed to COVID-19.

### B.     Defendants

15.     Defendant Texas Department of Criminal Justice ("TDCJ") is an agency of the State of Texas and responsible for criminal justice for adult prisoners, including managing prisoners in state prisons, state jails, and private correctional facilities.  Tex. Gov't Code § 493.004.  At all relevant times, TDCJ operated the Polunsky Unit, a maximum-security prison located near Livingston, in unincorporated Polk County, Texas.  Polunsky Unit houses the State of Texas death row for male prisoners, where Plaintiffs reside.  TDCJ's headquarters is located in Huntsville, in Walker County, within the Southern District, Houston Division.

16.     Defendant Bryan Collier is the executive director of TDCJ and works at TDCJ's Huntsville office.  As executive director, Mr. Collier is responsible for overseeing the various departments and divisions of TDCJ, including but not limited to, the Administrative Review & Risk Management Division, Emergency Action Center and Office of Emergency Management, and Health Services Division.  The executive director is responsible for the administration and enforcement of all laws relating to TDCJ, including rules implemented by TDCJ.  *Id*. § 493.006. Moreover, Mr. Collier is responsible for protecting the constitutional rights of all persons held in TDCJ custody.  At all times described herein, Mr. Collier was acting under color of state law.  He is being sued in his official capacity for declaratory and injunctive relief.

17.     Collectively, Mr. Collier and TDCJ with its various divisions and departments are responsible for "the care and custody of nearly 147,000 offenders," including the men incarcerated within the Polunsky Unit.[1]

18.     The mission of TDCJ's Administrative Review & Risk Management Division ("ARRM") is to "promote excellence in correctional practice through policy development, monitoring, identifying areas of potential risk or liability, and facilitating action to maintain safety, accountability, efficiency and professionalism."[2]  ARRM is comprised of various departments in order to fulfill its mission.  The departments of ARRM include the Review & Standards Department and the Monitoring & Standards Department.  On information and belief, ARRM and all related departments are located in TDCJ's headquarters, located in Huntsville, in Walker County, within the Southern District, Houston Division.

19.     On information and belief, AARM and its departments work with prisons, like the Polunsky Unit, to monitor and implement TDCJ policies, including new policies that may arise due to unique circumstances, such as the COVID-19 pandemic.  Within AARM, the Review & Standards Department is tasked with managing "risks affecting people, property and liability, and monitor[ing] adherence to rules, regulations, policies and correctional practices required for certification by the American Correctional Association, which focus on public safety, humane treatment of offenders and the effective operation of correctional units."[3]  On information and

---

[1] TDCJ Executive Director Biography, https://www.tdcj.texas.gov/divisions/es/exec_bio_exec_dir.html  (last visited Apr. 27, 2020).

[2] Administrative Review & Risk Management Division, https://www.tdcj.texas.gov/divisions/arrm/index.html  (last visited Apr. 27, 2020).

[3] TDCJ Administrative Review & Risk Management Division Review & Standards, https://www.tdcj.texas.gov/divisions/arrm/rev_stan.html (last visited Apr. 27, 2020).

belief, the Review & Standards Department monitors the implementation of rules, regulations, policies and correctional practices at the Polunsky Unit.

20.     The Monitoring & Standard Department of AARM is tasked with monitoring TDCJ facilities, like the Polunsky Unit, to ensure that "operations are in accordance with agency policies and procedures, court orders, and nationally accepted standard established by the American Correctional Association."[4]

21.     In order to streamline communication within TDCJ, the Emergency Action Center ("EAC") is tasked with coordination among the Texas Board of Criminal Justice, the various TDCJ units and departments and administrative staff to "report serious and unusual incidents."[5]  On information and belief, the EAC coordinated with units like the Polunsky Unit to respond to the spread of COVID-19 and such coordination occurred in TDCJ's headquarters, located in Huntsville, in Walker County, within the Southern District, Houston Division.

22.     The Health Services Division is authorized to "ensure access to care, monitor quality of care, investigate medical grievances, and conduct operational review audits of health care services at TDCJ facilities."[6]  On information and belief, the Health Services Division is tasked with monitoring quality of care related to COVID-19 at units, such as the Polunsky Unit.  The Health Services Division is located at TDCJ's headquarters, located in Huntsville, in Walker County within the Southern District, Houston Division.

---

[4] TDCJ Administrative Review & Risk Management Division Monitoring & Standards, https://www.tdcj.texas.gov/divisions/arrm/rev_mon_stan.html (last visited Apr. 27 2020).

[5] TDCJ Emergency Action Center (EAC), https://www.tdcj.texas.gov/divisions/es/exec_eac.html (last visited Apr. 27 2020).

[6] TDCJ Health Services Division, https://www.tdcj.texas.gov/divisions/hsd/index.html (last visited Apr. 27 2020).

23.     On information and belief, TDCJ and Mr. Collier consented to, have knowledge of, have materially participated in, and/or have controlled the activities of various divisions of TDCJ related to the COVID-19 pandemic, including but not limited to the Administrative Review & Risk Management Division, Emergency Action Center and Office of Emergency Management, and Health Services Division.

24.     Defendant Lorie Davis is the Director of the Correctional Institutions Division of TDCJ and works at TDCJ's Huntsville office.  The Correctional Institutions Division manages and oversees state prisons, state jails, and TDCJ medical facilities.  As director, Ms. Davis is responsible for the confinement, supervision, and rehabilitation of adult felony offenders and the management of correctional facilities in accordance with constitutional and statutory standards.  At all times described herein, Ms. Davis was acting under color of state law.  She is being sued in her official capacity for declaratory and injunctive relief.

25.     Defendant Daniel Dickerson is the warden of the Polunsky Unit.  At all times described herein, he was acting under the color of state law.  On information and belief, as the warden of the Polunsky Unit, Mr. Dickerson is responsible for coordinating with Mr. Collier, Ms. Davis, and the relevant divisions of TDCJ to ensure that the conditions of confinement at the Polunsky Unit are constitutional.  He is being sued in his official capacity for declaratory and injunctive relief.

## FACTS BACKGROUND

### A.     COVID-19 is a Deadly Pandemic and a Public Health Emergency

26.     Since the end of 2019, the novel coronavirus has spread throughout the world and has now caused a global pandemic.  COVID-19 is a disease caused by the highly communicable

respiratory virus that spreads through close contact and common surfaces containing the virus. People of all ages are at risk of serious injury and death from COVID-19.[7]

27. On January 21, 2020, the first confirmed COVID-19 case was diagnosed in the United States.[8]

28. On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "Public Health Emergency of International Concern" as cases had been "reported in five WHO regions in one month."[9]

29. The next day, the U.S. Secretary of Health and Human Services declared under Section 319 of the Public Health Service Act (42 U.S.C. § 247d) that COVID-19 "present[s] a Public Health Emergency in the United States."[10]

30. On February 28, 2020, the United States saw its first COVID-19 death.[11]

31. On March 11, 2020, the World Health Organization announced "that the COVID-19 outbreak can be characterized as a pandemic," as the rates of infection continued to rise throughout the world.[12]

---

[7] CDC, Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020 (March 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w (last visited Apr. 27 2020).

[8] Derrick Bryson Taylor, *A Timeline of the Coronavirus*, N.Y. Times, Apr. 21, 2020, https://www.nytimes.com/article/coronavirus-timeline.html.

[9] WHO, *Public Health Emergency of International Concern declared* (Jan. 30, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (The WHO's Emergency Committee "noted that early detection, isolating and treating cases, contact tracing and social distancing measures – in line with the level of risk – can all work to interrupt virus spread").

[10] Secretary Azar Delivers Remarks on Declaration of Public Health Emergency for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/leadership/secretary/speeches/2020-speeches/secretary-azar-delivers-remarks-on- declaration-of-public-health-emergency-2019-novel-coronavirus.html.

[11] Derrick Bryson Taylor, *A Timeline of the Coronavirus*, N.Y. Times, Apr. 21, 2020, https://www.nytimes.com/article/coronavirus-timeline.html.

