# Update on Wallace Pack Unit Response to COVID-19

*Valentine, et al. v. Collier, et al.*, No. 04-20-CV-01115

On May 23, 2020, the Court entered an order requiring the Defendants, by May 27, 2020, to:

> [F]ile an update with the Court, describing how they have changed or plan on changing their COVID-19 response in Pack Unit based on the large number of new positive tests.  For example, Defendants may wish to explain if there are plans to change numbers of physicians or nurses available on-site; availability of beds in the infirmary; spacing at communal gathering spaces such as the dining room, as well as within the dorms; changes to the frequency of testing or retesting of staff and inmates; attempts to trace recent contacts of inmates and staff who test positive; plans for compassionate release or other forms of release; and communications, if any with federal and state health authorities for advice in controlling the outbreak.

This update as requested provides the Court with an updated overview of the ongoing COVID-19 response at the Wallace Pack Unit, including actions bearing on the language of the Court's Order recited above.  This update summarizes actions taken and planning engaged in by the Texas Department of Criminal Justice (TDCJ), and specifically as implemented at the Pack Unit, in response to the COVID-19 pandemic outside the context of this or any other litigation.  Although Defendants continue to maintain their position that the Plaintiffs have failed to state any actionable claim for recovery of injunctive or other relief from this Court, TDCJ's maintenance of that position should never be construed by the Court or others as a lack of respect for the Court or the Court's indisputably well-intentioned interest in the impact of the COVID-19 pandemic on the Texas prison system and its offender population, including at the Pack Unit.

## Recent Test Results

### a.  Mass/Strike Team Testing

As the Court is aware from prior reports,[1] TDCJ has coordinated with the Texas Department of Emergency Management (TDEM) to engage in COVID-19 "mass testing" of the offender population at the Pack Unit and TDCJ staff working at the Pack Unit, as well as mass testing at other TDCJ units that have experienced an offender or employee having tested positive for COVID-19.  By definition, this

---

[1] In addition to the descriptions provided to the Court previously, descriptions of the "mass testing" or "strike team" testing program are set out in the reports provided on May 11 and on May 21 to the United States Court of Appeals for the Fifth Circuit and provided to this Court.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 2 of 20

_____

"mass testing" includes the testing of offenders and staff who have <u>not</u> exhibited the types of symptoms that the Centers for Disease Control and Prevention (CDC) has indicated may be associated with COVID-19, including:

- Cough;
- Shortness of breath or difficulty breathing;
- Fever;
- Chills;
- Muscle pain;
- Sore throat; and
- New loss of taste or smell.[2]

TDCJ proactively undertook this mass testing of Pack Unit offenders through the use of TDCJ "strike teams" (described more fully below), in coordination with other state agencies—not only TDEM, but also the Southwest Texas Regional Advisory Council (STRAC),[3] the Texas Department of State Health Services (DSHS), and the Office of the Governor—to ascertain more fully the scope of the existing spread of COVID-19 within the Pack Unit and among TDCJ staff who worked at the Pack Unit. This proactive step was taken by TDCJ in recognition of reports suggesting persons who do not exhibit any of the symptoms the CDC has indicated may be associated with COVID-19 could nonetheless be afflicted with or carry the novel coronavirus while asymptomatic. This mass/strike team testing is intended to allow TDCJ staff to take additional steps within the unit to protect offenders and staff. As applied specifically to the Pack Unit, these additional steps include:

- Isolating those offenders at the Pack Unit who test positive from those who test negative, through the medical isolation of each offender who has tested positive. This medical isolation is done under written policies and procedures issued by medical experts on the Correctional Managed Health Care Committee (CMHCC) for the State of Texas in effect from March 20, 2020, to

_____

[2] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html. It is important to note, as the Court undoubtedly has, that this list of symptoms that may indicate the presence of COVID-19 has evolved over time. For example, on April 27, 2020, the CDC expanded its initial list of symptoms (fever, cough, and shortness of breath) to include the additional conditions in the current list. *E.g.,* https://www.nytimes.com/2020/04/27/health/ coronavirus-symptoms-cdc.html. The current CDC guidance also indicates that "[o]ther less common symptoms have been reported, including gastrointestinal symptoms like nausea, vomiting, or diarrhea."

[3] The Southwest Texas Regional Advisory Council is one of twenty-two regional advisory councils in Texas that develop, implement, and maintain the state's trauma and emergency healthcare system. *See* https://www.strac.org.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 3 of 20

_____

present, and as revised over time in light of the ever-changing nature of the pandemic and medical guidance related to it.[4]

- Allowing contracted medical staff to focus observation and care on offenders at the Pack Unit who have received a positive test result but who have not exhibited the symptoms that the CDC has indicated may be associated with COVID-19.

- Placing in self-quarantine employees who work at the Pack Unit and receive a positive test result, even those who have not exhibited the symptoms that the CDC has indicated may be associated with COVID-19.

- Conducting contact tracing with respect to offenders and TDCJ employees at the Pack Unit who have had a positive COVID-19 test results, in order to place offenders and TDCJ employees at the Pack Unit who may have been exposed to the positive case on medical restriction under the written CMHC B-14.52 protocol.[5]

Each of these previously-anticipated follow-up steps from the mass/strike team testing have been and are continually being implemented at the Pack Unit, as described in the next section of this update.

