IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
**FILED**

JUN 10 2020

| | | |
|---|---|---|
| LADDY CURTIS VALENTINE, et al, | * | David J. Bradley, Clerk of Court |
|      Plaintiffs, | * | |
| | * | |
| vs. | * | Case No. 4:20-cv-01115 |
| | * | |
| BRYAN COLLIER, et al, | * | |
|      Defendnts. | * | |

### RAMSEY UNIT PLAINTIFF'S MOTION TO INTERVENE

Proposed intervenors John Anthony Saenz, Troy Robeson, Larry Gross, Rudy Rodriguez, Richard A.A. Lyon, Edward Patrick Smyth, Oliver Latura Leverett, Leyton Douglas Baugh, Bradon Johnson, Savorge Lee Curl, David Vega Morales, Demarcus Johnson, Pedro Gallegos, Earl McBride, Jr., Jerry Johnson, Hiram Carrasquillo, Brice Chatman, and Marshall Ray Armstrong (collectively, the "Ramsey Unit Plaintiffs"), pro se, respectfully move under Federal Rule of Civil Procedure 24(b) to intervene by permission as plaintiffs in the above-captioned case. Pursuant to Local Rule CV-7(i), the Ramsey Unit Plaintiffs certify that they have written the parties to the case to try and confer in good faith with them but have not received a response from either.

### BACKGROUND

This lawsuit arises from a constitutional and statutory challenge brought by prisoners housed at the Wallace Pack Unit (collectively, the "Pack Unit Plaintiffs") against Defendants the Texas Department of Criminal Justice ("TDCJ") and its officials (collectively, the Defendants). See March 30, 2020 Compl., ECF 1. Specifically, the Pack Unit Plaintiffs allege that the Defendants have engaged, and continue to engage, in deliberately indifferent and discriminatory conduct in

1

failing to protect the Pack Unit Plaintiffs and their fellow Pack Unit
prisoners who face a high risk of severe illness from exposure to
SARS-CoV-2019, the novel coronavirus that causes Corona Virus Disease
2019 (or "COVID-19"). See id. ¶¶ 31-43, 47-48, 73-100.

The Ramsey Unit Plaintiffs and the class they seek to represent are
also in the custody of the TDCJ, and their complaint also challenges
policies and conduct of the TDCJ and its personnel. The Ramsey Unit
Plaintiffs are minimum custody prisoners incarcerated in the Ramsey 1
Unit located near Rosharon, in unincorporated Brazoria County,
Texas. See June 5, 2020 Compl., Saenz v. Collier (Ex. 1) ¶¶ 13-30. The
Ramsey Plaintiffs' class action complaint brought under 42 U.S.C. § 1983
and the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"),
alleges violations of the Plaintiffs' and putative class members'
constitutional and statutory rights. See id. ¶¶ 153-161 (Eighth and
Fourteenth Am. Claim), id. ¶¶ 162-169 (ADA Claims). Specifically, the
Ramsey Unit Plaintiffs allege that the Defendants, in their official
capacities and acting under color of state law, have acted with
deliberate indifference to the serious risk COVID-19 poses to the Ramsey
Unit Plaintiffs and unnamed class members. Id. ¶¶ 73-90, 153-161. The
Defendants' deliberate indifference and failure to take action to
protect the Ramsey Unit Plaintiffs is in violation of their rights under
the Eighth and Fourteenth Amendments to the U.S. Constitution and the
ADA. Id. ¶¶ 153-169. The Ramsey Unit Plaintiffs also challenge arbitrary
and unjustified restrictions the TDCJ has placed on their efforts to
access the courts. Id. ¶¶ 170-175. The Ramsey Unit Plaintiffs also
challenge the unlawful restriction and denial of Plaintiff's inhalers
for chronic asthma in violation of the Eighth Amendment. Id. ¶¶

176-186. The Ramsey Unit Plaintiffs' further challenge the Defendant's unlawful deprivation of basic human needs in violation of the Eighth and Fouteenth Amendment right to exercise and from overcrowed conditions. Id.¶¶ 187-201.

## ARGUMENT

The Ramsey Unit Plaintiffs satisfy the standard for permissive intervention. Federal Rule of Civil Procedure 24(b)(1)(B) provides that "[o]n timely motion, the court may permit anyone to intervene who...has a claim or defense that shares with the main action a common question of law or fact." See also Newby v. Enron Corp., 443 F3d 416, 421 (5th Cir. 2006)("The decision to permit intervention...requires a threshold determination that the [intervenor's] claim or defense and the main action have a question of law or fact in common." (citation omitted)). While, "[p]ermissive intervention is wholly discretionary," Kneeland v. Nat'l Collegiate Athletic Ass'n, 806 F2d 1285, 1289 §5th Cir. 1987)(citation omitted), "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," Fed. R. Civ.P. 24(b)(3). See also Heaton v Monogram Credit Card Bank of Ga., 297 F3d 416, 422 (5th Cir. 2002)("Federal courts should allow intervention where no one would be hurt and the greater justice could be attained." (citation ommitted)). Thus, in the Fifth Circuit, permissive intervention is appropriate when: "(1) timely appliction is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." League of United Latin Am. Citizens, Council No. 4434

v. Clements, 884 F2d 185, 189 n.2 (5th Cir. 1989).

A. The Motion to Intervene Is Timely

Given the early stage of this litigation, the lack of potential prejudice to the parties, and the rapidly evolving nature of the COVID-19 outbreak, this motion is timely. To evaluate whether a Rule 24 motion is timely, the Court looks to the four factors articulated in Stallworth v Mansanto Co., 558 F2d 257, 264-66 (5th Cir. 1977); namely, (1) "[t]he length of time during which the would-be intervenor actually know[s] or reasonably should have known of his interest in the case before he petitioned for leave to intervene," (2) "[t]he extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or resonably should have known of his interest in the case," (3) "[t]he extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied," and (4) "[t]he existence of unusual circumstances militating either for or against a determination that the application is timely."

The first Stallworth factor "focuses on the time lapse between the applicant's receipt of actual or constructive knowledge of his interest in the litigation and the filing of his motion for intervention," Edwards v City of Houston, 78 F3d 983, 1000 (5th Cir. 1996). There was no material lapse between the Ramsey Unit Plaintiffs' receipt of notice of this lawsuit--which was filed 2 months ago-and their filing of this motion. See e.g., Sierra Club v. Espy, 18 F3d 1202, 1205-206 (5th Cir. 1994)(Rule 24 motion was timely when made within two months of becoming aware that interst were affected), Ass'n of Prof'l Flight Attendants v. Gibbs, 804 F2d 318, 320-21 (5th Cir. 1986)(five-month

lapse not unreasonable). Indeed, such a period of time was appropriate for the Ramsey Unit Plaintiffs to investigate the factual and legal bases for their claims. See Espy, 18 F3d at 1206 ("Courts should discourage premature intervention that wastes judicial resources.").

As the second factor, any potential prejudice "must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." Id. Again, this factor favors the Ramsey Unit Plaintiffs given the recent filing of the underlying litigation. See id. (:The movants sought intervention less than three weeks after the Forest Service issued its ... letter. We therefore conclude that no prejudice to the existing parties resulted from the delay in seeking intervention.").

The third Stallworth factor-the potential prejudice the Ramsey Unit will suffer if their motion is denied--likewise favors a finding of timeliness. This Court, having considered the Pack's Unit Plaintiffs' complaint and motion for a preliminary injunction, is already well-versed in the factual and legal issues underlying the claims brought by both sets of plaintiff classes against the TDCJ. Thus, if the Court denies the motion, the Ramsey Unit Plaintiffs will surely be prejudiced, if nothing else by their continued exposure to COVID-19 while their case is reassigned to a judge who is seeing these issues for the first time.

Finally, under the Fourth Stallworth factor, the Court "must ascertain whether any unusual factors weigh in favor of a finding of timeliness." Ross v Marshall, 426 F3d 74, 756 (5th Cir. 2005). To put it bluntly, it would be hard to imagine more unusual circumstances than these: the world is suffering from an unprecedented, deadly pandemic

from a novel virus that originated five months ago and saw its first
confirmed infection within this judicial district just ten weeks
ago. See Rebecca Hennes, How Did We Get Here? A Timeline of the
Coronavirus pandemic in Houston, Houston Chronicle, March 31,
2020,https://www.chron.com/coronavirus/article/Coronavirus-Houston
-pandemic-timeline-events-March-15167044.php.

   As this Court recently observed, We are living in unprecedented
times. The COVID-19 pandemic threatens our communities and has required
us to upend our routines and assumptions. With no known vaccine or cure
for COVID-19 and the highly contagious and asymptomatic nature of the
novel coronavirus, as well as overwhelmed medical systems throughout our
communities, our prisons, jails, and detention facilities are facing
outbreaks that differ from any infectious disease outbreak that have
occurred in the past. Vazquez Barrera v Wolf, 2020 WL 1904497, at *4
(S.D. Tex. April 17, 2020). Accordingly, the fourth factor is satisfied,
and the Court should find the motion timely.

   B. The Ramsey Unit Plaintiffs' claims share common questions of law
      and fact with this litigation.

   1 The "claim or defense" requirement of Rule 24(b)(2) is to be
construed liberally. Newby, 443 F3d at 422. But here, the Court need not
liberally construe the requirement to find the common questions that
warrant permissive intervention in these proceedings under Rule 24.

   2. Though the Defendants have not yet answered the Pack Unit
Plaintiffs' complaint in this action, given its similar legal claims and
fact patterns it stands to reason that the Defendants' defense in this
case will share common questions of law and fact with their defenses in
the Ramsey Unit litigation.

First the Ramsey Unit Plaintiffs' claims raise near identical questions of law to those of the Pack Unit Plaintiffs. Specifically, a court would have to determine all of the following to resolve both classes' allegations: (1) whether the Pack Unit and Ramsey Unit Plaintiffs' Eighth and Fourteenth Amendment rights are being violated by Defendants' failure to implement adequate procedures and practices to protect the class from COVID-19, (2) whether this failure constitutes cruel and unusual punishment; (3) whether members of the Disability Subclasses, as defined by both comlaints, are qualifying individuals with a disability under the meaning of the ADA and Rehabilitation Act, (4) whether the Disability Subclasses' rights under the ADA and Rehabilitation Act are violated by the TDCJ's policies and practices, and (5) whether TDCJ illegally discriminated against the Disability Class by denying the Disability Class reasonable accommodations recommended by the CDC, both in policy and in practice. Compare Compl. ¶¶ 73-90, 149, 153-161.

C. Intervention Will Not Unduly Delay the Litigation or Prejudice the Rights of Original Parties

The Ramsey Unit Plaintiffs' intervention will neither unduly delay the litigation nor prejudice the rights of the original parties. It is well established that when a case is recently filed, there is little risk that intervention will harm the original parties to the litigation. See, e.g., Home Ins. Co. v Hughes, 1996 WL 109292, at *2(E.D. La. Mar. 11, 1996)(holding that "Ford's intervention will not delay or prejudice the rights of the original parties as the suit was only recently filed"). Such a consideration readily distinguishes this case from Cole v Collier, where the Court denied a series of Rule 24(b)

motions filed over three years into litigation. See Cole v Collier, 2017 WL 2118970, at *2 (S.D. Tex. May 16, 2017)(denying Rule 24(b) motion upon finding that "permitting intervention would cause undue delay and prejudice to the existing parties"). Permitting the Ramsey Unit Plaintiffs to intervene will aid the Court in deciding these important questions of law and fact, and likewise assist the Parties to achieve a just outcome for a greater number of plaintiffs.

Such considerations weigh in favor of the Ramsey Unit Plaintiffs and the class they seek to represent.

The Fifth Circuit has instructed that when considering a Rule 24(b) motion to intervene , a district court may also consider "whether the intervenors' interests are adequately represented by other parties" and whether they "will significantly contribute to full development of the underlying factual issues in the suit." New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co., 732 F2d 452, 472 (5th Cir. 1984)(en banc)(citations omitted). Granting the Ramsey Unit Plintiffs' motion to intervene. See Texas v United States, 805 F3d 653, 657 (5th Cir. 2015)(observing that where greater justice can be obtained, federal courts should permit intervention).

CONCLUSION

For the foregoing reasons, the Ramsey Unit Plaintiffs respectfully request that the Court grant their motion to intervene through the filing of Exhibit 1, the Ramsey Unit Plaintiffs' Complaint in Intervention.

Dated: May 5, 2020                       Respectfully submitted,

John Anthony Saenz, pro se

Troy Roberson, pro se 6-5-20

Larry Gross, pro se

Rudy Rodriguez, pro se

Richard A.A. Lyon, pro se

Edward Patrick Smyth, pro se

Oliver LaTura Leverett, Pro se

Leyton Douglas Baugh, pro se

Brandon Johnson, pro se

Sayorge Lee Curl, pro se

David Vega Moralse, pro se

Demarcus Johnson, pro se

Pedro Gallegos, pro se

Earl McBride, Jr, pro se   6-5-20

Jerry Johnson, pro se

Hiram Carrasquillo, pro se

Bruce Chatman, pro se

Marshal Ray Armstrong, pro se

EXHIBIT - 1

Ramsey 1 Unit Complaint "Plaintiffs"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,　＊
LARRY GROSS, RUDY RODRIGUEZ, RICHARD ＊
A. A. LYON, EDWARD PATRICK SMYTH,　　　＊
OLIVER LATURA LEVERETT, LEYTON　　　　＊
DOUGLAS BAUGH, BRADON JOHNSON,　　　　＊
SAVORGE LEE CURL, DAVID VEGA　　　　　＊
MORALES, DEMARCUS JOHNSON, PEDRO　　　＊
GALLEGOS, EARL MCBRIDE, JR., JERRY　　＊
JOHNSON, HIRAM CARRASQUILLO, BRICE　　＊
CHATMAN, AND MARSHALL RAY ARMSTRONG　＊
individually and on behalf of those　＊
similarly situated,　　　　　　　　　　＊
　　　　　　　　　　　　　　　　　　　　＊
　　　　　　Plaintiffs,　　　　　　　　＊　　Case No._____
　　　　　　　　　　　　　　　　　　　　＊
BRYAN COLLIER, in his official　　　　＊
capacity, LORI DAVIS, in her　　　　　＊
official capacity, KATHERINE PITMAN, ＊
in her official capacity, and　　　　＊
DEFENDANT TEXAS DEPARTMENT OF　　　　＊
CRIMINAL JUSTICE,　　　　　　　　　　＊
　　　　　　　　　　　　　　　　　　　　＊
　　　　　　Defendant.　　　　　　　　＊

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs John Anthony Saenz, Troy Robeson, Larry Gross, Rudy

Rodriguez, Richard A.A. Lyon, Edward Patrick Smyth, Oliver Latura

Leverett, Leyton Douglas Baugh, Bradon Johnson, Savorge Lee Curl, David

Vega Morales, Demarcus Johnson, Pedro Gallegos, Earl McBride, Jr., Jerry

Johnson, Hiram Carrasquillo, Brice Chatman, and Marshall Ray Armstrong

(collectively "Plaintiffs"), on behalf of a class of similarly situated

minimum custody prisoners, bring this action to enjoin policies and

conduct that threaten their health and safety in violation of the United

States Constitution. Plaintiffs are minimum custody prisoners at the

Ramsey 1 Unit (the "Ramsey Unit"), a facility operated by the Texas

Department of Criminal Justice ("TDCJ"). TDCJ and the individual

defendants are failing to undertake basic measures to protect the

1

Plaintiffs from the risk of disease and death presented by the novel coronavirus know as SARS-CoV-2019. This failure amounts to deliberate indifference to their health and safety in violation of the Eighth and Fourteenth Amendments, and acute failures for Plaintiffs with disabilities in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Consequently, TDCJ and the individual defendants are impeding Plaintiffs' ability to access the courts, by imposing an exact cite system in order to have access to any case law and books. Further, TDCJ and the individual defendants are deliberately denying Plaintiffs access to grievances necessary to informally exhaust their issues. These restrictions, interfering with the Plaintiffs' ability to petition the Government for a redress of grievances, violate the Plaintiffs' rights under the First and Fourteenth Amendments to the Constitution. Plaintiffs ask this Court to address these violations amid an unprecedented, ongoing threat to Plaintiffs' health and safety. To further complicate matters, these defendants are denying a few plaintiffs their prescribed inhalers for chronic asthma when they have been prescribed these inhalers for years

## STATEMENT OF THE CASE

1. The spread of the novel coronavirus known as SARS-CoV-2019 presents an extraordinary threat to public health. Across the world, governments have ordered dramatic measures to prevent the spread of the coronavirus and to address the effects of Coronavirus Disease 2019 ("COVID-19"). The governments have ordered these measures at enormous social and economic cost because these drastic measures are compelled by the contagious nature of the coronavirus and the lethal nature of COVID-19. This is truly an unprecedented health cris.

2. The threat of COVID-19 poses special risks for the incarcerated. Unlike the rest of society, prisoners like the Plaintiffs are unable to limit their exposure to COVID-19. Given their living situations, and ability to participate proactively in measures to keep themselves safe, by exercising social distancing, wearing masks when social distancing is impossible, washing hands regularly with soap and water, using hand sanitizer when hand-washing is not possible, and systematically cleaning the areas they contact throughout the day. Instead, Plaintiffs must rely on Defendants to develope and implement policies that will safeguard each of them individually from infectious disease. At a time when the entire world is working to prevent the spread of the novel coronavirus, Plaintiffs are essentially at the mercy of corrections personnel to protect them from COVID-19.

3. These risk are heightened for prisoners at the Ramsey 1 Unit. A disporportionate number (approximately 50%) are over the age of 50. Because of the conditions of this unit, (red brick unit) those who entered with physical ailments have only declined; those who entered healthy are, by and large, no longer so. Moreover, there are a significant number of severely mentally ill and intellectually disabled prisoners, who are at particular risk because of their inability to understand signage, directions, or to maintain even the most basic self-care. This is the case for prisoners like Plaintiffs and similarly-situated minimum custody prisoners who are incarcerated in maximum-security conditions at the Ramsey 1 Unit.

4. TDCJ and other Defendants are failing to undertake the basic measures recommended by the CDC to protect the health of Plaintiffs. Defendants have not developed and do not adequately enforce policies

3

that will prevent the spread of COVID-19 within the Ramsey 1 Unit. Corrections officers and other personnel are not consistently using personal protective equipment ("PPE") in their interactions with Plaintiffs. Plaintiffs do not receive adequate supplies for personal hygiene in light of the heightened risk of disease. Nor do they receive adequate supplies for maintaining safe conditions in their cells. Defendants do not have a reasonable plan to alleviate the over-crowed conditions on this unit when they do not even have dayrooms and house two prisoners in cells desined for one. Defendants do not have a reasonable plan for addressing the treatment of Plaintiffs or any prisoners who contract COVID-19 when there is no medical personnel after 6 P.M.. Nor do Defendants have a plan for confining the disease in the event it infects the Ramsey 1 Unit. Defendants are also failing to take reasonable measures to educate Plaintiffs about COVID-19 and how to mitigate the risk of contracting the disease. Defendant's failure to address the threat that SARS-CoV-2019 poses to Plaintiffs in this global health crisis falls short of basic, minimum standards. This failure amounts to deliberate indifference to the health and safety of the Plaintiffs in their custody.

5. At the same time Defendants have failed to implement reasonable protections for Plaintiffs' health, Defendants have imposed highly restrictive and arbitrary policies governing access to courts. With the outbreak of COVID-19, it has become impossible for Plaintiffs to access any case law and books without an exact cite. And whenever these Plaintiffs come across a cite they can only request 3 cases, 3 times per week on loan each time to be returned the next day. In order to effectively obtain access to the courts, more than simple "facts" are

needed in order to file by way of a class action, or habeas corpus. A prisoner should know the rules concerning venue, jurisdiction, exhaustion of remedies, and proper parties respondent. A prisoner should know which facts are legally significant, and merit presentation to the Court, and which are irrelevant or confusing. When the return is filed, it is never without abundant citations to legal authority, and a proper traverse must take cognizance of these points. No attorney filing a law suit omits a statement of points and authorities, and neither does the State's attorney in responding to one. Because access to courts is being denied, there is no way that prisoners can petition the courts effectively in any meaningful way. Rather than accommodating this problem, Defendants systematically restricted access to the courts by requiring an exact cite before a Plaintiff could obtain any thing from their Law Library. and closing the only current means of real access to courts, while at the same time, allowing prisoners to go work at the Factory, Fields, Laundry, Kitchen, School house, Commissary, Vocation Etc..., with no restrictions on the number of inmates going to those jobs. In these setting there is no social distancing. The effects of Defendants' policies and their arbitrary implementations has been to impede Plaintiffs' access to courts and any attempt at exhaustion of their issues by denying them grievances as well.

