United States District Court
Southern District of Texas
**ENTERED**
June 27, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LADDY CURTIS VALENTINE, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-1115 |
| | § | |
| BRYAN COLLIER, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court is Plaintiffs' Motion to Certify Class (Doc. No. 98). Plaintiffs seek to certify a class of inmates incarcerated at the Wallace Pack Unit ("Pack Unit" or "Pack"). After considering the Motion and all applicable law, the Court finds that Plaintiffs' Motion must be **GRANTED**.

## I.    BACKGROUND

Plaintiffs Laddy Valentine and Richard King are currently incarcerated at Pack Unit, a geriatric and medical prison within the Texas Department of Criminal Justice ("TDCJ"). Plaintiffs filed this case as a putative class action on March 30, 2020. (Doc. No. 1). Plaintiffs claim that Defendants are violating their Eighth Amendment rights and the Americans with Disabilities Act ("ADA") by refusing to implement measures that protect Pack Unit inmates from the COVID-19 pandemic. *See id.* ¶¶ 74–89. Because Pack Unit is a prison that houses primarily individuals who are elderly and/or have health problems, and thus, are particularly vulnerable to serious illness in the face of a COVID-19 outbreak, Plaintiffs argue that such deliberate indifference to the inmates' health amounted to cruel and unusual punishment. *See id.* ¶¶ 74–79. Plaintiffs also claim

Defendants violated the ADA and the Rehabilitation Act by refusing to accommodate individuals with disabilities with measures that protect against the spread of COVID-19. *Id.* ¶ 81.

When this case was filed on March 30, 2020, the COVID-19 pandemic had already begun spreading rapidly throughout the United States. However, there were zero cases of COVID-19 in Pack Unit. The first positive test of a Pack Unit inmate was confirmed via autopsy on April 13, 2020, two days after that individual had died. As of June 13, 2020, 267 inmates have tested positive. As of June 26, 2020, eighteen people have died.

It is undisputed that TDCJ has adopted system-wide policies in reaction to the pandemic, and updated those policies over the course of the pandemic. However, Plaintiffs maintain that these measures have been, and remain, inadequate to protect a high-risk population like the inmates at Pack Unit. Additionally, Plaintiffs argue that Defendants are not properly implementing their own policies in Pack Unit, such that any protections the policies may confer in theory are not conferred in practice. Plaintiffs thus continue to seek declaratory and injunctive relief on behalf of the Plaintiffs and their proposed class, as set out in the Complaint and as updated in their June 1, 2020 letter to the Fifth Circuit (Doc. No. 137-5).

Much has been written about the subsequent preliminary proceedings in this case; the Court will not repeat them here. Given the urgency of the issues in this case, the Court set the trial date for July 13, 2020. (Doc. No. 88). Plaintiffs filed their Motion to Certify Class on May 13, 2020. (Doc. No. 94). Plaintiffs filed the motion as an emergency motion and requested an expedited briefing schedule, which Defendants strongly opposed, arguing that they needed the full response time to properly brief the question of certification. The Court allowed briefing to continue according to its usual briefing schedule. Briefing was completed on June 5, 2020. (Doc. No. 137).

Plaintiffs seek to certify a general class and one subclass:

**General Class**: All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide protection from exposure to COVID-19 during the class period.

. . .

**High-Risk Subclass**: All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who are subjected to TDCJ's policy and practice of failing to provide protection from exposure to COVID-19 during the class period and who are, according to the CDC, most at risk for severe illness, injury, or death from COVID-19 due to their age or their health conditions, including the following individuals:
- People aged 65 years or older;
- People with chronic lung disease or moderate to severe asthma;
- People who have serious heart conditions;
- People who are immunocompromised including patients undergoing cancer treatment;
- People with other underlying medical conditions, particularly if not well controlled, including, but not limited to, those with diabetes, renal failure, or liver disease; and
- People of any age with severe obesity (body mass index [BMI] ≥ 40).

(Doc. No. 98, at 25).[1]

As noted, the named Plaintiffs are Laddy Valentine and Richard King. Mr. Valentine is a 69-year-old man who suffers from hypertension and who has previously suffered from a stroke. (Doc. No. 1 ¶¶ 58, 60). Mr. Valentine also had a lumbar fusion in his back, and thus, uses a walker for mobility. *Id.* ¶ 59. Mr. King is a 73-year-old man who has diabetes and diabetic neuropathy. *Id.* ¶¶ 52, 56. Mr. King was also recently diagnosed with kidney problems. *Id.* ¶ 55.

Plaintiffs argue that both the class and subclass should be certified because they have met the requirements for certification set out in Rule 23(a) and (b)(2). Defendants oppose certification,

---

[1] Plaintiffs also originally pled a Disability Subclass, but now note that additional discovery may be necessary before certification, and so, are not seeking certification at this moment. (Doc. No. 98, at 25 n.88).

disputing whether Plaintiffs have fulfilled those requirements and arguing that the named Plaintiffs'

failure to exhaust administrative remedies as required by the Prison Litigation Reform Act (PLRA)

bars certification of any class. The Court held a hearing on Plaintiffs' Motion on June 15, 2020.

## II.    LEGAL STANDARD

The requirements for class certification under Federal Rule of Civil Procedure 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable [numerosity];
(2) there are questions of law or fact common to the class [commonality]
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and
(4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation].

Fed. R. Civ. P. 23(a). Parties seeking to certify a class must fulfill all four requirements of Rule

23(a), as well as one of the criteria listed in Rule 23(b). *Yates v. Collier*, 868 F.3d 354, 366 (5th

Cir. 2017). Plaintiffs seek certification under Rule 23(b)(2), which requires that "the party

opposing the class has acted or refused to act on grounds that apply generally to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs bear the burden of proving that the proposed class meets all requirements of Rule

23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). This burden is more than "a mere

pleading standard"; rather, Plaintiffs "must affirmatively demonstrate [their] compliance with the

Rule." *Id.* The trial court must conduct a "rigorous analysis" of the prerequisites of Rule 23(a)

before certifying a class. *Id.* at 350–51. Such an analysis will often "overlap" with analysis of the

merits of a plaintiff's underlying claim. *Id.* at 351. However, "Rule 23 grants courts no license to

engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans*

*& Trust Funds*, 568 U.S. 455, 466 (2013). Merits questions may only be considered to the extent that they are relevant to determine certification requirements. *Id.*

## III.   ANALYSIS

### A. Exhaustion of Administrative Remedies Under the PLRA

Defendants argue that the Court cannot certify any class in this case because named Plaintiffs have not exhausted their administrative remedies under the PLRA. Because exhaustion is required before inmates are allowed to file suit in federal court, Defendants argue, Plaintiffs cannot serve as class representatives because they have no standing to sue.

