## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LADDY CURTIS VALENTINE and | § | |
| RICHARD ELVIN KING, individually and | § | |
| on behalf of those similarly situated, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-01115 |
| | § | |
| BRYAN COLLIER, in his official capacity, | § | |
| ROBERT HERRERA, in his official capacity, | § | |
| And TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, | § | |
|     Defendants. | § | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants Bryan Collier ("Collier"), Robert Herrera ("Herrera"), and the Texas Department of Criminal Justice ("TDCJ") (collectively, "Defendants") submit the following proposed findings of fact and conclusions of law.

### Plaintiffs' Claims and Procedural History

Plaintiffs filed this putative class action suit on March 30, 2020, alleging that Defendants have failed to adequately protect them and other similarly situated inmates within the Pack Unit who are at high risk for severe illness should they become exposed to COVID-19. ECF 1 at 1. While Plaintiffs concede that the Texas Department of Criminal Justice ("TDCJ") has implemented policies in response to the COVID-19 pandemic, they contend that those policies are "woefully inadequate." *Id.* at 15, ¶ 31. Plaintiffs contend that Defendants' failure to implement adequate policies to protect their health and ensure their safety amounts to an Eighth Amendment violation. *Id.* at 28-29, ¶ 73-79. Plaintiffs also allege TDCJ has intentionally discriminated against them by

denying them reasonable accommodations recommended by the United States Center for Disease Control and Prevention ("CDC") in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). *Id.* at 29, ¶ 81. Plaintiffs seek injunctive and declaratory relief only. Id. at 24, ¶ 96-100.

On April 16, 2020, the Court entered a preliminary injunction order requiring Defendants to take specific actions Plaintiffs requested. ECF *40.* On April 22, 2020, the Fifth Circuit stayed the Court's preliminary injunction order pending Defendants' appeal of the order. *See Valentine v. Collier*, 956 F.3d 797, 801–05 (5th Cir. 2020) ("*Valentine I*"). On June 5, 2020, the Fifth Circuit vacated the Court's preliminary injunction order, noting that TDCJ has substantially complied with the measures ordered by the Court. *See Valentine v. Collier*, 960 F.3d 707, 707 (5th Cir. 2020) ("*Valentine II*").

During the pendency of Defendants' appeal of the Court's preliminary injunction order, Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 53. On July 2, 2020, the Court denied Defendants' motion to dismiss. ECF 172. Plaintiffs also filed an emergency motion for class certification. ECF 94. On June 27, 2020, the Court granted Plaintiffs' motion for class certification. ECF 160. On July 13, 2020, the case proceeded to a ____ day bench trial before this Court. Pursuant to Federal Rule of Civil Procedure 52, the Court announces and adopts the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### The COVID-19 Pandemic

1.   Coronavirus disease 2019 ("COVID-19") is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

2.     Common symptoms of COVID-19 include, but are not limited to, fever, cough, fatigue, shortness of breath, and loss of smell and taste. While most cases result in mild symptoms, other cases may progress to acute respiratory distress syndrome (ARDS), multi-organ failure, septic shock, and blood clots.

3.     COVID-19 is primarily spread between people during close contact, most often via small droplets produced by coughing, sneezing, and talking.

4.     COVID-19 was first identified in December 2019 in Wuhan, China, and it has resulted in an ongoing global pandemic.

5.     As of July 6, 2020, more than 11.5 million cases have been reported globally. Approximately 535,000 deaths have resulted.

6.     There have been approximately 2.98 million reported cases of COVID-19 in the United States, resulting in approximately 132,000 deaths. The first case of COVID-19 in the United States was confirmed in Washington State on January 21, 2020.

7.     There have been approximately 200,000 reported cases of COVID-19 in Texas, resulting in approximately 2,666 deaths. The first case of COVID-19 in Texas was confirmed on March 4, 2020.

8.     On March 13, 2020, Texas Governor Greg Abbott issued a disaster proclamation, certifying that COVID-19 posed an imminent threat of disaster for all counties in the State of Texas.

**TDCJ's Early Planning in Response to Threat of COVID-19**

9.     TDCJ began discussing how it planned to respond the to the threat of COVID-19 before the first case in Texas was confirmed and before Governor Abbott issued his disaster proclamation.

10.   On February 26, 2020, Dr. Lannette Linthicum, Director of the Health Services Division for TDCJ, attended a meeting of the Correctional Managed Health Care Committee ("CMHCC") partners to discuss planning and response to the coronavirus.

11.   CMHCC is a separate entity from TDCJ. It is a body created by the Texas Legislature that is responsible for developing the offender healthcare plan in TDCJ. The Legislature has charged the CMHCC with developing the policies and procedures to support that healthcare plan. [Dr. L. Depo at 16:7-12]. Dr. Linthicum is TDCJ's representative on the CMHCC.

12.   On February 28, 2020, TDCJ began receiving guidance documents from the Texas Department of Emergency Management ("TDEM") and the Department of State Health Services ("DSHS").

13.   In late February and early March—Collier began corresponding with Linthicum about preparations for COVID-19.

14.   In late February 2020, TDCJ began cleaning and disinfecting its facilities at a higher level in response to the risk of COVID-19.

15.   On March 4, 2020, Collier attended a meeting with Linthicum and TDCJ's university healthcare providers—Texas Tech University Health Sciences Center ("Texas Tech") and the University of Texas Medical Branch ("UTMB")—regarding TDCJ's response to COVID-19.

16.   At the March 4 meeting, there was a discussion about bed capacity, unit capability, the healthcare response to COVID-19, expectations that needed to be thought through, what

to do if there was a large number of positive offenders, how to medically isolate, and how to medically restrict.

17.  Beginning March 9, 2020, TDCJ participated in daily briefings by Dr. Hellderstedt, the commissioner of health for DSHS.

18.  On March 11, 2020, Dr. Linthicum, on behalf of  the TDCJ Health Services Division , called a meeting with other TDCJ divisions to review TDCJ's pandemic flu plan to tailor it for COVID-19.

19.  On March 11, 2020, TDCJ began providing COVID-19 specific updates on its website. TDCJ also implemented an Ombudsman Family Hotline for offenders' families and the public.

20.  On March 11, 2020, another meeting was held between Collier and TDCJ healthcare representatives. Among other things, they discussed: how to isolate positive offenders; facilities with empty beds and whether those beds had medical resources; where medical had resources available; what could be done to create space for isolation or large numbers of positive cases to separate those offenders from offenders who were not positive.

21.  On March 11, 2020, the Pack Unit instituted screening protocols for offender visitation.

22.  During Collier's March 4 and 11 meetings, there was discussion about using the dorm at the Pack Unit that was under construction for special housing to move Estelle Unit offenders in the event the Estelle Unit had positive cases. In early March, the facilities team expedited the construction so that space could be utilized.

