# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LADDY CURTIS VALENTINE and RICHARD ELVIN KING, individually and on behalf of those similarly situated, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| BRYAN COLLIER, in his official capacity, ROBERT HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | ) ) ) ) |
| Defendants. | ) |
| | ) |
| | ) |

Case No. 4:20-cv-01115

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to this Court's Procedures, Plaintiffs Laddy Curtis Valentine and Richard Elvin King, individually and on behalf of those similarly situated (collectively, "Plaintiffs") submit these proposed findings of fact and conclusions of law that Plaintiffs contend will be proven at trial:

**I. PROPOSED FINDINGS OF FACT**

**A. THE COVID-19 PANDEMIC**

1. Since the end of 2019, the novel coronavirus that causes Coronavirus Disease 2019 (COVID-19 or SARS-CoV-2) has spread across the world, resulting in a global pandemic.

2. On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "Public Health Emergency of International Concern" as cases had been "reported in five WHO regions in one month." The following day, the U.S. Secretary of Health and Human Services declared under Section 319 of the Public Health Service Act (42 U.S.C. § 247d), that COVID-19 "present[ed] a Public Health Emergency in the United States." "On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a

1

pandemic, as the rates of infection continue to rise in many locations around the world and across the United States."

3.      On March 13, 2020, Texas Governor Greg Abbott announced that "COVID-19 poses an imminent threat of disaster" and, under Section 418.014 of the Texas Government Code, declared "a state of disaster for all counties in Texas." Subsequently, the Texas Department of State Health Services determined on March 19, 2020 that "COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code." The same day, Gov. Abbott issued Executive Order GA08, which provides in part that "every person in Texas shall avoid social gatherings in groups of more than 10 people." Gov. Abbott extended the declaration on April 12, 2020,12 and again extended certain provisions of the orders on May 6, 2020, encouraging following CDC recommendations.

4.      On March 16, 2020, Grimes County (where the Wallace Pack Unit ("Pack Unit") is located) found that "extraordinary measures must be taken to contain COVID-19 and prevent its spread throughout Grimes County," and declared a local state of disaster pursuant to Section 418.108(a) of the Texas Government Code.

5.      The extensive body of evidence on COVID-19 demonstrates that it is highly communicable and spreads easily through close proximity or contact, and by touching contaminated surfaces. The disease is highly dangerous, causing severe illness and death.

6.      Individuals over the age of 65 and with comorbid conditions, such as individuals who are immunocompromised including patients undergoing cancer treatment, or who have chronic lung disease or moderate to severe asthma, serious heart conditions, or other underlying medical conditions (e.g., diabetes, renal failure, or liver disease), are at a higher risk for serious

illness and death. The same is true for individuals of any age with severe obesity, defined as someone with a body mass index greater than or equal to 40.

7.      Communicable diseases, including COVID-19, are far more easily transmissible in prisons than in the general population because of the tight-quartered living conditions. COVID-19 is particularly transmissible because of its long incubation period of up to two weeks and asymptomatic or pre-symptomatic presentation in many people, allowing them to spread the disease while exhibiting only mild or no symptoms and rendering screening for such symptoms ineffective.

8.      In only a few months, over 11.5 million people worldwide have been diagnosed with COVID-19, and over 500,000 of those people have died.  The United States has reported over 2.9 million cases of COVID-19 and over 138,000 deaths from the virus.  Those numbers are growing rapidly every day.  There is no vaccine or cure for COVID-19. No one is immune

9.      These features of COVID-19 have been well known, including by Defendants, since at least the time Plaintiffs filed suit on March 30, 2020.

**B.      THE WALLACE PACK UNIT**

10.      The Pack Unit is a Type-I Geriatric prison in the TDCJ system prison located in Grimes County, Texas, with a maximum capacity of 1,478 people.

11.      As of June 29, 2020, 1,132 people are incarcerated at the Pack Unit.

12.      The Pack Unit houses primarily individuals who are elderly and/or have health problems, and thus, who are particularly vulnerable to serious illness in the face of a COVID-19 pandemic.

13.      Most Pack Unit inmates live in small cubicles in a dormitory setting. Each inmate has his own bunk, separated from his neighbor only by a waist-high wall. It is impossible for the

vast majority of inmates at the Pack Unit, in their existing bunks, to sleep more than six-feet apart (as the CDC recommends for proper social distancing).

14.     The Pack Unit has communal restrooms, where dozens of inmates share toilets, sinks, and other fixtures. Most Pack Unit inmates shower communally, in showers that hundreds of people pass through each day.

