UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Laddy Curtis Valentine, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No. 4:20-cv-01115 |
| v. | ) | |
| | ) | Hon. Keith P. Ellison |
| Bryan Collier, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

**Plaintiffs' Emergency Supplemental Motion for Certification of Two Additional Subclasses**

# TABLE OF CONTENTS

**Page**

I. Factual Background ......................................................................................... 2

    A. TDCJ Discriminates Against Sick and Disabled Inmates in Conditions Likely to Spread the Virus .................................................................... 3

    B. TDCJ Discriminates Against the Mobility Impaired ............................... 5

II. Issue Presented ............................................................................................... 6

III. Argument and Authorities .............................................................................. 7

    A. The Proposed Subclasses Satisfy Numerosity ...................................... 7

    B. The Proposed Subclasses Satisfy Commonality .................................... 8

    C. The Proposed Subclasses Satisfy Typicality........................................ 12

    D. The Proposed Subclasses Satisfy the Adequacy Requirement ............ 14

    E. The Proposed Subclasses Meet Rule 23(b)(2)'s Requirements............ 14

    F. The Court Should Appoint the Same Class Counsel Under Rule 23(g)............. 14

IV. Conclusion ................................................................................................... 15

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahlman v. Barnes*,
   No. 20-cv-835, 2020 WL 2754938 (C.D. Cal. May 26, 2020)............................................2, 14

*Bennett-Nelson v. La. Board of Regents*,
   431 F.3d 448 (5th Cir. 2005) ......................................................................................................9

*Bumgarner v. NCDOC*,
   276 F.R.D. 452 (E.D.N.C. 2011) .................................................................................10, 12, 14

*Clarke v. Lane*,
   267 F.R.D. 180 (E.D. Pa. 2010)................................................................................................10

*Cole v. Collier*,
   No. 4:14-cv-1698, 2017 WL 3049540 (S.D. Tex. July 19, 2017) ........................................3, 7

*Cole v. Livingston*,
   No. 4:14-cv-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016)...................................13, 14

*Dodson v. CoreCivic*,
   No. 3:17-cv-48, 2018 WL 4776081 (M.D. Tenn. Oct. 3, 2018)...............................................10

*Fraihat v. U.S. Immig. & Customs Enf't*,
   No. 19-cv-1546, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020).................................................2

*Hernandez v. Cnty. of Monterey*,
   305 F.R.D. 132 (N.D. Ca. 2015)........................................................................................10, 14

*Lightbourn v. County of El Paso, Tex.*,
   118 F.3d 421 (5th Cir. 1997) ......................................................................................................9

*Luedecke v. Tenet Healthcare Corp.*,
   No. 3:14-cv-1582, 2015 WL 3867793 (N.D. Tex. June 23, 2015)..........................................13

*Martin v. St. Luke's Episcopal Hosp.*,
   No. 13-cv-0718, 2014 WL 4810303 (S.D. Tex. Sept. 23, 2014)..............................................13

*Martone v. Livingston*,
   No. 4:13-cv-3369, 2014 WL 3534696 (S.D. Tex. July 16, 2014) .............................................9

*McCoy v. Texas Department of Criminal Justice*,
   No. 5-cv-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) .....................................................9

*Melton v. Dallas Area Rapid Transit*,
   391 F.3d 669 (5th Cir. 2004) ..........................................................................9

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) ......................................................................8, 12

*Postawko v. Mo. Dep't of Corr.*
   910 F.3d 1030 (8th Cir. 2018) ......................................................................10

*Smith v. Harris Cnty., Tex.*,
   956 F.3d 311 (5th Cir. 2020) ..........................................................................9

*Sulima v. Tobyhanna Army Depot*,
   602 F.3d 177 (3d Cir. 2010)..........................................................................13

*U.S. v. Georgia*,
   546 U.S. 151 (2006)..........................................................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)........................................................................................12

*Yates v. Collier*,
   868 F.3d 354 (5th Cir. 2017) ....................................................................10, 11

**Statutes**

Americans with Disabilities Act ............................................................. *passim*

The Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (2006)................. *passim*

**Other Authorities**

28 C.F.R. § 36.104(iii) ...........................................................................13

Fed. R. Civ. P. 23 ................................................................................ *passim*

As Plaintiffs accurately predicted, information learned through recent discovery and at trial warrants certifying two additional subclasses of the already certified general class.[1] Recent evidence shows that inmates with disabilities, including those who are non-ambulatory, are at a heightened risk of contracting Covid-19 because they have difficulty making their way to a sink to wash their hands frequently enough. Even when they do manage to wash their hands, those inmates who use mobility-assist devices like walkers and wheelchairs immediately re-contaminate themselves when they use those devices to move back to their cubicles.

