UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LADDY CURTIS VALENTINE and RICHARD ELVIN KING, individually and on behalf of those similarly situated,<br><br>　　　　Plaintiffs,<br>v.<br><br>BRYAN COLLIER, in his official capacity, ROBERT HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE,<br><br>　　　　Defendants. | Case No. 4:20-cv-01115<br><br>Hon. Keith P. Ellison |

**Plaintiffs' Motion for Sanctions**

This Court has heard testimony and argument this week about the pictures produced from Assistant Warden Wilder's phone. It is now indisputable that much of it was false; some of it appears to be perjury. At least five false representations were made to this Court, including that:

1. Warden Wilder had only one photo, of the laundry;
2. there were two separate and different photos of the hot dog incident, and the one used in trial on July 16th was not the same photo later produced from Warden Wilder's phone;
3. Defendants were not aware of the photos from Warden Wilder's phone until around July 23, and instead received the photo from Warden Herrera;
4. the photo produced on July 23 was first discovered as rebuttal to an inmate's testimony; and
5. Warden Herrera was standing next to Warden Wilder and they took almost identical photos from the same location (the apparent perjury).

Now, after the two native images were ordered produced, forensic analysis shows there is only one photo from one phone, but one image was renamed sometime before production.

Plaintiffs request that Defendants be sanctioned for their misconduct. Fitting sanctions could include (1) striking or giving no weight to the trial testimony elicited by Defendants' counsel

1

of TDCJ witnesses Paul Wilder (direct testimony) and Warden Herrera ("cross" after being called adversely), both of whom are at the center of the misrepresentations and at least one of whom lied under oath, (2) awarding attorney's fees and costs associated with addressing these fabrications, (3) reprimanding the counsel who made reckless or knowingly false representations rather than admit they were withholding photos, and (4) ordering the production of forensic images of the devices sought in Plaintiffs' Motion to Compel (ECF No. 268) at Defendants' expense.

I.   **Factual Background**

On **Thursday, July 16, 2020**, Defendants introduced during trial a photo of what has been called "the hot dog incident" in the Pack Unit's Dorm B and represented "this is something that we recently provided." Trial Tr. at 4-15:14–17. Plaintiffs noted they were not certain the document had been produced but, recognizing it was a picture of the Pack Unit, did not object. *Id.* at 4-15:14–24. As it turned out, the document had not been produced, but was produced later that morning after Plaintiffs' counsel requested it (*see* Ex. 1) and after it was shown to a witness.



Warden Herrera testified that the picture (DTX 39, shown at left) shows the johnny [lunch] sacks on the floor of the B Wing Dorms and shows his staff trying to maintain order. *Id.* at 4-16:2–7. He explained that he passed through this Dorm before the incident, came back from the E Dorm, reentered *from the door shown in the distant end of this picture*, and "*when I come back through, this is what I encountered.*" *Id.* at 4-16:11–20. In Warden Herrera's own words, he came through the far end, opposite the point where this photo taken, and saw

2

this scene. He was asked "what action did you take when you entered into this hallway through the door at the end of the picture," and he explained he went into the Dorm with one of his sergeants. *Id.* at 4-16:2–17:14. He confirmed some staff, including Warden Wilder, remained in the hallway—as the picture shows. *Id.* at 4-20:6–10. He explained that the situation immediately deescalated when he went into the Dorm. *Id.* at 4-22:2–6.

On **Friday July 24, 2020**, at 9:41 a.m. during trial, Defendants sent an email stating only "Good morning, Attached are Defendants' Exhibits 53 and 54." Ex. 2. Less than six hours later, during the same trial day, a picture of the laundry room marked DTX 54 was shown to Assistant Warden Wilder, prompting the question "has this been previously produced?" and the answer "I believe it was produced last night. I'm not certain." Trial Tr. at 10-231:21–232:1. Defendants' counsel represented "[t]his is a document that was discovered upon conversation with Mr. Wilder" during witness preparation, prompting the Court to ask "[a]re there any other documents?" which was answered "No, Your Honor." *Id.* at 10-232:23–24. The Court asked counsel directly "So he had one photograph and that's all?" and received a very direct answer, "Yes, Your Honor." *Id.* at 10-233:2–3.

