UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LADDY CURTIS VALENTINE and RICHARD ELVIN KING, individually and on behalf of those similarly situated,<br>    Plaintiffs,<br><br>v.<br><br>BRYAN COLLIER, in his official capacity, ROBERT HERRERA, in his official capacity, And TEXAS DEPARTMENT OF CRIMINAL JUSTICE,<br>    Defendants. | § § § § § § § § § § § § § § |

Civil Action No. 4:20-cv-01115

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS

Defendants Bryan Collier ("Collier"), Robert Herrera ("Herrera"), and the Texas Department of Criminal Justice ("TDCJ") (collectively, "Defendants") file their Response in Opposition to Plaintiffs' Motion for Sanctions. In support, Defendants offer the following:

### INTRODUCTION

Plaintiffs' motion for sanctions is the latest—and most flagrant—unwarranted attack on both Defendants and their counsel. Plaintiffs have made allegations of hiding evidence, lying, and suborning perjury. These are incredibly serious accusations. But they are supported by nothing more than hyperbole, speculation, and a gross misstatement of the facts. Plaintiffs have painted a misleading picture for the Court and have asked the Court to sanction Defendants based on Plaintiffs' warped version of events. They continue to engage in the very gamesmanship that they have repeatedly—and wrongfully—attributed to Defendants. The Court should condemn Plaintiffs' behavior and deny their motion.

**FACTUAL BACKGROUND**

I.   **Timeline of Relevant Events**

Plaintiffs assume bad faith and willful misrepresentations when no such conduct has occurred. Below is a timeline of the events relevant to Plaintiffs' motion:

**July 14, 2020:** During the direct examination of Gary Butaud, Defendants' counsel Ralph Molina objected to testimony related to the "hot dog incident" on relevance grounds. Tr. Trans. at 2—217:23-25. To explain the circumstances surrounding the incident, Mr. Molina stated that he "saw the picture" of the aftermath of the hot dog incident. *Id.* at 2—219:6-9. Herrera sent the photograph to Defendants' counsel that day, and Defendants' counsel assumed that the photograph had been taken by Herrera.

**July 16, 2020:** To rebut the allegations made by Gary Butaud regarding the hot dog incident, Defendants' counsel questioned Herrera about the incident and offered the photograph Defendants had been sent into evidence. Tr. Trans. at 4—14-19. The photograph was admitted without objection as Defendants' Exhibit 39. *Id.* at 4—15:22-24. Defendants' counsel remained under the belief that the photograph had been taken by Herrera.

**July 20, 2020:** On cross examination, Plaintiffs' expert Eldon Vail expressed doubt as to whether offenders at the Pack Unit had ready access to soap and water in the laundry exchange area:

> Q: Is it my understanding that if the inmates you've identified, the wheelchair-bound offenders, and the areas that you've identified such as the laundry had access to soap and water to wash their hands, that would be sufficient, correct?
>
> A: I don't think it's possible for the folks in the wheelchairs. In those other places around the facility – and I did point out the laundry exchange area, I think – I think there needs to be further analysis, particularly regarding inmate workers to determine if they have ready access to soap and water in their work locations and,

> if not, then they should have access to hand sanitizer, too; but that would require more analysis than I've done.
>
> Q: And as we sit here today, the only place that you've identified that you believe the workers do not have adequate access to soap and water is laundry, correct?
>
> A: **I am not talking about the workers for the laundry. I'm talking about the counter where you exchange your old clothes for the clean clothes.** That's what I'm talking about, and so that's not related to workers. **That's related to the folks who have to go to laundry exchange.**

Tr. Trans. at 6—197:1-20 (emphasis added).

<u>July 21, 2020:</u> Defendants' counsel Jason Bramow met with Assistant Warden Paul Wilder ("Wilder"). Mr. Bramow asked Wilder for a description of the laundry exchange area. In response, Wilder showed Mr. Bramow the photograph of the laundry exchange area (Defendants' Exhibit 54), which shows ready access to sinks in that area.