[12] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-

32.     On March 13, 2020, Texas Governor Greg Abbott announced that "COVID-19 poses an imminent threat of disaster" and, under Section 418.014 of the Texas Government Code, declared "a state of disaster for all counties in Texas."[13]  At a press conference announcing the disaster declaration, Governor Abbott directed state agencies to restrict visitations at Texas prisons, jails, and juvenile justice facilities.[14]  TDCJ suspended visitations the same day.[15]

33.     Subsequently, the Texas Department of State Health Services determined on March 19, 2020 that "COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code."[16]  The same day, Governor Abbott issued Executive Order GA08, which provides in part that "every person in Texas shall avoid social gatherings in groups of more than 10 people."[17]

---

national-emergency- concerning-novel-coronavirus-disease-covid-19-outbreak/; *see also* WHO, WHO *Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 ("WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic.  Pandemic is not a word to use lightly or carelessly.  It is a word that, if misused, can cause unreasonable fear, or unjustified acceptance that the fight is over, leading to unnecessary suffering and death.").

[13] Office of the Texas Governor, Governor Abbott Declares State of Disaster In Texas Due To COVID-19 (Mar. 13, 2020), https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19.

[14] Jolie McCullough, *Texas Prisons, Youth Lockups Cancel Visitation After Coronavirus Disaster Declaration*, Texas Tribune, March 13, 2020, https://www.texastribune.org/2020/03/13/texas-prisons-cancel-visitation-coronavirus/.

[15] COVID-19 TDCJ Update, Procedures Implemented in Response to COVID-19 (March 11, 2020), https://www.tdcj.texas.gov/covid-19/index2.html.

[16] *See* Executive Order GA 08 Relating to COVID-19 preparedness and mitigation (Mar. 19, 2020), https://gov.texas.gov/uploads/files/press/EO-GA_08_COVID-19_preparedness_and_mitigation_FINAL_03-19-2020_1.pdf.

[17] *Id.*

34.     On March 19, 2020 Polk County (where the Polunsky Unit is located) issued an Executive Order, which requires "individuals currently living within Polk County … to remain at a place of residence" in accordance with Government Code Section 418.108(h).[18]

35.     On March 30, 2020, Governor Abbott issued Executive Order GA14, which instructs Texans to "minimize social gatherings and minimize in-person contact with people who are not in the same household."[19]

36.     The World Health Organization ("WHO") estimates that as of May 1, 2020, there are 3,175,207 confirmed cases and 224,172 confirmed deaths, and 203 countries, areas, or territories with confirmed cases.[20]

37.     In the United States, the Centers for Disease Control and Prevention ("CDC") estimates that as of April 30, 2020, there are 1,031,659 confirmed cases and 60,057 confirmed deaths in all 50 states and the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands.[21]

38.     As April 28, 2020, the Texas Department of Health Services reported 28,087 cases of COVID-19 with 782 deaths.[22]

---

[18] Polk County Executive Order, Order to Stay at Home Amended and Extended (Apr. 2, 2020), https://www.co.polk.tx.us/upload/page/3552/Polk County Executive Order - Order to Stay Home Amended and Extended 4-2-2020.pdf.

[19] Executive Order GA 14 Relating to statewide continuity of essential services and activities during the COVID-19 disaster (March 31, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-14_Statewide_Essential_Service_and_Activity_COVID-19_IMAGE_03-31-2020.pdf.

[20] *See* WHO, Coronavirus disease (COVID-19) Pandemic (May 1, 2020, 2:00 AM EST), https://covid19.who.int.

[21] *See* CDC, Cases in U.S. (April 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[22] Texas Case Counts, COVID-19, Texas Department of State and Health Services (Apr. 30, 2020 4:15 PM), https://dshs.texas.gov/coronavirus/cases/.

39.     Due to the highly contagious nature of COVID-19, despite widespread "shelter in place" orders throughout the United States, the rate of COVID-19 infections has grown, and continues to grow, exponentially.[23]

**B.     COVID-19 is Easily Transmissible and Spreads Rapidly in a Prison Environment**

40.     COVID-19 is a particularly contagious disease. A recent study showed that the virus can survive for up to three hours in the air and longer on certain surfaces: four hours on copper, twenty-four hours on cardboard, and two to three days on plastic and stainless steel—surfaces the prisoners at the Polunsky Unit come into contact with every day.[24]

41.     COVID-19 has been especially dangerous in areas of close confinement and has spread rapidly in jails and prisons.  Jails and prisons are at an even greater risk because of their close quarters and communal living spaces.[25]

42.     A study of an early cluster of COVID-19 cases in Wuhan, China, revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces.[26]

---

[23] *See Coronavirus in the U.S.: Latest Map and Case Count,* N.Y. Times, May 1, 2020 8:43 AM EST, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[24] Marilynn Marchione, *Test show new virus lives on some surfaces for up to 3 days,* Associated Press, Mar. 11, 2020, https://apnews.com/fe0239e95b8ad1037639ed833b990e48/.

[25] Evelyn Cheng and Huileng Tan, *China Says More than 500 Cases of the New Coronavirus Stemmed from Prisons*, CNBC, Feb. 20, 2020, https://www.cnbc.com/2020/02/21/coronavirus-china-says-two-prisons-reported-nearly-250-cases.html.

[26] Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect Virus Transmission in Cluster of COVID-19 cases, Wenzhou, China, 2020.* 26 Emerg Infect Dis. 6, June 2020, https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article.

43.     In Jining, China, 207 individuals in a correctional facility contracted COVID-19 after a prison officer contracted it outside of the facility and then came to work while he was asymptomatic.[27]

44.     Prisons throughout the United States have suffered widespread outbreaks.  In New York City, the first case of COVID-19 infection in a jail detainee was diagnosed on March 18, 2020.  Within four week, 650 cases had been diagnosed with five deaths at the Rikers Island Correctional Complex.[28]  The Marion Correctional Institution in Ohio was the largest source of reported infections in the United States on April 20, 2020.  Nearly 75 percent of prisoners at the prison tested positive for COVID-19.[29]

45.     COVID-19 has also spread to death row cell blocks in certain prisons.  For example, in Arizona four prisoners on death row tested positive for COVID-19 and another five exhibited symptoms, and one has died from COVID-19.[30]

46.     Several prisons throughout Texas have also experienced significant outbreaks of COVID-19 and the number of prisoners testing positive continues to skyrocket.[31]  TDCJ reported

---

[27]Elizabeth Law, *New Clusters of the Virus are Found in China's Prisons*, The Straits Times, Feb. 22, 2020, https://www.straitstimes.com/asia/east-asia/new-virus-clusters-in-chinese-prisons.

[28]  Zak Cheney-Rice, *Rikers Reports Its First COVID-Related Prisoner Death*, New York Mag, Apr. 6, 2020, https://nymag.com/intelligencer/2020/04/rikers-island-reports-its-first-covid-related-prisoner-death.html.

[29]  Bill Chappell, *73% Of Inmates At An Ohio Prison Test Positive For Coronavirus*, NPR, Apr. 20, 2020, https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

[30]  Arizona Republic, *Lawyer: 4 Arizona Death Row Inmates Test Positive for Coronavirus*, AZ Central, Apr. 23, 2020, https://www.azcentral.com/story/news/local/arizona-breaking/2020/04/23/lawyer-4-arizona-death-row-inmates-test-positive-coronavirus/3017448001/; Associated Press, *Another Arizona Death Row Inmate Dies From Coronavirus*, KNAU, https://www.knau.org/post/another-arizona-death-row-inmate-dies-coronavirus.