_____

[4] The Court has seen and had the opportunity to review the CMHC Infection Control Manual Policy B-14.52, Coronavirus Disease, 2019 (COVID-19), in various editions issued over time. *See* ECF 36-7 (Declaration of Dr. Lannette Linthicum). Each version of the Section B-14.52 policy in effect from its inception on March 20, 2020 to date (including the version of the policy as most recently amended on May 13, 2020) have been previously filed with the court or disclosed to Plaintiffs. *See* ECF 36-3 (March 20, 2020), ECF 38 (March 27, 2020), ECF 36-2 (April 2, 2020), ECF 36-6 (April 15, 2020), Defendants' Disclosures 0651-0688 (May 6, 2020), and Defendants' Disclosures 0689-0727 (May 13, 2020). As the Court is aware from earlier proceedings, medical isolation as first defined in the policy as of March 20, 2020 includes specific written guidance on how offenders who have tested positive for COVID-19 are to be housed, observed, fed, and equipped with PPE. *See, e.g.*, ECF 36-3 at 4-5 (March 20, 2020 version); Defendants' Disclosures 0689-0727 at 5-6 (May 13, 2020 version).

For more information on the author of the written policy, CMHC, and its operations, TDCJ would refer the Court to its website, at https://www.tdcj.texas.gov/divisions/cmhc/index.html, and to the underlying Texas statutes referred to on that website.

[5] The Court is previously aware from earlier presentations about how "medical restriction" is defined in writing under Policy B-14.52. For each of reference, please see, e.g., ECF 36-8 7-8 (March 20, 2020 version); Defendants' Disclosures 0689-0727 at 2, 8-9 (May 13, 2020 version).

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 4 of 20

_____

Between May 12-14, 2020, 1,492 mass/strike team tests were administered to 1,179 offenders and 313 TDCJ employees at the Pack Unit.[6]  As previously reported to the Court, a number of these mass/strike team test results have been returned by the testing laboratory through STRAC to TDCJ, and some remain pending. As of 5:00 p.m. on May 26, 2020, of the 1,492 mass/strike team tests administered to offenders at the Pack Unit, 876 test results have been returned by the testing laboratory through STRAC to TDCJ.  Those test results can be summarized as follows:

Offenders:

- 721  Negative
- 136  Positive (including 19 duplicates)
- 307  Pending
- 15  Invalid
- 1,179  Total offender mass/strike team tests[7]

Employees:

- 2  Negative
- 2  Positive
- 309  Pending
- 0  Invalid
- 313  Total employee mass/strike team tests[8]

*b.  Testing by Healthcare Providers*

Between March 17, 2020 and May 26, 2020, in addition to the mass/strike team testing by TDCJ at the Pack Unit discussed above, 216 COVID-19 tests were ordered by outside healthcare providers for offenders assigned to the Pack Unit and TDCJ employees who work at the Pack Unit. This offender testing has been conducted by healthcare providers at local hospitals, including CHI St. Joseph—Bryan, CHI St. Joseph—College Station, CHI St. Joseph—Grimes County, or

_____

[6]The mass/strike team testing of offenders at the Pack Unit does not include re-testing those offenders who were assigned to dorm 17 on the dates of the mass/strike team testing, May 12-14, 2020, because those offenders had previously received a positive test result from the Pack Unit infirmary, a local hospital, or Hospital Galveston.

[7]Those offenders whose mass/strike team test results were returned as "invalid" have been identified and will be re-tested. Pending re-testing, these asymptomatic offenders will be placed on medical restriction.

[8]Those employees whose mass/strike team test results were returned as "invalid" have been identified and will be re-tested. Pending retesting, these asymptomatic employees will be allowed to work unless they develop symptoms.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 5 of 20

_____

Baylor, Scott & White—College Station, during medical emergencies, by UTMB healthcare providers at the Pack Unit infirmary during a sick call or medical appointment, and by UTMB healthcare providers at the TDCJ Hospital Galveston Unit during medical emergencies or autopsies. Employee testing has been conducted by private physicians. As of 5:00 p.m. on May 26, 2020, the test results reported to TDCJ concerning this testing conducted by outside healthcare providers can be summarized as follows:

Offenders:

- 101   Negative
- 74   Positive
- 21   Pending
- 196   Total offender healthcare provider tests

Employees:

- 10   Negative
- 7   Positive
- 3   Pending
- 20   Total employee healthcare provider tests

Including 19 duplicate offender positive tests, 1,708 tests for COVID-19 have been conducted for Pack Unit offenders and TDCJ employees who work at the Pack Unit through mass/strike team testing by TDCJ and by outside healthcare providers. These test results can be summarized as follows:

Offenders:

- 822  Negative
- 210  Positive
- 328  Pending
- 15  Invalid
- 1,375  Total

Employees:

- 12   Negative
- 9   Positive
- 312   Pending
- 0   Invalid
- 333   Total

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 6 of 20

_____

As of 5:00 p.m. om May 26, 2020, of the Pack Unit offenders who have tested positive for COVID-19, 5 offenders have died; 3 offenders have recovered fully; and only 12 remain hospitalized at a local hospital or at Hospital Galveston. Of the TDCJ employees who work at the Pack Unit and tested positive none have died; 4 have fully recovered; and 5 remain quarantined at home.[9]

**Nature of Mass/Strike Team Tests**

The mass/strike team tests, including the 1,492 tests of Pack Unit offenders and employees, involve the administration of a viral test manufactured by a company called Curative Medical Inc. ("Curative"). This viral test, which relies on an oral sample rather than the nasal swabs used in other tests previously approved for use by the United States Food and Drug Administration (FDA), was approved by the FDA for use in COVID-19 testing on April 16, 2020.[10] Following this April 16 approval, TDEM contracted with Curative to obtain 300,000 these test kits at a cost of $45 million for use by TDCJ and other state agencies.[11] TDEM has provided TDCJ with 139,500 test kits to date. TDCJ received the first delivery of 40,000 Curative test kits on May 9, 2020.