6. Defendants deliberately transferred 20 inmates that were exposed to positive COVID-19 prisoners from the Scott and Stringfellow Units to the Ramsey 1 Unit without notifying local officials, when there were no active COVID-19 cases at Ramsey 1 Unit at the time. See Exhibit - A

7. On information and belief several days after the arrival of these 20 prisoners, two of them began exhibiting symptoms of COVID-19 and

thereafter tested positive for COVID-19.

8. Defendants, assigned officers to monitor these prisoners, and allowed these same officers to mingle with other prisoners and officers on the same day as the day they were assigned to monitor these 20 prisoners potentially cross contaminating the general population and exposing them to COVID-19 and to serious injury or death.

9. Defendants and others do not have an effective evacuation plan to deal with the COVID-19 pandemic in the event of a Hurricane emergency evacuation is needed for the Ramsey 1 Unit. In 2016 and 2017, the Ramsey 1 Unit evacuated all the prisoners to different units throughout the system exposing it's prisoners to cruel and unusual conditions by quaranting prisoners in extremely overcrowed settings that resemble live stock in a wet market for a total of six (6) weeks. See Exhibit - B These conditions combined with the COVID-19 pandemic would ensure the rapid spread of the virus, potentially exposing all the prisoners to the unnecessary infliction of serious injury or death

10. As a result of the foregoing actions and failures to act, Defendants have violated Plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution and the Americans with disabilities Act ("ADA").

JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C.§ 1331 (federal questions), § 1343 (civil rights), and § 2201 (declaratory Judgement Act).

12. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

PARTIES

A. Plaintiffs

13. John Anthony Saenz is 47 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

14. Troy Roberson is 52 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

15. Larry Gross is 57 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

16. Rudy Rodriguez is 40 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

17. Richard A.A. Lyon is 63 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

18. Edward Patrick Smyth is 36 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

19. Oliver LaTura Leverett is 46 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

20. Leyton Douglas Baugh is 40 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

21. Brandon Johnson is 38 years old and currently incarcerated at the

7

Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

22. Savorge Lee Curl, is 38 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

23. David Vega Morales is 37 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

24. Demarcus Johnson is 46 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

25. Pedro Gallegos is 41 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

26. Earl McBride is 62 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed ot COVID-19.

27. Jerry Johnson is 38 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

28. Hiram Carrasquillo is 47 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

29. Brice Chatman is 49 years old and currently incarcerated at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

30. Marshall Ray Armstrong is 57 years old and currently incarcerated

at the Ramsey 1 Unit, where he is at risk of death or serious injury if exposed to COVID-19.

    B. Defendants

31. Defendant Texas Department of Criminal Justice ("TDCJ") is an agency of the State of Texas and responsible for criminal justice for adult prisoners, including managing prisoners in state prison, state jails, and private correctional facilities. Tex. Gov't Code § 493.004. At all relevant times TDCJ operated the Ramsey 1 Unit, a maximum-security prison located near Rosharon, in unincorporated Brazoria County, Texas. Ramsey 1 Unit houses a lot of eldery prisoners, where Plaintiffs reside. TDCJ's headquarters is located in Huntsville, in Walker County, within the Southern District, Houston Divsion.

32. Defendant Bryan Collier is the executive director of TDCJ and works at TDCJ's Huntsville office. As executive director, Mr. Collier is responsible for overseeing the various departments and divisions of TDCJ, including but not limited to, the Administrative Review & Risk management Division, Emergency Action Center and Office of Emergency Management and Health Services Division. The executive director is responsible for the administration and enforcement of all laws relating to TDCJ, including rules implemented by TDCJ Id. § 493.006. Moreover, Mr. Collier is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, Mr. Collier was acting under color of state law. He is being sued in his official capacity for declaratory and injunctive relief.

33. Collectively, Mr. Collier and TDCJ with its various divisions and departments are responsible for "the care and custody of nearly 147,000 offenders," including the men incarcerated within the Ramsey 1 Unit.[1]

34. The mission of TDCJ's Administrative Review & Risk Management Division )"ARRM") is to "promote excellence in correctional practice through policy development, monitoring, identifying areas of potential risk or liability, and facilitating action to maintain safety, accountability, efficiency and professionalism."[2] ARRM is compromised of various department in order to fulfill its mission. The departments of ARRM include the Review & Standards Department and the Monitoring & Standards Department. On information and belief, ARRM and all related departments are located in TDCJ's headquaters, located in Huntsville, in Walker County, within the Southern District, Houston Division.

35. On information and belief, ARRM and its departments work with prisons, like the Ramsey 1 Unit to monitor and implement TDCJ policies, including new policies that may arise due to unique circumstances, such as the COVID-19 pandemic. Within AARM, the Review & Standards Department is tasked with managing "risks affecting people, property and liability, and monitor[ing] adherence to rules, regulations, policies and correctional practices required for certification by the American Correctional Association, which focus on public safety, humane treatment of offenders and the effective operation of correctional units." [3] On information and belief, the Review & Standard Department monitors the implementation of rules, regulations, policies and correctional practices at the Ramsey 1 Unit.

36. The Monitoring & Standard Department of AARM is tasked with monitoring TDCJ facilities, like the Ramsey 1 Unit, to ensure that "operations are in accordance with agency policies and procedures, court orders and nationally accepted standards established by the American Correctional Association." [4]

37. In order to streamline communication within TDCJ, the Emergency Action Center ("EC") is tasked with corrdination among the Texas Board of Criminal Justice, the various TDCJ units and departments and administrative staff to "report serious and unusual incidents."[5] On information and belief, the EAC coordinated with units like the Ramsey 1 Unit to respond to the spread of COVID-19 and such coordination occurred in TDCJ's headquarters, located in Huntsville, in Walker County, within the Southern District, Houston Division.

38. The Health Services Division is authorized to "ensure access to cre, monitor quality of care, investigate medical grievances, and conduct operational review audits of health care services at TDCJ facilities." [6] On information and belief, the Health Services Division is tasked with monitoring quality of care related to COVID-19 at units, such as the Ramsey 1 Unit. The Health Services division is located at 's headquarters, located in Huntsville, located in Huntsville, in Walker County within the Southern District, Houston Division.

39. On information and belief, TDCJ and Mr. Collier consented to, have knowledge of, have materially participated in, and/or have controlled the activities of various divisions of TDCJ related to the COVID-19 pandemic, including but not limited to the Administrative Review & Risk management Division, Emergency Action Center and Office of Emergency Management, and Health Services Division.

40. Defendant Katherine Pitman, is the Warden of the Ramsey 1 Unit. At all times described herein, she was acting under the color of state law. On information and belief, as the warden of the Ramsey 1 Unit, Ms. Katherine Pitman is responsible for coordinating with Mr. Collier, and the relevant divisions of TDCJ to ensure that the conditions of

confinement at the Ramsey 1 Unit are constitutional. She is being sued in her official capacity for declaratory and injunctive relief.

FACTS BACKGROUND

A. COVID-19 is a Deadly Pandemic and Public Health Emergency

41. Since the end of 2019, the novel coronavirus has spread throughout the world and has now caused a global pandemic. COVID-19 is a disease caused by the highly communicable respiratory virus that spreads through close contact and common surfaces containing the virus. People of all ages are at risk of serious injury and death from COVID-19.[7]

42. On January 21, 2020, the first confirmed COVID-19 case was diagnosed in the United States.[8]

43. On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "Public Health Emergency of International Concern" as cases had been "reported in five WHO regions in one month."[9]

44. The next day, the U.S. Secretary of Health and Human Services declared under Section 319 of the Public Health Service Act (42 U.S.C. § 247d), that COVID-19 "present[ed] a Public Health Emergency in the United States."[10]

45. On February 28, 2020, the United States saw its first COVID-19 death.[11]

46. On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States.[12]

47. On March 13, 2020, Texas Governor Greg Abbott determined that COVID-19 poses an imminent threat of disaster" and, under Section 418.014 of the Texas Government Code, declared "a state of disaster for all

counties in Texas."[13] At a press conference announcing the disaster declaration, Governor Abbott directed state agencies to restrict visitations at Texas prisons, jails, and juvenile justice facilities.[14] TDCJ suspended visitation the same day.[15]

48. Subsequently, the Texas Department of State Health Services determined on March 19, 2020 that "COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code.[16] The same day, Governor Abbott issued Executive Order CA08, which provides in part that "every person in Texas shall avoid social gatherings in groups of more than 10 people."[17]

49. On March 30, 2020 Governor Abbott issued Executed Order GA14, which instructs Texasns to "minimize social gatherings and minimize in-person contact with people who are not in the same household."[18]

50. The World Health Organization ("WHO") estimates that as of May 1, 2020, there are 3,157,207 confirmed cases and 224,172 confirmed deaths, and 203 countries, areas, or territories with confirmed cases.[19]

51. In the United States, the Centers for Disease Control and Prevention §"CDC"¶ estimates that as April 30, 2020, there are 1,031,659 confirmed cases and 60,057 confirmed deaths i all 50 states and the District of Columbia, Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands.[20]

52. As of April 28, 2020, the Texas Department of Health Services reported 28,087 cases of COVID-19 with 782 deaths.[21]

53. Due to the highly contagious nature of COVID-19, despite widespread "shelter in place" orders throughout the UNited States, the rate of COVID-19 infections has grown and continues to grow, exponentially.[22]

B. COVID-19 is Easily Transmissible and Spreads Rapidly in a Prison
   Environment

54. COVID-19 is a particularly contagious disease. A recent study
showed that the virus can survive for up to three hours in the air and
longer on certain surfaces: four hours on copper, twenty-four hours on
cardboard, and two to three days on plastic and stainless steel--surfaces
the prisoners at the Ramsey 1 Unit come into contact with everyday.[23]

55. COVID-19 has been especially dangerous in areas of close
confinement and has spread rapidly in jails and prisons. Jails and
prisons are at even greater risk because of their close quarters communal
living spaces.[24]

56. A study of an early cluster of COVID-19 cases in Wuhan, China
revealed the dangers of indirect transmission resulting from infected
people contaminating common surfaces- in the study, it was a communal
restroom, like the restrooms Ramsey 1 Unit prisoners use.[25]

57. In Jining China 207 individuals in a correctional facility
contracted COVID-19 after a prison officer contracted it outside of the
facility and then came to work while he was asymptomaic.[26]

58. Prisons throughout the United States have suffered widespread
outbreaks. In New York City, the first case of COVID-19 infection in a
jail detainee was diagnosed on March 18, 2020. Within four weeks, 650
cases had been diagnosed with five deaths at the Rikers Island
Correctional Complex.[27] The Marion Correctional Institution in Ohio
was the largest source of reported infection in the United States on
April 20, 2020. Nearly 75 percent of prisoners at the prison tested
positive for COVID-19.[28]

59. COVID-19 has also spread to death row cell blocks in certain

prisons. For example, in Arizona four prisoners on death row tested positive for COVID-19 and another five exhibited symptoms, and one has died from COVID-19.[29]

60. Several prisons throughout Texas have also experienced significant outbreaks of COVID-19 and the number of prisoners testing positive continues to skyrocket.[30] TDCJ reported on May 22, 2020 that 2495 prisoners have tested positive for COVID-19.[31] A further 21,468 prisoners are on medical restriction because they were exposed to COVID-19.[32] TDCJ also reported nearly 800 employees, staff, or contractors had contracted COVID-19.[33]

61. These outbreaks have already proven fatal. As of May 22, 2020, 36 prisoners have died as a result of COVID-19.and 22 other deaths are under investigation.[34] Moreover, several TDCJ employees have also succumbed to COVID-19[35]

62. Controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission of the virus by people who are contagious but who exhibit limited or no symptoms. The prominence of asymptomatic carries renders ineffective any screening tools dependent on identifying symptomatic behavior.[36] Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Disease, stated that "somewhere between 25% and 50% of people infected with the new coronavirus may never show symptoms or fall ill.[37] These asymptomatic carriers still spread the virus to others. In addition, TDCJ has spent $45 million on coronavirus test that prisoners can self-administer themselves. However their accuracy is uncertain.[38] There is no way to know the true results because, the people who are administering the test are TDCJ employees. TDCJ is know to give false narratives,

specifically Ramsey 1 Unit. Ramsey 1 Unit is notoriously know for this type of activity, especially in retaliation and setting prisoners up who disclose the truth.[39]

63. Evidence suggest that "symptom-based screening alone failed to detect a high proportion of infectious cases and was not enough to control transmission" in enclosed locations such as nursing homes, prisons, and shelters.[40]

64. The actual numbers of infected prisoners in Texas is likely much higher than reported because so many who have contracted the disease are asymptomatic. Testing of prisoners in four states--Arkansas, North Carolina, Ohio, and Virgina--shows that 96 percent of prisoners with COVID-19 are asymptomatic.[41]

65. Some states and the federal Bureau of prisons have enacted or announced widespread testing of prisoners in an effort to control the spread of coronavirus.[42]

C. COVID-19 Poses a High Risk of Serious Illness and Death to Older
   Adults and Persons With Underlying Medical Conditions

66. COVID-19 is more likely to cause serious illness and death for older adults and those with underlying medical conditions, such as lung disease, heart disease, chronic liver or kidney conditions, diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developemental delay, and pregnancy. According to the CDC, nearly 90 percent of hospitalized COVID-19 patients in March 2020 had at least one underlying condition.[43] These underlying medical conditions increase the risk of serious COVID-19 illness and death for people of any age. More than 20%

of the Texas prison population is over the age of 50 and thus, most at-risk for serious illness or death due to COVID-19[44] This percentage is higher for those living in the Ramsey 1 Unit, including several of the Plaintiffs in this action, are over the age of 50.

67. For people over the age of 50 or with medical conditions that increase the risk of serious COVID-19 disease, symptoms such as fever, coughing, and shortness of breath can be especially severe.

68. It is estimated that 60 percent of all Americans have at least one chronic health condition, and 40 percent have more than one.[45] The department of Justice has estimated that "half of state and federal prisoners and local jail prisoners reported ever having a chronic condition" and "[t]wenty-one percent of prisoners. reported ever having an infectious disease."[46] The incidents of serious health conditions is greater among those on units that are old like the Ramsey 1 Unit because of the deteriorating environment, with asbestos, mold and deficient plumbing, which brings a significant psychological toll on the environment.

69. COVID-19 disease can cause lung, heart, kidney, intestinal, liver, and brain damage. Recent evidence indicates that COVID-19 can also cause sometimes fatal blood clots to develop in patients.[47]

70. High risk individuals who develop serious symptoms will likely require hospitalization and many will require intensive treatment, including ventilator assistance and a team of care physicians. That level of support can quickly exceed local health care resources.

71. Patients who survive serious cases of COVID-19 may face prolonged recovery periods, inlcuding extensive rehabilitation from cardiovascular damage, neurologic damage, and diminished respiratory capacity.[48]

72. The only known, effective measures to reduce the risk of vulnerable people to serious illness or death caused by COVID-19 are aggressive social distancing and heightened attention to hygiene and disinfection. Yet consistent social distancing at the Ramsey 1 unit is impossible, because there are no dayrooms at the Ramsey 1 Unit and two prisoners are housed in cells designed for one. he inadequate and limited measures issued by Defendants are ineffectual in the face of this virus--and only more so given their arbitrary application.

D. CDC Interim Guidance on Management of Coronavirus Disease 2019
in Correctional and Detention Facilities

72. On March 23, 2020, the CDC published guidance for correctional and detention facilities to prepare for and protect prisoners and personnel from the COVID-19 pandemic.[49] The CDC recommends the following for virus transmission prevention.

* Facilities should ensure availability of sufficient stocks of hygiene supplies, cleaning supplies, personal protective equipment ("PPE"), and medical supplies (consistent with the healthcare capabilities of the facility).

* This includes liquid soap, alcohol-based hand sanitizer containing at least 60% alcohol, recommended PPE including facemasks and gloves, and supplies for testing, such as sterile viral transport media and sterile swabs. Facilities should make contingency plans in the event of PPE shortages.

* Facilities should provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.

* Facilities should provide alcohol-based hand sanitizer containing at least 60% alcohol.

* Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response, including cleaning and disinfecting frequently touched surfaces several times per day.

* Facilities should encourage all persons in the facility to protect themselves by practicing good cough etiquette and good hand hygiene and avoiding touching of the eyes, nose, or mouth.

* Facilities should encourage these behaviors by posting signage
  throughout the facility and communicating the information verbally
  on a regular basis. Facilities should implement social distancing
  strategies to increase the physical space between
  incarcerated/detained persons (ideally 6 feet between all
  individuals regardless of the presence of symptoms).

* This should include enforcing increased space between individuals
  in holding cells and waiting areas, staggering time in recreation
  spaces, staggering meals and rearranging seating in the dining hall
  to increase space between individuals.

Facilities should be providing prisoners with information and
consistent updates about COVID-19 and its symptoms.

E. TDCJ Has Failed to Adopt Adequate Policies in Response to the
COVID-19 Pandemic

73. Despite the CDC's robust guidelines for correctional and detention
facilities, TDCJ's adoption and implementation of policies in response to
the COVID-19 pandemic are inadequate and do not comport with many of the
CDC's recommendations. Indeed, although the CDC has issued a specific
Guidance on Management of COVID-19 in Correctional Facilities, TDCJ's
policy does not directly cite this Guidance in its references section,
instead citing only the CDC Guidance for the healthcare setting and for
clinical management of patients with confirmed disease.

74. For example, the CDC recommends "the posting of signage throughout
the facility" that communicates not only hand hygiene instructions, cough
etiquette, and symptoms of COVID-19, but also instructs prisoners to
"report symptoms to staff."[50] The CDC further recommends that "signage
is understandable for non-English speaking persons and those with low
literacy, and [that facilities] make necessary accommodations for those
with cognitive or intellectual disabilities and those who are deaf,
blind, or low-vision."[51] By contrast, TDCJ's policy on signage only
requires that signs be posted at entrances in the medical department or

any "strategic places" to provide instructions on hand hygiene, cough
etiquette, symptoms of COVID-19, and warning for high risk visitors.[52]
TDCJ's signage policy does not comport with the CDC's recommendation
because it is not posted throughout the facility and fails to include
instructions for prisoners to report symptoms to staff, and it does not
acknowledge the requirement for signage to be understandable for
non-English speaking persons, those with low literacy, those with
intellectual disabilities, and those who are deaf, blind, and low-vision.

75. As another example, the CDC recommends considering "relaxing
restrictions on allowing alcohol-based sanitizer in the secure setting
where security concerns allow."[53] TDCJ's policy acknowledge that hand
sanitizer is "used to prevent the spread of any respiratory virus" and
that it should be carried by staff "and used whenever there is concern
that hands have been contaminated."[54] However, TDCJ still mandates that
prisoners "must not have access to the waterless hand rub but must wash
hands with soap and water instead.[55] But as TDCJ's own policies
acknowledge, this is not always practical, and thus prisoners are at an
increased risk of contracting and spreading COVID- 9.

76. The CDC also recommends that correctional facilities "[r]estrict
transfers of incarcerated/detained persons to and from other
jurisdictions and facilities unless necessary for medical evaluation,
medical isolation/quarantine, clinical care, extenuating security
concerns, or to prevent overcrowding."[56] In contrast to the specific
instructions to restrict transfers to the limited circumstances where it
is absolutely necessary. TDCJ's policy only requires facilities to
"[m]inimize transfer of offenders between units.[57] This general
guideline is insufficient to properly reduce the risk to the prisoner

population.

77. In addition to being inadequate, some of TDCJ's policies are impossibly vague. Despite the CDC's robust guidelines for correctional and detention facilities, TDCJ has adopted bare-bones policies with vague guidance on preventing and managing a COVID-19 outbreak. For example, the CDC guidance explains that, while difficult, social distancing "is a cornerstone of reducing transmission of respiratory disease such as COVID-19.[58] The CDC then provides examples of steps that can be taken in prisons and jails.[59] TDCJ's policy, in contrast states only that units should "[p]ractice social distancing and avoid gatherings and meetings."[60] However, the policy's further reference to "teleconference or video conference" implies this policy is aimed at reducing risk to prison staff, not prisoners directly.[61] Moreover, consistent social distancing is simply not possible on the Ramsey 1 Unit because there are no dayrooms and two prisoners are housed in cells designed for one.

78. The CDC's interim guidelines are intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities. That these staff administrators at the Ramsey 1 Unit are likely not public health experts underscores the importance of having a clear and unambiguous policy that hews strictly to the CDC's interim guidelines. It is not acceptable to defer to non-medical staff's judgment in these circumstances, especially in light of a novel pandemic.

79. Currently, TDC's COVID-19 policy is inadequate and fails to include key CDC recommendations that are necessary to effectively prevent and manage a COVID-19 outbreak. For example, TDCJ's policy does not

include the following key CDC recommendations:

* Facilities should "[p]rovide a no-cost supply of soap to incarcerated/detained persons sufficient to allow frequent hand washing."

* Facilities should "[p]rovide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.

* Facilities should ensure "[s]taff performing temperature checks on any group of people" are required to wear face mask, eye protection, gloves, and gowns'coveralls.