The PLRA requires inmates to exhaust all available administrative remedies before they file suit in a federal court challenging prison conditions. *See* 42 U.S.C. § 1997e(a). This requirement to exhaust is "mandatory"—no court may "excuse a failure to exhaust," regardless of any "special circumstances." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Where the case is a class action, the Fifth Circuit has held that at least one named plaintiff must have properly exhausted administrative remedies in order for the PLRA's exhaustion requirement to be fulfilled for the class. *See Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004).

However, while exhaustion is mandatory, the question of whether Plaintiffs have exhausted their administrative remedies is "not jurisdictional." *Woodford v. Ngo*, 548 U.S. 81, 101 (2006). Standing is a jurisdictional requirement. *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 247–48 (5th Cir. 2008). Thus, the question of whether Plaintiffs have exhausted does not affect Plaintiffs' standing in this case. *See Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1169 n.9 (M.D. Ala. 2016) ("[T]his failure to exhaust [as required by the PLRA] would have no effect on these plaintiffs' standing . . . ."). Because exhaustion is not a jurisdictional question, lack of exhaustion does not strip Plaintiffs of standing to bring this suit.

While the Court need not decide the question of exhaustion as a jurisdictional matter, the Court finds it prudent to address the question at this juncture in order to properly evaluate certification.[2] Because at least one named Plaintiff must exhaust his administrative remedies on behalf of the class in order for the class to seek relief, it is reasonable to determine exhaustion at the point of certification.

Accordingly, the Court turns to the merits of exhaustion under the PLRA. It is undisputed that both named Plaintiffs failed to fully exhaust their remedies through TDCJ's grievance procedure prior to filing this suit. While prisoners are required to exhaust their administrative remedies before filing suit, 42 U.S.C. § 1997e(a), the PLRA has a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available,'" *Ross*, 136 S. Ct. at 1855. The Supreme Court has previously identified three examples of circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief": (1) when the procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the procedure is "so opaque that it becomes, practically speaking, incapable of use"; and (3) when prison administrators

---

[2] The Court is not aware of Fifth Circuit precedent that requires district courts to determine exhaustion prior to class certification. Defendants cite to a single district court case from the Middle District of Louisiana, which evaluates the "standing" of named plaintiffs to represent a class at the point of certification. *See Lewis v. Cain*, 324 F.R.D. 159, 163–66 (M.D. La. 2018). That case, however, is not binding on this Court. Although Defendants characterize a Fifth Circuit case as finding a determination of exhaustion to be "a prerequisite to class certification," (Doc. No. 132, at 12), that case involved an appeal of a final judgment after trial, *Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004). Appellants in *Gates v. Cook* were not arguing that the trial court incorrectly certified the class despite a failure to exhaust, nor does the Fifth Circuit raise such a rule in its opinion. Other jurisdictions, however, have adopted such a rule. *See Ekanem v. Health & Hosp. Corp. of Marion Cty.*, 724 F.2d 563, 573 (7th Cir. 1983) (decertifying a class where no named plaintiffs properly exhausted remedies through the EEOC); *see also* 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1776 (3d ed.) ("A representative who has failed to exhaust the applicable administrative remedies will not be allowed to serve as the class representative.").

thwart the use of the procedure "through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

In this Court's Preliminary Injunction Memorandum and Order, this Court found that TDCJ's grievance process was unavailable because it was not "capable of use" when Plaintiffs were seeking relief from the COVID-19 pandemic. *Valentine v. Collier*, No. 20-CV-1115, 2020 WL 1916883, at *8–9 (S.D. Tex. Apr. 20, 2020). This Court reasoned that "[w]here, as here, the circumstances present an imminent danger, TDCJ's lengthy administrative procedure, which TDCJ may choose to extend at will, presents no 'possibility of some relief.'" *Id.* at *9 (quoting *Ross*, 136 S. Ct. at 1859). Defendants sought an emergency stay of the Preliminary Injunction, pending appeal. The Fifth Circuit motions panel, relying on the factual record before it, concluded that Defendants were likely to succeed on the merits of their PLRA claim. The panel reasoned:

> The crux of the court's concern is that TDCJ has not acted speedily enough. . . . Moreover, the district court held that TDCJ's procedure would be unduly lengthy if TDCJ were to use the full time allotted for a response to the grievance under state law. But the district court never found that TDCJ *would* take the full time if given the chance. The holding that the TDCJ process "presents no 'possibility of some relief,'" is therefore unsupported by the evidence.

*Valentine v. Collier*, 956 F.3d 797, 805 (5th Cir. 2020) (citations omitted).

In a concurring opinion, Judge Higginson noted that the stay order "does not foreclose the possibility" that the grievance process was unavailable "because of the immediacy of the COVID-19 medical emergency coupled with statements credited by the district court that prisoners' grievances may not be addressed promptly." *Id.* at 806 (Higginson, J., concurring). Judge Higginson continued: "If these plaintiffs—geriatric prisoners, many of whom are medically compromised—have no opportunity to expedite systemic medical emergency grievances, our court might hold that prison administrative remedies 'operate[] as a simple dead end . . . .'" *Id.* Justice Sotomayor, in a statement accompanying the Supreme Court's denial of Plaintiffs'

application to vacate the Fifth Circuit's stay, expressed a similar sentiment: "[I]f a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19, the procedures may be 'unavailable' to meet the plaintiff's purposes, much in the way they would be if prison officials ignored the grievances entirely." *Valentine v. Collier*, 140 S. Ct. 1598, 1600–01 (2020) (mem.) (Sotomayor, J.). Upon reviewing Defendants' appeal of this Court's Preliminary Injunction on the merits, a different panel of the Fifth Circuit declined to reach the question of exhaustion and availability under the PLRA, vacating the injunction on other grounds instead. *Valentine v. Collier*, 960 F.3d 707, at *1 (5th Cir. 2020) (mem.). Although each judge wrote separately, none suggested that the PLRA should bar this suit from proceeding. In fact, Judge Davis stated that this Court should resolve the "factual dispute[s]" regarding exhaustion, emphasized the need for more factual development on the merits, and encouraged this Court to move the trial to an earlier date. *Id.* at *1–2 & n.2 (Davis, J., concurring).