23.  This dorm was ultimately utilized for offenders at the Pack Unit—not offenders from the Estelle Unit.

24.     On March 12, 2020, TDCJ produced a video that showed staff how to use personal protective equipment (PPE). Staff were the first focus for PPE because the threat of COVID-19 would be likely be coming from the community.

25.     On or about March 13, 2020, TDCJ management began regular communications with TDEM, DSHS, TDCJ's Health Services Division (which maintains contact with the TDCJ Office of Public Health Services), and its university healthcare providers (UTMB and Texas Tech) to monitor developments associated with the spread of COVID-19. The university healthcare providers, administrative medical staff (regional and at the unit level) and TDCJ Health Services Division also began holding daily conference calls.

26.     On March 13, 2020, all in-person offender visitation was suspended at all TDCJ facilities, including the Pack Unit.

27.     On March 16, 2020, TDCJ activated the Command Center located at the TDCJ Administrative Headquarters Building in Huntsville. The Command Center is staffed by various agency leaders Monday-Friday, 7:00 a.m. – 6:00 p.m. and as needed on Saturday and/or Sunday. TDCJ conducts conference calls with agency leadership and TDCJ personnel. As of July 6, 2020, the Command Center remains operational with staffing by agency leaders Monday – Friday, approximately 7:00 a.m. – 6:00 p.m., and conducts conference calls with agency leadership and TDCJ personnel as needed during the week.

28.     TDCJ relied on medical health care experts to inform and guide the measures taken by TDCJ in response to the COVID-19 pandemic. These experts include the TDCJ Health Services Division, TDCJ's two university medical partners they contract with for offender health care services (UTMB and Texas Tech), and epidemiologists.

29.   TDCJ also relied on CDC guidance to formulate their response to COVID-19.

30.   The following is a non-exclusive list of the precautionary measures TDCJ took in response to COVID-19 prior to the implementation of Policy B-14.52 and before there was any indication of COVID-19 directly affecting TDCJ facilities:

- TDCJ requested, and the Texas Governor granted, a statutory waiver for all offender medical copays, which have been and continue to be waived;

- TDCJ management asked staff to limit any unnecessary domestic travel, limited agency travel to travel that was necessary, limited international travel, and instituted telework on a case-by-case basis;

- TDCJ advised employees who felt ill or who were running a fever of 100.4 degrees or higher to stay at home, began implementing COVID-19 screenings for employees who felt ill at work and who worked in parts of the state in which the presence of COVID-19 had been confirmed, and required a physician's note stating that an employee who appeared to be ill was clear of any symptoms of COVID-19 as a condition of returning to work;

- Effective March 24, 2020, TDCJ minimized transfers between units based upon agency needs on a case-by-case basis.

- TDCJ manufactured COVID-19 related signs, an offender pamphlet, and an offender pocket card. The informational pamphlet and pocket cards were distributed to offenders systemwide. Signs were posted in high traffic areas and other locations on each unit as determined by the unit warden;

- TDCJ inventoried existing stock of PPE and began to acquire additional PPE for TDCJ units;

- TDCJ increased distribution of hand sanitizer for use by TDCJ employees at all TDCJ units, and in all divisions and departments;

- TDCJ began manufacturing cloth masks, face shields, and plastic gowns as supplemental PPE at TDCJ factories equipped to manufacture such PPE for use by TDCJ offenders and staff;

- TDCJ produces hand soap, which is issued to offenders in all facilities. Each unit was provided adequate supplies of hand soap for use by offenders and staff;

- TDCJ enhanced cleaning and disinfection of its facilities;

- TDCJ implemented social distancing measures as much as operationally possible in a correctional environment.

### The Development of CMHCC Policy B-14.52

31.   The process of developing a CMHCC policy to address how to manage COVID-19 began in January 2020, when the CMHCC and TDCJ began receiving news about the novel coronavirus.

32.   The CMHCC delegated the task of drafting the policy to the Joint Infection Control Committee, which created a larger subcommittee to develop the policy.

33.   On March 16, 2020, the Joint Infection Control Committee decided to create a freestanding policy that dealt specifically with COVID-19. This decision was made after reviewing two standing policies the CMHCC already had: the Influenza-Like Illness Policy (CMHC

Infection Control Policy B-14.51) and the Standard Precaution Policy (CMHC Infection Control Policy B-14.20).

34.     The Joint Infection Control Committee worked rapidly to complete Policy CMHC B-14.52 Coronavirus Disease 2019 (COVID-19) by March 19, 2020, when it was approved by Dr. Murray, Dr. DeShields, and Dr. Linthicum, the three CMHCC joint medical directors.

35.     Policy B-14.52 is based on guidelines from the CDC and DSHS guidelines.

36.     Dr. Stephanie Zepeda served as chair of the subcommittee created by the Joint Infection Control Committee.

37.     Once the original, March 20, 2020 version of Policy B-14.52 was approved by the joint medical directors and adopted, it was placed on the Correctional Managed Care ("CMC") website for wide dissemination to unit-based staff. It was also placed in the Correctional Managed Care Infection Control Policy Manual and posted on the TDCJ website the same day.

38.     After Policy B-14.52 was made available on March 20, 2020, each university medical director (Dr. Murray and Dr. DeShields) held conference calls with each of their respective regions to review the policy and answer questions.

39.     Six updates have been made to Policy B-14.52 since the original version was posted on March 20, 2020. Each time the policy is updated, it is drafted by the subcommittee and approved by the joint medical directors.

40.     When the subcommittee updates Policy B-14.52, the policy is widely disseminated via the CMC website and each university health care provider's intranet and posted on TDCJ's

website. Additionally, Dr. Murray and Dr. DeShields hold conference calls with each of their respective regions to review the policy and answer questions.

41. Policy B-14.52 applies to all 104 TDCJ institutions and healthcare facilities, which includes the Pack Unit.

42. TDCJ also disseminates each of the updates to Policy B-14.52 to all 104 TDCJ facilities for operational implementation.

**Policy B-14.52 and Similarities to CDC Guidelines**

43. The first version of Policy B-14.52 took effect on March 20, 2020. This version of Policy B-14.52 was based on the CDC guidance available at the time of adoption on March 19, 2020.

44. Three days later, on March 23, 2020, the CDC posted its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. This guidance is specifically intended for correctional and detention facilities, which includes state prisons.

45. After the CDC issued its interim guidance for correctional and detention facilities, the CMHCC Joint Infection Control Subcommittee reviewed the CDC interim guidance and recommended changes to Policy B-14.52 to ensure that policy and practices were consistent with the guiding principles issued by the CDC.

46. The second version of B-14.52 went into effect on March 27, 2020. This version incorporated the recommendations contained in the CDC's interim guidance for correctional and detention facilities.

47.     Policy B-14.52 is broken up into the following six sections that outline and explain in detail the following comprehensive measures: (1) infection control; (2) use of personal protective equipment; (3) diagnostic testing; (4) reporting; (5) clinical management; and (6) dental management.