15.     When the prison is operating normally, Pack Unit inmates eat in a communal dining hall that hundreds of inmates use multiple times a day.

16.     The Pack Unit is home to both the General Class and the High-Risk Subclass (collectively, "Class").

17.     The General Class consists of:

> All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide protection from exposure to COVID-19 during the class period.

The Pack Unit's typical inmate population is approximately 1,400 inmates.

18.     The High-Risk Subclass consists of:

> All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who are subjected to TDCJ's policy and practice of failing to provide protection from exposure to COVID-19 during the class period and who are, according to the CDC, most at risk for severe illness, injury, or death from COVID-19 due to their age or their health conditions, including the following individuals:

- People aged 65 years or older;

- People with chronic lung disease or moderate to severe asthma;

- People who have serious heart conditions;

- People who are immunocompromised including patients undergoing cancer treatment;

4

- People with other underlying medical conditions, particularly if not well controlled, including, but not limited to, those with diabetes, renal failure, or liver disease; and

- People of any age with severe obesity (body mass index [BMI] ≥ 40).

The High-Risk Subclass has at least several hundred members.  Due to their comorbidities, the members of the High-Risk Subclass are at an increased risk of serious illness, and death, from exposure to COVID-19.

19.     Both the General Class and the High-Risk Subclass will have future unknown members.

20.     When Plaintiff filed this action on March 30, 2020, there were no known cases of COVID-19 in Pack Unit. The first positive test of a Pack Unit inmate, Leonard Clerkly, was confirmed via autopsy on April 13, 2020, two days after the first member of the Class died of complications from COVID-19.  As of July 6, 2020, over 400 Class members have tested positive for COVID-19 and 18 Class members have died.

**C.     CDC GUIDANCE**

21.     In response to the COVID-19 pandemic, the CDC published guidance for correctional and detention facilities to prepare and protect inmates and personnel from the COVID-19 pandemic. The CDC's guidance includes the following advice for preventing the spread of COVID-19 in a correctional or detention facility:

- Facilities should ensure availability of sufficient stocks of hygiene supplies, cleaning supplies, personal protective equipment ("PPE"), and medical supplies (consistent with the healthcare capabilities of the facility).

- o This includes liquid soap, alcohol-based hand sanitizer containing at least 60% alcohol, recommended PPE including facemasks and gloves, and supplies for testing, such as sterile viral transport media and sterile swabs.

- Facilities should provide and enforce the appropriate use of personal protective equipment (PPE).

  - o Individuals handling laundry or used food service items from quarantined or confirmed positive individuals should wear recommended personal protective equipment—including gloves that are disposed after each use and gowns or coveralls—and should clean their hands often.

  - o Individuals, including inmates, who work with quarantined or confirmed positive cases or in the space where those cases are housed require full personal protective equipment—n95 masks, eye protection, gloves, and gowns or coveralls.

  - o Facilities should make contingency plans in the event of PPE shortages.

- Facilities should provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.

- Facilities should provide alcohol-based hand sanitizer containing at least 60% alcohol.

- Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response, including cleaning and disinfecting frequently touched surfaces several times per day.

- Facilities should encourage all persons in the facility to protect themselves by practicing good cough etiquette and good hand hygiene and avoiding touching of the eyes, nose, or mouth.

- Individuals who test positive should be housed in isolation and should be kept in the isolation space, including for meals, bathroom, and medical evaluations.

- Individuals with possible exposure should be housed in quarantine and should be kept in the quarantine space, including for meals bathroom, and medical evaluations.

   o Quarantined individuals should be further divided to separate those who are high risk of complications for COVID-19.

- Facilities should encourage these behaviors by posting signage throughout the facility and communicating the information verbally on a regular basis.

- Facilities should implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).

- This should include enforcing increased space between individuals in holding cells and waiting areas, staggering time in recreation spaces, staggering meals and rearranging seating in the dining hall to increase space between individuals, liming the size of group activities, and rearranging housing spaces to increase space between individuals.

- Facilities should be providing inmates with information and consistent updates about COVID-19 and its symptoms.

7

22.     The CDC's guidance for testing in nursing homes recommends weekly retesting of negative and invalid cases weekly until the spread has been contained in each housing unit.