Recent discovery and trial testimony have shown, for example, that immediately after wheelchair-bound inmates wash their hands, they must touch the wheelchair's wheels to roll themselves back to their cubicles. Because those wheels are in constant contact with the floor—where the virus can lurk undetected—wheelchair-bound inmates re-contaminate their hands *right after they wash them*, with no ability to disinfect themselves back at their cubicles before they eat a meal or turn in for the night.

Inmates with disabilities, including serious medical maladies like diabetes, chronic kidney disease, COPD, and others, have not been afforded reasonable accommodations to provide the increased protection they need to guard them against Covid-19. If disabled inmates become infected, the health consequences can be much more severe for them than for healthy, non-disabled inmates. While inmates with disabilities are at an increased risk of serious illness and death from Covid-19, TDCJ does nothing to increase protections against Covid-19 for those inmates.

---

[1] Plaintiffs noted in their original class-certification motion that "additional discovery" could reveal that more subclasses would be necessary. *See* Mot. for Class Cert. 21 n.88, ECF No. 98. Plaintiffs were right, and they therefore now file this supplemental motion to address the need for certifying two more subclasses. *Id.* n.88.

1

The unique and serious risks Covid-19 poses to sick, non-ambulatory, or otherwise disabled inmates, coupled with TDCJ's inaction, warrant the immediate certification of two additional, discrete subclasses. Plaintiffs therefore supplement their previous emergency class-certification motion and now ask the Court to amend its earlier certification order to also certify a Disability Subclass and a Mobility-Impaired Subclass, as defined below. At least two district courts have similarly certified classes for disability-related claims in Covid-19 litigation brought by disabled prisoners and detainees, and this Court should follow the lead of those district courts.[2]

## I.      Factual Background

The facts are the same as those already laid out in Plaintiffs' original emergency motion for class certification (ECF No. 98) and in their reply brief supporting that motion (ECF No. 137),[3] except that now, the situation inside the Pack Unit has grown even more dire since then. After Plaintiffs filed their class-certification reply brief, the Fifth Circuit vacated the preliminary injunction, based in part on Defendants' unsworn representation that they had "substantially complied" with the terms of the Court's preliminary injunction. *See* Order of the Fifth Circuit, ECF No. 163 (June 29, 2020) (per curiam). Discovery and trial testimony in the case, however, undermines the representations Defendants made to the Fifth Circuit and shows that Defendants aren't doing what they should to protect those within their charge from Covid-19's ravages. Indeed, since the preliminary injunction was vacated, more inmates with Covid-19 have

---

[2] *See*, *e.g.*, *Ahlman v. Barnes*, No. 20-cv-835, 2020 WL 2754938, at *7–8 (C.D. Cal. May 26, 2020) (certifying facility-wide class of disabled and medically vulnerable detainees challenging COVID-19 precautions); *Fraihat v. U.S. Immig. & Customs Enf't*, No. 19-cv-1546, 2020 WL 1932570, at *18 (C.D. Cal. Apr. 20, 2020) (certifying system-wide class of ICE detainees concerning government's COVID-19 response).

[3] Plaintiffs incorporate here by reference both their amended motion for class certification and their reply brief in support of that motion.

perished—a total of nineteen Pack inmates have died by last count—and scores more have been hospitalized. Hundreds have tested positive.[4] The situation inside Pack has become even more desperate in recent weeks. The increasingly dire situation calls for further action, and the new evidence recently adduced warrants certification of two additional subclasses.

### A.     TDCJ Discriminates Against Sick and Disabled Inmates in Conditions Likely to Spread the Virus

TDCJ has disclosed in a sworn interrogatory answer that over 270 inmates at Pack have one or more of the following disabilities or serious health conditions:[5]

a.   Asthma;

b.   Body-mass index at or over 40;

c.   Cystic Fibrosis;

d.   Congestive Heart Failure;

e.   Chronic obstructive pulmonary disorder (COPD);

f.   Cirrhosis;

g.   Diabetes;

h.   HIV or AIDS;

i.   Prolonged use of corticosteroids;

j.   Chronic kidney disease (or regularly undergo dialysis).[6]

---

[4] *See*, *e.g.*, **Ex. C**, Trial Tr. Vol. 3, 92:15–23 (Warden Herrera's testimony that he agrees that 19 of the men at the Pack Unit who tested positive for Covid-19 have died); *see also* **Ex. E,** Trial Tr. Vol. 6, 72:16–24 (Secretary Vail's testimony that he is aware there have been around 500 positive Covid-19 cases at Pack and 19 associated deaths).