Finding that strange, the Court asked Mr. Wilder "do you have other photos of the Pack Unit?" and Mr. Wilder answered "I do, yes, Judge"—contrary to counsel's representation. *Id.* at 10-233:14–16. He explained he had photos from "all over the facility" that may have been taken "in reference to this court case" or of construction, or just things he needed to document. *Id.* at 10-233:17–234:1. He admitted the photos were all on a state-issued phone. *Id.* at 10-234:2–7.

Mr. Wilder was asked if the photos were taken at Warden Herrera's or attorneys' direction, prompting a privilege objection. *Id.* at 10-235:2–9. The Court asked "[b]ut these are photographs taken before he was your client, wasn't it?" *Id.* at 10-235:25–236:2. Defendants' counsel, who

3

just moments before had represented there were no additional photos, stated "No, Your Honor. That is not correct"—somehow suddenly knowing the date and origin of the one photo that he had purportedly discovered only recently and the others he was allegedly unaware of.[1]  *Id.*

During Defendants' counsel's continued argument, he represented that "we were under no obligation to disclose this picture at which point I did not learn of this picture until conversation with Mr. Wilder -- I believe it was yesterday. It may have been the day before" and that the photos could not have been required to be disclosed or produced under Rule 26 because "[h]onestly, Your Honor, if I don't learn of this document until yesterday, how could I disclose it under a Rule 26 disclosure." *Id.* at 10-237:20–238:2, 10-239:15–20.  After asking for and receiving the weekend to brief the issue, counsel stated "this is the only photograph that we found and that we have seen. This is the only photograph that we intended to use. This was -- because this goes directly to rebuttal to show that sinks are available in the laundry exchange area." *Id.* at 10-247:6–13.

At this point, a second attorney for Defendants joined the argument, and represented "[t]his one photo, we've obtained as Mr. Bramow said in a rebuttal effort. One of the offenders testified that there were no sinks where they could wash their hands with soap and water in the laundry room facility area."[2]  *Id.* at 10-253:1–4.  He reiterated "in this case, an offender has testified that there are no sinks in the laundry room facility." *Id.* at 10-253:22–24.  He claimed the photo "was discovered two days ago." *Id.* at 10-253:25–254:1.  He repeated that the photo was only at issue

---

[1]   If the photos were taken on his own or at the direction of Warden Herrera, they are not privileged or work product, but even if taken at the direction of counsel they would be subject to production.  As another court in this district has noted "even pictures that are taken for the specific purposes of litigation may be discoverable, if the other party is unable to re-create the substance of the images." *Leamon v. KBR, Inc.*, No. H-10-253, 2012 WL 13156802, at *2 (S.D. Tex. June 28, 2012). Here, Plaintiffs' counsel have had no access to the Pack Unit during the entirety of this litigation. Further, if the photos were taken at Defendants' counsel's suggestion, then the representation to the Court that the photographs were "discovered upon conversation with Mr. Wilder" the day before, was false.

[2]   As explained below, no inmate testified to anything close to this.  When that was pointed out in briefing, the story changed to an expert said this, with no acknowledgement of the change. As shown by the testimony of the expert (Mr. Vail) reproduced below, this new story was also false.

4

because an inmate testified during trial "that there are no sinks in the laundry room facilities." *Id.* at 10-254:14–17. The Court asked for and received counsel's word nothing would be done to the phone. *Id.* at 10-255:14–17.