<u>July 23, 2020:</u> Wilder sent Mr. Bramow two photographs of the laundry exchange area. Mr. Bramow intended to use only one of the photographs during Wilder's testimony in order to rebut Eldon Vail's suggestion that the offenders in the laundry exchange area may not have ready access to soap and water.

<u>July 24, 2020:</u> The photograph of the laundry exchange area was marked as Defendants' Exhibit 54 and disclosed to opposing counsel. Later that day, the photo was offered during Wilder's direct examination to aid in his testimony regarding the availability of soap and water in the laundry exchange area. Tr. Trans. at 10—231:6-14.

Counsel for Plaintiffs, Jeff Edwards, interrupted Wilder's direct examination to ask whether the photograph had been produced. *Id.* at 10—231:21-24. He was assured that the photograph had been produced. *Id.* at 10—231:25-232:1. Mr. Edwards implied that the photograph was responsive to a document subpoena attached to Wilder's deposition notice; it was not. *Id.* at

10—232:2-7; *See* Exhibit 1 (Deposition Notice of Paul Wilder). Mr. Edwards then began questioning Mr. Bramow and asked whether this photograph was part of the documents that had not yet been reviewed. *Id.* at 10—232:8-15. Mr. Bramow informed Mr. Edwards that the photograph was discovered during witness preparation while discussing the laundry exchange area with Wilder. *Id.* at 10—232:16-19.

The Court then asked if there were any other documents. *Id.* at 10—232:23. Mr. Bramow answered, "No, your Honor," and explained, "This was the picture that was shown to me by the witness after I asked for a description of the interior of the laundry facility." *Id.* at 10—232:24-233:1. Mr. Bramow further confirmed that he had been shown the photograph only after asking Wilder for a description of the laundry exchange area. *Id.* at 10—233:11-13. Because Mr. Bramow was referencing the conversation he had with Wilder during his witness preparation where Wilder showed Mr. Bramow the photograph ultimately marked as Defendants' Exhibit 54, Mr. Bramow did not recall later receiving the additional photograph of the laundry exchange area from Wilder, which he did not intend to use.

The Court then questioned Wilder directly and asked him if he had any other photographs of the Pack Unit. *Id.* at 10—233:14-15. Mr. Wilder responded, "I do, yes, Judge." *Id.* at 10—233:16. It was at that point that Defendants' counsel learned that Wilder had photographs depicting other areas of the Pack Unit. The Court then ordered Defendants to produce the remaining photographs of the Pack Unit on Wilder's phone to Plaintiffs' counsel. *Id.* at 10—238:25-239:1.

**July 27, 2020:** All photographs of the Pack Unit from Wilder's phone were disclosed to Plaintiffs. The same day these photos were disclosed Plaintiffs filed a motion to compel photographs and text messages from the state-issued cell phones of Wilder, Collier, Herrera, Oscar

4

Mendoza (TDCJ Deputy Executive Director), and Lorie Davis (Director—Correctional Institutions Division). ECF No. 260. Defendants filed a response in opposition to the motion to compel, arguing this information was not required to be disclosed under Rule 26(a) and it was not responsive to any specific discovery request. ECF No. 264.

**July 28, 2020:** The Court ordered Defendants to review the photographs and text messages from the state-issued phones of Wilder, Collier, Davis, Mendoza, and Davis for privilege and relevance and produce them to Plaintiffs. Tr. Trans. at 11—17:25-18:4.

**July 29, 2020:** At the beginning of trial proceedings, Plaintiffs' counsel displayed two photographs of the hot dog incident. Tr. Trans. at 11—4:17-23. As the Court will recall, one of the photographs appeared to be cropped and to be clearer than the other photograph. Defendants' counsel Shawn Cowles reiterated that the photograph marked as Defendants' Exhibit 39 had been received from Herrera. Tr. Trans. at 11—11:23-24. Noting the differences between the two photographs, Mr. Cowles explained that Defendants' counsel received the photograph from Herrera with an understanding that he had taken the photograph, and that he still believed that was the case. *Id.* at 11—11:23-12:2. Importantly, Mr. Cowles did not affirmatively represent that Herrera had in fact taken a photograph of the hot dog incident:

> These photos, they're, obviously, depicting the same event to me; but they appear to be different, the shading and the shadows and the lighting, especially, as you can see on the right-hand side.
>
> **So, I don't know, your Honor, as we sit here today, if Warden Herrera also took a photo of this same event.** Paul Wilder also took a photo of the same event.