[31]Scott Gordon, *COVID-19 Cases Nearly Quadruple Inside Fort Worth Federal Medical Prison*, Apr. 23, 2020, https://www.nbcdfw.com/news/coronavirus/covid-19-cases-quadruple-to-132-at-fort-worth-federal-prison/2356912/; Gary Bass, *TDCJ's Beto Unit in Palestine Now up to 128 Confirmed COVID-19 Cases*, Apr. 24, 2020, https://www.kltv.com/2020/04/24/tdcjs-beto-unit-palestine-now-up-confirmed-covid-cases/.

on April 30, 2020 that 1118 prisoners have tested positive for COVID-19.[32]  A further 19,800 prisoners are on medical restriction because they were exposed to COVID-19.[33]  TDCJ also reported that 394 employees, staff, or contractors had contracted COVID-19.[34]  TDCJ is also investigating the death of a 53-year-old employee who worked at the Middleton Unit due to the virus.[35]

48. These outbreaks have already proven fatal.  As of April 30, 2020, 16 prisoners have died as a result of COVID-19.[36]  Moreover, several TDCJ employees have also succumbed to COVID-19.[37]

48. Controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—transmission of the virus by people who are contagious but who exhibit limited or no symptoms.  The prominence of asymptomatic carriers renders ineffective any screening tools dependent on identifying symptomatic behavior.[38]  Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Disease, stated that "somewhere between 25% and 50%" of people infected with the new coronavirus may never show

---

[32] COVID-19 TDCJ Update (April 29, 2020), https://www.tdcj.texas.gov/covid-19/index2.html ; TDCJ Offender Population (Apr. 30, 2020 5:00 PM), https://www.tdcj.texas.gov/covid-19/offender_mac.html.

[33] TDCJ Offender Population (Apr. 30, 2020 5:00 PM), https://www.tdcj.texas.gov/covid-19/offender_mac.html.

[34] *Id.*

[35] COVID-19 TDCJ Update (April 29, 2020), https://www.tdcj.texas.gov/covid-19/index2.html.

[36] TDCJ Offender Population (Apr. 30, 2020 5:00 PM), https://www.tdcj.texas.gov/covid-19/offender_mac.html

[37] COVID-19 TDCJ Update (April 29, 2020), https://www.tdcj.texas.gov/covid-19/index2.html.

[38] Chelsea Ritschel, *Coronavirus: Are People Who Are Asymptomatic Still Capable of Spreading COVID-19?* Independent, Mar. 15, 2020, https://www.independent.co.uk/life-style/health-and-families/coronavirus-symptomsasymptomatic-covid-19spread-virus-a9403311.html.

symptoms or fall ill.[39]  These asymptomatic carriers can still spread the virus to others.  In addition, there has been a shortage of tests for COVID-19 in the United States since the outbreak began.[40]  As a result, testing thus far has primarily been limited to those with serious symptoms.

49.     Evidence suggests that "symptom-based screening alone failed to detect a high proportion of infectious cases and was not enough to control transmission" in enclosed locations such as nursing homes, prisons, and shelters.[41]

50.     The actual numbers of infected prisoners in Texas is likely much higher than reported because so many who have contracted the disease are asymptomatic.  Testing of prisoners in four states—Arkansas, North Carolina, Ohio, and Virginia—shows that 96 percent of prisoners with COVID-19 are asymptomatic.[42]

51.     Some states and the federal Bureau of Prisons have enacted or announced widespread testing of prisoners in an effort to control the spread of coronavirus.[43]  TDCJ began "surveillance testing" of prisoners who have been exposed to COVID-19, but are not ill at certain facilities.[44]

---

[39] Aylin Woodward, *'Between 25% and 50%' of People Who Get the Coronavirus May Show No Symptoms, Fauci Says. Here's the Latest Research on Asymptomatic Carriers,* Business Insider, https://www.businessinsider.com/coronavirus-carriers-transmit-without-symptoms-what-to-know-2020-4.

[40] German Lopez, *Why America Is Still Failing On Coronavirus Testing*, Vox, April 10, 2020, https://www.vox.com/2020/4/10/21214218/trump-coronavirus-testing-social-distancing.

[41] M. Gandhi, D. Yokoe, D. Havlir, *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19*, New England J. of Med., https://www.nejm.org/doi/full/10.1056/NEJMe2009758.

[42] Linda So and Grant Smith, *In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive for Coronavirus -- 96% Without Symptoms*, Reuters, Apr. 25, 2020, https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-us-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX.

[43] Kevin Johnson, *Mass Virus Testing in State Prisons Reveals Hidden Asymptomatic Infections; Feds Join Effort*, USA Today, Apr. 25, 2020, https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/.

[44] *Coronavirus In Texas: Prisons Will Increase Testing; State Files Price Gouging Lawsuit Over Egg Prices*, Texas Tribune, Apr. 23, 2020, https://www.texastribune.org/2020/04/23/coronavirus-in-texas/.

Based on information and belief, no such surveillance testing is currently being conducted at the Polunsky Unit.

### C. COVID-19 Poses a High Risk of Serious Illness and Death to Older Adults and Persons With Underlying Medical Conditions

52.      COVID-19 is more likely to cause serious illness and death for older adults and those with underlying medical conditions, such as lung disease, heart disease, chronic liver or kidney conditions, diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and pregnancy.  According to the CDC, nearly 90 percent of hospitalized COVID-19 patients in March 2020 had at least one underlying condition.[45]  These underlying medical conditions increase the risk of serious COVID-19 illness and death for people of any age.  More than 20% of the Texas prison population is over the age of 50 and, thus, most at-risk for serious illness or death due to COVID-19.[46]  This percentage is higher for men living on death row: approximately 73 (35%) of the condemned prisoners at the Polunsky Unit, including several of the Plaintiffs in this action, are over the age of 50.[47]

53.      For people over the age of 50 or with medical conditions that increase the risk of serious COVID-19 disease, symptoms such as fever, coughing, and shortness of breath can be especially severe.

---

[45]Shikha Garg, MD *et al*, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*, Morbidity & Mortality Weekly Report, Apr. 17, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

[46]Jessica Priest, *Coronavirus in Texas: Prison Population at Risk of Outbreak*, Statesman, March 14, 2020, https://www.statesman.com/news/20200314/coronavirus-in-texas-prison-population-at-risk-of-outbreak.

[47] *See* TDCJ, Death Row Information (March 6, 2020), https://www.tdcj.texas.gov/death_row/dr_offenders_on_dr.html.

54.     It is estimated that 60 percent of all Americans have at least one chronic health condition, and 40 percent have more than one.[48]   The Department of Justice has estimated that "half of state and federal prisoners and local jail prisoners reported ever having a chronic condition," and "[t]wenty-one percent of prisoners … reported ever having an infectious disease."[49]   The incidents of serious health conditions is only greater among those on death row, not only because of the physical conditions, but also because of the significant psychological toll of the environment.[50]

55.     COVID-19 disease can cause lung, heart, kidney, intestinal, liver, and brain damage. Recent evidence indicates that COVID-19 can also cause sometimes fatal blood clots to develop in patients.[51]

56.     High risk individuals who develop serious symptoms will likely require hospitalization and many will require intensive treatment, including ventilator assistance, and a team of care providers in a 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.  That level of support can quickly exceed local health care resources.

---

[48] Roni Caryn Rabin, *Coronavirus Threatens Americans With Underlying Conditions*, N.Y. Times, March 14, 2020, https://www.nytimes.com/2020/03/12/health/coronavirus-midlife-conditions.html.

[49] Laura Maruschak, Marcus Berzofsky and Jennifer Unangst, *Medical Problems Of State And Federal Prisons And Jail Inmates, 2011-12*  U.S. Dep't Of Justice, Bureau Of Justice Statistics, Oct. 4, 2016, https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[50] *See, e.g*., Univ. of Tex. Sch. of Law Human Rights Clinic*, Designed to Break You: Human Rights Violations on Texas' Death Row*, Apr. 2017, https://law.utexas.edu/wp-content/uploads/sites/11/2017/04/2017-HRC-DesignedToBreakYou-Report.pdf.

[51] Ariana Eunjung Cha, *A Mysterious Blood-clotting Complication Is Killing Coronavirus Patients,* Washington Post, Apr. 22, 2020, ://www.washingtonpost.com/health/2020/04/22/coronavirus-blood-clots/; Lenny Bernstein, Carolyn Johnson, Sarah Kaplan and Laurie McGinley, *Coronavirus Destroys Lungs.,* Washington Post, Apr. 14, 2020, https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html.