In a period of two days from May 9th to May 11th, TDCJ assembled 12 "strike teams" made up of TDCJ employees. These employees included wardens of TDCJ units, division directors, and other TDCJ employees who were selected by their respective division or who volunteered to be part of the strike teams. One of these strike teams was dispatched with Curative test kits to the Pack Unit to test offenders and TDCJ employees.

Upon arrival and set-up in the gym at the Pack Unit, members of the strike team observed each offender or TDCJ employee being tested at the Pack Unit as the offender or TDCJ employee self-administered a COVID-19 test. The strike team member, from an appropriate social distance while wearing personal protective equipment, observed the offender cough into his sleeve three to five times to improve the quality of the test sample to be taken by the offender from his mouth, swab the inside of the roof of his mouth and left and right cheeks for ten seconds each, and place the swab into a collection tube. The offender then sealed the tube and placed it in a box. The box containing the sample was then logged in a computer system and linked to the offender or employee who provided the test sample.

_____

[9] *See* discussion *infra* "*Pack Unit Staff Quarantine*."
[10] https://www.fda.gov/media/137088/download.
[11] E.g., https://www.texastribune.org/2020/05/14wh/texas-prisons-coronavirus-tests-curative/.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 7 of 20

_____

At the end of each testing session, strike team members counted, inventoried, and double bagged the completed test kits for that session in two red biohazard bags.  Both red biohazard bags containing the test kits were wrapped securely in bubble wrap and placed into a double walled box. The box was sealed, and a UN3373 sticker was placed on top. The strike team leader contacted Strike Command to obtain a FedEx shipping label to affix to the box. A member of the TDCJ Office of Inspector General (OIG) picked up the box from the Pack Unit in Navasota, Texas and transported it to the nearest FedEx location in College Station, Texas. Strike Command tracked each of the boxes sent from the Pack Unit until they were received by the Curative lab in California.

## Implementation of Planned Follow-Up on Results of Mass/Strike Team Testing

### a. Medical Isolation

Pack Unit administrators and staff have implemented the written medical isolation protocol in effect since March 20, 2020 for those Pack Unit offenders who have received positive COVID-19 test results from the mass/strike team testing. The particular circumstances of the location on the Pack Unit or elsewhere[12] of the medical isolation of offenders who have tested positive may change based on the demands of the facility, but each offender who is in medical isolation is subject to the Policy B-14.52 protocol for medical isolation currently in effect. *See* Exh. F at 5-6 (describing medical isolation).

### b. Offender Relocations

TDCJ received the first set of results for the mass/strike team testing of Pack Unit offenders on May 19, 2020.  Pack Unit administrators and correctional staff began to reallocate offenders, pursuant to the B-14.52 written guidelines, as those results first came in.  As the mass/strike team results continue to be produced and provided to TDCJ and the Pack Unit, the Pack Unit has continued to engage in the re-allocation of unit space and re-assignment of offenders to particular housing areas within the unit.

For the Court's convenience, a diagram of the Pack Unit, along with separate diagrams showing the layout of each dorm at the Pack Unit, have been filed with the Court under seal contemporaneously with this update.[13]  Exhibit H.  With

_____

[12]As of 5:00 p.m. on May 26, 2020, only 12 offenders who received a positive test results remained at a local hospital or the Hospital Galveston Unit.

[13]These diagrams show the layout of Pack Unit, the individual dorms in the main building, the expansion dorm, and the trusty camp.  Given issues of unit security and offender privacy, these diagrams of the Pack Unit are being filed under seal, and the

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 8 of 20

_____

reference to the diagrams provided to the Court as Exhibit H, the bed count and capacity for each dorm, the medical infirmary, and any other areas at the Pack Unit currently being used for offender housing as of 7:30 a.m. on May 27, 2020,[14] is as follows:

| Dorm | Capacity | Current Bed Count | Housing Purpose | Medical Restriction/Isolation |
|------|----------|-------------------|-----------------|-------------------------------|
| 1 | 54 | 51 | Negative | Restriction |
| 2 | 30 | 21 | Negative | N/A |
| 3 | 54 | 54 | Negative | N/A |
| 4 | 30 | 28 | Negative | N/A |
| 5 | 54 | 45 | Negative | Restriction |
| 6 | 54 | 42 | Negative | Restriction |
| 7 | 54 | 49 | Negative | Restriction |
| 8 | 54 | 38 | Negative | Restriction |
| 9 | 54 | 42 | Negative | Restriction |
| 10 | 54 | 48 | Negative | Restriction |
| 11 | 54 | 35 | Negative | Restriction |
| 12 | 54 | 50 | Negative | Restriction |
| 13 | 52 | 51 | Positive | Isolation |
| 14 | 52 | 52 | Positive | Isolation |
| 15 | 52 | 46 | Positive | Isolation |
| 16 | 52 | 5 | Positive | Isolation |
| 17 | 48 | 2 | Negative | N/A |
| 18 | 48 | 45 | Negative | Restriction |
| 19 | 93 | 74 | Negative | Restriction |
| 20 | 93 | 89 | Negative | Restriction |
| TC1 | 107 | 90 | Negative | N/A |
| TC2 | 107 | 89 | Negative | N/A |
| TC3 | 107 | 95 | Negative | N/A |
| Infirmary | 12 | 8 | Illness; non COVID-19 | N/A |
| RH | 27 | 24 | Positive / Negative | Isolation |
| Education | @30 | 25 | Quarantine / Pending Test | Restriction |

_____

location within the unit of particular offenders are not specified in this publicly filed update.