* Facilities should "[c]ommunicate with the public about any changes to facility operations, including visitation programs."[62]

80. Correctional facilities across the country are now seeing the ramifications of an inadequate response.

81. According to the New York Times, "more than 16,000 infections in state prison systems, including almost 12,000 inmates who have tested positive. More than 130 inmates have died.[63] "Nearly every state prison system has at least one infection among either prisoners or staff, suggesting that the problem will become significantly large during the next several weeks."[64] Another report indicated that continued failures to make prison and jails safe would double the coronavirus death count in the U.S.[65]

82. As of April 26, 2020, Marion Correctional Institution, a state prison in Marion Ohio, has 2,191 confirmed cases of COVID-19, which is reported to be the largest single source of coronavirus infections in the United States.[66]

83. According to the New York Times, some facilities have refused to release the numbers of cases or deaths.[67]

84. Unfortunately, the coronavirus outbreak has already reached TDCJ facilities. As of the date of this filing, it was reported that TDCJ prisons had more than 2500 prisoners and nearly 800 employees across the

state that have tested positive and 36 prisoners and 7 employees have
died as a result of complications from the coronavirus.[68] Ramsey 1 Unit
has reported only 2 confirmed cases, and it is presumed that at least 7
employees have tested positive for the coronavirus. As of May 11, 2020
Other units fewer than a few miles away from the Ramsey 1 Unit have
reported confirmed cases: the Stringfellow Unit has reported 6 confirmed
cases among prisoners and 13 among employees, the Terrel Unit has reported
47 confirmed cases among prisoners and 6 employees, the Darrington Unit have
reported 4 confirmed cases among prisoners and 3 employees, and the Scott
Unit have reported 50 confirmed cases among the prisoners and 13
employees.[69]

> F. The Ramsey 1 Unit Houses Sick, Elderly Prisoners in Conditions
> Likely to Spread the Virus

85. The Ramsey 1 Unit ("Ramsey"), currently houses approximately 1400
prisoners. A large number of these prisoners face significant physical
and mental health issues, are over the age of 50, or both.

86. Ramsey prisoners live two prisoners per cell in cells designed for
one for up to 22 to 23 hours per day since the pandemic began. Cells are
approximately 40 sq Ft, with 2'5" by 4" of unobstructive space in one area
of the cell and 3'by 3' in another area. Inside each cell are two bunks
stacked on top of each other like shelves, 2 lockers, a toilet and sink.

87. Ramsey does not have any Dayrooms, however prisoners are allowed 1
hour in the common area right infront on the cells, the run, when on
limited movement. Row by row at a time. Each row contains approxitmately
36 to 40 prisoners. These areas do not allow for any social distancing,
despite leaving the cell, a prisoner is merely a few feet away from
someone at all times.

88. Ramsey prisoners interact on a regular basis with prison staff, who are responsible for distributing mail to the prisoners, checking prisoners' cells and persons for contraband and escorting prisoners to any lay-ins, pill window, etc... Further when, chow, shower or rec is called there are at least 150 prisoners on the run at one time if not all 180. These activities require contact between prisoners and guards. At least 7 employees at the Ramsey Unit have tested positive for COVID-19. Prisoners cannot escape the overcrowded conditions, no matter if they acted proactively to protect themselves.

G. Despite the Exceptionally-High Risk Its Prisoners Face, the
   Ramsey Unit is Not Meeting Even TDCJ's Inadequate Polices

89. TDCJ has implemented a number of policies designed to combat the COVID-19 threat.

90. Not only are these policies largely inadequate, but also TDCJ is neglecting to follow and/or enforce them. TDCJ is among other things:

* Failing to provide prisoners with effective PPE

* Failing to provide prisoners access to cleaning supplies to disinfect their cells or belongings,

* Failing to provide prisoners access to warm water and free personal hygiene supplies, such as soap, tissue, or disposable paper towels,

* Failing to educate prisoners about the virus and measures that can be taken to minimize the risk of contracting or spreading the virus. Instead the defendants air a video propagating that the Coronavirus was a punishment from God for our sins.

* Failing to educate prison staff about the virus and measures that can be taken to protect themselves and their families, as well as the people in their custody. But instead allow officers who are monitoring positive prisoners for COVID-19, to go and mingle with other staff and inmates on the same day.

* Failing to enforce policies requiring staff to wear PPE, including gloves and masks, at all times in the facility including but not limited to while delivering mail, working the blocks and dorms and escorting prisoners. But instead allow some officers to wear their mask around their necks, while others pull them off to talk or yell.

* failing to enforce policies requiring staff to change gloves after they have been in contact with a potentially contaminated surface or individual. But instead only some wear gloves.

* Lacking a plan for housing persons exposed to the virus

* Not sanitizing the phones, the common areas before each use, the chow hall, the rec, and the showers.

* Permitting sick offenders to report to and remain at work;

* Failing to have an effective evacuation plan in the event the Ramsey Unit has to evacuate due to a Hurricane during this COVID-19 pandemic,

* Failing to have adequate access to courts by demanding an exact cite before receiving any case law or books effectively denying any meaningful access to the courts.

* Failing to provide medical prescribed medication for Chronic asthmatics.

* Failing to relieve the overcrowded conditions that exist on the Ramsey Unit.

- Failing to provide access to mental health workers to discuss how to handle stress, due to the prolonged isolation experienced during the COVID-19 pandemic.

* Failing to provide access to devices that alleviate the stress of being cooped up in their cells, such as access to telephones, and approved electronic tablets, video visitation, as are already being done on certain units in TDCJ;

91. Defendants failure to enforce--or in some cases, even implement--policies covering the above deficiencies puts Plaintiffs at further risk of extreme harm. Because Plaintiffs are significantly at risk of severe illness or even death from COVID 19 given pre-existing health conditions and/or age, they must be provided adequate care and safeguards recommended by the CDC and health experts. TDCJ is not currently meeting those standards.

### H. The Ramsey Unit Has a History of Litigation Stemming from Poor Treatment of Prisoners

92. Ramsey has been widely criticized for its treatment of prisoners. For having disciplinary case quotas, for setting prisoners up

with screw drivers for exercising their right to grieve conditions and medical issues. Ramsey Unit is well known for creating false narratives of incidents and issues and outright lying about following policies.[70]

I. Plaintiffs are at Serious Risk of Death or Injury if Exposed to COVID-19

1. As Prisoners, Plaintiffs and Proposed Class Members Face an Elevated Risk of Death or Serious Injury if They are Exposed to COVID-19

93. Incarcerated individuals in the United States have poorer health than the general population. According to the CDC's national Survey of Prison Health Care, "prison prisoners have higher rates of mental illness, chronic medical conditions and infectious disease compared with the general population.[71]

94. Plaintiffs and proposed class members are also at a heightened risk of serious injury or death if exposed to COVID-19 because they lack access to quality medical care equipped to handle a disease outbreak. Ramsey does not have any medical personnel after 6 P.M.

95. Plaintiffs and proposed class members regularly wait days to receive medical care, if its something they want to address, if not they will cite that due to COVID-19, it's not important.

96. Plaintiffs and proposed class members are not getting their masks washed daily. If anything once a week. Officers will walk by their cell and take a roster and mark down if anyone wants to wash their mask to be picked for laundry, but the pick up of masks never comes. In other words, they're pencil whipping the paper work to make it seem like they're doing everything within their power to prevent the spread.

      2. Plaintiff John Anthony Saenz faces Increased Risk from COVID-19 Due to His Chronic Asthma

97. Plaintiff John Anthony Saenz suffers from a serious medical condition and according to the CDC, place him "at higher risk of severe illness from COVID-19[72]

98. Mr. Saenz suffers from chronic asthma. According to the CDC people with moderate to severe asthma are at "higher risk for severe illness from COVID-19.[73]

99. Mr Saenz is a 47 year old Hispanic American. While his age and race are not qualifying disabilities, it does independently place him "at higher risk of severe illness from COVID-19

      3. Plaintiff Troy Roberson Faces Increased Risk from COVID-19 Due to His Disability and Underlying Medical Conditions

100. Plaintiff Troy Roberson suffers from multiple serious medical conditions and disabilities that according to the CDC, place him "at higher risk of severe illness from COVID-19.[74]

101. Mr. Roberson suffers from Hypertension and Heart Issues, which has impaired the operation of his circulatory system. Mr. Roberson's hypertension and heart issues is a "serious heart condition" that places him at higher risk for severe illness from COVID-19.[75]

102. Mr. Roberson suffers from chronic breathing issues, COPD/Sleep Apnea and must sleep with CPAP machine. According to the CDC, people with lung problems are "at higher risk for severe illness from COVID-19.[76]

103. Mr. Roberson is 52 year old African American. While his advanced age is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19," according to the CDC.[77]

      4. Plaintiff Larry Gross Faces Increased Risk from COVID-19 Due to

His Disability and Underlying Medical Conditions.

104. Plaintiff Larry Gross suffers from multiple serious medical conditions and disabilities that according to the CDC, place him "at higher risk of severe illness from COVID-19.[78]

105. Mr Gross suffers from an ilenstomy/colostomy which results in an open wound (stoma) attached to his abdominal wall. While his medical condition is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19," according to the CDC because it's an open wound.[79]

106. Mr. Gross is morbidly obese, with a severe thyroid medical condition. While these issues are not a qualifying disability, it does independently place him, "at higher risk of severe illness from COVID-19," according to the CDC.[80]

107. Mr. gross is 57 years old. While his advanced age is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19," according to the CDC.[81]

     5. Plaintiff Rudy Rodriguez Faces Increased Risk from COVID-19
        Due to His Underlying Medical Condition

108. Plaintiff Rudy Rodriguez suffers from a serious medical condition and that, according to the CDC, place him "at higher risk of severe illness from COVID-19.[82]

109. Mr. Rodriguez suffers from hypertension. Mr. Rodriguez's hypertension is a "serious heart condition" that places him at "higher risk for severe illness from COVID-19.[83]

     6. Plaintiff Richard A.A. Lyon Faces Increased Risk from COVID-19
        Due to HIs Underlying Medical Condition

110. Plaintiff Richard A.A. Lyon was exposed to asbestos. This places

him at "higher risk for severe illness from COVID-19.

111. Mr. Lyon is 63 years old. While his advanced age is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19," according to the CDC.[84]

### 7. Plaintiff Edward Patrick Smyth Faces Increased Risk from COVID-19 Due to His Underlying Medical Condition

112. Plaintiff Edward Patrick Smyth suffers from a serious medical condition that, according to the CDC, place him "at higher risk of severe illness from COVID-19.[85]

113. Mr. Smyth suffers from hypertension. Mr. Smyth's hypertension is a serious heart condition that places him at "higher risk for severe illness from COVID-19.[86]

### 8. Plaintiff Oliver LaTura Leverett Faces Increased Risk from COVID-19 Due to His Underlying Medical Condition

114. Plaintiff Oliver LaTura Leverett suffers from breathing problems that places him at higher risk for severe illness from COVID-19.

115. Mr. Leverett is a 46 year old African American. While his age and race is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19, according to the CDC.[87]

### 9. Plaintiff Leyton Douglas Baugh Faces Increased Risk from COVID-19 Due to His Disability and Underlying Medical Condition

116. Plaintiff Leyton Douglas Baugh suffers from a serious medical condition and disability that according to the CDC, place him at higher risk of severe illness from COVID-19.[88]

117. Mr. Baugh suffers from hypertension and seizures. Mr. Baugh's hypertension and seizures is a serious medical condition, that places him at, "higher risk for severe illness from COVID-19.[89]

118. Mr. Baugh is a 40 year old African American. While his age and race is not a qualifying disability, it does independently place him, "at higher risk of severe illness from COVID-19, according to the CDC.

   10. Plaintiff Brandon Johnson Faces Increased Risk from COVID-19
         Due to His Underlying Medical Condition

119. Plaintiff Brandon Johnson suffers from a serious medical condition that, according to the CDC, place him "at higher risk of severe illness from COVID-19.[90]

120. Mr. Johnson suffers from bronchitis. According to the CDC, people with moderate to severe bronchitis are at "higher risk for severe illness from COVID-19.[91]

   11. Plaintiff Savorge Lee Curl Faces Increased Risk from COVID-19

121. Plaintiff Savorge Lee Curl is a 38 year old African American. While his age and race is not a qualifying disability, it does independently place him, "at higher risk of severe illness from COVID-19.

   12. Plaintiff David Vega Morales Faces Increased Risk from
         COVOD-19

122. Plaintiff David Vega Morales is a 37 year old Hispanic American. While his age is not a qualifying disability, it does independently place him, "at higher risk of severe illness from COVID-19.

   13. Plaintiff Demarcus Johnson Faces Increased Risk From COVID-19

123. Plaintiff Demarcus Johnson suffers from allergies. Mr Johnson is a 46 year old African American. While his age and race is not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19.

   14. Plaintiff Pedro Gallegos Faces an Increased Risk from COVID-19

124. Plaintiff Pedro Gallegos is a 41 year old Hispanic Mexican. While

his age and race are not a qualifying disability, it does independently place him "at higher risk of severe illness from COVID-19.

15. Plaintiff Earl McBride, Jr. Faces Increased Risk from COVID-19 Due to His Underlying Medical Condition

125. Plaintiff Earl McBride, Jr. suffers from multiple serious medical conditions that, according to the CDC, place him "at higher risk of severe illness from COVID-19.[92]

126. Mr. McBride suffers from Kidney disease. According to the CDC, people with kidney disease "are at higher risk for serious illness from COVID-19[93]

127. Mr. McBride suffers from an Enlarged Heart and he takes yearly corticosteroid treatments. According to the CDC, these medical conditions, place him at higher risk for severe illness from COVID-19[94]

128. Mr. McBride is 62 year old African American. While his advanced age is not a qualifying disability, it does independently place him, "at higher risk of severe illness from COVID-19, according to the CDC.[95]

16. Plaintiff Jerry Johnson Faces an Increased Risk from COVID-19 Due to His Body Fat Index

129. Plaintiff Jerry Johnson is morbidly obese and has more than 40% body fat index. According to the CDC, pople who are obese ar at higher risk of severe illness from COVID-19.[96]

17. Plaintiff Hiram Carrasquillo Faces an Increased Risk from COVID-19 Due to His Underlying Medical Condition

130. Plaintiff Hiram Carrasquillo suffers from a serious medical condition and according to the CDC, place him "at higher risk of severe illness from COVID-19[97]

131. Mr. Carrasquillo suffers from chronic asthma. According to the

CDC people with moderate to severe asthma are at "higher risk for severe illness from COVID-19.[98]

132. Mr Carrasquillos a 46 year old Hispanic American. While his age and race are not qualifying disabilities, it does independently place him "at higher risk of severe illness from COVID-19

18. Plaintiff Brice Chatman Faces an Increased Risk from COVID-19

133. Plaintiff Brice Chatman is 48 year old African American. While his age and race are not qualifying disabilities, it does independently place him, "at higher risk of severe illness from COVID-19.

19. Plaintiff Marshall Ray Armstrong Faces and Increased Risk from COVID-19 Due to his Underlying Medical Conditions

134. Plaintiff Marshall Ray Armstrong suffers from multiple serious medical conditions that according to the CDC, place him, "at higher risk for severe illness from COVID-19[99]

135. Plaintiff Mr. Armstrong suffers from hypertension. Mr. Armstrong's hypertension is a serious medical condition that places him at "higher risk for severe illness from COVID-19[100]

136. Plaintiff Mr. Armstrong has suffered a stroke and a heart attack. According to the CDC, people who have suffered from strokes or heart attacks are "at higher risk of severe illness from COVID-19[101]

137. Mr. Armstrong is 67 years old. While his advanced age is not a qualifying disability, it does independently place him, "at higher risk of severe illness from COVID-19.[102]

I. TDCJ and Ramsey Unit Grievance Procedure are Unavailable During the COVID-19 Pandemic

138. On May 14, 2020, Plaintiffs Saenz, Roberson, Gross, Rodriguez, Lyon, Smyth, Leverett, Baugh, Johnson, Curl, Morales, Johnson, Gallegos,

McBride, Johnson, Carrasquillo, Chatman, and Armstrong filed separate grievances related to the Ramsey 1 Unit's failure to adequately protect them and other prisoners from COVID-19.

139. On May 29, 2020, Assistant Warden Demerson responded to each of Plaintiffs Step grievance by stating," The following is the result of the Administrative investigation in to your allegation. The Ramsey Unit has gone above and beyond to protect the offenders as much that can be controlled. Social distancing is being enforced daily. Sanitation of all areas and offender housing areas are constantly done throughout a 24-hour period. Excess soap and items are provided upon request. An abundance of offender phone calls ar made daily to check the wellness of their family members due to not having visitation. Offenders are assigned to groups that control the social distancing aspects within the housing areas. Each group has 10 offenders and they are allowed an hour in the dayroom, after the hour is up the dayrrom is sanitized before the next group. There is enough room within the double dayrooms to have up to 20 offenders at a time but separate with 10 offenders on each side. the living areas with smaller dayrooms only have 10 offenders in their group. There is no evidence of State or Agency policy violations. No further action is warranted."

140. If a prisoner is not satisfied with the response to the Step-1 grievance process, an appeal may be filed by filing a Step 2 grievance form (I-28). A prisoner has 15 days from the date the Step-1 grievance process is complete to file a Step-2 grievance appeal. The Step 2 appeal process may take up to 40 days to receive a written response.

141. Absent resolution of Plaintiff's grievances, Plaintiffs would be unable to exhaust the grievance procedure outlined by Defendants before

July 23, 2020 at the earliest.

142. Because of the nature of COVID-19, especially its propensity to rapidly spread among densely populated communities, including prisons and cause death within a matter of days, Defendants grievance process is unavailable to Plaintiffs during the COVID-19 pandemic. Further if their response to the step 1's is an indication of where they stand on Plaintiff's issues, there is no available remedy for the Plaintiffs when all they're doing is denying any violations.

CLASS ACTION

143. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1) and (b)(2), Plaintiff's bring this action on behalf of themselves and all similarly situated persons.

144. Plaintiffs propose to represent a class composed of all inmates who currently are, or who in the future will be, incarcerated at the Ramsey 1 Unit, and who are subjected to the TDCJ's policies and practices regarding COVID-19("Class").

145. Plaintiffs also seek to represent two subclasss of Ramsey 1 Unit inmates:

  * High-Risk Subclass: those who are, according to the CDC, most
    at risk of severe illness from COVID-19, including death--these
    high-risk conditions include:
  + People aged 65 or older;
  + People with chronic lung disease or moderate to severe asthma;
  + People who have serious heart conditions;
  + People who are immunocompromised including cancer treatment, and
  + People of any age with severe obesity (body mass index ÷[BMI]
    greater than 40) or certain underlying medical conditions,

34

particularly if not well controlled, such as those with

diabetes, renal failure, or liver disease might also be at

risk; or

* Disability Subclass: those who suffer from a disability that

substantially limits one or more of their major life activities

and who are at increased risk of COVID-19 illness, injury, or

death due to their disability or any medical treatment necessary

to treat their disability.

146. Plaintiffs, Saenz, Roberson, Gross, Rodriguez, Lyon, Smyth,

Leverett, Baugh, Johnson, Curl, Morales, Johnson, Gallegos, McBride,

Johnson, Carrasquillo, Chatman, and Armsrtong are typical members of the

proposed class. Plaintiffs Saenz, Roberson, Rodriguez, Smyth, Leverett,

Baugh, Johnson, McBride, Johnson, Carrasquillo, and Armstrong are typical

members of the High Risk subcalss. Plaintiffs Gross, Baugh and Armstrong

are also typical members of the Disability subclass.

147. This action has been brought and may properly be maintained as a

class action under Federal law and satisfies the numerosity, commonality,

typicality, and adequacy requirements for maintaining a class action

under Fed. R. Civ. P. 23(a).

148. Numerosity: The joinder of each class member would be

impracticable because each class is so numerous. The approximate number

of Class members exceeds 1,400 as the ramsey Unit house over 1,400

inmates and many other inmates could possibly be housed at the Ramsey 1

Unit over the course of this litigation, or in the future. Joining all

members of the Class is impracticable due to the minimum 1,400-person

size and the fluctuating population of the Ramsey 1 Unit. Approximately

200 prisoners over the age 65 live at the Ramsey 1 Unit. Joining all 200

prisoners over the age 65 would be impracticable. In addition, the Ramsey 1 Unit is a "Chronic Care I" facility; more than 700 inmates incarcerated there suffer from at least one medical condition or disability that would make them a class member. Identifying every inmate at the Ramsey 1 Unit who is a member of the Class would require interviewing hundreds of prisoners and reviewing each of their medical records. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the Court.

149. Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, in that they all have right to be administered COVID-19 prevention, testing, and treatment measures. See Exhibit - C

* The common question of law and fact for the proposed Class include:

+ Whether Defendants Collier and Pitman adequately protect the Class from the immediate threat of COVID-19;

+ Whether the Class's Eighth and Fourteenth Amendment rights are being violated by Defendants Collier and Pitman's failure to implement adequate procedures and practices to protect the class from COVID-19,

+ Whether Defendants Collier and pitman's failure to implement adequate procedures and practices constitutes cruel and unusual punishment under the Eighth Amendment and Fourteenth Amendments; and

+ Whether The Class's First and Fourteenth Amendment rights are being violated by Defendants Collier and Pitman's failure to implement adequate procedures for access to courts and by

36

demanding an exact cite before any legal material can be
loaned to a prisoner who is confined in his cell during the
COVID-19 pandemic

+ Whether Defendants Collier and Pitman's failure to implement
adequate procedures and practices for emergency evacuation of
the Ramsey 1 Unit during a Hurricane evacuation constitutes
cruel and unusal punishment under the Eight and Fourteenth
Amendments, when prisoners are housed like cattle at a wet
market, potentially exposing them to severe illness from
COVID-19

+ What practices Defendants are actually implementing with
respect to COVID-19 at the Ramsey 1 Unit.

* The common questions of law and fact for the proposed High Risk
Subclass include:

+ Whether the members of the proposed High Risk subclass are at
heightened health risk from COVID-19, and

+ Whether the members of the proposed High Risk subclass require
heightened measures to protect them from COVID-19 infection,

* The common question of law and fact for the proposed Disability
Subclass include:

+ Whether members of the Disability Subclass are qualifying
individuals with a disability under the meaning of the ADA and
Rehabilitation Act,

+ Whether TDCJ's policies and procedures are adequate to protect
the Disability Class from the immediate threat of COVID-19;

+ Whether the Disability Class's right under the ADA are
violated by TDCJ's policies and practices,

+ Whether the Disabilities Class's right under the
Rehabilitation Act are violated by TDCJ's policies and
procedures; and

+ Whether TDCJ illegally discriminated against the Disability
Class by denying the Disability Class reasonable
accommodations recommended by the CDC, both in policy and
practice.

150. Typicality: Plaintiffs' claims are typical and representative of
each class and subclass member's claims against Defendants, as identified
above. The claims of Plaintiffs and the Class all arise from the same
conduct by Defendants and are based not only on identical legal theories,
but also seek identical relief. All members of the Class are similarly
injured by Defendants' wrongful conduct and the harms Plaintiffs suffer
are typical of the harms suffered by the Class.

151. Adequacy: Plaintiffs are class representatives who meet all of
the requirements of Rule 23(a)(4). They have no conflict of interest in
this case with other class members. They will fairly and adequately
represent the interests of the class, and each understands the
responsibilities of a representative. Plaintiffs will request appointment
of counsel to help prosecute the interests of the class pursuant to 28
U.S.C.§ 1915(e)(1). Plaintiff is unable to afford counsel. He will
request leave to proceed in forma pauperis. Plaintiff's imprisonment will
greatly limit his ability to litigate. The procedures and practices in
place as a result of the COVID-19 pandemic has only restricted Plaintiffs
access to law and the majority have limited knowledge of the law.The
issues involved in this case are complex, and will require significant
research and investigation. A trial in this case will likely involve

conflicting testimony, and counsel would better enable plaintiffs to present evidence and cross examine witnesses.

152. Class treatment under Rule 23(b)(1) is appropriate because separate actions--if feasible--would create a risk of inconsistent or varying adjudications across class members. If individual class members were to bring separate actions challenging Defendants'conduct with respect to COVID-19, the interest of other class members would be impaired. Further, class treatment is appropriate under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the proposed class, so that injunctive and declaratory relief is appropriate and necessary respecting the class as a whole. Class members as a whole are threatened by Defendants' failure to take basic steps to safeguard them from COVID-19, and Plaintiffs seek protections in the form on injunctive and declaratory relief as to the class as a whole.

CAUSES OF ACTION

FIRST CAUSE OF ACTION
VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS:
UNLAWFUL CONDITIONS OF CONFINEMENT

153. Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein. The U.S. Constitution's Eighth Amendment, as incorporated against the States through the Fourteenth Amendment, protects Plaintiffs and proposed class members from cruel and unusual punishment by State actors and requires State actors to provide adequate healthcare to prisoners.

154. To amount to the infliction of cruel and unusual punishment (1) prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health (an objective test) and (2) prison officials must

acted with deliberate indifference to the risk posed (a subjective test).

155. Plaintiffs and proposed class members are subject to a risk of harm that today's society does not tolerate.

156. Defendants fail to comply with all CDC guidelines to prevent an outbreak of COVID-19 and cannot protect the health or safety of Plaintiffs and proposed class members, who suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of COVID-19.

157. Society does not tolerate the risk of exposure to COVID-19 to which Defendants' policies and procedures (or lack thereof) have subjected Plaintiffs and proposed class members.

158. Defendants are aware of the COVID-19 pandemic, and know of the risks that COVID-19 poses to Plaintiffs and proposed class members.

159. Defendants have acted with deliberate indifference to the risks posed to Plaintiffs and proposed class members by COVID-19.

160. The risks of COVID-19 were, and are, obvious to Defendants.

161. As a result of Defendants' actions and inactions, Plaintiffs and proposed class members are suffering irreparable injury.

SECOND CAUSE OF ACTION
VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
AND THE REHABILITATION ACT OF 1973

162. Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein. This claim arises under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, which make it unlawful for a public entity to deny qualified individuals with disabilities the opportunity to participate in or benefit from the services, programs, or services of the public entity or to otherwise discriminate against qualified individuals with disabilities.

163. Public entities have an affirmative obligation to make reasonable accommodations for qualified individuals with disabilities.

164. TDCJ is a public entity and recipient of federal funds under the ADA and Rehabilitation Act.

165. The Ramsey 1 Unit is a facility whose operation by TDCJ is a program or activity under the ADA and Rehabilitation Act.

166. Defendants are responsible for providing programs, services, and/or activities to Plaintiffs under the ADA and Rehabilitation Act, including medical care and reasonable safety.

167. Plaintiffs Gross, Baugh, and Armstrong and proposed members of the Disability subclass are qualified individuals with disabilities.

168. Reasonable accommodations recommended by the CDC to control the spread of COVID-19, which are necessary to protect Plaintiffs Gross, Baugh and Armstrong and proposed members of the Disability subclass include, but are not limited to:

   a. Access to alcohol-based hand sanitizer;

   b. Access to antibacterial hand soap and disposable hand towels for regular handwashing;

   c. Access to personal protective equipment, including clean masks and gloves, for Plaintiffs and staff members;

   d. Increased cleaning and disinfecting of housing areas and common surfaces;

   e. Increased cleaning of facilities used specifically by the Disabled subclass, including but not limited to the handicap showers and bathrooms, and

   f. Assisted sanitizing and distancing measures for those who are unable to follow directions or comprehend the dangers of failing to do so.

169. Denying or otherwise failing to ensure that such reasonable accommodations recommended by the CDC are made at the Ramsey 1 Unit is illegal discrimination under the ADA and Rehabilitation Act, entitling Plaintiffs to injunctive and declaratory relief.

THIRD CAUSE OF ACTION
VIOLATION OF FIRST AND FOURTEENTH AMENDMENT:
UNLAWFUL RESTRICTION ON RIGHT TO ACCESS TO COURT
BY IMPLEMENTING AN EXACT CITE SYSTEM

170. Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein. The U.S. Constitution's First and Fourteenth Amendments protect Plaintiffs' and proposed class members' rights of access to the courts and the law.

171. Defendants are violating Plaintiffs' and proposed class members's First amendment rights because "regulations and practices that unjustifiably obstruct the availability of any case or books without an exact cite or other aspects of the right of access to the courts are invalid.

174. Defendants have implemented overly restrictive policies to general population prisoners. Practices that apply to those prisoners in restrictive housing. These policies are unreasonable under any circumstances but particularly unconscionable during the COVID-19 pandemic, when no in-person access are permitted, yet, prisoners are allowed to go to work, school, factory, and other activities were large gatherings are held.

175. These actions constitute substantial interference with Plaintiffs' and proposed class members' right of access to the courts and the right to consult with other prisoners, in violation of the First and Fourteenth Amendment.

FOURTH CAUSE OF ACTION
VIOLATION OF EIGHTH AMENDMENT:
UNLAWFUL RESTRICTION AND DENIAL OF INHALER

176. Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein. The U.S. Constitution's Eighth Amendment protect plaintiffs and proposed class members' from cruel and unusual punishment.

177. Plaintiffs Saenz and Carrasquillo and proposed members are being denied their inhalers for their chronic asthma.

178. Plaintiff Saenz has not been able to obtain an inhaler since April 13, 2020 when his inhaler expired with 2 refills left. The prescription specifically states, two puffs 4X's a day. The inhalers only carry 200 puffs and it was required to last for 3 months. Under the recommended instruction, these inhalers can never last 3 months, but Plintiffs and the proposed class made due with them. However now, Plaintiff is being denied an inhaler altogether because of the COVID-19 pandemic.

. 179. Plaintiif Carrasquillo has received information from medical that inhalers are supposed to last 6 months not three. This is not possible under any condition, must less now, with the COVID-19 pandemic.

180. TDCJ's Correction Managed Care Formulary book lists the Albuterol Proventil Inhaler at $29.75 (200 Actuations) that is supposed to last the Plaintiffs for three months. Because of the high demand of these inhalers in the free world, due to the COVID-19 pandemic, the cost has allegedly sky rocketed, and Plaintiff's prescribed refills are being denied. And now being changed from the original script of 3 months to 6 months, without consideration of whether the last one was used up. Cost in chronic care medication should never be an issue when Plaintiffs are being charged a co-pay. Further Plaintiffs cannot purchase their needed medications from an outside approved vendor. They are totally dependent

on the Defendants care for their safety and well being.

181. According to CDC, people with moderate to severe asthma are at "higher risk for severe illness from COVID-19. Without inhalers, Plaintiffs and proposed class members' medical conditions are serious medical needs. Left without inhalers, pos[es] a substantial risk of serious harm.Adams v Poag, 61 F.3d 1537, 1543 (11th Cir. 1995);  see also Garvin v Armstrong, 236 F.3d 896, 898 (7th Cir. 2001

182. Defendants are aware of the COVID-19 pandemic, and know of the risks that COVID-19 poses to Plaintiffs and proposed class members who have asthma.

183. Defendants have acted with deliberate indifference to the risk posed to Plaintiffs and proposed class members.

184. The risks of COVID-19 were, and are obvious to Defendants.

185. Defendants' response to COVID-19 has not been reasonable.

186. As a result of Defendants' actions and inactions, Plaintiffs and proposed class members are suffering irreparable injury.

FIFTH CAUSE OF ACTION
VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENT:
UNLAWFUL DEPRIVATION OF BASIC HUMAN NEEDS

187. Plaintiffs and proposed class members incorporate the previous paragraphs as if alleged herein. The U.S. Constitution's Eighth and Fourteenth Amendment protect plaintiffs and proposed class members' from cruel and unusual punishment and any violation of due process..

188. On March 23, 2020, TDCJ adopts a policy that requires "social distancing". Plaintiffs and proposed class members are locked in their cells with 1 hr of out-of-cell time., with limited movement.

189. On April 8, 2020, TDCJ adopted a policy that requires any unit operated by TDCJ to quarantine for 14 days if any prisoner or staff has tested positive for the COVID-19 virus. On the same day Ramsey 1 Unit

went on lock down as well as 24 other units.

190. On April 21, 2020, Ramsesy 1 Unit went on quarantine lockdown again. Each quarantine there is no out-of-cell time.

191. On May 5th Plaintiffs and proposed class members are up from quarantine lockdown, and on limited movement. On limited movement plaintiffs and proposed class members are allowed 1 hr of out of cell time with options of outside rec with half the building mingling together, defeating any kind of preventive measures and possibly cross contaminating..

192. On May 14, 2020, the Ramsey 1 Unit goes on another 14 day quarantine lockdown

193.On the 27th of May the Plaintiffs and proposed class members are back on limited movement.

194. On June 4, 2020 the Ramsey 1 Unit goes on another 14 day quarantine lockdown.

195. The Ramsey 1 Unit does not have any dayrooms and the Defendants are housing two prisoners in a cell designed for one. The lack of space in these cells is depriving Plaintiffs and proposed class members of the basic human need to exercise during the continued 14 day quarantines every time a prisoner or staff tests positive for the COVID-19 virus. Not including the times of limited movement were most Plaintiffs and proposed class member are either forced to go out of thier cells to relieve the stress of being cooped up in a cell for long periods, while others are afraid of coming out for fear of being infected because of the Defendants practices of not following their own policies.

196. Plaintiff Saenz, on June 4 had a medical lay-in because of the extremely high levels of stress caused by the Defendants not following

the policies of social distancing, and careless of officers not wearing their masks properly, and overcrowed conditions which caused his eczema to flare up all over his body. The Telemed Dr. Wallae, proscribed him Kenalog 80MG/ML injection, with a 10 day prescription of prednisone, Lotion, suncreen, and a shampoo. Many of the medical issues reported since the beginning of the pandemic are merely the physical manifestations of the mental anxiety and stress that Mr. Saenz and many of the proposed class members are experiencing as a result of the overcrowed conditions and restriction of movement.

197. Plaintiff Mr. Saenzs' heightened immune system as a result of his eczema puts him at higher risk of illness from COVID-19 because, the skin is the first line of defense against germs, viruses and infections. As long as the barriers of the skin remain unbroken, many invaders cannot enter the body. The CDC recommends that people not rub their eyes after touching objects. The cornea of the eyes is the second line of defense against germs, virus or infections after the skin, and if this is listed as a line of defense against the COVID-19, then Plaintiff's eczema caused by the high levels of stress caused by the Defendants not practicing their own policies, should be a concern to the Defendants because of the potential exposure to COVID-19. This puts Mr. Saenz at a very high risk of severe illness from COVID-19

198. Defendants have acted with deliberate indifference to the risk posed to Plaintiffs and proposed class members.

199. The risks of COVID-19 were, and are obvious to Defendants.

200. Defendants' response to COVID-19 has not been reasonable.

201. As a result of Defendants' actions and inactions, Plaintiffs and proposed class members are suffering irreparable injury.

RELIEF SOUGHT:

INJUNCTION AND DECLARATORY RELIEF

202. Plaintiffs and proposed class members incorporate all previous paragraphs as if alleged herein.

203. Plaintiffs and proposed class members seek preliminary and permanent injunctive relief against Defendants under the First, Eighth, and Fourteenth Amendments, 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act, for themselves and for the proposed class members to protect their health, safety, and well-being in accordance with their constituional and statutory rights.

204. Without the injunctive relief that the Plaintiffs nd proposed class members seek, Defendants will continue perilous practices and conduct, disregarding federal legal mandates and endangering the lives and welfare of current and future prisoners at Ramsey 1 Unit. Without swift intervention by this Court, Plaintiffs and proposed class members face immediate and irreparable injury of contracting COVID-19 and--due to their particular medical susceptibility and/or age likely will sustain severe, potentially life threatening, health complications.

205. Plaintiffs and the proposed class members have no plain,adequate, or complete remedy at law to address the wrongs described herein.

206. Plaintiffs and proposed class members are likely to succeed on the merits of their claims because Defendants are constitutionally required to take measures--and enforce any policies implemented--to avoid jeopardizing the health and safety of Plaintiffs and the proposed class in the face of the COVID-19 pandemic.

207. Granting injunctive relief also serves the public interest,

because it will help guard against further community spread of COVID-19
in vulnerable populations and will help protect medically-compromised
individuals from contracting a potentially life-threatening virus. As an
outbreak of COVID-19 at Ramsey 1 Unit would likely result in prison
staff becoming infected and suffering as well as, the public interest
strongly favors granting immediate injunctive relief.

COURT COSTS

208. Plaintiffs are entitled to recover court cost.

PRAYER FOR RELIEF

Plaintiffs and proposed class members request an order declaring that
the current conditions inside Ramsey 1 Unit are unconstituional because
those conditions are medically unsafe and dangerous to Plaintiffs and
the proposed class members, in violation of their Eighth and Fourteenth
Amendments rights.

Plaintiffs and proposed class members request an order declaring that
TDCJ violates the ADA and Rehabilitation Act by failing to reasonably
accommodate prisons with disabilities. Plaintiffs and proposed class
members request an order declaring that TDCJ's access to courts policies
demanding an exact cite before any legal material can be requested for
loan.are unconstitutional because those policies interfere with access to
courts and law in violation of their First and Fourteenth Amendments
rights.

Plaintiffs and proposed class members are entitled to injunctive and
declaratory relief to end this unlawful discrimination.

Therefore, Plaintiffs respectfully request that the Court awards the
following relief:

        * Certify this action a class action, as described above;

   \* Appointment John R. Keville as counsel in this case of Winston
    &amp; Strawn LLP, Capital Street, Suite 2400, Houston, Texas 77002
    because he has extensive experience with factual and legal
    issues involved in representing prisoners, in asserting
    constitutional rights, and/or fighting class actions

   \* Remedy ongoing violations of law and the Constitution by
    granting declaratory and injunctive relief, as set out in this
    Complaint, on behalf of the Plaintiffs, and the class.

   \* Issue a preliminary and permanent injunction, to abate the risk
    of serious harm described above by requiring Defendants to
    take the following health and safety measures:

      \* Require Defendants to implement adequate procedures and
       practices for emergency evacuation of the Ramsey 1 Unit
       during a Hurricane evacuations that include housing
       prisoners in conditions that allows for social distancing
       and that require prisoners to sleep on cots and not the
       floor as done in every prior evacuation to prevent the
       potential spread of COVID-19.

      \* Require cleaning and disinfecting surfaces and objects,
       several times a day, that are frequently touched,
       especially in common areas, including doorknobs, sink
       handles, toilet handles, recreation equipment and
       telephones.

      \* Implement social distancing strategies.

      \* Provide prisoners access to protective coverings for their
       mouths and hands.

      \* Provide prisoners no-cost access to soap, running water,
       hand drying machines or disposable paper towels, and
       tissue.

      \* Educate prisoners about the virus and measures that can be
       taken to minimize the risk of contracting or spreading the
       virus by, for example, posting or disseminating to
       prisoners cells signage and information throughout the
       Ramsey 1 Unit that provide: (1) general updates and
       information about the COVID-19 pandemic: (ii) the CDC's
       recommendations on "How to Protect Yourself!", from
       contracting COVID-19 and (iii) instructions on how to
       properly wash hands;

      \* Educate prison staff about the virus and measures that can
       be taken to protect themselves and their families, as well
       as the people in their custody;

      \* Encourage staff to wear personal protective equipment,
       including gloves and masks, when delivering food trays,
       lunch sacks, handling dirty laundry, escorting prisoners,
       and at other times when social distancing is not possible.

* Enforce policies requiring staff to wear gloves and change gloves after they have been in contact with a potentially contaminated surface or individual, or hourly, whichever is more frequent;

* Enforce staff performing temperature checks on any group of people, to require them to wear face mask, eye protection, gloves and gowns/coveralls;

* Quarantine staff or officers for 14 days, before they come in contact with prisoners, or provide testing everytime any staff or officer exits the unit and comes back anew to determine those who are infected with COVID-19. Anything less, would be a smoke screen that precautions are being taken. The single testing being performed on prisoners is useless if staff and officers are steady exiting the unit. The preventive measures have to real rather than illusory.

* Ensure that any prisoner held in quarantine have access to regular showers and recreation, providing that prisoners with at least one shower per day;

* Restrict transfers of incarcerated/detained persons to and from other jurisdiction and facilities unless necessary for medical evaluations, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding;

* Single cell every high risk prisoner during the COVID-19 pandemic. and

* Provide reasonable accommodations necessary to protect proposed members of the Disability subclass (individuals with disabilities).

* Find that Plaintiffs are the prevailing parties in this case and award court costs; and

* Grant such other and further relief as appears reasonable and just to which Plaintiffs may be entitled, separately or collectively.