The motions panel made its ruling on a different procedural posture, and on a much narrower record. Availability is a fact-based analysis. *Ross*, 136 S. Ct. at 1859 ("When the facts on the ground demonstrate that no such potential [for relief] exists, the inmate has no obligation to exhaust the remedy."). Judges and justices throughout these proceedings have accordingly noted that further factual development could change their preliminary evaluations of the issue of exhaustion and unavailability. *See Valentine*, 140 S. Ct. at 1600–01 (Sotomayor, J.) ("[W]hen 'the facts on the ground' indicate that the grievance procedure provides no possibility of relief[,] the procedures may well be 'unavailable.'"); *Valentine*, 960 F.3d 707, at *1 (5th Cir. 2020) (Davis, J., concurring) ("[V]acating the preliminary injunction allows the district court to expeditiously conduct factfinding to determine what relief is necessary under the current circumstances.");

*Valentine*, 956 F.3d at 806 (Higginson, J., concurring) ("[T]he instant stay order does not foreclose the possibility that . . . our court may nonetheless conclude that a remedy using the [TDCJ's] grievance system is not 'available' because of the immediacy of the COVID-19 medical emergency coupled with statements credited by the district court that prisoners' grievances may not be addressed promptly.").

The facts in this case have indeed changed since this Court issued its preliminary injunction Order in April. First, Plaintiffs have now presented evidence that Plaintiff Valentine filed an informal resolution form on March 27, 2020, three days before this suit was first filed. Defendants, both in oral argument before the Fifth Circuit and in their briefings before this Court on the present motion, made much of the fact that Plaintiffs did not file *any* grievance before filing the present suit. (Doc. No. 132, at 13). It remains true that neither Plaintiff filed a Step 1 grievance before March 30, 2020, when this suit was filed. However, TDCJ's own internal grievance screening policy, as well as its Offender Grievance Operations Manual, require that inmates attempt informal resolution before they are allowed to file a Step 1 grievance. (Doc. No. 94-8, at 37 ("Offenders must attempt informal resolution for their problems with a staff member before a grievance will be processed."); Doc. No. 137-2, at 19 ("Offenders must document an attempt to informally resolve the issue prior to filing a Step 1 grievance. . . . Offender grievances that do not include a documented attempt at an informal resolution may be returned to the offender unprocessed.")). As required by TDCJ's policy, Plaintiff Valentine attempted informal resolution by filing an I-60 form with the Unit Safety Officer, Mr. Selby, on March 27, 2020. (Doc. No. 137-1, at 2, 5–6). After not receiving any response to his I-60, Mr. Valentine filed his Step 1 grievance on March 31. *Id.* at 2. Defendants have not presented any evidence to dispute this series of events. Thus, to the extent Defendants' arguments rely on the fact that neither Plaintiff had filed any grievance before filing

this lawsuit, those arguments are no longer sound. Indeed, Judge Davis called for this Court, upon remand, to "resolve the apparent factual dispute concerning when Plaintiff Valentine sought administrative relief and whether TDCJ offered any emergency grievance procedures to the inmates." *Valentine*, 960 F.3d 707, at *1 n.2 (Davis, J., concurring). Based on the record presented, Plaintiff Valentine began the administrative process when he filed an I-60 to attempt informal resolution on March 27, 2020.

Second, as this case has progressed, both named Plaintiffs' grievances have been slowly wending their way through the administrative process, providing evidence on how TDCJ's grievance procedure works in practice. As of June 5, 2020, when Plaintiffs filed their Reply brief, and over two months after Plaintiffs had first initiated administrative proceedings, Plaintiff Valentine's grievance still had not been finally resolved. (Doc. No. 137, at 5). Mr. Valentine had received a response to his Step 1 grievance on April 22, 2020. (Doc. No. 137-1, at 8). At the hearing on June 15, 2020, Defendants' counsel represented to the Court that Plaintiff Valentine's Step 2 grievance has now been exhausted. Counsel did not clarify, however, when it was finally exhausted, nor have they described or provided a copy of the final disposition, although it was clear that Plaintiff Valentine had not received all the relief he had sought. Plaintiff King first submitted his Step 1 grievance on April 2, 2020. (Doc. No. 98, at 44). He received a response on May 5, 2020, and has now submitted his Step 2 grievance. *Id.* According to TDCJ's original grievance process, TDCJ has 35 days to respond to Step 2 grievances, and may extend that deadline by an additional 35 days if it so chooses. *Id.* at 43. In the two months that it took for Plaintiff Valentine to exhaust his initial grievance—and during which time, TDCJ still has not fully responded to Plaintiff King's grievance—Plaintiff Valentine has now tested positive for COVID-19, and the virus has now spread throughout Pack Unit.

10

Third, and relatedly, the situation in Pack Unit has further deteriorated since this Court issued its Preliminary Injunction. On April 16, 2020, when this Court issued its Order, one individual had tested positive for and passed away from COVID-19. Two months later, at least 267 inmates have tested positive and at least eighteen inmates have died from the virus. Pack Unit is now the site of an outbreak of COVID-19. Plaintiffs' original concerns about the speed at which COVID-19 would spread throughout Pack Unit if it entered have become reality.

Finally, Defendants themselves have since implemented amended grievance procedures for COVID-related grievances. Beginning May 26, 2020, all COVID-related grievances must be processed "with an expedited time frame (15 calendar days) with no extensions" for each step, such that grievances are exhausted within thirty days after the Step 1 grievance is filed. (Doc. No. 137, at 5; Doc. No. 137-3, at 3–5). Defendant Bryan Collier, the executive director of TDCJ, testified in his deposition that the timeline was shortened because "the prior policy's time frames did not give adequate attention to the COVID-19 issue." (Doc. No. 137-4, at 6). This implementation of an emergency process appears to be unique; Defendant Collier was not aware of any other instance in which grievance response times had been shortened in the past. *See id.*

Taken together, these facts further support the finding that TDCJ's original grievance process that was in place for most of this lawsuit was unavailable. Given how the TDCJ grievance process was previously structured, Plaintiff did not receive, and could not possibly have received, meaningful relief to their COVID-related grievances under the normal process in the face of a rapidly spreading pandemic. It is worth emphasizing again the unprecedented situation in which the Pack Unit finds itself: a global pandemic for which there is no cure or vaccine, and which is highly contagious, especially in a densely packed environment, and which is highly dangerous to elderly and sickly individuals, like those imprisoned at Pack Unit. The only known method for

staying safe is to avoid getting the disease in the first place. Accordingly, communities in the "free world" quickly began implementing sets of measures to prevent the spread of the virus—universally shutting down public functions and areas, enforcing policies that ensured social distancing, and educating the public on how to keep themselves safe.