48.     Under the infection control section, Policy B-14.52 directs all units to implement the following, non-exclusive measures during a COVID-19 outbreak: (1) educate offenders on how COVID-19 is transmitted, signs and symptoms of COVID-19, treatment, and prevention of transmission; (2) remind staff and offenders on methods used to prevent the spread of respiratory virus; (3) practice social distancing; (4) disinfect common areas and surfaces that are often touched with a 10% bleach solution; and (5) post visual alerts (signs and posters) at entrances, in the medical department, and other strategic places providing instruction on hand hygiene, cough hygiene, etiquette, and symptoms of COVID-19.

49.     Policy B-14.52 states that staff and offenders should be encouraged to wash their hands with soap and water for at least 20 seconds. If soap and water is unavailable, Policy B-14.52 states that hand sanitizer may be used by medical and security staff to cleanse hands.

50.     Policy B-14.52 recommends the use of cloth face coverings in settings where social distancing measures are difficult to maintain.

51.     Policy B-14.52 recommends that all units evaluate the need to minimize offender movement throughout the unit.

52.     Policy B-14.52 directs that offenders complaining of symptoms consistent with COVID-19 should be triaged as soon as possible.

53. Policy B-14.52 states that offenders with suspected or confirmed COVID-19 cases should be placed in medical isolation.

54. Policy B-14.52 states that offenders in medical isolation should be kept in medical isolation until at least 3 days (72 hours) have passed since recovery, defined as a resolution of fever without the use of fever-reducing medications and improvement in respiratory symptoms; and at least 14 days have passed since symptoms first appeared.

55. Policy B-14.52 recommends that offenders be placed in medical restriction according to their COVID-19 risk exposure.

56. Policy B-14.52 states that offenders should not be transported on a chain bus or multi-person vehicle except for medical emergencies.

57. Policy B-14.52 states that employees who are sick should stay home and not report to work. It recommends that staff be allowed to return to work based on a symptom-based strategy or a test-based strategy. Under the symptom-based strategy, staff may return to work 10 days after symptom onset and 3 days (72 hours) after resolution of fever without the use of fever-reducing medications and improvement in respiratory symptoms. Under the test-based strategy, staff may return to work if they provide a negative COVID-19 test result and a healthcare provider's note releasing the employee to return to work.

58. Policy B-14.52 directs that security staff screen all individuals entering the unit for COVID-19 symptoms.

59. Regarding personal protective equipment (PPE), Policy B-14.52 states that offenders who are required to perform duties for which staff would wear PPE should be provided the same

PPE for the job, except they must not have access to the waterless hand rub but must wash hands with soap and water instead.

60.    Policy B-14.52 specifically cites to the CDC's interim guidance for correctional and detention facilities. It also cites to the following CDC interim guidelines: (1) Interim Infection Prevention and Control Recommendations for Patients with Suspect or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings; (2) Interim Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19); (3) Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures: Geographic Risk and Contacts of Laboratory-confirmed Cases; (4) Interim Guidance for Risk Assessment and Public Health Management of Healthcare Personnel with Potential Exposure in a Healthcare Setting to Patients with Coronavirus Disease (COVID-19); and (5) Interim Guidance for Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19.

61.    CDC's interim guidance for correctional and detention facilities recommends providing alcohol-based sanitizer only if soap and water is not available.

62.    Policy B-14.52 conforms with the CDC's interim guidance for correctional detention facilities in all material respects.

63.    Any differences between Policy B-14.52 and the CDC guidelines are insubstantial.

**Implementation of Policy B-14.52 and Other Preventative Measures at the Pack Unit**

**_Pack Unit Logistics_**

64.     The Pack Unit currently houses approximately 1,100 offenders. Approximately 800 of those offenders are over the age of 65.

65.     There are 60 beds for wheelchair offenders at the Pack Unit.

66.     The Pack Unit consists of 20 dorms inside the perimeter fences and a trusty camp outside the perimeter. There are 16 dorms in the main building and four dorms in the expansion dorm.

67.     Each dorm in the main building can house approximately 54 offenders, except for two wheelchair dorms that can house 30 offenders each. Two of the dorms in the expansion dorm have 48 beds each, and the other two dorms have 93 beds each.

68.     Each of the trusty camp dorms have a housing capacity of 107 offenders.

### *Policy B-14.52 Implemented at Pack Unit*

69.     Upon the issuance of the updated version of Policy B-14.52 on March 27, 2020, TDCJ directed its unit personnel—including personnel at the Pack Unit—to put in place the operational requirements set out in the policy, including requirements for enhanced cleaning and sanitation protocols, signage, education, screening, use of PPE, and medical isolation or restriction for confirmed or potential exposures.

70.     Robert Herrera, the warden at the Pack Unit, was made aware by TDCJ that COVID-19 posed a threat to the offender population at TDCJ in early-to-mid March, 2020.

71.     Since that time, Herrera has been in constant communication about COVID-19 with Gene Monroe, his supervisor and regional director.

72.     Herrera has used Policy B-14.52 as a guide on what to implement at the Pack Unit since the policy's enactment.

### *Precautions Implemented in Early-to-Mid March*

73.   The Pack Unit was instituting precautions to protect inmates from the potential dangers of COVID-19 even before Governor Abbott issued his disaster declaration on March 13, and before the creation of Policy B-14.52.

74.   The Pack Unit was already implementing social distancing measures inside the unit, and it was conducting temperature checks for employees entering the unit.

75.   As a matter of general correctional practice, Herrera verbally implemented social distancing measures at the Pack Unit before Plaintiffs filed their lawsuit by telling offenders to stay 6 feet apart and instructing staff to not get close together and maintain 6 feet of distance.

76.   Since March 13, 2020, social distancing measures were implemented in areas such as the hallways, recreation yards, pill window, commissary line, and the dining hall.

77.   The dining hall was limited to two dorms eating at one time on opposite sides of the dining hall.

78.   Feeding only two dorms at one time caused meal serving times to extend from approximately 2 hours per meal to feed the Unit (before the pandemic) to taking 4 to 5 hours to serve each meal.

79.   Social distancing was also implemented at the recreation yard. Before the Pack Unit went on precautionary lockdown on April 14, 2020, only two dorms were permitted to go to the recreation yard at a time. Recreation was discontinued after the precautionary lockdown.

80.     Sports equipment, such as basketballs, volleyballs, and handballs were removed from the recreation yard to eliminate potential transmission of COVID-19 and to prevent offenders from being in close proximity to one another.

### *Social Distancing*

81.     "Strict social distancing"—requiring 6 feet of space between offenders at all times—is not feasible in all areas of the Pack Unit.

82.     The dorms at the Pack Unit cannot be altered to accomplish strict social distancing because the dorm cubicles are bolted to the ground and cannot be moved. Moreover, even if the dorm cubicles could be moved, the physical layout of the dorms would not allow the cubicles to be spread out any more.