**D.     TDCJ ACTED WITH INDIFFERENCE BY ADOPTING WOEFULLY INADEQUATE POLICIES IN RESPONSE TO COVID-19**

23.     While TDCJ implemented a policy in response to the COVID-19 pandemic, CMHC Infection Control Policy B-14.52, the procedures promoted by the policy are woefully inadequate and do not comport with many of the CDC's recommendations.

24.     Indeed, the CDC notes its recommendations "**may need to be adapted based on individual facilities' physical space, staffing population, operations, and other resources and conditions**"—such as the predominantly elderly and disabled population of inmates at the Pack Unit, and the prison's dormitory-style layout that makes social distancing impossible for Pack Unit inmates.

25.     For example, the CDC recommends considering "relaxing restrictions on allowing alcohol-based sanitizer in the secure setting where security concerns allow."  TDCJ's policy acknowledges that hand sanitizer is a method "used to prevent the spread of any respiratory virus" and that it should be carried by staff "and used whenever there is concern that hands have been contaminated." However, TDCJ still mandates that inmates—even those performing the same duties as staff that need PPE and alcohol-based hand rub—"must not have access to the waterless hand rub but must wash hands with soap and water instead." But as TDCJ's own policies acknowledge, this is not always practical, and thus inmates are at an increased risk of contracting and spreading COVID-19.

26.     The CDC also recommends correctional facilities "[r]estrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or

8

to prevent overcrowding."  In contrast to this specific instruction to restrict transfers, except in limited circumstances where it is absolutely necessary, TDCJ's policy only requires facilities to "[m]inimize transfer of offenders between units."  This guideline is insufficient to actually protect the inmate population. The Pack Unit itself only went on precautionary lockdown after Mr. Clerkly died from COVID-19, and TDCJ has never committed to stopping transfers into the Pack Unit for the duration of the pandemic. Indeed, as of July 1, 2020, TDCJ began accepting new inmates into the prison system from Texas county jails.

27.    In addition to being inadequate, some of TDCJ's policies are impossibly vague, further preventing proper precautions from taking place. For example, the CDC guidance explains that, while difficult, social distancing "is a cornerstone to reducing transmission of respiratory diseases such as COVID-19." The CDC then provides examples of steps that can be taken in prisons and jails. TDCJ's policy, in contrast, states only that prisons should "[p]ractice social distancing and avoid gatherings and meetings." TDCJ's further reference to "teleconference or video conference" implies this policy is aimed more at reducing risk to prison staff, not prisoners directly.

E.    **TDCJ ACTED WITH INDIFFERENCE BY NOT IMPLEMENTING POLICIES AT THE PACK UNIT**

28.    In addition to its policies being inadequate to combat the COVID-19 threat, TDCJ is neglecting to even follow or enforce many of its own written policies at the Pack Unit.

29.    Plaintiffs and members of the Class have observed that, despite committing to do so, TDCJ is not:

- Meaningfully educating inmates on how COVID-19 is transmitted, signs and symptoms, and prevention of transmission;

- Monitoring inmates for COVID-19 symptoms and referring symptomatic inmates for medical quarantine, testing, isolation, and treatment;

- Adhering to social distancing requirements while inmates shower, receive meals, exchange laundry, stand in line for medication, receive medical treatment, and otherwise leave their housing areas;

- Ensuring that staff adhere to social distancing requirements;

- Ensuring that officers and inmates have and use appropriate PPE depending upon their level of exposure;

- Appropriately separating symptomatic and sick prisoners from prisoners who do not have the virus;

- Providing adequate cleaning supplies to regularly disinfect common areas;

- Adequately cleaning common areas such as showers and laundry exchange; and,

- Providing hand sanitizer when necessary.

30. In addition, despite amending the policy to provide for face masks to staff and each inmate, numerous TDCJ officials do not wear masks despite the requirements in the policy.

31. Thus, there is a pattern of the Pack Unit not following the guidelines in the CMHCC 14.52 policy.

32. Moreover, TDCJ is not rigorously testing and performing contact tracing of infected prisoners—a predicate to its own policies concerning those who are "a close contact" of an infected person.

33. TDCJ's failure to implement these policies puts Plaintiffs and the Class members at further risk of extreme harm. Because Plaintiffs and the Class members are particularly at risk of severe illness and death should they contract COVID-19, they must be provided the adequate

care and safeguards recommended by the CDC and health experts. TDCJ is not meeting those standards, placing Plaintiffs and the putative class at intolerable risk.