[5] *See* **Ex. G**, Verification of J. Pulvino with attachments (***filed under seal***). For clarity, Plaintiffs have excluded from this count any Pack Unit inmate who is over the age of 65, because Defendants' interrogatory response did not indicate whether inmates who were over 65 also had disabilities or serious health conditions. It stands to reason that they do—which would of course increase beyond 270 the total number of Pack inmates with disabilities or serious health conditions. Indeed, as this Court observed in a 2017 preliminary injunction order involving the Pack Unit, a large number of Pack inmates face significant health issues including diabetes, coronary artery disease, and other ailments. *See Cole v. Collier*, No. 4:14-cv-1698, 2017 WL 3049540, at *4 (S.D. Tex. July 19, 2017).

[6] During the course of this litigation, Plaintiffs asked Defendants to also identify Pack inmates who had other serious health conditions, including uncontrolled hypertension, chronic lung disease, immune deficiencies, and

During recent depositions and at trial, various inmates have confirmed that they indeed suffer from these serious health conditions and disabilities.[7] These serious health conditions and disabilities substantially impair the affected inmates' resilience to Covid-19 and decrease the likelihood that they would survive the disease without resulting permanent injuries.[8] Indeed, people with these disabilities are at serious risk of developing severe complications from Covid-19 compared to non-disabled inmates, and they thus require additional protection to guard against contracting the disease.[9] Despite the prevalence of Pack inmates who are afflicted with these serious conditions, Defendants have done nothing to protect this unique and particularly vulnerable population from contracting Covid-19.[10]

---

liver disease—but Defendants refused, incorrectly claiming that the requested information is somehow "vague, ambiguous, and overbroad." *See* **Ex. H**, Defs.' 3d Suppl. Resp. to Interrog. No. 5.

[7] *See*, *e.g.*, **Ex. I**, A. Smith Dep. Tr. 8:2–7; **Ex. J**, Pennington Dep. Tr. 13:22–14:4; **Ex. K**, Butaud Dep. Tr. 11:6–10; **Ex. L**, Beal Dep. Tr. 10:7–11:8; *see also* **Ex. A**, Trial Tr. Vol. 1, 148:20–149:150–3.

[8] *See* Decl. of Dr. Jeremy Young, M.D., ECF No. 94-94; Decl. of Dr. Robert Cohen, M.D., ECF No. 94-95; Decl. Dr. Joseph Gathe, M.D., ECF No. 94-97; *see also* excerpts from Apr. 16, 2020 Hr'g Tr. ECF No. 94-92; World Health Organization, Rpt. of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), at 12 (Feb. 28, 2020) ECF No. 94-22 (finding fatality rates for patients with COVID-19 and comorbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); Weijie Guan *et al.*, Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis, medRxiv, (Feb. 27, 2020) at 5, ECF No. Doc. 94-23 (finding that even after adjusting for age and smoking status, patients with COVID-19 and comorbidities of chronic obstructive pulmonary disease, diabetes, hypertension, and malignancy were 1.79 times more likely to be admitted to an ICU, require invasive ventilation, or die, the number for two comorbidities was 2.59); Fei Zhou *et al.*, Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study, *The Lancet* (March 11, 2020), tb. 1, ECF No. 94-27, (finding that among hospital patients, who tended to be older, of those who had COVID-19 and died, 48% had hypertension, 31% had diabetes, and 24% had coronary heart disease).

[9] *See generally* Young Decl. ¶ 5, 19–21, ECF No. 94-94.

[10] *See*, *e.g.*, **Ex. M**, Herrera Dep. Tr. 108:4–14; **Ex. E**, Trial Tr. Vol. 6, 75:4–15 (testimony from Secretary Vail, noting that in his expert opinion, "Texas has not done what they need to do to respond to the risk of the virus within this vulnerable population.")