On **Monday, July 27, 2020**, contemporaneous with submitting their brief regarding their opposition to producing the phones and photos, Defendants filed and served the photos from Warden Wilder's phone under seal. ECF. No. 262. Unlike the high-resolution photos used during the examinations of Herrera and Wilder, most of the photos were produced as low quality and reduced-size versions, but one was recognizable as DTX 39, the photo Warden Herrera had testified about. Ex. 3. In their brief, the story about what triggered the Wilder photo changed to "Defendants were not planning to use any photos from Wilder – which they did not know about – until after Plaintiffs' expert, Eldon Vail, represented to the Court during trial that there are no sinks located by the laundry room." ECF. No. 264 at 2–3. Defendants have never cited any testimony of any inmate witness or of Mr. Vail that supports either story, and Mr. Vail's testimony was clear and cannot possibly be read as saying there were no sinks in the laundry:

> Q. And as we sit here today, the only place that you've identified that you believe the workers do not have adequate access to soap and water is laundry, correct?
>
> A. I am not talking about workers for the laundry. I'm talking about that counter where you exchange your old clothes for the clean clothes. That's what I'm talking about, and so that's not related to workers. That's related to the folks who have to go to laundry exchange.

Trial Tr. at 6-197:13–20. Two separate times, Defendants created false reasons as backfill to justify their conduct. Defendants' brief also contended they had "no intention to use any content from the phones of Collier, Mendoza, Herrera, or Davis" and therefore would not disclose photos or texts from those devices. ECF No. 264 at 4.

5

On **Tuesday July 28, 2020**, Plaintiffs pointed out to the Court that a photo that appeared to be DTX 39 was in the group of photos on Mr. Wilder's phone. Trial Tr., at 11-4:17–5:1. In response, just one day after representing in a brief that Defendants had no intention of using any photos from Warden Herrera's phone, Mr. Cowles directly contradicted this, telling the Court "[w]e received the photo that has been marked into evidence from Warden Robert Herrera, your Honor. And we received that from Warden Herrera under the understanding that Warden Herrera took that photo which I still believe is the case." *Id.* at 11-11:23–12:2. Mr. Cowles also explained that the hot dog incident photo was "only provided to OAG ***during the course*** of one of the offender's testimony about this incident." *Id.* at 11-13:11–19 (emphasis added). This was flatly untrue. Mr. Molina had previously represented to the Court that "we've got pictures that demonstrate how many Johnny sacks were thrown out at the officers," which they had *before* Mr. Butaud[3] testified about the hot-dog incident, and which, in support of his relevance objection, offered "[w]e'd be happy to show you the pictures." Trial Tr. at 2-216:6–217:13, 2-219:24.

Regarding DTX 39 and the later-produced photo from Mr. Wilder, Mr. Cowles went on to say "[t]hese two photos, they're, obviously, depicting the same event to me; but they appear to be different, the shading and the shadows and the lighting, especially, as you can see on the right-hand side," and said "if the two people took the photo, then our -- what happened is perfectly consistent." *Id.* at 11-12:3–6, 11-12:19–20. He stated "[t]here was nothing that myself, any of the OAG attorneys knew about Paul Wilder's photos until exactly when we told the Court," i.e., reiterating no knowledge of Wilder's photos until a week after using the hot dog incident photo,

---

[3] On July 14, 2020, Mr. Butaud was the first (and only) inmate to testify about the hot dog incident, drawing one of Defendants' counsel's many relevance objections and requests for a breakout room conference during crosses. Trial Tr. at 2-216:6–220:14, 2-226:8227:1. The statements made by Mr. Molina confirm Defendants' counsel had DTX 39 and other photos, likely from Mr. Wilder since Mr. Molina mentions him by name, no later than July 13, 2020.

6

DTX 39. *Id.* at 11-12:13–15. He stated again that Warden Herrera provided DTX 39. *Id.* at 11-13:11–13.

> I know we received this photo of the johnny sacks being thrown at the offenders from Warden Herrera. 100 percent. That's exactly what happened. If Warden Herrera received that from Paul Wilder, I don't know about that. If the two of them both took photos of the same incident, that would make sense to me.

*Id.* at 11-15:3–8. Defendants represented 100% they used a photo from Warden Herrera, right after representing they had no intent to use Herrera's photos, and stated "[t]here was no disclosure obligation because the Defendants weren't intending to use any of these photos to support its claims or defenses." *Id.* at 11-17:11–13. Defendants' stories were making less and less sense, but counsel followed this blatant contradiction and demonstrably proven false story with "I would not lead the Court down a road that is untrue or is misleading." *Id.* at 11-17:18–19. Defendants attempted to lay the blame on Plaintiffs and the time to trial, but the Court noted the urgency and that "these telephones do not seem to me to be something that the Defendants did not reasonably be expected to have looked at. They seem to be pretty critical." *Id.* at 11-37:19–38:15.