Id. at 11—12:2-9 (emphasis added).

During questioning from Plaintiffs' counsel, Wilder testified that he had taken a photograph of the hot dog incident. Tr. Trans. at 11—107:21-108:2. He explained that the took the photograph of the hot dog incident contained on his phone. *Id.* at 11—108:6. Wilder testified that he took a photograph of the hot dog incident, and that he stood next to Herrera as Herrera also took a photograph. Tr. Trans. at 12—37:10-18. Wilder further testified that he did not send the photograph he had taken of the hot dog incident to Herrera. *Id.* at 12—43:21-22.

**August 2, 2020:** In the process of reviewing Herrera's photographs for production as ordered by the Court, Defendants' counsel determined that the only photograph of the hot dog incident on Herrera's phone was the photograph that Wilder had taken.

## II.     Response to Plaintiffs' Specific Allegations

Plaintiffs assert that five misrepresentations were made to the Court: (1) that Wilder had only one photo, of the laundry; (2) that there were two separate and different photographs of the hot dog incident, and the one used in trial on July 16th was not the same photo later produced from Wilder's phone; (3) that Defendants were not aware of the photographs from Wilder's phone until around July 23, and instead received the photo from Herrera; (4) that the photo produced on July 23 was first discovered as rebuttal to an inmate's testimony; and (5) that Herrera was standing next to Wilder and they took almost identical photographs from the same location. ECF No. 280 at 1. As explained below, these allegations are untrue.

### 1.     Wilder's photo of the laundry exchange.

Defendants' counsel have never asserted that "Warden Wilder only had one photo." The record plainly reflects that. Defendants' counsel represented that he did not know of any photographs showing areas other than the laundry exchange area, which is the only area he asked

about during witness preparation. Tr. Trans. at 10—232:24-233:1; 10—233:11-13. Defendants' counsel learned of the additional photographs of other areas of the Pack Unit from Wilder's phone only after the Court began asking Wilder about any additional photographs on July 24.

Plaintiffs' accusation appears to be based on a faulty premise: that Defendants had received the hot dog photo from Wilder's phone toward the beginning of trial, and that they therefore had knowledge of photographs depicting areas other than the laundry exchange area. ECF No. 280 at 6. This simply did not occur. Again, Defendants' counsel received the photograph of the hot dog incident admitted as Defendants' Exhibit 39 from Herrera, as explained by Mr. Cowles on July 28. Tr. Trans. at 11—14:24-15:11.

> But I want to get to the point of the photos for Mr. Wilder. We first learned of them exactly when we represented them to the Court last week. This photo, to me, if may be the same, it may be two different photos. My under – we – I know we received this photo of the johnny sacks being thrown at the offenders from Warden Herrera. 100 percent. That's exactly what happened.
>
> If Warden Herrera received that from Paul Wilder, I don't know about that. If the two of them both took photos of the same incident, that would make sense to me.

Tr. Trans. at 11—14:24-15:8. This statement accurately reflected what had occurred and what Defendants' counsel's understanding of the photographs was at that time. In no way did Defendants' counsel ever indicate that Warden Wilder had only one photograph. Plaintiffs' assertion to the contrary is untrue and not supported by the record.