57.     Patients who survive serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from cardiovascular damage, neurologic damage, and diminished respiratory capacity.[52]

58.     The only known, effective measures to reduce the risk of vulnerable people to serious illness or death caused by COVID-19 are aggressive social distancing and heightened attention to hygiene and disinfection.  Yet consistent social distancing at the Polunsky Unit is impossible, as prisoners must be accompanied by guards whenever they leave their cells.  The inadequate and limited measures issued by Defendants are ineffectual in the face of this virus—and only more so given their arbitrary application.

**D.      CDC Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities**

59.     On March 23, 2020, the CDC published guidance for correctional and detention facilities to prepare for and protect prisoners and personnel from the COVID-19 pandemic.[53]  The CDC recommends the following for virus transmission prevention:

- Facilities should ensure availability of sufficient stocks of hygiene supplies, cleaning supplies, personal protective equipment ("PPE"), and medical supplies (consistent with the healthcare capabilities of the facility).

  - This includes liquid soap, alcohol-based hand sanitizer containing at least 60% alcohol, recommended PPE including facemasks and gloves, and supplies for testing, such as sterile viral transport media and sterile swabs. Facilities should make contingency plans in the event of PPE shortages.

- Facilities should provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.

---

[52] *It's not just lungs: Covid-19 may damage the heart, brain, and kidneys*, Advisory Board, Apr. 17, 2020, https://www.advisory.com/daily-briefing/2020/04/17/organ-damage.

[53] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

- Facilities should provide alcohol-based hand sanitizer containing at least 60% alcohol.

- Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response, including cleaning and disinfecting frequently touched surfaces several times per day.

- Facilities should encourage all persons in the facility to protect themselves by practicing good cough etiquette and good hand hygiene and avoiding touching of the eyes, nose, or mouth.

- Facilities should encourage these behaviors by posting signage throughout the facility and communicating the information verbally on a regular basis. Facilities should implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).

  - This should include enforcing increased space between individuals in holding cells and waiting areas, staggering time in recreation spaces, staggering meals and rearranging seating in the dining hall to increase space between individuals, liming the size of group activities, and rearranging housing spaces to increase space between individuals.

- Facilities should be providing prisoners with information and consistent updates about COVID-19 and its symptoms.

### E. TDCJ Has Failed to Adopt Adequate Polices in Response to the COVID-19 Pandemic

60.    Despite the CDC's robust guidelines for correctional and detention facilities, TDCJ's adoption and implementation of policies in response to the COVID-19 pandemic are inadequate and do not comport with many of the CDC's recommendations.  Indeed, although the CDC has issued a specific Guidance on Management of COVID-19 in Correctional Facilities, TDCJ's policy does not directly cite this Guidance in its references section, instead citing only the CDC Guidance for the healthcare setting and for clinical management of patients with confirmed disease.

61.    For example, the CDC recommends "the posting of signage throughout the facility" that communicates not only hand hygiene instructions, cough etiquette, and symptoms of COVID-19, but also instructs prisoners to "report symptoms to staff."[54]  The CDC further recommends that

---

[54] *Id.*

"signage is understandable for non-English speaking persons and those with low literacy, and [that facilities] make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision."[55]  By contrast, TDCJ's policy on signage only requires that signs be posted at entrances in the medical department or any "other strategic places" to provide instructions on hand hygiene, cough etiquette, symptoms of COVID-19, and warning for high risk visitors.[56]  TDCJ's signage policy does not comport with the CDC's recommendation because it is not posted throughout the facility and fails to include instructions for prisoners to report symptoms to staff, and it does not acknowledge the requirement for signage to be understandable for non-English speaking persons, those with low literacy, those with intellectual disabilities, and those who are deaf, blind, and low-vision.

62.     As another example, the CDC recommends considering "relaxing restrictions on allowing alcohol-based sanitizer in the secure setting where security concerns allow."[57]  TDCJ's policy acknowledges that hand sanitizer is "used to prevent the spread of any respiratory virus" and that it should be carried by staff "and used whenever there is concern that hands have been contaminated."[58]  However, TDCJ still mandates that prisoners "must not have access to the waterless hand rub but must wash hands with soap and water instead."[59]  But as TDCJ's own

---

[55] *Id.*.

[56] CMHC *Infection Control Manual, No. B-14.52, Coronavirus Disease 2019 (COVID-19)* (Apr. 2, 2020), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection_control_policy_manual/B-14.52.pdf

[57]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities.*

[58] CMHC I*nfection Control Manual, No. B-14.52, Coronavirus Disease 2019 (COVID-19).*

[59] *Id.*

policies acknowledge, this is not always practical, and thus prisoners are at an increased risk of contracting and spreading COVID-19.

63.     The CDC also recommends that correctional facilities "[r]estrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding."[60]  In contrast to the specific instruction to restrict transfers to the limited circumstances where it is absolutely necessary, TDCJ's policy only requires facilities to "[m]inimize transfer of offenders between units."[61]   This general guideline is insufficient to properly reduce the risk to the prisoner population.

64.     In addition to being inadequate, some of TDCJ's policies are impossibly vague. Despite the CDC's robust guidelines for correctional and detention facilities, TDCJ has adopted bare-bones policies with vague guidance on preventing and managing a COVID-19 outbreak.  For example, the CDC guidance explains that, while difficult, social distancing "is a cornerstone of reducing transmission of respiratory diseases such as COVID-19."[62]   The CDC then provides examples of steps that can be taken in prisons and jails.[63] TDCJ's policy, in contrast, states only that units should "[p]ractice social distancing and avoid gatherings and meetings."[64]  However, the policy's further reference to "teleconference or video conference" implies this policy is aimed at

---

[60]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities*.

[61] CMHC *Infection Control Manual, No. 5-14.52, Coronavirus Disease 2019 (COVID-19)*.

[62]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities*.

[63] *Id*.

[64] CMHC *Infection Control Manual, No. 5-14.52, Coronavirus Disease 2019 (COVID-19)*.

reducing risk to prison staff, not prisoners directly.[65]  Moreover, consistent social distancing is simply not possible on death row.

65.     The CDC's interim guidelines are intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities.  That these staff administrators at the Polunsky Unit are likely not public health experts underscores the importance of having a clear and unambiguous policy that hews strictly to the CDC's interim guidelines.  It is not acceptable to defer to non-medical staff's judgment in these circumstances, especially in light of a novel pandemic.

66.     Currently, TDCJ's COVID-19 policy is inadequate and fails to include key CDC recommendations that are necessary to effectively prevent and manage a COVID-19 outbreak.  For example, TDCJ's policy does not include the following key CDC recommendations:

- Facilities should "[p]rovide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing."

- Facilities should "[p]rovide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions."

- Facilities should ensure "[s]taff performing temperature checks on any group of people" are required to wear face mask, eye protection, gloves, and gowns/coveralls.

- Facilities should "[c]ommunicate with the public about any changes to facility operations, including visitation programs."[66]

67.     Correctional facilities across the country are now seeing the ramifications of an inadequate response.

_____

[65] *Id.*

[66]  CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities.*

68.     According to the *New York Times*, "more than 16,000 infections in state prison systems, including almost 12,000 inmates who have tested positive.  More than 130 inmates have died."[67] "Nearly every state prison system has at least one infection among either prisoners or staff, suggesting that the problem will become significantly larger during the next several weeks."[68] Another report indicated that continued failures to make prison and jails safe would double the coronavirus death count in the U.S.[69]

69.     As of April 26, 2020, Marion Correctional Institution, a state prison in Marion, Ohio, has 2,191 confirmed cases of COVID-19, which is reported to be the largest single source of coronavirus infections in the United States.[70]

70.     According to the *New York Times*, some facilities have refused to release the numbers of cases or deaths.[71]

71.     Unfortunately, the coronavirus outbreak has already reached TDCJ facilities.  As of the date of this filing, it was reported that TDCJ had 950 inmates in TDCJ prisons had tested positive and 12 prisoners had died as a result of complications from the coronavirus.[72] Though the Polunsky

---

[67] *Prisons have been overwhelmed by the virus*, N.Y. Times, May 1, 2020 8:43 AM EST, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[68] *Id.*

[69] ACLU, *COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails*, https://www.houstonpublicmedia.org/app/plugins/pdfjs-viewer-shortcode/pdfjs/web/viewer.php?file=https%3A%2F%2Fcdn.hpm.io%2Fwp-content%2Fuploads%2F2020%2F04%2F23162112%2Faclu_covid19-jail-report_2020-8_1-1.pdf&dButton=true&pButton=true&oButton=false&v=1.4.6.