[14]*See* Exhibit A (Pack Unit dorm counts and capacities).

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 9 of 20

_____

Starting on May 4, 2020, and prior to conducting the mass/strike team testing, Dorms 17 and 19 of the Pack Unit were utilized to house offenders who had tested positive for COVID-19 and offenders who had been returned to the Pack Unit after visiting a local hospital and being tested for COVID-19, but whose test results had not been received.[15]  Offenders who tested positive for COVID-19 were housed as a cohort in Dorm 17 and placed on medical isolation in accordance with Policy B-14.52.  Offenders who were awaiting their test results were housed in dorm 19 and placed on medical restriction in accordance with Policy B-14.52.

Upon receipt of the first set of mass/strike team test results on May 19, 2020, Pack Unit officials acted swiftly in accordance with Policy B.14-52 to reallocate offender housing assignments based on those test results. Due to a concentration of offenders assigned to dorms in D-Hall who received a positive test result, Pack Unit officials designated the four dorms in D-Hall, Dorms 13, 14, 15, and 16—as COVID-19 housing for offenders who received a positive test result.  Offenders in Dorm 17 who had previously tested positive were re-housed in D-Hall.  All offenders who were assigned to Dorm 19 and received a positive test result from the mass/strike team testing were also rehoused in D-Hall.  All dorms in D-Hall were placed on medical isolation in accordance with Policy B-14.52.

Dorms 18, 19 and 20 were designated for offenders who received a "negative" test result. Dorm 17 was designated for wheel-chair-bound offenders who received a negative test result and for overflow for offenders who received a negative result or were awaiting test results. Depending on the pace at which results are received, additional wheel-chair-bound offenders who received a positive test result were re-housed in Dorm 2 in A-hall, and wheel-chair-bound offenders who received a negative test result or were awaiting their test result were re-housed in Dorm 4 in A-hall, with any overflow being housed in Dorm 17, as needed. As additional results are received, Pack Unit officials will evaluate and determine, as needed, which dorms to designate as housing offenders who receive a positive versus negative test result with a goal to minimize the number of offenders to relocate and the impact on those offenders.

There are 27 single cells in restrictive housing at the Pack Unit, and there are 24 offenders currently housed in restrictive housing. Offenders in restrictive housing are grouped into positive and negative offender groups and housed with at least one buffer cell between the two groups. Pack Unit officials do not control the 12 beds in the infirmary. The use of those beds is at the discretion of UTMB, who is

_____

[15]Before May 4, 2020, Dorms 17 and 19 were held in reserve by TDCJ leadership as part of a plan to relocate offenders who had not tested positive for COVID-19 from the Hospital Galveston Unit, if needed to create space at the Hospital Galveston Unit to treat those offenders who had tested positive for COVID-19 and needed more advanced healthcare than was available on-site at another medical unit within the TDCJ system.

_____

the contracted healthcare provider for the Pack Unit. There are currently 12 offenders in the Pack Unit infirmary beds for non-COVID-19 illness or treatment.

Offenders who return to the Pack Unit after a hospital visit are being quarantined for 14 days in the unit's education building. There are 30 beds available in the education building, and 25 offenders are currently on quarantine in those beds as of 7:30 a.m. on May 27, 2020.

As of 5:00 p.m. on May 26, 2020, none of the offenders in the three trusty camp dorms have tested positive.[16] To the extent an offender housed in the trusty camp dorm receives a positive test result, that offender would be rehoused in D-hall or, if space is unavailable in D-hall, in another dorm that has been designated by Pack Unit officials to house offenders who have tested positive.

c. *Contact Tracing*

Contact tracing was first conducted on the Pack Unit after the TDCJ learned on April 13, 2020, that an autopsy performed on offender Leonard Clerkly showed he tested positive for COVID-19. Before he was transferred off of the Pack Unit on April 11, 2020, for medical treatment, Offender Clerkly had been living in 3-Dorm. After learning of the positive COVID-19 test, Pack Unit administrators and staff determined that Offender Clerkly's close contacts as defined in Policy B-14.52 were were likely limited to those offenders who also lived in 3-Dorm. Unit administrators and staff immediately placed the 54 offenders assigned to 3-Dorm at the time of Clerkly's death on medical restriction, pursuant to the written B-14.52 policy.

All 54 offenders in 3-Dorm were tested for the COVID-19 virus by UTMB staff on April 15, 2020,[17] and all 54 of those offender tests were negative.