Dated June 5, 2020                         Respectfully submitted,

                                           _John Anthony Saenz_ 6-5-20
                                           John Anthony Saenz, pro se

                                           _Troy Roberson_ 6-5-20
                                           Troy Roberson, pro se

                                           _Larry Gross_
                                           Larry Gross, pro se

Rudy Rodriguez, pro se

Richard A.A. Lyon, pro se

Edward Patrick Smyth, pro se

Oliver LaTura Leverett, pro se

Leyton Douglas Baugh, pro se

6-5-20

Bradon Johnson, pro se

Savorge Lee Curl, pro se

David Vega Morales, pro se

Demarcus Johnson, pro se

Pedro Gallegos, pro se

Earl Mcbride Jr. 6-5-20
Earl MacBride, Jr., pro se

Jerry Johnson, pro se

Hiram Carrasquillo, pro se

Brice Chatman, pro se

Marshall Ray Armstrong, pro se

FOOTNOTES

1. TDCJ Executive Director Biography, https://www.tdcj.texas.gov//division/es/execbio_exc
_dir.html

2. Administrative Review & Risk Management
Division.https://www.tdcj.texas.gov/divisions/arm/index.html

3. TDCJ Administrative Review & Risk Management Division review & Standards,
hhtps://www.tdcj.texas.gov/divisions/arms/rev_stan.html_

4. TDCJ Administrative Review & Risk Management Division Monitoring & Standards, https://www.tdcj.texas.gov/divisions/arrm/rev_mon_stan.html

5. TDCJ Emergency Action Center (EAC),https://www.tdcj.texas.gov/divisions/es/exec eac.htm;1

6. TDCJ Health Services Division, http://www.tdcj.texas.gov/divisions/hsd/index.html

7. CDC Severe Outcome Among Patients with Coronavirus Disease 2019 (COVID-19) -- United States february 12--March 16, 2020(March 27, 2020), https//www.cdc.gov/mmwr/volumes/69/wr/mm69/wr/mm6912e2.htm?s_cid=mm6912e2_w

8. Derrick Bryson Taylor, A Timeline of the Coronavirus, N.Y.Times,Apr.21, 2020,https//www.nytimes.com/article/coronavirus-timeline.html

9. WHO Public Health Emergency of International Concern Declared (Jan.30, 2020),https://www.who.int/emergencies/diseases/novel-coronavirus 2019/events-as-they-happen(The WHO's Emergency Committee "noted that early detection isolating and treating cases, contact tracing and social distancing measures in line with the level of risk _ can all work to interrupt virus spread")

10. Secretary Azar Delivers Remarks on Declaration of Public Health Emergency for 2019 Novel Coronavirus (Jan. 31, 2020),https//www.hhs.gov/about/leadership/secretary/speeches/2020_speeches/secretary azar-delivers-remarks-on-declaration-of-public-health-emergency-2019-novel-coronavirus.html

11. Derrick Bryson Taylor, A Timeline of the Coronavirus, N.Y.Times,Apr.21, 2020,https//www.nytimes.com/article/coronavirus-timeline.html

12. The Whitehouse, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https//www.whitehouse.gov/presidential-actions/proclamation-declaring national emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/;see also WHO, WHO Director-General's opening remarks at the media briefing on COVID-19 (Mar. 11, 202), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-om-covid has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inactio. We have therefore made the assessment that COVID-19 can be characterized as a pandemic. Pandemic is not a word to use lightly or carelessly. It is a word that, if misused, can cause unreasonable fear or unjustified acceptance that the fight is over, leading to unnecessary suffering and death.")

13. Office of the Texas Governor, Governor Abbott Declares State of Disaster in Texas Due To COVID-19(Mar.13, 2020),https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19.

14. Jolie McCallogh, Texas Prisons, Youth Lockups Cancel Visitation After Coronavirus Disease Declaration, Texas Tribune, March 13,2020,https//www.texastribune.org/2020/03 13/texas-prisons-cancel-visitation-coronavirus/

15. COVID-19 TDCJ Update, Procedures Implemented in Response to COVID-19 (Mar. 19, 2020), https://www.tdcj.texas.gov/covid-19/index2.html.

16. See Executive Order GA 08 Relating to COVID-19 preparedness and mitigation (Mar. 19,

2020), https//gov.texas.gov/up'bads/files/press/E)—GA_08_COVID-19_preparedness_and
mitigation_FINAL_03-19-2020_j.pdf.

17. Id.

18. Executive Order GA 14 Relating to statewide continuity of essential services and
activities during the COVID-19 disaster (March 31, 2020), https://gov.texas.gov/uploads/
files/press/EO-GA-14_Statewide_Essential_Service_and_Activity_COVID-19_IMAGE
03-31-2020.pdf.

19. See WHO, Coronavirus disease(COVID-19) Pandemic (May 1, 2020, 2:00AM
EST),https://covid-19 who int.

20. See CDC, Cases in U.S.(April 30, 2020),https://www.cdc.gov/coronavirus/2019-Ncov/cases
-in-us.html

21. Texas Case Counts, COVID-19, Texas Department of State and Health Services(Apr.30,
2020 4:15PM)https://dsbs.texas.gov/coronavirus/cases/

22. See Coronavirus in the U.S.; Latest Map and Cases Count N.Y. Times, May 1, 2020 8:43
AM EST,https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.httpl

23. Marilynn Marchione, Testshow new virus lives on some surfaces for up to 3 days,
Associated Press, Mar. 11, 2020,https://apnews.com/fc0239e95b8ad1037639ed833b990e48/

24.
Evelyn Cheng and Huilend Tan, China Says More than 500 Cases of the New Coronavirus
Stemmed from Prisons, CNBC,Feb 20,
2020,https://www.cnbc.com/2020/02/21/coronavirus-china-says-two-prisons-reported-nearly-2
50-cases.html.

25. Cai J. Sun W,Huang J, Gamber M, Wn J. He G. Indirect Virus Transmission in Cluster of
COVID-19 cases, Wenzhon, China 2020, 26 Emerg Infect Dis. 6, June
2020,https://wwwnc.cdc.gov/cid/article/26/6/20-0412_article.

26. Elizabeth Law, New Clusters of the Virus are Found in China's Prisons, The Straits
Times,Feb.22,2020,https://www.straighttimes.com/asia/new-virus-cluster-in-chinese-prisons.

27. Zak Cheney-Rice,Rikers Reports Its First COVID-19-Related Prisoner Death, New York
Mag, Apr. 6,
2020,https://nymag.com/intelligencer/2020/04/rikers-island-reports-its-first-covid-related-prisoner-death
html

28. Bill Chappell, 73% Of Inmates At An Ohio Prison Test Positive For Coronavirus,
NPR,Apr. 20,2020,https://www.npt.org/sections/coronavirus-live-updates/2020
/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

29.Arizona Republic ,Lawyer; 4 Arizona Death Row Inmates Test Positive for Coronavirus, AZ
Central, Apr. 23, 2020,
https://www.azcentral.com/story/news/local/arizona-breaking/2020/04/23/lawyer-4-arizona-
death-row-inmates-test-positive-coronavirus/3017448001/;Associated Press, Another Arizona
Death Row Inmate Dies From Coronavirus,KNAU,https://www.knou.org/post/another-arizona-
death-row-inmate-dies-coronavirus.

30. Scott Gordon,COVID-19 Cases Nearly Quadruple Inside Fort Worth Federal Medical Prison, Apr 23, 2020, https://www.nbcdfw.com/news/coronavirus/covid-19-cases-quadruple-to-132-at fort-worth federal-prison/2356912/, Gary Bass, TDCJ's Beto Unit in Palestine Now up to 128 Confirmed COVID-19 Cases, Apr 24, 2020,https://www.kltv.com/2020/04/24/tdcjs-beto-unit -palestine-now-up-confirmed-covid-cases/.

31. COVID-19 TDCJ Update (April 29, 2020) https://www.tdcj.texas.gov/covid-19/index2.html; TDCJ Offender Population (Apr. 30, 2020 5:00PM),https://www.tdcj.texas.gov/covid-19 /offenderm_mac.html.

32.TDCJ Offender Population (Apr. 30, 2020 5:00PM),https://www.tdcj.texas.gov/covid-19 /offenderm_mac.html.

33. Id.

34. TDCJ Offender Population (Apr. 30, 2020 5:00PM),https://www.tdcj.texas.gov/covid-19 /offenderm_mac.html.

35. COVID-19 TDCJ Update (April 29, 2020) https://www.tdcj.texas.gov/covid-19/index2.html

36. Chelsea Ritchel, Coronavirus: Are People Who Are Asymptomatic Still Capable of Spreading COVID-19? Independent, Mar. 15, 2020, https://www.independent.co.uk/life-style/health-and-families/coronavirus-symptomsasymptomatic -covid-19spread-virus-a9403311.html.

37. Aylin Woodward. 'Between 25% and 50% of People Who Get the Coronavirus May Show No Symptoms, Fauci Says. Here's the Latest Research on Asymptomatic Carriers, Business Insider. https://www.businessinsider.com/coronavirus-carriers-transmit-witout-symptoms-what -to-know-2020-4

38. Jolie McCollough, Texas Spending $45 million on Conronavirus Test Prisoners Are Administering to Themselves, Texas Tribune May 14, 2020,https://www.texastribune.org/2020 /05/14/texas-spending-45million-on-coronavirus-test/

39. See Giese v. Jackson U.S.D.C (S.D. Tex.), Case No. 3:19-cv-00081

40. M Gandhi, D. Yokoe,D. Havlir,Asyptomatic Transmission, the Achillies' Heel of Current Strategies to Control Covid-19, New England j. of Med.,https://www.nejm.org/doi/full/10 .1056/NEJMe2009758.

41. Linda So and Grant Smith, In Four U.S.State Prisons, Nearly 3,300 INmates Test Positive For Coronavirus - 96% Without Symptoms, Reuters,Apr. 25,2020,https:// www.retuers.com.article/us-health-coronavirus-prisons-testing-in/in-four-usstate-prisons -nearly-3500-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX.

42. Kevin Johnson, Mass Virus Testing in state Prisons Reveals Hidden Asymptomatic Infections; Feds Join Effort, USA Today, Apr. 25, 2020, https://www.usatoday.com.story news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic- infections/3003307001/.

43. Shikha Garg. MD. et al, Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-confirmed Coronavirus Disease 2019 --COVID-19-NET, 14 States, March 1-30, 2020, Morbidly & Mortality Weekly Report, Apr. 17, 2020,https://www.cdc.gov /mmwr/volumes/69/wr/mm6915e3.htm.

44. Jessica Priest, Coronavirus in Texas: Prison Population at Risk of Outbreak, Stateman, March 14, 2020,https://www.stateman.com/news/20200314/coronavirus-in-texas-prison population-at-risk-of-outbreak.

45. Roni Caryn Rabin, Cornoavirus Threatens Americans With Underlying Conditions, N.Y. Times, March 14, 2020. https://www.nytimes.com/2020/03/12/health/coronavirus-midlife -conditions.html

46 Laura Maruschak. Marcus Betzofsky and Jennifernangst, Medical Problems Of State And Federal Prisons And all Inmates, 2011-12 U.S. Dep't Of Justice Bureau Of Justice Statistics, Oct. 4, 2016, https://www.bjs.gov/content/pub/pdf/mpsfpji1112pdf.

47. Anana Eunjung Cha. A Mysterious Blood-clotting Complication Is Killing Coronavirus Patients, Washington Post, Apr. 22,2020,;//www.washingtonpost.com/health/2020/04/22/ coronavirus-blood-clots/; LennyBernstein, Carolyn Johnson, Sarah Kaplan and Laurie McGinley, Coronavirus Destroy Lungs., Washington Post,Apr. 14,2020,https://www.washingtonpost .com/health/coronavirus-destroys-lungs-but-doctors-are-finding-itsdamage-in-kidneys -hearts-and-elsewhere/202/04/14/?f17ee0-7dbl-11e

48. It's not just lungs: COVID-19 may damage the heart, brain, and kidneys, Advisory Board, Apr.17, 2020,https://www.advisory.com/daily-briefing/2020/04/17/organ-damage.

49. CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities (Mar. 23, 2020),https://www.cdc.gov/coronavirus/2019 -ncov/downloads/guidance-correctional-detention.pdf

50. Id.

51. Id.

52. CMHC Infection Control Manual, No. B-14.52, Coronavirus Disease 2019 (COVID-19)(Apr. 2, 2020), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_infection control_policy_manual/B-14.52.pdf

53. CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID Disease 2019 (COVID-19) In Correctional Detention Facilities.

54. CMHC Infection Control Manual, No. B-14.52, Coronavirus Disease (COVID-19)

55. Id.

56. CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19 in Correctional Detention Facilities.

57. CMHC Infection Control Manual, No. B-14.52, Coronavirus Disease (COVID-19)

58. CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19 in Correctional Detention Facilities.

59. Id.

60. CMHC Infection Control Manual, No. B-14.52, Coronavirus Disease 2019 (Covid-19

61. Id.

62. CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional Detention Facilities.

63. Prisons have been overwhelmed by the virus, N.Y. Times, May 1, 2020 8:43 AM EST, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases-html

64. Id.

65. ACLU, COVID-19 Model Finds Nearly 100,000 More Than Current Estimates, Due to Failures to Reduce Jails,https://www.houstonpublicmedia.org/app/plugins/pdfjs-viewer-shortcode/pdfjs/web/viewer/php?file=https%2Fedn.hptm.jo%21/wp-content%2Fuploads%2F2020%2F04%2F23162112%2Facjucovid19-jail-report_2020-81-1_pdf&dButton=true&oButton-false&v=1.4.6

66. In America's nursing homes, outbreaks surge, N.Y. Times May 1, 2020 8:43 AM EST, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases-html

67. Id.

68. Gary Base, TDCJ's Beto Unit in Palestine Now up to 128 Confirmed COVID-19 Cases Apr. 24, 2020, https://www.kltv.com/2020/04/24/tdcjs-beto-unit-palestine-now-up-confirmed-covid-cases/.

69. TDCJ Offender Population (Apr. 30, 2020 5:00 PM), https://www.tdcj.texas.gov/covid-19/offender_mac.html

70. See Giese v. Jackson U.S.D.C. (S.D. Tex.), Case No. 3:19-cv-00081

71. Karishma Chari, et al, Nat'l Survey of Prison Care: Selected Findings, Nat'l Health Statistics Report, July 28, 2016, https://www.cdc.gov/nchs/data/nhsr/nhsr096.pdf

72. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk-html.

73. Id.

74. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk-html.

75. Id.

76. Id.

77. Id.

78. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk-html.

79. Id.

80. Id.

81. Id.

82. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra -precautions/people-at-higher-risk-html.

83. Id.

84. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra -precautions/people-at-higher-risk-html.

85. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra -precautions/people-at-higher-risk-html.

86. Id.

87. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra -precautions/people-at-higher-risk-html.

88. Id.

89. Id.

90  CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra -precautions/people-at-higher-risk-html.

91. Id.

92. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra -precautions/people-at-higher-risk-html.

93. Id.

94. Id.

95. Id.

96. Id.

97. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019 (COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra

-precautions/people-at-higher-risk-html.

98. Id.

99. CDC, People Who Are At Higher Risk For Severe Illnee-Coronavirus Disease 2019
(COVID-19)(Apr. 15,2020)https://www.cdc.gov/coronavirus/2019-ncov/need-extra
-precautions/people-at-higher-risk-html.

100. Id.

101. Id.

102. Id.

EXHIBIT - A

RAMSEY UNIT EVACUATION 2017
HURRICANE HARVEY

COPY of PHOTO TAKEN BY TDCJ FROM CATWALK

(WINGS 1-6 & Trusty Camp, over 500 Prisoners in gym at Wynne Unit)
(on the floor for over 6 weeks)



EXHIBIT - B

COPIES OF NEWS PAPER CLIPPINGS FROM
"THE FACTS", BRAZORIA COUNTY

On TDCJ's transfer of 128 positive prisoners to Brazoria
County prisons without notifying local officials
"2020"

# Confined with COVID

## Prison spread of virus scares inmates, guards and families

By NICK IRENE
nick.irene@thefacts.com



PRENTICE C. JAMES/Special to The Facts

A Texas Department of Criminal Justice employee glances up at the watchtower while entering the Clemens Unit in unincorporated Brazoria County.

ROSHARON

Anthony Coffield watched as scores of COVID-positive inmates came into the prison while serving a 40-year sentence for burglary at the Stringfellow Unit in Rosharon. Coffield, 55, detailed the events in a letter he wrote to The Facts.

"This was the initiation of the tragedy," Coffield wrote in the letter. "No one, absolutely no one, knew these people were confirmed cases of COVID-19, not even the guards."

In April, the Texas Department of Criminal Justice transferred at least 128 inmates with COVID-19 from other units to Brazoria County prisons without notifying local officials. TDCJ cited a need to be closer to medical facilities in Galveston.

Coffield saw wardens and administration move cellblocks full of inmates to make room for transferred inmates with COVID-19, he said.

Prison administrators were working UTMB officials to make testing available after the infected inmates came to the unit, Coffield said.

Whether connected to the transfers or borne of people living in close quarters, coronavirus is undeniably spreading through TDCJ prison

■ See CONFINED, 5A

# Confined

CONTINUED FROM COVER

units, acounting more than 200 of Brazoria County's confirmed COVID-19 cases. The situation is leaving residents anxiously awaiting phone calls from family behind bars and inmates claiming their civil rights are violated.

## FILING SUIT

Coffield filed a federal lawsuit Wednesday against many state and TDCJ officials, including Gov. Greg Abbott, claiming their actions unconstitutionally endanger state prisoners.

"The governor has violated the Eighth Amendment by placing the plaintiffs in imminent danger of death by failing to test the prison population to separate the infected from the non-infected and potential carriers," states the original complaint filed in the U.S. Southern District of Texas court, which Coffield wrote by hand.

"The most terrifying thing to me about the way TDCJ officials did this was that they were not concerned about placing any of us at risk of death and infection," Coffield wrote in his letter to The Facts. "It was all about getting these people in here without anyone from the public knowing."

Texas Department of Criminal Justice denies the allegations and units are doing everything they can to protect everyone involved, spokesman Jeremy Desel said.

"COVID-19 positive offenders are and continue to be in medical isolation," Desel said. "Any unit with a positive case is on precautionary lockdown. The agency has been focused on the prevention and treatment of any COVID-19 case since well before cases were noted in the system."



PRENTICE C. JAMES/Special to The Facts

**A sign of support welcomes Texas Department of Criminal Justice employees at the Darrington Unit in Rosharon.**

Meza said the unit officials never informed her or her family about her brother's illness.

"The symptoms he told me sounded like the ones the news was saying," Meza said. "They checked his temperature once a day and guards were scared to go in because they didn't have masks. He thinks another inmate gave it to him."

Her brother said he heard another inmate screaming for help and the guards would wait for direction before assisting, Meza said.

## FAMILY FEARS

Minerva Meza felt hopeless when she heard her brother had become sick at New Boston's Telford Unit with corona-virus-like symptoms.

Telford had 34 positive COVID-19 tests as of Friday. That does not include 23 inmates transferred from Telford to Stringfellow.

Her brother, who she declined to name, is serving a 25-year sentence for aggravated assault, she said. Meza and her mother endure sleepless nights worrying about his well-being.

"We can't see him," Meza said. "We can't do our normal routine. Not knowing how he is taken care of is sad. I called the unit and they wouldn't tell me anything because they were on lockdown."

Meza heard encouraging news from her brother in late April.

"It was emotional hearing he was doing better," Meza said. "He said they tried to put a T-shirt over his face and that he had a lot of contact with inmates. He said he was doing better, but a lot were infected."

## WORRIED GUARDS

Those supervising the inmates also operate in fear of correcting the new coronavirus, said Jeff Ormsby, executive director of American Federation of State, County and Municipal Employees Texas Corrections Union.

"It's hard to keep morale up when you are facing a double danger," Ormsby said. "We get phone calls daily from officers scared they are going to give it to their families."

With 12- to 15-hour workdays and their health in peril, Ormsby is fighting for more appropriate respects for his fellow officers.

"Make COVID-19 a workplace hazard," Ormsby said. "When you go into work and ... prisoners have COVID-19, they should be eligible for worker's comp."

Correctional officers did not have high enough pay before the pandemic, he said.

"We want legislators to look at an officer pay raise because this is showing how dangerous their work is," Ormsby said.

The union leader has also fought for a statewide lockdown until all guards and inmates can be tested. Desel said the agency has no interest in it.

"No, there is no reason to create stresses of lockdown in units with no cases," Desel said.

Without full testing in all units, protective plans are reactive rather than proactive right now, Ormsby said.

"We need open testing to every staff member," Ormsby said. "We know they are testing in some areas, but we want them to expand on it."

**CORONAVIRUSUPDATES** *Sat./Sun.,*
*May 2, 3*

# Coronavirus spread accelerates in prisons

From Facts staff reports

ANGLETON — Brazoria County prisoners again made up the bulk of new COVID-19 cases reported Friday, the most coming from Rosharon's C.T. Terrell Unit, which reported 14 new positive tests.

The C.T. Terrell Unit had one man test positive in his 20s, three in their 30s, two in their 40s, two in their 50s, five in their 60s, and one in his 70s, according to county numbers.

"You have people in close confines and it's ripe for a virus to spread," Brazoria County Judge Matt Sebesta said.

The cases are evidently community-spread, Sebesta said, and could have been brought into the prison by asymptomatic staff members.

"It's hard to tell at this point," Sebesta said.

Prison employees live in all surrounding areas, Sebesta said, making it especially difficult to tell where the cases are coming from.

"The employees live in the entire region, they live in Brazoria, Matagorda, Harris, they live all over," Sebesta said.

Other prison cases were reported out of Rosharon's Darrington Unit, with four prisoners to test positive, including two men in their 30s, and two in their 40s and the Clemens Unit in Brazoria had one prisoner test positive in his 30s, county numbers said.

Two new cases were reported out of Lake Jackson from one man in his 20s and one woman in her 40s. Pearland also reported two cases from a woman and a man in their 50s. Manvel reported one man in his 40s tested positive.