With this in mind, what Plaintiffs sought, and absolutely required, was a set of swift and coordinated preventative measures to stop COVID-19 from entering and spreading throughout Pack Unit. Swiftness of relief was required because Plaintiffs were most protected before COVID-19 entered Pack Unit. And coordinated relief, incorporating scientific recommendations, was required because, to date, there is no single effective measure in preventing spread in this pandemic. The CDC guidelines on COVID-19 protections for prisons and detention facilities, which have formed a minimal baseline for evaluating protection in this litigation, demonstrate this point: the CDC's recommendations form a network of overlapping measures, which work in tandem to protect high-risk populations such as the inmates at Pack Unit. Some form of coordinated emergency relief was necessary in order to keep Plaintiffs and other class members safe.

The Court finds that TDCJ's grievance procedure was not "capable of use to obtain some relief," in the form of such coordinated emergency protection from COVID-19, under two theories of unavailability. The three examples of unavailability listed by the Supreme Court in *Ross* did not constitute an exhaustive list. *See West v. Emig*, 787 F. App'x 812, 815 (3d Cir. 2019) ("[N]either the Supreme Court nor this Circuit has held that those three circumstances [listed in *Ross*] are comprehensive, as opposed to exemplary."); *Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) ("The Supreme Court recognizes at least three circumstances where an administrative remedy is . . . unavailable . . . ."); *Ramirez v. Young*, 906 F.3d 530, 538 (7th Cir. 2018) ("[The three examples in *Ross*] were only examples, not a closed list . . . ."); *Andres v. Marshall*, 867 F.3d

1076, 1078 (9th Cir. 2017) (describing the three examples in *Ross* as a "non-exhaustive list"); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016) ("We note that the three circumstances discussed in *Ross* do not appear to be exhaustive . . . ."). As discussed below, the Court concludes that this case exhibits the kind of "dead end" unavailability described in *Ross*. At the same time, given the unprecedented nature of this pandemic, it should come as no surprise that this case, in some respects, exceeds the bounds of the three, more commonplace instances of unavailability imagined in *Ross.* The Court thus begins its analysis with a commonsense articulation of the way in which the TDCJ grievance procedures were, under the unprecedented circumstances, not "capable of use to obtain some relief," *Ross*, 136 S. Ct. at 1859, before turning to the analysis of TDCJ's grievance procedures as a "dead end."

Fundamentally, the reason that TDCJ's grievance process was "not capable of use to obtain some relief" from COVID-19 is that it did not fit the problem Plaintiffs were facing. TDCJ's grievance procedure was not designed with a worldwide pandemic in mind. The unique situation presented by the COVID-19 pandemic—a highly contagious disease that poses an imminent risk of serious illness or death to all individuals in Pack Unit, at the same time—could not have been redressed through individual grievances, filed through TDCJ's normal system of grievance review. What Plaintiffs sought in the face of COVID-19 was a set of proactive, preventative measures for an imminent threat that would affect the entire prison. Yet, TDCJ's grievance procedure was not designed to field requests for swift, prison-wide preventative measures. According to TDCJ's Offender Grievance Operations Manual, grievances are screened for emergencies. (Doc. No. 137-2, at 14). Step 1 grievances flagged as emergencies are not screened for the usual requirements that TDCJ imposes on grievances, and must be resolved within forty days. *Id.* at 22. There are twenty categories of emergencies recognized by TDCJ's normal grievance process. *Id.* at 90–91.

Other than a code for "lethal injection issues," the other nineteen relate to injuries that have already occurred or are ongoing: allegations of physical or sexual harm, discrimination claims, extortion, and medical emergencies. *See id.* Medical emergencies provide no possibility for preventative relief either, as TDCJ defines a medical emergency extremely narrowly: "threats of suicide, chest pains, or difficulty breathing." (Doc. No. 137-2, at 22). Indeed, though Plaintiff Valentine wrote "EMERGENCY GRIEVANCE" at the top of his Step 1 grievance, (Doc. No. 137-1, at 8), TDCJ did not flag the grievance as an emergency. Rather, Plaintiff Valentine's first grievance was given the nonemergency code "503"—the code for "SANITATION (Issues regarding the cleanliness of any area of the unit)." (Doc. No. 137-1, at 8; Doc. No. 137-2, at 93). Accordingly, it has taken over two months for Plaintiff Valentine's grievance to complete the grievance process. It is clear that TDCJ's grievance process was not designed to provide emergency prison-wide preventative measures, which is exactly what Plaintiffs requested in order to protect themselves from COVID-19. Because TDCJ's normal grievance procedure does not fit the needs of prisoners when they are faced with a quickly spreading, potentially deadly pandemic, the grievance procedure was "not capable of use to obtain some relief" from the imminent threat of COVID-19. *Valentine*, 140 S. Ct. at 1600–01 (Sotomayor, J.). ("[I]f a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19, the procedures may be 'unavailable' to meet the plaintiff's purposes . . . .").

With this fundamental point in mind, it is clear that TDCJ's grievance process also was incapable of use to obtain some relief because it served as a "simple dead end," in the language of *Ross*. 136 S. Ct. at 1859. Because of the disconnect between then-existing grievance procedures and the threat of the pandemic, officers operating under TDCJ's normal grievance process were

either "unable or consistently unwilling" to provide the swift, coordinated preventative relief that Plaintiffs requested through their grievances. *Id.*

First, TDCJ's grievance process was a "simple dead end" because it could not provide the emergency relief that Plaintiffs needed in order to be protected from the pandemic to the degree required by the Eighth Amendment. Until about three weeks ago, TDCJ did not have a way for inmates to request emergency relief related to COVID-19 prevention and protection. As discussed *supra*, TDCJ's initial screening process actually does allow for a grievance to be flagged as an emergency. (Doc. No. 137-2, at 14). However, among the permissible categories of emergencies listed in TDCJ's grievance operations manual (Doc. No. 137-2, at 22), the only emergency category that Plaintiffs' requests for protection from a quickly spreading pandemic could have fallen under was medical emergency. Plaintiff Valentine's first grievance, though, was not flagged as a medical emergency. (Doc. No. 137-1, at 8). His grievance was not flagged as any sort of emergency, despite his attempts to label his grievance as such. *Id.* Rather, Plaintiff Valentine's grievance regarding COVID-19 was labeled as a sanitation problem, and continued along the normal grievance process. (Doc. No. 137-1, at 8; Doc. No. 137-2, at 93). Despite the urgent nature of Plaintiff Valentine's complaint, and despite his attempts to flag his own complaint as an emergency, it still took 22 days for TDCJ to respond to his Step 1 grievance, and over two months to fully exhaust his administrative remedies, even with this ongoing litigation. During those two months, the injury that Plaintiff Valentine sought to protect himself and his fellow inmates from came to pass, in the form of an outbreak of COVID-19.