83.     The gymnasium cannot be used as alternate living quarters because it is not air conditioned.

84.     Social distancing has been implemented in all areas of the Pack Unit where feasible.

### *Offender Education Regarding COVID-19*

85.     Several posters have been displayed through the Pack Unit to educate and remind offenders to look out for symptoms of COVID-19. The signs and posters remind offenders to wash their hands frequently, and to clean and disinfect their living areas frequently.

86.     Specifically, the Pack Unit has posted the CDC poster, "Stop Germs! Wash Your Hands" in the main hallways, in high traffic areas between the commissary and infirmary, and the front office.

87.     A TDCJ pamphlet entitled "COVID—What to do" has been posted throughout the main building at the Pack Unit, the expansion building, the trusty camp, and by all sinks. This

pamphlet has been provided to every offender, and offenders have also received this information in the form of a pocket card to carry with them.

88.   TDCJ has posted a sign that reads, "How are you feeling? Cough, fever, shortness of breath. Contact your supervisor" throughout the main building, the expansion building, and in the trusty camp. [Herrera Dec. at 5].

89.   Correctional employees at the Pack Unit have been talking to offenders and answering questions about COVID-19 during count checks and daily rounds in each dorm.

90.   Medical staff from the Pack Unit infirmary have been talking with offenders and answering questions about COVID-19 when conducting temperature checks twice daily for those dorms on medical restriction and when conducting daily temperature and well checks.

91.   TDCJ produced a video about COVID-19 that is being shown to Pack Unit offenders via the televisions in the dayrooms of each dorm.

92.   The educational video describes the symptoms of COVID-19 and how to prevent the spread of COVID-19 by washing your hands frequently with soap and water.

93.   The video also explains the importance of wearing a mask and maintaining separation or social distance between oneself and others to avoid spreading the virus.

94.   The televisions in the dayrooms of each dorm at the Pack Unit have been turned so that they are visible to offenders throughout each dorm. The video is shown 3 times per day in each dorm of the Pack Unit.

95.   Pack Unit officials are also making announcements twice per week that medical co-pays have been waived and offenders may request a sick call with no charge. These announcements are made in English and Spanish.

### *Hygiene and Hand Washing*

96.    Soap and water are readily available to all offenders at the Pack Unit.

97.    Each offender receives 5 bars of soap per week and may request additional soap at any time at no cost.

98.    Unlimited soap has been provided to offenders at the Pack Unit since April 6, 2020.

99.    During the precautionary lockdown, offenders have access to sinks and water to wash their hands in each of the dorms throughout the Pack Unit.

100.   TDCJ does not allow offenders to possess alcohol-based hand sanitizer because it is a security concern. Additionally, alcohol-based products are considered contraband when possessed by offenders in TDCJ.

101.   In its interim guidance for correctional and detention facilities, the CDC recommends cleaning hands with an alcohol-based hand sanitizer only if soap and water are not available and where security concerns allow.

102.   Soap and water are readily available to all offenders at the Pack Unit.

### *Precautionary Lockdown*

103.   The Pack Unit went on precautionary lockdown on April 14, 2020, after the unit was notified of its first positive COVID-19 case.

104.   The precautionary lockdown was lifted for the trusty camp dorms on April 24, 2020. The trusty camp dorms went back on precautionary lockdown on June 4, 2020 when an offender residing in one of the dorms tested positive for COVID-19.

105.   Precautionary lockdown means that all transfers to and from the Pack unit have stopped unless it is a medical necessity.

106. During precautionary lockdown, substantially all offender movement has stopped. The only offender movement permitted is for medical emergencies and scheduled showers. Otherwise, offenders remain in their housing areas during precautionary lockdown.

107. The following non-exclusive measures have also been taken at the Pack Unit as a result of being on precautionary lockdown since April 14, 2020:

- Offenders do not eat at the dining hall. Instead, they eat each meal in their housing area;

- Showers are offered to offenders three times per week on a rotating schedule, where they receive a clean bath towel for each shower; and

- Medical staff delivers medications to the offenders in their housing areas.

### *Cleaning and Sanitation*

108. There is at least one offender janitor ("SSI," which is an acronym for Support Service Inmate) assigned to each common area, including each dorm.

109. SSIs are supervised by correctional officers assigned to their location. SSIs work 12-hour shifts, where they clean continuously and are permitted to take breaks.

110. Each SSI receives a pair of wrist-length vinyl gloves at the start of his shift.

111. If the vinyl gloves become damaged or torn, an SSI may request another pair at any time during his shift by notifying a correctional officer or the Pack Unit property officer.

112. Over one year ago, SSIs were given one pair of elbow-length industrial gloves per shift to share.

113. About one year ago, the Pack Unit stopped using elbow-length gloves and began providing a clean pair of vinyl gloves to each janitor during his shift.

114.    During precautionary lockdown, the Pack Unit property officer provides cleaning materials to the SSIs in each dorm at the start of each shift.

115.    SSIs at the Pack Unit receive a mop bucket with a bleach pod that is dissolved in a small amount of water, which is then filled with water by the SSI's to use throughout their shift.

116.    Each SSI receives two spray bottles, one containing two ounces of a product called Bippy, which is similar to the commercial product Comet, and one containing two ounces of a product called "Double D," which is similar to the commercial product Pine Sol, and the SSI then fills each spray bottle with water, so the chemicals are diluted to the required concentration.

117.    In response to the COVID-19 pandemic, the Pack Unit also provides a 1.5-gallon sprayer filled with 8 ounces of powdered bleached dissolved in a small amount of water that the SSI fills with water to use during his shift.

118.    The Pack Unit property officer makes rounds during each shift to determine if SSIs need more cleaning materials at any time during his shift by notifying a correctional officer or the Pack Unit property officer.

119.    The SSIs clean commonly touched surfaces in the common areas, such as sinks, toilets, toilet handles, showers, door handles, telephones, and tabletops.

120.    In the dorms, each offender may clean his own personal housing area, or cubicle, with a bleach-based cleaning solution. Additionally, there is a spray bottle of disinfectant cleaner available for offenders to use if they wish to clean their housing area more frequently.

121.    Correctional officers assigned to each area of the Pack Unit monitor and observe the janitors' cleaning to ensure that cleaning is happening on a consistent basis throughout each janitor's shift.

### *Mass/Strike Team Testing*

122.    TDCJ Coordinated with the Texas Department of Emergency Management ("TDEM") to perform COVID-19 "mass testing" of the offender population and TDCJ staff at the Pack Unit.

123.    The mass testing, conducted by "strike teams," included testing of offenders and staff who had not exhibited COVID-19 symptoms.

124.    Mass testing at the Pack Unit was implemented so that TDCJ staff could take additional steps within the unit to protect offenders and staff.

125.    Mass testing at the Pack Unit was conducted on May 12-14, 2020. 1,492 tests were administered: 1,179 to offenders and 313 to employees.