### F.   AD HOC TESTING AND THE OUTBREAK OF COVID-19 AT THE PACK UNIT

34.   TDCJ's has refused to adopt and implement a comprehensive plan for continued testing of inmates in Type-I Geriatric like the Pack Unit.  Indeed, the CDC has recommended that facilities like the Pack Unit (e.g., nursing homes, assisted living facilities, intermediate care facilities for individuals with intellectual disabilities, institutions for mental disease, and psychiatric residential treatment facilities) implement a plan for testing "in addition to other infection and prevention control measures" for COVID-19.  Despite these recommendations and their applicability to the Pack Unit, Defendants have not implemented a plan for continued testing that could facilitate effective intervention at the Pack Unit.

35.   Specifically, CDC has three Guidelines for nursing homes that are centrally relevant here:  (1) Preparing for COVID-19 in Nursing Homes, (2) Testing Guidelines for Nursing Homes, and (3) Considerations for Performing Facility-wide SARS-CoV-2 Testing in Nursing Homes.

36.   In its Preparing for COVID-19 in Nursing Homes Guidance, CDC states, "Given their congregate nature and resident population served (e.g., older adults often with underlying chronic medical conditions), nursing home populations are at high risk of being affected by respiratory pathogens like COVID-19 and other pathogens, including multidrug-resistant organisms (e.g., Carbapenemase-producing organisms, *Candida auris*).  As demonstrated by the COVID-19 pandemic, a strong infection prevention and control (IPC) program is critical to protect both residents and healthcare personnel (HCP)."  Like a nursing home, the Pack Unit is also congregate in nature had has a population of older adults often with underlying medical conditions.

37.     The Preparing for COVID-19 in Nursing Homes Guidance further states that facilities should "[c]reate a [p]lan for [t]esting [r]esidents and [h]ealthcare [p]ersonnel for SARS-CoV-2" because testing "can detect current infections."  The Guidance also recommends:

- Education of residents

- Cloth face covering or facemask for residents

- The provision of alcohol based hand sanitizer in every resident room and common areas because "[u]nless hands are visibly soiled, an alcohol-based hand sanitizer is preferred over soap and water in most clinical situations"

- Adequate soap and hand towels at sinks for handwashing

- Availability of tissues and trash cans

- Monitoring all residents daily for fever and symptoms consistent with COVID-19

- Implementing social distancing measures.

38.     In the Testing Guidelines for Nursing Homes, the CDC states that testing of residents "is an important addition to other infection prevention and control (IPC) recommendations aimed at preventing SARS-CoV-2 from entering nursing homes, detecting cases quickly, and stopping transmission."  CDC implores facilities to "have a plan for testing residents for SARS-CoV-2" that "should aim for rapid turnaround times (e.g., less than 24 hours) in order to facilitate effective interventions."  The Guidelines specifically note that "[w]hile this guidance focuses on testing in nursing homes, several of the recommendations such as testing residents with signs or symptoms of COVID-19 and testing asymptomatic close contacts should also be applied to other long-term care facilities."

39.     The Testing Guidelines and the Considerations for Performing Facility-wide SARS-CoV-2 Testing in Nursing Homes further mention that "CDC recommends repeat testing

to ensure there are no new infections among residents and [Healthcare Professionals] and that transmission has been terminated."  Specifically, CDC recommends "continue[d]  repeat viral testing of all previously negative residents, generally every 3 days to 7 days, until the testing identifies no new cases of SARS-CoV-2 infection among residents or HCP for a period of at least 14 days since the most recent positive result. This follow-up viral testing can assist in the clinical management of infected residents and in the implementation of infection control interventions to prevent SARS-CoV-2 transmission."

40.    CDC's Considerations for Performing Facility-wide SARS-CoV-2 Testing in Nursing Homes provides specific instructions for how to perform facility-wide testing.

41.    TDCJ has only implemented ad hoc testing, which has demonstrated that there is a continuing transmission of COVID-19 throughout the Pack Unit.

42.    On May 12–14, 2020, TDCJ began an initial round of mass testing at the Pack Unit. This testing showed about 200 positives cases of COVID-19 among Class members.

43.    On June 23–24, 2020, TDCJ began another round of testing of inmates who had previously tested positive.  To date, that testing confirmed at least 171 additional positives cases of COVID-19 among Class members.

44.     As of July 3, 2020, more than 23 class members have been hospitalized due to COVID-19.

45.    As of June 26, 2020, at least 18 Class members have died due to COVID-19.

46.    When a Pack Unit inmate is hospitalized, he must be supervised by two TDCJ correctional officers. Due to the large number of Pack Unit inmates currently hospitalized, the staff at the prison is depleted, hindering other operations of the prison.