### B.   TDCJ Discriminates Against the Mobility Impaired

The Pack Unit is a single-level facility with several dormitories designed for inmates with wheelchairs or other mobility-assistance devices. Plaintiff Valentine is among the many inmates at Pack who requires the use of a walker to ambulate. **Ex. N**, Valentine Dep. Tr. 36:16–37:20.[11] At least 40—and perhaps many more—Pack inmates require wheelchairs.[12] With the arrival of Covid-19 at the Unit, these inmates face obvious heightened vulnerability compared to those able to ambulate without a mobility-assist device.

Unlike other ambulatory inmates, inmates confined to wheelchairs or who must use walkers cannot move around easily to wash their hands frequently, and certainly cannot ambulate to a sink without touching their mobility-assist device while moving to and from a washing station. Inmates in wheelchairs must constantly touch the chair's wheels or its push-rings to move around, and yet those wheels and rings quickly become coated in the same dust, dirt, and pathogens present on the ground.[13]

As a result, the mobility-impaired inmates are far *more* likely to come into contact with surfaces and objects contaminated with the virus, even though they are far *less* likely to be able to properly clean and disinfect their hands to prevent infecting themselves and others.[14] These

---

[11] Other Pack Unit inmates use walkers, too. *See*, *e.g.*, **Ex. J**, Pennington Dep. Tr. 13:22–24.

[12] *See*, *e.g.*, **Ex. F**, Trial Tr. Vol. 6, 246:4–8 (testimony from the Pack Unit's Major Sullivan, noting that he is aware that there are at least 40 inmates—and perhaps more—who are in wheelchairs). The record also reflects that the current occupancy of the original wheelchair-accessible dormitories at Pack—i.e., dorms A-2 and A-4—is 50. *See generally* **Ex. O**, Pack Unit Roster (May 26, 2020) (identifying inmates assigned to A-2 and A-4 dorms). Inmates also have recently testified in deposition and at trial that they are confined to, or must use, wheelchairs. *See* **Ex. P**, Michael Smith Dep. Tr. 9:16–24; **Ex. Q**, Dove Dep. Tr. 8:25–9:4; **Ex. R**, Jones Dep. Tr. 59:10–60:13.

[13] **Ex. D**, Trial Tr. Vol. 4, 233:19–234:18; *see also*, *e.g.*, **Ex. B**, Trial Tr. Vol. 2, 94:10–96:16; **Ex. R**, Jones Dep. Tr. 59:10–60:13.

[14] **Ex. D**, Trial Tr. Vol. 4, 233:19–234:18; **Ex. E**, Trial Tr. Vol. 6, 87:12–88:18 (Plaintiffs' expert, Secretary Vail, noted that "I think it's very clear from the trial testimony and the depositions -- the trial testimony and the

inmates need greater protections from Covid-19 than the average inmate who isn't disabled does. Even TDCJ's written, aspirational plan—which Plaintiffs will show Defendants fall short of—makes no accommodation for this category of Pack inmates. Specifically:

1.     Defendants have no schedule of cleaning surfaces, including the floors, faucets, and other objects that the mobility impaired cannot avoid touching;

2.     Defendants have not adequately increased the supply of cleaning fluids and tools for inmates who are responsible for sanitizing dormitories, including dormitories housing those with mobility impairments who cannot wash their hands without then immediately touching a common surface or another potentially contaminated object (for example, their wheelchairs);

3.     Defendants continue to deny inmates access to personal cleaning supplies, making it impossible to thoroughly clean and disinfect their cubicle areas and their mobility-assist devices;

4.     Defendants have otherwise failed to clean common surfaces to which they expose those who are mobility impaired; and

5.     Defendants have not provided hand sanitizer to allow inmates to clean their hands, including for those using wheelchairs and walkers and who have no other way to keep their hands disinfected after they wash them.

## II.    Issue Presented

Laddy Valentine and Richard King are the named Plaintiffs in this class action case. They seek injunctive and declaratory relief on behalf of themselves and others who are similarly situated. Plaintiffs hereby move this Court to certify the proposed two additional subclasses as fol-

---

depositions that it is difficult, if not impossible, for some of those mobility-impaired people to keep their hands clean").

lows, for a class period from the present until protections against Covid-19 are no longer necessary:

> **The Disability Subclass:** All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who suffer from a disability that substantially limits one or more of their major life activities, are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide protection from exposure to Covid-19 during the class period, and who are at increased risk of serious illness, injury, or death if exposed to Covid-19 due to their disability and any medical treatment necessary to treat their disability.