Testimony then resumed with Mr. Wilder. He confirmed that he had taken the photo of "the johnnies on the floor." *Id.* at 11-107:21–108:6. When asked whether it would be inaccurate to state someone else took the photo, counsel objected as "Vague. Which photograph are we talking about here?" and then after being overruled added another even more explicit non-objection warning to the witness "Your Honor, they put up two photographs at the start of today's proceedings that we believe are two separate photographs, and he hasn't identified which one he's speaking about here." *Id.* at 11-107:19–109:4. Many of the photos from Mr. Wilder's camera were admitted as relevant to whether TDCJ employees at the Pack Unit followed TDCJ's policy 14.52.

7

On **Wednesday July 29, 2020**, Defendants' counsel led Mr. Wilder through blatantly false testimony.  Although it is unclear with whom it originated, it was clearly intended to preserve the false stories previously told.

> **Q** Were you the only one who took pictures of the hot dog incident or the johnny sack incident?
>
> **A** No, sir, I was not. I was standing right next to Warden Herrera. As a matter of fact, in that particular situation, Warden Herrera was taking a picture; and I decided that it was a good idea for me to have a picture on my phone in case any of the CID leadership or there were questions regarding the incident that I had a picture on my phone for prosperity, as well -- or posterity, as well. So, we were standing literally right next to each other when we took the picture.

Trial Tr., at 12-37:10–20.  First, this is impossible based on Warden Herrera's under oath description of the event and his positions through it.  Second, this led to an Order to produce the two photos as native images, and that proved there was only one photo taken—as discussed in the paragraphs below.  But in re-cross, Mr. Wilder dug the hole deeper, stating he saw Warden Herrera take a photo at the exact same location.  *Id.* at 12-42:24–43:9.  Cross examined with a summary of Warden Herrera's testimony about being in the Dorm when Mr. Wilder was in the hallway, he said "that's accurate testimony because at one point of that situation I was in the hallway and he was in the housing area." *Id.* at 12-43:10–19.  Contrariwise, Warden Herrera testified when he saw the scene represented in the picture *he was at the other end of the hall*—and when he exited the Dorm the incident was already de-escalated.  These conflicts cannot be reconciled.  One or both witnesses testified falsely.

Finally, Mr. Wilder testified unequivocally that he did not send the photo he took to Warden Herrera. *Id.* at 12-43:21–23.

Before passing the witness, Plaintiffs asked the Court to Order "that we could get native copies of the photo from Mr. Wilder's phone *and* from Mr. Herrera's phone" immediately.  *Id.* at

12-48:7–13 (emphasis added). The Court thought this was a request for all photos from all five phones, but Plaintiffs clarified "this request is just for two photos from two phones. It should take all of two minutes. And we would respectfully, given the testimony from Warden Wilder, ask that -- ask that they be produced right away." *Id.* at 12-48:20–23. With that, it was agreed the two photos would be produced. *Id.* at 12-49:2–6. Two photos, with slightly different names allegedly from the two phones, were produced at 9:06 p.m. Ex. 4.

On **Thursday, July 30, 2020**, a forensic examination of the two photos proved indisputably what was visible all along—there is only one photo, taken on one iPhone 7. *See* Ex. 5, Declaration of Lee Whitfield, a Certified Forensic Examiner. Mr. Whitfield confirms "[a]s both pictures are visually identical, were taken in the same 1000th of a second on the same make and model phone, and the time since the last power on matched in both pictures there is no other conclusion that I can draw other than to say these are the same picture." *Id.* at ¶ 6. One was renamed, giving the impression of two separate photos, and it is currently unknown when and by whom that was done. Mr. Whitfield states that he would require access to at least the iPhone in question to determine who did that and when. *Id.* at ¶ 8.