**2.   Two separate and different photographs regarding the hot dog incident.**

Plaintiffs assert that Defendants' counsel made the false representation that there were two separate and different photographs of the hot dog incident, and that the one used in trial on July 16th was not the same photo later produced from Wilder's phone. ECF No. 280 at 1. Again, this

7

was not a false representation. It accurately reflected Defendants' counsel's understanding of the photographs based on receiving one photo from Herrera and learning that another photograph of the hot dog incident was contained on Wilder's phone as well. This understanding was reinforced by Wilder's testimony that: (1) he stood next to Herrera as Herrera took a photo of the hot dog incident; and (2) that he had also taken a photo of the hot dog incident, and he did not send the photo to Herrera. Tr. Trans. at 12—37:10-18; 12—43:21-22.

Defendants' counsel have since learned that the only photograph of the hot dog incident on Herrera's phone is the photograph of the hot dog incident that was taken from Wilder's phone. This was confirmed only after a review of Herrera's phone for the production of photographs, which occurred on August 2, 2020. Defendants' counsel have never made a knowingly false representation regarding the photographs of the hot dog incident.

       3.     **Defendants' counsel's awareness of the photographs from Wilder's phone.**

Plaintiffs assert that Defendants' counsel falsely represented that they were not aware of the photographs from Wilder's phone until around July 23 and that they received the hot dog photo from Warden Herrera. ECF No. 280 at 1. Again, as reflected above, Plaintiffs misunderstand the facts and extract certain portions of the record out of context to imply bad conduct. Defendants' counsel received the photograph admitted as Defendants' Exhibit 39 from Herrera. Defendants' counsel did not learn that Wilder had photographs of the Pack Unit depicting areas other than the laundry exchange until the Court began asking Wilder about the contents of his phone on July 24. This is the truth, and it is accurately reflected by the record.

       4.     **The laundry exchange photo offered in rebuttal.**

Plaintiffs assert that Defendants' counsel falsely represented that the photograph of the laundry exchanged was offered in rebuttal to an offender's testimony when no offender testified that there were no sinks in the laundry exchange area. ECF No. 280 at 1, 10. Again, this accusation paints a misleading picture and wrongfully assumes bad faith.

While there was no explicit testimony from offenders that there were no sinks in the laundry exchange area, Laddy Valentine, Roger Beal, and Marvin Jones each testified about the cleanliness of the counter at the laundry exchange area, implying that it was not clean and that their hands could be contaminated from touching the counter. Tr. Trans. at 1—162:2-21; 1—165:12-16; 2—98:2-23; 2—100:20-23. Eldon Vail later testified and expressed doubt as to whether offenders in the laundry exchange area had ready access to soap and water. *Id.* at 6—197:1-20. The photograph from Wilder's phone was offered to rebut this testimony and demonstrate that there is in fact ready access to soap and water near the laundry exchange area.

While the photograph *directly* rebuts the testimony from Eldon Vail—not a testifying offender—the photograph also rebutted the implication created by the testimony of Valentine, Beal and Jones: that their hands could be contaminated from the laundry exchange counter and they could not adequately address the issue in that area. At worst, Plaintiffs have demonstrated that Defendants' counsel did not accurately recall which specific testimony came from what person. To characterize this isolated mistake as a "dishonest affair" and a "false representation" is nothing short of outrageous. Defendants' counsel have neither the time nor the desire to comb through the record to expose every instance of Plaintiffs' counsel's inaccurate recollection of

9

events. But they almost certainly exist—as they do in almost every trial, especially one with many witnesses.[1] Attributing this mistake to bad faith is flatly disingenuous.

### 5. Warden Herrera standing next to Warden Wilder.

Plaintiffs' last accusation is the most offensive: that Defendants' counsel went along with or suborned perjury from Wilder regarding the photograph of the hot dog incident. ECF No. 280 at 10-11. This accusation is also false.