[70] *In America's nursing homes, outbreaks surge*, N.Y. Times, May 1, 2020 8:43 AM EST, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[71]*Id.*

[72] Gary Bass, *TDCJ's Beto Unit in Palestine Now up to 128 Confirmed COVID-19 Cases*, Apr. 24, 2020, https://www.kltv.com/2020/04/24/tdcjs-beto-unit-palestine-now-up-confirmed-covid-cases/.

unit has reported no confirmed prisoner cases *yet*, at least three employees have tested positive for coronavirus.[73] Other TDCJ units fewer than 50 miles away from Polunsky have reported confirmed cases: the Wynne Unit has reported 49 confirmed cases among prisoners and 50 among employees, the Estelle Unit has reported confirmed cases in 41 prisoners and 14 employees, and the Ellis Unit has reported confirmed cases in 50 prisoners and 7 employees.[74] Sadly, just last week, a longtime TDCJ chaplain passed away due to complications from the coronavirus.[75]

72.    As of April 29, 2020, at least 1118 prisoners in TDCJ custody tested positive for COVID-19. There have been 12 confirmed deaths due to complications from the coronavirus.[76]

**F.    The Polunsky Unit Houses Sick, Elderly Prisoners in Conditions Likely to Spread the Virus**

73.    The Allan B. Polunsky Unit ("Polunsky") death row[77] currently houses 208 male prisoners.[78] A large number of death row prisoners at Polunsky face significant physical and mental health issues, are over the age of 50, or both.

74.    Polunsky death row prisoners live in near-solitary confinement, remaining in their cells for 22 to 23 hours per day.[79] Cells are approximately ten feet by six feet and are fully enclosed by

---

[73] TDCJ Offender Population (Apr. 30, 2020 5:00 PM), https://www.tdcj.texas.gov/covid-19/offender_mac.html

[74] *Id.*

[75] COVID-19 TDCJ Update (Apr. 23, 2020), https://www.tdcj.texas.gov/covid-19/index2.html.

[76] COVID-19 TDCJ Update (Apr. 29, 2020), https://www.tdcj.texas.gov/covid-19/index2.html; TDCJ Offender Population (Apr. 30, 2020 5:00 PM), https://www.tdcj.texas.gov/covid-19/offender_mac.html.

[77] Polunsky also houses prisoners that are not part of death row, but rather part of Administrative Segregation. This complaint pertains solely to death row prisoners, and not those in Administrative Segregation.

[78] TDJC Death Row Information (Mar. 6, 2020), https://www.tdcj.texas.gov/death_row/dr_gender_racial_stats.html.

[79] Joanna Walters, *Prison Guards Working on Texas Death Row Call for Softer Conditions for Condemned Inmates*, The Telegraph, Feb. 18, 2014, , http://www.telegraph.co.uk/news/worldnews/northamerica/10647442/Prison-guards-working-on-Texas-Death-Row-call-for-softer-conditions-for-condemned-inmates.html.

steel doors containing one narrow horizontal window slit and a small slot through which food can be passed.[80]  Inside each cell is a bed, storage space, and a toilet connected to a sink.[81]  The only view of the sky or sunshine is through the one small window in their cell, and the six-sided cage in which the prisoners take their one hour per day of separated recreation.[82]

75.     Despite the solitary nature of life in Polunsky, prisoners interact on a regular basis with prison staff, who are responsible for distributing food and mail to the prisoners; checking prisoners' cells and persons for contraband; and transporting prisoners to and from recreation, showers, phone call booths, and—prior to the COVID-19 pandemic—visitation booths.  These activities require contact between guards and prisoners.  Handcuffs are repeatedly used whenever a prisoner is taken out of his cell, which heightens the risk of transmitting the virus between prisoners, and between guards and prisoners.  At least three employees at the Polunsky Unit have tested positive for COVID-19.[83]

### G.     Despite the Exceptionally-High Risk Its Prisoners Face, the Polunsky Unit is Not Meeting Even TDCJ's Inadequate Policies

76.     TDCJ has implemented a number of policies designed to combat the COVID-19 threat.

77.     Not only are these policies largely inadequate, but also TDCJ is neglecting to follow and/or enforce them. TDCJ is, among other things:

- Failing to provide prisoners access to protective coverings for their mouths or hands;

---

[80] *Id.*

[81] Thomas Bartlett Whitaker, *Fifty Thousand Words, Supposedly*, Minutes Before Six, Aug. 15, 2009, http://minutesbeforesix.blogspot.com/2009/08/fifty-thousand-words-supposedly.html.

[82] Alex Hannaford, *Letters from Death Row: Alone on the Inside*, The Texas Observer, Mar. 16, 2015, https://www.texasobserver.org/letters-from-death-row-alone-on-the-inside/.

[83] TDCJ Offender Population (Apr. 30, 2020 5:00 PM), https://www.tdcj.texas.gov/covid-19/offender_mac.html

- Failing to provide prisoners access to cleaning supplies to disinfect their cells or belongings;

- Failing to provide prisoners access to warm water and free personal hygiene supplies, such as soap, tissue, or disposable paper towels;[84]

- Failing to educate prisoners about the virus and measures that can be taken to minimize the risk of contracting or spreading the virus;

- Failing to educate prison staff about the virus and measures that can be taken to protect themselves and their families, as well as the people in their custody;

- Failing to enforce policies requiring staff to wear personal protective equipment, including gloves and masks, at all times in the facility including but not limited to while delivering food trays, handling dirty laundry, and escorting prisoners;

- Failing to enforce policies requiring staff to change gloves after they have been in contact with a potentially contaminated surface or individual;

- Lacking a plan for housing persons exposed to the virus;

- Not sanitizing phone booths, phones, doorknobs, day room surfaces, and handcuffs between each use;

- Permitting sick officers to report to and remain at work; and

- Denying prisoners held in quarantine regular showers or recreation, with one report of an prisoner being permitted to shower only once in a 14-day period.

78.     Defendants failure to enforce—or in some cases, even implement—policies covering the above deficiencies puts Plaintiffs at further risk of extreme harm.  Because Plaintiffs are significantly at risk of severe illness or even death from COVID-19 given pre-existing health conditions and/or age, they must be provided adequate care and safeguards recommended by the CDC and health experts. TDCJ is not currently meeting those standards.

---

[84] Inmates are being given a "daily towel" similar to a hand towel or face towel, but it is unclear whether these items are being exchanged and laundered on a regular basis.

## H. The Polunsky Unit Has a History of Litigation Stemming from Poor Treatment of Prisoners

79. Polunsky has been widely criticized for its treatment of death row prisoners.[85] A 2017 study completed by the University of Texas Law School's Human Rights Clinic concluded that death row prisoners at Polunsky are living in cruel conditions that "fall woefully behind international standards for confinement."[86] The resulting 48-page report details not only Polunsky's practice of solitary confinement, but also its vastly subpar access to medical treatment (including for mental health conditions) and access to religious services.[87]

80. Criticisms of Polunsky have reached such international fora as the Inter-American Commission on Human Rights ("IAHCR"). In IAHCR briefings, "[p]etitioners state[d] that medical care and nutrition are a major concern for prisoners given that breakfast is served at 3:00 am, so prisoners must choose between sleeping through the night or skipping the meal, and many feel hungry after lunch, having to buy additional food at a store in the prison facility. They also indicate that necessities like soap, shampoo, and deodorant are not provided by the prison and must also be purchased at the prison store."[88] IAHCR did not make a ruling addressing inadequate health care, but it found Texas in violation of "the right to life, liberty, and personal security

---

[85] *See, e.g.,* Jacey Fortin, *Report Compares Texas' Solitary Confinement Policies to Torture*, N.Y. Times, Apr. 26, 2017, https://www.nytimes.com/2017/04/26/us/texas-death-row-torture-report.html; Dave Mann, *Solitary Men*, Texas Observer, Nov. 10, 2010, https://www.texasobserver.org/solitary-men/; James Ridgeway and Jean Casella, *America's 10 Worst Prisons: Polunsky*, Mother Jones, May 2, 2013, https://www.motherjones.com/politics/2013/05/10-worst-prisons-america-allan-polunsky-unit-texas-death-row/; *Inside Polunsky*, Solitary Watch, https://solitarywatch.org/resources/multimedia/photography/polunsky/.