TDCJ has continued to conduct contact tracing analysis with respect to each Pack Unit-assigned offender and Pack Unit employee who has tested positive for COVID-19 since the positive test produced during Offender Clerkly's autopsy. With respect to offenders, this contact tracing analysis is simplified because, as reported to the Court previously, the Pack Unit has been on precautionary lockdown from April 13, 2020 (following receipt of the positive test from the autopsy of Offender Clerkly) to today. As described more fully below, this precautionary lockdown has restricted offender movement at the Pack Unit to the extent that, with few

_____

[16]One of the offenders currently housed at the trusty camp previously tested positive for COVID-19 and was returned to the Pack Unit after a lengthy stay at Hospital Galveston and full recovery from COVID-19.

[17]These tests were nasal swab tests, as opposed to the sputum tests used in the mass/strike team testing.

exceptions, the only offenders with which an offender has close contact[18] are those in his dorm. Thus, all offenders assigned to a dorm in which an offender who received a positive test result for COVID-19 was assigned at the time of testing are placed on medical restriction when that positive test result is obtained per CMHC Policy B-14.52 for at least 14 days, and all employees identified through contact tracing efforts as having been in close contact of a COVID-19 case are required to self-quarantine for a minimum of 14-days.

### d.  Pack Unit Staff Quarantine

Pursuant to Policy B-14.52, TDCJ has established and maintained the following process for employees at all units, including the Pack Unit, who are sick or test positive for COVID-19. If an employee is sick, the employee is required to stay home from work. If an employee gets sick while at work, the employee is required to promptly report the illness to a supervisor and go home. In general, TDCJ employees, including employees working at the Pack Unit, may return to work based on a symptom-based strategy or a test-based strategy.

- Symptom-Based Strategy – Employees may return to work 14 days after symptom onset as long as they are no longer exhibiting symptoms (e.g., fever, cough, shortness of breath).

- Test-Based Strategy – Employees may return to work if they provide a negative COVID-19 test result and a healthcare provider's note releasing the employee to return to work.

Employees who return to work at the Pack Unit must self-monitor their symptoms and seek re-evaluation or medical treatment from a healthcare provider if symptoms recur or worsen.

---

[18]The term "close contact" in the context of COVID-19, is defined in the CDC Interim Guidance for Correctional and Detention Facilities as an individual who has been "within approximately 6 feet of a COVID-19 case for a prolonged period of time" or "ha[s] had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on)." ECF 36-8 at 3 (definition of "close contact of a COVID-19 case"). Policy B-14.52 similarly defines the term "close contact of a COVID-19 case" as "[a]n individual [who has] been within 6 feet of a COVID-19 case for a prolonged period of time, or (2) have had direct contact with respiratory droplets from a COVID-19 case such as a cough or sneeze." Defendants' Disclosures 0689-0727 (May 13, 2020, version of Policy B-14.52). For purposes of these definitions, TDCJ considers contact within 6 feet of a COVID-19 case for more than 15 minutes to be "a prolonged period of time."

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 12 of 20

_____

**Precautionary Lockdown at Pack Unit**

The Pack Unit has been under a "precautionary lockdown" since April 13, 2020, the day the autopsy conducted on offender Leonard Clerkly produced the first positive COVID-19 test result as reported to the Pack Unit. As a result, several of the Court's suggested areas for this update in the May 23, 2020 order are, by definition, covered by precautionary lockdown status.

The precautionary lockdown status at the Pack Unit will continue until the expiration of 14 days after receipt by TDCJ of a positive COVID-19 test relating to an offender assigned to the Pack Unit at time of testing or an employee who has worked at the Pack Unit. Under current operations (which include ongoing receipt of results from the mass/strike team testing and healthcare providers), it is not anticipated that the unit will be taken off precautionary lockdown until June 11, 2020 at the very earliest.

During precautionary lockdown, pursuant to TDCJ protocols, the following limitations on offender movement are in place at the Pack Unit:

- Offenders are restricted to their dorms except for showers, medical appointments, and medical emergencies.
- Offenders are fed in their dorms.
- All offender activities at the Pack Unit have been restricted during the precautionary lockdown, including recreation, religious programming, craft shop, lay-ins to the law library, and access to the general law library, barber shop and general library.[19]

**Education, Masks, Gloves, Cleaning Materials and Hand Sanitizer**

*a. Education for Offenders Regarding COVID-19*

The Pack Unit has continued to provide education to offenders about COVID-19 in many ways. Signs instructing offenders about washing their hands frequently have been posted in each dorm and in high traffic areas of the Pack Unit.[20] Correctional employees at the Pack Unit have been talking to offenders and

_____

[19]Offenders may submit a request to check out a book from the law library or the general library. The book will be brought to the offender for use in his assigned cubicle. Once the offender is finished with a book, that book will be returned to the law library or the general library to be sanitized and wiped down with a bleach solution before being returned to circulation.

[20]*See* Declaration of Warden Robert Herrera, filed under seal (copies of signs posted at the Pack Unit).

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 13 of 20

_____

answering questions about COVID-19 during count checks and daily rounds in each dorm. Medical staff from the Pack Unit infirmary have been talking with offenders and answering questions about COVID-19 when conducting temperature checks twice daily for those dorms on medical restriction and when conducting temperature and well checks twice daily or more for those dorms on medical isolation.

In addition, TDCJ produced a video about COVID-19 that is being shown to Pack Unit offenders via the televisions in the dayrooms of each dorm.[21]  The video describes the symptoms of COVID-19 and how to prevent the spread of COVID-19 by washing your hands frequently with soap and water. The video also explains the importance of wearing a mask and maintaining separation or social distance between oneself and others to avoid spreading the virus. The televisions in the dayrooms of each dorm at the Pack Unit have been turned, so they are visible by offenders throughout each dorm, and the video is shown 3 times per day in each dorm of the Pack Unit.