This brings the active case count to 260 people, with a total of 537 cases reported in Brazoria County overall.

"Everyone needs to continue to social distance, wash your hands, and if people are sick, they shouldn't go to work, and if you feel like you are symptomatic, you need to go and get a test," Sebesta said.

People still need to be cognizant that this is a public health emergency, Sebesta said.

One person was reported to have recovered.

"It's always good to see recoveries," Sebesta said.

Six people have died from COVID-19 complications in the county.



PRENTICE C. JAMES/Special to The Facts

**Medical services from Angleton Area Emergency Medical Corp exit the Texas Department of Criminal Justice's Terrell Unit in unincorporated Brazoria County.**

**The Facts** — May 9-10 Sat, Sun, **TOP ST(**



PRENTICE C. JAMES/Special to The Facts

**Donning masks and face shields, people enter through secure airlocks at the Texas Department of Criminal Justice's Terrell Unit in unincorporated Brazoria County.**

Friday, May 8, 2020 • Vol. 107, No. 69 @ 2020 • Published in Clute, Texas

# County records 8th death, 600th case

### 3rd state inmate dies of COVID complications; 21 others test positive

From Facts staff reports

ANGLETON — Brazoria County reached eight COVID-19 related fatalities with county's third prisoner death Thursday. "I hate to see any death,"
Brazoria County Judge Matt Sebesta said. "Thoughts and prayers to the inmate's family."

The Stringfellow inmate in his 50s was among 21 Texas Department of Criminal Justice prisoners the county reported testing positive Thursday.

Angleton's Scott Unit led the case count with eight inmates, four in their 40s, two in their 50s and one in their 60s and 20s
becoming sick. Rosharon's Terrell unit had seven inmates test positive; three in their 60s and two in their 30s and 40s.

Darrington unit added an inmate in his 40s while Brazoria's Clemens unit added two prisoners in their 20s.

Only four of the county's 25 new cases were outside of confinement. Three Pearland men, two in their 30s and one in
his 20s and a Manvel woman in her 20s tested positive, according to county data.

"The numbers have been better the last week for sure, besides the prison numbers," Sebesta said.

The county passed 600 reported cases at 613 residents to test positive. The county had 16 recoveries, bringing the total

■ See **CASES**, Page 6A

## Cases

CONTINUED FROM COVER

recoveries to 319 people; 286 cases remain active.

The county's next major announcement would likely follow any incoming news from the governor's office, Sebesta said.

"We are on the same line as the general public," he said.

As more businesses — including tanning, nail and hair salons — can reopen their doors today, Sebesta wants residents to educate and read up on protocols.

"Each individual needs to become familiar with those standards to protect people," Sebesta said. "They post their state agencies, so if they see their practices aren't in line, let them know what you witnessed."

Residents need to continue being safe and not forget guidelines and recommendations preached over the last six to eight weeks, Sebesta said.

For most people, the coronavirus causes mild or moderate symptoms, such as fever and cough that clear up in two to three weeks. For some, especially older adults and people with existing health problems, it can cause more severe illness, including pneumonia and death. The vast majority of people recover.

# Inmate infections continue climbing

From Facts staff reports

The fourth COVID-19 related death inside prison walls was one of 31 people Brazoria County announced to test positive for COVID-19 Friday.

This is the second-highest daily total and includes mostly nursing facility residents and inmates.

The Scott Unit inmate to die was in his 60s, the only Scott unit inmate announced to have tested positive Friday and the first death from that facility, according to

■ See **UPDATES**, 7A

# Updates

CONTINUED FROM COVER

county data.

"We hate having any deaths and we hate to see it," Brazoria County Judge Matt Sebesta said.

Amongst the 16 cases inside of prison, Rosharon's Stringfellow unit had the highest total in confinement with nine cases, two in their 70s, three in their 60s and four in their 50s.

Brazoria's Clemens unit added two inmates in their 20s and 30s while the Terrell Unit in Rosharon had two inmates in their 60s and another in his 50s test positive.

The Pearland Windsong Care Center added eight residents to become sick from COVID-19, Sebesta said.

Outside of prisons or facilities, two Pearland men and a woman in their 50s, a Danbury man in his 20s and an Angleton woman in her 30s also came back positive for COVID-19.

Hillcrest Village had its first case with a woman in her 60s, according to county data.

"No community is immune from this virus," Sebesta said.

With six reported recoveries, the county is up to 325 people who have gotten over the virus, though county officials believe the number could be higher due to a lack of communication with the Texas Department of Criminal Justice.

"The recoveries are probably much higher than we are reporting," Sebesta said. "The TDCJ isn't the easiest to contact."

Unlike the majority of the cases, county health officials are not in direct communication with inmates and are unaware of their status until the agency reports to them, Sebesta said.

The county has had 644 residents to test positive with 310 remaining active. Nine people with COVID-19 have died.

For most people, the coronavirus causes mild or moderate symptoms, such as fever and cough that clear up in two to three weeks. For some, especially older adults and people with existing health problems, it can cause more severe illness, including pneumonia and death. The vast majority of people recover.

EXHIBIT – C

UNSWORN DECLARATION FROM PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,    ✻
LARRY GROSS, RUDY RODRIGUEZ, RICHARD ✻
A. A. LYON, EDWARD PATRICK SMYTH,     ✻
OLIVER LATURA LEVERETT, LEYTON       ✻
DOUGLAS BAUGH, BRADON JOHNSON,       ✻
SAVORGE LEE CURL, DAVID VEGA         ✻
MORALES, DEMARCUS JOHNSON, PEDRO    ✻
GALLEGOS, EARL MCBRIDE, JR., AND    ✻
JERRY JOHNSON individually and on   ✻
behalf of those similarly situated, ✻
                                  ✻
        Plaintiffs,         ✻   Case No._____
                                  ✻
BRYAN COLLIER, in his official     ✻
capacity, LORI DAVIS, in her       ✻
official capacity, KATHERINE PITMAN, ✻
in her official capacity, and      ✻
DEFENDANT TEXAS DEPARTMENT OF      ✻
CRIMINAL JUSTICE,               ✻
                                  ✻
        Defendants.        ✻

DECLARATION OF JOHN ANTHONY SAENZ

1. My name is John Anthony Saenz. I am over the age of 18 and of sound mind. The following is based on personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ #01113101)

3. I am extremely concerned for my health and safety because of the COVID-19 virus at the Ramsey Unit.

4. I am 47 years old. My date of birth is August 24, 1972.

5. I am a Hispanic American. I suffer from Asthma and Eczema as well as Allergies which is made worse with all this stress.

6. I have not been able to get my inhaler since 4-13-2020 despite the fact that I still have 2 left on my prescription. When I made a complaint that I need it, medical gave me an expired one instead.

7. Since the Pandemic began, the Ramsey Unit has been on limited movement lockdown

8. This Facility accepted the transfer of 20 offenders from Stringfellow and Retrieve Unit on April 15, 2020, who had been exposed to COVID-19 on their respective units.

9. This Facility was placed on full locked down on April 21, 2020 because 2 of the transferred offenders exhibited symptoms and tested positive for COVID-19.

Declaration of John Anthony Saenz

10. The transferred offenders have been kept separated from Ramsey I Unit offenders. However we share showers, dining, and recreational areas.

11. Ramsey I Unit staff are assigned to monitor these offenders while still intermingling with their co-workers and offenders assigned to clean in the hallways, or cell blocks on the same day, increasing the probability of potential spread of COVID-19.

12. Though officers have been instructed to wear face coverings and gloves, many either don't or do so improperly further increasing the probability of potentially passing on COVID-19.

13. I personally feel the threat of infection because of the over crowded conditions and the impossibility of practicing social distancing.

14. There is no way to practice CDC recommended social distancing guidelines or TDCJ recommended guidelines on the Ramsey I Unit because of the shear volume of offenders and the lack of space to accommodate those offenders.

15. I am housed in a cell with another offender of equal stature in a space designed for one.

16. The cell has less than 3ft by 2ft in one area and 4ft by 3ft of available floor space in another area because of the design of 40 sq ft cell which has 2 bunks stacked on top of each other like shelves with only 3ft of space in between each offender.

17. Because there are no dayrooms on this facility the area where offenders are allowed outside of their cells for one hour, during limited movement is the run which is less than 6 feet away from the person inside the cell, futher inhibiting social distancing.

18. There is no workable solution to overcrowding of the Ramsey I Unit that effectively address protection from COVID-19, specifically for the more prominent health issues.

19. There have been no oral tutorials on sterilization of living areas.

20. There aren't disinfectants passed out on a regular basis for offenders to clean cells, bars, sinks and toilets.

21. Staff at the Ramsey I Unit are not requiring me or other offenders to maintain physical distance in living areas, dining hall, or showers. In most instances it has been business as usual meaning crowds, long lines, and staging.

22. There is little to no regard for cross contamination being given in the dining hall, and showers. Offenders from many different cell blocks are intermingled. Even on lock down.

23. I see a number of elderly offenders on the Ramsey I Unit.

24. I see extremely long lines of offenders waiting, in the pill dispensary window packed in a cluster of 25 to 30 inmates on a

Declaration of John Anthony Saenz

regular basis.

25. I understand that I am a named plaintiff in a class action lawsuit about the COVID-19 virus seeking to protect myself and others on the Ramsey I Unit.

26. I understand that this is a lawsuit seeking a court order to implement the protection I and other Ramsey I Unit offenders need to minimize the spread of COVID-19.

27. I understand that the lawsuit is claiming violations of the U.S. Constitution and of laws protecting people with disabilities as well as State law violations.

28. I understand that this lawsuit is supposed to help offenders at the Ramsey I Unit protect themselves from exposure to COVID-19.

29. I am willing to cooperate in any ongoing litigation about the issues of COVID-19, overcrowding, or the lack of appropriate PPE.

30. I will testify in court or any deposition that are necessary to clarify my points as needed.

31. I am committed to serve as a spokesperson and class representative in this case.

32. I am not expecting to receive any money from serving as class representative In this case. I am only asking that I, and everyone else on the Ramsey I Unit, receive the protection they need from the virus. I am requesting no Damages.

33. All prisoners on Ramsey I Unit need the same protections: PPE as appropriate, access to sterilization materials, relief from overcrowded conditions (namely single occupancy cells as they were designed) Protection from officers cross contaminating cell blocks.

34. All prisoners need to be able to access the devices that alleviate the stress of being cooped up in their cells, such as access to telephones and approved electronic tablets, video visitation, ETC... as are already being tested on certain units in TDCJ.

35. The prolonged isolation experienced during COVID-19 pandemic is emotionally and mentally taxing. Prisoners need outlets to cope such as access to mental health workers to discuss how to handle stress.

36. All offenders here at Ramsey I Unit have need of the same protections. I do not see how these protections would harm any prisoners and in fact would make the Ramsey I Unit a safer environment and surrounding communities.

38. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this day    5/16/20

John Anthony Saenz
TDCJ #01113101

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,     *
LARRY GROSS, RUDY RODRIGUEZ, RICHARD   *
A. A. LYON, EDWARD PATRICK SMYTH,      *
OLIVER LATURA LEVERETT, LEYTON         *
DOUGLAS BAUGH, BRADON JOHNSON,         *
SAVORGE LEE CURL, DAVID VEGA           *
MORALES, DEMARCUS JOHNSON, and PEDRO   *
GALLEGOS individually and on           *
behalf of those similarly situated,    *
                                       *
          Plaintiffs,                  *      Case No._____
                                       *
BRYAN COLLIER, in his official         *
capacity, LORI DAVIS, in her           *
official capacity, KATHREN PITMAN,     *
in her official capacity, and          *
DEFENDANT TEXAS DEPARTMENT OF          *
CRIMINAL JUSTICE,                      *
                                       *
          Defendants.                  *

DECLARATION OF TROY ROBERSON

1. My name is Troy Roberson I am over the age of 18 and of
   sound mind. The following is based on personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey I Unit (TDCJ
   #00660306)

3. I am extremely concerned for my health and safety because of the
   COVID-19 virus at the Ramsey I Unit.

4. I am 52 years old. My date of birth is September 15, 1967.

5. I am African American, suffer from Hypertension and Heart issues
   both of which I take medications to manage.

6. I have Chronic Breathing issues, COPD/Sleep Apnea and must sleep
   with a CPAP machine

7. Since the Pandemic began, the Ramsey I Unit has been on limited
   movement lockdown.

8. This Facility accepted the transfer of 20 offenders from Stringfellow
   and Retrieve Unit on April 15, 2020, who had been exposed to COVID-19
   on their unit.

9. This Facility was placed on full lockdown on April 21, 2020 because 2
   of the transferred offenders exhibited symptoms and tested positive
   for COVID-19.

1

Declaration of Trey Roberson

10. The transferred offenders have been kept separated from Ramsey I Unit offenders. However we share showers, dining, and recreational areas.

11. Ramsey I Unit staff are assigned to monitor these offenders while still intermingling with their co-workers and offenders assigned to clean in the hallways, or cell blocks on the same day, increasing the probability of potential spread of COVID-19.

12. Though officers have been instructed to wear face coverings and gloves, many either don't or do so improperly further increasing the probability of potentially passing on COVID-19.

13. On April 6, 2020 I made an attempt to wear a handmade mask to the dinning hall and I was stopped and reprimanded by the Ramsey I Unit Major for wearing the mask, which he said was not necessary for my protection, despite all officers wearing masks.

14. I personally feel the threat of infection because of the over crowded conditions and the impossibility of practicing social distancing.

15. There is no way to practice CDC recommended social distancing guidelines or TDCJ recommended guidelines on the Ramsey I Unit because of the shear volume of offenders and the lack of space to accommodate those offenders.

16. I am housed in a cell with another offender of equal stature in a space designed for one.

17. The cell has less than 3ft by 2ft in one area and 4ft by 3ft of available floor space in another area because of the design of 40 sq ft cell which has 2 bunks stacked on top of each other like shelves with only 3ft of space in between each offender.

17. Because there are no dayrooms on this facility the area where offenders are allowed outside of their cells for one hour, during limited movement is the run which is less than 6 feet away from the person inside the cell, futher inhibiting social distancing.

19. There is no workable solution to overcrowding of the Ramsey I Unit that effectively address protection from COVID-19, specifically for the more prominent health issues.

20. There have been no oral tutorials on sterilization of living areas.

21. There aren't disinfectants passed out on a regular basis for offenders to clean cells, bars, sinks and toilets.

22. Staff at the Ramsey I Unit are not requiring me or other offenders to maintain physical distance in living areas, dining hall, or showers. In most instances it has been business as usual meaning crowds, long lines, and staging.

23. There is little to no regard for cross contamination being given in the dining hall, and showers. Offenders from many different cell blocks are intermingled. Even on lock down.

Declaration of Troy Roberson

24. I see a number of elderly offenders on the Ramsey I Unit.

25. I see extremely long lines of offenders waiting, in the pill dispensary window packed in a cluster of 25 to 30 inmates on a regular basis.

26. I understand that I am a named plaintiff in a class action lawsuit about the COVID-19 virus seeking to protect myself and others on the Ramsey I Unit.

27. I understand that this is a lawsuit seeking a court order to implement the protection I and other Ramsey I Unit offenders need to minimize the spread of COVID-19.

28. I understand that the lawsuit is claiming violations of the U.S. Constitution and of laws protecting people with disabilities as well as State law violations.

29. I understand that this lawsuit is supposed to help offenders at the Ramsey I Unit protect themselves from exposure to COVID-19.

30. I am willing to cooperate in any ongoing litigation about the issues of COVID-19, overcrowding, or the lack of appropriate PPE.

31. I will testify in court or any deposition that are necessary to clarify my points as needed.

32. I am committed to serve as a spokesperson and class representative in this case.

33. I am not expecting to receive any money from serving as class representative In this case. I am only asking that I, and everyone else on the Ramsey I Unit, receive the protection they need from the virus. I am requesting no Damages.

34. All prisoners on Ramsey I Unit need the same protections: PPE as appropriate, access to sterilization materials, relief from overcrowded conditions (namely single occupancy cells as they were designed) Protection from officers cross contaminating cell blocks.

35. All prisoners need to be able to access the devices that alleviate the stress of being cooped up in their cells, such as access to telephones and approved electronic tablets, video visitation, ETC... as are already being tested on certain units in TDCJ.

36. The prolonged isolation experienced during COVID-19 pandemic is emotionally and mentally taxing. Prisoners need outlets to cope such as access to mental health workers to discuss how to handle stress.

37. All offenders here at Ramsey I Unit have need of the same protections. I do not see how these protections would harm any prisoners and in fact would make the Ramsey I Unit a safer environment and surrounding communities.

Declaration of Troy Roberson

38. I declare under penalty of perjury under the laws of the United
States of America that the foregoing is true and correct.

_Troy Roberson 5-16-20_
Executed on this day

Troy Roberson
TDCJ #00660306

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,       ☆
LARRY GROSS, RUDY RODRIGUEZ, RICHARD     ☆
A. A. LYON, EDWARD PATRICK SMYTH,        ☆
OLIVER LATURA LEVERETT, LEYTON           ☆
DOUGLAS BAUGH, BRADON JOHNSON,           ☆
SAVORGE LEE CURL, DAVID VEGA             ☆
MORALES, DEMARCUS JOHNSON, and PEDRO     ☆
GALLEGOS individually and on             ☆
behalf of those similarly situated,      ☆
                                         ☆
            Plaintiffs,                   ☆       Case No._____
                                         ☆
BRYAN COLLIER, in his official           ☆
capacity, LORI DAVIS, in her             ☆
official capacity, KATHERINE PITMAN,     ☆
in her official capacity, and           ☆
DEFENDANT TEXAS DEPARTMENT OF            ☆
CRIMINAL JUSTICE,                        ☆
                                         ☆
            Defendants.                   ☆

DECLARATION OF LARRY GROSS

1.  My name is Larry Gross. I am over the age of 18 and of
    sound mind. The following is based on personal knowledge.

2.  I am currently incarcerated in the TDCJ Ramsey I Unit (TDCJ
    #00545873)

3.  I am extremely concerned for my health and safety because of the
    COVID-19 virus at the Ramsey I Unit.

4.  I am 57 years old. My date of birth is August 15, 1962.

5.  I have an ilenstomy/colostomy which results in an open wound (Stoma)
    attached to my abdominal wall; I am also morbidly obese, with a severe
    thyroid medical condition.
    my own.

6.  I take medications to manage my thyroid problems.

7.  I am forced to wear an external artificial bladder for fecal matter.

8.  The Ramsey Unit is denying me and other prisoners protection from
    COVID-19

9.  The Ramsey Unit does not allow me or other offenders to use waterless
    hand sanitizer.

10  The Ramsey Unit does not issue or allow us to have any disinfectant
    or sanitation products to clean or disinfect our extremely small

1

Declaration of Larry Gross

cell housing area

11. This Facility accepted the transfer of 20 offenders from Stringfellow and Retrieve Unit on April 15, 2020, who had been exposed to COVID-19 on their unit.

12. This Facility was placed on full lockdown on April 21, 2020 because 2 of the transferred offenders exhibited symptoms of COVID-19.

13. The transferred offenders have been kept separated from Ramsey I Unit offenders. However we share showers, dining, and recreational areas.

14. Ramsey I Unit staff are assigned to monitor these offenders while still intermingling with their co-workers and offenders assigned to clean in the hallways, or cell blocks on the same day, increasing the probability of potential spread of COVID-19.

15. Though many officers wear face masks, there are other staff members who still do not wear masks, or wear them improperly or with a valve that renders the mask useless.
gloves, many either don't or do so improperly further increasing the probability of potentially passing on COVID-19.

16. I personally feel the threat of infection because of the over crowded conditions and the impossibility of practicing social distancing.

17. There is no way to practice CDC recommended social distancing guidelines or TDCJ recommended guidelines on the Ramsey I Unit because of the shear volume of offenders and the lack of space to accommodate those offenders.

18. The prison does not provide us with proper spacing to stay 6 feet from other inmates, at work, recreation, or in our living area.

19. I am housed in a cell with another offender of equal stature in a space designed for one.

20. The cell has less than 3ft by 2ft in one area and 4ft by 3ft of available floor space in another area because of the design of 40 sq ft cell which has 2 bunks stacked on top of each other like shelves with only 3ft of space in between each offender.

21. Because there are no dayrooms on this facility the area where offenders are allowed outside of their cells for one hour, during limited movement is the run which is less than 6 feet away from the person inside the cell, futher inhibiting social distancing.

22. There is no workable solution to overcrowding of the Ramsey I Unit that effectively address protection from COVID-19, specifically for the more prominent health issues.

23. There has been no oral instructions for inmates about how washing hands can help prevent the spread of the virus. There are some general posted notices on the unit, but many prisoners are illiterate and cannot read them. I have not see a film or video about how to

Declaration of Larry Gross

24. The Ramsey Unit does not require me or other inmates to maintain a physical distance of 6 feet or more from others during group activities like meals, rec, showers, and infirmary medical appointments.