Indeed, TDCJ itself recognizes the necessity of having a process in place that can resolve COVID-related complaints on an emergency basis. As Defendant Collier testified at his deposition, the new emergency process was implemented in May because the usual grievance process "did

not give adequate attention to the COVID-19 issue." (Doc. No. 137-4, at 6). Indeed, a separate code was created to specifically flag COVID-related complaints as emergencies—930—because the normal grievance process did not label those complaints as emergencies. (Doc. No. 137-3, at 4). Unfortunately, such an expedited process for COVID-related complaints did not exist at the time that Plaintiffs were seeking relief. Without some process by which TDCJ could have identified emergency COVID-related grievances as such, "these plaintiffs—geriatric prisoners, many of whom are medically compromised—ha[d] no opportunity to expedite systemic medical emergency grievances," and thus, TDCJ's "administrative remedies 'operate[] as a simple dead end.'" *Valentine*, 956 F.3d at 806 (Higginson, J., concurring) (quoting *Ross*, 136 S. Ct. at 1859).

Additionally, even if a TDCJ official had been able to note Plaintiffs' emergency requests and expedite review, TDCJ was still unable or unwilling to respond to grievances with coordinated relief. Although Defendants now argue that it provided some of the relief requested by Plaintiffs in their grievances, it did so in a piecemeal fashion, and only in reaction to the introduction and spread of COVID-19 into Pack Unit, and subsequent court proceedings. For example, Defendants note that they stopped transferring inmates into Pack Unit, which addressed one of Plaintiff King's complaints about transfer of inmates between units. (Doc. No. 132, at 17). However, Defendants did so because all of Pack Unit went into a precautionary lockdown, *after* the first inmate died from COVID-19. Similarly, Defendants' claims that they have resolved Plaintiff Valentine's requests for mass testing and utilization of empty dorm space, *see id.*, omit the fact that these measures were only implemented very recently, in reaction to an outbreak of COVID-19 in Pack Unit. And, as noted by this Court previously, almost all of the COVID-19 measures adopted by TDCJ were not implemented until after this lawsuit was filed, and most were implemented immediately before parties were required to appear before this Court for an evidentiary hearing.

*See Valentine*, 2020 WL 1916883, at *10. Thus, Defendants' own actions show that they were either unable or unwilling to timely provide the minimum level of swift, coordinated relief that was needed to protect Plaintiffs from COVID-19. Instead, even where they have resolved Plaintiffs' complaints, TDCJ's responses have been gradual and piecemeal over the course of the past few months, taken in response to the worsening situation in Pack Unit, rather than in response to Plaintiffs' requests for protection from infection.

Defendants argue that TDCJ's grievance system was available to Plaintiffs because Defendants have, in fact, provided some of the relief that Plaintiffs have requested. However, as discussed *supra*, Defendants' responses have been incomplete and implemented piecemeal, mostly after COVID-19 had already entered the prison. This was not the kind of systemic emergency relief that Plaintiffs requested and required. Without a minimal amount of swift and coordinated action, Defendants could not protect Plaintiffs to the level that the Constitution requires. Since TDCJ's grievance process could not provide that swift and coordinated relief, the Court concludes that the grievance process was not "available" to Plaintiffs before this case was filed, and thus, per the text of the PLRA, Plaintiffs did not need to exhaust their administrative remedies.

The Court is also concerned that, if the Court construed the word "available" to find that PLRA requires exhaustion here, the PLRA could be unconstitutional as applied in this case. When the state incarcerates a person, that person becomes dependent on the state for all of their basic human needs—food, clothing, safety, and medical care. *Brown v. Plata*, 563 U.S. 493, 510 (2011). Where the state fails to provide those basic human needs, the state violates the Eighth Amendment. *See id.* at 510–11. In the present pandemic, inmates at Pack Unit could not protect their health and lives without TDCJ's systemic, emergency interventions. If TDCJ fails to provide those interventions, the inmates must turn to the courts in order to vindicate their Eighth Amendment

rights. If the PLRA requires those inmates to exhaust their remedies through the normal grievance process first, however—even once it is clear that the prison does not have a process for responding to inmates' COVID-related complaints with the urgency required by the pandemic—then the PLRA effectively denies those prisoners any protection of their Eighth Amendment rights. Because the PLRA's exhaustion requirement functions in this case to so fully deny prisoners their ability to protect their own Eighth Amendment rights, that requirement is itself of questionable constitutionality as applied to that case. These constitutional concerns weigh in favor of interpreting TDCJ's grievance procedures in this case as "unavailable." *See Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) ("[W]hen a serious doubt is raised about the constitutionality of an act of Congress, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (quotations and alterations omitted) (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018))). Were the Court to reach the opposite conclusion, it would need to engage directly with serious concerns about the PLRA's constitutionality as applied in this case.

The Court notes that any constitutional concerns in this case relate only to the PLRA as applied to the facts of this case. Normally, the PLRA's exhaustion requirement does not raise constitutional concerns. Congress did not intend for the PLRA's exhaustion requirement to bar prisoners from bringing meritorious claims. *See* Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1633–34 (2003). Instead, Congress adopted the PLRA's gatekeeping provisions, including its exhaustion requirement, with two goals in mind: first, to give prison authorities the chance to resolve complaints before courts intervene; and second, to conserve judicial resources by encouraging resolutions at the administrative level and minimizing frivolous litigation. *See Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). In the present case, requiring exhaustion fulfills

neither of those goals. TDCJ has failed to provide, and shown that it was not equipped to provide through its grievance process the emergency coordinated relief necessary to protect Plaintiffs. Plaintiffs now seek meritorious emergency relief before this Court. Where, as here, the PLRA serves neither of its intended functions, and instead, serves as a roadblock to meritorious civil rights litigation, the PLRA's constitutionality is questionable. These constitutional concerns lend this Court an additional reason to interpret the statute's exhaustion requirement to find that TDCJ's grievance process was not "available" to Plaintiffs at the start of their lawsuit.