126.    Between March 17, 2020 and May 26, 2020, in addition to the mass/strike team testing by TDCJ at the Pack Unit, 216 COVID-19 tests were ordered by outside healthcare providers for offenders assigned to the Pack Unit and employees who work at the Pack Unit.

127.    Those who tested positive as a result of the mass/strike team testing were placed in medical isolation, pursuant to Policy B-14.52.

128.    Medical isolation is for persons who are sick and contagious and for those who are suspected to have COVID-19. It is used to separate ill persons who have a communicable disease from those who are healthy.

129. When TDCJ began receiving results of the mass/strike team testing on May 19, 2020, it relocated and re-assigned offenders to particular housing areas within the unit based on the results.

130. Due to a concentration of offenders assigned to dorms in D-Hall who received a positive test result, Pack Unit officials designated the four dorms in D-Hall—Dorms 13, 14, 15, and 16—as COVID-19 medical isolation housing for offenders who received a positive test result.

131. Prior to the mass/strike team testing, offenders who had tested positive for COVID-19 had been housed in a cohort in Dorm 17 and placed on medical isolation in accordance with Policy B-14.52. Offenders who were awaiting their test results were housed in Dorm 19 and placed on medical restriction in accordance with Policy B-14.52.

132. Medical restriction is used to separate and restrict the movement of well persons who may have been exposed to a communicable disease to see if they become ill. These people may have been exposed to a disease and do not know it, or they may have the disease but do not show symptoms. CMHC B-14.52.

133. After the mass/strike team testing, offenders in Dorm 17 who tested positive were re-housed in D-Hall. All offenders who were assigned to Dorm 19 and received a positive test result were also re-housed in D-Hall.

134. After the first round of strike team testing results came back, all dorms in D-Hall were placed on medical isolation in accordance with Policy B-14.52. [ECF 122-1 at 9]

135. Dorms 18, 19, and 20 were designated for offenders who received a "negative" test result.

136.   Dorm 17 was designated for wheelchair-bound offenders who received a negative rest result and for overflow for offenders who received a negative result or were awaiting test results.

137.   There are 27 single cells in restrictive housing at the Pack Unit.

138.   Offenders who are housed in restrictive housing are grouped into positive and negative offender groups and housed with at least one buffer cell between the two groups.

139.   Offenders who return to the Pack Unit after a hospital visit are being quarantined for 14 days in the unit's education wing. There are 30 beds available in the education building.

140.   Officials at the Pack Unit conducted a second round of mass/strike team testing on June 23-25, 2020.

141.   As a result of that testing, offenders were again medically isolated or restricted according to Policy B-14.52, their test results, and risk level of contracting COVID-19.

142.   The following measures have been taken at the Pack Unit since the second round of mass/strike team testing was conducted:

- The following housing areas are under medical restriction as of July 6, 2020: A1, A2, A3, A4, B5, B6, B7, B8, C10, D13, E18, E19, E20, TC2, and TC3.

- The following housing areas are currently under medical isolation as of July 6, 2020: D14, D15, D16, E17, TC1, Education Room #2;

- Offenders who are symptomatic and are awaiting test results are placed in "pending test" housing. In this housing area, offenders are spaced apart to prevent transmission of COVID-19. This is made possible by the limited number of offenders who are symptomatic who have a pending test. As of July 6, 2020, an

education room with a housing capacity of nine offenders is being used to house five

offenders;

- Offenders who return to the Pack Unit after a visit to the hospital are quarantined for 14 days in the air-conditioned education wing of the main building. There are 30 beds available in the education wing;

- Regular housing is used for offenders who are negative and do not meet the criteria for medical restriction, medical isolation, the "pending test" dorm, or quarantine housing. Offenders who have tested positive are returned to regular housing only after they have been medically cleared by UTMB.

### *Contact Tracing*

143. TDCJ learned on April 13, 2020, that an autopsy performed on offender Leonard Clerkly showed he tested positive for COVID-19.

144. After learning of the positive test, Pack Unit administrators and staff determined that Offender Clerkly's close contacts as defined in Policy B-14.52 were likely limited to those offenders who also lived in his dorm—Dorm 3.

145. Unit administrators immediately placed the 54 offenders assigned to Dorm 3 at the time of Clerkly's death on medical restriction, pursuant to Policy B-14.52.

146. All 54 offenders living in Dorm 3 were tested for COVID-19 by UTMB staff on April 15, 2020, and all those offender tests were negative.

147. The Pack Unit has continued to conduct contact tracing with respect to each Pack Unit-assigned offender and Pack Unit employee who has tested positive for COVID-19.

148.    All offenders assigned to a dorm in which an offender who received a positive test result for COVID-19 was assigned at the time of testing are placed on medical restriction when that positive test result is obtained pursuant to Policy B-14.52 for at least 14 days. All employees identified through contact tracing efforts as having been in close contact with a positive COVID-19 case are required to self-quarantine for a minimum of 14 days.

### *Employee Quarantine*

149.    For employees that are sick or test positive for COVID-19, the Pack Unit follows the Policy B-14.52's staff quarantine procedure. In general, TDCJ employees, including those at the Pack Unit, may return to work based on a symptom-based strategy or a test-based strategy.

150.    Under a system-based strategy, employees may return to work 14 days after symptom onset if they are no longer exhibiting symptoms, such as fever, cough, or shortness of breath.

151.    Under a test-based strategy, employees may return to work if they provide a negative COVID-19 test result and a healthcare provider's note releasing the employee to return to work.

152.    Employees who return to work at the Pack Unit must self-monitor their symptoms and seek re-evaluation or medical treatment from a healthcare provider if symptoms recur or worsen.

### *Communication and Coordination with Authorities*

153.    TDCJ has communicated regularly with representatives of the following agencies and organizations: the Texas Department of State Health Services, the University of Texas Medical Branch, the Texas Tech University Health Sciences Center, the Texas Division of Emergency Management, and the Southwest Texas Regional Advisory Council.

154.    TDCJ leadership has coordinated its response to COVID-19 and communicated regularly with representatives of the Office of the Texas Governor, the Office of the Lieutenant Governor, the Office of Speaker of the Texas House of Representatives, as well as members of the Texas Senate and Texas House of Representatives, including legislators serving on the Texas Senate Criminal Justice Committee and Texas House Corrections Committee.

155.    TDCJ's contact with these agencies, organizations, and entities began with the onset of the first reported COVID-19 cases in Texas in the first half of March 2020.

156.    TDCJ representatives have been in contact with federal and state health authorities as they have implemented the various steps under Policy B-14.52.

### *Other Ongoing Precautions at the Pack Unit*

157.    Policy B-14.52 continues to be implemented and enforced at the Pack Unit, where the below measures, among others, have been taken:

158.    All offenders who receive positive test results for COVID-19 and remain at the Pack Unit have been placed in medical isolation. Those offenders are receiving treatment from UTMB pursuant to Policy B-14.52.