47.     Despite these results and the ongoing outbreak, TDCJ still has not articulated or implemented a plan for continued testing of the Pack Unit inmates.

**G.     TDCJ'S GRIEVANCE PROCESS IS NOT AN AVAILABLE REMEDY**

48.     As of March 30, 2020, TDCJ had a three-step grievance process set forth in its "Grievance Operations Manual." This was the grievance system in place when Plaintiffs filed this suit. TDCJ did not have any separate formal grievance process for COVID-19 related grievances. This grievance procedure was also the same across all TDCJ facilities, including the Pack Unit.

49.     Based on the plain language of the Grievance Operations Manual, TDCJ's grievance process begins with a required informal complaint to prison staff.

50.     Only after an informal complaint is submitted can an inmate file what is referred to as a "Step 1" grievance. A TDCJ prison unit has 40 days to respond to most Step 1 grievances. However, it can unilaterally grant itself an extension of an additional 40 days to respond. The Step 1 grievance is handled on the unit level, and can receive a response from unit-level staff such as a grievance officer, assistant warden, or the senior warden.

51.     Once an inmate receives a response to their "Step 1," they can file what is referred to as a "Step 2" grievance. The Step 2 grievance is taken outside the unit for administrative review—usually to the Regional Grievance Office. TDCJ has 40 days to respond to most Step 2 grievances, but can grant itself an extension of up to 40 days.

52.     Receiving a response to the Step 2 grievance "exhausts" the administrative grievance process. In total, the full grievance process can take over 5 months to exhaust for a typical grievance.

14

53.     By at least May 18, 2020, TDCJ recognized that its then-existing grievance procedure was ineffective with regard to issues relating to the COVID-19 pandemic. TDCJ then drafted a new grievance procedure for COVID-19 related issues.

54.     Under the new grievance procedure, Step 1 grievances would be processed on a 15-day expedited basis, with no extensions. Step 2 grievances would then be processed on a 15-day expedited basis, with no extensions.

55.     This new grievance procedure was not available to Plaintiffs when they filed suit.

56.     On March 27, 2020, Plaintiff Valentine began the then-existing grievance procedure by submitting an I-60 informal grievance to a Unit Safety Officer named Mr. Selby. Mr. Valentine was attempting to resolve the lack of hand sanitizing solutions and other precautions for preventing the spread of COVID-19. That was three days before this suit was filed. Mr. Valentine never received a response to his informal grievance.

57.     Mr. Valentine then submitted his Step 1 grievance form on March 31, 2020, although it was not retrieved by the grievance office until April 1, 2020, again raising the issue of lack of hand sanitizing solutions and other precautions to prevent the spread of COVID-19. Mr. Valentine requested hand sanitization supplies, gloves, masks, and additional cleaning supplies.

58.     Mr. Valentine's Step 1 grievance was returned on April 22, 2020. The response stated that "The Wallace Pack Unit is following all necessary precautions to help minimize the exposure of COVID-19" and that "[s]taff is following all guidelines."

59.     The Pack Unit did not provide many of the items Mr. Valentine requested, including hand sanitizer.

60.     Mr. Valentine submitted his Step 2 grievance form on or about April 28, 2020. Mr. Valentine's Step 2 grievance form was returned via production in this case on June 8, 2020, although the grievance form states it was returned on May 8, 2020.

61.     While Mr. Valentine's Step 2 grievance was pending, Mr. Clerkly and Mr. Thompson died of COVID-19, and numerous other inmates became infected.

62.     While Mr. Valentine's Step 2 grievance was pending, Mr. Valentine tested positive for COVID-19.

## II.     PROPOSED MIXED FINDINGS OF LAW AND FACT

### A.     DEFENDANTS FAILURE TO PREVENT HARM FROM COVID-19 IS A VIOLATION OF PLAINTIFFS' EIGHTH AMENDMENT RIGHTS

63.     The government has a constitutional duty to protect those it detains from conditions of confinement that create "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This duty extends to providing "adequate . . . medical care" and "tak[ing] reasonable measures to guarantee the safety of the inmates." *Id*. at 832, 114 S.Ct. 1970. However, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id*. at 847, 114 S.Ct. 1970

64.     Thus, to demonstrate that Defendants are violating the General Class' and High-Risk Subclass' Eighth Amendment rights based on a failure to prevent harm, Plaintiffs must prove two distinct elements: 1) that exposure to COVID-19 is an objectively serious risk of harm, and 2) that Defendants failure to adequately protect them from COVID-19 manifests "deliberate indifference" toward that risk. *See id*. at 834.