> *Plaintiffs Valentine and King are similarly situation to the Disability Subclass.*

> **The Mobility-Impaired Subclass:** All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who suffer from a disability that substantially limits one or more of their major life activities, are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide protection from exposure to Covid-19 during the class period, and who require the use of a walker, cane, or wheelchair to ambulate.

> *Plaintiff Valentine is similarly situation to the Mobility-Impaired Subclass.*

## III.   Argument and Authorities[15]

Plaintiffs' proposed subclasses meet all of the applicable requirements for certification under Rule 23.

### A.   The Proposed Subclasses Satisfy Numerosity

The numerosity standard is identical to that addressed in Plaintiffs' original class certification motion. *See* Mot. for Class Cert., ECF No. 98; *see also* Fed. R. Civ. P. 23(a)(1). Here, the proposed Disability Subclass is currently expected to include at least 270 members—and likely

---

[15] The legal standard and legal bases for class certification are discussed at length in Plaintiffs' original class-certification motion, in Plaintiffs' reply brief supporting that motion, and in the Court's order granting certification. For that reason, Plaintiffs will not unnecessarily repeat all of that here. *See* Emerg. Mot. for Class Cert. 21–23, ECF No. 98; Pls.' Reply Br., ECF No. 137; Order Granting Cert., ECF No. 160. Plaintiffs incorporate here by reference their original motion and their reply brief.

many more.[16] All members of the Disability Subclass are subject to the same unnecessary Covid-19 exposure from Defendants' refusal to take steps to adequately protect this uniquely vulnerable group. In addition, mere joinder of all the inmates in this subclass would result in an undeniably inefficient resolution of a single issue, running counter to the judicial economy certification provides.

The Mobility-Impaired Subclass is also numerous, albeit with somewhat fewer members. A Pack Unit roster reflects that at least 50 inmates are wheelchair-bound, as they occupy the original wheelchair-accessible dormitories—i.e., dorms A-2 and A-4. *See generally* **Ex. O**, Pack Unit Roster (May 26, 2020) (identifying inmates assigned to A-2 and A-4 dorms). And Major Sullivan just testified that he is aware that 40 or more Pack inmates are confined to wheelchairs. **Ex. F**, Trial Tr. Vol. 6, 246:4–8. Plaintiffs estimate that many more Pack Unit inmates use walkers, canes, or other mobility-assist devices. *See*, *e.g.*, **Ex. N**, Valentine Dep. Tr. 36:16–37:20. This easily satisfies the numerosity requirement. *See generally Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing with approval authority suggesting that classes of more than forty members should raise a presumption that joinder is impracticable).

Both proposed subclasses will also have unknown future members, once the prison lifts the precautionary lockdown and new prisoners are housed at Pack. *See* Order 20, ECF No. 160. Accordingly, the proposed Disability subclass and Mobility-Impaired subclasses easily meet Rule 23's numerosity requirement. *See* Fed. R. Civ. P. 23(a)(1).

### B.    The Proposed Subclasses Satisfy Commonality

The proposed subclasses meet Rule 23(a)(2)'s commonality requirement. The standard for commonality here is the same as discussed in Plaintiffs' original certification motion. *See*

---

[16] *See*, *e.g.*, *Cole v. Collier*, No. 4:14-cv-1698, 2017 WL 3049540, at *4 (S.D. Tex. July 19, 2017); *see also* f.n. 5, *supra*.

Mot. 25–33, ECF No. 98; *see also* Order 20–24, ECF No. 160. Both of these proposed subclasses present new common questions relating the Americans with Disabilities Act and Rehabilitation Act claims that Plaintiffs have alleged.

A claim under the ADA and Rehabilitation Act requires that a plaintiff prove (1) that he is a qualified individual within the meaning of the act; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).[17]

When a person has a qualifying disability, the ADA and Rehabilitation Act require public entities to provide a "reasonable accommodation" to assist the person in accessing public programs and services. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004). TDCJ's failure to accommodate a prisoner is "discrimination" under both statutes.[18] This Court held in *McCoy v. Texas Department of Criminal Justice* that, in the prison context, a "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners. No. 5-cv-370,

---

[17] "The close relationship between Section 504 of the Rehabilitation Act and Title II of the ADA means that precedents interpreting either law generally apply to both." *Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020); *see also Bennett-Nelson v. La. Board of Regents*, 431 F.3d 448, 455 (5th Cir. 2005). The Rehabilitation Act adds only the requirement that the entity also receive federal funding. *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973 shall be the remedies, procedures and rights this title provides to any person alleging discrimination on the basis of disability in violation of [Title II of the ADA]"); 29 U.S.C. § 794(a) (2006).