**II.     Argument**

      **A.     Defendants' Conduct Is Sanctionable**

This Court has the inherent power to manage its docket and "achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962). A key aspect of that authority is "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991); *see also Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) ("A district court has the inherent authority to impose sanctions in order to control the litigation before

it.").[4] Defendants have abused the judicial process by hiding evidence and then making repeated misrepresentations despite multiple opportunities to come clean to Plaintiffs and the Court. Appropriate sanctions are necessary. The use of the Court's inherent power is especially appropriate here because Defendants' repeated misconduct is so egregious and widespread, it is "beyond the reach of the rules." *Sarco Creek Ranch v. Greeson*, 167 F. Supp. 3d 835, 845 (S.D. Tex. 2016).

This dishonest affair began with Defendants introducing a photo of the Pack Unit laundry room from Mr. Wilder's phone that they knew about for at least a week, yet only disclosed to Plaintiffs' the morning of the trial day when Mr. Wilder testified. Trial Tr. at 10-231:21–232:1. Instead of just admitting they had seen and withheld other pictures, Defendants' fabricated an excuse—this one photo was needed to rebut nonexistent testimony about laundry room sinks (*Id.* at 10-253:1–4, 10-253:22–24)—and then changed that story to another false pretext when called out. ECF. No. 264 at 2–3. Even under direct questioning from the Court, Defendants' counsel misrepresented the number of photos on Mr. Wilder's phone, and then the next Monday misrepresented when they had learned of those other photos, claiming to have only learned of Mr. Wilder's photo of the hot dog incident recently despite having used it earlier in trial. *Id.* at 10-232:23–24; *id.* at 11-12:13–15. Backed into a corner, Defendants' counsel still refused to just admit that they knew about the photos earlier in the trial. Instead, they lied again, arguing that DTX 39 and the photos from Mr. Wilder's phone were *different* photos of the same event, and identifying supposed (but nonexistent) differences in the photos. *Id.* at 11-12:3–6, 11-12:19–20. Defendants then put Mr. Wilder back on the stand to back up their claim, allowing or directing

---

[4] Appellate review of sanctions is necessarily narrow because "the imposition of sanctions is often a fact-intensive inquiry, for which the trial court is given wide discretion." *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001).

him to testify that Warden Herrera had taken a nearly identical photo at the same instant, despite that being impossible based on Warden Herrera's previous testimony. *Id.* at 12-37:10–20.

This conduct—misrepresenting facts to the Court and going along with or suborning perjury to cover it up—is sanctionable and courts rightly refuse to tolerate it. *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (affirming the district court's imposition of attorney's fees under its inherent power when plaintiff litigated in bad faith and produced fraudulent testimony to the court); *Greeson*, 167 F. Supp. 3d at 850 (imposing sanctions for failing to disclose evidence, fabricating evidence, and lying to the court); *Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215, at *7 (S.D. Tex. Aug. 25, 2014) (imposing death penalty sanction under the court's inherent power after a lawyer lied to the court because "such an affront . . . can only be answered with dismissal"); *Shangold v. Walt Disney Co.*, No. 03-civ-9522(WHP), 2006 WL 71672, at *5–6 (S.D.N.Y. Jan. 12, 2006) (imposing death penalty sanctions and awarding attorney's fees under the court's inherent power where plaintiffs fabricated evidence and then sought to conceal it). As this Court noted, "[j]ust as with witnesses testifying truthfully under oath, the proper administration of justice depends upon counsel being completely forthright with the Court." *Tesco Corp. v. Weatherford Intern., Inc.*, CIV.A. H-08-2531, 2014 WL 4244215, at *7 (S.D. Tex. Aug. 25, 2014). Because "not every lawyer who lies to a court will be caught, [] when such deliberate and advantage-seeking untruthful conduct is uncovered, the penalty must be severe enough to act as a deterrent. *Id.*

**B.     Suggested Appropriate Sanctions**

As sanctions are clearly warranted, the question for the Court is what sanction is tailored to "foster the appropriate purpose of the rule, depending upon the parties, the violation, and the nature of the case." *Thomas v. Capital Sec. Services, Inc.*, 836 F.2d 866, 877 (5th Cir. 1988). The

most severe sanction would be striking Defendants' pleadings for their bad faith conduct. *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 614 (S.D. Tex. 2010) ("As a general rule, in this circuit, the severe sanctions of granting default judgment, striking pleadings, or giving adverse inference instructions may not be imposed unless there is evidence of "'bad faith.'"). While that would be warranted here under Circuit precedent, *see Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 76–80 (5th Cir. 2011) (affirming dismissal for perjury), Plaintiffs propose several more measured sanctions.