Plaintiffs again have extracted certain testimony out of context from Herrera and Wilder to demonstrate that Herrera and Wilder could not have been standing next to each other during the hot dog incident. ECF No. 280 at 8. Plaintiffs appear to claim that Herrera and Wilder could not have possibly stood next to each other at any time because at one point, Herrera was at the other end of the hallway. *Id.* This ignores the fact that Herrera moved from that location. Plaintiffs further allege that Wilder's testimony that he was standing next to Herrera when he took the photograph of the hot dog incident was false. *Id.*

Plaintiffs further assert that Wilder's testimony about standing next to Herrera was purposefully elicited "to preserve the false stories previously told." *Id.* This allegation is purely speculative and untrue. While it is now apparent that Wilder did send his photograph of the hot dog incident to Herrera, it is likely that he simply did not remember sending the photograph. To say that this discrepancy is "perjury" and to go even further to accuse Defendants' counsel of suborning perjury is incendiary. It is also untrue. As Plaintiffs' counsel undoubtedly know, not all

---

[1] In fact, relevant to this motion, the record demonstrates that Plaintiffs' counsel inaccurately stated that Mr. Wilder had a subpoena attached to his deposition notice. Tr. Trans. at 10—232:2-7. Defendants assume this was an honest mistake not made in bad faith.

discrepancies in testimony are perjury. To assume so in the absence of any facts to support that allegation is reckless.

## ARGUMENT AND AUTHORITIES

### I. Sanctions are wholly inappropriate.

Sanctions are wholly inappropriate in this case because neither Defendants nor their counsel have acted in bad faith. The sanction of an adverse inference is especially inappropriate, as it is among the most severe sanctions a court may impose.

#### A. Defendants have not acted in bad faith.

Plaintiffs ask the Court to use its inherent authority to impose sanctions. ECF No. 280 at 9-10. A court has inherent power to impose sanctions when other rules do not provide an adequate remedy. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to task, the court may safely rely on its inherent power."). A court's inherent power to sanction "is not a broad reservoir of power, ready at an imperial hand, but a limited source." *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 591 (5th Cir. 2008) (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696 702 (5th Cir. 1990), *aff'd sub nom.* Chambers, 501 U.S. at 32). Reliance on this inherent authority is appropriate when there is a "wide range of willful conduct" implicating multiple rules, *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995), or when the conduct at issue is altogether "beyond the reach of the rules." *Chambers*, 501 U.S. at 51.

The burden for imposing sanctions under the court's inherent power is higher than those under Rule 37 or other sources. *Sarco Creek Ranch v. Greeson*, 167 F.Supp.3d 835, 845 (S.D. Tex. 2016). It requires a finding of bad faith and arguably a "clear and convincing evidence" burden of proof. *See Chambers*, 501 U.S. at 50; *White v. Reg'l Adjustment Bureau, Inc.*, 632 Fed. App'x 234, 236 n.1 (5th Cir. Jan. 29, 2016).

Here, Plaintiffs have come nowhere close to establishing bad faith—and certainly not by clear and convincing evidence. *See Chambers*, 501 U.S. at 50; White, 632 Fed. App'x at 236 n.1. Plaintiffs' allegations about the hot dog photographs are based on a misunderstanding of what actually happened. Plaintiffs' allegation that Defendants' counsel represented that Wilder "had only one photo" is flatly false—as is the allegation that Defendants' counsel falsely represented that they learned of Wilder's additional photographs around July 23. Plaintiffs' reckless accusation that Defendants' counsel suborned perjury from either Herrera or Wilder is based on nothing more than hyperbole and speculation, and it is untrue. Finally, Plaintiffs' allegation that Defendants' counsel misrepresented that specific testimony regarding the sinks in the laundry exchange came from Eldon Vail instead of a testifying offender is frivolous. It falls well short of sanctionable conduct and seeks to hold Defendants' counsel to a standard of perfection that Plaintiffs' counsel have, understandably, also been unable to satisfy.

Plaintiffs have failed to show any bad conduct—let alone a "wide range of willful conduct" that would justify sanctions under a court's inherent power. *See Woodson*, 57 F.3d at 1418. Plaintiffs have also not demonstrated any conduct that is "beyond the reach of the rules," such that sanctions are appropriate. *Chambers*, 501 U.S. at 51. Accordingly, sanctions of any type are wholly inappropriate in this case.