[86] Univ. of Tex. Sch. of Law Human Rights Clinic, *Designed to Break You: Human Rights Violations on Texas' Death Row*, Apr. 2017, https://law.utexas.edu/wp-content/uploads/sites/11/2017/04/2017-HRC-DesignedToBreakYou-Report.pdf.

[87] *Id.*

[88] IACHR, Report No. 11/15, Case 12.833, Felix Rocha Diaz, United States, March 23, 2015, ¶ 42, https://www.oas.org/en/iachr/decisions/2015/USPU12833EN.pdf.

(Article I), right to a fair trial (Article XVIII), right of protection from arbitrary arrest (Article XXV), and right to due process of law (Article XXVI) guaranteed in the American Declaration[.]"[89]

## I. Plaintiffs are at Serious Risk of Death or Injury if Exposed to COVID-19

### 1. As Prisoners, Plaintiffs and Proposed Class Members Face an Elevated Risk of Death or Serious Injury if They are Exposed to COVID-19

81.     Incarcerated individuals in the United States have poorer health than the general population.  According to the CDC's National Survey of Prison Health Care, "prison prisoners have higher rates of mental illness, chronic medical conditions, and infectious diseases compared with the general population."[90]

82.     Plaintiffs and proposed class members are also at a heightened risk of serious injury or death if exposed to COVID-19 because they lack access to quality medical care equipped to handle a disease outbreak.

83.     Plaintiffs and proposed class members regularly wait days to receive medical care.

84.     Plaintiffs and proposed class members are not given masks or gloves even after they exhibit symptoms of COVID-19.

---

[89] *Id.* ¶ 110.

[90] Karishma Chari, *et al*, *Nat'l Survey of Prison Care:  Selected Findings*, Nat'l Health Statistics Report, July 28, 2016, https://www.cdc.gov/nchs/data/nhsr/nhsr096.pdf.

### 2. Plaintiff William Mason Faces Increased Risk from COVID-19 Due to His Disability and Underlying Medical Conditions

85.     Plaintiff William Mason suffers from multiple serious medical conditions and disabilities that, according to the CDC, place him "at higher risk of severe illness from COVID-19."[91]

86.     Mr. Mason suffers from asthma. According to the CDC, people with moderate to severe asthma are at "higher risk for severe illness from COVID-19."[92]

87.     Mr. Mason has suffered from at least one heart attack and has been prescribed blood-thinners. According to the CDC, people who have serious heart conditions are "at higher risk for serious illness from COVID-19."[93]

88.     Mr. Mason also suffers from diabetes. According to the CDC, people with diabetes are "at higher risk for serious illness from COVID-19."[94]

89.     Mr. Mason's diabetes substantially limits several of his major life activities, including his ability to eat, and to digest food.

90.     Mr. Mason's diabetes also substantially impairs the operation of several major bodily systems, including neurological system.

91.     Mr. Mason also suffers from Hepatitis C and hypertension.

92.     Mr. Mason cannot walk without assistance and is in a wheelchair. His immobility substantially limits his ability to take steps to protect himself from COVID-19, such as while

---

[91] CDC, People Who Are At Higher Risk For Severe Illness–Coronavirus Disease 2019 (COVID-19) (April 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[92] *Id.*

[93] *Id.*

[94] *Id.*

showering in the prison's handicap shower where he must touch more surfaces than in a regular shower.

93. Mr. Mason is 66 years old. Although his age is not a qualifying disability, it independently places him "at higher risk for severe illness from COVID-19," according to the CDC.[95]

### 3. Plaintiff Travis Green Faces Increased Risk from COVID-19 Due to His Serious Mental Illness and HIV Status

94. Plaintiff Travis Green is paranoid schizophrenic and has an extremely tenuous relationship to reality.

95. As such, his ability to follow directions, or comprehend the risks of COVID-19, or the critical importance of following necessary precautions, is limited, at best.

96. Mr. Green is also HIV positive. This is a "serious underlying medical condition" that means he is also immunocompromised. Both put him at greater risk of contracting COVID-19, and at greater risk of serious illness or death.[96]

### 4. Plaintiff John Balentine Faces Increased Risk from COVID-19 Due to His Underlying Medical Condition

97. Plaintiff John Balentine suffers from a medical condition that, according to the CDC, places him "at higher risk for severe illness from COVID-19."

---

[95] *Id.*

[96] CDC, *What To Know About HIV And COVID-19* (March 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/hiv.html.

98.     Mr. Balentine suffers from hypertension and hyperlipidemia, which has impaired the operation of his circulatory system.  Mr. Balentine's hypertension and hyperlipidemia is a "serious heart condition" that places him at "higher risk for severe illness from COVID-19."[97]

**J.      TDCJ's Phone Policy is Overly Restrictive and Imposes Unconstitutional Restrictions on Plaintiffs' Access to Counsel**

99.     Prisoners have a constitutional right to access their attorneys.  Moreover, attorneys are ethically required to regularly communicate with their clients about their cases.

100.    TDCJ suspended legal visits to their prisons on March 13, 2020.  In the absence of legal visits, the Polunsky Unit and TDCJ are required to provide prisoners with accommodations for confidential communications with counsel.

101.    TDCJ is, among other things:

- Only permitting prisoners to call attorneys if that prisoner has a hearing date or filing date within the next thirty days, or has an execution date set (considered "critical circumstances"), despite a commitment to allow open access to legal representation now that legal visits are prohibited;

- Limiting prisoner phone calls with attorneys to 30 minutes, despite a commitment not to limit such calls whatsoever;

- Limiting prisoner phone calls to only attorneys on the legal team, despite previously permitting telephone requests submitted on behalf of authorized non-lawyer members of the legal team;

- Limiting phone calls to collect calls, which poses a challenge for attorneys currently working from home and using cell phones that typically do not allow collect calls to be accepted, as well as capital habeas units, where the phone system is not set up to accept collect calls; and

- Forbidding prisoners from speaking in languages other than English during phone calls, despite the fact that many prisoners are native speakers of other languages.

---

[97] CDC, People Who Are At Higher Risk For Severe Illness–Coronavirus Disease 2019 (COVID-19) (April 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

102.    On April 23, 2020, TDCJ stated that the "process for requesting an attorney/prisoner call has not changed" and that these remain "a collect call."[98]

### K.    TDCJ and Polunsky Grievance Procedures are Unavailable During the COVID-19 Pandemic

103.    On information and belief, in April 2020 Plaintiffs Balentine, Ford, Luna, Mason, and Gutierrez filed separate grievances related to the Polunsky Unit's failure to adequately protect them and other prisoners from COVID-19.  Due to the limitations on communication, counsel are currently unable to verify the exact date such grievances were filed.

104.    Due to Plaintiff Green's severe mental illness, it is unclear if he has or will be capable of filing a grievance.

105.    Based on information and belief, since at least February 2017, Defendants oversaw a two (2) step grievance process for prisoners at one or more of Defendants' units, including the Polunsky Unit.

106.    In order to file a grievance, a prisoner must attempt to informally resolve the grievance before commencing the formal grievance process.  A grievance may be initiated by filing a written submission on the designated grievance form (I-127).  This is called the Step 1 process.  The Step 1 process may take up to ***40 days*** from the date the Step 1 grievance form is submitted to the Unit's grievance office to the date a response is received.

107.    Based on information and belief, Plaintiff Ford's Step 1 grievance process may take until May 25, 2020 to receive a response from Defendants.

---

[98] April 23, 2020 Letter from O. Mendoza to T. Schardl.

108.    Based on information and belief, Plaintiffs Balentine, Luna, Mason, and Gutierrez's Step 1 grievance processes may take until at least the end of May to receive a response from Defendants.