Pack Unit officials are also making announcements twice a week that medical co-pays have been waived and offenders may request a sick call with no charge. These announcements are made in English and Spanish, and they are broadcast over the public announcement (PA) system for Dorms 1 through 16 in the main building. The same announcements in English and Spanish are made by correctional officers twice a week in the 4 dorms in the expansion dorm, Dorms 17 through 20, and 3 dorms in the trusty camp.

### b.  Cotton Masks Provided to Offenders and TDCJ employees

TDCJ provided cotton masks to all correctional staff at the Pack Unit on April 5, 2020. On April 14, 2020, TDCJ issued cotton masks to 827 offenders at the Pack Unit who were age 65 and older. On April 15, 2020, all offenders at the Pack Unit received cotton masks. TDCJ also established and maintains a process by which an offender at the Pack Unit receives a clean cotton mask daily through a one-for-one exchange.

### c.  Gloves Provided to Janitors

The Pack Unit currently has four offenders housed in each dorm, who also work as SSIs. The Pack Unit SSIs work in two shifts with two SSIs assigned to work each shift. At the start of their shift, the Pack Unit property officer brings gloves and cleaning materials to the SSIs in each dorm.  The Pack Unit property officer has also confirmed that during the earlier time period ending nearly a year ago, SSIs were given one pair of elbow-length industrial gloves per shift, and the

_____

[21]*See* Defendants' Disclosures 2164-2166.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 14 of 20

_____

SSIs would share that pair of industrial gloves and the same pair of gloves would be reused on the next shift without being sanitized between uses. The Pack Unit stopped using the elbow-length gloves and has been providing the vinyl gloves to SSIs for about a year. Currently, each SSI receives a pair of wrist-length vinyl gloves at the start of his shift.[22] If the gloves are damaged or torn, an SSI may request another pair at any time during his shift by notifying a correctional officer or the Pack Unit property officer.

### d.  Cleaning Materials for Janitors

During the precautionary lockdown, the Pack Unit property officer brings cleaning materials to the SSIs in each dorm at the start of each shift. SSIs at the Pack Unit receive a mop bucket with a bleach pod that is dissolved in a small amount of water, which is then filled with water by the SSIs to use throughout their shift. Each SSI also receives two spray bottles, one containing two ounces of a product called Bippy and one containing two ounces of a product called Double D, as diluted with water. Additionally, with the onset of the COVID-19 pandemic, the Pack Unit also provides each SSI with a one-and-a-half-gallon sprayer filled with 8 oz. of powdered bleach dissolved in a small amount of water, that the SSI fills with water to use during his shift.[23] The Pack Unit property officer makes rounds during each shift to determine if SSIs need additional gloves or cleaning materials. SSIs may also request more cleaning materials at any time during his shift by notifying a correctional officer or the Pack Unit property officer.

### e.  Hand Sanitizer for Offenders

Including at the Pack Unit, TDCJ continues to make hand soap and water available to offenders for frequent hand-washing. Soap and water are readily available to all offenders at the Pack Unit. Each offender receives 5 bars of soap per week and may request additional bars of soap at any time and at no cost. During the precautionary lockdown, offenders have access to sinks and water to wash their hands in each of the dorms throughout the Pack Unit.

TDCJ has not provided hand sanitizer with 60% alcohol content to offenders. Distribution of hand sanitizer to offenders in correctional facilities is neither recommended nor required by the CDC Interim Guidance for Correctional and Detention Facilities. At page 8 of the CDC Interim Guidance previously filed with the Court, *see* ECF 36-8, the CDC states:

_____

[22] *See* Exhibit B (pictures of gloves and cleaning materials issued to each SSI at the start of his shift).

[23] *See id.*

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 15 of 20

_____

> *If soap and water are not available*, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol.  Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty. (Emphasis added.)

Distribution of alcohol-based hand sanitizer continues to implicate security concerns and alcohol-based products are considered contraband when possessed by offenders in a TDCJ prison unit.  Alcohol-based hand sanitizer is highly flammable and could be used by offenders as an accelerant to start or spread a fire. TDCJ continues to have concerns that due to high alcohol content, hand sanitizer may be consumed by offenders, thereby leading not only to potential intoxication but also to alcohol poisoning and illness. TDCJ's concerns are shared by other correctional institutions across the country, and TDCJ further notes for the Court that when the Nevada Department of Corrections (NDOC) relaxed their contraband policies and provided small bottles of alcohol-based hand sanitizer with 60% alcohol content to offenders on a trial basis in reaction to COVID-19, "within a few hours, two offenders drank their hand sanitizer and got sick…. NDOC had to confiscate all of the bottles [of hand sanitizer]."[24]

## Medical Staffing at Pack Unit

The medical staffing at the Pack Unit consists of 31 personnel:

| Position | Allotted | Filled |
|----------|----------|--------|
| Medical Doctor | 1 | 1 |
| Nurse Practitioner | 3 | 3 |
| Nurse Manager | 1 | 1 |
| RN | 8 | 6 |
| LVN | 14 | 8 |
| CMA | 8 | 2 |
| Dentist | 1 | 1 |
| Hygienist | 1 | 1 |
| Dental Assistant | 2 | 2 |
| Counselor | 1 | 1 |
| Social Worker | 1 | 1 |
| CCA | 5 | 4 |

_____

[24]https://www.cnn.com/2020/05/05/us/coronavirus-prison-hand-sanitizer-contraband-invs/index.html.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 16 of 20

_____

At least one RN, LVN and CMA are onsite at the Pack Unit 24 hours a day, seven days a week.  The physician goes to the Pack Unit twice a week to provide healthcare services.