25. There are many elderly and handicapped people at the Ramsey Unit.

26. I have seen long lines of prisoners waiting at the pill window to get medications and at the infirmary for lab and to receive isulin, so I believe there are many chronically ill people at the Ramsey Unit.

27. I understand that I am a named plaintiff in a class action lawsuit about the COVID-19 virus seeking to protect myself and others on the Ramsey I Unit.

28. I understand that this is a lawsuit seeking a court order to implement the protection I and other Ramsey I Unit offenders need to minimize the spread of COVID-19.

29. I understand that the lawsuit is claiming violations of the U.S. Constitution and of laws protecting people with disabilities as well as State law violations.

30. I understand that this lawsuit is supposed to help offenders at the Ramsey I Unit protect themselves from exposure to COVID-19.

31. I am ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in deposition, assisting any appointed lawyers in response to written questions, or any other tasks attorneys advice me to do.

32. I am committed to serve as a spokesperson and class representative in this case.

33. I am not expecting to receive any money from serving as class representative In this case. I am only asking that I, and everyone else on the Ramsey I Unit, receive the protection they need from the virus. I am requesting no Damages.

34. All prisoners on Ramsey I Unit need the same protections: PPE as appropriate, access to sterilization materials, relief from overcrowded conditions (namely single occupancy cells as they were designed) Protection from officers cross contaminating cell blocks.

35 All prisoners need to be able to access the devices that alleviate the stress of being cooped up in their cells, such as access to telephones and approved electronic tablets, video visitation, ETC... as are already being tested on certain units in TDCJ.

36. The prolonged isolation experienced during COVID-19 pandemic is emotionally and mentally taxing. Prisoners need outlets to cope such as access to mental health workers to discuss how to handle stress.

37. All offenders here at Ramsey I Unit have need of the same
protections. I do not see how these protections would harm any
prisoners and in fact would make the Ramsey I Unit a safer
environment and surrounding communities.

38. I declare under penalty of perjury under the laws of the United
States of America that the foregoing is true and correct.

*Larry Gross* 5-16-20

Executed on this day

Larry Gross
TDCJ #00545873

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,　＊
LARRY GROSS, RUDY RODRIGUEZ, RICHARD ＊
A. A. LYON, EDWARD PATRICK SMYTH,　＊
OLIVER LATURA LEVERETT, LEYTON　＊
DOUGLAS BAUGH, BRADON JOHNSON,　＊
SAVORGE LEE CURL, DAVID VEGA　＊
MORALES, DEMARCUS JOHNSON, and PEDRO ＊
GALLEGOS individually and on　＊
behalf of those similarly situated,　＊
　　　　　　　　　　　　　　　　＊
　　　　　Plaintiffs,　　　　　＊　　Case No._____
　　　　　　　　　　　　　　　　＊
BRYAN COLLIER, in his official　＊
capacity, LORI DAVIS, in her　＊
official capacity, KATHERINE PITMAN, ＊
in her official capacity, and　＊
DEFENDANT TEXAS DEPARTMENT OF　＊
CRIMINAL JUSTICE,　　　　　　　＊
　　　　　　　　　　　　　　　　＊
　　　　　Defendants.　　　　　＊

## DECLARATION OF RUDY RODRIGUEZ

1. My name is Rudy Rodriguez. I am over 18 and of sound mind. The following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#00770622).

3. I am very concerned for my health and safety because of the COVID-19 virus at the Ramsey Unit.

4. I am 40 years old. My date of birth is August 21, 1979.

5. I have high blood pressure and am currently taking medication for it. Because of this the risk of catching COVID-19 is higher for me.

6. My job on the unit is 2nd shift "SSI" with janitorial duties on my wing. The prison doesn't provide me or other inmates with any kind of waterless hand sanitizer.

7. As an SSI, my job is to clean the housing area I am assigned to and while doing so I put bars of soap in the restroom used by all inmates, so they could wash their hands. Lt. Reed seen the soap and told me to throw it away and put me ni my cell, when I tried to explain to him why I placed the soap there. This is just another example of how the Officers on the Ramsey Unit deny me and other inmates protection from the COVID-19 virus.

8. There had not been any cases of COVID-19 on Ramsey Unit until inmates from another TDCJ unit that had inmates test positive were brought to the Ramsey Unit making the threat of the virus a reality for me.

Declaration of Rudy Rodriguez

9. On the Ramsey Unit we do not have dayrooms and are being forced to stay in cells with a cellmate in a cell that is by law not fit to house 2 people. This makes social distancing impossible.

10. We are also herded into groups of more than 10 inmates when waiting for chow, showers, rec, pill window.

11. Only when the wardens are around, which is seldom, do the officers attempt to practice social distancing.

12. Officer and inmates are made to wear masks but several officers pull them off their face and only wear them hanging around their necks.

13. During my work as an SSI I am given what the officers claim is bleach but the liquid has been watered down to the point of it being more water than anything.

14. There is a lot of elderly inmates here and the pill window line is always long, so I believe there are many chronically ill people here on Ramsey Unit, myself being one of them.

15. Inmate workers are not given anything to sanitize there hands while working making the spread of the virus easier.

16. Officers are not being quarantined and are allowed to leave the unit and come back the next day. Any one of them can be asymptomatic and this can be a disaster waiting to happen.

17. I don't feel the administration is taking the threat of the virus spreading on the unit seriously.

18. I understand I am a named plaintiff in a class action lawsuit about the virus pandemic seeking to protect me and other Ramsey inmates.

19. I understand that this is a lawsuit asking the Court to order this prison to protect me and others against exposure to COVID-19.

20. I am committed to serving as a class representative in this case and give will testimony.

21. I am not seeking monetary compensation for serving as a class-action representative.

22. I declare under penalty of perjury, under U.S. Laws, that the foregoing is true and correct.

_May 17, 2020_
Executed on this day

Rudy Rodriguez
TDCJ# 770622

_Rudy Rodriguez_

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,      *
LARRY GROSS, RUDY RODRIGUEZ, RICHARD    *
A. A. LYON, EDWARD PATRICK SMYTH,       *
OLIVER LATURA LEVERETT, LEYTON          *
DOUGLAS BAUGH, BRADON JOHNSON,          *
SAVORGE LEE CURL, DAVID VEGA            *
MORALES, DEMARCUS JOHNSON, and PEDRO    *
GALLEGOS individually and on            *
behalf of those similarly situated,     *
                                        *
          Plaintiffs,                   *      Case No._____
                                        *
BRYAN COLLIER, in his official          *
capacity, LORI DAVIS, in her            *
official capacity, KATHERINE PITMAN,    *
in her official capacity, and           *
DEFENDANT TEXAS DEPARTMENT OF           *
CRIMINAL JUSTICE,                       *
                                        *
          Defendants.                   *

DECLARATION OF RICHARD A. A. LYON

1.  My name is Richard A.A. Lyon, I am over the age of 18 and of
    sound mind. The following is based on personal knowledge.

2.  I am incarcerated at the Ramsey Unit, my TDCJ # is 00612188.

3.  I am urgently concerned for my helth and safety because of the
    COVID-19

4.  I am 63 years old, April 22, 1957, and am in the high risk group.

5.  I was exposed to asbestos while working the Boiler Room.

6.  The only vector to bring the virus into the prison is through the
    changing of staff.

7.  Neither the staff nor prisoners have access to a clean sink and hand
    sanitizer while working on the wing. They remove their masks to yell,
    projecting the virus to handrails, bars, and tables.

8.  We cannot practice social distancing in the cell, in the choll hall or
    the showers, the cells are 6X8' with a 2 foot separation from bunk to
    bunk, we are forced to sit within a foot in the chow hall, the tray
    sanitizer machine does not operate and barrels are used, over one third
    of the showers don't operate forcing us to shower 2 feet apart.

9.  The over 60 age group, most at risk as stated by the Surgeon General
    are much like a nursing home, the single virus vector is not trained or
    motivated to protect our safety and health, No PPE equipment, beyond a
    cloth mask has been available at the Ramsey Unit.

Declaration of Richard A.A. Lyon

10. The Infirmary requires us to sit on an unclean bench for hours adjacent to another ill prisoner, no sanitizer is available, nor is a clean sink with soap, each cage (8X10') holds 16-20 prisoners, the medical staff move from unit to unit and do not don gowns or shields.

11. I understand I am a named Plaintiff in a class action lawsuit about the virus pandemic seeking to protect me and other Ramsey inmates.

12. I understand that this is a lawsuit asking the Court to order this prison to protect me and others against exposure to COVID-19

13. I am committed to serving as a class action representative in this case and give testimony.

14. I am not seeking monetary compensation for serving as a class-action representative.

15. All prisoners, living in this confined, unclean environment need protection from exposure to this virus.

16. I declare under penalty of perjury, under U.S. Laws, that the foregoing is true and correct.

*Richard A. A. Lyon*

Executed on this day

May 16, 2020

Richard A.A. Lyon
TDCJ #00612188

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,    *
LARRY GROSS, RUDY RODRIGUEZ, RICHARD *
A. A. LYON, EDWARD PATRICK SMYTH,    *
OLIVER LATURA LEVERETT, LEYTON      *
DOUGLAS BAUGH, BRADON JOHNSON,      *
SAVORGE LEE CURL, DAVID VEGA       *
MORALES, DEMARCUS JOHNSON, and PEDRO *
GALLEGOS individually and on       *
behalf of those similarly situated,  *
                             *

       Plaintiffs,          *    Case No._____
                             *
BRYAN COLLIER, in his official      *
capacity, LORI DAVIS, in her       *
official capacity, KATHERINE PITMAN, *
in her official capacity, and      *
DEFENDANT TEXAS DEPARTMENT OF      *
CRIMINAL JUSTICE,             *
                             *
       Defendants.         *

## DECLARATION OF EDWARD PATRICK SMYTH

1. My name is Edward Patrick Smyth. 1. I am over 18 and of sound mind,
   The following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#01225209).

3. I am very concerned for my health and safety because of the COVID-19
   virus present, at the Ramsey Unit.

4. I am 36 years old. My date of birth is Febuary 13, 1984.

5. I have currently stopped taking my blood pressure medication for
   severe migraines due to side effects of medication.

6. The Prison has denied myself and other offenders any real
   protection from COVID-19.

7. The Ramsey Unit does not allow me or other offenders to use waterless
   hand sanitizer or any hand sanitizer at all.

8. I work as a Presser in Laundry, and I am not allowed gloves or
   handsanitizer in or during the handling of officer's clothes

9. The prison does not provide us with proper spacing to stay six feet
   from other inmates, at work, recreation, or in our living area.

10. Though most officers wear masks to work there are some that work in
    Laundry and my dorm that take their masks off during break even when
    it's not their break.

Declaration of Edward patrick Smyth

11. We have had no instruction on how to protect ourselves vt video or peer educators, but have received a handout although many offenders are illiterate.

12. There are many elderly people with medical conditions on Ramsey

13. I understand that I am a named Plaintiff in a class action law suit about the virus seeking to protect myself and other Ramsey Unit inmates

18. I understand that the lawsuit is claiming violations of the Constitution and of laws protecting the rights of human beings, and Inmate  persons and health. Incarceration does not nullify rights of persons.

19. I am willing and ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in despositions, assistiing any lawyer appointed to represent us, responses to written questions, or any other tasks.

20. All of the prisoners on Ramsey Unit need the same protection.

21. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

_May 16, 2020_
Executed on this day

Edward Patrick Smyth
TDCJ# 1225209

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,    �²
LARRY GROSS, RUDY RODRIGUEZ, RICHARD  �²
A. A. LYON, EDWARD PATRICK SMYTH,     �²
OLIVER LATURA LEVERETT, LEYTON        �²
DOUGLAS BAUGH, BRADON JOHNSON,        �²
SAVORGE LEE CURL, DAVID VEGA          �²
MORALES, DEMARCUS JOHNSON, PEDRO      �²
GALLEGOS, EARL MCBRIDE, JR., AND      �²
JERRY JOHNSON individually and on     �²
behalf of those similarly situated,   �²
                                      �²
             Plaintiffs,              �²      Case No._____
                                      �²
BRYAN COLLIER, in his official        �²
capacity, LORI DAVIS, in her          �²
official capacity, KATHERINE PITMAN,  �²
in her official capacity, and         �²
DEFENDANT TEXAS DEPARTMENT OF         �²
CRIMINAL JUSTICE,                     �²
                                      �²
             Defendants.              �²

DECLARATION OF OLIVER LATURA LEVERETT

1. My name is Oliver LaTura Leverett. I am over 18 and of sound mind,
   The following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#00688873).

3. I am very concerned for my health and safety because of the COVID-19
   virus present, at the Ramsey Unit.

4. I am 46 years old. My date of birth is August 21, 1973.

5. I have some minor breathing problems that I constantly deal with on
   my own

6. Since the pandemic began, my wing has been locked down twice. Both
   times after an inmate showed signs of having symptoms.

7. The Ramsey Unit does not allow me or other offenders to use waterless
   hand sanitizer or any hand sanitizer at all.

8. The prison has not adjusted my housing area so that I can sleep at
   least 6 feet away from other people.

9. Many of the Officers have started wearing masks but some do not wear
   them constantly.

10. The officers do not enforce inmates to maintain a physical distance
    of 6 feet or more from other inmates during group activities like

Declaration of Oliver LaTura Leverett

meals, showers, recreation and the pill window

11. I work at a job that goes outside the gate and work in a manner that does not maintain social distancing. Under orders, placed on wagons with 14 other inmates.

12. Despite the stay at home orders, from the Governor, I and other inmates were forced to go to work under threat of receiving a disciplinary case and this was before having access to a mask.

13. I filed a step one grievance asking to get protection from COVID-19 but, to the best of my knowledge, it has not yet been answered.

14. I see many elderly inmates lined up together waiting at the pill window to get medication.

15. I understand this is a suit about the virus seeking to protect myself and other Ramsey Unit inmates

16. I understand that the lawsuit is claiming violations of the Constitution and of laws protecting the rights of human beings, and Inmate  persons and health.

17. I am willing and ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in despositions, assistiing any lawyer appointed to represent us, responses to written questions, or any other tasks.

18. All of the prisoners on Ramsey Unit need the same protection.

19. I understand that the lawsuit is claiming violations of the U.S. Constitution, state laws and laws protecting people including those with disabilities.

20. I understand that we are asking for the court to order that everyone be etter protected from the virus.

21 I am not expecting to receive any money from serving as a class representative in this cause. I am asking only that I and everyone else at the Ramsey Unit, receive the protection they need from the virus. I am not asking for damages for myself or the class in this case.

22. All of the prisoners here need the same protections. I do not see how these protections would harm any prisoners, and the protections would be better if everyone at the prison was safer.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

5 -16 -20

Executed on this day

Oliver LaTura Leverett
TDCJ# 006878873

*Oliver LaTura Leverett*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,      *
LARRY GROSS, RUDY RODRIGUEZ, RICHARD    *
A. A. LYON, EDWARD PATRICK SMYTH,       *
OLIVER LATURA LEVERETT, LEYTON          *
DOUGLAS BAUGH, BRADON JOHNSON,          *
SAVORGE LEE CURL, DAVID VEGA            *
MORALES, DEMARCUS JOHNSON, PEDRO        *
GALLEGOS, EARL MCBRIDE, JR., AND        *
JERRY JOHNSON individually and on       *
behalf of those similarly situated,     *
                                        *
        Plaintiffs,                     *      Case No._____
                                        *
BRYAN COLLIER, in his official          *
capacity, LORI DAVIS, in her            *
official capacity, KATHERINE PITMAN,    *
in her official capacity, and          *
DEFENDANT TEXAS DEPARTMENT OF           *
CRIMINAL JUSTICE,                       *
                                        *
        Defendants.                     *

DECLARATION OF LEYTON DOUGLAS BAUGH

1.  My name is Leyton Douglas Baugh. I am over 18 and of sound mind,
    The following is based on my personal knowledge.

2.  I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#01510886).

3.  I am extremely concerned for my health and safety because of the
    COVID-19 virus present, at the Ramsey Unit.

4.  I am 40 years old. My date of birth is July 13, 1975.

5.  I am African American. I suffer from high blood pressure
    (Hyper-tension) and seizures both of which I take medication and it
    is made worse with the stress COVID-19 brings.

6.  I was transferred to the Ramsey Unit for college.

7.  I am assigned as a wing SSI. We are not given proper PPE (no gloves,
    bleach, waterless base handsanitizer).

8.  SSI's were never properly trained through any CDC guidelines for
    proper sanitation

9.  Chemicals such as soap are not passed out regularly for when inmates
    are out on the run.

10. Wing ventilations, fans do not work properly to regulate flow of air
    on wing.

Declaration of Leyton Douglas Baugh

11. The unit had no cases of COVID-19 until inmates were brought from
another unit.

12. I do not wish to be moved to another unit. All units present the same
problems and this unit (Ramsey) is where I will be enrolled in college.
I do not wish to be retaliated against, (cases, transfers, Etc.)

13  Since the pandemic began, my wing has been locked down twice.
Both times after an inmate showed signs of having symptoms.

14. The prison has not adjusted my housing area so that I can sleep at
least 6 feet away from other people.

15. Many of the Officers have started wearing masks but some do not wear
them constantly.

16. The officers do not enforce inmates to maintain a physical distance
of 6 feet or more from other inmates during group activities like

17. I see many elderly inmates lined up together waiting at the pill
window to get medication.

18. I understand this is a suit about the virus seeking to protect myself
and other Ramsey Unit inmates

19. I am willing and ready and willing to cooperate in the ongoing
litigation about the virus, including by testifying in the court,
participating in despositions, assisting any lawyer appointed to
represent us, responses to written questions, or any other tasks.

20. All of the prisoners on Ramsey Unit need the same protection.

21. I understand that the lawsuit is claiming violations of the U.S.
Constitution, state laws and laws protecting people including those
with disabilities.

22. I understand that we are asking for the court to order that everyone
be etter protected from the virus.

23  I am not expecting to receive any money from serving as a class
representative in this cause. I am asking only that I and everyone
else at the Ramsey Unit, receive the protection they need from the
virus. I am not asking for damages for myself or the class in this
case.

24. All of the prisoners here need the same protections. I do not see how
these protections would harm any prisoners, and the protections would
be better if everyone at the prison was safer.

I declare under penalty of perjury under the laws of the United
States of America, that the foregoing is true and correct.

_leytoN D. Baugh_ _May 16, 2020_          Leyton Douglas Baugh
Executed on this day                       TDCJ# 01510886

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,          *
LARRY GROSS, RUDY RODRIGUEZ, RICHARD        *
A. A. LYON, EDWARD PATRICK SMYTH,           *
OLIVER LATURA LEVERETT, LEYTON              *
DOUGLAS BAUGH, BRADON JOHNSON,              *
SAVORGE LEE CURL, DAVID VEGA                *
MORALES, DEMARCUS JOHNSON, and PEDRO        *
GALLEGOS individually and on               *
behalf of those similarly situated,         *
                                            *
          Plaintiffs,                       *        Case No. _____
                                            *
BRYAN COLLIER, in his official              *
capacity, LORI DAVIS, in her                *
official capacity, KATHERINE PITMAN,        *
in her official capacity, and              *
DEFENDANT TEXAS DEPARTMENT OF               *
CRIMINAL JUSTICE,                           *
                                            *
          Defendants.                       *

JUN 10 2020

David J. Bradley, Clerk of Court

DECLARATION OF BRANDON JOHNSON

1. My name is Brandon Johnson. I am over 18 and of sound mind, The
   following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#01117697).

3. I am very concerned for my health and safety because of the COVID-19
   virus present, at the Ramsey Unit.

4. I am 38 years old. My date of birth is July 18, 1981.

5. I have Been diagnosed with bronchitis since '87 (or around that
   time), and entered TDCJ with this documented and entered into their
   records.

6. Shortly after the pandemic began inadequate measures were taken to
   prevent the spread of the virus on Ramsey I.

7. Several times we have been placed on "Lockdown" because Officer,
   outside personnel, tested positive for the virus, the most recent  a
   14 day locked.

8. The reason for the 14 day lockdown, was due to the subsequent
   infection of officers, and inmates whom tested positive, because other
   inmates were transferred to the Ramsey Unit from Stringfellow and
   Retreive Units, which hsd positive testing results for COVID-19.

9. The Administration of Ramsey Unit knowingly and deliberately put my
   person and every inmate in great risk by not denying acceptance of

Declaration of Brandon Johnson

these carrier inmates.

10. None of the measures to ensure safety have been followed. There is no sanitation being implemented or measures given to inmates to reduce the risk of spreading of the virus.

11. At any point in time I am less 5 feet away from another inmate, in and out of the cell.

12. There are officers who do not wear masks, homemade or otherwise, until they see a supervisor approaching. They do not sanitize their hands, or wear gloves to prevent spreading of COVID-19.