Given all that has unfolded in Pack Unit during the pendency of this case, the Court finds that TDCJ's grievance processes were indeed "utterly incapable of responding to a rapidly spreading pandemic like Covid-19," such that the procedures were "'unavailable' to meet the plaintiff's purposes, much in the way they would be if prison officials ignored the grievances entirely." *Valentine*, 140 S. Ct. at 1600–01 (Sotomayor, J.); *see also McPherson v. Lamont*, Civil No. 3:20cv534, 2020 WL 2198279, at *10 (D. Conn. May 6, 2020) (noting that Connecticut state prisons' grievance process "was not set up with a pandemic in mind" and the pandemic "has rendered DOC's administrative process inadequate to the task of handling Plaintiffs' urgent complaints regarding their health"). As Justice Sotomayor has stated in this case, "in these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance process cannot or does not answer, the PLRA's textual exception could open the courthouse doors where they would otherwise stay closed." *Valentine*, 140 S. Ct. at 1600–01 (Sotomayor, J.). Thus, the Court concludes that the PLRA's exhaustion requirement does not bar Plaintiffs' claims or the certification of this class.[3]

---

[3] The Court notes that TDCJ's actions or inactions at Pack Unit in the face of the COVID-19 pandemic impact not only the lives of those incarcerated at Pack Unit, but also the staff who work at Pack Unit, the loved ones those staff members go home to each night, and the broader

**B. Rule 23(a) Requirements**

The Court thus turns to the question of class certification under Rule 23(a), which requires all classes to meet prerequisites of numerosity, commonality, typicality, and adequacy of representation before they may be certified.

*1. Numerosity*

Rule 23(a)(1) requires that the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the proposed General Class constitutes the entire population of the Pack Unit, which has a capacity of over 1,400 prisoners. (Doc. No. 98, at 27). The High-Risk Subclass will have several hundred members, based on testimony by TDCJ in the *Cole* and *Yates* prison heat litigations. *Id.* at 28. Both the General Class and the Subclass will also have unknown future members, once the prison lifts its precautionary lockdown, as new prisoners are placed in the Pack Unit. *Id.* at 27–28. Defendants do not dispute that Plaintiffs have met the numerosity requirement. Thus, Plaintiffs have established that the proposed class is too numerous to proceed through joinder.

*2. Commonality*

Rule 23(a)(2) requires common questions of law or fact for the proposed class. Fed. R. Civ. P. 23(a)(2). These common questions must show that all class members suffered the same injury and their claims for relief "depend upon a common contention," such that their claims are "capable of class-wide resolution—which means that determination of its truth or falsity will resolve an

---

community that surrounds Pack Unit. An outbreak in the prison inevitably spreads beyond the prison walls, as prison staff enter and exit as their work days begin and end, and as sick inmates are transferred to community hospitals for care. While this fact is not a reason for the Court's decision today, the Court continues to believe that COVID-19 prevention in Pack Unit is a community health concern, not one confined to just those individuals who are incarcerated.

issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Plaintiffs assert that there is commonality among all proposed class members because all class members are subject to the policies at the Pack Unit that leave them at high risk of contracting COVID-19. Plaintiffs allege that Defendants are violating the Eighth Amendment for the entire class by "intentionally treating *all* putative class members below the constitutional baseline by taking inadequate measures to protect them from COVID-19, thus exposing them to a known hazard." (Doc. No. 98, at 32). The Court must decide whether Defendants are refusing to provide adequate COVID-19 protections, and whether Defendants are deliberately indifferent to inmate health and safety. The answer to these two questions, argue Plaintiffs, will resolve all class members' claims "in one stroke."

Defendants argue that Plaintiffs have failed to establish that the class suffered from the "same injury." This, they argue, is for a number of reasons. First, some members of the proposed class have now contracted COVID-19, and some others have fully recovered. Thus, argues Defendants, those with immunity are no longer at risk. However, it has not been scientifically shown that individuals who have recovered from COVID-19 are protected from reinfection, nor if they are conferred immunity, how long that immunity would last. (Doc. No. 137, at 8); *see "Immunity Passports" in the Context of COVID-19*, WHO (Apr. 24, 2020), https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19 ("There is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."). Thus, even those individuals who have recovered from COVID-19 may be at risk for reinfection later on, and so, Defendants' actions in preventing the spread of COVID-19 affect all members of the proposed class.

Second, Defendants claim that not all members of the proposed class are housed in areas with a risk of COVID-19 exposure, because individuals are being segregated based on their test results and exposure to positive cases. Plaintiffs need not prove that each class member has an identical injury or risk of injury; rather, like in previous litigation involving the Pack Unit and air-conditioning, Plaintiffs need only show that Defendants' actions "were ineffective to reduce the risk of serious harm to a constitutionally permissible level for *any* inmate" at Pack Unit.[4] *Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017). Plaintiffs have shown this to be true. First, although Defendants have tested all inmates in Pack Unit, they have represented to the Court that they do not have plans for systematic retesting. Thus, it is likely that, while the tests remained pending for weeks, those individuals who were later identified as positive cases transmitted COVID-19 to individuals who had originally tested negative before those who tested positive were transferred into isolation. Because Defendants refuse to conduct systematic retesting, there is no way for Defendants to verify that all individuals with COVID-19 are currently segregated from all individuals without COVID-19. Additionally, Pack Unit employees continue to move between housing areas and to enter and exit Pack Unit from the outside world. (Doc. No. 137, at 8–9). There is a significant risk that an employee may contract COVID-19 and bring it into a housing area that has been designated for those with negative tests. Based on all of these facts, all putative class members are still affected by Defendants' policies and practices, regardless of where they are

---

[4] Defendants do not explicitly raise the argument that individual class members are at varying risk levels for serious harm because of differing ages and medical histories, but the argument is related to their argument about varying risk levels for contracting COVID-19. Similarly, this argument was raised in the prior air-conditioning litigation and was rejected by the Fifth Circuit. *See Yates*, 868 F.3d at 363. Here, even younger and healthier inmates are still placed at unacceptably higher risk of serious illness if Defendants are deliberately indifferent in preventing spread of COVID-19, as borne out by those individuals from Pack Unit who have already been hospitalized. (Doc. No. 98, at 37 & n.101 (noting that at least four identified inmates from Pack Unit who have been hospitalized for COVID-19 were younger than 50)).

currently being housed, because Defendants have not completely controlled the outbreak. Every inmate in Pack Unit remains at risk of contracting COVID-19, and thus, may be injured by Defendants if they are not adequately protecting the inmates.

Finally, Defendants argue that, because putative class members are at different levels of risk for contracting COVID-19 based on their housing, some class members would not be able to argue that the administrative process was "unavailable" to them, and thus, would have a different exhaustion argument than the other class members. Because individual class members do not need to exhaust their remedies if at least one of the named Plaintiffs exhausted, this argument is not relevant to the question of commonality.