159.    In furtherance of Policy B-14.52's provisions related to hygiene, cleaning, and use of PPE:

- A process has been continued at the Pack Unit for offenders to receive clean face masks daily. Under this process, a used mask is exchanged for a clean mask in a one-for-one daily exchange;

- A process has been continued by which Pack Unit staff are issued N95 masks and face shields, which are to be worn at all times while on the unit;

- A process has been continued to make hand soap available upon request by an offender at various locations within the Pack Unit, including the officer podiums outside of each dorm. There is no cost to an offender for additional hand soap;

- A process has been continued at the Pack Unit for offenders to receive clean face towels daily. Under this process, a used face towel is exchanged for a clean face towel is a one-for-one daily exchange;

- A process has been maintained at the Pack Unit for offenders to receive additional toilet paper, as needed. There is no cost to an offender for additional toilet paper; and

- Common areas within the Pack Unit continue to be cleaned on a regular basis with anti-bacterial cleaning materials.

160.    In furtherance of Policy B-14.52's provisions related to medical restriction due to possible exposure to COVID-19, the following steps continue to be taken:

- A process continues for medical staff to take the temperatures of offenders who are on medical restriction twice daily within the dorms;

- Any offender who remains on-site at the Pack unit after testing positive for COVID-19 is placed on medical restriction. In addition, the dorm in which the offender resided is placed on medical restriction; and

- Any offender who remains on-site at the Pack Unit while a test result is pending is placed on medical isolation. The offender is returned to the general population only if the pending result is negative.

161.    In furtherance of Policy B-14.52's provisions related to social distancing:

- A process has been continued to minimize staff rotation at duty posts within the Pack Unit;

- Pack Unit staff have continued to enforce social distancing among themselves and offenders when possible, as offenders move outside dorms to other areas within the unit; and

- A process has been continued to minimize offender "turnout" for work assignments at the Pack Unit and to enforce social distancing when possible during such turn outs.

162.   In furtherance of Policy B-14.52's provisions related to dissemination of information and education related to COVID-19:

- The CDC handout entitled "Share Facts About COVID-19," and other signage informing offenders about the symptoms of COVID-19 and how to prevent spread of the virus, continues to be posted in all dorms, and a copy of this CDC handout has been distributed to each offender in the Pack Unit;

- Pack Unit medical staff continue to answer offender questions during their rounds to take temperatures;

- Pack Unit correctional staff continue speaking to offenders about COVID-19 and answering questions from offenders about the COVID-19 virus;

- A video produced by TDCJ continues to be shown on a regular basis to the offender population at the Pack Unit. This video explains and discusses COVID-19 symptoms and methods of preventing spread of the virus, through such actions as

washing hands and observing social distancing. This video is made available via the televisions in the dayroom of each dorm; and

- A process has been continued for regular announcements in English and Spanish within each dorm encouraging offenders to request sick call appointments whenever they are feeling ill and reminding them that medical co-pays have been waived.

### *Exhaustion*

163.   The Texas prison system has developed a two-step formal grievance process, which must be completed in order to satisfy the exhaustion requirement before filing a lawsuit.

164.   The Step 1 grievance, which must be filed within 15 days of the complained-of incident, is handled within the offender's facility of incarceration. If the Step 1 grievance results in an adverse decision, the offender has 10 days to file a Step 2 grievance, which is handled at the state level.

165.   An offender must pursue a grievance through both Step 1 and Step 2 for it to be considered exhausted.

166.   Plaintiffs filed suit in this case on March 30, 2020.

167.   Neither Valentine nor King had filed a Step 1 or Step 2 grievance related to issues in this suit before March 30, 2020.

168.   Neither Valentine nor King exhausted the available administrative remedies prior to filing suit.

169.   Both Valentine and King have filed multiple grievances since this suit was filed.

170.   On March 31, 2020, Valentine filed a grievance requesting hand sanitizing solution and cleaning supplies for cubicles. Valentine has substantially received the relief he requested. He is provided with unlimited soap to facilitate handwashing, and he may clean his own cubicle with a spray bottle of cleaning solution.

171.   On April 2, 2020, King filed a grievance requesting that offender transfers to the Pack Unit be stopped during the pandemic. King has received the relief he requested. The Pack Unit stopped receiving new offenders when it went on precautionary lockdown on April 14, 2020.

172.   On May 10, 2020, Valentine filed a grievance requesting COVID-19 testing. Valentine has received the relief he requested. All offenders at the Pack Unit, including Valentine, have been tested for COVID-19.

173.   On May 19, 2020, Valentine requested that Dorm 14 be utilized to facilitate social distancing. Valentine has received the relief he requested. Dorm 14 had been under construction, and since construction was completed, it has been utilized.

174.   Effective May 26, 2020, TDCJ implemented a new policy for processing offender grievances related to COVID-19.

175.   Under the new grievance policy, a Step 1 grievance related to COVID-19 must be processed within 15 days with no extensions. A Step 2 grievance must also be processed within 15 days with no extensions.

176.   The new COVID-19 grievance policy was not implemented because the previous grievance policy was inadequate to address Plaintiffs' COVID-19 concerns; rather, it was

implemented as a proactive measure to show commitment and dedication to addressing COVID-19 related grievances in an expeditious manner.

177.    Valentine and King have successfully navigated TDCJ's grievance process and have largely obtained the relief they have requested in their grievances.

## LEGAL STANDARD

### A.    Injunctive Relief and the Prison Litigation Reform Act

It is well-settled that a suit against a state employee in his official capacity is the same as a suit against the state agency. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In general, state agencies are entitled to Eleventh Amendment immunity from suits brought under § 1983. *See generally Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240 (1999). An exception to a state official's Eleventh Amendment immunity exists, however, for prospective injunctive relief. *Ex Parte Young*, 209 U.S. 123, 159–60 (1908); *Kentucky*, 473 U.S. at 167 n.14; *Edelman v. Jordan*, 415 U.S. 651, 666–68 (1974). Before granting injunctive relief against a state official, however, the court must make a straightforward inquiry into whether there is an ongoing violation of federal law. *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645–46 (2002).

"[A] plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). The Fifth Circuit has cautioned that an injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *PCI Transportation Inc.*

*v. Fort Worth & Western Railroad Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (citations omitted).

In a case challenging prison conditions like the case at bar, the Prison Litigation Reform Act (the "PLRA") imposes additional restrictions on the authority of the Court to grant an injunction. The PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). In particular, the PLRA prohibits an order granting prospective relief unless the court first finds that such relief is: (1) narrowly drawn; (2) extends no further than necessary to correct the harm; and (3) is the least intrusive means necessary to correct that harm. *See* 18 U.S.C. §§ 3626(a)(1)(A), 3626(a)(2). In considering a prisoner's request for prospective relief, the reviewing court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" caused by the relief and shall respect the certain principles of comity where state or local law is concerned. *See* 18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2).