65.     Plaintiffs have proven both elements in this case.

16

66.     For the first prong, the risk of exposure to COVID-19 is objectively serious. Defendants do not dispute that COVID-19 is objectively serious and have admitted it before the Court in previous filings. Indeed, the evidence has shown that hundreds on Class members have tested positive for COVID-19, numerous have suffered serious symptoms, dozens have been hospitalized, and at least 18 have died.

67.     For the second prong, based on the evidence, Defendants are deliberately indifferent to the serious risk posed by COVID-19.

68.     On April 2, 2020, Plaintiffs submitted three declarations by physicians and one declaration by a correctional expert describing the steps TDCJ needed to take, and the flaws in its policies.

69.     On April 11, 2020, Leonard Clerkly died after being sent to the hospital from the Pack Unit.

70.     On April 13, 2020, a posthumous test confirmed Clerkly had COVID-19 when he died.

71.     On April 16, 2020, this Court entered a preliminary injunction requiring, among other relief, a plan for testing at the Pack Unit, but it was stayed and ultimately vacated. The Court's memorandum and order of April 20, 2020 found that even on precautionary lockdown, with cloth masks, and with cleaning solution provided for dormitories, "The current pandemic presents a substantial risk of serious harm and death to Pack Unit's current residents." The Court further found, "Defendant's actions fall short of their own policy and do not reasonably abate the extremely high risks facing the inmates in Pack Unit."

72.     From the time this case was filed through April 27, 2020, Defendants fielded over 50 grievances complaining of similar issues addressed in the Court's orders.

73.     On May 5, 2020, Daniel Thompson died from COVID-19 after being transported from the Pack Unit due to a medical condition on April 30, 2020.

74.     On May 19, 2020, David Uhrich died from COVID-19 after being transported from the Pack Unit on May 13, 2020.

75.     On May 28, 2020, Cedric Lacy died from COVID-19 after being transported from the Pack Unit on May 12, 2020.

76.     On June 4, 2020, Michael Sprague died from COVID-19 after being transported from the Pack Unit on May 25, 2020.

77.      On June 5, 2020, Isidro Hernandez died from COVID-19 after being transported from the Pack Unit on May 28, 2020.

78.     In the order vacating the injunction, on June 5, 2020, Fifth Circuit Judge W. Eugene Davis warned, "The Plaintiffs and their fellow inmates are now being held under circumstances that seriously threaten their life."

79.     On June 6, 2020, Charles Hart died, presumably from COVID-19, after being transported from the Pack Unit on June 2, 2020.

80.     On June 12, 2020, Earnest Jones Jr. died from COVID-19 after being transported from the Pack Unit the day before.

81.     On June 13, 2020, James Gibson died from COVID-19 after being transported from the Pack Unit on May 28, 2020—the day before he tested positive.

82.     On June 14, 2020, Stephen Fox died from COVID-19 after being transported from the Pack Unit on May 29, 2020.

83.     On June 15, 2020, Jimmy Malone died from COVID-19 after being transported from the Pack unit on May 31, 2020, the same day he tested positive for COVID-19.

84.     One June 16, 2020, Lewis Anderson died from COVID-19 after being transported from the Pack Unit on June 7, 2020.

85.     On June 18, 2020, Jesus Rodriguez died from COVID-19 after being transported from the Pack Unit on May 30, 2020—a week after he tested positive.

86.     On June 19, 2020, James Sampley died from COVID-19 after being transported from the Pack Unit on May 25, 2020.

87.     On June 21, 2020, Tommy Shoefstall died from COVID-19 after being transported from the Pack Unit on June 13, 2020.

88.     At least three other Pack Unit inmates died as of June 25, 2020.

89.     Despite personal knowledge of this stunning cascade of deaths and infection at the Pack Unit, and the specific deficiencies highlighted in this litigation, in inmate grievances, and their other personal experience, Defendants continue to omit obvious, critical steps to mitigate the deadly progress of COVID-19 at the Pack Unit. Moreover, despite being aware of the extreme risk the Pack Unit inmates face, there is a clear pattern of the policies not being followed at the Pack Unit.

### B.     DEFENDANTS ARE VIOLATING THE ADA AND REHABILITATION ACT

90.     The ADA and the Rehabilitation Act provide that a public entity cannot deny people with disabilities the benefits or services the entity provides and cannot otherwise discriminate against people with disabilities based on their disabilities. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (quoting *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011)).