[18] To succeed on a failure-to-accommodate claim, a plaintiff ultimately must prove: "(1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Smith*, 956 F.3d at 317 (internal quotation marks and citation omitted).

2006 WL 2331055, *7 (S.D. Tex. Aug. 9, 2006) (Jack, J.); *see also U.S. v. Georgia*, 546 U.S. 151 (2006); *Martone v. Livingston*, No. 4:13-cv-3369, 2014 WL 3534696, *16 (S.D. Tex. July 16, 2014) (Ellison, J.). Thus, the ADA and Rehabilitation Act both protect inmates with disabilities, like the Plaintiffs here.

In fact, the Fifth Circuit has expressly found that the commonality requirement was satisfied in certifying classes of prisoners asserting ADA and Rehabilitation Act claims. *See Yates v. Collier*, 868 F.3d 354, 366 (5th Cir. 2017) (common questions included failure to accommodate disabilities that affect ability to withstand extreme heat). The Fifth Circuit's decision is hardly exceptional: Other courts have found Rule 23(a) commonality is satisfied in class action cases where ADA and Rehabilitation Act reasonable-accommodation claims are at play. *See*, *e.g.*, *Dodson v. CoreCivic*, No. 3:17-cv-48, 2018 WL 4776081, at *3–4 (M.D. Tenn. Oct. 3, 2018) (disabled inmates who claimed prison failed to accommodate their disabilities satisfied commonality); *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 158 (N.D. Ca. 2015) (common questions included failure to accommodate disabilities); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 456 (E.D.N.C. 2011) (same); *Clarke v. Lane*, 267 F.R.D. 180, 196 (E.D. Pa. 2010) (same); *see also Postawko v. Mo. Dep't of Corr.* 910 F.3d 1030, 1038 & n.4 (8th Cir. 2018) (commonality satisfied as to ADA claim in case involving inmates with Hepatitis C who sought to implement a screening procedure to reduce future transmission). As the court noted in *Bumgarner*: "In a lawsuit wherein individuals with varying disabilities challenge policies and practices that affect all of the putative class members, factual differences regarding their disabilities does not defeat commonality." 276 F.R.D. at 456.

In *Yates*, the Fifth Circuit affirmed class certification for a subclass asserting ADA and Rehabilitation Act claims in the prison context. 868 F.3d at 366. The court found that in addition

to sharing the same common question identified for the general class, the disability subclass had the "additional common contention that TDCJ officials failed to provide reasonable accommodations to inmates suffering from disabilities that may impact their ability to withstand extreme heat." *Id.* Differences in underlying medical conditions and disabilities did not defeat commonality or class certification. *Id.*

The proposed Disability and Mobility-Impaired Subclasses present at least these common questions:

1. Are the members of the Disability Subclass (a) persons with a diagnosis of a disability that substantially limits one or more of their major life activities; and (b) either a person with a disability that increases the risk of illness, injury, or death, or a person who receives any medical treatment necessary to treat their disability, which thereby increases the risk of illness, injury, or death?

2. Does TDCJ provide reasonable accommodations to prisoners from whom it withholds Covid-19 protections whose disabilities or treatment for their disabilities increase their risk of serious injury or death?

3. Do the ADA and Rehabilitation Act require TDCJ to make reasonable accommodations to allow members of the Mobility-Impaired Subclass to effectively clean and sanitize their hands the way ambulatory inmates can?

4. Did TDCJ fail to provide reasonable accommodations to members of the subclasses by not allowing them to clean and disinfect their hands in their cubicles, including before they eat or go to sleep?

5. Did TDCJ deny members of the subclasses access to the prison's services, programs, or activities (including, for example, hygiene services and medical care) by failing to provide them with an effective way to clean and disinfect their hands?

6. Did TDCJ fail to provide members of the subclasses with reasonable accommodations, including increased protections from contracting Covid-19 beyond whatever measures it is purportedly taking with respect to the prison system as a whole, in light of the serious risk of harm that Covid-19 poses particularly and uniquely to the members of the proposed subclasses?

These are just some of the several common questions of law and fact that will apply to the proposed Disability and Mobility-Impaired Subclasses. Rule 23(a) commonality is therefore easily satisfied.