Defendants' conduct goes to the fundamental fairness of this case. They hid evidence they knew about, lied about it when caught, and then doubled and tripled down with new lies, appearing to even go along with or suborn perjury from their client Mr. Wilder to back up their story. *See* Section I, *infra*. This was all done to avoid disclosing the existence of TDCJ's state-issued phones and the relevant information on them. Despite this Court ordering production of the photos and text messages from five phones last week, Defendants have dragged their feet, making unsupported claims about the number of text messages (then refusing to state the actual number) as well as the farcical suggestion that they must use search terms because TDCJ employees may have texted credit card information, passwords, social security numbers and other personal information to other employees—a suggestion we know is untrue for at least Mr. Wilder (Trial Tr. at 12-45:5–47:7) and likely untrue for Mr. Mendoza, who Defendants indicated until Friday July 31, 2020 would be called before they rested. Contrary to their representation to this Court, Defendants do not really want the Court to see the "full story" this information would show, and are not in fact "proud" of what is on these devices, given it likely shows their deliberate indifference.[5] Once they were caught hiding presumably bad evidence, Defendants dragged their feet on producing it, made

---

[5] July 1, 2020 Status Conf. Tr. at 17:22–18:3 ("I think that the Court is going to be proud of the work that TDCJ is doing once we're able to tell the full story, but that's what I want the opportunity to do.").

12

false representations to cover up their previous knowledge, and now hope to finish trial with the issue unresolved.

Defendants' conduct, while not identical to spoliating evidence, raises similar concerns. Defendants did not search devices for relevant information that its witnesses possessed and that was responsive to discovery requests (ECF No. 268), then misrepresented when they learned about the information on these devices to excuse their failure. Defendants' misdeeds only came to light near the end of this trial. While the evidence *may* still exist, Defendants have effectively deprived Plaintiffs of having it at trial. One appropriate sanction for this type of conduct is an adverse inference that the material on these state-issued devices was detrimental to Defendants' case because it demonstrated deliberate indifference by Warden Herrera and TDCJ Officers. *See, e.g.*, *Rimkus*, 688 F. Supp. 2d at 645 ("Although a terminating sanction is not appropriate, a lesser sanction of a form of adverse inference instruction is warranted to level the evidentiary playing field and sanction the improper conduct."); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ("Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction."

That would moot Plaintiffs' Motion to Compel (ECF No. 268), and is tailored to the sanctionable conduct at issue—a discovery violation that Defendants chose to escalate by making misrepresentations to a federal judge and through witness perjury rather than cure. Importantly, this would not be "death penalty" sanctions, as the Court would still weigh the credibility of Defendants' witnesses against that adverse inference and Plaintiffs' witnesses.

An alternative appropriate sanction would be striking or giving no weight to the trial testimony elicited by Defendants' counsel of TDCJ witnesses Paul Wilder (direct testimony) and Warden Herrera ("cross" after being called adversely), both of whom are at the center of the misrepresentations and at least one of whom lied under oath. Striking or giving no weight to these two witnesses' affirmative testimony would be tailored to the misconduct, because one or both lied under oath, and because Plaintiffs should have had the benefit of the relevant information on those devices during depositions and cross examination, but did not based on Defendants' actions. If this is found appropriate, the Court could also grant Plaintiffs' Motion to Compel (ECF No. 268) requiring Defendants to immediately produce forensic images of the state-issued devices for Mr. Collier, Mr. Mendoza, Mr. Herrera, Mr. Wilder, and Ms. Davis, which would likely reveal what additional information was withheld, when the photo was renamed to appear as a second photo and by whom (*see* Whitfield Decl. at ¶ 8), and whether additional information was altered or deleted.