### B. An adverse-inference instruction is inappropriate because there is no allegation of spoliation.

Plaintiffs have not established that Defendants have acted in bad faith. Therefore, Plaintiffs are not entitled to sanctions. Plaintiffs are especially not entitled to a sanction in the form of an adverse inference—one of the harshest sanctions a court can impose.

Adverse-inference instructions are usually given in cases where the defendant destroys or materially alters evidence. *See, e.g., Russell v. Univ. of Texas of Permian Basin*, 234 F. App'x 195, 207 (5th Cir. 2007); *Escobar v. City of Houston*, No. 04-1945, 2007 WL 2900581, *17 (S.D. Tex. Sept. 29, 2007). Such instructions are predicated on the "bad conduct" of the defendant. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (citing *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000). An adverse-inference instruction permits the fact finder to presume that the destroyed evidence was prejudicial. *See Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 618 (S.D. Tex. 2010). Although adverse-inferences instructions are less harsh than so-called terminating sanctions or "death penalty" sanctions (such as granting a default judgment), they are among the most severe sanctions a court can impose. *See id.* at 618–19.

For the same reason sanctions should be denied altogether—because there has been no bad faith or bad conduct—an adverse-inference instruction is especially improper. Such an instruction is generally predicated on a bad-faith destruction of evidence. *See Ford v. Potter*, 354 Fed. App'x 28, 33 (5th Cir. 2009). Plaintiffs' motion alleges no such conduct. Moreover, although they concede that death-penalty sanctions are not appropriate in this case, the adverse inference Plaintiffs ask the Court to make would essentially have the same effect as a death penalty sanction. Plaintiffs ask the Court to make the adverse inference that "the material on these state-issued devices was detrimental to Defendants' case because it demonstrated deliberate indifference."

13

ECF No. 280 at 13. This inference would go well beyond an inference that the information on the phones was merely prejudicial. Should the Court infer that the information on the phones "demonstrated deliberate indifference," such a finding would essentially dispose of the deliberate-indifference claim—resulting in a death penalty sanction. This type of sanction—the harshest sanction a court can impose—is certainly not appropriate in this case. *See Cammarata*, 688 F.Supp.2d at 614 (explaining that "[a]s a general rule, in this circuit, the severe sanctions of granting a default judgment, striking pleadings, or giving adverse inference instructions may not be imposed unless there is evidence of 'bad faith'").

## **CONCLUSION**

Plaintiffs have embarked on a unilateral, unjustifiable campaign of mud-slinging. Plaintiffs have recklessly and without cause cast aspersions on Defendants' counsel's character, motives, and professionalism. Not surprisingly, these personal attacks come at the close of trial, where Plaintiffs have limited means by which they can advance their case. This is a desperate litigation tactic. It is wrong. It is offensive. And it cannot continue.

Plaintiffs' reckless, incendiary allegations are supported by nothing more than mere conjecture and either a gross misunderstanding or a blatant misrepresentation of the facts. They have very clearly not established any sanctionable conduct. And they certainly have not established conduct that would justify the severe sanctions they seek. It is clear Plaintiffs' counsel will stop at nothing to advance their case—even if it means making false accusations to impugn the character of Defendants' counsel. It is unfortunate the Court has been put in a position where it must mediate this frivolous dispute. Defendants urge the Court to condemn Plaintiffs' conduct and deny their motion for sanctions.

Respectfully Submitted.

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**RYAN L. BANGERT**
Deputy First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense Division

*/s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General
Texas State Bar No. 24074047
Federal Bar No. 1125898
christin.vasquez@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P.O Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / (512) 370-9996 (fax)

## NOTICE OF ELECTRONIC FILING

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that I have electronically submitted a true and correct copy of the foregoing for filing in accordance with the Court's electronic filing system, on August 5, 2020.

*/s/ Christin Cobe Vasquez*

**CHRISTIN COBE VASQUEZ**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing **Defendants' Response in Opposition to Plaintiffs' Motion for Sanctions** has been served electronically upon all counsel of record *via* the electronic filing system of the Southern District of Texas, on August 5, 2020.

*/s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General