109.    If a prisoner is not satisfied with the response to the Step 1 grievance process, an appeal may be filed by filing a Step 2 grievance form (1-128).  A prisoner has 15 days from the date the Step 1 grievance process is complete to file a Step 2 grievance appeal.  The Step 2 appeal process may take up to **_another 40 days_** to receive a written response.

110.    Absent resolution of Plaintiff's grievances, Plaintiffs would be unable to exhaust the grievance procedures outlined by Defendants before July 4, 2020 at the earliest.

111.    Because of the nature of COVID-19, especially its propensity to rapidly spread among densely populated communities, including prisons, and cause death within a matter of days, Defendants grievance process is unavailable to Plaintiffs during the COVID-19 pandemic.

## CLASS ACTION

112.    Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(2), Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

113.    Plaintiffs propose to represent a class composed of all death row prisoners who currently are, or who in the future will be, incarcerated at the Polunsky Unit.

114.    Plaintiffs also seek to represent two subclasses of Polunsky prisoners:

- **High Risk subclass:** persons confined on death row at the Polunsky Unit who are, according to the CDC, most at risk of death or serious injury from COVID-19.  These high risk individuals include:

  - People aged 65 or older;

  - People with chronic lung disease or moderate to severe asthma;

  - People who have serious heart conditions;

  - People who are immunocompromised, including from cancer treatment; and

- People of any age with severe obesity (body mass index [BMI] >40) or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, renal failure, or liver disease; and

- **Disability subclass:** those who suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or medical treatment necessary to treat a disability.

115. Plaintiffs Balentine, Luna, Gutierrez, Ford, and Mason are typical members of the proposed class. Plaintiffs Balentine and Mason are typical members of the High Risk subclass. Plaintiffs Mason and Green are also typical members of the Disability subclass.

116. This action has been brought and may properly be maintained as a class action under Federal law and satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

117. **Numerosity:** The proposed class is so numerous that joinder is impracticable. Based upon information and belief, the size of the proposed class exceeds 200 people and other prisoners could potentially be condemned to death row over the course of this litigation, or in the future. Joinder is also inherently impracticable for other, independent reasons. The proposed class members includes unnamed, future class members who cannot by definition be joined. Further, proposed class members are highly unlikely to file individual suits on their own, as all are incarcerated, and thus have limited access to their retained or court-appointed counsel due to Defendants' telephone policies and restrictions related to COVID-19. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

118. **Commonality:** The claims of the proposed class members share common issues of fact and law, including but not limited to whether Defendants' policies regarding health, hygiene, and restrictions to counsel as relevant to the COVID-19 pandemic—policies that systemically affect all proposed class members—violate the First, Eighth, and Fourteenth Amendments to the

United States Constitution. The resolution of this question will drive the outcome of the litigation.

The common questions of law and fact for the proposed class include:

- Whether Defendants' adequately protect the proposed class from the immediate threat of COVID-19;

- Whether the proposed class members' Eighth and Fourteenth Amendment rights are being violated by Defendants' failure to implement adequate procedures and practices to protect the class from COVID-19;

- Whether Defendants' failure to implement adequate procedures and practices constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments;

- Whether the proposed class members' First and Fourteenth Amendment rights are being violated by Defendants' telephone policies and restrictions related to COVID-19; and

The common questions of law and fact for the proposed High Risk subclass include:

- Whether the High Risk subclass members require heightened measures to protect them from COVID-19 infection.

The common questions of law and fact for the proposed Disability subclass include:

- Whether Defendants' policies and procedures are adequate to protect the Disability subclass members from the immediate threat of COVID-19;

- Whether the Disability subclass members' rights under the ADA are violated by Defendants' policies and practices;

- Whether the Disabilities subclass members' rights under the Rehabilitation Act are violated by Defendants' policies and procedures; and

- Whether Defendants illegally discriminated against the Disability subclass members by denying the Disability subclass reasonable accommodations recommended by the CDC, both in policy and practice.

119. **Typicality:** The claims of Plaintiffs are typical and representative of those of each class and subclass members' claims against Defendants, because each Plaintiff is currently in Defendants' custody, their claims arise from the same policies and procedures (or failure to adopt policies and procedures), and they also seek identical relief. Plaintiffs and the proposed class are similarly injured by Defendants' wrongful conduct.

120. **Adequacy:** Plaintiffs are adequate class representatives who meet all of the requirements of Rule 23(a)(4). They have no conflicts of interest in this case with other class members. They will fairly and adequately represent the interests of the class, and each understands the responsibilities of a representative. Counsel for Plaintiffs will vigorously prosecute the interests of the class and include attorneys with extensive experience with the factual and legal issues involved in representing prisoners, in asserting constitutional rights, and/or litigating class actions.

121. Class treatment under Rule 23(b)(1) is appropriate because separate actions—if feasible—would create a risk of inconsistent or varying adjudications across class members. If individual class members were to bring separate actions challenging Defendants' conduct with respect to COVID-19, the interests of other class members would be impaired. Further, class treatment is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the proposed class, so that injunctive and declaratory relief is appropriate and necessary respecting the class as a whole. Class members as a whole are threatened by Defendants' failure to take basic steps to safeguard them from COVID-19, and Plaintiffs seek protections in the form of injunctive and declaratory relief as to the class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS:
### UNLAWFUL CONDITIONS OF CONFINEMENT

122. Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein. The U.S. Constitution's Eighth Amendment, as incorporated against the States through the Fourteenth Amendment, protects Plaintiffs and proposed class members from cruel and unusual punishment by State actors and requires State actors to provide adequate healthcare to prisoners.

123.    To amount to the infliction of cruel and unusual punishment (1) prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health (an objective test) and (2) prison officials must have acted with deliberate indifference to the risk posed (a subjective test).

124.    Plaintiffs and proposed class members are subject to a risk of harm that today's society does not tolerate.

125.    Defendants fail to comply with all CDC guidelines to prevent an outbreak of COVID-19 and cannot protect the health or safety of Plaintiffs and proposed class members, who suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

126.    Society does not tolerate the risk of exposure to COVID-19 to which Defendants' policies and procedures (or lack thereof) have subjected Plaintiffs and proposed class members.

127.    Defendants are aware of the COVID-19 pandemic, and know of the risks that COVID-19 poses to Plaintiffs and proposed class members.

128.    Defendants have acted with deliberate indifference to the risks posed to Plaintiffs and proposed class members by COVID-19.

129.    The risks of COVID-19 were, and are, obvious to Defendants.

130.    Defendants' response to COVID-19 has not been reasonable.

131.    As a result of Defendants' actions and inactions, Plaintiffs and proposed class members are suffering irreparable injury.

### SECOND CAUSE OF ACTION
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### AND THE REHABILITATION ACT OF 1973

132.    Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein.  This claim arises under Title II of the Americans with Disabilities Act ("ADA") and

Section 504 of the Rehabilitation Act, which make it unlawful for a public entity to deny qualified individuals with disabilities the opportunity to participate in or benefit from the services, programs, or activities of the public entity or to otherwise discriminate against qualified individuals with disabilities.

133.    Public entities have an affirmative obligation to make reasonable accommodations for qualified individuals with disabilities.

134.    TDCJ is a public entity and recipient of federal funds under the ADA and Rehabilitation Act.

135.    The Polunsky Unit is a facility whose operation by TDCJ is a program or activity under the ADA and Rehabilitation Act.

136.    Defendants are responsible for providing programs, services, and/or activities to Plaintiffs under the ADA and Rehabilitation Act, including medical care and reasonable safety.

137.    Plaintiffs Mason and Green and proposed members of the Disability subclass are qualified individuals with disabilities.

138.    Defendants know that Plaintiff Mason and proposed members of the Disability subclass are qualified individuals with disabilities in need of reasonable accommodations during the COVID-19 pandemic, but have failed to make such reasonable accommodations, including by refusing to provide hand sanitizer and adequate personal protective equipment or by accommodating and protecting those who are severely mentally ill.