The infirmary (*see* Exhibit H) continues to have 12 beds and as of 7:30 a.m. on May 27, 2020, has sufficient capacity for those who continue to receive care in the infirmary.

This level of medical staffing has proven to be sufficient to allow for utilization of the unit infirmary for medical appointments and also to provide sufficient nursing staff to administer temperature checks and other observation for offenders in medical isolation pursuant to the written B-14.52 protocol.  This is true even with the increased number of positive cases being uncovered through the proactive mass/strike force testing.  At the same time, this level of medical staffing is always subject to re-evaluation in the exercise of medical judgments of officials with UTMB, the contracted health care provider for offenders at the Pack Unit.

Of course, as the Court is aware from prior reports, the onset of emergency medical conditions may require the transportation of an offender at the Pack Unit to a local hospital, including CHI St. Joseph – Bryan, CHI St. Joseph – College Station, Baylor, Scott & White – College Station, and CHI St. Joseph – Grimes County, and for longer-term care to UTMB Galveston and the Hospital Galveston Unit within TDCJ.  To date, TDCJ has not received any indication from the local hospitals serving the Pack Unit offender population as needed that they have insufficient capacity to handle emergency care for Pack Unit offenders, and the Hospital Galveston Unit continues to have sufficient capacity to intake offenders from the Pack Unit and elsewhere who need longer-term medical care.

As of 5:00 p.m. on May 26, 2020, 12 offenders assigned to the Pack Unit were hospitalized offsite at a local hospital or at Hospital Galveston.

## Coordination/Communications with Federal and State Health Authorities

As indicated above, TDCJ representatives have been in contact with and have coordinated their action plan and policies with respect to COVID-19 response based on information provided by the CDC, the Texas Department of State Health Services, CMHC, and the TDCJ university healthcare providers.  More specifically, TDCJ leadership has communicated regularly with representatives of the following agencies and organizations:  the Texas Department of State Health Services, the University of Texas Medical Branch, the Texas Tech University Health Science Center, the Texas Division of Emergency Management, and the Southwest Texas Regional Advisory Council.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 17 of 20

_____

In addition to these contacts and communications, TDCJ leadership has coordinated its response to COVID-19 and communicated regularly with representatives of the Office of the Texas Governor, the Office of the Lieutenant Governor, the Office of Speaker of the Texas House of Representatives, as well as of members of the Texas Senate and Texas House of Representatives, including legislators serving on the Texas Senate Criminal Justice Committee and Texas House Corrections Committee

This contact and coordination began with the onset of the first reported COVID-19 cases in the State of Texas, in the first half of March 2020. TDCJ representatives have been in contact with federal and state health authorities as they implemented the various steps under the written policy B-14.52 as described above and in previous reports to the Court, as well as through the following steps:

As previously reported to this Court and to the Fifth Circuit, TDCJ has also continued diligently to implement the infection control policy first announced by TDCJ on March 20, 2020, and revised and updated on subsequent dates. As the Court is aware from the record, TDCJ adopted and implemented the original version of CMHC Infection Control Policy B-14.52 Coronavirus Disease 2019 (COVID-19) (the "Policy") on March 20, 2020. See ROA.552 (declaration of TDCJ Health Services Director). The Policy was most recently revised on May 13, 2020. *See* CMHC Infection Control Policy B-14.52 Coronavirus Disease 2019 (COVID-19), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection_control_policy_manual/B-14.52.pdf. The implementation of the Policy has been ongoing at the Pack Unit since the Policy was first enacted, and that implementation has continued. The continued implementation of the Policy has been reflected and manifested in the following ways, among others, since April 16, 2020:

a. Since April 13, 2020, the unit has remained on "precautionary lockdown," pursuant to the Policy, and offender movement during this lockdown has been restricted to the offender's assigned housing dorm, except for showers and medical appointments pursuant to the Policy.
b. In furtherance of the Policy's provisions related to medical isolation, offenders who have received a positive test result for COVID-19 and remain at the Pack Unit have been placed on medical isolation. These offenders are receiving medical treatment pursuant to the Policy from the University of Texas Medical Branch.
c. In furtherance of the Policy's provisions related to hygiene, cleaning, and use of personal protective equipment ("PPE"):
   - A process has been continued at the unit for offenders to receive clean face masks daily. Under this process, a used mask is exchanged for a clean mask in a one-for-one daily exchange.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 18 of 20

_____

- A process has been continued by which unit staff are issued N95 masks and face shields, which are to be worn at all times while on the unit.
- A process has been continued to issue hand sanitizer in small bottles to unit staff to be carried while on duty.
- Unit staff have continued to make hand soap available upon request by any offender at various locations within the unit, including the officer podiums outside of each dorm. There is no cost to an offender for additional hand soap.
- A process has been continued at the unit for offenders to receive clean face towels daily. Under this process, a used face towel is exchanged for a clean face towel in a one-for-one daily exchange.
- A process has been maintained at the unit for offenders to receive additional toilet paper, as needed. There is no cost to an offender for additional toilet paper.
- Common areas within the unit continue to be cleaned on a regular basis with anti-bacterial cleaning materials.