13. At chow time, the dayroom; hallway; chowhall are filled with inmates less than 8 inches apart. At pill window the same is apparent. There are numerous inmates who are either ill (chronically), or have respitory problems. No social distancing has increased the risk of spread and infection of COVID-19

14. I understand that I am a named Plaintiff in a class action lawsuit about the virus seeking to protect myself and other Ramsey Unit inmates

15. I understand that the lawsuit is claiming violations of the Constitution and of laws protecting the rights of human beings, and Inmate persons and health. Incarceration does not nullify rights of persons.

16. I am willing and ready to co-operate in the ongoing litigation about the deliberate actions of the Administration on Ramsey Unit, by testifying in court, participating in deposition, and assisting with any necessary tasks to reach a resolution.

17. All of the prisoners on Ramsey Unit need the same protection.

18. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

May 16 2020
Executed on this day

Brandon Johnson
TDCJ# 1117697

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,  ☆
LARRY GROSS, RUDY RODRIGUEZ, RICHARD ☆
A. A. LYON, EDWARD PATRICK SMYTH,  ☆
OLIVER LATURA LEVERETT, LEYTON  ☆
DOUGLAS BAUGH, BRADON JOHNSON,  ☆
SAVORGE LEE CURL, DAVID VEGA  ☆
MORALES, DEMARCUS JOHNSON, and PEDRO ☆
GALLEGOS individually and on  ☆
behalf of those similarly situated,  ☆
                                           ☆

        Plaintiffs,  ☆     Case No. _____

                                           ☆
BRYAN COLLIER, in his official  ☆
capacity, LORI DAVIS, in her  ☆
official capacity, KATHERINE PITMAN, ☆
in her official capacity, and  ☆
DEFENDANT TEXAS DEPARTMENT OF  ☆
CRIMINAL JUSTICE,  ☆
                                           ☆

        Defendants.  ☆

DECLARATION OF SAVORGE LEE CURL

1. My name is Savorge Lee Curl. I am over 18 and of sound mind, The following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#01834184).

3. I am extremely concerned for my health and safety because of the COVID-19 virus present, at the Ramsey Unit.

4. I am 38 years old. My date of birth is May 22, 1981.

5. The Ramsey Unit has denied myself and other offenders any real protection from COVID-19.

6. The Ramsey Unit does not allow me or other offenders to use waterless hand sanitizer or any hand sanitizer at all.

7. Since the Pandemic began my wing has been locked down twice. Both Times after an offender showed symptoms.

8. Since the Pandemic began the Ramsey Unit has been on limited movement lock down.

9 This Facility accepted the transfer of twenty offenders from Stringfellow and Retreive Unit on April 15, 2020 who had been exposed to COVID-19 on their respective units.

10. his Fcility does not provide us with proper spacing to stay 6 feet from other inmates, at work, recreation, or in our living area.

Declaration of Savorge Lee Curl

11. The transferred offenders have been kept separated from the Ramsey Unit offenders (residents). However we share showers, dining and recreation areas.

12. Ramsey Unit staff are assigned to monitor these offenders while still intemingling with their co-workers and offenders assigned to clean the hallways or cell blocks on the same day, increasing the probability of spreading COVID-19

13. I personally fell the threat of infection because of the overcrowded conditions and the impossibility of practing social distancing.

14. There is no way to practice CDC recommended social distancing guidelines or TDCJ recommended guidelines on the Ramsey Unit because of the sheer volume of offenders and the lack of space to accommodate those offenders.

15. We have no instructions on how to protect ourselves by video or peer educators but have received a handout although many offenders are illiterate.

16. I have high blood pressure and very bad allergies.

17. I understand that I am a named Plaintiff in a class action law suit about the virus seeking to protect myself and other Ramsey Unit inmates

18. I understand that the lawsuit is claiming violations of the Constitution and of laws protecting the rights of human beings, and Inmate persons and health. Incarceration does not nullify rights of persons.

19. I am willing and ready to co-operate in the ongoing litigation about the deliberate actions of the Administration on Ramsey Unit, by testifying in court, participating in deposition, and assisting with and necessary tasks to reach a resolution.

20. All of the prisoners on Ramsey Unit need the same protection.

21. declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on this day    5/16/20

Savorge Lee Curl
TDCJ# 1834184

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,     ✼
LARRY GROSS, RUDY RODRIGUEZ, RICHARD   ✼
A. A. LYON, EDWARD PATRICK SMYTH,      ✼
OLIVER LATURA LEVERETT, LEYTON         ✼
DOUGLAS BAUGH, BRADON JOHNSON,         ✼
SAVORGE LEE CURL, DAVID VEGA           ✼
MORALES, DEMARCUS JOHNSON, and PEDRO   ✼
GALLEGOS individually and on           ✼
behalf of those similarly situated,    ✼
                                       ✼
          Plaintiffs,                  ✼     Case No._____
                                       ✼
BRYAN COLLIER, in his official         ✼
capacity, LORI DAVIS, in her           ✼
official capacity, KATHERINE PITMAN,   ✼
in her official capacity, and          ✼
DEFENDANT TEXAS DEPARTMENT OF          ✼
CRIMINAL JUSTICE,                      ✼
                                       ✼
          Defendants.                  ✼

DECLARATION OF DAVID VEGA MORALES

1. My name is David Vega Morales. 1. I am over 18 and of sound mind,
   The following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#02104244).

3. I am very concerned for my health and safety because of the COVID-19
   virus present, at the Ramsey Unit.

4. I am 37 years old. My date of birth is March 18, 1983.

5. Since the Pandemic began our wing has been locked down several times
   due to the fact that this unit Ramsey I accepted inmates from two
   different units (Stringfellow and Retreive) putting at risk
   deliberately the whole unit knowing that some of these new inmates
   potentially had been infected with COVID-19.

6. The Prison has denied myself and other offenders any real
   protection from COVID-19.

7. The Ramsey Unit does not allow me or other offenders to use waterless
   hand sanitizer or any hand sanitizer at all.

8. During the pandemic I have been put to work at the Furniture factory
   and at some point the Plant manager denied me a mask to wear while we
   worked. The excuse was, we have no money to buy masks.

9. The prison has not adjusted my housing area so that I can sleep at
   least 6 feet away from other people.

Declaration of David Vega Morales

10. There has been no oral instructions for inmates about how washing hands can prevent spreading the virus. I have not seen a video about how to prevent catching the virus, and there has not been an officer, Nurse, or peer educator teach us how to stay safe.

11. The prison does not require me or other inmates to maintain a physical distance of 6 feet or more from others during traffic movement as showers, recreation, meals or pill window. Sometimes I force myself to stay in my cell knowing some of the staff members who don't care about physical distance, skipping meals, or showers. Doing this is very difficult for me and several inmates.

12. The Ramsey population is about 1200 inmates. The majority of these inmates are elderly people which I am very concerned due to the vulnerability of the COVID-19

13. I understand that I am a named Plaintiff in a class action law suit about the virus seeking to protect myself and other Ramsey Unit inmates

14. I understand that the lawsuit is claiming violations of the Constitution and of laws protecting the rights of human beings, and Inmate persons and health. Incarceration does not nullify rights of persons.

15. I am willing and ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in despositions, assistiing any lawyer appointed to represent us, responses to written questions, or any other tasks.

16. All of the prisoners on Ramsey Unit need the same protection.

17. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

_05 / 16 / 2020_____

Executed on this day

David Vega Morales
TDCJ# 02104244

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,   *
LARRY GROSS, RUDY RODRIGUEZ, RICHARD *
A. A. LYON, EDWARD PATRICK SMYTH,    *
OLIVER LATURA LEVERETT, LEYTON       *
DOUGLAS BAUGH, BRADON JOHNSON,       *
SAVORGE LEE CURL, DAVID VEGA         *
MORALES, DEMARCUS JOHNSON, and PEDRO *
GALLEGOS individually and on         *
behalf of those similarly situated,  *
                                     *
            Plaintiffs,              *      Case No._____
                                     *
BRYAN COLLIER, in his official       *
capacity, LORI DAVIS, in her         *
official capacity, KATHERINE PITMAN, *
in her official capacity, and        *
DEFENDANT TEXAS DEPARTMENT OF        *
CRIMINAL JUSTICE,                    *
                                     *
            Defendants.              *

DECLARATION OF DEMARCUS JOHNSON

1.  My name is Demarcus Johnson. I am over 18 and of sound mind,
    The following is based on my personal knowledge.

2.  I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#02154411).

3.  I am very concerned for my health and safety because of the COVID-19
    virus present, at the Ramsey Unit.

4.  I am 46 years old. My date of birth is May 3, 1974.

5.  I have allergies and currently waiting to have surgery, my right
    hip joint replacement

6.  The Prison has denied myself and other offenders any real
    protection from COVID-19.

7.  The Ramsey Unit does not allow me or other offenders to use waterless
    hand sanitizer or any hand sanitizer at all.

8.  The prison has not adjusted my housing area so that I can sleep at
    least 6 feet away from other people.

9.  There has been no oral instructions for inmates about how washing
    hands can prevent spreading the virus. I have not seen a video about
    how to prevent catching the virus, and there has not been an officer,
    Nurse, or peer educator teach us how to stay safe.

10. I understand that I am a named Plaintiff in a class action law

DECLARATION OF DEMARCUS JOHNSON

suit about the virus seeking to protect myself and other Ramsey Unit inmates

11. I understand that the lawsuit is claiming violations of the Constitution and of laws protecting the rights of human beings, and Inmate  persons and health. Incarceration does not nullify rights of persons.

12. I am willing and ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in despositions, assistiing any lawyer appointed to represent us, responses to written questions, or any other tasks.

13. All of the prisoners on Ramsey Unit need the same protection.

14. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

*DeMarcus Johnson* May 17 2020            DeMarcus Johnson
Executed on this day                                  TDCJ # 02154411

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,    &#42;
LARRY GROSS, RUDY RODRIGUEZ, RICHARD &#42;
A. A. LYON, EDWARD PATRICK SMYTH,    &#42;
OLIVER LATURA LEVERETT, LEYTON    &#42;
DOUGLAS BAUGH, BRADON JOHNSON,    &#42;
SAVORGE LEE CURL, DAVID VEGA    &#42;
MORALES, DEMARCUS JOHNSON, PEDRO    &#42;
GALLEGOS, EARL MCBRIDE, JR., AND    &#42;
JERRY JOHNSON individually and on    &#42;
behalf of those similarly situated,    &#42;
  &#42;
    Plaintiffs,    &#42;    Case No._____
  &#42;
BRYAN COLLIER, in his official    &#42;
capacity, LORI DAVIS, in her    &#42;
official capacity, KATHERINE PITMAN, &#42;
in her official capacity, and    &#42;
DEFENDANT TEXAS DEPARTMENT OF    &#42;
CRIMINAL JUSTICE,    &#42;
  &#42;
    Defendants.    &#42;

DECLARATION OF PEDRO GALLEGOS

1. My name is Pedro Gallegos. I am over 18 and of sound mind. The following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#01174256)

3. I am Very concerned for my health and safety because of the COVID-19 virus present, at the Ramsey Unit. I am passing through a very difficult situation here including tremendous stress, anxiety and fear worrying about the health of family members. Under the conditions it is impossible to remain calm, people are panicking and nobody wants to die in prison.

4. I am 41 years old. My date of birth is June 14, 1979.

5. The Prison has denied myself and other offenders any real protection from COVID-19.

6. I work as a Presser in Laundry, and I am not allowed gloves or handsanitizer in or during the handling of Officer's clothes.

7.. Recently TDCJ moved some inmates to the new gym and two of these inmates have tested positive for COVID-19 virus. The media is told that no inmates on the Ramsey Unit are mixing and mingling with these inmates in which that is misinformation, based on the Hall SSI, who got locked up, who had to be quarantined for being in the gym with these inmates on the day these inmates began showing symptoms.

Declaration of Pedro Gallegos

8.. Since the pandemic began, we have been locked down several times. due to positive test either inmates or guards for COVID-19.

9. The prison has not adjusted my housing area so that I can sleep at least 6 feet away from other people.

10. Many of the Officers have started wearing masks but some do not wear them constantly.

11. The officers do not enforce inmates to maintain a physical distance of 6 feet or more from other inmates during group activities like

12. There are many elderly inmates on this unit.

13. The guards who watch these inmates in the gym come to and from the main building for breaks as well as to escort these inmates to the Ramsey Unit building for showers. These inmates share the same laundry as the Ramsey Unit inmates.

14. I understand this is a suit about the virus seeking to protect myself and other Ramsey Unit inmates

15. I am willing and ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in despositions, assistiing any lawyer appointed to represent us, responses to written questions, or any other tasks.

16. All of the prisoners on Ramsey Unit need the same protection.

17. I understand that the lawsuit is claiming violations of the U.S. Constitution, state laws and laws protecting people including those with disabilities.

18. I understand that we are asking for the court to order that everyone be etter protected from the virus.

19 I am not expecting to receive any money from serving as a class representative in this cause. I am asking only that I and everyone else at the Ramsey Unit, receive the protection they need from the virus. I am not asking for damages for myself or the class in this case.

20 I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

_Pedro Gallegos_ 5-16-2o                    Pedro Gallegos
Executed on this day                         TDCJ# 01174256

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,       *
LARRY GROSS, RUDY RODRIGUEZ, RICHARD     *
A. A. LYON, EDWARD PATRICK SMYTH,        *
OLIVER LATURA LEVERETT, LEYTON           *
DOUGLAS BAUGH, BRADON JOHNSON,           *
SAVORGE LEE CURL, DAVID VEGA             *
MORALES, DEMARCUS JOHNSON, PEDRO         *
GALLEGOS, EARL MCBRIDE, JR., AND         *
JERRY JOHNSON individually and on        *
behalf of those similarly situated,      *
                                         *
          Plaintiffs,                    *    Case No._____
                                         *
BRYAN COLLIER, in his official           *
capacity, LORI DAVIS, in her             *
official capacity, KATHERINE PITMAN,     *
in her official capacity, and           *
DEFENDANT TEXAS DEPARTMENT OF            *
CRIMINAL JUSTICE,                        *
                                         *
          Defendants.                    *

DECLARATION OF EARL MCBRIDE, JR.

1.  My name is Earl Mc Bride, Jr. I am over 18 and of sound mind,
    The following is based on my personal knowledge.

2.  I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#00315371)

3.  I am extremely concerned for my health and safety because of the
    COVID-19 virus present, at the Ramsey Unit. I am passing through a
    very difficult situation here including tremendous stress, anxiety
    and fear worrying about the health of family members. Under the
    conditions it is impossible to remain calm, people are panicking and
    nobody wants to die in prison.

4.  I am 62 years old.

5.  I am African American. I suffer from decreased Glomerular Filtration
    Rate (GFR) of stages one and two that have placed markers on my
    kidneys (Kidney disease), as well as chronic high liver enzyme
    levels, Enlarged Heart and I take yearly corticosteroid treatments.
    Before the age of 21 at the St. Joseph Hospital of Houston, Texas I
    contracted Menigitis that eventually led to pneumonia.

6.  I live in a dorm with over 150 inmates. The overcrowed conditions
    makes this place a tinder box waiting to explode.

7.  Chemicals such as soap are not passed out regularly despite there
    being only 4 toilets down stairs and 4 upstairs for all these inmates.

Declaration of Earl McBride

8. Dorm ventilations, and fans do not work properly to regulate flow of air.

9.. Recently TDCJ moved some inmates to the new gym and two of these inmates have tested positive for COVID-19 virus. The media is told that no inmates on the Ramsey Unit are mixing and mingling with these inmates in which that is misinformation, based on the Hall SSI, inmate Carter, who had to be quarantined for being in the gym with these inmates on the day these inmates began showing symptoms.

10. Since the pandemic began, we have been locked down several times. due to positive test either inmates or guards for COVID-19.

11. The prison has not adjusted my housing area so that I can sleep at least 6 feet away from other people.

12. Many of the Officers have started wearing masks but some do not wear them constantly.

13. The officers do not enforce inmates to maintain a physical distance of 6 feet or more from other inmates during group activities like

14. There are many elderly inmates  on this unit.

15. The guards who watch these inmates in the gym come to and from the main building for breaks as well as to escort these inmates to the Ramsey Unit building for showers. These inmates share the same laundry  as the Ramsey Unit inmates.

16. I understand this is a suit about the virus seeking to protect myself and other Ramsey Unit inmates

17. I am willing and ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in despositions, assisting any lawyer appointed to represent us, responses to written questions, or any other tasks.

18. All of the prisoners on Ramsey Unit need the same protection.

19. I understand that the lawsuit is claiming violations of the U.S. Constitution, state laws and laws protecting people including those with disabilities.

20. I understand that we are asking for the court to order that everyone be etter protected from the virus.

21 I am not expecting to receive any money from serving as a class representative in this cause. I am asking only that I and everyone else at the Ramsey Unit, receive the protection they need from the virus. I am not asking for damages for myself or the class in this case.

Declaration of Earl McBride, Jr.

22. All of the prisoners here need the same protections. I do not see how these protections would harm any prisoners, and the protections would be better if everyone at the prison was safer.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

*Earl McBride Jr.* 5-16-20

Executed on this day

Earl McBride, Jr.
TDCJ# 00315371

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN ANTHONY SAENZ, TROY ROBERSON,      ✻
LARRY GROSS, RUDY RODRIGUEZ, RICHARD     ✻
A. A. LYON, EDWARD PATRICK SMYTH,        ✻
OLIVER LATURA LEVERETT, LEYTON           ✻
DOUGLAS BAUGH, BRADON JOHNSON,           ✻
SAVORGE LEE CURL, DAVID VEGA             ✻
MORALES, DEMARCUS JOHNSON, PEDRO         ✻
GALLEGOS, EARL MCBRIDE, JR., AND         ✻
JERRY JOHNSON individually and on        ✻
behalf of those similarly situated,      ✻
                                         ✻
            Plaintiffs,                  ✻      Case No._____
                                         ✻
BRYAN COLLIER, in his official           ✻
capacity, LORI DAVIS, in her             ✻
official capacity, KATHERINE PITMAN,     ✻
in her official capacity, and           ✻
DEFENDANT TEXAS DEPARTMENT OF            ✻
CRIMINAL JUSTICE,                        ✻
                                         ✻
            Defendants.                  ✻

DECLARATION OF JERRY JOHNSON.

1. My name is Jerry Johnson. I am over 18 and of sound mind. The
   following is based on my personal knowledge.

2. I am currently incarcerated in the TDCJ Ramsey Unit (TDCJ#01986798)

3. I am extremely concerned for my health and safety because of the
   COVID-19 virus present, at the Ramsey Unit. I am passing through a
   very difficult situation here including tremendous stress, anxiety
   and fear worrying about the health of family members. Under the
   conditions it is impossible to remain calm, people are panicking and
   nobody wants to die in prison.

4. I have more than 40% body fat index. I am 5'10" and weigh 340 lbs.

5. I live in a dorm with over 150 inmates. The overcrowed conditions
   makes this place a tinder box waiting to explode.

6. Chemicals such as bleach and soap are not passed out regularly
   despite there being only 4 toilets down stairs and 4 upstairs for
   all these inmates.

7. Dorm ventilations, and fans do not work properly to regulate flow of
   air.

8.. Recently TDCJ moved some inmates to the new gym and two of these
    inmates have tested positive for COVID-19 virus. The media is told
    that no inmates on the Ramsey Unit are mixing and mingling with these

Declaration of Jerry Johnson

inmates in which that is misinformation, based on the Hall SSI, inmate Carter, who had to be quarantined for being in the gym with these inmates on the day these inmates began showing symptoms.

9.. Since the pandemic began, we have been locked down several times. due to positive test either inmates or guards for COVID-19.

10. The prison has not adjusted my housing area so that I can sleep at least 6 feet away from other people.

11. Many of the Officers have started wearing masks but some do not wear them constantly.

12. The officers do not enforce inmates to maintain a physical distance of 6 feet or more from other inmates during group activities like

13. There are many elderly inmates  on this unit.

14. The guards who watch these inmates in the gym come to and from the main building for breaks as well as to escort these inmates to the Ramsey Unit building for showers. These inmates share the same laundry  as the Ramsey Unit inmates.

15. I understand this is a suit about the virus seeking to protect myself and other Ramsey Unit inmates

16. I am willing and ready and willing to cooperate in the ongoing litigation about the virus, including by testifying in the court, participating in despositions, assistiing any lawyer appointed to represent us, responses to written questions, or any other tasks.

17. All of the prisoners on Ramsey Unit need the same protection.

18. I understand that the lawsuit is claiming violations of the U.S. Constitution, state laws and laws protecting people including those with disabilities.

19. I understand that we are asking for the court to order that everyone be etter protected from the virus.

20 I am not expecting to receive any money from serving as a class representative in this cause. I am asking only that I and everyone else at the Ramsey Unit, receive the protection they need from the virus. I am not asking for damages for myself or the class in this case.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

_5-16-20_
Executed on this day

Jerry Johnson
TDCJ# 01986798

*Jerry Johnson*

2