Thus, the Court finds there are two primary common questions for this proposed class that would satisfy the *Wal-Mart* standard: (1) whether withholding COVID-19 protections in Pack Unit constitutes a condition of confinement that poses a substantial risk of serious harm to the health of all inmates, and (2) whether Defendants were deliberately indifferent to the risk posed to inmates at the Pack Unit. Additional common questions of law and fact that will need to be answered in order to answer those two primary common questions include:

- What are the policies and practices for addressing COVID-19 in Pack Unit?

- Were the policies that TDCJ implemented ineffective?

- Were the policies implemented in an ineffective manner in Pack Unit?

- Are the Defendants subjectively aware of the danger to class members?

- Are Defendants deliberately withholding adequate and recommended COVID-19 protections from class members?

- What measures are feasible and appropriate to adequately reduce the serious health risk to the class members that COVID-19 poses?

- Does exposing all prisoners to a substantial risk of COVID-19 infection violate the Eighth Amendment?

Additional common questions for the High-Risk Subclass include:

- What medical conditions create an additional risk of serious complications of COVID-19?

- Are Defendants deliberately indifferent to this risk, such as to violate the Eighth Amendment?

- Do Defendants know these conditions create intolerable risk of COVID-19 infection?

The Court finds that the preceding common questions of law and fact have common answers for the entire class, and thus, fulfill the commonality requirement of Rule 23(a)(2).

> ### 3. Typicality

Rule 23(a)(3) requires that the claims of the named Plaintiffs be typical of those of the class. Fed. R. Civ. P. 23(a)(3). The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-mart*, 564 U.S. at 349 n.5 (quotation omitted). Here, because the claims across all class members share commonality, named Plaintiffs' claims are also typical of those of other class members. Like the claims raised by putative class members, named Plaintiffs seek an injunction requiring policy change based on claims of deliberate indifference by Defendants to the risk of medical harm. Defendants' policies regarding COVID-19 affect all the proposed class members, including the named Plaintiffs.

Defendants argue that, because Plaintiffs have failed to exhaust their administrative remedies, they have no claims against which the class members' claims can be assessed. However, because this Court finds that Defendants' grievance procedure was "unavailable" to Plaintiffs, exhaustion was not required in the present case. Additionally, the Court notes that, because only one named Plaintiff need exhaust his claim for the whole class to continue, the question of

exhaustion is not one that needs to be typical of the class. Thus, the merits of Plaintiffs' Eighth Amendment claims are what establish typicality, and Plaintiffs' claims are typical of those brought by proposed class members. Thus, because claims brought by the named Plaintiffs are the same as those that they brought on behalf of the class, the Court finds that the named Plaintiffs' claims are typical of those of the class.

### 4. Adequacy of Representation

The adequacy determination requires "an inquiry into [1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005) (quoting *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)). The Court must also seek out "conflicts of interest between the named plaintiffs and the class they seek to represent." *Id.* (quoting *Berger*, 257 F.3d at 480).

Defendants do not challenge the adequacy and experience of class counsel, who have extensive experience in litigating class actions, prisoner civil rights actions, and conditions of confinement claims, and who have shown themselves to be both competent and zealous in this case. However, Defendants argue that Mr. King and Mr. Valentine do not have a strong enough understanding of the case to be capable of driving the litigation. The Fifth Circuit has held that class representatives must direct litigation, not their counsel, and thus, "class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). However, as this Court noted in *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016), where named Plaintiffs are prisoners representing a class of prisoners, named Plaintiffs "cannot be expected to have a sophisticated understanding of the legal intricacies" of the case. *Id.* at *9. Here, the required

understanding of the case for named Plaintiffs cannot be the same as the requirements in the complex class action securities cases that Defendants cite. *See Feder*, 429 F.3d at 130; *Unger*, 401 F.3d at 319–20; *Berger*, 257 F.3d at 484. Defendants argue that Plaintiff King did not know what a "putative class action" was, and could not articulate his responsibilities as a class representative or the legal claims brought on behalf of a class. However, named Plaintiffs do not need to be legal scholars or understand legal terms. *See* 7A Wright & Miller, Federal Practice and Procedure § 1766 ("[K]nowledge of all the intricacies of the litigation is not required . . . ."); *see also Cole*, 2016 WL 3258345, at *9 (describing evidence that named Plaintiffs understood basic goals of the case). Rather, named Plaintiffs need only "show a willingness to take an active role in, and control, the litigation." *Cole*, 2016 WL 3258345, at *9. Here, Plaintiffs have done that. Plaintiffs allege that both Mr. King and Mr. Valentine have read and are familiar with the complaint, have assisted counsel throughout the litigation, submitted declarations, testified at hearings, and have been or will be deposed. Both named Plaintiffs testified thoroughly and thoughtfully when they appeared before this Court telephonically for the preliminary injunction hearing. The Court finds that the named Plaintiffs have a sufficient understanding of the case and claims to adequately represent the class.

Defendants also challenge the adequacy of representation by arguing that there is a conflict of interest between the representatives and the class. Defendants argue that, because this class action is brought only for declaratory and injunctive relief, a decision in this case could preclude individual class members from seeking monetary damages in the future. Not all conflicts automatically defeat adequacy. *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017). Rather, when class representatives decide to forego certain claims, a court reviews that decision to waive claims by inquiring into: "(1) the risk that unnamed class members will forfeit

their right to pursue the waived claim in future litigation, (2) the value of the waived claim, and (3) the strategic value of the waiver, which can include the value of proceeding as a class (if the waiver is key to certification)." *Id.* at 413. "A class representative's decision to waive unnamed class members' claims will defeat adequacy where the lost value of the waived claims (percent risk of future preclusion multiplied by the value of the waived claim) is greater than the strategic value of the decision to waive." *Id.* There is, however, always a risk of preclusion because courts "cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action." *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 396 (1996) (Ginsburg, J., concurring in part and dissenting in part)). Additionally, "courts have inconsistently applied claim preclusion to class actions," with some recognizing that class actions are an exception to the rule against claim-splitting, while others have refused to certify class actions because of "perceived risk of down the line preclusion." *Id.* at 413–14.