## B.    Law of the Case and Law of the Circuit

The law of the case doctrine provides that both "issues of law and fact" and "legal principles" announced in a prior decision become the law of that case in all its later stages or developments. *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012) ("an issue of fact or law"); *Hoffart v. Wiggins*, 600 F. App'x 261, 262 (5th Cir. 2015) (per curiam) ("legal principles"); *see also* 18B Wright and Miller, *Federal Practice and Procedure* § 4478 (2d ed.). This rule applies both horizontally ("constricting a later panel [or judge] vis-à-vis an earlier panel [or judge] of the same court") and vertically ("constricting a lower court vis-à-vis a higher court"). *In re Deepwater Horizon*, 928 F.3d 394, 398 (5th Cir. 2019). As is the case here, "an appellate court's decision to

stay (or not) a lower court decision or to reverse (or affirm) a preliminary injunction amounts to a final decision for purposes of the [law of the case] doctrine." Bryan A. Garner et. al., The Law of Judicial Precedent § 53 (2016). The law of the circuit doctrine provides that published Fifth Circuit opinions are binding precedent—on later Fifth Circuit panels and on all district courts within the circuit. A later three-judge panel may not overrule another, so an earlier precedential opinion controls the later panel. *Sw. Bell Telephone Co. v. City of El Paso*, 243 F.3d 936, 940 (5th Cir. 2001).

## C.    Exhaustion

The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). The Supreme Court has made clear that the exhaustion requirement applies to all suits regarding prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and that "unexhausted claims cannot be brought in court," *Jones v. Bock*, 549 U.S. 199, 211 (2007). Exhaustion is mandatory.  The statute provides no exception for "special circumstances." *See Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016); *see also Farmer v. Brennan,* 511 U.S. 825, 847 (1994) (in a case seeking injunctive relief to address "current" prison conditions, inmates are not "free to bypass adequate internal prison procedures and bring their health and safety concerns directly to court"); *Valentine v. Collier*, 956 F.3d at 805. And there are no "futility or other [judicially created] exceptions [to] statutory exhaustion requirements." *Booth*, 532 U.S. at 741 n.6.

The PLRA creates an exception to the exhaustion requirement only when administrative remedies are not "available."  A remedy is not "available"—and exhaustion is not required—when:

> (1) the procedure "operates as a simple dead end" because "the relevant administrative procedure lacks authority to provide any relief," or

"administrative officials have apparent authority, but decline ever to exercise it";

(2) the "administrative scheme [is] so opaque that . . . no reasonable prisoner can use them"; or

(3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 136 S. Ct. at 1859–60 (quotation omitted).  When the State provides administrative remedies, the prisoner bears the burden to prove that those remedies are not available. *See, e.g.*, *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) ("[T]he onus falls on the inmate to show that such remedies were unavailable to him."); *accord Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir.2011); *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir.2008); *Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir.2001).  Additionally, the Supreme Court has made clear that the administrative process qualifies as a "dead end" only when it creates no "potential" for an inmate to obtain relief. *See Ross*, 136 S. Ct. at 1859. As long as the State's administrative procedure grants "authority to take *some* action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands." *Id.*

## D.    Deliberate Indifference

To establish an Eighth Amendment violation in the prison context, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference under the Eighth Amendment requires a showing of "subjective recklessness" as used in criminal law. *Id.* at 839. Under the deliberate-indifference standard, "a prison official cannot be found liable under the Eighth Amendment for

denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. "[D]eliberate indifference 'is a stringent standard of fault, requiring proof that a [defendant] disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also Easter v. Powell*, 467 F.3d 459, 463 (5th Cir.2006) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). This is "an extremely high standard to meet," *Domino v. TDCJ*, 239 F.3d 752, 756 (5th Cir. 2001), and it "exists wholly independent of an optimal standard of care." *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006).

A prison official's failure to avoid harm or eliminate a risk does not violate the Eighth Amendment. To be liable for deliberate indifference, the official must "*know of* and *disregard* an excessive risk to inmate health and safety." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)) (emphasis added). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Actions and decisions that are merely inept, ineffective, or negligent do not constitute deliberate indifference. *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 458-59 (5th Cir. 2001) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."). And complaints that policies or practices were inadequate to prevent harm—even if true—are not sufficient for liability. *See, e.g.*, *Brumfield v. Hollins*, 551 F.3d 322, 328 (5th Cir. 2008) (while jail's

policies "lacked the specific directives Brumfield would have preferred to have been in place, policies nonetheless existed").

Additionally, deliberate indifference is not the equivalent of negligence; rather, deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. Evidence of unsuccessful medical treatment, negligence, neglect, or even malpractice is insufficient to demonstrate deliberate indifference. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Moreover, an inmate's dissatisfaction or disagreement with the medical treatment he received does not mean that he suffered deliberate indifference. *See Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Therefore, neither claims of negligence nor disagreement with the type of medical care received rise to the level of a constitutional issue under section 1983. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Rather, an inmate must show that the officials intentionally treated him incorrectly, refused to treat him, ignored his complaints, or engaged in similar conduct that would "clearly evidence a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756.  "Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297, 302–03 (1991)). In determining whether officials have been deliberately indifferent, courts must give "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions,'" *id.* at 845 (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)), and "consider arguments regarding the realities of prison administration," *Helling v. McKinney*, 509 U.S. 25, 37 (1993).

**E.**     **Americans with Disabilities Act and Rehabilitation Act**

"A prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated. He thus loses those rights that are necessarily sacrificed to legitimate penological needs." *Elliott v. Lynn*, 38 F.3d 188, 190-91 (5th Cir. 1994). The Fifth Circuit has held that an ADA claim is not available under Title II under "exigent circumstances." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *accord Wilson v. City of Southlake*, 936 F.3d 326, 331 (5th Cir. 2019) ("[O]fficers do not first have to consider whether their actions will comply with the ADA . . . when they are reacting 'to potentially life-threatening situations.'").

Title II of the ADA prohibits "disability discrimination in the provision of public services." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011). Specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, the RA prohibits discrimination against individuals with disabilities in federally-funded institutions. *See* 29 U.S.C. § 794(a).

The same legal standards apply to both the ADA and the RA. *See Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). To establish a viable claim, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) he is being discriminated against by reason of his disability. *See Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011); *Back v. Texas Dep't of Criminal Justice Institutional Div.*, 684 F. App'x 356, 358 (5th Cir. 2017). Under both statutes, the plaintiff must show intentional discrimination. *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002).

37

## CONCLUSIONS OF LAW

### *Law of the Case*

1. The Fifth Circuit's holding in *Valentine I* that TDCJ's grievance procedure is "available" to Plaintiffs and that they were therefore required to exhaust their administrative remedies before filing suit is now law of the case.

2. The Fifth Circuit's holding in *Valentine I* that TDCJ's grievance procedure is "available" to Plaintiffs and that they were therefore required to exhaust their administrative remedies before filing suit is now law of the circuit.

3. The Court is bound by the Fifth Circuit's holding in *Valentine I* under the law-of-the-case and law-of-the-circuit doctrines.

4. Therefore, as held by the Fifth Circuit in *Valentine I*, TDCJ's grievance procedure was available to Plaintiffs and, accordingly, Plaintiffs were required to exhaust their administrative remedies under the PLRA before filing suit.

5. Moreover, the Fifth Circuit's determination in *Valentine I* (that Plaintiffs cannot establish deliberate indifference) and *Valentine II* (that TDCJ has voluntarily implemented policies and procedures that overlap with the measures ordered by the Court in its preliminary-injunction order) are binding on the Court.

6. The Fifth Circuit's holdings in *Valentine I* and *Valentine II* foreclose Plaintiffs' claim that Defendants acted with deliberate indifference.

7. Defendants cannot meet their burden of proving that Defendants acted with deliberate indifference as a matter of law.

### *Exhaustion*

8.     Plaintiffs bring a suit challenging prison conditions; therefore, they were required to exhaust their administrative remedies under the PLRA before filing suit.

9.     Valentine did file a Step 1 or Step 2 grievance related to the complaints he brings in this suit before suit was filed. Therefore, he did not exhaust his administrative remedies as required by the PLRA.

10.    King did not file a Step 1 or Step 2 grievance related to the complaints he brings in this suit before suit was filed. Therefore, he did not exhaust his administrative remedies as required by the PLRA.

11.    Since this suit was filed, both Valentine and King have heavily utilized the grievance process. Therefore, TDCJ's grievance procedures are not "so opaque that . . . no reasonable prisoner can use them."

12.    Valentine and King have received much of the relief they had requested in their grievances. As to these requests, therefore, the grievance process has not resulted in a "dead end."

13.    As to any grievances that have not been resolved to Valentine and King's satisfaction, Valentine and King have not shown that TDCJ's grievance process does not grant TDCJ the authority to take *some* action in response to their complaints.

14.    There is no evidence that TDCJ administrators thwarted Plaintiffs from taking advantage of the grievance process through machination, misrepresentation, or intimidation.

15.    TDCJ's grievance process was available to Plaintiffs; therefore, they were required to exhaust their remedies before filing suit.

16.    Plaintiffs' failure to exhaust before filing suit is fatal to their claims.

*Deliberate Indifference*

17.   TDCJ began discussing formulating a response to COVID-19 in early February 2020, before any COVID-19 cases were identified in Texas. This demonstrates that Defendants did not disregard an excessive risk to inmate health or safety.

18.   In formulating and implementing Policy B-14.52, TDCJ relied on experts, including the CDC, and its infectious disease experts from its university healthcare providers—Texas Tech and UTMB. TDCJ's reliance on experts to formulate a specific COVID-19 related plan was a reasonable measure to abate the risk of harm presented by COVID-19.

19.   TDCJ's implementation of a Policy that substantially complies with CDC guidelines for mitigating the spread of COVID-19—Policy B-14.52—was a reasonable measure to abate the risk of harm presented by COVID-19.

20.   TDCJ acted promptly by implementing Policy B-14.52 on March 20, 2020, before the CDC had drafted specific guidelines applicable to correctional and detention facilities. TDCJ's prompt implementation of Policy B-14.52 belies any assertion of deliberate indifference.

21.   TDCJ's updates to Policy B-14.52 as new information about the coronavirus is discovered indicates that it is not disregarding an excessive risk to inmate health or safety.

22.   Collier participated in TDCJ meetings in early March to formulate a plan in response to COVID-19. This demonstrates that Collier did not disregard an excessive risk to inmate health and safety.

23.   Since March 16, 2020, TDCJ and its executive leadership, including Collier, have participated in daily briefings regarding COVID-19 at TDCJ's Command Center. This demonstrates that Collier has not disregarded an excessive risk to inmate health and safety.

24.     Herrera has implemented Policy B-14.52 at the Pack Unit and has been in constant communication with his supervisor regarding COVID-19 since early-to-mid March. This demonstrates that Herrera has not disregarded an excessive risk to inmate health and safety.

25.     Herrera's implementation of Policy B-14.52 at the Pack Unit represents a reasonable measure to abate the risk of harm presented by COVID-19.

26.     Herrera's implementation of precautionary measures at the Pack Unit before the promulgation of Policy B-14.52—such as social distancing measures and temperature checks—demonstrates that he has not disregarded an excessive risk to inmate health and safety.

27.     Herrera's implementation of Policy B-14.52 and his continued enforcement of Policy B-14.52 at the Pack Unit demonstrates that he has not disregarded an excessive risk to inmate health and safety.

28.     To the extent Plaintiffs contend that Defendants' actions have been inept, ineffective, or negligent, such actions do not constitute deliberate indifference.

29.     Plaintiffs' complaints of occasional lapses in the enforcement of Policy B-14.52 at the Pack Unit do not establish deliberate indifference. At most, such allegations might indicate negligence, which is a lower standard than deliberate indifference.

30.     Plaintiffs' allegations that Defendants have failed to avoid the harm presented by COVID-19 or eliminate the risk of COVID-19 does not establish deliberate indifference.

31.     Plaintiffs have not met their "extremely high" burden of showing deliberate indifference.

32. Plaintiffs have not shown that Defendants have engaged in unnecessary and wanton infliction of pain repugnant to the conscience of mankind.

33. Defendants Collier and Herrera have not been deliberately indifferent in violation of the Eighth Amendment.

### *ADA and RA Claims*

34. TDCJ is operating under exigent circumstances due to the COVID-19 pandemic; therefore, the ADA does not apply, and Plaintiffs cannot prevail on their ADA and RA claims.

35. Alternatively, Plaintiffs have not shown they were discriminated against because Policy B-14.52 applies to all Texas prisons—not just the Pack Unit.

36. Further, Plaintiffs have not shown they have been discriminated against because of their disabilities.

37. Plaintiffs have not demonstrated that Defendants have denied them participation or the benefits of any of the Pack Unit's services, programs, or activities.

38. Further, Plaintiffs have not demonstrated that Defendants have denied them participation or the benefits of any of the Pack Unit's services, programs, or activities because of their disabilities.

39. Since Plaintiffs have failed to demonstrate discrimination by reason of their disabilities, they cannot prevail on their ADA and RA claims.

Respectfully Submitted.

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**RYAN L. BANGERT**
Deputy First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense Division

*/s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General
Texas State Bar No. 24074047
Federal Bar No. 1125898
christin.vasquez@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P.O Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / (512) 370-9996 (fax)

## <u>NOTICE OF ELECTRONIC FILING</u>

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that I have electronically submitted a true and correct copy of the foregoing for filing in accordance with the Court's electronic filing system, on July 6, 2020.

*/ s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing **Defendants' Proposed Findings of Fact and Conclusions of Law** has been served electronically upon all counsel of record *via* the electronic filing system of the Southern District of Texas, on July 6, 2020.

*/ s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General