91.     Both the Rehabilitation Act and the ADA "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals," including prison inmates. *Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020) (quoting *Bennett-*

*Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005)); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998); *U.S. v. Georgia*, 546 U.S. 151 (2006); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020); *Garrett*, 560 F. App'x at 382.

92.     To have a claim under the ADA and the Rehabilitation Act, a plaintiff must show (1) they have a qualifying disability, (2) that they are being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity, and (3) that such discrimination is by reason of their disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

93.     A prison's failure to make reasonable accommodations for disabled inmates can "constitute denial of services and discrimination sufficient to satisfy the second two prongs" of an ADA claim. *Garrett*, 560 F. App'x at 382 (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004)). A failure to reasonably accommodate people with disabilities "will often have the same practical effect as outright exclusion" from the benefits of services and programs a public entity provides. *Lane*, 541 U.S. at 531. "In fact, it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted exclusion from participation in or . . . denial of the benefits of the prison's services, programs, or activities." *United States v. Georgia*, 546 U.S. 151, 157 (2006) (emphasis added) (quoting 42 U.S.C. § 12132).

94.     Defendants have violated the ADA and Rehabilitation Act. Defendants failed to reasonably accommodate disabled prisoners at the Pack Unit by providing hand sanitizer to disabled inmates, and failing to provide additional protections necessary to provide safe conditions of confinement for Class members with disabilities.

95.     The Pack Unit is a facility, and its operation comprises a program and service, for ADA and Rehabilitation Act purposes. Medical treatment and safe conditions of confinement are programs or services that Defendants provide to prisoners for purposes of the ADA and Rehabilitation Act.

96.     Numerous members of the General Class and the High-Risk Subclass have qualifying disabilities that require reasonable accommodations. Specifically, the approximately 575 inmates living at the Pack Unit with one or more of the following conditions are at heightened risk of death from COVID-19:

a) Asthma;
b) Morbid obesity (Body-mass index at or over 40);
c) Cystic Fibrosis;
d) Congestive Heart Failure;
e) Chronic obstructive pulmonary disorder (COPD);
f) Cirrhosis;
g) Diabetes;
h) Uncontrolled Hypertension;
i) HIV or AIDS;
j) Chronic lung disease;
k) Immune deficiencies;
l) Prolonged use of corticosteroids;
m) Chronic kidney disease (or regularly undergo dialysis);
n) Liver disease.

97.     Moreover, at least 50 inmates require wheelchairs, with many more having disabilities that require other mobility-assistive devices. These inmates have difficulty getting to sinks to wash their hands. Even then, inmates who use wheelchairs, cane, walker, or similar device must then use their wheelchair to return to their bunk, frequently getting their hands dirty again by operating the mobility assistance device. These inmates are then required to eat meals at their cubicles without a meaningful opportunity to clean their hands.

98.     Despite these issues and others, Defendants have not made reasonable accommodations to provide hand sanitizer or other protections to inmates with disabilities.

Defendants considered providing hand sanitizer to all inmates, but determined not to do so. Other than that *carte blanche* refusal, Defendants have taken no steps to consider how hand sanitizer can be provided to inmates with disabilities. The evidence shows that such an accommodation is reasonable, and could have been made.

99.     Defendants have also not made any other reasonable accommodations necessary to protect inmates with disabilities from COVID-19, including members of the High Risk subclass.

**C.     PLAINTIFFS WERE NOT REQUIRED TO EXHAUST TDCJ'S GRIEVANCE PROCEDURE BECAUSE IT WAS NOT AVAILABLE FOR COVID-19 ISSUES**

100.     The Prison Litigation Reform Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a).

101.     The remedies that must be exhausted are those that exist at the time the action is brought. *Capozzi v. Pigos*, 640 F. App'x 142, 145 (3d Cir. 2016) (holding that the "plain language of the PLRA . . . suggests that prisoners must exhaust those remedies that exist at the time that they bring the action").

102.     The PLRA has a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016). The exhaustion requirement in this way "hinges on the 'availab[ility]' of administrative remedies." *Id.* at 1858. The meaning of "available" in the PLRA is the ordinary meaning of "capable of use for the accomplishment of a purpose." *Id.* at 1858 (quoting *Booth v. Churner*, 532 U.S. 731, 737 (2001)). Accordingly, an inmate is required to exhaust only those grievance procedures that are "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738).

103.    The Supreme Court identified three examples of circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief": (1) when the procedure "operates as a simple dead end," such that the procedure is not "'capable of use' for the pertinent purpose," (2) when the procedure is "so opaque that it becomes, practically speaking, incapable of use," and (3) when prison administrators thwart the use of the procedure "through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

104.    These examples were only those that were relevant to the *Booth* case. *Id.* at 1853 ("As relevant here, there are three kinds of circumstances . . ."). These three examples are not exclusive of instances where a remedy, although on the books, is not capable of use to obtain relief. *West v. Emig*, 787 F. App'x 812, 815 (3d Cir. 2019) ("Notably, however, neither the Supreme Court nor this Circuit has held that those three circumstances are comprehensive, as opposed to exemplary."); *see also Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (referring to the examples in Ross as "at least three" circumstances where an administrative process may be "unavailable"); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016) ("We note that the three circumstances discussed in Ross do not appear to be exhaustive . . . .").

105.    An inmate need not file a grievance at all if the grievance system is not available since the PLRA's requirement "does not apply in a case in which there is no administrative process to exhaust." *Malik v. D.C.*, 574 F.3d 781, 785 (D.C. Cir. 2009) (Garland, J.). Thus, an inmate filing a grievance after filing suit is irrelevant if the grievance system is not available at all. *Id.* ("[T]he fact that [an inmate] filed his grievance one day later than [prison] policy permits is irrelevant because [the inmate] was not required to file a grievance at all.").

106.    The present situation is one where there was no available remedy at the time Plaintiffs filed suit. TDCJ's grievance procedure was not capable of use for COVID-19 related issues because it is simply not equipped to respond to such an emergency and provide actual relief.

107.    Since this case was filed, COVID-19 has spread across the country and through the Pack Unit at an alarming speed. As one example, after TDCJ's second strike team testing, there were over 171 inmates tested positive.

108.    As another example, Mr. Valentine began the grievance process on March 27, 2020. At the time, the Pack Unit did not have any inmates that had tested positive for COVID-19.  Before Mr. Valentine's Step 2 grievance was responded to, 2 inmates had died from COVID-19 and Mr. Valentine himself tested positive.

109.    TDCJ's conduct also demonstrates tacit knowledge that its previous grievance process was not "available" when this suit was filed. TDCJ has since changed the policy because it was not fast enough to provide actual relief for COVID-19 related problems. The new policy does not allow for extensions and is required to be complete within a total of 30 days. In contrast, the previous grievance process could linger for months, leaving no available remedy to prisoners in the Pack Unit when the pandemic began and when this suit was filed.

110.    Accordingly, because Plaintiffs did not have an available remedy at the time they field suit, they did not need to exhaust TDCJ's grievance process.

**D.    A PERMANENT INJUNCTION IS NECESSARY TO PROTECT THE CLASS FROM FURTHER HARM**

111.    Plaintiffs have proven that Defendants violated their Eight Amendment rights, and that Defendants have violated the ADA and Rehabilitation Act.

112.    Given that the population at Pack Unit is particularly vulnerable if exposed to COVID-19 and the current outbreak of COVID-19 at the unit, Plaintiffs face irreparable harm in

the form of serious illness or death. An injunction is necessary to prevent these irreparable harms to Plaintiffs and members of the Class and to keep COVID-19 from further spreading throughout Pack Unit.

113.    The equities at issue and the public interest weigh in Plaintiffs' favor as they and members of the Class face serious irreparable harm—including severe illness, long-term health effects, and possibly death—if forced to remain in the current conditions at Pack Unit.  Moreover, an injunction will not be unduly burdensome or waste resources.

114.    The public interest favors a permanent injunction. First, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. D.C.*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (collecting cases). Second, the public has a strong interest in the health and safety of its inmates, both because they are public charges, and because prison health is community health, given that the prison guards live within the surrounding communities. Moreover, when Pack Unit inmates become severely ill, they must be transferred to community hospitals, which are at risk of reaching capacity due to the rapid spread of COVID-19 in the larger community in Texas.

115.    The relief ordered by the Court extends no further than necessary to correct the violations of the Plaintiffs' federal rights. The relief ordered is narrowly drawn, and is the least intrusive means of protecting the rights of the Plaintiffs and the Class. The Court has given substantial weight to any adverse impact on public safety and the operation of the criminal justice system in fashioning this relief. 18 U.S.C. § 3626(a)(1)(A).