### C.  The Proposed Subclasses Satisfy Typicality

As explained in the original class certification motion (ECF No. 98), the test for typicality is "not demanding" and "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186 F.3d at 625 (quotation omitted). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011). The typicality inquiry focuses on "whether the plaintiffs and each member of the class have an interest in prevailing on similar legal claims." *Bumgarner*, 276 F.R.D. at 457. Here, because the claims across all proposed subclass members share commonality, named Plaintiffs' claims are also typical of those within the proposed subclasses.

Plaintiff King's claims are typical of those in the proposed Disability Subclass. He suffers from diabetes with diabetic neuropathy, and is 73 years old.[19] King's age and diabetes substantially impair the operation of major bodily functions, including metabolism, and, according to the CDC, those conditions place him at heightened risk of serious injury or death if he contracts Covid-19. *See* King Decl. ¶¶ 4–8, ECF No. 32.

Plaintiff Valentine is typical of both proposed subclasses. He suffers from significant hypertension, a serious heart condition that has previously contributed to a stroke, and is 69 years old.[20] According to the CDC, Valentine's serious heart condition and age likewise place him at

---

[19] **Ex. B**, Trial Tr. Vol. 2, 8:23–24; 10:6–22.

[20] **Ex. A**, Trial Tr. Vol. 1, 148:13–15; 148:20–150:17.

heightened risk of serious injury or death if he contracts COVID-19.[21] Valentine's claims are also typical of the Mobility-Impaired subclass because he requires a walker to ambulate.[22]

Like the members of the proposed subclasses, King and Valentine are both disabled under the ADA and the Rehabilitation Act. *See*, *e.g.*, *Cole v. Livingston*, No. 4:14-cv-1698, 2016 WL 3258345, *8 (S.D. Tex. June 14, 2016) *aff'd sub nom. Yates*, 868 F.3d 354; *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 187 (3d Cir. 2010) (collecting cases in Seventh, Eighth, and Eleventh Circuits and holding that medication's side effect can be a "physical impairment," and can therefore create a disability, if the medication is "required in the 'prudent judgment of the medical profession'"); *Luedecke v. Tenet Healthcare Corp.*, No. 3:14-cv-1582, 2015 WL 3867793, at *4 (N.D. Tex. June 23, 2015) (holding that disability was pleaded for chronic pain caused by variety of disorders because pain restricted mobility, flexibility, thinking, sleeping, and other activities); *Martin v. St. Luke's Episcopal Hosp.*, No. 13-cv-0718, 2014 WL 4810303, at *7 (S.D. Tex. Sept. 23, 2014) (denying summary judgment because plaintiff had shown a dispute of fact as to whether her high blood pressure was a disability).[23]

Like all other members of the proposed subclasses, King and Valentine have been denied adequate protection from Covid-19 contrary to the CDC's guidance. *See* Young Decl. ¶ 22, ECF No. 94-95. As class representatives, King's and Valentine's claims are thus typical of the proposed subclasses' claims in that they allege TDCJ failed to reasonably accommodate their disabilities. Their claims—like those of the members of the proposed subclasses—all "arise from

---

[21] *See* Centers for Disease Control & Prevention, "Coronavirus Disease 2019 (COVID-19): People who are at higher risk of severe illness" (April 15, 2020), ECF No. 94-3; *see also* Young Decl. ¶¶ 17, 19, ECF No. 94-95 (noting that serious illness and death from COVID-19 is most common among the elderly and those with underlying health conditions).

[22] **Ex. A**, Trial Tr. Vol. 1, 150:4–17.

[23] *See also* 28 C.F.R. § 36.104(iii) (physical or mental impairment includes, among other things, cancer, heart disease, diabetes, emotional illness, tuberculosis, drug addiction, and alcoholism).

the same operative facts in that they all suffer the same injury as a result of [the prison's] policies and procedures ...." *Bumgarner*, 276 F.R.D. at 457. Plaintiffs have therefore satisfied the typicality requirement as to the proposed subclasses.[24]

**D.     The Proposed Subclasses Satisfy the Adequacy Requirement**

The adequacy analysis is the same as that which was discussed in Plaintiffs' original class-certification motion and applies here with equal force. *See* Mot. for Class Cert. 36–41, ECF No. 98. Plaintiffs easily fulfil this requirement for the two new proposed subclasses.

**E.     The Proposed Subclasses Meet Rule 23(b)(2)'s Requirements**

The analysis under Rule 23(b)(2) is likewise the same as that which was discussed in the original motion. *See* Mot. 41–42, ECF No. 98. On top of the policies, practices, and conditions that may be relevant to the general class and the high-risk subclass already certified by the Court, the Mobility-Impaired and Disability Subclasses may need additional relief that is uniquely important to their disabilities. That relief, however, will still be only to modify whatever ineffective precautions Defendants have purportedly implemented, or failed to implement as to "the class as a whole." Fed. R. Civ. P. 23(b)(2). Thus, Plaintiffs' proposed subclasses meet the requirements of Rule 23(b)(2).

**F.     The Court Should Appoint the Same Class Counsel Under Rule 23(g)**

The Court has already found that "counsel for the named Plaintiffs fulfill the requirements of Rule 23(g)." Order Granting Cert. 31, ECF No. 160. Having found that Plaintiffs' counsel meets Rule 23(g)'s requirements as to the already certified class and subclass, the Court should

---

[24] Courts regularly find typicality satisfied where classes of prisoners bring ADA and Rehabilitation Act claims. *See*, *e.g.*, *Cole*, 2016 WL 3258345, at *8; *Hernandez*, 305 F.R.D. at 158; *Bumgarner*, 276 F.R.D. at 457. Other district courts dealing with ADA or Rehabilitation Act claims from prisoners in the Covid-19 context have similarly found typicality satisfied. *See*, *e.g.*, *Ahlman v. Barnes*, 2020 WL 2754938, at *8 (C.D. Cal. May 26, 2020).

likewise appoint Plaintiffs' current attorneys as class counsel for the Disability Subclass and the Mobility-Impaired Subclass as well.

## IV.    Conclusion

Plaintiffs ask that the Court modify its original certification order and certify two additional subclasses in this case: the Disability Subclass and the Mobility-Impaired Subclass, as defined above.

Dated:  July 21, 2020

**WINSTON & STRAWN LLP**


By:   _/s/ John R. Keville_
     John R. Keville

**THE EDWARDS LAW FIRM**
     _Attorney-in-Charge_
     Texas Bar No. 00794085

Jeff Edwards
     S.D. Tex. ID No. 20922
Texas Bar No. 24014406
     jkeville@winston.com
jeff@edwards-law.com
     Denise Scofield
Scott Medlock
     Texas Bar No. 00784934
Texas Bar No. 24044783
     S.D. Tex. ID No. 1529 dsco-
scott@edwards-law.com
     field@winston.com
Michael Singley
     Michael T. Murphy
Texas Bar No. 00794642
     Texas Bar No. 24051098
mike@edwards-law.com
     S.D. Tex. ID No. 621098
David James
     mtmurphy@winston.com
Texas Bar No. 24092572
     Brandon W. Duke
S.D. Tex. ID No. 2496580
     Texas Bar No. 240994476
david@edwards-law.com
     S.D. Tex. ID No. 2857734
The Haehnel Building
     bduke@winston.com
1101 East 11th Street
     Benjamin D. Williams
Austin, Texas 78702
     Texas Bar No. 24072517
Tel. (512) 623-7727
     S.D. Tex. ID No. 1447500
Fax (512) 623-7729
     bwilliams@winston.com
     Robert L. Green
     Texas Bar No. 24087625
     S.D. Tex. ID No. 2535614
     rlgreen@winston.com
     Corinne Stone Hockman
     Texas Bar No. 24102541
     S.D. Tex. ID No. 3019917
     chockman@winston.com
     800 Capital Street, Suite 2400
     Houston, Texas 77002
     Tel. (713) 651-2600
     Fax (713) 651-2700

**_Counsel for Plaintiffs_**

## CERTIFICATE OF CONFERENCE

I certify that the evening of July 20, 2020, I emailed Defendants' counsel regarding whether Defendants would agree to, or oppose, Plaintiffs' request to certify two additional sub-classes. Counsel did not respond to that email before Plaintiffs filed this emergency motion.

*/s/ Benjamin D. Williams*
Benjamin D. Williams

## CERTIFICATE OF SERVICE

I certify that on July 21, 2020, a copy of this emergency supplemental motion, along with the accompanying exhibits and attachments, were served upon all counsel of record through the Court's CM/ECF filing system.

*/s/ Benjamin D. Williams*
Benjamin D. Williams