Lastly, the Court may consider an award of Plaintiffs' costs and attorney's fees. Here, Plaintiffs incurred attorney's fees arguing about Mr. Wilder's phone at trial, questioning Mr. Wilder, briefing the issue, moving to compel, and hiring a forensic expert to analyze the photos at issue and provide a declaration. Plaintiffs should at least be reimbursed these costs and fees that would not have been needed absent Defendants' misconduct. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1187 (2017) ("The court's fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct. The award is then the sum total of the fees that, except for the misbehavior, would not have accrued.").

### III.     CONCLUSION

Defendants' willingness to lie about the hot dog incident photo, in addition to their delays through refusal to narrow issues, stipulate to facts pre-trial, or pre-admit a single exhibit, and their all-too-frequent speaking objections intended to signal answers to their witnesses, puts into question the credibility of Defendants' entire case. Plaintiffs do not know what other misdeeds may have gone undiscovered. But the record is clear that, in relation to Mr. Wilder's and Warden Herrera's phones, Defendants were willing to make false representations to Plaintiffs and the Court, and even possibly alter evidence and fabricate testimony, to avoid admitting they had withheld it. Plaintiffs bring this motion reluctantly, but the conduct here is too clear and too egregious. Defendants must be sanctioned. Plaintiffs have proposed several sanctions tailored to the specific misconduct, but of course leave it to the Court's discretion to decide how best to remedy the conduct at issue and to deter this type of conduct in future litigation.

| | |
|---|---|
| Dated: August 1, 2020 | Respectfully submitted,<br><br>**WINSTON & STRAWN LLP**<br><br>By:    /s/ *John R. Keville* |
| Jeff Edwards<br>Texas Bar No. 24014406<br>jeff@edwards-law.com<br>Scott Medlock<br>Texas Bar No. 24044783<br>scott@edwards-law.com<br>Michael Singley<br>Texas Bar No. 00794642<br>mike@edwards-law.com<br>David James<br>Texas Bar No. 24092572<br>S.D. Tex. ID No. 2496580<br>david@edwards-law.com<br>**THE EDWARDS LAW FIRM**<br>The Haehnel Building<br>1101 East 11th Street<br>Austin, Texas 78702<br>Tel. (512) 623-7727<br>Fax (512) 623-7729 | John R. Keville<br>*Attorney-in-Charge*<br>Texas Bar No. 00794085<br>S.D. Tex. ID No. 20922<br>jkeville@winston.com<br>Denise Scofield<br>Texas Bar No. 00784934<br>S.D. Tex. ID No. 1529<br>dscofield@winston.com<br>Michael T. Murphy<br>Texas Bar No. 24051098<br>S.D. Tex. ID No. 621098<br>mtmurphy@winston.com<br>Brandon W. Duke<br>Texas Bar No. 240994476<br>S.D. Tex. ID No. 2857734<br>bduke@winston.com<br>Benjamin D. Williams<br>Texas Bar No. 24072517<br>S.D. Tex. ID No. 1447500<br>bwilliams@winston.com<br>Robert L. Green<br>Texas Bar No. 24087625<br>S.D. Tex. ID No. 2535614<br>rlgreen@winston.com<br>Corinne Stone Hockman<br>Texas Bar No. 24102541<br>S.D. Tex. ID No. 3019917<br>chockman@winston.com<br>800 Capital Street, Suite 2400<br>Houston, Texas 77002<br>Tel. (713) 651-2600<br>Fax (713) 651-2700 |

*Counsel for Plaintiffs*

**Certificate of Conference**

On August 1, 2020, Plaintiffs' counsel conferred by phone with Defendants' counsel and confirmed that Defendants are opposed to Plaintiffs' motion for sanctions.

*/s/ John R. Keville*
John R. Keville

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record on August 1, 2020 by filing it with the Court's CM/ECF system.

*/s/ John R. Keville*
John R. Keville