139.    Reasonable accommodations recommended by the CDC to control the spread of COVID-19, which are necessary to protect Plaintiffs Mason and Green and proposed members of the Disability subclass  include, but are not limited to:

a.    Access to alcohol-based hand sanitizer;

b.   Access to antibacterial hand soap and disposable hand towels for regular handwashing;

c.   Access to personal protective equipment, including clean masks and gloves, for Plaintiffs and staff members;

d.   Increased cleaning and disinfecting of housing areas and common surfaces;

e.   Increased cleaning of facilities used specifically by the Disabled subclass, including but not limited to the handicap showers and bathrooms; and

f.   Assisted sanitizing and distancing measures for those such as Plaintiff Green who are unable to follow directions or comprehend the dangers of failing to do so.

140.   Denying or otherwise failing to ensure that such reasonable accommodations recommended by the CDC are made at the Polunsky Unit is illegal discrimination under the ADA and Rehabilitation Act, entitling Plaintiffs to injunctive and declaratory relief.

### THIRD CAUSE OF ACTION
### VIOLATION OF FIRST AND FOURTEENTH AMENDMENT:
### UNLAWFUL RESTRICTIONS ON RIGHT TO ACCESS COUNSEL

141.   Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein. The U.S. Constitution's First and Fourteenth Amendments protect Plaintiffs' and proposed class members' rights of access to the courts and to consult with attorneys.

142.   Defendants are violating Plaintiffs' and proposed class members' First Amendment rights because "regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez* 416 U.S. 396, 419 (1974), *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989).

143.   Defendants have implemented overly restrictive telephone policies and interfered with the attorney-client relationship, including (1) placing arbitrary limits on the frequency and duration; (2) restricting use absent critical circumstances, such as a litigation deadline; and (3) limiting communications to only the attorney of record.  There is no legitimate interest that justified

these limits on attorney-client communications. These policies are unreasonable under any circumstances but particularly unconscionable during the COVID-19 pandemic, when no in-person legal visits are permitted.

144. These actions constitute substantial interference with Plaintiffs' and proposed class members' right of access to the courts and the right to consult with attorneys, in violation of the First and Fourteenth Amendments.

## RELIEF SOUGHT:
## INJUNCTION AND DECLARATORY RELIEF

145. Plaintiffs and proposed class members incorporate all previous paragraphs as if alleged herein.

146. Plaintiffs and proposed class members seek preliminary and permanent injunctive relief against Defendants under the First, Eighth, and Fourteenth Amendments, 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act, for themselves and for proposed class members, to protect their health, safety, and well-being in accordance with their constitutional and statutory rights.

147. Without the injunctive relief that the Plaintiffs and proposed class members seek, Defendants will continue perilous practices and conduct, disregarding federal legal mandates and endangering the lives and welfare of current and future prisoners at Polunsky. Without swift intervention by this Court, Plaintiffs and proposed class members face immediate and irreparable injury of contracting COVID-19 and—due to their particular medical susceptibility and/or age— likely will sustain severe, potentially *life-threatening*, health complications.

148. Plaintiffs and the proposed class members have no plain, adequate, or complete remedy at law to address the wrongs described herein.

149. Plaintiffs and proposed class members are likely to succeed on the merits of their claims because Defendants are constitutionally required to take measures—and enforce any policies

implemented—to avoid jeopardizing the health and safety of Plaintiffs and the proposed class in the face of the COVID-19 pandemic.

150.    Granting injunctive relief also serves the public interest, because it will help guard against further community spread of COVID-19 in vulnerable populations and will help protect medically-compromised individuals from contracting a potentially life-threatening virus. As an outbreak of COVID-19 at Polunsky would likely result in prison staff becoming infected and suffering as well, the public interest strongly favors granting immediate injunctive relief.

## ATTORNEY'S FEES

151.    Pursuant to 42 U.S.C. § 1988, and 42 U.S.C. § 12205 Plaintiffs are entitled to recover attorney's fees, litigation expenses, and court costs, including expert costs.

## PRAYER FOR RELIEF

Plaintiffs and proposed class members request an order declaring that the current conditions inside Polunsky are unconstitutional because those conditions are medically unsafe and dangerous to Plaintiffs and the proposed class members, in violation of their Eighth and Fourteenth Amendments rights.

Plaintiffs and proposed class members request an order declaring that TDCJ violates the ADA and Rehabilitation Act by failing to reasonably accommodate prisoners with disabilities. Plaintiffs and proposed class members request an order declaring that TDCJ's telephone policies are unconstitutional because those policies interfere with the attorney-client relationship, in violation of their First and Fourteenth Amendments rights.

Plaintiffs and proposed class members are entitled to injunctive and declaratory relief to end this unlawful discrimination.

THEREFORE, Plaintiffs respectfully request that the Court award the following relief:

- Certify this action as a class action, as described above;

- Appoint undersigned as class counsel pursuant to Fed. R. Civ. P. 23(g).

- Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this Complaint, on behalf of the Plaintiffs, and the class;

- Issue a preliminary and permanent injunction, to abate the risk of serious harm described above by requiring Defendants to take the following health and safety measures:

  - Freely permit phone calls to attorneys regardless of whether the prisoner has a hearing date or filing date within the next 30 days, or has an execution date set (considered "critical circumstances");

  - Freely permit phone calls with attorneys without a time limit;

  - Freely permit phone calls with non-lawyer members of the legal team;

  - Allow members of the legal team to coordinate calls that originate from the legal team and that are not limited to collect calls, such that members of the legal team using cell phones can participate in calls;

  - Freely permit prisoners to speak in languages other than English during phone calls;

  - Require communication with the public about any changes to facility operations, including visitation programs and phone accessibility;

  - Require cleaning and disinfecting of surfaces and objects, several times per day, that are frequently touched, especially in common areas, including doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones;

  - Implement social distancing strategies where practicable;

  - Provide prisoners access to protective coverings for their mouths and hands if social distancing measures cannot be implemented;

  - Provide prisoners no-cost access to soap, running water, hand drying machines or disposable paper towels,[99] and tissues;

  - Provide prisoners with alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions;

---

[99] Should TDCJ insist on providing prisoners only a "daily towel" similar to a hand towel or face towel, TDCJ should ensure that these towels are replaced and laundered at least daily.

- Educate prisoners about the virus and measures that can be taken to minimize the risk of contracting or spreading the virus by, for example, posting or disseminating to prisoner cells signage and information throughout Polunsky that provides: (i) general updates and information about the COVID-19 pandemic; (ii) the CDC's recommendations on "How to Protect Yourself"[100] from contracting COVID-19; and (iii) instructions on how to properly wash hands;

- Educate prison staff about the virus and measures that can be taken to protect themselves and their families, as well as the people in their custody;

- Encourage staff to wear personal protective equipment, including gloves and masks, when delivering food trays, handling dirty laundry, escorting prisoners, and at other times when social distancing is not possible;

- Enforce policies requiring staff to change gloves after they have been in contact with a potentially contaminated surface or individual, or hourly, whichever is more frequent;

- Enforce staff performing temperature checks on any group of people are require to wear face mask, eye protection, gloves, and gowns/coverall;

- Provide testing of all prisoners to determine those who are infected with COVID-19;

- Ensure that any prisoner held in quarantine have access to regular showers and recreation, providing that prisoner with at least one shower per day;

- Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding; and

- Provide reasonable accommodations necessary to protect proposed members of the Disability subclass (individuals with disabilities).

- Find that Plaintiffs are the prevailing parties in this case and award them attorney's fees, court costs, expert costs, and litigation expenses; and

- Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

---

[100] *See* CDC, How to Protect Yourself and Others, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 27, 2020).

Dated: May 1, 2020                         Respectfully submitted,

_/s/ David R. Dow_
David R. Dow
Texas Bar No. 06064900
Jeffrey R. Newberry
Texas Bar No. 24060966
University of Houston Law Center
4604 Calhoun Rd.
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131
Email ddow@central.uh.edu
jrnewber@central.uh.edu

_Attorneys for Polunsky Unit Plaintiffs_

**CERTIFICATE OF SERVICE**

I, David R. Dow, certify that a true and correct copy of the above and foregoing CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF has been served electronically upon all counsel of record via the electronic filing system of the Southern District of Texas, on May 1, 2020.

*/s/ David R. Dow*
David R. Dow
*Attorneys for Plaintiffs*