d. In furtherance of the Policy's provisions related to medical restriction due to possible exposure to the COVID-19 virus, the following steps continue to be taken:
- A process continues for medical staff to take the temperatures of offenders who are on medical restriction twice daily within the dorms.
- Any offender who remains on-site at the Pack Unit after testing positive for COVID-19 is placed on medical isolation. In addition, the dorm in which the offender resided is placed on medical restriction.
- Any offender who remains on-site at the Pack Unit while a test result is pending is placed on medical isolation. The offender is returned to the general population only if the pending result is negative.

e. In furtherance of the Policy's provisions related to social distancing:
- A process has been continued to minimize staff rotation at duty posts within the unit.
- Unit staff have continued to enforce social distancing among themselves and offenders when possible, as offenders move outside dorms to other areas within the unit.
- A process has been continued to minimize offender "turn out" for work assignments and the unit, and to enforce social distancing when possible during such turn out.

f. In furtherance of the Policy's provisions related to dissemination of information and education related to COVID-19:
- The CDC handout entitled "Share Facts About COVID-19," and other signage informing offenders about the symptoms of COVID-19 and how to prevent spread of the virus, continues to be posted in all dorms, and a copy of this CDC handout has been distributed to each offender in the unit.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 19 of 20

---

- Unit medical staff continue to answer offender questions during their rounds to take temperatures.
- Unit correctional staff continue speaking to offenders about COVID-19 and answering questions from offenders about the COVID-19 virus.
- A video produced by TDCJ continues to be made available on a regular basis to the offender population. This video explains and discusses COVID-19 symptoms and methods of preventing spread of the virus, through such actions as washing hands and observing social distancing. This video is made available via the televisions in the dayroom of each dorm.
- In furtherance of the Texas Governor's executive order suspending medical co-pays and the Policy's provisions related to dissemination of information related to COVID-19, a process has been continued for regular announcements in English and Spanish within each dorm encouraging offenders to request sick call appointments whenever they are feeling ill and reminding them that medical co-pays have been waived.

## Court's Inquiry on Release of Offenders

The Court has previously inquired and again inquires on what the Court characterizes as "compassionate release," undoubtedly with reference to provision of law applicable to federal incarceration, such as the First Step Act. Texas law does not grant authority for compassionate release.

First, the emergency absence provision in Texas Government Code § 501.006 is not a form of compassionate release. The relief afforded by this statute authorizes TDCJ only to grant an emergency absence under escort so that an offender in TDCJ custody may obtain medical diagnosis or treatment, obtain treatment and supervision at a Texas Department of Mental Health or Mental Retardation facility, or attend a funeral or visit a critically ill relative. *See* Tex. Gov't Code § 501.006. The emergency absence provision applies only in limited circumstances and does not authorize TDCJ to grant parole, shorten a sentence, or release an offender.

Second, Chapter 508 of the Texas Government Code governs parole and mandatory supervision. Section 508.118 provides for the use of halfway houses, through the Pardons and Paroles Division. Section 508.118 directs the Pardons and Paroles Division, together with the Institutional Division, to use halfway houses "to divert from housing in regular units of the institutional division suitable low-risk inmates and other inmates who would benefit from a smoother transition from incarceration to supervised release." Tex. Gov't Code § 508.118(a). This is not "compassionate release," as an offender must demonstrate eligibility for placement in a halfway house under the statutory criteria before being considered for this program.

Wallace Pack Unit COVID 19 Update
*Valentine, et al. v. Collier, et al.*, No. 4:20-CV-01115
May 27, 2020
Page 20 of 20

_____

Third, TDCJ is not vested with any special authority under a state of emergency to grant early releases.

Fourth, as Defendants have previously apprised the Court, there is under state law a form of parole release known as Medically Recommended Intensive Supervision (MRIS). This form of parole release is, conceptually, the closest equivalent to a form of compassionate relief under Texas law. Under the MRIS program, the Texas Board of Pardons and Paroles is given authority to consider an inmate's suitability for release to parole in circumstances in which a doctor has certified that the inmate has a terminal illness or requires serious long-term care. *See* Tex. Gov't Code § 508.146. The MRIS program gives no decision-making authority to TDCJ.

For the Court's information, from September 1, 2019, through April 6, 2020, there were 37 offenders housed at the Pack Unit who had MRIS referrals. Of these 37 offenders:

- 6 were approved for release to parole prior to the receipt of the MRIS referral.
- 9 were ineligible because of their conviction of an offense described in Article 42A.054, Code of Criminal Procedure, and did not meet the heightened statutory criteria. *See* Tex. Gov't Code § 508.146(a)(1)(A).
- 12 were ineligible because they have reportable convictions under Chapter 62, Code of Criminal Procedure, and did not meet the heightened statutory criteria. *See* Tex. Gov't Code § 508.146(a)(1)(B).
- 1 was denied MRIS because he is a not a citizen of the United States. *See* Tex. Gov't Code § 508.146(f).
- 9 offenders did not meet the clinical criteria for MRIS. *See* Tex. Gov't Code § 508.146(a).
  - 1 of these 9 offenders who did not meet the clinical criteria for MRIS was subsequently released to parole on March 23, 2020.
- None of the 37 Pack Unit offenders referred for MRIS consideration during this time period were approved for MRIS release.