Here, the risk of future preclusion is outweighed by the value of pursuing only injunctive and declaratory relief in this case. Given the Fifth Circuit's recognition that class actions are usually an exception to the rule against claim-splitting, *see id.*, and given that prisoner class actions like this one are very commonly certified, *see Cole*, 2016 WL 3258345, at *9; 7AA Wright & Miller, Federal Practice and Procedure § 1776, the risk of res judicata is lower than in other cases cited by Defendants, where class representatives waived monetary damages claims in employment discrimination suits, *see McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 283 (5th Cir. 2008); *Zachery v. Texaco Expl. & Prod., Inc.*, 185 F.R.D. 230, 243 (W.D. Tex. 1999), or waived one type of claim for monetary damages, but proceeded as a class on another, *see Slade*, 856 F.3d at 412. Additionally, because claims for damages in this case would raise individual damages calculations, as well as questions of qualified immunity, adding those claims would certainly impose a cost on

certification in this case. *See Bogard v. Cook*, 586 F.2d 399, 409 (5th Cir. 1978). Thus, because the risk of future preclusion is lower in this particular case, and because the value of proceeding as a class and obtaining injunctive and declaratory relief for class members in a situation of life and death is high, the Court finds there is no conflict that would destroy adequacy of representation here.

Because both the named Plaintiffs and Plaintiffs' counsel are adequate representatives of the class and class members' interests, the Court finds that Plaintiffs have fulfilled the adequacy of representation requirement of Rule 23(a)(4).[5]

### C. Rule 23(b)(2) Requirements

Rule 23 also requires that a proposed class fulfill one of the requirements listed in Rule 23(b). Here, Plaintiffs seek to certify a class under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. The Fifth Circuit has previously held that Rule 23(b)(2) certification requires that "(1) class members must have been harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; and (3) the injunctive relief sought must be specific." *Yates*, 868 F.3d at 366 (internal quotations omitted) (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)). The specificity element requires Plaintiffs to

---

[5] The Court has received one objection (Doc. No. 151), from five inmates, to Plaintiffs' Motion to Certify, specifically to the adequacy of representation. The objection is not meritorious. However, these inmates, and all others, will have the right to opt out of the class.

"describe in reasonable detail the acts required" for final injunctive relief. *Id.* at 367 (quoting *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 848 (5th Cir. 2012)).

Plaintiffs seek relief for the entire class based on policies and practices by Defendants that affect the class equally. Plaintiffs claim that Defendants have been deliberately indifferent in enacting and following measures that would protect inmates at Pack Unit from the spread of COVID-19. Any injunction involving those measures would occur on a unit-wide level, thus affecting all class members. Because COVID-19 spreads from human to human, protective measures must be implemented at a unit-wide level, in order to prevent spread throughout the unit; accordingly, measures that only protect part of the unit are not effective as long as COVID-19 is allowed to spread in other parts of the unit. The relief that Plaintiffs seek here is similar to the relief that was sought in the prison heat litigation, which the Fifth Circuit found to fulfill the requirements of Rule 23(b)(2), because TDCJ's policies were the same for the entire unit, and thus, harmed the entire class in the same way. *Yates*, 868 F.3d at 368. Plaintiffs listed the measures they are seeking as injunctive relief in their Complaint. (Doc. No. 1 ¶¶ 96–98). As ordered by the Fifth Circuit, Plaintiffs filed a letter on June 1, 2020, describing and explaining additional relief sought after COVID-19 had spread through Pack Unit. (Doc. No. 137-5). The Court finds Plaintiffs' requested relief to be clear and specific.

Defendants argue that Plaintiffs have not met their burden under Rule 23(b)(2) because the relief requested is not specific enough. First, Defendants argue that Plaintiffs did not "explicitly detail the injunctive relief they seek in their motion [for class certification]." (Doc. No. 132, at 32). However, there is no requirement that Plaintiffs spell out the injunctive relief requested in this specific motion. Rather, through months of litigation, and after this Court issued a preliminary injunction that Defendants argued was *too* detailed, it should be quite apparent from pleadings,

briefings, expert testimony, and oral argument exactly what Plaintiffs seek. The Fifth Circuit has indeed noted that "Rule 23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only 'reasonable detail' as to the 'acts required.'" *Yates*, 868 F.3d at 368 (quoting *Perry*, 675 F.3d at 848). Accordingly, in *Yates*, the Fifth Circuit evaluated the plaintiffs' requested relief in their Amended Complaint and upheld this Court's finding that the plaintiffs had requested specific enough relief, because they had described their requested relief with "reasonable detail"—by seeking maintenance of heat index of 88 degrees or lower—and this Court identified air-conditioning as relief sought by the plaintiffs, even if it was not stated in their complaint. *Id.* Similarly, Plaintiffs have asserted with reasonable detail the relief requested in their complaint and subsequent filings; they need not reassert it in their motion for class certification. Any "jot" or "tittle" may be filled in later as this case proceeds as well.

Second, Defendants claim that the relief requested lacks specificity because Plaintiffs have not asserted a specific class period. Rather, Plaintiffs have asked for the class period to run from present until "protections against COVID-19 are no longer necessary." The Court does not find this to be an unreasonable class period, given the complete unpredictability of the COVID-19 pandemic at this point. If Defendants wish to designate who will determine when these protections are no longer necessary, that is a detail that can be determined at a later date, and need not be fleshed out at class certification.

The Court thus finds that Plaintiffs have established the requirements to certify a class under Rule 23(b)(2). Because Plaintiffs have fulfilled the requirements for class certification under Rule 23(a) and (b)(2), the Court hereby certifies Plaintiffs' proposed General Class and High-Risk Subclass.

### D. Appointment of Class Counsel Under Rule 23(g)

Plaintiffs request that their current attorneys be appointed class counsel pursuant to Rule 23(g). Under Rule 23(g), "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). In appointing class counsel, courts must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Class counsel has a duty to "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

The Court finds that counsel for the named Plaintiffs fulfill the requirements of Rule 23(g). Plaintiffs' attorneys have investigated the case, engaged in voluminous discovery, drafted numerous and lengthy briefs, and competently participated in argument, all on an expedited schedule. The proposed class counsel have extensive experience handling complex litigation and class actions, as well as cases similar to the present case in this and other jurisdictions. Proposed class counsel have demonstrated their familiarity with the applicable law through their briefings and oral arguments. They have also shown that they will devote substantial resources to representing the class. The Court finds that proposed class counsel will fairly and adequately represent the interest of the class. Therefore, the Court appoints Plaintiffs' current attorneys as class counsel for both the General Class and the High-Risk Subclass that are certified by this Order.

## VI.  CONCLUSION

Plaintiffs' Motion for Class Certification is hereby **GRANTED**. The General Class and the High-Risk Subclass, as defined in Part I, are certified.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 27th day of June, 2020.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE