```
 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF TEXAS

 3                      HOUSTON DIVISION

 4   LADDY CURTIS VALENTINE and         .
     RICHARD ELVIN KING,                .
 5                                       .
                  Plaintiffs,            .
 6                                       .  Civil Action
     VS.                                 .  No. H-20-CV-1115
 7                                       .
     BRYAN COLLIER, ROBERT HERRERA, and  .  Houston, Texas
 8   TEXAS DEPARTMENT OF CRIMINAL JUSTICE, .  July 13, 2020
                                         .  9:16 a.m.
 9                  Defendants.          .
     . . . . . . . . . . . . . . . . . .

10

11               TRANSCRIPT OF PROCEEDINGS (HELD REMOTELY)

12            BEFORE THE HONORABLE KEITH P. ELLISON

13            BENCH TRIAL - DAY 1 - MORNING SESSION

14   APPEARANCES:

15   FOR THE PLAINTIFFS:

16           Mr. John R. Keville
             Mr. Brandon W. Duke
17           Ms. Denise Scofield
             Ms. Corinne Stone Hockman
18           Mr. Michael T. Murphy
             Mr. Rob Green
19           Mr. Mark Werbner
             Mr. Kyle Terao
20           WINSTON & STRAWN, LLP
             800 Capitol Street
21           Suite 2400
             Houston, Texas 77002
22           713.651.2600
             FAX:  713.651.2700
23           jkeville@winston.com
             bduke@winston.com
24

25       PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS REMOTELY,
         TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
```

```
 1                         APPEARANCES

 2                         (continued)

 3  FOR THE PLAINTIFFS:

 4          Mr. Jeffrey S. Edwards
            Mr. David James
 5          Mr. Scott Medlock
            THE EDWARDS LAW FIRM
 6          1101 East 11th Street
            Austin, Texas  78702
 7          512.623.7727
            FAX:  512.623.7729
 8          jeff@edwards-law.com

 9  FOR THE DEFENDANTS:

10          Mr. Shawn E. Cowles
            Ms. Christin Cobe Vasquez
11          Mr. Jason Bramow
            Mr. Ralph Molina
12          Mr. Landon Wade
            Ms. Shea Fennessey
13          OFFICE OF THE ATTORNEY GENERAL
            PO Box 12548
14          Austin, Texas 78711
            512.936.1378
15          512.370.9996
            shawn.cowles@oag.texas.gov
16          christin.vasquez@oag.texas.gov

17

18  COURT REPORTER:

19          GAYLE L. DYE, CSR, RDR, CRR
            515 Rusk, Room 8004
20          Houston, Texas  77002
            713.250.5582
21

22

23

24

25
```

1                           INDEX OF WITNESSES

2                                                              Page

3    FOR THE PLAINTIFFS:

4    **BRYAN COLLIER**

5        AS ON CROSS-EXAMINATION BY MR. KEVILLE              41
         DIRECT EXAMINATION BY MS. VASQUEZ                  117
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS

 2                      July 13, 2020

 3          THE COURT:  Welcome to all of you.  We have some

 4  preliminary matters I thought we might take care of before we

 5  get started with opening statements.

 6               Let me ask Plaintiffs:  A few members of the

 7  class have asked to be excluded from the class.  Does Plaintiff

 8  have any objection to excluding those who request exclusion?

 9               MR. KEVILLE:  No, your Honor, we have no objection.

10          THE COURT:  Okay.  On the briefing schedule for the

11  motion for summary judgment, I think we're going --

12          THE COURT REPORTER:  I'm sorry, Judge.  I couldn't

13  hear you.  I think someone's cell phone was ringing.

14          THE COURT:  The briefing schedule for the motion for

15  summary judgment, we're going to use the standard schedule as

16  provided in the rules.

17               The post-trial briefing schedule, the briefs will

18  be due from both parties three days after we finish the hearing.

19               Now, we have this emergency motion -- oh, the

20  motion in limine.  I don't worry too much about motions in

21  limine when I'm sitting without a jury.  I think we need to

22  minimize the time we spend on the matters that are the subject

23  of the motions in limine, but I think I can decide what's

24  relevant and what's not without granting the motion in limine.

25               Now, there's an emergency motion to enforce.  I
```

09:16:16   (line 5)
09:16:35   (line 10)
09:16:54   (line 15)
09:17:15   (line 20)
09:17:33   (line 25)

1  need to hear some argument on that.  It's Plaintiffs' motion so

2  we'll start with Plaintiff.

3          MR. KEVILLE:  Yes, your Honor.  John Keville, and I'm

4  going to turn it over to David James for that.

09:17:46  5          THE COURT:  Okay.

6          MR. JAMES:  Good morning, your Honor.  This is David

7  James.

8              As we said in the motion, this is about a motion

9  to compel hospitalization records which was granted on July 8th.

09:18:06  10  We had not received the documents -- any documents that were

11  remotely responsive when we filed the motion.  Later, Sunday

12  night, we did receive a declaration which states that it is not

13  attesting to the factual accuracy of the document or where the

14  information came from; but it does purport to list

09:18:29  15  hospitalization information for Pack Unit inmates.

16              You know, I don't know whether Defendants are

17  willing to stipulate to the accuracy of that document.  If

18  they're not, then we certainly still need the actual documents;

19  and I mean, I don't really understand Defendants' position on

09:18:51  20  the issue because during the hearing Defendants agreed to

21  provide the documents by Thursday; and we didn't get anything

22  until Friday they sent us another version of the same snapshot

23  sort of declaration that we had previously been complaining

24  about and said that was good enough on Saturday.

09:19:08  25              So, I just don't know why it's -- what the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1    problem is in actually getting the documents.  This would really

2    simplify the dispute.  We know that several different types of

3    documents would show exactly what we've been asking for.

4                    And quite frankly, Defendants have been willing

09:19:27   5    to go search medical records for their own case even though

6    we've been asking for this specific -- we've been asking for all

7    positive inmates' medical records since the beginning of this

8    case; and we narrowed that to the hospitalization records which

9    would actually be very small because TDCJ doesn't actually hold

09:19:48  10    the hospital records, they just hold the record saying, "We sent

11    them to the hospital."

12                    But TDCJ has decided they're not going to give us

13    that, they're going to create some weird declaration; and they

14    keep on changing their position without getting us the evidence

09:20:03  15    that we've asked for.  So, that's -- we're at a loss, but we

16    need the answer of how many people have been hospitalized with

17    COVID-19 from the Pack Unit.

18                    Thank you, your Honor.

19            THE COURT:  Did you have a current total of how many

09:20:16  20    people have been -- have tested positive and how many people

21    have died?

22            MR. JAMES:  Your Honor, they did e-mail us over the

23    weekend that a 19th person have died.  Based on the documents

24    that we received, it does appear that we have a total of

09:20:32  25    positive cases of about 487.

1       THE COURT:  487?

2       MR. JAMES:  Yes, 487, including people who are no

3   longer at the prison but were tested while they were at the

4   prison.  So --

09:20:45    5       THE COURT:  Have they gone to other prisons or have

6   they been released?

7       MR. JAMES:  So, 19 are dead.  So, they're no longer at

8   the prison.  I don't know the exact location of all of them, but

9   I think about 409 are still at the prison.

09:20:59   10       THE COURT:  Okay.

11       MR. COWLES:  Your Honor, may I provide an update?

12       THE COURT:  Yes, you may.

13       MR. COWLES:  Yes.  Thank you, your Honor.

14           This is the Shawn Cowles, Texas Attorney

09:21:09   15   General's Office on behalf of the Defendants.  It's nice to at

16   least see you in person via Zoom.  I wanted to provide the Court

17   with --

18       THE COURT:  Nice to see you.  Nice to see you.

19       MR. COWLES:  Thank you, your Honor.

09:21:12   20           I wanted to provide the Court with an update at

21   the outset.  I'm happy to do so as we go through this trial as

22   often as the Court would like.

23           So, as of the numbers from yesterday, there have

24   been -- these are all numbers at the Pack Unit, of course.  So,

09:21:31   25   at the Pack Unit there have 1,863 negative tests for offenders,

1    there have been a total of 481 positive offenders, offenders who

2    have tested positive for COVID-19.

3           Of that 481 number, 413 are recovered positives.

4    There are currently five hospitalizations; and there have been

09:22:02  5    19 deaths, your Honor.

6           THE COURT:  Okay.  Now, as to the documents that

7    Mr. James is talking about, what's the problem on these?

8           MS. VASQUEZ:  Your Honor, TDCJ has recently as

9    yesterday --

09:22:19  10           THE COURT:  Who is speaking, please?  Who is speaking?

11    Is this Ms. Vasquez?

12           MS. VASQUEZ:  Yes.

13           THE COURT:  Yes, Ms. Vasquez.

14           MS. VASQUEZ:  This is the Christin Vasquez, your

09:22:37  15    Honor.

16           We provided a comprehensive list of all of the

17    Pack Unit hospitalizations that we have a record for yesterday,

18    your Honor.

19           Regarding medical records, those are things we

09:22:48  20    would have to get through UTMB; and it is going to take an

21    extensive amount of time is my understanding.  So, regarding

22    records that TDCJ has regarding the Pack Unit hospitalizations

23    for COVID-19, we have provided that.

24           THE COURT:  Okay.  Where are we not communicating?

09:23:09  25    Tell me -- what is it that -- Mr. James, that you want that you

1  don't have?

2       MS. VASQUEZ:  It's my understanding that Mr. James

3  wants medical records, and that's going to take more than the

4  time we have to obtain and provide, and that would be from UTMB.

09:23:31  5       MR. JAMES:  Your Honor, I just -- I apologize that the

6  Court doesn't have the benefit of this document.  It was served

7  after the motion was filed which was filed more than a day after

8  I asked Defendants to tell us immediately whether they were

9  going to provide us anything.

09:23:46  10       But regardless, the first page is a declaration

11  of the deputy director of prison jail operations; and all he

12  attests to is that his information received but not factually

13  verified by my office concerning Pack Unit offenders who were

14  transported to hospitals and who stayed in the hospital

09:24:06  15  overnight.

16       So, if that is -- if it is a comprehensive

17  document as counsel just represented, then it's what we need.  I

18  mean, I don't -- I don't -- I don't know it to be true that it

19  is difficult to get the information that they're describing.  I

09:24:24  20  think that there are other categories of documents that are

21  responsive as we listed in the motion.

22       This document would have been pulled from one of

23  those documents.  They created a new document instead of giving

24  us the underlying document.  I also wanted to briefly address

09:24:41  25  just to clarify the numbers.  I think counsel said that there

1   were over 1800 tests; but that does not represent the number of

2   unique individuals who have been tested, if I'm understanding

3   correctly, unless there were 600 inmates brought into the Pack

4   Unit and tested and then taken out again.  It was probably a

5   maximum of 1248 tests.  Anyway, so --

6           THE COURT:  You're wondering if these are -- some

7   people got tested twice?  Is that what you're wondering?

8           MR. JAMES:  Your Honor, we know that several people

9   were tested twice.  I don't know how many; but I just wanted to

10  make that clear from counsel's update.

11          So, back to this document.  If TDCJ is going to

12  agree that this is what the Court -- this represents the

13  information that the Court already ordered them to produce, then

14  I guess my only complaint is that it was provided on Saturday.

15          And -- and you know, I think that it's -- it was

16  ordered on Thursday; but we can address that issue later.  If

17  they're willing to -- regardless of this declaration -- I just

18  want to be clear the declaration does not say that any of this

19  is accurate or that they even know where this came from.  It

20  says information received in the passive voice.

21          So, if TDCJ notwithstanding this declaration is

22  willing to say this is everybody who is hospitalized, then I

23  guess we can proceed with this.  I mean, I don't -- without the

24  document, I don't know whether I even believe that to be true;

25  but this has hundred names on it.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Ms. Vasquez, is that an omission -- an

2    accidental omission on the declaration?  Are you saying -- are

3    you representing this document is accurate?

4          MS. VASQUEZ:  It's my understanding, your Honor --

09:26:47   5    it's my understanding that the information that TDCJ receives

6    regarding hospitalizations is very informal.  It's by phone

7    calls, and it's information that's transmitted.

8               So, it's my understanding that there is no

9    document that -- that is underlying this chart that was created.

09:27:07  10    This is what TDCJ knows regarding the hospitalizations from the

11    Pack Unit related to COVID-19.

12               I don't know what the purpose, you know,

13    Plaintiffs want to use this document for, this information for.

14          THE COURT:  Well, but whatever they want to use it

09:27:26  15    for, it would be helpful to know that the document is accurate.

16               Let me ask about the negative tests.  How do you

17    arrive at that number?  All the tests -- all the tests that were

18    used as to the entire population including retests?  Is that it.

19          MS. VASQUEZ:  That's correct, your Honor.

09:27:51  20          THE COURT:  So, we don't know if one inmate was tested

21    four times, another was tested zero times?

22          MS. VASQUEZ:  The way that the Strike Team testing

23    works, your Honor, is they start by testing everybody at the

24    Pack Unit.  Then, the next Strike Team test tests the people who

09:28:10  25    were not previously tested or that test negative.  And then, it

1    goes from there.

2                 So, the tests that are being performed, they test

3    all offenders who previously tested negative or who have not

4    been tested before.

09:28:29    5    THE COURT:  Okay.  Well, let's not delay the substance

6    of the hearing any longer.  We can address this issue later if

7    it becomes relevant.

8                 I think we agreed that we'd start with opening

9    statements of 15 minutes duration or less.  Is that right?

09:28:43    10    MS. VASQUEZ:  Yes, your Honor.

11    THE COURT:  Is there anything else we need to do

12    before opening statements?

13       (No response.)

14    THE COURT:  Okay.  Then, let's go ahead with

09:28:57    15    Plaintiffs' opening statement.

16    MR. COWLES:  Your Honor, may I address a couple of

17    issues?  I apologize.  We're trying to mute and unmute.  This is

18    Shawn Cowles.

19    THE COURT:  Yes, sir.  Go ahead.

09:29:09    20                 Yes, sir, go ahead.

21                 Mr. Cowles.

22    MR. COWLES:  Can you hear me now, your Honor?

23    THE COURT:  I can hear you fine.  Can you hear me?

24    MR. COWLES:  Now, I can.  Sorry about that.

09:29:22    25                 There are just two housekeeping issues before we

1   move to opening statements, your Honor, if we may.

2             THE COURT:  Okay.

3             MR. COWLES:  First, we had requested -- and I have a

4   feeling I know the Court's order; but I just wanted to get this

09:29:35   5   official.  We had requested an advisory jury pursuant to Federal

6   Rule of Civil Procedure, Rule 39.  Has the Court denied that

7   request?

8             THE COURT:  Yeah, I'm going to deny that.  I -- for a

9   number of reasons.  The most significant is I have not since

09:29:51  10   mid-March asked any jurors to report for duty.  I'm concerned

11   about the ramifications to their health.

12             MR. COWLES:  Understand, your Honor.

13             And then, secondly, last question.  I apologize

14   for not keeping up with the technology.  I'm sure it will get

09:30:08  15   better as we go through our first Zoom trial here.  But on our

16   motion in limine, did the Court deny that?

17             THE COURT:  Yes.

18             MR. COWLES:  Okay.

19             THE COURT:  I don't worry too much about motions in

09:30:18  20   limine when I'm sitting without a jury because I don't think

21   there is anybody who will be misled or enraged by statements

22   that I think are clearly irrelevant.

23             Okay, let's proceed with opening statements then.

24             MR. KEVILLE:  Thank you, your Honor.  John Keville for

25   the Plaintiffs.

1          THE COURT REPORTER:  I'm sorry.  Before you start, for

2    some reason I can't see anybody.  It says, "You are viewing

3    Plaintiffs' exhibit display."  Is that something that -- am I

4    the only one who can't see anyone?

5          THE COURT:  I can see Mr. Keville, and I can see

6    Ms. Vasquez, and I've been able to see --

7          THE COURT REPORTER:  Okay.  I'm good.  I'm good.

8    Thank you.  I'm sorry.

9          MR. KEVILLE:  Okay.  I think that's just a function

09:31:11  10    that we're going to put up some slides during the opening.  So,

11    it may go back and forth.

12              All right.  Are we ready?

13          THE COURT:  Yes.

14          THE COURT REPORTER:  Yes.

09:31:15  15          MR. KEVILLE:  All right.  Good morning.

16              Your Honor, as this Court knows and everyone on

17    the call knows, COVID-19 is one of most fast-moving, highly

18    contagious, infectious diseases we're ever seen in this country

19    requiring us to social distance, wear masks, avoid big crowds,

09:31:35  20    and stay in our homes as much as possible.

21              But inmates in prisons can't do many of these

22    things and are disproportionately at risk.  And the Pack Unit is

23    much more so.  It's the highest risk among the high risk and the

24    hardest hit.

09:31:49  25              The Pack Unit is not a common Texas prison.  It

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  houses around 1200 inmates, more than 800 of whom are over 65;

2  many others with comorbidities that make them especially

3  vulnerable.  These numbers, your Honor, are from earlier

4  official statistics we have.  I think the number now is 1179 or

09:32:08  5  in that range.

6          Nevertheless, the vast majority of the inmates in

7  the Pack Unit are elderly and have other health issues that make

8  them extremely high risk.  They live in dorms that have short

9  walls, providing no separation from those around them that would

09:32:24  10  protect them from COVID-19.

11          This is -- showing on the screen Plaintiffs'

12  Exhibit 226 at 24.  This comes from Warden Herrera's declaration

13  for the preliminary injunction hearing.  You'll note in this,

14  your Honor, the low walls that the inmates have which do not

09:32:41  15  prevent separation and have them very closely packed together.

16          And you'll also note the inmate janitor in the

17  background after the lockdown, after the regulations, the

18  Guidance 14.52 that they put in place, is cleaning wearing no

19  gloves.

09:33:02  20          Now, in the preliminary injunction hearing and

21  before, Dr. Young warns that the Pack Unit was like a tinder box

22  where COVID-19 virus would spread rapidly if immediate action

23  was not taken.  He explained that Leonard Clerkly's death was a

24  spark.

09:33:18  25          Dr. Young and Dr. Gathe stressed the need for a

1   plan for repeated testing among other cautions.  After hearing

2   the evidence, the Court ordered Defendants to immediately make

3   such a plan and to put in place common sense CDC-recommended

4   safeguards.

09:33:33   5           Unfortunately, instead of heeding the experts'

6   warnings and following this Court's guidance, TDCJ sought and

7   was granted a stay of the injunction preliminarily on the basis

8   that the inmates had not exhausted their administrative

9   remedies; and now, COVID-19 at the Pack Unit is a raging fire.

09:33:53   10          Your Honor, what we have is a comparison of the

11  COVID-19 positivity rate from the State of Texas where the

12  positive rate is 8.84 percent, to TDCJ across all prisons where

13  the positivity rate is 8.45 percent, to the Pack Unit where it's

14  38.41 percent, six times the number across all the other TDCJ

09:34:17   15  prisons -- five times roughly.

16          And I'm not sure where the disconnect is where

17  Mr. Cowles this morning said 481 positive.  The documents they

18  have produced show 487 discrete individual positives; but

19  nonetheless, it's an astounding large number.

09:34:37   20          Nineteen people are dead.  Much has been heard

21  from Defendants already about the need for class members to

22  exhaust their grievance remedies before filing, but TDCJ's

23  grievance procedure was not capable of use to obtain relief in

24  the face of the COVID-19 pandemic, and instead, was a literal

09:34:55   25  dead-end, as these numbers clearly show; and TDCJ knows and knew

1    that.

2              A month after arguing for a stay based on the

3    failure to exhaust the grievance process, on May 26, TDCJ

4    changed the policy and cut the grievance time from its original

5    80-to-160 days down to no more than 30 days.  TDCJ recognized

6    the timeline was too long under the original grievance policy

7    and that a much faster policy was needed in this fast-pace

8    pandemic.  That's why we can say for certain the original policy

9    provided no available remedies.

10             Beyond that, to establish an 8th Amendment

11   violation based on a failure to prevent harm, we must show, one,

12   that the inmates are incarcerated under conditions posing a

13   substantial risk to serious harm.  I trust that is not really in

14   dispute with COVID-19 already having killed 19 and infected over

15   400.

16             Second, we must show that the prison officials'

17   failure to act manifests a deliberate indifference toward that

18   risk; and there are two ways, your Honor, that we will show

19   deliberate indifference:  You will hear --

20        (Interruption.)

21             THE COURT:  Go ahead, Mr. Keville.

22             MR. KEVILLE:  First, your Honor, you will hear that

23   TDCJ adopted guidelines, its policy 14.52, intended to be based

24   on the CDC guidance; but having a policy alone doesn't save

25   lives; and the evidence will show that the Defendants often pay

1   lip service to what their policies require.

2            In addition to Mr. Valentine and Mr. King, you

3   will hear testimony from ten other inmates, each of whom will

4   explain how much TDCJ ignores its own policies; and just for a

09:36:42   5   few examples to preview what you'll hear:  As to isolating

6   COVID-19 positive results, Policy 14.52 says, "Offenders should

7   be kept in medical isolation until at least three days, 72

8   hours, have passed since recovery defined as, one, resolution of

9   fever without the use of fever reducing medications; two,

09:37:04   10   improvement in respiratory symptoms, e.g., cough, shortness of

11   breath; and three, at least 14 days have passed since symptoms

12   have appeared.

13            You'll hear from Mr. Beal, one of the inmates at

14   the Pack Unit, who tested positive but then was put back into

09:37:22   15   Dorm 17 after a 14-day quarantine even though he was still

16   symptomatic, including coughing, shortness of breath; but he had

17   no fever.  He told medical and security personnel that he had

18   these other symptoms, and both told him they were following the

19   policy, and there was nothing they could do.

09:37:39   20            As another example of what you will hear:  Policy

21   14.52 also requires cleaning.  "During the COVID outbreak" --

22            The next slide, if you could, Allen.

23            "During the COVID outbreak, all units should

24   disinfect common areas and surfaces that are often touched with

09:37:57   25   a ten percent bleach solution."  It also requires "Thoroughly

1     cleaning and disinfecting all areas where suspected or confirmed

2     COVID-19 cases spent time.

3               "Staff and offenders performing cleaning should

4     wear gloves and gowns."  We've already seen they've put in their

09:38:11   5     own evidence of inmates cleaning without gloves.

6               In arguing against the preliminary injunction

7     with regard to enhanced cleaning, TDCJ said this.

8               Go to the next slide, Allen.

9               No, that's not it.

09:38:28  10     So, what TDCJ just said, your Honor --

11              You can put -- there we go.

12              They said to this Court what Pack has done

13    regarding this item -- and that's the cleaning.  Said, again,

14    there's one, at least one inmate janitor assigned to clean each

09:38:41  15     common area.  There are at least four janitors assigned to the

16    E Dorm and at least three janitors assigned to the trustee camp.

17              Also, there are additional janitors assigned to

18    the infirmary, laundry, and kitchen.  They all work 12-hour

19    shifts in which they are permitted breaks; and as part of their

09:38:58  20     duties, they are -- the officers are assigned to monitor and

21    observe these janitors cleaning to ensure the cleaning is

22    happening and is on a consistent basis.  That's what they told

23    this Court.

24              You'll hear testimony, your Honor, from Mr. Dove,

09:39:12  25     one of those inmate janitors.  He is, essentially, blind and in

1  a wheelchair; and he cannot perform these critical functions.

2  It is the height of deliberate indifference to say that a blind,

3  wheelchair-bound inmate is responsible for cleaning during

4  COVID-19.

09:39:30  5          You'll hear testimony from the inmates regarding

6  other things TDCJ hasn't done, such as guards not always wearing

7  masks and guards cross-contaminating dorms.  You'll hear they're

8  not always providing additional soap, that they have not

9  increased the number of janitors, that they have not increased

09:39:47  10  the amount of cleaning supplies provided for many of the

11  inmates, that they have not reassigned bunks to achieve more

12  space, that they're not cleaning the showers, that they're not

13  making accommodations for the mobility-impaired.

14          If TDCJ and its staff do not implement and comply

09:40:04  15  with the guidance, their own guidance, that is deliberate

16  indifference; and that is one way the evidence will prove

17  deliberate indifference.

18          The second way is that its deliberate

19  indifference to treat the Pack Unit the same as every other

09:40:19  20  prison in Texas with regard to COVID-19.

21          You will hear that TDCJ knew the Pack Unit was a

22  higher risk population from the very start of this pandemic, but

23  they adopted a one-size-fits-all policy, and one size did not

24  fit all.

09:40:33  25          The inmates at the Pack Unit are paying the price

1  for that indifference.  The numbers are indisputable as I showed

2  before:  487 positive, 19 dead.  19 dead is 20 percent of the

3  deaths in the -- across the entire system.  The Pack Unit is one

4  of 100 units, and they have 20 percent of the deaths from

09:40:56   5  COVID-19.

6          So, what are Plaintiffs asking for?  Plaintiffs

7  aren't asking for things, your Honor, that will make their lives

8  more comfortable.  They're only asking for what they need to

9  survive:  soap, hand sanitizer, disinfectants, cleaning

09:41:15  10  materials, protective masks, appropriate distancing,

11  dedensification of the dorms, testing and retesting,

12  quarantining, and restrictions on movements.

13          In conferences, Defendants have said several

14  times, compared themselves to the worst disaster areas of

09:41:32  15  COVID-19 telling this Court that TDCJ at the Pack Unit is doing

16  better than nursing homes in New Jersey.  That's not the

17  standard that we hold ourselves to in Texas:  being better than

18  the very worse.

19          Nineteen men have died so far.  More are likely

09:41:47  20  to.  The Pack Unit is one unit out of hundred with 20 percent of

21  the deaths.  We must have compassion for the men, the prisoners,

22  at the Pack Unit, many of whom are elderly and infirm and at the

23  highest risk for severe disease and death in this pandemic but

24  men who have the least control and depend entirely on TDCJ.

09:42:09  25  Many have already died because TDCJ has been indifferent to the

1    heightened risk and the heightened needs of the Pack Unit.

2              The Plaintiffs here are simply asking this Court

3    to protect their Constitutional rights under Section 1983 and

4    the ADA Rehab Act.  A permanent injunction is desperately needed

09:42:29   5    to contain the fire and save lives at the Pack Unit, and that is

6    what we are requesting.

7              Thank you.  Your Honor.

8              THE COURT:  Thank you very much.

9              Okay.  Ms. Vasquez or --

09:42:44   10         MR. COWLES:  Your Honor, this is Shawn Cowles with the

11   Texas Attorney General's Office.  If you'll bear with me one

12   moment.

13             THE COURT:  Sure.

14             MR. COWLES:  I think we're having some technology

09:42:53   15   issues.  But let me see if I can use -- are you able to hear me,

16   your Honor?

17             THE COURT:  I can hear you fine, yeah.  I can see you,

18   too.

19             MR. COWLES:  Let me pull up our share screen document.

09:43:08   20   Bear with me one moment, your Honor.

21             Your Honor, are you seeing up on the screen our

22   PowerPoint?

23             THE COURT:  I can see it, yeah.

24             MR. COWLES:  Okay, great.

09:44:15   25             So, may it please the Court, again, my name is

1    Shawn Cowles with the Texas Attorney General's Office on behalf

2    of Defendants Bryan Collier, Robert Herrera, and the Texas

3    Department of Criminal Justice.

4              Your Honor, this case is not about COVID-19

09:44:41    5    because it's undisputed COVID-19 is a lethal viral killer where

6    no person and no --

7        (Technical interference.)

8              -- is immune.  Instead, this case boils down to

9    two words:  deliberate indifference.  This case is about TDCJ's

09:44:58    10    response to COVID-19.

11              Let's look at these two words:  "deliberate" and

12    "indifference."  Intentional, purposeful, uninterestedness,

13    intentionally unconcerned.  This is what the Fifth Circuit --

14        (Technical interference.)

09:45:15    15        THE COURT REPORTER:  Mr. Cowles, I'm having --

16    Mr. Cowles, I'm having a really hard time.  You're fading in and

17    out.

18        THE COURT:  Maybe you can get closer to the mike.

19        MR. COWLES:  Yeah.  I think, you know, this is just a

09:45:42    20    technology problem, your Honor.  I'm going to switch computers,

21    if that's all right.

22        THE COURT:  Yeah.

23        MR. COWLES:  So the reporter can hear me better.

24              Your Honor, can you see and hear me any better

09:46:41    25    now?

1        THE COURT:  I definitely hear you.

2            Gayle, can you hear?

3        THE COURT REPORTER:  Yes, I can hear him better.

4        MR. COWLES:  Thank you.

09:46:49  5        All right.  Well, I'm going to pick up, your

6  Honor, where I left off.  So --

7            I'm sorry.  Maybe the court reporter wasn't able

8  to hear me.  Do you want me to -- can you tell me, Madam Court

9  Reporter, what the last thing you were able to hear me say was;

09:47:05  10  and I'll be able to pick up.

11        THE COURT REPORTER:  Yes.  Hold on one second.

12            "Let's look at these two words:  'deliberate' and

13  'indifference.'

14        MR. COWLES:  Okay.  I'll beginning from there then.

09:47:27  15  Thank you.

16            What does "deliberate indifference" mean?  It

17  means intentionally ignoring, purposely disregarding, willfully

18  uninterested, intentionally unconcerned.

19            The Fifth Circuit in *McCormick versus Stalder*

09:47:46  20  say, quote, "Deliberate indifference encompasses only

21  unnecessary and wanton infliction of pain repugnant to the

22  conscience of mankind."

23            So, this case is about deliberate indifference;

24  but it's also in the context of COVID-19 which we know is lethal

09:48:12  25  viral killer.  And we've all become familiar in this case with a

1    gentlemen named Leonard Clerkly.  Leonard Clerkly,

2    unfortunately, was the first person from the Pack Unit amongst

3    the offenders to test positive for COVID-19

4              Leonard Clerkly passed away at a hospital April

09:48:39  5    11th of this year and then tested positive for COVID-19 two days

6    later.  It's a tragedy, your Honor, that Leonard Clerkly isn't

7    with us today.  No one wanted that result, no one on this Zoom

8    trial conference call that we're having, no one at TDCJ, no one

9    at the Pack Unit, none of the offenders.

09:49:04  10   The unfortunate reality is that COVID-19 is a

11   killer despite the best efforts of countries around the globe

12   including our own, despite the efforts of the states in the

13   United States, despite the efforts of TDCJ at the Pack Unit.

14   COVID-19 is a lethal viral killer.  No one is going to dispute

09:49:35  15   that in this trial from our side, and I'm confident no one from

16   the Plaintiffs' side is going to dispute that.

17             But the real issue is did TDCJ respond to

18   COVID-19 at the Pack Unit with a deliberate indifference?  And

19   your Honor, I would like to address head on the elephant in the

09:49:56  20   room.  I understand that the Court has lost faith to a certain

21   degree in TDCJ, and your trust has been broken down because of

22   other cases; most notably, it sounds like the heat case.

23             I'm sorry that this has occurred.  I wasn't

24   involved in the heat case.  In fact, I wasn't even at the AG's

09:50:16  25   office when that case was occurring; but it sounds like some

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  very unfortunate things occurred in that case; and I'm sorry for

2  that.

3            The question I've been asking myself is how can

4  trust be rebuilt between this Court; TDCJ; myself, as we're just

09:50:34  5  getting to know each other.  It's my first time appearing before

6  your Honor in this case.  I can tell you there are new people on

7  our side, your Honor, which is true; but I don't believe that

8  would persuade you to begin trusting our side right now.

9            But here's what I do believe should persuade the

09:50:52  10  Court to start trusting our side:  motive.  TDCJ is

11  incentivized, your Honor, to rely upon the leading medical

12  experts, to act promptly, to reasonably respond to the risk of

13  COVID-19 because the offender population at the Pack Unit and

14  the TDCJ staff and officers are so interconnected,

09:51:23  15  intermingling, interacting that it would be impossible to

16  protect one group without protecting the other group.

17            Therefore, even if one were to assume that TDCJ

18  only wanted to protect its officers and staff, TDCJ necessarily

19  would be required to protect the Pack Unit offenders because to

09:51:48  20  protect one group is to protect the other and to not protect one

21  of the groups is to leave everyone exposed to the ravages of

22  COVID-19 at the Pack Unit.

23            Well, how did TDCJ rely upon its medical experts,

24  your Honor?  TDCJ deliberately relied upon medical healthcare

09:52:13  25  experts to inform and guide the measures taken by TDCJ in

1  response to the COVID-19 pandemic.  These experts include TDCJ's

2  Health Services Division, and you'll hear from Dr. Lannette

3  Linthicum from that division.

4              These experts also included TDCJ's university

09:52:33  5  medical partners at UTMB and Texas Tech University.  TDCJ

6  purposely relied upon Policy B-14.52 that the Court is going to

7  hear a lot about in this case which was prepared by the

8  Correctional Managed Healthcare System.  It has three directors,

9  a combination of Dr. Lannette Linthicum, the medical

09:52:56  10  professionals at UTMB and at Texas Tech.  TDCJ deliberately also

11  relied upon the CDC guidance for correctional and detention

12  facilities to formulate their response to COVID-19.

13              I heard the Court state something to the effect

14  that there was a concern your Honor had about whether TDCJ would

09:53:18  15  have done anything without this lawsuit.  The undisputed facts

16  are that before this lawsuit was filed TDCJ deliberately

17  participated on March 16, 2020, in a meeting with the Joint

18  Infection Control Committee that decided to create a new policy

19  to expressly address this novel Coronavirus and COVID-19.

09:53:44  20              Also before the lawsuit on March 20, 2020,

21  intentionally adopted CMHC's Policy B-14.52 which was posted on

22  TDCJ's website the very same day.  Three days later after the

23  14:52 policy was adopted by TDCJ, the CDC guidelines for

24  correctional and detention facilities -- correctional

09:54:10  25  institutions and detention facilities were published by the CDC.

1          What did TDCJ do in response?  Four days later on

2  March 27th, TDCJ adopted its first revision to Policy B-14.52.

3  Your Honor, there were six subsequent updates to the original

4  version of the B-14.52 policy which apply to all the TDCJ

09:54:39  5  institutions including the Pack Unit.

6          There are other actions that TDCJ took in

7  response to COVID-19 before this lawsuit was filed.  In late

8  February, TDCJ increased the cleaning and disinfecting at the

9  Pack Unit.  TDCJ also engaged in daily briefings in March with

09:55:00  10  DSHS, Department of State Health Services.

11          On March 4th, there was a meeting between the

12  executive director of TDCJ, Bryan Collier; Dr. Lannette

13  Linthicum; Texas Tech University; and UTMB to address how to

14  respond to COVID-19.  On March 9th, daily briefings began

09:55:22  15  regarding how to address TDCJ.

16          On March 12th, an educational video was produced

17  which was shown and still is shown at the Pack Unit about how to

18  respond to COVID-19, proper and good practices for healthy

19  hygiene.  TDCJ also participated in daily conference calls with

09:55:44  20  UTMB and Texas Tech University beginning in the middle of March.

21          TDCJ on March 13th suspended the in-person

22  visitation at the Pack Unit in order to effectively have the

23  Pack Unit offenders sheltered in place from people coming in

24  from the outside to visit.

09:56:04  25          On March 16th, TDCJ set up a command center at

1     its headquarters to address its responses to COVID-19.  This

2     command center is similar to what TDCJ has set up in the past

3     for Hurricane Katrina, other hurricanes, other natural

4     disasters.

09:56:26   5               Subsequently, the evidence is going to show, your

6     Honor, TDCJ also set up a strike command center at the TDCJ

7     headquarters to address and organize the Strike Team testing

8     that this Court is going to hear about that the offenders at the

9     Pack Unit went through in order to determine who had tested

09:56:48   10    positive and who hadn't.

11               There's a third command center at TDCJ's

12    headquarters, your Honor.  It's a strike command center for the

13    Correctional Institutions Division of TDCJ that has been set up

14    to monitor and address the Strike Team testing.

09:57:05   15              So, well before this lawsuit was ever filed, TDCJ

16    was taking prompt action that was even ahead of CDC when the CDC

17    guidelines for correctional institutions was delivered -- was

18    published.

19               TDCJ acted deliberately to plan its response even

09:57:27   20    before Governor Abbott issued his statewide disaster

21    proclamation which occurred before this lawsuit was filed.  TDCJ

22    continued in close communication with its medical partners

23    before and continued after this lawsuit was filed regarding the

24    appropriate response to COVID-19 at the Pack Unit.

09:57:54   25              On March 11th, your Honor, the Pack Unit

1    instituted screening protocols for the visitors -- visitor

2    screening before they were coming in which was subsequently

3    closed off as the pandemic increased in its intensity.

4               Your Honor, TDCJ has acted promptly to respond to

09:58:17   5    this COVID-19 which -- you know, it's important to take a step

6    back here in the middle -- almost the middle of July now -- that

7    just came into our country this year.  All of these events are

8    in the year 2020.

9               And TDCJ, the evidence is going to show, has

09:58:35  10    acted in a prompt fashion by advising its employees who are ill

11    or running a fever of 100.4 degrees or higher to stay at home,

12    began implementing COVID-19 screening for employees that fell

13    ill at work.

14               On March 24th, your Honor, TDCJ intentionally

09:58:56  15    minimized transfers between units based upon an agency and

16    case-by-case need -- needed basis.  TDCJ's prompt response also

17    included manufacturing COVID-19 signs and posters to increase

18    the educational awareness of the offenders at the Pack Unit

19    about how to practice good hygiene.

09:59:19  20               They prepared an offender pamphlet, an offender

21    pocket card.  They disseminated the information and posted it in

22    high traffic areas at the Pack Unit in order to educate the

23    offenders about the risk of COVID-19 and what they could do to

24    protect themselves.

09:59:36  25               TDCJ intentionally inventoried existing

1    stockpiles of PPE, personal protective equipment, masks, gloves,

2    gowns; began to acquire additional PPE for the Pack Unit and its

3    other units.  TDCJ began deliberately manufacturing cloth masks,

4    face shields, plastic gowns as a supplement to its PPE at the

09:59:58    5    TDCJ factories or manufacturing places that it had.

6              Your Honor, after Leonard Clerkly tested positive

7    on April 13th, on that same day the order was issued in the

8    evening, implemented the next day, for precautionary lockdown at

9    the Pack Unit; under this precautionary lockdown, the offenders

10:00:22    10    who had been previously advised before the precautionary

11    lockdown.  And social distancing was enforced when the offenders

12    lined up to go to the chow line.

13             Instead of four offenders at a table before the

14    precautionary lockdown, that was reduced to two offenders in

10:00:39    15    order to practice social distancing.  Social distancing was

16    enforced by the TDCJ officers as the offenders were lining up at

17    their pill window before the precautionary lockdown.

18             But after the precautionary lockdown, in order to

19    enforce an even further quarantine, the offenders are now fed as

10:00:53    20    of April 14th through the present date in their dormitories at

21    their cubicles to minimize the risk of coming in contact with

22    each other.  Also, the offenders are no longer having to line up

23    at a pill window, your Honor.  The offenders are able to receive

24    their medicines in their own dorm.

10:01:13    25             In response to Leonard Clerkly's positive test,

1   what did TDCJ do?  TDCJ purposefully tested all of the offenders

2   in Mr. Clerkly's dorm.  All of the test results from

3   Mr. Clerkly's dorm-mates came back negative.

4                TDCJ has also responded reasonably, your Honor,

10:01:36   5   to the risk of COVID-19.  TDCJ produces its own hand soap, and

6   offenders are given adequate supplies of hand soap for use by

7   them and the staff.  In fact, the offenders are given five bars

8   of soap, the evidence will show, your Honor, per week; and

9   they're able to request more if they run out.

10:01:55   10   Their soap as they're entering into the shower

11   that the offenders can grab on the way, and they're given the

12   opportunity to shower on a daily basis if they want.  TDCJ

13   enhanced the cleaning and disinfection of the Pack Unit facility

14   in response to COVID.  TDCJ also implemented a number of the

10:02:16   15   social distancing measures that I've already talked about and

16   we'll discuss further in the course of this case.

17                One issue that I want to address, your Honor, is

18   the difference between a medical issue and a security issue.  A

19   medical issue, your Honor, concerns hand sanitizer; and you

10:02:37   20   won't hear any disagreement from the Defendants' experts that

21   hand sanitizer can be one of the items used for a good hygiene

22   practice.

23                But what you will hear, your Honor, is that hand

24   sanitizer poses a security issue.  That's a twofold security

10:02:57   25   issue.  First, hand sanitizer is alcohol-based.  It's supposed

1    to be made with 60 percent alcohol, your Honor, which alcohol

2    can be used as an accelerant to start and intensify a fire.

3              The alcohol-based hand sanitizer can also be

4    adjusted.  Reality in the Pack Unit as well as a number of other

10:03:21  5    institutions is that there have been substance abuse problems;

6    and unfortunately, during this pandemic, two inmates at a Nevada

7    correctional institution died after drinking the hand sanitizer

8    which necessitated the Nevada correctional institution to remove

9    the hand sanitizer from all of its facilities.

10:03:41  10             So, your Honor, the issue isn't whether

11   Plaintiffs think it would be more reasonable, more appropriate

12   to provide hand sanitizer or even if the Court disagrees with

13   TDCJ's recent decision to not supply hand sanitizers in order to

14   protect the offenders because soap and water is readily

10:04:07  15   available and TDCJ is complying with the CDC guidelines for

16   making soap and water available.

17             It's considered relaxing the restrictions on hand

18   sanitizer and made the deliberate determination that the

19   security risks are too great relative to the benefit when

10:04:20  20   offenders can wash their hands with soap and water as often as

21   they like, essentially, at the Pack Unit.

22             So, the issue isn't even whether the Court

23   disagrees, finds that policy inadequate.  The issue again comes

24   back to our two words that this case is about:  deliberate

10:04:36  25   indifference.  There is no evidence that TDCJ acted deliberately

1    indifferent to the risks of COVID-19 for the offenders at the

2    Pack Unit with regard to hand sanitizer or with regard to soap.

3              I'd just like to real quickly move through, your

4    Honor, TDCJ's response has been reasonable; and these are some

10:05:00  5    of the signs or posters or items that are at the Pack Unit in

6    response to COVID-19 and continue to remain up at the Pack Unit.

7              If we can scroll down further.

8              Bear with me one moment, your Honor.  I think we

9    have a technological issue.

10:05:32  10          THE COURT:  Okay.

11          MR. COWLES:  Your Honor, I'm afraid my computer where

12    my PowerPoint is on just crashed.  We'll pull that back up or

13    change out my --

14          THE COURT:  We can do that later, yeah.

10:05:59  15          MR. COWLES:  My colleague is going to pull this up on

16    his computer, I believe.

17          THE COURT:  Your 15 minutes has been exceeded.  How

18    much more do you have?

19          MR. COWLES:  Your Honor, if I can just, after we get

10:06:15  20    this up and rolling, have two more minutes, I will close things

21    out.

22              Your Honor, I just wanted to -- we'll start up;

23    and I'll close out in two minutes, your Honor.  These are just

24    some of the slides I just want to go through real quickly to

10:07:28  25    show what's been posted to educate the offenders about what they

1    can do to prevent the spread of COVID-19, how they can control

2    the risks.

3                    Are we able to scroll down?

4                    Again, additional pamphlets, posters that are up

10:07:45    5    there, what can be done; identifying the symptoms; how to stop

6    germs; wash your hands for 20 seconds with the soap and water.

7    On the right, your Honor, those are the bars of soap, one of the

8    boxes, the many that are at the Pack Unit; cleaning supplies;

9    the PPE on the left.

10:08:03    10                    If we can keep scrolling down.

11                    So, lastly, your Honor, I just want to address

12    one final point in the last minute I have.  You've heard from

13    the Plaintiffs' counsel that they think that the 19 deaths

14    demonstrate that TDCJ's policy and implementation was

10:08:20    15    insufficient or inadequate.

16                    Your Honor, that is not the standard that is used

17    by the US Supreme Court to determine whether the Defendants can

18    be found liable in this case.  Instead, this case, again, comes

19    down to those two words, whether TDCJ acted with a deliberate

10:08:36    20    indifference.

21                    And your Honor, I tried to come up with the best

22    analogy that I could for this standard in the application to the

23    real world.  I found a medical journal article.  It stated that

24    there are 131 million surgeries performed throughout the world

10:09:00    25    every year.  Of those 131 million surgeries, within 30 days 4.2

1       million people, unfortunately, pass away.

2                   What the surgeons are doing in attempting to save

3       lives does benefit the vast majority of people, but the

4       unfortunate reality of the world that we live in is that in that

10:09:27   5    case 4.2 million people died within 30 days from the surgery.

6       It's, like, the unfortunate reality for the Pack Unit is that

7       there have been 19 offenders who have died and tested positive

8       for COVID-19.

9                   It's an unfortunate reality 135,000 Americans

10:09:46  10    have dialed.  It's an unfortunate reality 569,000 people

11      worldwide from the last information that I have seen have died.

12      But the numbers do not establish bad policy or bad

13      implementation or inadequate implementation of the policy.

14                  Even if they did, your Honor, that is not the

10:10:05  15    standard.  The standard is deliberate indifference; and your

16      Honor, the relevant numbers are just like the surgeons across

17      the globe save 127 million lives per year, TDCJ has saved the

18      lives of 1,160 inmates so far at the Pack Unit because of these

19      deliberate measures that were reasoned and considered and

10:10:33  20    implemented promptly based upon the leading medical authority's

21      guidance and recommendations and have been implemented in the

22      most reasonable fashion, the evidence is going to show, at trial

23      today.

24                  We submit that the Plaintiffs -- their evidence

10:10:49  25    goes to a different standard of reasonableness, of inadequacy,

1  of insufficiency when the legal standard articulated by the

2  Fifth Circuit, the United States Supreme Court in this case is

3  one of deliberate indifference for which there's no evidence the

4  Plaintiffs will be able to establish, let alone persuade the

10:11:07  5  Court, that they met their burden.

6               And with that, I will stop, your Honor.

7               Thank you.

8          THE COURT:  Okay, thank you.

9               Do we want to pre-admit exhibits?

10:11:20  10         MR. KEVILLE:  Your Honor, this is John Keville for the

11  Plaintiffs.  We do want to pre-admit exhibits.  Unfortunately,

12  we have a couple of issues.  They were unable to discuss that

13  with us last night.  Mr. Cowles said he did not have the time.

14              Number 2, we got their exhibits; and none of

10:11:37  15  their exhibits have numbers on them.  So, we can't tell from

16  page 1 to page 1,000 where exhibits start and end without

17  guessing.  So, it's going to be very difficult; and we've asked

18  them to give us actual exhibit numbers; and we haven't received

19  that yet.

10:11:52  20         THE COURT:  Okay.  We'll just have to take it exhibit

21  by exhibit then.

22         MR. COWLES:  Your Honor, may I address one point in

23  response?

24         THE COURT:  Yes, sir.

10:12:00  25         MR. COWLES:  We did speak with the Plaintiffs' counsel

1    last night.  We had a conversation.  Plaintiffs' counsel told me

2    it was seven minutes long.  The problem was Plaintiffs' counsel

3    before our conference call at 8:00 o'clock last night, 21

4    minutes before, sent us an amended exhibit list.

10:12:13    5            It just identified 16 new documents.  It was 27

6    pages long.  It did not initially contain the documents.  They

7    subsequently provided them, but I did not have time 21 minutes

8    before -- they scheduled the conference call -- when they sent

9    us 16 new exhibits that were identified which we didn't have, to

10:12:33   10   go through their last minute attempt to change the nature of

11   this trial.

12            And Plaintiffs' counsel, I would submit, have

13   been engaged in a trial by ambush which is entirely unfair.

14   They've amended their witness list.  They continue to change

10:12:49   15   things.  And this is not only a COVID-19 pandemic situation that

16   we're dealing with, this is a trial three and a half months

17   after the complaint was filed.

18            We are doing everything that we reasonably can I

19   want to assure this Court; and to say that we didn't have time,

10:13:05   20   the context is important.  When I'm given an amended exhibit

21   list 21 minutes before a scheduled conference call at 8:00

22   o'clock the night before we're going to start this trial, I

23   think that that is misleading to this Court; and I wanted to

24   correct that.

10:13:21   25            THE COURT:  Okay.  We'll just have to take the

1    exhibits as they come up then.

2                   Are we ready for the presentation of evidence

3    then?

4                   MR. KEVILLE:  We are, your Honor, for the Plaintiffs.

10:13:32  5        THE COURT:  Do you want to call your first witness?

6                   MR. KEVILLE:  Yes, your Honor.  We call Bryan -- oh,

7    your Honor, I would like to invoke the rule to preclude the

8    witnesses -- the percipient fact witnesses from TDCJ.

9                   THE COURT:  Any objection to enforcing the rule?

10:13:46  10       MR. COWLES:  I just would like the rule to go both

11   ways, that --

12                  THE COURT:  Of course.  Of course.

13                  MR. COWLES:  -- it's going to be all witnesses are

14   precluded other than the testifying witness.  Is that what your

10:13:57  15  Honor is going to be enforcing?

16                  THE COURT:  Yes.  But normally -- there's arisen

17   something of a common law exception to the rule which is that

18   experts are not subject to it.  Now, do you intend to exclude

19   experts, too?

10:14:11  20       MR. KEVILLE:  Your Honor, for the Plaintiff, we would

21   not intend to exclude experts.  I think the experts need to hear

22   what is --

23                  THE COURT:  That's the reason for the exception.

24                  Is that agreeable, Mr. Cowles?

10:14:25  25       MS. VASQUEZ:  Your Honor, this is Christin Vasquez.


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

1              We agree --

2              THE COURT:  You say you don't have a problem --

3              MS. VASQUEZ:  -- that the experts should be able to

4    watch the testimony.  I just want to clarify for the Defendants

10:14:38   5    that the parties, including the TDCJ 30(b)(6) witness, will be

6    allowed to watch the testimony.

7              THE COURT:  Well, the parties aren't subject to the

8    rule at all.  The parties can listen to anything they want.

9              Okay.  Let's proceed and the rule will be

10:14:56  10    invoked.  Parties will be allowed to hear all the testimony.

11    Experts will be allowed to hear all the testimony.

12              Okay.  Your first witness, Mr. Keville.

13              MR. KEVILLE:  Your Honor, we call Bryan Collier.

14              THE COURT:  Okay.  Is he going to appear in person or

10:15:11  15    by deposition?

16              MR. KEVILLE:  In person.

17              THE COURT:  Okay.  Mr. Collier then.

18              Mr. Rivera will administer the oath.  If you'll

19    raise your right hand, please.

10:15:45  20              Okay.  Is Mr. Collier on the premises?

21              THE WITNESS:  Good morning, your Honor.

22              THE COURT:  Good morning.

23              Raise your right hand for the administration of

24    the oath.

10:15:59  25    //

Collier - As On Cross/Keville

1          (The witness, **BRYAN COLLIER,** Defendant, called on behalf of

2     the Plaintiffs, was sworn.)

3               THE COURT:  Okay.  Thank you, Mr. Collier.

4                    Your inquiry, Mr. Keville.

10:16:16    5          MR. KEVILLE:  Thank you, your Honor.

6                    AS ON CROSS-EXAMINATION

7     BY MR. KEVILLE:

8     **Q**     Good morning, Mr. Collier.

9     **A**     Good morning, sir.

10:16:19   10    **Q**     You are the executive director of the Texas Department of

11    Criminal Justice, TDCJ, correct?

12    **A**     Yes, sir.

13    **Q**     Executive director is the highest position in the agency?

14    **A**     Correct, yes, sir.

10:16:29   15    **Q**     You oversee the activities of TDCJ?

16    **A**     Yes, sir.

17    **Q**     TDCJ is responsible for the operation of correctional

18    facilities or the prison system in Texas which includes 104

19    prisons around the state, correct?

10:16:44   20    **A**     Yes, sir, that is correct.

21    **Q**     The Pack Unit is one of those 104 prisons, correct?

22    **A**     Yes, sir.

23    **Q**     And there are a large number of staff that work at those

24    104 prisons, correct?

10:16:58   25    **A**     Yes, sir.

Collier - As On Cross/Keville

1    Q    And there's a significantly larger number of inmates at
2    those 104 prisons, correct?
3    A    Yes, sir.
4    Q    The safety of the staff and of the inmates in those 104
10:17:10    5    prisons is of the utmost importance to you and to TDCJ, correct?
6    A    Yes, sir, it is.
7    Q    As to your specific staff, the Correctional Institution
8    Division director is Lorie Davis, correct?
9    A    Yes, sir.
10:17:25    10    Q    She reports directly to you?
11    A    Yes, sir.
12    Q    Lorie Davis is responsible for the day-to-day operation of
13    the Correctional Institution Division which includes the Pack
14    Unit?
10:17:36    15    A    Yes, sir.
16    Q    Ultimately, you and Lorie Davis are the people responsible
17    for the policies at the Pack Unit?
18    A    Ultimately, in a global sense I think, yes, sir.
19    Q    You understand now and you understood in March when you
10:17:53    20    were beginning to plan how to deal with COVID-19 that
21    individuals that are older and individuals with health
22    conditions are at a higher risk if they're infected by COVID-19?
23    A    I understood that an offender or anyone with a preexisting
24    medical condition or anyone who is elderly could have more
10:18:16    25    significant complications from COVID-19.

Collier - As On Cross/Keville

1  Q    Okay and you understood that back in March when you began
2  planning how to deal with COVID-19?
3  A    Yes, sir.
4  Q    And you knew back in March that the Pack Unit had an
5  elderly population, older than many of the prisons in Texas?
6  A    Yes, sir.
7  Q    You had several talks with Warden Herrera during this
8  pandemic, correct?
9  A    Yes, sir.
10  Q    Warden Herrera is the warden at the Pack Unit, correct?
11  A    He is, yes, sir.
12  Q    And you don't remember Warden Herrera ever raising anything
13  that he wanted or needed to help prevent COVID-19 spread in the
14  Pack Unit in your discussions with him?
15  A    In my discussions with Warden Herrera, I don't remember any
16  specific need that he met -- did not have met.
17  Q    Yeah.  My question was a little different, sir.  You don't
18  remember Warden Herrera ever raising anything that he wanted or
19  needed to help prevent COVID-19 spread in the Pack Unit?
20  A    I'm not aware of a specific request like that, sir.
21  Q    Okay.  Mr. Collier, you're a busy man, correct?
22  A    I mean, I'm busy like lots of folks, yes, sir.
23  Q    I mean, heck, you have the entire Texas prison system to
24  oversee, correct?
25  A    Yes, sir.

10:18:30 (line 5)
10:18:42 (line 10)
10:18:58 (line 15)
10:19:24 (line 20)
10:19:42 (line 25)

Collier - As On Cross/Keville

1  Q     And we're about to start a trial that, at least, according

2  to your counsel, will probably go two weeks.

3                 Do you understand that?

4  A     Yes, sir, I do.

10:19:51  5  Q     We will hear from a number of inmates who will say that

6  TDCJ Policy 14.52 is not being followed in certain respects.

7                 Do you understand that?

8  A     I understand that I may hear from those offenders; and if

9  that's what their testimony will be, yes, sir.

10:20:08  10  Q     Okay.  And you understand there have been inmate grievances

11  about COVID-19 protection, correct?

12     (Technical interference.)

13            MR. KEVILLE:  Your Honor, I think there was a somewhat

14  inaudible objection, and I think the witness is --

10:20:34  15            THE COURT:  I didn't hear the objection.

16                 Could you repeat it, please.

17            MS. VASQUEZ:  Objection for lack of personal

18  knowledge.

19            THE COURT REPORTER:  I'm sorry.  Who is speaking?  And

10:20:37  20  I can't hear you.

21            THE COURT:  Is the objection --

22            MS. VASQUEZ:  This is Christin Vasquez, and my

23  objection was lack of personal knowledge, lack of foundation.

24            THE COURT:  This is Ms. Vasquez objecting.

10:21:02  25                 Okay.  Well, the warden is an intelligent person.

Collier - As On Cross/Keville

1    If he lacks the knowledge, he can say so.  I'm going to allow to

2    the question.

3    BY MR. KEVILLE:

4    **Q**    Mr. Collier, you understand that there have been inmate

10:21:17    5    grievances about COVID-19 protection?

6    **A**    I'm aware that there have been COVID-19 grievances; but of

7    the substances of those grievances, I'm not specifically aware.

8    **Q**    Okay.  In fact, you changed the grievance policy across all

9    the TDCJ units to address inmates' COVID-19 grievances quicker,

10:21:32    10    correct?

11    **A**    We modified the time frame and also created a specific code

12    for COVID-19 grievances.  The purpose behind that was to be more

13    proactive in knowing if there were any COVID-related grievances

14    that were filed.

10:21:45    15    **Q**    And you did that at the end of May, correct?

16    **A**    Yes, sir, that occurred in May.

17    **Q**    Okay.  And you did not apply that retroactively to

18    grievances that were filed before the end of May, correct?

19    **A**    I do not believe that we did.

10:22:01    20    **Q**    Mr. Collier, you remember that I took your deposition,

21    correct?

22    **A**    I do.

23    **Q**    Okay.  And I know that you and TDCJ did not agree to allow

24    inmates access to hand sanitizer so that will be a dispute for

10:22:14    25    this trial.  But perhaps, we can put the inmates' other

Collier - As On Cross/Keville

1  Constitutional violation complaints behind us by agreeing to

2  narrow some of the issues other than hand sanitizer.  And that's

3  why we're here, correct, to resolve our disputes?

4  **A**    Yes, sir, I suppose so.

10:22:31  5  **Q**    Okay.  I'd like to see first maybe what we can reach

6  agreement on.  So, let me ask this question to start:  You agree

7  that testing for COVID-19 is an important thing to do in order

8  to control the spread of COVID-19?

9  **A**    As I understand COVID-19 and the ability to test offenders

10:22:56  10  for positivity or negativity of COVID-19, TDCJ has implemented a

11  process of testing large numbers of offenders to help identify

12  those that are positive; separate them from anyone who is

13  negative because, COVID-19, for many people, you can have

14  asymptomatic COVID-19 and display no symptoms or signs and,

10:23:19  15  therefore, be a carrier without anyone really knowing it.

16      So, we have done mass testing across our system

17  to try to identify offenders that may have it but don't have any

18  symptoms or signs.

19      We also have continued to do symptomatic testing.

10:23:34  20  Our two medical universities do symptomatic testing of offenders

21  who display any signs or symptoms related to COVID-19.

22  **Q**    And I appreciate you telling us what you're doing.  My

23  question was a little simpler, and I apologize if I wasn't

24  clear.

10:23:48  25      You agree that testing for COVID-19 is an

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  important thing to do to control the spread of that disease?

2          MS. VASQUEZ:  Objection.  Calls for an expert opinion.

3          THE COURT:  No.  He's -- he's being offered as a -- as

4  the executive director of TDCJ; and in that capacity, he can

10:24:10  5  offer his best opinion.  We understand he's not testifying as an

6  expert.

7          THE WITNESS:  I do understand that testing is

8  absolutely a way to identify offenders that may have COVID-19

9  and separate those from those who do not.

10:24:26  10  BY MR. KEVILLE:

11  Q    And that's an important thing to do to control the spread,

12  correct?

13  A    I believe it is, yes, sir.

14  Q    Okay.  Going back to early March of this year, you and

10:24:33  15  others at TDCJ understood that testing was an important factor

16  in trying to control the spread of COVID-19, correct?

17  A    Could you repeat your question, sir, I'm sorry.

18  Q    Sure.  Going back to early March of this year, you and

19  others at TDCJ understood that testing was an important factor

10:24:49  20  in trying to control the spread of COVID-19?

21  A    I think that if you go back to March where testing was

22  fairly limited, limited in that testing was primarily done in

23  outside hospitals because tests themselves were hard to get, we

24  understood that testing, obviously, was the way you validated if

10:25:08  25  someone had COVID-19.

Collier - As On Cross/Keville

1          I couldn't say that I knew in March what I know
2    now about testing larger populations.
3  **Q**    Do you remember you were deposed just a few weeks ago, sir?
4  **A**    I do, yes, sir.
10:25:20  5  **Q**    Did you answer that question differently then?
6  **A**    I don't recall specifically.
7          MR. KEVILLE:  Allen, could you play his deposition,
8    please.
9  BY MR. KEVILLE:
10:25:34  10  **Q**    So, you were asked by Mr. Cowles:  "You agree that even
11    going back to early March, you and others at TDCJ understood
12    that testing was an important factor in trying to control the
13    spread of COVID-19?"
14          And you said, "Yes, sir, that's correct."
10:25:49  15  **A**    Yes, sir.
16  **Q**    Okay.  So, do you agree now with the answer you gave in
17    your deposition?
18  **A**    I do.  I also agree with what I told you just a moment ago.
19  **Q**    As of June 4th, 2020, when you were deposed, there was no
10:26:04  20    plan, formal or informal, to do any retesting at the Pack Unit,
21    correct?
22  **A**    When I was deposed, as I told you in my deposition, we were
23    completing our Strike Team testing of 67 units and 107,000
24    offenders.  After we completed that, we were then going to
10:26:24  25    reprioritize and identify based our healthcare providers' advice

Collier - As On Cross/Keville

1  on how we should move forward with any additional testing.  And

2  that's the status we were in when you and I talked before.

3  **Q**     Did you answer that question differently when you were

4  deposed?

10:26:42  5  **A**     I believe I have would have answered then that there was

6  not a definite plan; but I explained in my deposition, if I'm

7  not mistaken, what I just explained.

8  **Q**     Okay.

9          MR. KEVILLE:  Allen, could you put up his deposition

10:26:54  10  at page 185, line 25, through 186, line 3.

11  BY MR. KEVILLE:

12  **Q**     And sir, you were asked "Well, so, currently, there is no

13  plan to do any retesting at the Pack Unit, formal or informal?"

14          And you answered "That is correct."

10:27:10  15          Do you recall that, sir?

16  **A**     I do.  I also recall explaining what I just explained, that

17  we were in the midst of completing our Strike Team testing and

18  that, upon the completion of that Strike Team testing, we had

19  identified that the tests would continue to be available; and we

10:27:25  20  would be working with our healthcare providers to develop the

21  plan to move forward, if we were going to move forward, with

22  additional testing.

23  **Q**     Sir, as of June 4, 2020, you had no specific plan, formal

24  or informal, to do any retesting at the Pack Unit?

10:27:42  25  **A**     That would be absolute correct in the literal sense.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1 **Q**    But just this past Friday, on July 10th, when we deposed

2 Lorie Davis, she testified that, as of June 27th, there is a

3 plan for retesting.

4             Now, you're aware of that plan, correct?

10:27:58  5 **A**    I'm aware, as I had explained earlier, after we completed

6 our Strike Team testing, we met with our healthcare providers

7 and developed, essentially, a plan to move forward with

8 additional Strike Team testing.  That included Strike Team

9 testing the Pack Unit in June.  I believe the second week of

10:28:20  10 June.

11             Since then, we have also tested the Pack Unit one

12 more time and have plans to continue to do that on a seven-day

13 basis.

14 **Q**    The current plan is that you will test the entire -- all

10:28:33  15 the COVID-19 negatives, correct?  And then, when you get the

16 results and isolate any positives, you go back in and test the

17 negative population again, get the results back, identify those

18 that are still negative, retest them, and repeat until you get

19 results back that have no positives, correct?

10:28:51  20 **A**    The current plan for the Pack Unit and three other

21 facilities would be that we would go in and do testing and then

22 test everyone who has been negative in the past.  None of the

23 positive offenders or positive staff who have ever had a

24 positive test will be retested.

10:29:10  25             We will test the negatives; separate, obviously,

Collier - As On Cross/Keville

1    anyone who is positive from that population; come back in seven

2    days; retest the negative; continue to do that on a seven-day

3    cycle until we identify no positive cases.

4                Following that, we would come back seven days and

10:29:28    5    again seven days after that to ensure that we had no additional

6    positives.  Then, we would begin focusing our attention on

7    testing staff at least every 14 days.

8    **Q**    You authorized that plan about two, three weeks ago,

9    correct?

10:29:46    10    **A**    That would be correct, yes, sir.

11    **Q**    That plan is not in writing anywhere, correct?

12    **A**    Probably not at this point, no, sir.

13    **Q**    There are no documents we could look at to determine the

14    details of implementation or even that showed TDCJ has actually

10:30:03    15    committed to this plan?

16    **A**    There would be information that would reflect that we have

17    done the first round of testing on those facilities.  I'm not

18    sure if we have done all four.  I know we have done -- I believe

19    the Pack Unit and the Duncan Unit have been completed.

10:30:20    20    **Q**    Sure.  That's just documents that show you're doing

21    testing.  There are no documents we could look at to determine

22    how this plan is going to be implemented or documents that show

23    TDCJ has committed to this plan, correct?

24    **A**    At this time, that is correct.

10:30:35    25    **Q**    Mr. Collier, will you address the judge and commit to the

Collier - As On Cross/Keville

1  plan that you just said you're going to do for the Pack Unit?

2          MS. VASQUEZ:  Objection, your Honor.  This calls for

3  a --

4          THE COURT REPORTER:  I'm sorry, I couldn't hear you.

5  This calls for --

6          MS. VASQUEZ:  A legal conclusion and Mr. Collier's

7  conference with his attorneys.

8          MR. COWLES:  Your Honor, I asked about no legal

9  conclusion.  I asked simply whether he would address the Court

10 and commit to what he just testified he was going to do.

11          THE COURT:  I think the question is legitimate.

12          THE WITNESS:  Two things:  One, I would need to confer

13 with our attorneys to find out if there is additional

14 ramifications for that; however, the testing that we are doing

15 on the four facilities as discussed like we're doing at the Pack

16 Unit, again, is a model developed by our healthcare partners,

17 the university partners and Dr. Linthicum.

18          It is not one that -- it is possible that that

19 plan could see multiple changes as we continue to do it because

20 it is not based specifically on a CDC direct guideline as it

21 relates to correctional facilities.

22          So, I do not know if the plan will change in the

23 future; but on the bigger scale, I would still need to address

24 with our attorneys if there is legal ramifications for agreeing

25 to do that for the Court.

Collier - As On Cross/Keville

1  BY MR. KEVILLE:

2  **Q**    Okay.  So, as of now, you're not willing to commit to doing

3  this --

4             THE COURT:  I think he's answered the question.  Let's

10:32:01  5  move on.

6             MR. KEVILLE:  Okay.

7  BY MR. KEVILLE:

8  **Q**    Let me ask another question, Mr. Collier:  The men that we

9  represent at the Pack Unit have asked that TDCJ provide all

10:32:18  10  class member inmates with unrestricted access to hand soap and

11  clean hand towels.

12             Do you agree to continue to do this throughout

13  the pandemic?

14             MS. VASQUEZ:  Objection, your Honor.  This calls for a

10:32:29  15  legal conclusion and consultation with --

16             THE COURT:  No.  It's what they're willing to commit

17  to.  He can admit it or deny it.

18             THE WITNESS:  Within our protocols for TDCJ, we have

19  continued to provide hand soap and encouraged offenders to use

10:32:47  20  hand soap as a way -- that's one of the number one ways to

21  actually prevent COVID-19 is frequently washing our hands.

22             We provided soap but also provide soap access so

23  that they can have additional soap as necessary, and we also

24  provided an exchange for a hand towel each day.  We have done

10:33:05  25  that for the last -- not the entire amount of time since this

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  started; but again, I don't know what ramifications that would

2  have if I agree to that on behalf of the Court.  So, I would

3  need to talk to my attorneys about that.

4  BY MR. KEVILLE:

10:33:17   5  Q    Okay.  So, while you're saying that you have a policy

6  you're not agreeing to it on the record; is that correct?

7            THE COURT:  He's saying he's not going to commit to it

8  going forward.  I think that's an adequate answer.  Let's move

9  on.

10:33:32  10           MR. KEVILLE:  Okay.

11  BY MR. KEVILLE:

12  Q    Mr. Collier, the men that we represent at the Pack Unit

13  have asked that TDCJ provide all inmates and staff members with

14  masks.  And you have indicated that inmates receive cloth masks

10:33:46  15  which can be turned in each day and fresh masks provided.

16            Do you agree to continue to do this until the end

17  of the COVID-19 outbreak?

18            MS. VASQUEZ:  Your Honor, same objection.  This calls

19  for a legal conclusion and consultation with Mr. Collier's

10:33:57  20  attorneys.

21            THE COURT:  If he thinks it calls for a legal

22  conclusion, he can say that.  What he's asking about is a matter

23  of procedure, if they're going to provide masks daily.  That's

24  not a hard question.

10:34:07  25            THE WITNESS:  We have continued to provide -- we --

Collier - As On Cross/Keville

1    one, we manufactured masks early in the process.  We issued

2    those masks to offenders in the month of April, to the offenders

3    that were over 65 first.  Then, we followed up with the rest of

4    the offender population with cotton masks.  We have since

10:34:24   5    created enough cotton masks in inventory.  Daily exchange of

6    those masks is done with offenders, and that has been done

7    throughout the COVID-19 epidemic since we were able to get that

8    out.

9            That process remains again subject to anything

10:34:40   10    that may interpret that differently from the CDC or any other

11    outside guidelines that change it.  But again, answering that

12    and agreeing to that for the Court might have legal

13    ramifications; and I would have to ask my attorneys.

14    BY MR. KEVILLE:

10:34:57   15    Q    Mr. Collier, the men that we represent at the Pack Unit

16    have asked that TDCJ provide cleaning supplies for each housing

17    area, including bleach-based cleaning agents and CDC-recommended

18    disinfectants in sufficient quantities to facilitate frequent

19    cleaning, including in quantities sufficient for each inmate to

10:35:16   20    clean and disinfect the floor and all services of his own

21    housing cubicle and provide new gloves and masks to each inmate

22    during each time they're cleaning or performing janitorial

23    services.

24            Do you agree to do this?

10:35:30   25            MS. VASQUEZ:  Objection, your Honor.  Calls for a

Collier - As On Cross/Keville

1    legal conclusion and requires Mr. Collier to consult with his

2    attorneys.

3              THE COURT:  I'm going to allow --

4              THE WITNESS:  I think while I recognize --

10:35:38   5   THE COURT:  I'm going to allow the question.  He can

6    qualify the answer however he wishes.

7              THE WITNESS:  I apologize, your Honor.

8              THE COURT:  All right.

9              THE WITNESS:  I'm aware that those protocols are in

10:35:49  10   place within TDCJ; but again, I would have to ask our attorneys

11   for advice based upon agreeing to that for the Court.

12   BY MR. KEVILLE:

13   **Q**   Okay.  But you agree -- you believe that the protocols that

14   I just read to you are in place at TDCJ?

10:36:05  15  **A**   I do believe the -- I'd have to go back through your list

16   again; but yes, sir, I do believe the protocols that you

17   referenced are protocols that we have in place.

18   **Q**   Mr. Collier, Plaintiffs have asked that TDCJ provide all

19   inmates with access to tissues or, if tissues are not available,

10:36:22  20   additional toilet paper above their normal allotment.

21              Do you agree to do this through the end of the

22   COVID-19 outbreak at the Pack Unit?

23              MS. VASQUEZ:  Objection.  Calls for a legal conclusion

24   and consultation with his attorneys.

10:36:36  25              THE COURT:  Same ruling.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE WITNESS:  Within our protocols, we have added an
2     additional roll of toilet paper; and that's also something that
3     can be available, if necessary, upon request, not specifically
4     tissues but the extra toilet paper to help address that issues.
10:36:49  5     Again, I would have to ask the attorneys if there's a
6     ramification for agreeing to that for the Court.
7     BY MR. KEVILLE:
8     Q    Mr. Collier, the men we represent at the Pack Unit have
9     asked that TDCJ institute a prohibition on new prisoners
10:37:03  10    entering the Pack Unit for the duration of the pandemic or, in
11    the alternative, test all new prisoners entering or place new
12    prisoners in quarantine for 14 days.
13              Do you agree to these measures?
14              MS. VASQUEZ:  Objection.  Calls for a legal conclusion
10:37:18  15    and consultation with Mr. Collier's attorneys.
16              THE COURT:  Same ruling.
17              THE WITNESS:  It would require, obviously, for me to
18    confer with attorneys.  We do not have that -- we have not added
19    any offenders to the Pack Unit during this event.  However, to
10:37:29  20    agree that we would never -- because this event may last quite
21    sometime.
22              For us to agree -- I'm not sure I can agree to
23    that either way.  But I certainly would have to ask attorneys
24    for advice.  That's not a protocol that's in place now;
10:37:43  25    although, we have not moved anyone new to the Pack Unit.

Collier - As On Cross/Keville

1  BY MR. KEVILLE:

2  **Q**     Okay.  Would you agree that in the alternative to a

3  complete prohibition that you would test all new prisoners

4  entering the Pack Unit for COVID-19 or place them in quarantine

10:37:58  5  for 14 days if there's no test available?

6            MS. VASQUEZ:  Objection.  Calls for a legal conclusion

7  and consultation with his attorneys.

8            THE COURT:  Same ruling.

9            THE WITNESS:  Again, I would have to ask our attorneys

10:38:10  10  for what ramifications that might have.

11  BY MR. KEVILLE:

12  **Q**     Mr. Collier, the men that we represent at the Pack Unit

13  have asked that TDCJ limit transportation of Pack Unit inmates

14  out of the prison to transportation involving immediately

10:38:21  15  necessary medical appointments and release from custody and,

16  when that transport is necessary for medical release, provide

17  social distancing.

18            Do you agree to do this through the remainder of

19  this pandemic?

10:38:35  20            MS. VASQUEZ:  Objection.  Calls for a legal conclusion

21  and consultation with his attorneys.

22            THE COURT:  Same ruling.

23            THE WITNESS:  That is a practice that TDCJ does have

24  in place.  We have limited transportation not only at the Pack

10:38:44  25  Unit but throughout the system for only critical needs.  At the

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1  same time, to agree to that before the Court would potentially

2  have ramifications.  I would have to talk to our attorneys about

3  that.

4  BY MR. KEVILLE:

10:38:57  5  **Q**   Mr. Collier, the men we represent at the Pack Unit have

6  asked that TDCJ implement and enforce strict social distancing

7  measures requiring at least six feet of distance between

8  individuals where the inmates are required to congregate and, to

9  the extent possible, use common areas like the gymnasium, the

10:39:14  10  library, the law library, classrooms as temporary housing for

11  inmates without disabilities to increase the social distancing

12  at the Pack Unit.

13         Do you agree to do this for the remainder of the

14  COVID-19 outbreak?

10:39:25  15         MS. VASQUEZ:  Objection.  Calls for a legal conclusion

16  and consultation with his attorneys.

17         THE WITNESS:  Social distancing is --

18         THE COURT:  Same ruling.

19         Go ahead, Mr. Collier.

10:39:34  20         THE WITNESS:  I'm sorry, again.  I'm sorry, your

21  Honor.

22         Social distancing in prison is a difficult issue.

23  One, spaces may not allow for an exact six-foot rule; and

24  according to the CDC guidelines, you have to the develop a plan

10:39:50  25  for the specific facility that are working within.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1    We have done that at the Pack Unit as we have

2 with our other facilities.  We have also looked at alternatives

3 of where we can house.  One thing I would point out to is that

4 the Pack Unit is a unit that is required to have

10:40:06   5 air-conditioning, which it does; however, the gymnasium does not

6 have air conditioning and is not suitable for housing based upon

7 that and the population that is housed there.  We have maximized

8 the use of other space on the unit to ensure that we are

9 spreading out offenders, to the best of our ability, within the

10:40:22   10 design of that facility.

11    Warden Herrera and his team have continued to

12 enhance that process throughout; but again, I think agreeing to

13 do that for the Court, I don't know the legal ramifications of

14 that; and I would have to ask our attorneys.

10:40:37   15 BY MR. KEVILLE:

16 **Q**    Mr. Collier, the men we represent at the Pack Unit have

17 requested that TDCJ post signage and information in common areas

18 about COVID-19 and how to protect themselves and educate inmates

19 on the COVID-19 pandemic by providing information about

10:40:56   20 pandemic, the symptoms, transmission, and how to protect

21 themselves.

22    Do you agree to do this for the remainder of the

23 COVID-19 pandemic?

24 **A**    TDCJ --

10:41:07   25    MS. VASQUEZ:  Objection.  Calls for a legal conclusion

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

 1    and consultation with his attorneys.

 2            THE COURT:  Same ruling.

 3            THE WITNESS:  TDCJ has had signage in place, continues

 4    to look at how we provide information to the offender and staff

10:41:23   5    populations that are within our facilities.  We've had that in

 6    place for sometime, not only signs but as well as videos that we

 7    play regularly as well as announcements on things like the

 8    healthcare fee being waived.

 9            TDCJ has had that protocol in place; but again,

10:41:39  10    to agree to that may have legal ramifications that I would have

11    to understand from our attorneys.

12    BY MR. KEVILLE:

13    Q    Mr. Collier, the men we represent have requested that for

14    any inmate correctional officer or staff member who tests

10:41:56  15    positive for COVID-19 TDCJ perform contact tracing to determine

16    all individuals and surfaces contacted during the two-week

17    period before the test result.

18            Do you agree to do that?

19            MS. VASQUEZ:  Objection.  Calls for a legal conclusion

10:42:09  20    and consultation with his attorneys.

21            THE COURT:  Same ruling.

22            THE WITNESS:  According to what I understand according

23    to the CDC guidelines, contact tracing is a 48-hour window, not

24    necessarily a two-week window; but again, we do contact tracing

10:42:27  25    for staff as well as offenders.  We've had that protocol in

Collier - As On Cross/Keville

1  place as well.  However, to agree to that for the Court may have

2  legal ramifications; and obviously, I would have to talk to our

3  attorneys.

4  BY MR. KEVILLE:

10:42:42  5  Q    Mr. Collier, your attorneys have represented to this Court

6  and to the Fifth Circuit that TDCJ is doing many or most of the

7  things we've just discussed.

8          Do you understand that?

9  A    Yes, sir.

10:42:52  10  Q    And you're the top man at TDCJ, correct?

11  A    I'm the executive director for TDCJ.

12  Q    So, who has authority to agree on behalf of TDCJ if it's

13  not you?

14  A    It ultimately could be me; but it, again, would require me

10:43:09  15  to conference with attorneys and understand the full

16  ramifications of that.

17  Q    And without revealing any discussions with counsel, have

18  you ever discussed agreeing to the conditions that we've just

19  discussed?

10:43:27  20          MS. VASQUEZ:  Objection.  Calls for attorney/client

21  communications.

22          THE COURT:  No.  He specifically excluded

23  attorney/client communications.  He's saying other than

24  attorney/client communications.

10:43:40  25          THE WITNESS:  Other than specifically with the

Collier - As On Cross/Keville

 1  attorneys, no, sir, I'm not aware of that.
 2  BY MR. KEVILLE:
 3  **Q**    Mr. Collier, will you commit to discussing with your
 4  attorneys, without telling me any substance of what you'll
 5  discuss in the future, whether you will agree to do this in a
 6  way so we can narrow this trial down to what's really at issue?
 7              MS. VASQUEZ:  Objection.  Attorney/client privilege.
 8              THE COURT:  I'm going to allow it.
 9              THE WITNESS:  As I understand your question, you're
10  asking me to commit to the Court that I will talk with our
11  attorneys about the things you asked me to agree to?
12  BY MR. KEVILLE:
13  **Q**    That is correct.
14  **A**    And again, I don't know even what legal ramifications that
15  would have.
16              THE COURT:  Okay.  Let's move on.
17              MR. KEVILLE:  Okay.
18  BY MR. KEVILLE:
19  **Q**    Mr. Collier, let's talk for a minute about hand sanitizer.
20  TDCJ rejected the idea of providing hand sanitizer to inmates
21  even though it's -- that are mobility-impaired, correct?
22  **A**    TDCJ followed the CDC guidelines which recommend the use of
23  soap and water to help with preventing COVID-19.  It does say if
24  soap and water are not available that hand sanitizer should be
25  considered, but we did provide hand sanitizer to staff in small

Collier - As On Cross/Keville

 1   bottles that they could keep on their person because they don't

 2   have the same level of access necessarily to sinks and soap as

 3   offenders would in their housing areas.

 4               But hand sanitizer for offenders, no, sir, we did

10:45:13    5   not issue; and we have discussed it but chose not to issue.

 6   **Q**    The staff that you're talking about that got the small

 7   bottles of hand sanitizer, they can get to a sink easier than a

 8   man in a wheelchair or a walker can, correct?

 9   **A**    I don't know that that would be accurate based upon where

10:45:32   10   you're working, where your work station is.  I'm not sure that

11   that would be accurate.

12   **Q**    And you don't know how far the staff has to go compared to

13   how far inmates in a wheelchair would to go to get to a sink, do

14   you?

10:45:48   15   **A**    It would depend on a specific housing area or a specific

16   work assignment for the staff.  So, it could vary quite a bit.

17   **Q**    Understood.  And you understand that there are a number of

18   mobility-impaired inmates at the Pack Unit, many in wheelchairs?

19   **A**    I do, sir.

10:46:03   20   **Q**    Okay.  And you made -- you and TDCJ made no analysis of how

21   you could help those mobility-impaired individuals get to

22   handwashing more frequently, correct?

23   **A**    We have recommended throughout the pandemic that

24   handwashing is one of the key ways we can prevent COVID-19, and

10:46:25   25   we have continued to provide that information but also provide

Collier - As On Cross/Keville

1    the materials to do that to the offender population.

2  **Q**    I apologize.  Might be my fault because I didn't make my

3    question clear.  My question was you and TDCJ have done no

4    specific analysis to see how you could help the

10:46:43    5    mobility-impaired and wheelchair inmates at the Pack Unit be

6    able to get more frequent handwashing?

7              MS. VASQUEZ:  Objection.  Calls for attorney/client

8    privileged communications.

9              THE COURT:  All right.  I'm going to overrule the

10:47:01    10   objection.

11             THE WITNESS:  I'm not familiar with a specific

12   analysis.  There may have been discussions, but I'm not aware of

13   a specific analysis of those mobility-impaired offenders as it

14   relates to the handwashing.

10:47:14    15  BY MR. KEVILLE:

16  **Q**    You say there may have been discussions.  Did you have

17   those discussions?

18  **A**    Not that I recall.

19  **Q**    Okay.  So, you're not aware of any discussions or analysis

10:47:21    20   that was done with regard to the mobility-impaired inmates at

21   the Pack Unit and how to provide them better access to

22   handwashing?

23  **A**    No, sir.

24  **Q**    Okay.  And you didn't look at -- for that particular set of

10:47:35    25   inmates, those that are mobility-impaired or wheelchair-bound at

Collier - As On Cross/Keville

1  the Pack Unit, whether it would make sense to provide them with

2  the small bottles of hand sanitizer?

3  **A**    Any offender within the system, if there were a need such

4  as the one you described, our medical partners, medical staff

10:47:55  5  assigned to the unit would identify if an accommodation for an

6  offender needed to be made.  If an offender was distance-wise

7  not close to a sink, that kind of accommodation can be made.

8              It would be made based upon a recommendation,

9  typically, from the medical department advising that that would

10:48:14  10  assist that individual in meeting that need.  I'm not aware of

11  us either having that need or not meeting that need.

12  **Q**    Did you ever instruct the medical department to look at the

13  needs of the mobility-impaired inmates at the Pack Unit in

14  regard to COVID-19?

10:48:32  15  **A**    I did not specifically instruct them.  I know that they

16  specifically within their practices and protocols monitor those

17  offenders; and if there is a need there, they would bring that

18  to administration's -- the unit administration for resolution.

19  **Q**    Let's see if we can clear this up.  You and anyone at TDCJ

10:48:52  20  that works with or for you never instructed medical to take a

21  look at how we can help the mobility-impaired inmates at the

22  Pack Unit have more frequent access to handwashing?

23              MS. VASQUEZ:  Objection.  Lack of personal knowledge.

24  Calls for speculation.

10:49:12  25              THE COURT:  Objection is overruled.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE WITNESS:  I'm not specifically aware of a

2    discussion.  I can't say if one did or did not happen.

3    BY MR. KEVILLE:

4    **Q**    Right.  Your counsel objected about speculation.  You would

10:49:23  5    be speculating if you said that because you have no personal

6    knowledge of that happening, correct?

7    **A**    That is correct.

8    **Q**    Okay.  And you have no personal knowledge that anyone in

9    the medical department ever did any analysis to say how can we

10:49:32  10   help the wheelchair or mobility-impaired inmates at the Pack

11   Unit get more frequent access to handwashing, correct?

12   **A**    I'm not aware.

13   **Q**    And you have no intention of providing any of the inmates,

14   including the mobility-impaired inmates at the Pack Unit, with

10:49:53  15   hand sanitizer, correct?

16          MS. VASQUEZ:  Objection.  Calls for a legal

17   conclusion.

18          THE WITNESS:  Again, I follow the advice of our

19   healthcare professions; and again, as it relates to an offender

10:50:01  20   with mobility issues, they would advise us on protocols that

21   they need -- that we need to provide for those offenders.

22   They've made no such recommendation that we provide them hand

23   sanitizer.

24          But that's the advice that I would follow is from

10:50:15  25   our healthcare providers.  If they brought that advice forward,

 1    we would review it and determine if that's feasible or not.

 2    BY MR. KEVILLE:

 3    **Q**    But even after this lawsuit, you never went to your medical

 4    people and said, "Hey, how can we help the mobility-impaired

 5    inmates at the Pack Unit get more frequent access to handwashing

 6    or can we provide those inmates with hand sanitizer?"

 7                    MS. VASQUEZ:  Objection.  Asked and answered.

 8                    MR. KEVILLE:  I believe that was a different question,

 9    your Honor.

10                    THE COURT:  I'm going to overrule the objection.

11                    THE WITNESS:  I'm sorry, Mr. Keville, would you remind

12    repeating it.

13                    MR. KEVILLE:  Sure.

14                        Ms. Court Reporter, could you just read that

15    back.

16                        Thank you.

17        (The last question was read.)

18                    THE WITNESS:  That is correct.  I have not had a

19    specific discussion related to that.

20    BY MR. KEVILLE:

21    **Q**    In opening -- were you listening to the opening,

22    Mr. Collier?

23    **A**    I was.

24    **Q**    Okay.  In opening, your counsel talked about having

25    implemented Policy 14.52 and some of the things we've been just

Collier - As On Cross/Keville

1   talking about and that they're being done at TDCJ units,

2   correct?

3   **A**      Yes, sir.

4   **Q**      All the things that Mr. Cowles was talking about in his

10:51:48   5   opening that TDCJ is doing, those are all being done across all

6   of the TDCJ units, correct?

7   **A**      I didn't write down what Mr. Cowles specifically listed.

8   There are large numbers of protocols we have in place across the

9   system.  Generally, I would agree with your question, yes, sir.

10:52:14  10   **Q**      Okay.  All of the steps that Mr. Cowles said TDCJ took that

11   were described in opening are steps that were taken as applied

12   across all 104 TDCJ prisons, correct?

13   **A**      I believe that would be correct.

14   **Q**      And we've talked about 14.52.  There was not and there is

10:52:33  15   not a policy like 14.52 that is specific to the Pack Unit,

16   correct?

17   **A**      The Correctional Managed Healthcare Policy 14.52 would be a

18   system policy as it relates to how we address COVID-19 in TDCJ.

19   **Q**      Okay.  So, there was not and is not a policy that is

10:52:55  20   specific to the Pack Unit, correct?

21   **A**      Not that I'm personally aware of.

22   **Q**      And there is no supplement or adaptation of Policy 14.52

23   that is specific to the Pack Unit, correct?

24   **A**      I'm not aware of a subpart of 14.52; but also, I'm not

10:53:16  25   aware of anything that the unit medical clinic at the Pack Unit

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1   or the physicians or the nurses at the Pack Unit may have in

2   place that either is having to carry out 14.52 or may be in

3   addition to what's in 14.52.

4              But 14.52 is a general policy related to TDCJ and

10:53:34   5   instructs us on how we address many aspects of managing the

6   COVID-19.

7   Q   Sure.  And my question goes a little differently.  My

8   question is you're not aware that there's any adaptation or

9   supplement to 14.52 that TDCJ has specific to the Pack Unit?

10:53:55  10   A   I guess as you say "adaptation," there are certain things

11   that we have done because of the population at the Pack Unit.

12   I'm not sure if that would qualify as an adaptation of 14.52.

13              But we have done certain things such as the

14   repeated strike testing that we're not doing at every unit in

10:54:13  15   the system.  We're only doing that on units with specifically a

16   very high percentage of elderly offenders.

17   Q   Okay.  That's the thing that you say is in addition.  Other

18   than that, there's no adaptation or changes to the policy that

19   are specific to the Pack Unit other than this new repeated

10:54:30  20   testing?

21   A   Again, throughout the event, we tested the first dorm after

22   Mr. Clerkly was positive.  That was the only location in the

23   system that we did that.  At the time, tests were very difficult

24   to achieve to get to volume testing; but we did test everybody

10:54:47  25   at that dorm that -- where Mr. Clerkly was residing before he

Collier - As On Cross/Keville

1    passed away.

2                That was -- that was not within the system.  That

3    was something specific to Pack.  So, again, I don't know if that

4    qualifies as an adaptation; and then, of course, the strike

10:55:04    5    testing that we're doing at Pack now.

6    **Q**    By the way, the repeated strike testing that we talked

7    about a little earlier, that came about a few weeks ago, right?

8    **A**    Yes, sir, that's correct.

9    **Q**    And that came out about right around the time that there

10:55:18    10    were some additional expert reports requiring that kind of

11    testing in this case, correct?

12    **A**    I don't know any expert reports specifically on the repeat

13    testing.  I know that we started strike testing in early May

14    based upon those tests becoming available to the state, and TDCJ

10:55:36    15    was able to acquire the test for use to test large quantities

16    within the system.

17                After we completed the first round of Strike Team

18    testing, we then consulted our healthcare experts to move

19    forward.  We did another round of Strike Team testing on several

10:55:51    20    units.  The repeated testing that we are working with now at the

21    Pack Unit and three other facilities was based upon our

22    healthcare professionals and Dr. Linthicum coming up with that

23    model to help us pursue how we continue to test at those

24    facilities based on their populations.

10:56:11    25                I'm not aware of an expert -- I'm not arguing

Collier - As On Cross/Keville

1   that there's not one.  I'm just saying I'm not aware that expert

2   testimony or report had anything to do with it.

3   Q    Whose idea was it to do this repeated strike testing that

4   you guys agreed to a couple of weeks ago?

10:56:25   5   A    The testing protocol, specifically, I believe Dr. Linthicum

6   worked through that with Dr. Keiser who is the chair of the

7   Managed Healthcare Committee also working with the university

8   partners.  She made recommendations to me, to myself.  We

9   discussed it; and then, she and Ms. Davis based upon the

10:56:48   10   populations identified a plan to carry it forth.

11   Q    So, you -- as the top guy for TDCJ, you were brought this

12   and you agreed to it?

13   A    Yes, sir.  Dr. Linthicum talked with me about it and

14   continued to work and develop the plan talking with those

10:57:07   15   individuals and then confirming if we should move forward with a

16   plan like that.

17   Q    Is there any plan to put the plan in writing and to make it

18   a policy?

19   A    There certainly could be, Mr. Keville; but at this time, I

10:57:25   20   couldn't assure you that that's a permanent model because of the

21   nature of this entire COVID-19 experience.  But we have

22   identified protocols that were modified sometimes over the

23   course of even a week.

24            So, I don't know what -- if that will stand as

10:57:41   25   the best plan for the future or if there will be a modified

Collier - As On Cross/Keville

1  version of that or if that is identified as something we should

2  not do.

3          Again, we are trying that to see if it will help

4  us again identify any positive offenders and keep a process in

10:58:00  5  place that will keep us from having anybody positive come into

6  that facility.

7  **Q**   So, as I understand, the plan is that you will hopefully

8  continue and do this repeated testing until COVID-19 is

9  eliminated at the Pack Unit but you're not sure you will, that

10:58:14  10  may change?

11  **A**   In a short way, I suppose your answer is right; but I think

12  our determination of that would be based on the best evidence of

13  what we understand from the testing as well as the best advice

14  that's within our experts that we have within the two teaching

10:58:32  15  universities and Dr. Linthicum.

16          So, we are moving forward with that plan based on

17  in that advice today; but if COVID-19 science develops a

18  different model or comes up with a better way to do what we're

19  trying to do, which is eliminate any positives on a facility,

10:58:48  20  then we would have to look at that and maybe modify that.

21  That's really all I'm trying to explain.

22  **Q**   You agree that you should look at what many experts say and

23  what the recommendations are as it relates to preventing

24  COVID-19 in the facilities, correct?

10:59:05  25          MS. VASQUEZ:  Objection.  Vague, overbroad.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1          THE COURT:  Rephrase the question, Mr. Keville.

2          MR. KEVILLE:  Sure.

3    BY MR. KEVILLE:

4    Q    Mr. Collier, one thing you should consider in determining

10:59:16    5    the policies for TDCJ and how it responds to COVID-19 is what

6    experts say, correct?

7          MS. VASQUEZ:  Objection.  Overbroad with respect to

8    experts.

9          THE COURT:  I'm going to allow it.  I'm going to allow

10:59:30    10   it.

11         THE WITNESS:  Our healthcare policies are modeled by

12   the Correctional Managed Healthcare Committee which is,

13   essentially, a committee of experts also with partnership with

14   two teaching universities.

10:59:41    15         Those entities together develop our healthcare

16   policies for the system that we implement.  That is a team of

17   experts that we rely on heavily.  They may receive information

18   from sources beyond that.  I know we also look at what the CDC

19   recommends, and we're aware of other best practices around the

10:59:58    20   country.

21   BY MR. KEVILLE:

22   Q    Okay.  So, you're saying that it's CMHC that should

23   consider what is being done around the country or what other

24   experts say?

11:00:10    25   A    The Correctional Managed Healthcare Committee does the --

Collier - As On Cross/Keville

1  identifies what the healthcare plan is going to be or healthcare
2  protocols.  So, that's the base of experts that we rely on for
3  our healthcare policy and practice.  Who they rely on outside of
4  their teaching universities as well as what they know from other
11:00:28  5  states, I'm only speculating.
6  **Q**    Mr. Collier, we were talking -- we got a little
7  sidetracked.  We were talking about hand sanitizer.  Your basis
8  for not allowing the inmates at the Pack Unit to have hand
9  sanitizer is because it has alcohol and inmates may ingest it,
11:00:46  10  number one; and number two, because it is flammable, correct?
11  **A**    Yes, sir.
12  **Q**    Okay.  And you've done no analysis of the inmates across
13  the Pack Unit to see if there is a risk of that, specifically,
14  at the Pack Unit, correct?
11:01:00  15  **A**    We did conduct a study of the Pack Unit.  We know that
16  offenders are at the Pack Unit.  We also know that from stories
17  outside of the State of Texas offenders have ingested it.  We
18  also know that alcohol is a flammable substance and can be used
19  as an accelerant for fire.  So, it poses a risk for any
11:01:22  20  facility.
21  **Q**    I'm sorry.  Is the answer to my question, no, you've done
22  no analysis specific to the inmates at the Pack Unit as to the
23  risk for allowing hand sanitizer?
24        MS. VASQUEZ:  Objection.  This misstates his prior
11:01:36  25  testimony and argumentative.

Collier - As On Cross/Keville

1          THE COURT:  I'm going to allow it.

2          THE WITNESS:  We did not do -- we did not do a

3     specific study at the Pack Unit as it relates to your question.

4     BY MR. KEVILLE:

11:01:47    5     Q     Okay.  And you didn't do any specific study for

6     mobility-impaired inmates or wheelchair-bound inmates, right?

7     So, the wheelchair-bound inmates have to roll their hands across

8     the wheels which are rolling across the floor which are

9     gathering dirt and other germs potentially, possibly infection.

11:02:06    10          You did no analysis of whether we could provide

11     hand sanitizer to those individuals because of the risk of them

12     being in a wheelchair?

13     A     There was, to my knowledge, not a specific analysis of

14     those offenders.  If medical has identified that as an issue,

11:02:23    15     again, our medical providers would bring that information

16     forward for us to address.

17          THE COURT:  Mr. Keville, you might look for a place we

18     can take our morning break.

19          MR. KEVILLE:  Sure.  Maybe, your Honor, I'll just

11:02:32    20     finish a few questions on hand sanitizer.

21          THE COURT:  Okay.  All right.

22     BY MR. KEVILLE:

23     Q     Mr. Collier, at TDCJ's Roach facility, inmates are taking

24     hand sanitizer that TDCJ buys in bulk and are rebottling that

11:02:46    25     hand sanitizer for staff use, correct?

Collier - As On Cross/Keville

1    **A**    That is correct.

2    **Q**    And you're not aware of any incidents at the Roach facility

3    where any offender drank the hand sanitizer, correct?

4    **A**    Not specifically, no, sir.

11:03:01    5    **Q**    Heck, not generally either, correct?  You're not aware of

6    any such incident at the Roach facility?

7    **A**    I'm not aware of any report of an offender ingesting or

8    using the alcohol-based hand sanitizer that they bottle at the

9    unit.  I'm also not aware of -- they're supervised when they

11:03:22    10    rebottle that; and at the same time, it's within one of our

11    factories.

12              So, there's oversight there with them the entire

13    time; and I'm not sure how much access they have to the product.

14    I'm not personally aware of that.

11:03:32    15    **Q**    You're not aware of any inmate at the Roach facility

16    setting a fire using hand sanitizer, correct?

17    **A**    No, sir.

18    **Q**    And you're aware that 30 states have now relaxed

19    restrictions on hand sanitizer for the period of this pandemic,

11:03:45    20    correct?

21    **A**    No, sir, I was not aware of that.

22    **Q**    And you've done no further analysis since you started back

23    in March to say let me see what other states are doing with

24    regard to hand sanitizer, correct?

11:03:59    25    **A**    I've had discussions with other state directors.  I have

Collier - As On Cross/Keville

1    not been told that there were 30 states using hand sanitizer.

2    The research that I had seen last was that only six states were

3    using hand sanitizer, and I wasn't aware personally of any of

4    those states.

11:04:14    5            But I have had discussions with other states as

6    it relates to COVID-19, as it relates to protocols that need to

7    be in place; and I've not had a discussion with anyone that

8    referenced hand sanitizer for offenders.

9    **Q**   Have you discussed specifically with any of the states that

11:04:31   10   have allowed access -- inmates access to hand sanitizer how they

11   did it?

12   **A**   No, sir.

13           MR. KEVILLE:  Your Honor, why don't we take our break

14   here.

11:04:43   15           THE COURT:  We'll take a 10-minute -- a 15-minute

16   break.  15-minute break.

17       (Court recessed at 11:04 a.m.)

18       (Court resumed at 11:22 a.m.)

19           THE COURT:  Are we all back?

11:22:09   20           MR. KEVILLE:  Your Honor, Plaintiffs are back.

21           THE COURT:  Let's proceed then.

22   BY MR. KEVILLE:

23   **Q**   Mr. Collier, in opening, your counsel showed us signs that

24   were posted at the Pack Unit.

11:22:22   25           Do you remember that?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

 1  **A**    Yes, sir.

 2           MR. KEVILLE:  And Allen, if you would put up the sign

 3  from the Plaintiffs' opening.

 4  BY MR. KEVILLE:

 5  **Q**    And here, in your response, if we look on the left, the

 6  signs you're posting in the Pack Unit say "Wash hands often for

 7  20 seconds; encourage others to do the same," correct?

 8  **A**    Yes, sir.

 9  **Q**    And then, they say, "If no soap and water available, use

10  hand sanitizer with at least 60 percent alcohol."

11           So, you're posting signs in the Pack Unit that

12  the inmates see that say, if you can't get soap and water, use

13  hand sanitizer, correct?

14  **A**    Yes, sir.  The reason the sign says that is because it is

15  for staff as well; and our staff would -- if they're not

16  available to use soap and water have access to hand sanitizer.

17  **Q**    Now, is it only staff who are in certain places where

18  there's no access to soap and water that have hand sanitizer or

19  did you give the hand sanitizer to all the staff?

20  **A**    We did issue hand sanitizer to all staff.

21  **Q**    So, it wasn't because they didn't have soap and water

22  available, you just gave it to everyone as to staff?

23  **A**    Staff could be working in locations where washing with a

24  sink is not as easily accessible; but we did issue it to

25  everyone, yes, sir.

Collier - As On Cross/Keville

1  **Q**    Okay.  And you didn't look at whether inmates who didn't

2  have easy access to a sink would be able to get hand sanitizer

3  at all, correct?

4  **A**    We looked at the issue of offenders having hand sanitizer

11:23:52  5  and discussed that and discusses the security concerns around

6  that and chose not to issue hand sanitizer; but again, CDC

7  recommendations indicate that soap and water are the number one

8  recommended way to keep your hands clean.

9  **Q**    Sure.  But then, after you did that, you put up signs that

11:24:08  10  all the inmates can see that say, "Hey, if you can't access to

11  soap and water, use hand sanitizer," correct?

12  **A**    They -- the offenders may see those signs.  I have no doubt

13  the offenders understand that there's not hand sanitizer

14  available for them.

11:24:23  15  **Q**    Your counsel, Mr. Cowles, said in his opening that trust

16  had broken down between TDCJ and the Court because of our

17  clients in the heat litigation, correct?

18           You heard that, correct?

19  **A**    I did hear that, yes, sir.

11:24:42  20  **Q**    Okay.  And without getting into that, you understand that

21  to be the case, that trust is broken down, right?

22           MS. VASQUEZ:  Objection.  Calls for speculation.

23           THE COURT:  Yeah.  He doesn't need to -- he doesn't

24  need to answer that.  Let's move on.

11:24:57  25           MR. KEVILLE:  Okay.

Collier - As On Cross/Keville

1  BY MR. KEVILLE:

2  **Q**    Mr. Collier, do you understand that our clients are

3  reluctant to assume you will continue to do what you say you're

4  doing even after this lawsuit ends?

11:25:08    5            MS. VASQUEZ:  Objection.  Calls for speculation.

6            THE WITNESS:  No, sir, I'm not aware -- oh, sorry.  I

7  apologize.

8  BY MR. KEVILLE:

9  **Q**    Can you answer my question, sir.

11:25:31   10            THE COURT:  He said he wasn't aware of that.

11            MR. KEVILLE:  Okay.

12  BY MR. KEVILLE:

13  **Q**    Given the breakdown in trust that your lawyers say exist,

14  right, and in an effort to repair the trust, now that you've had

11:25:42   15  a break and an opportunity to consult your lawyers and without

16  telling me anything that was discussed, will you now agree on

17  the record before Judge Ellison to do the things that we

18  discussed that you claim you were doing?

19            MS. VASQUEZ:  Objection.  Compound and already ruled

11:25:57   20  on by the Court.

21            MR. KEVILLE:  I don't think there's been any ruling.

22  It's a new question.

23            THE COURT:  Well, his repeated answer has been he

24  needs to consult with counsel, and I'm sure that's going to be

11:26:10   25  the answer now.  Let's move on.  He doesn't have to say that.

Collier - As On Cross/Keville

1  BY MR. KEVILLE:

2  **Q**    Mr. Collier, you mentioned earlier the gymnasium not having

3  air-conditioning.  Do you have any plan to use the gymnasium to

4  increase social distancing when the temperatures cool down in

11:26:31   5  October or November?

6  **A**    I do not personally know if Warden Herrera has plans to use

7  the gymnasium when temperatures go down.  He would have the

8  discretion within being the facility warden to operationalize

9  how he does social distancing at that facility.

11:26:50   10          I do not know if there is temp monitoring there,

11  but that would be something that could be considered.  But I do

12  not know if Warden Herrera has plans for that, but he would

13  certainly have an opportunity to evaluate that as we continue to

14  deal with the pandemic and if the weather, obviously, changes to

11:27:07   15  an acceptable temperature.

16  **Q**    There is no plan that you're aware of to do that, to use

17  the gymnasium if the temperatures cool down to increase social

18  distancing, correct?

19  **A**    The specific plans at the Pack Unit as it relates to social

11:27:22   20  distancing Warden Herrera has developed on his own working with

21  risk managers and working with his regional director.  I

22  personally have not been involved in that, and I'm not aware of

23  their plans as it relates to social distancing for now or in the

24  immediate future when temperatures change.

11:27:39   25  **Q**    And you haven't given any instruction to Warden Herrera to

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1  do that, to use the gymnasium when temperatures cool down to

2  increase social distancing at the Pack Unit?

3  **A**    Warden Herrera, as all of our wardens, were required to go

4  in and develop their plan for social distancing.  Obviously,

11:27:57  5  that would be now during this time and temperature.  That plan

6  can be modified as we go forward, but I have not had a specific

7  discussion with Warden Herrera as it relates to the gymnasium.

8  **Q**    Mr. Collier, do you remember every seeing a written plan by

9  Warden Herrera to increase social distancing at the Pack Unit?

11:28:17  10  **A**    No, sir.  I didn't personally review any of our plans as it

11  relates to social distancing on our facilities.  That would have

12  been conducted by the management team within the Correctional

13  Institutions Division.

14  **Q**    Around March 4th of this year, you had a meeting with

11:28:40  15  Ms. Davis and Dr. Linthicum and CMHC regarding COVID-19 and

16  TDCJ's response, correct?

17  **A**    Yes, sir.

18  **Q**    No one took any notes at that meeting, correct?

19  **A**    I have turned over all my notes.  I'm not aware if anyone

11:28:59  20  else took notes or not.  I don't remember a lot of detail of the

21  meeting, if I personally took notes; but I have turned over

22  everything I had.

23  **Q**    You turned those over to your counsel sometime back in May

24  or June?

11:29:15  25  **A**    Specific time frames, I'm not -- I don't recall; but I've

Collier - As On Cross/Keville

1    been keeping everything that I've been doing and providing that

2    to our general counsel to provide to the AG's Office.

3    **Q**    At the March 4th meeting, one of the things you talked

4    about was facilities where TDCJ had empty beds that could be

11:29:35   5    used for isolation, including at the Pack Unit, correct?

6    **A**    Yes, sir.

7    **Q**    And you discussed the dorm that's outside the Pack Unit

8    that's being remodeled and that that housing could be used if

9    you needed to move inmates, correct?

11:29:50   10    **A**    We did discuss the dormitory at the Pack Unit that was

11    under construction and discussed what would need to be done to

12    accelerate the construction to get it to where it could be

13    utilized.  I believe at that time it was not useable for that

14    purpose.

11:30:08   15    **Q**    Well, at the time the construction was going on, it wasn't

16    to build the unit, it was simply to alter it's wheelchair

17    accessibility, correct?

18    **A**    I'm not specifically aware of what other details were being

19    done, but we were modifying that dormitory so that we could put,

11:30:28   20    essentially, more of a -- I won't say geriatric but a population

21    that had a higher degree of issues within that -- within that

22    dormitory but also had medical staff out there at that

23    dormitory.

24            We were in the process of modifying four of our

11:30:45   25    dormitories that are similar around the system to help,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

 1  essentially, house offenders that don't need to be in general

 2  population but would be better in that kind of an environment.

 3  So, we were modifying Pack as well as some others to do that.

 4  **Q**    You say you were modifying but you don't know what specific

11:31:06  5  modifications were being made to the dorms at the Pack Unit,

 6  correct?

 7  **A**    I believe they were spreading the cubicles or making sure

 8  that they were ADA compliant.  They were also creating some

 9  degree of medical space, also electrical outlets for CPAP

11:31:21 10  machines.  Oxygen connections, things like that were being

11  installed.

12  **Q**    At the dorms in Pack Unit or is this generally you're

13  talking?

14  **A**    That's within all of those locations.  So, I would believe

11:31:34 15  for the Pack Unit as well.

16  **Q**    You were talking about this on March 4th, correct?

17  **A**    We were talking about the availability of that dorm, if it

18  would have availability to, essentially, do essential social

19  distancing or house offenders who needed to be relocated because

11:31:52 20  of COVID.

21  **Q**    On the documents you produced in this case --

22        MR. KEVILLE:  Your Honor, I would like to put up

23  Plaintiffs' Exhibit 172 which I would offer into evidence.

24        THE COURT:  Any objection to this exhibit?

11:32:15 25        Any objection to this exhibit?

Collier - As On Cross/Keville

1        MS. VASQUEZ:  Objection as to --

2        THE COURT:  I can't hear you.  Ms. Vasquez, any

3   objection to this exhibit?

4        MS. VASQUEZ:  Yes.

11:32:35  5        THE COURT:  You do object to it?

6        MS. VASQUEZ:  Yes.

7        THE COURT:  What's your objection?

8        MS. VASQUEZ:  Relevance.

9        THE COURT:  What now?

11:32:44  10        MS. VASQUEZ:  Relevance, your Honor.

11        MR. KEVILLE:  Your Honor, this is a roster of where

12   the inmates were housed at the Pack Unit as of May 4th, 2020,

13   which specifically shows that they had on May 4th, 2020, not

14   moved any inmates into these open dorms, E-17 and 19.

11:33:04  15        THE COURT:  This is TDCJ's own document, isn't it?

16        MR. KEVILLE:  It is.

17        THE COURT:  I'm going to admit it.  I'm going to allow

18   it.

19   BY MR. KEVILLE:

11:33:12  20   Q    Mr. Collier, by May 4th looking at this roster -- and I

21   don't know if you need to see the whole thing or you can tell us

22   from your memory.  By May 4th, 2020, there were still no inmates

23   that were assigned to Dorms E-17 or E-19.

24             Do you understand that to be the case?

11:33:31  25   A    I'm not familiar with the document that you have in front

Collier - As On Cross/Keville

1  of me.  I know what it is, but I don't use that document.  I'm

2  not familiar with it, so I'm not sure what it's talking about

3  where people are housed.  I see inmate names and I see job

4  assignments it looks like, but I'm not familiar with that

11:33:47  5  document at all.

6  **Q**     You understand that by the second week of May there were

7  still no inmates assigned to the Dorms E-17 or E-19 at the Pack

8  Unit, the ones that you had discussed back on March 4th?

9  **A**    I know that Warden Herrera has used those dorms.  I do not

11:34:05  10  know specifically when that began.

11            MR. KEVILLE:  I'm going to put up, if I would,

12  Plaintiffs' Exhibit 2 and move the admission of Plaintiffs'

13  Exhibit 2.

14            THE COURT:  Any objection to this exhibit?

11:34:14  15            THE COURT REPORTER:  We can't hear you, Ms. Vasquez.

16            MS. VASQUEZ:  It's confidential, your Honor, and

17  should be filed under seal.

18            THE COURT:  This is to be filed under seal.

19                Any objection to that, Mr. Keville?

11:34:37  20            MR. KEVILLE:  No objection, your Honor.

21            THE COURT:  Admitted under seal.

22  BY MR. KEVILLE:

23  **Q**     This is a layout of the Pack Unit showing Dorms E-17 and

24  19, and those two dorms have capacity for 111 inmates and 56

11:34:55  25  inmates respectively.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1                    Do you understand that?

2  **A**    I see what's written on the drawing.  I'm not familiar with

3  the layout.  I'm not arguing with you.  I'm just telling you I'm

4  not familiar with the document or the layout.  Warden Herrera

11:35:11   5  would be, but I'm not -- I see what says.  It says 19 dorm, 111

6  capacity; 17 dorm, 56 capacity.

7  **Q**    Can you give us any explanation why -- when you discussed

8  in early March the empty space in the E Dorm at the Pack Unit

9  and there being over 160 additional spaces, why inmates were not

11:35:35   10  moved into those spaces for over two months?

11  **A**    I don't know when the dorm was actually completed and

12  ready.  I don't know when the construction was complete and when

13  that dorm was ready for occupancy.  I know it wasn't when we

14  talked about in March.  I'm not sure at what point it became

11:35:54   15  available.

16  **Q**    When you say it wasn't ready for occupancy, you mean all

17  the things you were trying to do weren't done; but there was

18  still bunks and space available in there, correct?  There might

19  not have been outlets for CPAP machines or wheelchair ramps but

11:36:10   20  there was space available, correct?

21           MS. VASQUEZ:  Objection.  Lack of personal knowledge.

22  He's already testified that this is something that Warden

23  Herrera would have knowledge about, and Mr. Collier does not.

24           THE COURT:  I'm going to allow the follow-up question.

11:36:22   25  He can say he doesn't know.

1          THE WITNESS:  I'm not specific as to what needed to be

2    done.  I don't remember that.  I know we had ADA ramps at some.

3    I don't know if that was a Pack issue.  I know that one of them,

4    there was also a build-out of the medical area where they would

5    do a medical exam.  I don't know if that was with the Pack Unit.

6    So, I don't recall specifically.

7    BY MR. KEVILLE:

8    Q     Okay.  But you never instructed Warden Herrera or Ms. Davis

9    to hurry up and use the empty dorm at the Pack Unit to provide

10   more space between offenders, correct?

11   A     No, sir, I did not instruct them specifically on that dorm

12   at the Pack Unit.

13   Q     And you never told Warden Herrera, "Hey, it's urgent in

14   view of the risk for these elderly inmates that you get that

15   dorm used to provide more distance between offenders"?  You

16   never told Warden Herrera that, correct?

17   A     Not specifically, no, sir.  I'm not aware of that.

18   Q     Not generally either, correct?

19             MS. VASQUEZ:  Objection.  Asked and answered.

20             THE COURT:  Let's move on.  Let's move on.

21             MR. KEVILLE:  Okay.

22   BY MR. KEVILLE:

23   Q     You're not aware of anyone on your staff, Lorie Davis or

24   anyone on her team, that had a conversation with Warden Herrera

25   to say, "Hey, in view of COVID-19, let's move people into these

1   empty dorms as quickly as we can"?

2   **A**   I don't know if a conversation like that happened or didn't

3   happen.

4   **Q**   You never gave any -- Lorie Davis or -- to do that?  You

11:37:42   5   never gave her any instruction, correct?

6   **A**   Not specific that I'm aware of to the Pack Unit.  We had

7   discussions multiple times about the dormitory space, at one

8   time looking at where we could move offenders and at one time

9   even looked at the Pack Unit dormitory as a possible location

11:38:00   10   for offenders from another unit if we had to evacuate geriatric

11   offenders from another unit.

12   **Q**   When did you have that conversation?

13   **A**   That was in March as well, I believe.

14   **Q**   But Lorie Davis or no one on her team ever told you, "Hey,

11:38:16   15   we've talked to Warden Herrera and told him to move quickly and

16   put inmates into the empty dorm to increase social distancing"?

17   **A**   I don't recall a specific discussion, sorry.

18   **Q**   That's okay.

19             Sir, your counsel stated in opening that you and

11:38:32   20   the Defendants had motive and incentive to rely on what medical

21   experts said about responding to COVID-19.

22             You heard that, correct?

23   **A**   Yes, sir.

24   **Q**   You never even read the declarations that were submitted in

11:38:47   25   this lawsuit by the medical professionals and the prison

Collier - As On Cross/Keville

1  administration professionals, correct?

2            MS. VASQUEZ:  Objection.  Vague, argumentative.

3            THE COURT:  I'm going to allow it.

4            THE WITNESS:  I have not personally read the expert

11:39:01  5  depositions from the Plaintiffs' side.

6  BY MR. KEVILLE:

7  Q    And you didn't direct Dr. Linthicum to read the medical

8  expert declarations that were submitted in this lawsuit,

9  correct?

11:39:14  10  A    No, sir.

11  Q    You didn't direct anyone to -- that reports to you to read

12  the declarations from the doctors and prison administration

13  experts who submitted sworn testimony in this case, correct?

14  A    I did not direct anyone specifically, no, sir.

11:39:30  15  Q    And you didn't direct them -- I think you mentioned

16  deposition testimony.  You haven't given anybody the direction

17  to read the declarations or any of the things that the medical

18  experts have provided, correct?

19  A    From the Plaintiffs' side of experts, no, sir.  Again, we

11:39:44  20  relied on our university -- two teaching universities as well as

21  Dr. Linthicum and the Correctional Managed Healthcare as our

22  team of experts to help us guide and how we can help with

23  COVID-19; and we continue to rely on them.

24  Q    So, you will only rely on what the experts on your side say

11:40:01  25  in this case, correct?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1  **A**    I have a high degree of confidence after working with the

2  two universities partners, Texas Tech Health Science Center and

3  University of Texas Medical Branch.  I had worked with them for

4  many, many years in my career; and I have an extreme amount of

11:40:20  5  confidence in not only what those teaching universities provide

6  as far as information and direction to the agency.

7              But Dr. Lannette Linthicum I would consider as

8  probably the best national expert in correctional care that

9  exists, and she is on our staff.  I also consider highly the

11:40:33  10  experts that are on the Correctional Managed Healthcare such as

11  Dr. Keiser who also serves as the health director for Galveston

12  County.

13              We have the experts within our reach that provide

14  great advice to this agency on how we should take care of our

11:40:51  15  medical care.

16  **Q**    Because of that, you chose not to even consider what the

17  medical experts and prison experts in this case had said on the

18  other side?

19              MS. VASQUEZ:  Objection.  Argumentative.  Asked and

11:41:03  20  answered.

21              THE COURT:  I'm going to allow it.

22              THE WITNESS:  I did not read those experts'

23  depositions.

24  BY MR. KEVILLE:

11:41:14  25  **Q**    Or their declarations?

1    A    Correct.

2    Q    Mr. Collier, during this COVID-19 event, TDCJ modified its

3    grievance policy, correct?

4    A    We actually modified the time frame.  We never have

11:41:24   5    modified the exact policy.  What we did was in late May we

6    created a specific code for COVID-19 grievances and then

7    required that staff have to respond to those grievances within

8    15 days and that staff are not allowed to give an extension or

9    request an extension on those grievances.

11:41:46  10    Q    But two things changed, right?  You're not allowing

11    extensions and the time frame has been modified to 15 days for

12    each step, correct?

13    A    Yes, sir, we made those adjustments.

14    Q    And by the way, are you aware that there are over a hundred

11:42:03  15    -- probably way more than hundred COVID-19 grievances that have

16    been filed at the Pack Unit?

17             MS. VASQUEZ:  Objection.  Vague.

18             THE COURT:  Allow it.

19             THE WITNESS:  I'm not specifically aware of the number

11:42:19  20    filed at the Pack Unit.

21    BY MR. KEVILLE:

22    Q    Do you know whether it's over hundred, less than hundred?

23    A    Again, not specifically aware.

24    Q    Okay.  Ultimately, it's Warden Herrera's responsibility to

11:42:31  25    ensure how a grievance is addressed at the Step I phase in the

1    Pack Unit, correct?

2    **A**    There's a grievance investigator that works for a different

3    division than Mr. Herrera.  They work for the Administrative

4    Review and Risk Management Division and have a separate

11:42:49    5    reporting mechanism.  That grievance investigator would receive

6    the grievance and then counsel with the warden on the solution

7    for the grievance and provide that -- would work with the warden

8    on the response for that grievance.

9                  But there's a grievance investigator that works

11:43:03   10    for a different entity within TDCJ assigned to that facility.

11    **Q**    All right.  Ultimately, though, it's the warden's final

12    recommendation as to how you resolve a Step I grievance,

13    correct?

14    **A**    The warden would make a recommendation.  If the grievance

11:43:18   15    investigator felt that that recommendation was not suitable,

16    they certainly can take that up their chain of command.

17    **Q**    Did you answer that differently in your deposition, sir?

18    **A**    I don't really recall.

19            MR. KEVILLE:  Allen, could you put up his deposition

11:43:45   20    at page 51, line 22, through 52, line 1.

21    BY MR. KEVILLE:

22    **Q**    You were asked, "Though, ultimately, it's the warden's

23    responsibility to ensure how a grievance is addressed at the

24    Step I phase?"

11:44:11   25                  You answered, "It would be the warden's final

Collier - As On Cross/Keville

1    recommendation; and yes, sir, that resolves the Step I."

2                    Do you see that?

3    A    I see that, yes, sir.

4    Q    Okay.  Do you stand by that testimony?

11:44:18    5    A    I would not disagree that the warden makes the

6    recommendation; however, I would supplement that the grievance

7    investigator on the unit, in many cases they're going to agree

8    with the warden's recommendation; but if for some reason they

9    don't, they do have the ability to address that through a

11:44:34    10    separate chain of command.

11    Q    Now, the Step I grievance comes after informal resolution

12    in TDCJ's policy regarding processing of grievances, correct?

13    A    Step I grievance is the initial phase of the grievance

14    process within the procedure.  So, you -- the grievance policy

11:44:52    15    does recommend before you file a grievance that you -- or

16    dictates that before you file a grievance you need to try to

17    find an informal resolution.

18    Q    Okay.  And that's a dictate of the policy, you have to

19    informal resolution in TDCJ's policy, correct?

11:45:08    20    A    I can't remember the specific wording, but I know it's not

21    a consistent requirement.  But I know that it encourages it, and

22    it may specifically state that it needs to be attempted.  Before

23    you go into the grievance process, you need to try to informally

24    resolve the issue.

11:45:30    25    Q    And up until the recent change you made at the end of May,

Collier - As On Cross/Keville

1  the grievance policy was that, if the TDCJ staff did not give

2  themselves an extension, it would be 80 days before TDCJ was

3  required to go through Step I and Step II grievances, correct?

4           MS. VASQUEZ:  Objection.  Assumes facts.

11:45:55  5           THE COURT:  I'm going to allow it.

6           THE WITNESS:  The grievance policy allows for when a

7  grievance is filed there is a window of 40 days that requires

8  the response to be within 40 days.  There can be an extension

9  requested for an additional 40 days.

11:46:10  10  BY MR. KEVILLE:

11  Q    Correct.  So, you could have 80 days for Step I if you got

12  an extension, correct?

13  A    Yes, sir, you could prior to the modification of the

14  protocols.

11:46:19  15  Q    Right.  And now, after the modification, it's no longer 40

16  days or 80 days to respond to Step I, it's 15 days and you can't

17  get an extension, correct?

18  A    It would be 15 days; and for a COVID-related grievance --

19  the emergency grievances have always been required to be --

11:46:41  20  they're not extendable, if I'm not mistaken, if it's an

21  emergency.

22           But for a COVID-specific grievance, it would be

23  15 days; and it would be coded as a COVID-related grievance and

24  tracked specific to that code so that we can identify those

11:46:58  25  issues.  Also, you could have a medical grievance; and I believe

Collier - As On Cross/Keville

1   the time frames may be different on that as well.

2   **Q**   Now, to get through Step I and Step II as of May 26th, the

3   maximum allowable for a COVID-19-related grievance is 30 days,

4   correct?

11:47:14   5   **A**   Yes, sir.  You could have a maximum of 15 days on Step I

6   and then a maximum of 15 days on Step II.

7   **Q**   And the reason TDCJ reduced the amount of time to

8   investigate a grievance related to COVID-19 is because the old

9   80-day extendable to 160-day policy was way too slow to address

11:47:33   10   COVID-19 grievances, correct?

11   **A**   There's really nothing -- the policy that we have in place

12   -- and it still remains in place.  It's not a bad policy or a

13   policy that's been found to be an issue.  We just identified

14   that we've never been in this situation before, never dealt with

11:47:49   15   something like COVID-19, and we wanted to be as proactive as we

16   could in identifying any complaints or issues that come through

17   the grievance process.  So, we created a protocol to do that and

18   bring those to our attention and then resolve them in a quicker

19   manner.

11:48:04   20   **Q**   Yes.  And I understand this is a completely unique new

21   circumstance, and that's the reason you made a carve-out of your

22   original grievance policy and said for COVID-19-related

23   grievances, we're going to reduce that to 30 days, no extensions

24   because the older policy was too slow to deal with those

11:48:22   25   specific grievances, the COVID-19 grievances?

Collier - As On Cross/Keville

1  **A**    I guess I don't that I ever came to the conclusion that the

2  existing policy was too slow or that there was some other issue

3  with it.  I just identified that we wanted to know if we had

4  COVID-related issues quickly, and the offenders knew if they

11:48:41  5  filed a COVID-related grievance that we would respond to it as

6  quickly as we could.

7            Other grievances have continued on the regular

8  track; and again, there is nothing necessarily wrong with that

9  at all.  But right now, I think it's important that we identify

11:48:54  10  and respond to those as quickly as we can.

11  **Q**    Not because people can get sick and die so quickly that you

12  needed to have this faster time frame, correct?

13  **A**    I'm not sure I understand your question.

14  **Q**    Sure.  The reason you're saying, "Hey, the grievance policy

11:49:16  15  is fine for a lot of things but we felt it was necessary to

16  reduce the time to respond to COVID-19 grievances" is because

17  COVID-19, as your counsel said earlier, is fast and fatal; and

18  you needed to have a policy that could react to that?

19            MS. VASQUEZ:  Objection.  Calls for a hypothetical.

11:49:45  20  Calls for speculation.

21            THE COURT REPORTER:  I'm sorry, I couldn't understand

22  you.

23            MS. VASQUEZ:  Calling for hypothetical.  Calling for

24  speculation.

11:49:45  25            THE COURT:  I'm going to allow it.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE WITNESS:  Our aim at reducing the time frame,

2    Mr. Keville, was so that we could just be as proactive as we can

3    be on COVID-19 issues.  That was --

4    BY MR. KEVILLE:

11:50:00    5    Q    Fine.  And the reason you were being proactive is because

6    your old policy had such a long time frame that people could get

7    sick and die before the grievance was responded to, correct?

8                    You recognized that?

9                    MS. VASQUEZ:  Same objection.

11:50:13   10          THE COURT:  Overruled.

11          THE WITNESS:  I wouldn't agree as you say,

12    Mr. Keville.

13    BY MR. KEVILLE:

14    Q    You do agree that one of the reasons you reduced the amount

11:50:24   15    of time to investigate COVID-19-related grievances is because

16    the old 80-day policy was too slow to address COVID-19

17    grievances?

18    A    No, sir, I don't think I said it was too slow; and I've

19    already said that.  What I said was we just wanted -- this is

11:50:41   20    what we had been focused on for the last three months as an

21    entire agency.

22                    So, COVID-related grievances were another area

23    that we wanted to make sure, one, we knew that they were COVID

24    really; and two, that we could respond to them as quickly as we

11:50:55   25    could.  That's -- we've done many things as it relates to COVID.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1    That was just how we addressed it within the grievance protocol.

2    **Q**    Did you answer that question differently when asked in your

3    deposition, sir?

4    **A**    I'm happy to look at it.  I'm not sure how different it

11:51:14  5    would have been.

6    **Q**    Remember that you said the old policy allowed more time

7    than we felt was appropriate for COVID-19-type grievances?

8    **A**    I do recall that in my deposition I was able to clarify for

9    you that information within our policy was our policies were

11:51:35  10   fine, we just wanted to be as proactive as we could with

11   COVID-19.

12   **Q**    Okay.

13        MR. KEVILLE:  Allen, could you put up his deposition

14   page 72, line 20, through page 73, line 3 -- or actually,

11:52:03  15   through line 6.

16   BY MR. KEVILLE:

17   **Q**    You were asked "The reason you reduced the amount of time

18   to investigate a grievance related to COVID-19 is because the

19   old 80-day policy was way too slow to address those grievances?"

11:52:14  20        And you said, "It would certainly be fair to say

21   that we felt the policy as it was allowed more time than we felt

22   was appropriate for COVID-19-type grievances."

23        Do you remember that testimony?

24   **A**    I see it.  Yes, sir, I remember it.

11:52:26  25   **Q**    Do you stand by that testimony?

Collier - As On Cross/Keville

1              MS. VASQUEZ:  Objection.  The question is vague.

2    Overbroad.

3              THE COURT:  I'm going to allow it.

4              THE WITNESS:  And I'm not looking at the end of my

11:52:39   5    deposition, but I was requestioned on that item by the Attorney

6    General's Office and I thought provided better clarification at

7    that time.

8    BY MR. KEVILLE:

9    **Q**   My question was different, sir.  Do you stand by the

11:52:51  10    testimony you gave that we just read, that you said, "It would

11    certainly be fair to say we felt the policy as it was allowed

12    more time than we felt was appropriate for COVID-19-type

13    grievances"?

14    **A**   I would agree that's my testimony, but I would also agree

11:53:05  15    that I had additional testimony that clarified that.

16    **Q**   And another thing that happened with this change in the

17    grievance policy is that you went faster to change the policy

18    than the normal approval process, correct?

19    **A**   Actually, in this case, we didn't necessarily need to

11:53:22  20    change the entire policy, we needed to make a modification of

21    the existing protocols which we put in place.

22    **Q**   Right.  And you felt that making this change needed to be

23    done faster than the normal administrative approval process

24    would take, correct?

11:53:42  25    **A**   We did not go through a modification of the existing

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1   policy.  That policy still stands today.  What we did was modify

2   protocols on the time frames that we would respond to COVID-19

3   grievances as well as the code for specific COVID-19 grievances.

4   Q    Did you answer that question differently in your

11:54:04  5   deposition, sir?

6   A    I don't recall.

7   Q    Okay.

8            MR. KEVILLE:  Allen, could you put up page 89 of his

9   deposition, line 12 through 18 -- or 20.

11:54:19  10  BY MR. KEVILLE:

11  Q    We were talking about the change to the grievance policy

12  and you were asked:  "And you felt even making this change

13  needed to be done faster than the normal administrative process

14  would take, correct, making this change to the grievance

11:54:33  15  policy?"

16            And you said, "Yes, sir."

17  A    Yes, sir, I see exactly that.  I don't argue with that at

18  all.

19  Q    Okay.

11:54:40  20  A    I will tell you that in doing that, when you're making a

21  protocol change within the system, you don't necessarily always

22  go through a policy change and go through that process; and

23  again, I don't know that this will be a permanent adjustment.

24  But for right now, it is an adjustment in the protocol.

11:54:57  25            But we did not go through the whole process to

Collier - As On Cross/Keville

1  modify the policy.  That would definitely have taken a long

2  time, but it also may not be a policy modification we intend to

3  make for the long haul.

4  **Q**    But you stand by your testimony that you went faster than

11:55:11   5  the normal process would to make this change?

6  **A**    Yes, sir.

7  **Q**    Okay.  I think you said earlier -- let me just be sure --

8  that you left it up to Warden Herrera to determine where he

9  could enforce increased social distancing at the Pack Unit?

11:55:40   10  **A**    Throughout the process and throughout the time that we

11  dealt with COVID-19, each of our unit wardens developed a plan

12  on their facilities how they could do social distancing.  They

13  worked with our risk managers that are assigned to the facility.

14  They helped develop those plans.  So, I know Warden Herrera has

11:56:02   15  done that at the Pack Unit.

16  **Q**    I'm sorry.  Maybe my question wasn't clear, and I

17  apologize.  You left it up to Warden Herrera to determine where

18  he can enforce increased social distancing at the Pack Unit,

19  correct?

11:56:14   20  **A**    Each warden, yes, sir.  Each warden working with risk

21  management.  Warden Herrera knows the Pack facility better than

22  anyone else.  And his expertise as the warden of that facility

23  would be the one that we would want developing the social

24  distancing plan working, obviously, with our risk managers and

11:56:32   25  then having that plan approved by his management team.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1    Q    And you said each warden, including Warden Herrera,

2    developed a plan for their unit; but you've never seen Warden

3    Herrera's plan for the Pack Unit, correct?

4    A    I did not personally review it, no, sir.

11:56:49    5    Q    You've never seen?

6    A    No, sir.

7    Q    Don't even know if it exists?

8    A    I have no reason to believe it doesn't exist, but I haven't

9    personally seen it.

11:56:57   10    Q    Okay.  And it's on Warden Herrera and his leadership team

11   to make the necessary adaptions to enforce social distancing at

12   the Pack Unit, correct?

13   A    I'm sorry, Mr. Keville, could you say that again.  I

14   apologize.

11:57:10   15    Q    Sure.  It's on Warden Herrera to make the necessary

16   adaptions to enforce social distancing at the Pack Unit,

17   correct?

18            MS. VASQUEZ:  Objection.  Vague and overbroad.

19            THE COURT:  I'm going to allow it.

11:57:22   20            THE WITNESS:  Warden Herrera would develop the plan of

21   how they're going to do social distancing at the Pack Unit; and

22   yes, through his management team, they would enforce the social

23   distancing at the Pack Unit.

24   Q    And did you give him any specific instructions, Warden

11:57:37   25   Herrera, where you said, "Hey, I want you to make a plan"?  Or

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

 1  was that just something that you assumed was filtered down to

 2  him through others?

 3  **A**    I know that each warden conducting a social distancing

 4  plan.  I know that Ms. Davis and I had discussions about that.

11:57:53   5  I have no reason to question that Warden Herrera did that.

 6  **Q**    Did you ever instruct anything about rearranging inmates in

 7  the dorms at the Pack Unit, for example, moving people into open

 8  bunks or having people change the way they're sleeping so

 9  they're head to foot?  Anything like that that you did

11:58:23  10  specifically for the Pack Unit to increase social distancing?

11  **A**    I have had discussions about head to foot as it's

12  identified within the CDC guidelines, but I don't recall

13  specifically a discussion about Pack.  I'm not sure that I did.

14  I don't recall one specifically.

11:58:43  15  **Q**    Let's talk a minute about contact tracing.  You're not

16  aware of any written policy at TDCJ for how TDCJ is supposed to

17  perform contact tracing, correct?

18  **A**    For offenders or staff?

19  **Q**    For -- well, offenders.  Let's start there.

11:59:03  20  **A**    Okay.  For offenders, no, sir.  I'm personally not aware of

21  written instructions.  They may exist within the Correctional

22  Institution Division, but I'm not specifically aware of that.

23  **Q**    And is there a specific written policy for how you perform

24  contact tracing for staff?

11:59:19  25  **A**    We perform contact tracing for staff with the assistance of

Collier - As On Cross/Keville

1    the Health Services Division and, essentially, the Department of

2    Health Services.  There may be specific policies related to that

3    because they extend even beyond our agency, but I'm not

4    personally aware of a TDCJ policy.  I'm surely not saying it

11:59:40   5    exists, but I'm not saying it doesn't exist either.

6    Q    Now, when we discussed contact tracing in your deposition,

7    you said you understand that the unwritten practice at TDCJ for

8    contact tracing for positive COVID-19 inmates is a review of

9    where that inmate was housed and looking for who that inmate has

12:00:03   10   been around during the last 14 days; and then, those inmates

11   would be placed on observation, correct?

12   A    Yes, sir, I believe that's what I said.  I believe the

13   actual protocol is 48 hours, not 14 days.

14   Q    Okay.  So, you thought the protocol was 14 days; and since

12:00:19   15   then, you found out it's only 48 hours?

16   A    I believe in our deposition, if I remember as I read it, I

17   even was confused as you and I talked about that time frame

18   because I did -- but I absolutely agree I said 14 days when we

19   started.  And then -- but it is 48 hours.  I confirmed that

12:00:36   20   after our deposition -- my deposition.

21   Q    You also said the other thing that was part of the TDCJ

22   practice, unwritten practice for contact tracing, was, if the

23   offender was working, identify individuals that he has been

24   around through work.  Do you recall that?  Is that part of the

12:01:02   25   practice or did you find something different out later?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1   **A**   For contact tracing for an offender.  You would, "A," look
2   at the housing area.  We know who is housed where on a facility.
3   We also know who works there -- where on a facility.  So, you
4   would look at the housing area; and if the offender had a job
12:01:18   5   and had been working, you would have identified, if that
6   individual was working, who were the other offenders that were
7   working at the same time as well as the other staff.
8   **Q**   And I think the last thing you said was part of the
9   unwritten practice of contact tracing was identify by which
12:01:36   10   staff had prolonged contact within six feet of the offender.
11                   Do you recall that?
12   **A**   Contact tracing, if I'm not mistaken, would have a
13   discussion about anybody who's had contact within a less than
14   six-foot window for an extended period of time such as 15
12:01:54   15   minutes.
16   **Q**   All right.
17             MR. KEVILLE:  I'd like to put up Plaintiffs' Exhibit
18   186 which I will move into evidence.
19             THE COURT:  Any objection?
12:02:10   20             Any objection to this exhibit?
21             Ms. Vasquez, is there any objection to this
22   exhibit?
23             MS. VASQUEZ:  Is this a document received from
24   Defendants?
12:02:34   25             MR. KEVILLE:  This was a document that you produced.

Collier - As On Cross/Keville

1      MS. VASQUEZ:  No objection.

2      THE COURT:  Admitted without objection.

3  BY MR. KEVILLE:

4  **Q**    Okay.  This is a contact tracing form for TDCJ.

12:02:46  5          Do you recognize that?

6  **A**    Not specifically.  I don't use the form, but I won't argue

7  with you that that's a form that we use.

8  **Q**    Okay.  Earlier, you said that contact tracing had been done

9  after Mr. Clerkly passed away, correct?

12:03:02  10  **A**    I believe that's my understanding, yes, sir.

11  **Q**    Okay.

12      MR. KEVILLE:  Let's go to page 3 of this Plaintiffs'

13  Exhibit 186.

14          And blow up the bottom there.

12:03:17  15          Let's start at the top, actually.  Let's start at

16  the top, Allen.

17  BY MR. KEVILLE:

18  **Q**    First box says timeline starting two days prior to symptoms

19  appeared, what housing areas, populations has the offender been

12:03:37  20  in; and there is nothing filled out, correct?

21  **A**    I'm just grabbing another form, Mr. Keville, so I can see

22  what you're talking about.  You're talking about -- I see

23  nothing filled out, yes, sir.

24  **Q**    Yeah.  And then, if we go down to the next section, it says

12:03:44  25  timeline starting two days prior to the date symptoms appeared

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1    with all staff who were working in the housing area where the

2    offender was living on both days.  And you see there is nothing

3    filled out there either?

4  **A**    Yes, sir, I see that.

12:03:57  5  **Q**    Okay.  So, then, we see in the bottom section COVID-19

6    offender source contact tracing continued timeline.  So, there's

7    a timeline written out in the bottom, but there are zero people

8    identified in the contact tracing form for Mr. Clerkly that

9    should have been figured out, correct?

12:04:22  10  **A**    It's say offender -- let's see Clerkly lived in 3 dorm,

11   bunk 49.  There were a total of 53 offenders.  So, it's my

12   understanding, obviously -- because we tested that dorm as well.

13   We knew he was housed with at the facility.

14          So, I don't know if that's what you're asking;

12:04:38  15  but I know that we knew where he was housed.  Also knew, if I'm

16   not mistaken, he had not worked during the two days prior to him

17   leaving.  I think it was two weeks before that when he was

18   working.

19  **Q**    Did you know -- is there any investigation here on when he

12:04:53  20  was working?

21  **A**    I don't see it documented.  My understanding is it had been

22   at least two weeks before he left the unit that he was actually

23   working.

24  **Q**    One of the reasons he wasn't working was because he had

12:05:05  25  symptoms that appeared earlier than April 11th, correct?

1          MS. VASQUEZ:  Objection.  Calls for speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  No, sir.  I'm not aware of -- if he had

4   COVID-related symptoms prior to that or not.

12:05:20    5   BY MR. KEVILLE:

6   Q    Mr. Clerkly had shortness of breath and breathing

7   difficulties that he reported on April 5th, April 8th, and April

8   11th.

9               Are you aware of that?

12:05:30    10         MS. VASQUEZ:  Objection.  This is misleading, your

11  Honor.

12         THE COURT:  I'm going to allow it.

13         MS. VASQUEZ:  Also, Bryan Collier has no personal

14  knowledge about Mr. Clerkly's --

12:05:43    15         THE COURT:  He can say that.  No personal knowledge.

16  He can say that.

17         THE WITNESS:  And I don't, your Honor, I'm sorry.  I

18  don't have any knowledge of his medical.

19         THE COURT:  Okay.

12:05:50    20  BY MR. KEVILLE:

21  Q    Do you know if Mr. Clerkly had gone to the medical

22  department several times in the week before?  Do you know that

23  generally?

24  A    No, sir.

12:05:57    25  Q    If he should -- if he did, that should show up on this

Collier - As On Cross/Keville

1    form, correct?

2           MS. VASQUEZ:  Objection.  Incomplete hypothetical.

3    Assumes facts.

4           THE COURT:  I'm going to allow it.

12:06:12  5           THE WITNESS:  In contact tracing, if he went to

6    medical, yes, sir, I think you would look at where that person

7    has been in the 48 hours prior.  If he had gone there in the 48

8    hours, if he was seen in medical, then you would -- that would

9    probably be something identified.

12:06:24 10   BY MR. KEVILLE:

11   **Q**    You see the date for the timeline is April 11th, correct?

12   **A**    I see that, yes, sir.

13   **Q**    That's the date Clerkly had passed away, right?  There was

14   no tracing done for even the two days before the day he passed

12:06:40 15  away?

16   **A**    It was my understanding that Clerkly had been in the dorm.

17   They identified the offenders in the dorm as offenders that were

18   put on medical restriction.  That's the same offenders that we

19   tested, and it was also my understanding through discussions

12:06:56 20  that he had not worked for two weeks prior to the time he was

21   out of the unit.

22   **Q**    In this contact tracing, there is no identification of

23   where Mr. Clerkly may have gone outside the dorm or who he may

24   have been in contact with, correct?  It just says where he

12:07:13 25  lived?

Collier - As On Cross/Keville

1   **A**     It does, yes, sir, you're right.

2   **Q**     It says contact -- the contact tracing is supposed to go

3   and find who he's been in contact with, correct?

4   **A**     If he had contact with someone two days prior to that

12:07:28   5   outside of his living area, that would have to be a discussion

6   that you would have as you do the contact investigation.  I

7   don't know whether Warden Herrera talked to medical, if that was

8   identified, or if he was even in medical or seen in his -- as

9   you say, was he seen during that time?  I'm not sure if he was

12:07:45   10   seen or not or if he was seen in the dorm or in medical, but

11   that would certainly be part of the discussion.

12   **Q**     Well, we can just see right in the first line we're looking

13   at here on the screen about the timeline.  It says he received

14   daily breathing treatments.  But there's nothing identifying who

12:08:00   15   the medical people he saw that had the daily breathing

16   treatments, correct?

17   **A**     No documentation of that here, yes, sir.

18   **Q**     No documentation of anyone he saw from the medical

19   department, correct?

12:08:15   20   **A**     Not that I can see.

21   **Q**     No documentation of what officers he came in contact with

22   or, heck, even what officers were in the dorm that he lived in

23   for the two days prior to April 11th, correct?

24   **A**     There's no documentation.  The facility would know that;

12:08:31   25   and then -- again; but it's not documented on the form.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - As On Cross/Keville

1  **Q**    Right.  And it's supposed to be documented on the form if

2  you're doing contact tracing, correct?

3  **A**    I would think you would document the staff that they had

4  contact with; but I haven't completed a form, haven't done that;

12:08:46  5  but I would think that would be part of the protocol.

6  **Q**    So, are you saying sometimes at TDCJ people just say, heck,

7  we know who he's been in contact with and they don't put it on

8  the form or are you --

9  **A**    I don't know.  Mr. Keville, that would be the first contact

12:09:00  10  form probably done probably at the Pack Unit because he was the

11  first Pack Unit offender.  I don't know details.  I don't do the

12  form.  I'm not specifically familiar with the form.

13  **Q**    But it would have been really important since he was the

14  first inmate on the Pack Unit who died of COVID-19 to make sure

12:09:17  15  you get the contact tracing right on that one.  You would agree

16  with that, right?

17  **A**    I think it would be important to get the contact tracing

18  correct on anyone.

19  **Q**    And what we see on this form, Plaintiffs' Exhibit 186, is

12:09:32  20  there is not a single individual identified who Mr. Clerkly had

21  contact with either the two days before the day he died or 14

22  weeks (sic).  There's no one, correct?

23  **A**    There is no name documented.  I don't know that that

24  equates to that nothing occurred.  Because I do know we tested

12:09:50  25  the dorm.  So, I would have confidence that Warden Herrera knew

Collier - As On Cross/Keville

 1   what staff he was in contact with; and if he was in medical, he

 2   would also know what medical staff and also what medical staff

 3   were wearing if they had contact with him.  If they're in full

 4   protective equipment, then I think the warden would know that as

12:10:09  5   well.  He didn't document that on the form.

 6   **Q**    Right.  And he didn't tell you he knew or did any of that,

 7   correct?

 8   **A**    Warden Herrera and I have not had a discussion about that

 9   contact tracing specifically.

12:10:18  10  **Q**    And you would agree, at least according to what's on this

11   form, contact tracing was not done correctly.  This is the form

12   for Leonard Clerkly that you guys gave us.

13   **A**    Yes, sir.  But again, I didn't provide the instruction.

14   I've not ever done a contact investigation personally.  Yes,

12:10:37  15  it's not documented.  That level of documentation is not there.

16   **Q**    Do you agree that -- do you know that everyone in that dorm

17   tested negative after Mr. Clerkly died?

18   **A**    Yes, sir.

19   **Q**    And then, after that up until now, over 400 people have

12:10:55  20  tested positive in the Pack Unit, correct?

21   **A**    Yes, sir.

22   **Q**    Do you think maybe you could have done a better job with

23   the contact tracing in isolating COVID-19 after Mr. Clerkly's

24   death?

12:11:07  25           MS. VASQUEZ:  Objection.  Argumentative.  Vague.

Collier - As On Cross/Keville

1          THE COURT:  I'm going to allow it.

2          MS. VASQUEZ:  Personal knowledge.

3          THE WITNESS:  I don't have any reason to believe that

4     the contact investigation with Mr. Clerkly has anything to do

12:11:19  5     with additional positives on the unit.  We tested everyone that

6     to my knowledge had been exposed to him on the unit, and those

7     tests were negative.  And it was sometime before we had an

8     additional positive, if I'm not mistaken.

9     BY MR. KEVILLE:

12:11:31  10    Q    Sure.  But as far as you can see from this form, nobody

11    went back and tried to isolate specific individuals either

12    outside the dorm that he came in contact with or people who came

13    inside the dorm, no staff, no medical.  None of that was done at

14    least according to the form you gave us, correct?

12:11:47  15    A    It's not documented on the form.

16    Q    Mr. Collier, you've had no discussions with anyone about

17    early release as a way to social distance -- increase social

18    distancing at the Pack Unit, correct?

19          MS. VASQUEZ:  Objection, your Honor.  Early release is

12:12:07  20    not anything that Plaintiffs have pled.

21          THE COURT:  I'm going to allow it.

22          THE WITNESS:  TDCJ during the COVID event has

23    continued to make sure that anyone scheduled for release or

24    anyone already enrolled in a program continued so we kept

12:12:23  25    releasing on track, and we did not delay people's release so

Collier - As On Cross/Keville

1    that they could continue in programs.

2              We did have to stop placement of offenders into

3    programs when we became -- we stopped intake and, essentially,

4    became gridlocked because we had so many units.  We were not

12:12:41  5    transferring offenders to new units.  So, we had released

6    everyone that we could during the course of the event.

7              And our overall population has gone from 142,000

8    to 126,000.  So, we had released -- we did not do an early

9    release.  We don't have the authority to do an early release or

12:12:58  10   any other mechanism, and I have not had a discussion about doing

11   that with any outside entity.

12   **Q**    Mr. Collier, you kept daily notes on a notepad of your

13   meetings and you're looking at issues regarding COVID-19 and

14   then reporting that information out, correct?

12:13:15  15   **A**    I kept a lot of notes during the whole event.  So, I kept

16   notes that I did provide to the attorneys.

17   **Q**    And you took those sheets of your notes off your daily

18   notes and you gave it to your assistant every day, correct, the

19   notes about COVID-19?

12:13:32  20   **A**    They were notes that I gathered before we, typically, did

21   our conference calls in the afternoon.  But it could have been

22   notes from even other events as well, yes, sir.

23   **Q**    And you did that every day since March; and then, you gave

24   those notes to your counsel, correct, your general counsel?

12:13:50  25   **A**    Yes, sir.

Collier - Direct/Vasquez

1  **Q**    You were deposed on June 4th, 2020, and you said you had

2  given those notes to your counsel, correct?

3  **A**    That was my understanding, yes, sir.

4  **Q**    Can you explain why those notes were never produced,

12:14:02   5  Mr. Collier?

6           MS. VASQUEZ:  Objection.  Personal knowledge.  He

7  doesn't know why they weren't produced.

8           THE COURT:  If he doesn't know, he can say he doesn't

9  know.  I'm going to allow it.

12:14:15  10           THE WITNESS:  No, sir, I don't -- I know I provided

11  those notes, but I don't know that answer.

12           MR. KEVILLE:  Your Honor, I'll pass the witness now.

13           THE COURT:  Okay.

14               Any questions for this witness, Ms. Vasquez?

12:14:24  15               Ms. Vasquez, any questions of this witness?

16           MS. VASQUEZ:  Yes, your Honor.

17                   DIRECT EXAMINATION

18  BY MS. VASQUEZ:

19  **Q**    Mr. Collier, what is your understanding as to what prompts

12:15:01  20  contact tracing to be done?

21  **A**    When we receive information regarding a positive test

22  result, that would trigger the next steps of doing the contact

23  investigation.

24  **Q**    So, once you receive a positive test result, then you can

12:15:20  25  conduct contact tracing for the previous 48 hours from that test

Collier - Direct/Vasquez

1    result, correct?

2    **A**    From the test date.

3    **Q**    From the test date?

4    **A**    Yes, ma'am.

12:15:29   5    **Q**    Earlier, Mr. Keville was questioning you regarding the

6    grievance procedure.  Is there an instance where the grievance

7    procedure that has been in place with TDCJ was shown to be

8    ineffective or not to respond quickly enough to any grievance --

9    any COVID-19-related grievances?

12:16:02   10   **A**    I don't know of any specific COVID grievance in that

11   category.

12   **Q**    So, there was never an instance where the previous

13   deadlines in place for the grievance procedure were shown to be

14   too long to adequately respond to a COVID-19 grievance?

12:16:28   15   **A**    No, ma'am.  I'm not -- this -- the change that we made was

16   not in response to an incident or a grievance that I'm aware of

17   or a specific notation of a grievance problem.  It was just to

18   try to make sure that we got that information sooner and

19   responded to it and had it coded so we could clearly identify

12:16:45   20   it.

21   **Q**    Earlier, Mr. Keville was questioning you regarding your

22   deposition.

23            MR. KEVILLE:  Your Honor, this is improper.  Excuse

24   me.

12:17:08   25            THE COURT:  There's an objection.  What's the

Collier - Direct/Vasquez

1    objection?  Hold on a second, we got --

2            THE COURT REPORTER:  I'm sorry, there's, like, five

3    people talking at the same time.  Ms. Vasquez.

4        (Simultaneous speaking; indiscernible.)

12:17:15    5            THE COURT:  Ms. Vasquez, can you hear me?

6        (No response.)

7            THE COURT:  Ms. Vasquez, can you hear me?

8        (No response.)

9            THE COURT:  Ms. Vasquez, can you hear me?

12:17:51    10            MS. VASQUEZ:  Yes.

11            THE COURT:  We couldn't hear you.  So, none of that

12    question has been -- has been transcribed.

13                And do we have an objection, too?

14            MR. KEVILLE:  Yes, your Honor.  I object to putting up

12:18:02    15    his deposition.  This is not impeachment.  This is leading him

16    with his own prior testimony.  She's actually reading in his

17    testimony.  If she has a question, ask the question.  But you

18    can't put up his deposition testimony in advance of the

19    question.

12:18:16    20            THE COURT:  What is the purpose of showing him his

21    deposition testimony, Ms. Vasquez?

22            MS. VASQUEZ:  Mr. Keville attempted to impeach

23    Mr. Collier earlier with deposition testimony, and this is

24    deposition testimony from the same deposition where he testified

12:18:30    25    consistent with what he is saying now.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

Collier - Direct/Vasquez

1          THE COURT:  Well, you can ask him about that; but you

2     can't show it to him yet.  You can ask him about that.

3     BY MS. VASQUEZ:

4     **Q**     Mr. Collier, what you're testifying to today regarding the

12:18:49  5     grievance procedure and the COVID-19 change to the grievance

6     procedure, is that consistent with how you testified in your

7     deposition?

8     **A**     Yes, ma'am.

9          MS. VASQUEZ:  Pass the witness.

12:19:06  10          THE COURT:  You pass the witness?

11          MS. VASQUEZ:  Yes.

12          THE COURT:  Okay.

13               Any redirect?

14          MR. KEVILLE:  No, your Honor, no recross.

12:19:16  15          THE COURT:  Okay, you may step down.  Thank you,

16     Director Collier.  Thank you.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  What would you like to do, guys?  Do you

19     want to take a break now or you want to do one more witness?

12:19:30  20     What's your preference.

21               You're excused, Mr. Collier.  Thank you.  You're

22     excused.

23          THE WITNESS:  Yes, sir.

24          MR. KEVILLE:  Your Honor, for Plaintiffs, our next

12:19:37  25     witness is Mr. Valentine.  He will take a little while.  So,

Collier - Direct/Vasquez

1  perhaps, we take our break here and then start --

2          THE COURT:  We'll break until 1:00 o'clock.  Thank

3  you.

4      (Court recessed at 12:19 p.m.)

5

6

7              C E R T I F I C A T E

8

9      I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter, to

11  the best of my ability.

12      This record was taken through video or telephone

13  conference which may have affected the quality of the record.

14

15  By: /s/*Gayle L. Dye*                    *07-13-2020*

16          Gayle L. Dye, CSR, RDR, CRR        Date

17

18

19

20

21

22

23

24

25

**'** [1] - 88:9

**'deliberate'** [1] - 24:12
**'indifference'** [1] - 24:13

## /

**/s/Gayle** [1] - 121:15

## 1

**1** [3] - 1:12, 37:16, 94:20
**1,000** [1] - 37:16
**1,160** [1] - 36:18
**1,863** [1] - 7:25
**10-minute** [1] - 78:15
**100** [1] - 21:4
**100.4** [1] - 30:11
**104** [6] - 41:18, 41:21, 41:24, 42:2, 42:4, 69:12
**107,000** [1] - 48:23
**10th** [1] - 50:1
**1101** [1] - 2:6
**111** [2] - 87:24, 88:5
**1179** [1] - 15:4
**11:04** [1] - 78:17
**11:22** [1] - 78:18
**11th** [7] - 2:6, 25:5, 29:25, 109:25, 110:8, 111:11, 112:23
**12** [1] - 102:9
**12-hour** [1] - 19:18
**1200** [1] - 15:1
**1248** [1] - 10:5
**12548** [1] - 2:13
**126,000** [1] - 116:8
**127** [1] - 36:17
**12:19** [1] - 121:4
**12th** [1] - 28:16
**13** [2] - 1:8, 4:2
**131** [2] - 35:24, 35:25
**135,000** [1] - 36:9
**13th** [2] - 28:21, 31:7
**14** [9] - 18:11, 51:7, 57:12, 58:5, 106:10, 106:13, 106:14, 106:18, 113:21
**14-day** [1] - 18:15
**14.52** [16] - 15:18, 17:23, 18:6, 18:21, 44:6, 68:25, 69:14, 69:15, 69:17, 69:22, 69:24, 70:2, 70:3, 70:4, 70:9, 70:12
**142,000** [1] - 116:7
**14:52** [1] - 27:23
**14th** [1] - 31:20
**15** [10] - 12:9, 34:17, 93:8, 93:11, 96:16, 96:18, 96:23, 97:5, 97:6, 107:14
**15-minute** [2] - 78:15, 78:16
**16** [3] - 27:17, 38:5, 38:9

**160** [1] - 88:9
**160-day** [1] - 97:9
**16th** [1] - 28:25
**17** [2] - 18:15, 88:6
**172** [1] - 85:23
**18** [1] - 102:9
**1800** [1] - 10:1
**185** [1] - 49:10
**186** [4] - 49:10, 107:18, 108:13, 113:19
**19** [10] - 7:7, 8:5, 17:14, 21:2, 35:13, 36:7, 86:14, 87:24, 88:5
**1983** [1] - 22:3
**19th** [1] - 6:23
**1:00** [1] - 121:2

## 2

**2** [3] - 37:14, 87:12, 87:13
**20** [8] - 21:2, 21:4, 21:20, 27:20, 35:6, 79:7, 100:14, 102:9
**2020** [11] - 1:8, 4:2, 27:17, 27:20, 30:8, 48:19, 49:23, 86:12, 86:13, 86:22, 117:1
**21** [3] - 38:3, 38:7, 38:21
**22** [1] - 94:20
**226** [1] - 15:12
**24** [1] - 15:12
**2400** [1] - 1:21
**24th** [1] - 30:14
**25** [1] - 49:10
**26** [1] - 17:3
**26th** [1] - 97:2
**27** [1] - 38:5
**27th** [2] - 28:2, 50:2

## 3

**3** [4] - 49:10, 100:14, 108:12, 109:10
**30** [7] - 17:5, 35:25, 36:5, 77:18, 78:1, 97:3, 97:23
**30(b)(6** [1] - 40:5
**38.41** [1] - 16:14
**39** [1] - 13:6

## 4

**4** [1] - 49:23
**4.2** [2] - 35:25, 36:5
**40** [4] - 96:7, 96:8, 96:9, 96:15
**400** [2] - 17:15, 114:19
**409** [1] - 7:9
**41** [1] - 3:5
**413** [1] - 8:3
**48** [6] - 106:13, 106:15, 106:19, 111:7, 117:25

**48-hour** [1] - 61:23
**481** [3] - 8:1, 8:3, 16:17
**487** [5] - 6:25, 7:1, 7:2, 16:18, 21:2
**49** [1] - 109:11
**4th** [11] - 28:11, 48:19, 83:14, 84:3, 85:16, 86:12, 86:13, 86:20, 86:22, 87:8, 117:1

## 5

**51** [1] - 94:20
**512.370.9996** [1] - 2:15
**512.623.7727** [1] - 2:7
**512.623.7729** [1] - 2:7
**512.936.1378** [1] - 2:14
**515** [1] - 2:19
**52** [1] - 94:20
**53** [1] - 109:11
**56** [2] - 87:24, 88:6
**569,000** [1] - 36:10
**5th** [1] - 110:7

## 6

**6** [1] - 100:15
**60** [2] - 33:1, 79:10
**600** [1] - 10:3
**65** [2] - 15:1, 55:3
**67** [1] - 48:23

## 7

**713.250.5582** [1] - 2:20
**713.651.2600** [1] - 1:22
**713.651.2700** [1] - 1:22
**72** [2] - 18:7, 100:14
**73** [1] - 100:14
**77002** [2] - 1:21, 2:20
**78702** [1] - 2:6
**78711** [1] - 2:14

## 8

**8.45** [1] - 16:13
**8.84** [1] - 16:12
**80** [3] - 96:2, 96:11, 96:16
**80-day** [3] - 97:9, 99:16, 100:19
**80-to-160** [1] - 17:5
**800** [2] - 1:20, 15:1
**8004** [1] - 2:19
**89** [1] - 102:8
**8:00** [2] - 38:3, 38:21
**8th** [3] - 5:9, 17:10, 110:7

## 9

**9:16** [1] - 1:8
**9th** [1] - 28:14

## A

**a.m** [3] - 1:8, 78:17, 78:18
**Abbott** [1] - 29:20
**ability** [4] - 46:9, 60:9, 95:9, 121:11
**able** [15] - 14:6, 22:15, 24:7, 24:9, 24:10, 31:23, 32:9, 35:3, 37:4, 40:3, 55:7, 65:6, 71:15, 80:2, 100:8
**above-entitled** [1] - 121:10
**absolute** [1] - 49:25
**absolutely** [2] - 47:8, 106:18
**abuse** [1] - 33:5
**accelerant** [1] - 33:2, 75:19
**accelerate** [1] - 84:12
**acceptable** [1] - 82:15
**access** [16] - 45:24, 53:10, 53:22, 56:19, 64:2, 65:21, 66:22, 67:11, 68:5, 77:13, 78:10, 79:16, 79:18, 80:2, 80:10
**accessibility** [1] - 84:17
**accessible** [1] - 79:24
**accidental** [1] - 11:2
**accommodation** [2] - 66:5, 66:7
**accommodations** [1] - 20:13
**according** [6] - 44:1, 59:24, 61:22, 114:10, 115:14
**accuracy** [2] - 5:13, 5:17
**accurate** [5] - 10:19, 11:3, 11:15, 64:9, 64:11
**achieve** [2] - 20:11, 70:24
**acquire** [2] - 31:2, 71:15
**act** [3] - 17:17, 22:4, 26:12
**acted** [5] - 29:19, 30:4, 30:10, 33:25, 35:19
**action** [2] - 15:22, 29:16
**Action** [1] - 1:6
**actions** [1] - 28:6
**activities** [1] - 41:15
**actual** [5] - 5:18, 37:18, 66:13
**ADA** [3] - 22:4, 85:8, 89:2
**adaptation** [6] - 69:22, 70:8, 70:10, 70:12, 70:18, 71:4
**adaptions** [2] - 104:11, 104:16
**added** [2] - 57:1, 57:18
**addition** [3] - 18:2, 70:3, 70:17
**additional** [18] - 19:17, 20:8, 31:2, 35:4, 49:1, 49:22, 50:8, 51:5, 52:13, 53:23, 56:20, 57:2, 71:10, 88:9, 96:9, 101:15, 115:5, 115:8
**address** [26] - 9:24, 10:16, 12:6, 12:16, 25:19, 27:19, 28:13, 28:15, 29:1, 29:7,

29:14, 32:17, 35:11, 37:22, 45:9, 51:25, 52:9, 52:23, 57:4, 69:18, 70:5, 76:16, 95:9, 97:9, 99:16, 100:19
**addressed** [3] - 93:25, 94:23, 100:1
**adequate** [2] - 32:6, 54:8
**adequately** [1] - 118:14
**adjusted** [1] - 33:4
**adjustment** [2] - 102:23, 102:24
**adjustments** [1] - 93:13
**administer** [1] - 40:18
**administration** [4] - 40:23, 66:18, 91:1, 91:12
**administration's** [1] - 66:18
**administrative** [4] - 16:8, 94:3, 101:23, 102:13
**admission** [1] - 87:12
**admit** [4] - 37:9, 37:11, 53:17, 86:17
**admitted** [2] - 87:21, 108:2
**adopted** [5] - 17:23, 20:23, 27:21, 27:23, 28:2
**advance** [1] - 119:18
**advice** [9] - 48:25, 56:11, 57:24, 67:18, 67:24, 67:25, 73:13, 73:17, 92:14
**advise** [1] - 67:20
**advised** [1] - 31:10
**advising** [2] - 30:10, 66:9
**advisory** [1] - 13:5
**affected** [1] - 121:13
**afraid** [1] - 34:11
**afternoon** [1] - 116:21
**AG's** [2] - 25:24, 84:2
**agency** [6] - 30:15, 41:13, 92:6, 92:14, 99:21, 106:3
**agents** [1] - 55:17
**ago** [5] - 48:3, 48:18, 51:8, 71:7, 72:4
**agree** [41] - 10:12, 40:1, 45:23, 46:6, 46:25, 48:10, 48:16, 48:18, 53:12, 54:2, 54:16, 55:24, 56:13, 56:21, 57:13, 57:20, 57:22, 58:2, 58:18, 59:1, 59:13, 60:22, 61:10, 61:18, 62:1, 62:12, 63:5, 63:11, 69:9, 73:22, 81:16, 95:7, 99:11, 99:14, 101:14, 106:18, 113:15, 114:10, 114:16
**agreeable** [1] - 39:24
**agreed** [4] - 5:20, 12:8, 72:4, 72:12
**agreeing** [8] - 46:1, 52:24, 54:6, 55:12, 56:11, 57:6, 60:12, 62:18
**agreement** [1] - 46:6
**ahead** [6] - 12:14, 12:19,

12:20, 17:21, 29:16, 59:19
**AIDED** [1] - 1:25
**aim** [1] - 99:1
**air** [3] - 60:5, 60:6, 82:3
**air-conditioning** [2] - 60:5, 82:3
**alcohol** [8] - 32:25, 33:1, 33:3, 75:9, 75:18, 77:8, 79:10
**alcohol-based** [3] - 32:25, 33:3, 77:8
**Allen** [9] - 18:22, 19:8, 48:7, 49:9, 79:2, 94:19, 100:13, 102:8, 108:16
**allotment** [1] - 56:20
**allow** [23] - 45:1, 45:23, 56:3, 56:5, 59:23, 63:8, 74:9, 76:1, 86:17, 88:24, 91:3, 92:21, 93:18, 96:5, 98:25, 101:3, 104:19, 110:12, 111:4, 115:1, 115:21, 117:9
**allowable** [1] - 97:3
**allowed** [8] - 40:6, 40:10, 40:11, 78:10, 93:8, 100:6, 100:21, 101:11
**allowing** [3] - 75:8, 75:23, 93:10
**allows** [1] - 96:6
**almost** [1] - 30:6
**alone** [2] - 17:24, 37:4
**alter** [1] - 84:16
**alternative** [2] - 57:11, 58:2
**alternatives** [1] - 60:2
**ambush** [1] - 38:13
**amended** [3] - 38:4, 38:14, 38:20
**Amendment** [1] - 17:10
**Americans** [1] - 36:9
**amount** [7] - 8:21, 20:10, 53:25, 92:4, 97:7, 99:14, 100:17
**analogy** [1] - 35:22
**analysis** [11] - 64:20, 65:4, 65:12, 65:13, 65:19, 67:9, 75:12, 75:22, 76:10, 76:13, 77:22
**announcements** [1] - 61:7
**answer** [16] - 6:16, 48:5, 48:16, 49:3, 54:8, 56:6, 73:11, 75:21, 80:24, 81:9, 81:23, 81:25, 94:17, 100:2, 102:4, 117:11
**answered** [7] - 49:5, 49:14, 53:4, 68:7, 89:19, 92:20, 94:25
**answering** [1] - 55:11
**anyway** [1] - 10:5
**apologize** [9] - 9:5, 12:17, 13:13, 46:23, 56:7, 65:2,

81:7, 103:17, 104:14
**appear** [2] - 6:24, 40:14
**APPEARANCES** [2] - 1:14, 2:1
**appeared** [4] - 18:12, 108:19, 108:25, 109:25
**appearing** [1] - 26:5
**application** [1] - 35:22
**applied** [1] - 69:11
**apply** [2] - 28:4, 45:17
**appointments** [1] - 58:15
**appreciate** [1] - 46:22
**appropriate** [6] - 21:10, 29:24, 33:11, 100:7, 100:22, 101:12
**approval** [2] - 101:18, 101:23
**approved** [1] - 103:25
**April** [10] - 25:4, 31:7, 31:20, 55:2, 109:25, 110:7, 111:11, 112:23
**area** [9] - 19:15, 55:17, 64:15, 89:4, 99:22, 107:2, 107:4, 109:1, 112:5
**areas** [8] - 18:24, 19:1, 21:14, 30:22, 59:9, 60:17, 64:3, 108:19
**argue** [2] - 102:17, 108:6
**arguing** [4] - 17:2, 19:6, 71:25, 88:3
**argument** [1] - 5:1
**argumentative** [4] - 75:25, 91:2, 92:19, 114:25
**arisen** [1] - 39:16
**arrive** [1] - 11:17
**article** [1] - 35:23
**articulated** [1] - 37:1
**AS** [2] - 3:5, 41:6
**aspects** [1] - 70:5
**assigned** [10] - 19:14, 19:15, 19:16, 19:17, 19:20, 66:5, 86:23, 87:7, 94:10, 103:13
**assignment** [1] - 64:16
**assignments** [1] - 87:4
**assist** [1] - 66:10
**assistance** [1] - 105:25
**assistant** [1] - 116:18
**assume** [2] - 26:17, 81:3
**assumed** [1] - 105:1
**assumes** [2] - 96:4, 111:3
**assure** [2] - 38:19, 72:20
**astounding** [1] - 16:19
**asymptomatic** [1] - 46:14
**attempt** [1] - 38:10
**attempted** [2] - 95:22, 119:22
**attempting** [1] - 36:2
**attention** [2] - 51:6, 97:18
**attesting** [1] - 5:13
**attests** [1] - 9:12

**ATTORNEY** [1] - 2:13
**attorney** [2] - 7:14, 23:1
**Attorney** [2] - 22:11, 101:5
**attorney/client** [5] - 62:20, 62:23, 62:24, 63:7, 65:7
**attorneys** [29] - 52:7, 52:13, 52:24, 54:3, 54:20, 55:13, 56:2, 56:10, 56:24, 57:5, 57:15, 57:18, 57:23, 58:7, 58:9, 58:21, 59:2, 59:16, 60:14, 61:1, 61:11, 61:20, 62:3, 62:5, 62:15, 63:1, 63:4, 63:11, 116:16
**Austin** [2] - 2:6, 2:14
**authority** [2] - 62:12, 116:9
**authority's** [1] - 36:20
**authorized** [1] - 51:8
**availability** [2] - 85:17, 85:18
**available** [16] - 17:9, 33:15, 33:16, 49:19, 56:19, 57:3, 58:5, 63:24, 71:14, 78:9, 79:16, 79:22, 80:14, 88:15, 88:18, 88:20
**avoid** [1] - 14:19
**aware** [47] - 43:20, 45:6, 45:7, 50:4, 50:5, 56:9, 63:1, 65:12, 65:19, 66:10, 67:1, 67:12, 69:21, 69:24, 69:25, 70:8, 71:25, 72:1, 74:19, 77:2, 77:5, 77:7, 77:9, 77:14, 77:15, 77:18, 77:21, 78:3, 81:6, 81:10, 82:16, 82:22, 83:19, 84:18, 89:17, 89:23, 90:6, 93:14, 93:19, 93:23, 105:16, 105:20, 105:22, 106:4, 110:3, 110:9, 118:16
**awareness** [1] - 30:18

## B

**B-14.52** [4] - 27:6, 27:21, 28:2, 28:4
**background** [1] - 15:17
**bad** [3] - 36:12, 97:12
**bars** [2] - 32:7, 35:7
**base** [1] - 75:2
**based** [22] - 6:23, 17:2, 17:11, 17:23, 30:15, 32:25, 33:3, 36:20, 48:25, 52:20, 55:17, 56:11, 60:6, 64:9, 66:8, 71:14, 71:21, 71:24, 72:9, 73:12, 73:16, 77:8
**basis** [6] - 16:7, 19:22, 30:16, 32:12, 50:13, 75:7
**bduke@winston.com** [1] - 1:23
**Beal** [1] - 18:13
**bear** [3] - 22:11, 22:20, 34:8
**became** [3] - 88:14, 116:3,

116:4
**become** [1] - 24:25
**becomes** [1] - 12:7
**becoming** [1] - 71:14
**beds** [1] - 84:4
**BEFORE** [1] - 1:11
**began** [6] - 28:14, 30:12, 31:2, 31:3, 43:1, 87:10
**begin** [2] - 26:8, 51:6
**beginning** [4] - 6:7, 24:14, 28:20, 42:20
**behalf** [5] - 7:15, 23:1, 41:1, 54:2, 62:12
**behind** [2] - 45:12, 46:1
**BENCH** [1] - 1:12
**benefit** [3] - 9:6, 33:19, 36:3
**best** [10] - 25:11, 35:21, 47:5, 60:9, 72:25, 73:12, 73:13, 74:19, 92:8, 121:11
**better** [12] - 13:15, 21:16, 21:17, 23:23, 23:24, 24:3, 65:21, 73:18, 85:2, 101:6, 103:21, 114:22
**between** [8] - 26:4, 28:11, 30:15, 32:18, 59:7, 80:16, 89:10, 89:15
**beyond** [3] - 17:10, 74:18, 106:3
**big** [1] - 14:19
**bigger** [1] - 52:23
**bit** [1] - 64:16
**bleach** [2] - 18:25, 55:17
**bleach-based** [1] - 55:17
**blind** [2] - 19:25, 20:2
**blow** [1] - 108:14
**boils** [1] - 23:8
**bottle** [1] - 77:8
**bottles** [3] - 64:1, 64:7, 66:2
**bottom** [3] - 108:14, 109:5, 109:7
**bound** [4] - 20:3, 65:25, 76:6, 76:7
**Box** [1] - 2:13
**box** [2] - 15:21, 108:18
**boxes** [1] - 35:8
**Bramow** [1] - 2:11
**Branch** [1] - 92:3
**Brandon** [1] - 1:16
**break** [8] - 76:18, 78:13, 78:16, 81:15, 120:19, 121:1, 121:2
**breakdown** [1] - 81:13
**breaks** [1] - 19:19
**breath** [3] - 18:11, 18:16, 110:6
**breathing** [3] - 110:6, 112:14, 112:15
**briefing** [3] - 4:10, 4:14, 4:17
**briefings** [2] - 28:9, 28:14

**briefly** [1] - 9:24
**briefs** [1] - 4:17
**bring** [3] - 66:17, 76:15, 97:18
**broken** [3] - 25:21, 80:16, 80:21
**brought** [3] - 10:3, 67:25, 72:11
**Bryan** [5] - 23:2, 28:12, 39:6, 40:13, 110:13
**BRYAN** [3] - 1:7, 3:4, 41:1
**build** [2] - 84:16, 89:4
**build-out** [1] - 89:4
**bulk** [1] - 76:24
**bunk** [1] - 109:11
**bunks** [2] - 20:11, 88:18, 105:8
**burden** [1] - 37:5
**busy** [2] - 43:21, 43:22
**buys** [1] - 76:24
**BY** [59] - 1:24, 3:5, 41:7, 45:3, 47:10, 48:9, 49:11, 53:1, 53:7, 54:4, 54:11, 55:14, 56:12, 57:7, 58:1, 58:11, 59:4, 60:15, 61:12, 62:4, 63:2, 63:12, 63:18, 65:15, 67:3, 68:2, 68:20, 74:3, 74:21, 76:4, 76:22, 78:22, 79:4, 81:1, 81:8, 81:12, 82:1, 86:19, 87:22, 89:7, 89:22, 91:6, 92:24, 93:21, 94:21, 96:10, 99:4, 99:13, 100:16, 101:8, 102:10, 108:3, 108:17, 110:5, 110:20, 111:10, 115:9, 117:18, 120:3

**C**

**camp** [1] - 19:16
**cannot** [1] - 20:1
**capable** [1] - 16:23
**capacity** [4] - 47:4, 87:24, 88:6
**Capitol** [1] - 1:20
**card** [1] - 30:21
**care** [4] - 4:4, 92:8, 92:14, 92:15
**career** [1] - 92:4
**carrier** [1] - 46:15
**carry** [2] - 70:2, 72:10
**carve** [1] - 97:21
**carve-out** [1] - 97:21
**case** [29] - 6:5, 6:8, 23:4, 23:8, 23:9, 24:23, 24:25, 25:22, 25:24, 25:25, 26:1, 26:6, 27:7, 30:16, 32:16, 33:24, 35:18, 36:5, 37:2, 71:11, 80:21, 85:21, 86:24, 91:13, 91:25, 92:17,

101:19
**case-by-case** [1] - 30:16
**cases** [5] - 6:25, 19:2, 25:22, 51:3, 95:7
**categories** [1] - 9:20
**category** [1] - 118:11
**cautions** [1] - 16:1
**CDC** [17] - 16:3, 17:24, 27:11, 27:23, 27:25, 29:16, 33:15, 52:20, 55:10, 55:17, 59:24, 61:23, 63:22, 74:18, 80:6, 105:12
**CDC-recommended** [2] - 16:3, 55:17
**cell** [1] - 4:13
**center** [6] - 28:25, 29:2, 29:6, 29:11, 29:12, 92:2
**certain** [6] - 17:8, 25:20, 44:6, 70:10, 70:13, 79:17
**certainly** [8] - 5:18, 57:23, 72:19, 82:13, 94:16, 100:20, 101:11, 112:11
**certify** [1] - 121:9
**chain** [2] - 94:16, 95:10
**chair** [1] - 72:6
**change** [24] - 34:13, 38:10, 38:14, 52:22, 55:11, 73:10, 82:24, 95:25, 101:16, 101:17, 101:20, 101:22, 102:11, 102:12, 102:14, 102:21, 102:22, 103:5, 105:8, 118:15, 120:5
**changed** [3] - 17:4, 45:8, 93:10
**changes** [3] - 52:19, 70:18, 82:14
**changing** [1] - 6:14
**chart** [1] - 11:9
**chose** [3] - 64:5, 80:6, 92:16
**chow** [1] - 31:12
**Christin** [4] - 2:10, 8:14, 39:25, 44:22
**christin.vasquez@oag. texas.gov** [1] - 2:16
**Circuit** [4] - 23:13, 24:19, 37:2, 62:6
**circumstance** [1] - 97:21
**Civil** [1] - 1:6
**civil** [1] - 13:6
**claim** [1] - 81:18
**clarification** [1] - 101:6
**clarified** [1] - 101:15
**clarify** [3] - 9:25, 40:4, 100:8
**class** [4] - 4:7, 16:21, 53:10
**classrooms** [1] - 59:10
**clean** [4] - 19:14, 53:11, 55:20, 80:8
**cleaning** [20] - 15:18, 18:21, 19:1, 19:3, 19:5, 19:7, 19:13, 19:21, 20:3, 20:10,

20:12, 21:9, 28:8, 32:13, 35:8, 55:16, 55:17, 55:19, 55:22
**clear** [6] - 10:10, 10:18, 46:24, 65:3, 66:19, 103:16
**clearly** [3] - 13:22, 16:25, 118:19
**Clerkly** [18] - 25:1, 25:4, 25:6, 31:6, 70:22, 70:25, 108:9, 109:8, 109:10, 110:6, 110:21, 111:13, 111:16, 111:23, 113:20, 114:12, 114:17, 115:4
**clerkly** [1] - 25:1
**Clerkly's** [6] - 15:23, 31:25, 32:2, 32:3, 110:14, 114:23
**clients** [2] - 80:17, 81:2
**clinic** [1] - 69:25
**close** [4] - 29:22, 34:20, 34:23, 66:7
**closed** [1] - 30:3
**closely** [1] - 15:15
**closer** [1] - 23:18
**cloth** [2] - 31:3, 54:14
**CMHC** [2] - 74:22, 83:15
**CMHC's** [1] - 27:21
**Cobe** [1] - 2:10
**code** [4] - 45:11, 93:6, 96:24, 102:3
**coded** [2] - 96:23, 118:19
**colleague** [1] - 34:15
**Collier** [45] - 23:2, 28:12, 40:13, 40:17, 40:20, 41:3, 41:8, 43:21, 45:4, 45:20, 51:25, 53:8, 54:12, 55:15, 56:1, 56:18, 57:8, 58:12, 59:5, 59:19, 60:16, 61:13, 62:5, 63:3, 63:19, 68:22, 74:4, 75:6, 76:23, 78:23, 81:2, 82:2, 83:8, 86:20, 88:23, 93:2, 110:13, 115:16, 116:12, 117:5, 117:19, 119:23, 120:4, 120:16, 120:21
**COLLIER** [3] - 1:7, 3:4, 41:1
**Collier's** [3] - 52:6, 54:19, 57:15
**combination** [1] - 27:9
**comfortable** [1] - 21:8
**coming** [4] - 28:23, 30:2, 31:21, 71:22
**command** [7] - 28:25, 29:2, 29:6, 29:11, 29:12, 94:16, 95:10
**commit** [7] - 51:25, 52:10, 53:2, 53:16, 54:7, 63:3, 63:10
**committed** [2] - 51:15, 51:23
**Committee** [1] - 74:12
**committee** [4] - 27:18, 72:7,

74:13, 74:25
**common** [7] - 14:25, 16:3, 18:24, 19:15, 39:17, 59:9, 60:17
**communicating** [1] - 8:24
**communication** [1] - 29:22
**communications** [4] - 62:21, 62:23, 62:24, 65:8
**comorbidities** [1] - 15:2
**compared** [2] - 21:14, 64:12
**comparison** [1] - 16:10
**compassion** [1] - 21:21
**compel** [1] - 5:9
**complaining** [1] - 5:23
**complaint** [2] - 10:14, 38:17
**complaints** [2] - 46:1, 97:16
**complete** [2] - 58:3, 88:12
**completed** [6] - 48:24, 50:5, 51:19, 71:17, 88:11, 113:4
**completely** [1] - 97:20
**completing** [2] - 48:23, 49:17
**completion** [1] - 49:18
**compliant** [1] - 85:8
**complications** [1] - 42:25
**comply** [1] - 20:14
**complying** [1] - 33:15
**compound** [1] - 81:19
**comprehensive** [2] - 8:16, 9:16
**computer** [2] - 34:11, 34:16
**COMPUTER** [1] - 1:25
**COMPUTER-AIDED** [1] - 1:25
**computers** [1] - 23:20
**concern** [1] - 27:14
**concerned** [1] - 13:10
**concerning** [1] - 9:13
**concerns** [2] - 32:19, 80:5
**conclusion** [15] - 52:6, 52:9, 53:15, 54:19, 54:22, 56:1, 56:23, 57:14, 58:6, 58:20, 59:15, 60:25, 61:19, 67:17, 98:1
**condition** [1] - 42:24
**conditioning** [3] - 60:5, 60:6, 82:3
**conditions** [3] - 17:12, 42:22, 62:18
**conduct** [2] - 75:15, 117:25
**conducted** [1] - 83:12
**conducting** [1] - 105:3
**confer** [2] - 52:12, 57:18
**conference** [17] - 25:8, 28:19, 38:3, 38:8, 38:21, 52:7, 62:15, 116:21, 121:13
**conferences** [1] - 21:13
**confidence** [3] - 92:1, 92:5, 113:25

**confident** [1] - 25:15
**confidential** [1] - 87:16
**confirmed** [2] - 19:1, 106:19
**confirming** [1] - 72:15
**confused** [1] - 106:17
**congregate** [1] - 59:8
**connections** [1] - 85:10
**conscience** [1] - 24:22
**consider** [5] - 74:4, 74:23, 92:7, 92:9, 92:16
**considered** [4] - 33:17, 36:19, 63:25, 82:11
**consistent** [4] - 19:22, 95:21, 119:25, 120:6
**constitutional** [2] - 22:3, 46:1
**construction** [4] - 84:11, 84:12, 84:15, 88:12
**consult** [3] - 56:1, 81:15, 81:24
**consultation** [9] - 53:15, 54:19, 56:24, 57:15, 58:7, 58:21, 59:16, 61:1, 61:20
**consulted** [1] - 71:18
**contact** [47] - 31:21, 61:15, 61:23, 61:24, 105:15, 105:17, 105:24, 105:25, 106:6, 106:8, 106:22, 107:1, 107:9, 107:10, 107:12, 107:13, 108:4, 108:8, 109:6, 109:8, 111:5, 111:22, 111:24, 112:2, 112:3, 112:4, 112:6, 112:21, 113:2, 113:4, 113:7, 113:9, 113:15, 113:17, 113:21, 114:1, 114:3, 114:9, 114:11, 114:14, 114:23, 115:4, 115:12, 117:20, 117:22, 117:25
**contacted** [1] - 61:16
**contagious** [1] - 14:18
**contain** [2] - 22:5, 38:6
**contaminating** [1] - 20:7
**context** [2] - 24:24, 38:20
**continue** [14] - 34:6, 38:14, 49:19, 50:12, 51:2, 52:19, 53:12, 54:16, 71:23, 73:8, 81:3, 82:13, 91:23, 116:1
**continued** [13] - 2:2, 29:22, 29:23, 46:19, 53:19, 54:25, 60:11, 64:25, 72:14, 98:7, 109:6, 115:23, 115:24
**continues** [1] - 61:3
**control** [9] - 21:24, 27:18, 35:1, 46:8, 47:1, 47:11, 47:16, 47:20, 48:12
**conversation** [4] - 38:1, 89:24, 90:2, 90:12
**cool** [3] - 82:4, 82:17, 83:1

**Corinne** [1] - 1:17
**Coronavirus** [1] - 27:19
**correct** [140] - 11:19, 38:24, 41:11, 41:14, 41:19, 41:20, 41:21, 41:24, 42:2, 42:5, 42:8, 43:8, 43:10, 43:21, 43:24, 44:11, 45:10, 45:15, 45:18, 45:21, 46:3, 47:12, 47:16, 48:14, 48:21, 49:14, 49:25, 50:4, 50:15, 50:19, 51:9, 51:10, 51:11, 51:23, 51:24, 54:6, 62:10, 63:13, 63:21, 64:8, 64:22, 67:6, 67:7, 67:11, 67:15, 68:18, 69:2, 69:6, 69:12, 69:13, 69:16, 69:20, 69:23, 71:8, 71:11, 73:24, 74:6, 75:10, 75:14, 76:25, 77:1, 77:3, 77:5, 77:16, 77:20, 77:24, 79:7, 79:13, 80:3, 80:11, 80:17, 80:18, 82:18, 83:16, 83:18, 84:5, 84:9, 84:17, 85:6, 85:16, 88:18, 88:20, 89:10, 89:16, 89:18, 90:5, 90:22, 91:1, 91:9, 91:13, 91:18, 91:25, 93:1, 93:3, 93:12, 94:1, 94:13, 95:12, 95:19, 96:3, 96:11, 96:12, 96:17, 97:4, 97:10, 98:12, 99:7, 101:18, 101:24, 102:14, 103:19, 104:3, 104:12, 104:17, 105:17, 106:11, 108:9, 108:20, 109:9, 109:25, 111:1, 111:11, 111:24, 112:3, 112:16, 112:19, 112:23, 113:2, 113:18, 113:22, 114:7, 114:20, 115:14, 115:18, 116:14, 116:18, 116:24, 117:2, 118:1, 121:9
**Correctional** [1] - 74:12
**correctional** [20] - 27:8, 27:11, 27:24, 29:13, 29:17, 33:7, 33:8, 41:17, 42:7, 42:13, 52:21, 61:14, 69:17, 74:25, 83:12, 91:21, 92:8, 92:10, 105:21
**correctly** [2] - 10:3, 114:11
**cotton** [2] - 55:4, 55:5
**cough** [1] - 18:10
**coughing** [1] - 18:16
**counsel** [22] - 9:17, 9:25, 35:13, 37:25, 38:1, 38:2, 38:12, 44:2, 62:17, 67:4, 68:24, 78:23, 80:15, 81:24, 83:23, 84:2, 90:19, 94:6, 98:17, 116:24, 117:2
**counsel's** [1] - 10:10
**countries** [1] - 25:11

**country** [4] - 14:18, 30:7, 74:20, 74:23
**county** [1] - 92:12
**couple** [3] - 12:16, 37:12, 72:4
**course** [7] - 7:24, 32:16, 39:12, 71:4, 72:23, 116:6
**court** [5] - 24:7, 24:8, 52:9, 68:14, 78:17
**Court** [42] - 7:16, 7:20, 7:22, 9:6, 10:12, 10:13, 13:6, 13:16, 14:16, 16:2, 19:12, 19:23, 21:15, 22:2, 22:25, 25:20, 26:4, 26:10, 27:6, 27:13, 29:8, 33:12, 33:22, 35:17, 37:2, 37:5, 38:19, 38:23, 52:25, 54:2, 55:12, 56:11, 57:6, 59:1, 60:13, 62:1, 62:5, 63:10, 78:18, 80:16, 81:20, 121:4
**COURT** [148] - 1:1, 2:18, 4:3, 4:10, 4:12, 4:14, 5:5, 6:19, 7:1, 7:5, 7:10, 7:12, 7:18, 8:6, 8:10, 8:13, 8:24, 10:6, 11:1, 11:14, 11:20, 12:5, 12:11, 12:14, 12:19, 12:23, 13:2, 13:8, 13:17, 13:19, 14:1, 14:5, 14:7, 14:13, 14:14, 17:21, 22:8, 22:13, 22:17, 22:23, 23:15, 23:18, 23:22, 24:1, 24:3, 24:11, 34:10, 34:14, 34:17, 37:8, 37:20, 37:24, 38:25, 39:5, 39:9, 39:12, 39:16, 39:23, 40:2, 40:7, 40:14, 40:17, 40:22, 41:3, 44:15, 44:19, 44:21, 44:24, 47:3, 52:4, 52:11, 53:4, 53:16, 54:7, 54:21, 56:3, 56:5, 56:8, 56:25, 57:16, 58:8, 58:22, 59:18, 61:2, 61:21, 62:22, 63:8, 63:16, 65:9, 66:25, 68:10, 74:1, 74:9, 76:1, 76:17, 76:21, 78:15, 78:19, 78:21, 80:23, 81:10, 81:23, 85:24, 86:2, 86:5, 86:7, 86:9, 86:15, 86:17, 87:14, 87:15, 87:18, 87:21, 88:24, 89:20, 91:3, 92:21, 93:18, 96:5, 98:21, 98:25, 99:10, 101:3, 104:19, 107:19, 108:2, 110:2, 110:12, 110:15, 110:19, 111:4, 115:1, 115:21, 117:8, 117:13, 118:25, 119:2, 119:5, 119:7, 119:9, 119:11, 119:20, 120:1, 120:10, 120:12, 120:15, 120:18, 121:2
**Court's** [2] - 13:4, 16:6

**COVID** [16] - 18:21, 18:23, 32:14, 45:13, 85:20, 96:18, 96:22, 96:23, 98:4, 98:5, 99:22, 99:23, 99:25, 110:4, 115:22, 118:10
**COVID-19** [120] - 6:17, 8:2, 8:23, 11:11, 14:17, 15:10, 15:22, 16:9, 16:11, 16:24, 17:14, 18:6, 19:2, 20:4, 20:20, 21:5, 21:15, 23:4, 23:5, 23:10, 24:24, 25:3, 25:5, 25:10, 25:14, 25:18, 26:13, 26:22, 27:1, 27:12, 27:19, 28:7, 28:14, 28:18, 29:1, 29:24, 30:5, 30:12, 30:17, 30:23, 32:5, 34:1, 34:6, 35:1, 36:8, 38:15, 42:20, 42:22, 42:25, 43:2, 43:13, 43:19, 44:11, 45:5, 45:6, 45:9, 45:12, 46:7, 46:8, 46:9, 46:10, 46:13, 46:14, 46:21, 46:25, 47:8, 47:16, 47:20, 47:25, 48:13, 50:15, 53:21, 54:17, 55:7, 56:22, 58:4, 59:14, 60:18, 60:19, 60:23, 61:15, 63:23, 64:24, 66:14, 69:18, 70:6, 72:21, 73:8, 73:17, 73:24, 74:5, 78:6, 83:15, 89:25, 90:21, 91:23, 93:2, 93:6, 93:15, 97:8, 97:10, 97:15, 97:25, 98:16, 98:17, 99:3, 99:16, 100:11, 100:18, 102:2, 102:3, 103:11, 106:8, 109:5, 113:14, 114:23, 116:13, 116:19, 118:14, 120:5
**COVID-19-related** [4] - 97:3, 97:22, 99:15, 118:9
**COVID-19-type** [3] - 100:7, 100:22, 101:12
**COVID-related** [7] - 45:13, 96:18, 96:23, 98:4, 98:5, 99:22, 110:4
**COVID-specific** [1] - 96:22
**Cowles** [16] - 2:10, 7:14, 12:18, 12:21, 16:17, 22:10, 23:1, 23:15, 23:16, 37:13, 39:24, 48:10, 69:4, 69:7, 69:10, 80:15
**COWLES** [25] - 7:11, 7:13, 7:19, 12:16, 12:22, 12:24, 13:3, 13:12, 13:18, 22:10, 22:14, 22:19, 22:24, 23:19, 23:23, 24:4, 24:14, 34:11, 34:15, 34:19, 37:22, 37:25, 39:10, 39:13, 52:8
**CPAP** [1] - 85:9, 88:19
**crashed** [1] - 34:12
**create** [2] - 6:13, 27:18

**created** [6] - 9:23, 11:9, 45:11, 55:5, 93:6, 97:17
**creating** [1] - 85:8
**Criminal** [2] - 23:3, 41:11
**CRIMINAL** [1] - 1:8
**critical** [2] - 20:1, 58:25
**CROSS** [2] - 3:5, 41:6
**cross** [1] - 20:7
**cross-contaminating** [1] - 20:7
**CROSS-EXAMINATION** [2] - 3:5, 41:6
**crowds** [1] - 14:19
**CRR** [2] - 2:19, 121:16
**CSR** [2] - 2:19, 121:16
**cubicle** [1] - 55:21
**cubicles** [1] - 31:21, 85:7
**current** [3] - 6:19, 50:14, 50:20
**CURTIS** [1] - 1:4
**custody** [1] - 58:15
**cut** [1] - 17:4
**cycle** [1] - 51:3

# D

**daily** [10] - 28:9, 28:14, 28:19, 32:12, 54:23, 55:5, 112:14, 112:15, 116:12, 116:17
**Date** [1] - 121:16
**date** [6] - 31:20, 108:25, 111:11, 111:13, 118:2, 118:3
**David** [3] - 2:4, 5:4, 5:6
**Davis** [11] - 42:8, 42:12, 42:16, 50:2, 72:9, 83:15, 89:8, 89:23, 90:4, 90:14, 105:4
**DAY** [1] - 1:12
**day-to-day** [1] - 42:12
**days** [44] - 4:18, 17:5, 18:7, 18:11, 25:5, 27:22, 28:1, 35:25, 36:5, 51:2, 51:4, 51:5, 51:7, 57:12, 58:5, 93:8, 93:11, 96:2, 96:7, 96:8, 96:9, 96:11, 96:16, 96:18, 96:23, 97:3, 97:5, 97:6, 97:23, 106:10, 106:13, 106:14, 106:18, 108:18, 108:25, 109:2, 109:16, 111:14, 112:4, 112:23, 113:21
**dead** [5] - 7:7, 16:20, 16:25, 21:2
**dead-end** [1] - 16:25
**deadlines** [1] - 118:13
**deal** [4] - 42:20, 43:2, 82:14, 97:24
**dealing** [1] - 38:16

**dealt** [2] - 97:14, 103:11
**death** [3] - 15:23, 21:23, 114:24
**deaths** [5] - 8:5, 21:3, 21:4, 21:21, 35:13
**decide** [1] - 4:23
**decided** [2] - 6:12, 27:18
**decision** [1] - 33:13
**declaration** [9] - 5:12, 5:23, 6:13, 9:10, 10:17, 10:18, 10:21, 11:2, 15:12
**declarations** [5] - 90:24, 91:8, 91:12, 91:17, 92:25
**dedensification** [1] - 21:11
**Defendant** [1] - 41:1
**DEFENDANTS** [1] - 2:9
**Defendants** [15] - 1:9, 5:16, 5:20, 6:4, 7:15, 9:8, 16:2, 16:21, 17:25, 21:13, 23:2, 35:17, 40:4, 90:20, 107:24
**Defendants'** [2] - 5:19, 32:20
**defined** [1] - 18:8
**definite** [1] - 49:6
**definitely** [2] - 24:1, 103:1
**degree** [4] - 25:21, 84:21, 85:9, 92:1
**degrees** [1] - 30:11
**delay** [2] - 12:5, 115:25
**Deliberate** [1] - 24:20
**deliberate** [17] - 17:17, 17:19, 20:2, 20:15, 20:17, 20:18, 23:9, 23:11, 24:16, 24:23, 25:18, 33:18, 33:24, 35:19, 36:15, 36:19, 37:3
**deliberately** [6] - 26:24, 27:10, 27:16, 29:19, 31:3, 33:25
**delivered** [1] - 29:17
**demonstrate** [1] - 35:14
**denied** [1] - 13:6
**Denise** [1] - 1:17
**deny** [3] - 13:8, 13:16, 53:17
**Department** [2] - 41:10, 106:1
**department** [7] - 23:3, 28:10, 66:9, 66:12, 67:9, 110:22, 112:19
**DEPARTMENT** [1] - 1:8
**deposed** [6] - 48:3, 48:19, 48:22, 49:4, 50:1, 117:1
**deposition** [28] - 40:15, 45:20, 48:7, 48:17, 48:22, 49:6, 49:9, 91:16, 94:17, 94:19, 100:3, 100:8, 100:13, 101:5, 102:5, 102:9, 106:6, 106:16, 106:20, 118:22, 119:15, 119:18, 119:21, 119:23, 119:24, 120:7
**depositions** [2] - 91:5, 92:23

**deputy** [1] - 9:11
**described** [2] - 66:4, 69:11
**describing** [1] - 9:19
**design** [1] - 60:10
**desperately** [1] - 22:4
**despite** [3] - 25:11, 25:12, 25:13
**detail** [1] - 83:20
**details** [3] - 51:14, 84:18, 113:11
**detention** [3] - 27:11, 27:24, 27:25
**determination** [2] - 33:18, 73:12
**determine** [8] - 29:9, 35:17, 51:13, 51:21, 61:15, 68:1, 103:8, 103:17
**determining** [1] - 74:4
**develop** [7] - 49:20, 59:24, 72:14, 74:15, 83:4, 103:14, 104:20
**developed** [5] - 50:7, 52:16, 82:20, 103:11, 104:2
**developing** [1] - 103:23
**develops** [1] - 73:17
**dialed** [1] - 36:10
**dictate** [1] - 95:18
**dictates** [1] - 95:16
**die** [2] - 98:11, 99:7
**died** [11] - 6:21, 6:23, 21:19, 21:25, 33:7, 36:5, 36:7, 36:11, 113:14, 113:21, 114:17
**difference** [1] - 32:18
**different** [11] - 6:2, 36:25, 43:17, 68:8, 73:18, 94:2, 94:10, 97:1, 100:4, 101:9, 106:25
**differently** [7] - 48:5, 49:3, 55:10, 70:7, 94:17, 100:2, 102:4
**difficult** [4] - 9:19, 37:17, 59:22, 70:23
**difficulties** [1] - 110:7
**DIRECT** [1] - 117:17
**direct** [5] - 52:20, 91:7, 91:11, 91:14, 91:15
**direction** [2] - 91:16, 92:6
**directly** [1] - 42:10
**Director** [1] - 120:16
**director** [9] - 9:11, 28:12, 41:10, 41:13, 42:8, 47:4, 62:11, 82:21, 92:11
**directors** [2] - 27:8, 77:25
**dirt** [1] - 76:9
**disabilities** [1] - 59:11
**disagree** [1] - 95:5
**disagreement** [1] - 32:20
**disagrees** [2] - 33:12, 33:23
**disaster** [2] - 21:14, 29:20

**disasters** [1] - 29:4
**disconnect** [1] - 16:16
**discrete** [1] - 16:18
**discretion** [1] - 82:8
**discuss** [4] - 32:16, 37:12, 63:5, 84:10
**discussed** [15] - 52:15, 62:7, 62:18, 62:19, 64:5, 72:9, 78:9, 80:5, 81:16, 81:18, 84:7, 84:11, 87:8, 88:7, 106:6
**discusses** [1] - 80:5
**discussing** [1] - 63:3
**discussion** [11] - 67:2, 68:19, 78:7, 83:7, 90:17, 105:13, 107:13, 112:5, 112:11, 114:8, 116:10
**discussions** [14] - 43:14, 43:15, 62:17, 65:12, 65:16, 65:17, 65:19, 77:25, 78:5, 90:7, 105:4, 105:11, 111:19, 115:16
**disease** [2] - 21:23, 47:1
**diseases** [1] - 14:18
**disinfect** [2] - 18:24, 55:20
**disinfectants** [2] - 21:9, 55:18
**disinfecting** [2] - 19:1, 28:8
**disinfection** [1] - 32:13
**display** [3] - 14:3, 46:14, 46:21
**disproportionately** [1] - 14:22
**dispute** [5] - 6:2, 17:14, 25:14, 25:16, 45:24
**disputes** [1] - 46:3
**disregarding** [1] - 24:17
**disseminated** [1] - 30:21
**distance** [5] - 14:19, 59:7, 66:6, 89:15, 115:17
**distance-wise** [1] - 66:6
**distancing** [32] - 21:10, 31:11, 31:15, 32:15, 58:17, 59:6, 59:11, 59:17, 59:22, 82:4, 82:9, 82:18, 82:20, 82:23, 83:2, 83:4, 83:9, 83:11, 85:19, 90:16, 103:9, 103:12, 103:18, 103:24, 104:11, 104:16, 104:21, 104:23, 105:3, 105:10, 115:18
**DISTRICT** [2] - 1:1, 1:2
**division** [9] - 27:2, 27:3, 29:13, 42:8, 42:13, 83:13, 94:3, 94:4, 105:22
**Division** [1] - 106:1
**DIVISION** [1] - 1:3
**doctors** [1] - 91:12
**document** [23] - 5:13, 5:17, 9:6, 9:17, 9:22, 9:23, 9:24,

10:11, 10:24, 11:3, 11:9, 11:13, 11:15, 22:19, 86:15, 86:25, 87:1, 87:5, 88:4, 107:23, 107:25, 113:3, 114:5
**documentation** [5] - 112:17, 112:18, 112:21, 112:24, 114:15
**documented** [6] - 109:21, 112:25, 113:1, 113:23, 114:15, 115:15
**documents** [18] - 5:10, 5:18, 5:21, 6:1, 6:3, 6:23, 8:6, 9:20, 9:23, 16:17, 38:5, 38:6, 51:13, 51:20, 51:21, 51:22, 85:21
**done** [40] - 19:12, 20:6, 27:15, 35:5, 46:16, 47:22, 51:17, 51:18, 53:24, 55:6, 60:1, 65:3, 65:20, 69:1, 69:5, 70:11, 70:13, 74:23, 75:12, 75:21, 77:22, 84:11, 84:19, 88:17, 89:2, 99:25, 101:23, 102:13, 103:15, 108:8, 111:14, 113:4, 113:10, 114:11, 114:14, 114:22, 115:13, 117:20
**dorm** [29] - 18:15, 19:16, 31:24, 32:2, 32:3, 70:21, 70:25, 84:7, 85:17, 88:5, 88:6, 88:8, 88:11, 88:13, 89:9, 89:11, 89:15, 90:16, 109:10, 109:12, 111:16, 111:17, 111:23, 112:10, 112:22, 113:25, 114:16, 115:12, 115:13
**dorm-mates** [1] - 32:3
**dormitories** [2] - 31:20, 84:25
**dormitory** [6] - 84:10, 84:19, 84:22, 84:23, 90:7, 90:9
**dorms** [12] - 15:8, 20:7, 21:11, 85:5, 85:12, 86:14, 87:7, 87:9, 87:23, 87:24, 90:1, 105:7
**Dorms** [1] - 86:23
**doubt** [1] - 80:12
**Dove** [1] - 19:24
**down** [18] - 17:5, 23:8, 25:21, 34:7, 35:3, 35:10, 35:19, 63:6, 69:7, 80:16, 80:21, 82:4, 82:7, 82:17, 83:1, 105:1, 108:24, 120:15
**Dr** [17] - 15:21, 15:25, 27:2, 27:9, 28:12, 52:17, 71:22, 72:5, 72:6, 72:13, 73:15, 83:15, 91:7, 91:21, 92:7, 92:11
**drank** [1] - 77:3
**drawing** [1] - 88:2

**drinking** [1] - 33:7
**DSHS** [1] - 28:10
**due** [1] - 4:18
**Duke** [1] - 1:16
**Duncan** [1] - 51:19
**duration** [2] - 12:9, 57:10
**during** [18] - 5:20, 14:10, 18:21, 18:23, 20:3, 33:6, 43:7, 55:22, 57:19, 61:16, 83:5, 93:2, 106:10, 109:16, 112:9, 115:22, 116:6, 116:15
**duties** [1] - 19:20
**duty** [1] - 13:10
**DYE** [1] - 2:19
**Dye** [2] - 121:15, 121:16

# E

**E-17** [4] - 86:14, 86:23, 87:7, 87:23
**E-19** [2] - 86:23, 87:7
**e-mail** [1] - 6:22
**e.g** [1] - 18:10
**early** [10] - 47:14, 47:18, 48:11, 55:1, 71:13, 88:8, 115:17, 115:19, 116:8, 116:9
**easier** [1] - 64:7
**easily** [1] - 79:24
**East** [1] - 2:6
**easy** [1] - 80:2
**educate** [3] - 30:22, 34:25, 60:18
**educational** [2] - 28:16, 30:18
**Edwards** [1] - 2:4
**EDWARDS** [1] - 2:5
**effect** [1] - 27:13
**effectively** [1] - 28:22
**effort** [1] - 81:14
**efforts** [3] - 25:11, 25:12, 25:13
**either** [9] - 57:23, 66:11, 70:2, 77:5, 89:18, 106:5, 109:3, 113:21, 115:11
**elderly** [6] - 15:7, 21:22, 42:24, 43:5, 70:16, 89:14
**electrical** [1] - 85:9
**elephant** [1] - 25:19
**eliminate** [1] - 73:19
**eliminated** [1] - 73:9
**Ellison** [1] - 81:17
**ELLISON** [1] - 1:11
**ELVIN** [1] - 1:4
**emergency** [4] - 4:19, 4:25, 96:19, 96:21
**employees** [2] - 30:10, 30:12
**empty** [5] - 84:4, 88:8, 89:9, 90:1, 90:16

**encompasses** [1] - 24:20
**encourage** [1] - 79:7
**encouraged** [1] - 53:19
**encourages** [1] - 95:21
**end** [8] - 16:25, 37:16, 45:15, 45:18, 54:16, 56:21, 95:25, 101:4
**ends** [1] - 81:4
**enforce** [8] - 4:25, 31:19, 59:6, 103:9, 103:18, 104:11, 104:16, 104:22
**enforced** [2] - 31:11, 31:16
**enforcing** [2] - 39:9, 39:15
**engaged** [2] - 28:9, 38:13
**enhance** [1] - 60:12
**enhanced** [2] - 19:7, 32:13
**enraged** [1] - 13:21
**enrolled** [1] - 115:24
**ensure** [5] - 19:21, 51:5, 60:8, 93:25, 94:23
**entering** [4] - 32:10, 57:10, 57:11, 58:4
**entire** [9] - 11:18, 21:3, 43:23, 50:14, 53:25, 72:21, 77:12, 99:21, 101:20
**entirely** [2] - 21:24, 38:13
**entities** [1] - 74:15
**entitled** [1] - 121:10
**entity** [2] - 94:10, 116:11
**environment** [1] - 85:2
**epidemic** [1] - 55:7
**equates** [1] - 113:24
**equipment** [2] - 31:1, 114:4
**especially** [1] - 15:2
**essential** [1] - 85:18
**essentially** [9] - 19:25, 33:21, 50:7, 74:13, 84:20, 85:1, 85:18, 106:1, 116:3
**establish** [3] - 17:10, 36:12, 37:4
**evacuate** [1] - 90:10
**evaluate** [1] - 82:13
**evening** [1] - 31:8
**event** [7] - 57:19, 57:20, 70:21, 93:2, 115:22, 116:6, 116:15
**events** [2] - 30:7, 116:22
**evidence** [16] - 6:14, 16:2, 17:25, 19:5, 20:16, 29:5, 30:9, 32:8, 33:25, 36:22, 36:24, 37:3, 39:2, 73:12, 85:23, 107:18
**exact** [3] - 7:8, 59:23, 93:5
**exactly** [2] - 6:3, 102:17
**exam** [1] - 89:5
**EXAMINATION** [3] - 3:5, 41:6, 117:17
**example** [2] - 18:20, 105:7
**examples** [1] - 18:5

**exceeded** [1] - 34:17
**exception** [2] - 39:17, 39:23
**exchange** [2] - 53:24, 55:5
**exclude** [2] - 39:18, 39:21
**excluded** [2] - 4:7, 62:22
**excluding** [1] - 4:8
**exclusion** [1] - 4:8
**excuse** [1] - 118:23
**excused** [2] - 120:21, 120:22
**executive** [5] - 28:12, 41:10, 41:13, 47:4, 62:11
**exhaust** [2] - 16:22, 17:3
**exhausted** [1] - 16:8
**exhibit** [12] - 14:3, 37:18, 37:20, 37:21, 38:4, 38:20, 85:24, 85:25, 86:3, 87:14, 107:20, 107:22
**Exhibit** [7] - 15:12, 85:23, 87:12, 87:13, 107:17, 108:13, 113:19
**exhibits** [7] - 37:9, 37:11, 37:14, 37:15, 37:16, 38:9, 39:1
**exist** [4] - 81:13, 104:8, 105:21, 106:5
**existing** [4] - 30:25, 98:2, 101:21, 101:25
**exists** [3] - 92:9, 104:7, 106:5
**experience** [1] - 72:21
**expert** [9] - 47:2, 47:6, 71:10, 71:12, 71:25, 72:1, 91:4, 91:8, 92:8
**expertise** [1] - 103:22
**experts** [31] - 26:12, 26:23, 26:25, 27:1, 27:4, 32:20, 39:18, 39:19, 39:21, 40:3, 40:11, 71:18, 73:14, 73:22, 74:6, 74:8, 74:13, 74:17, 74:24, 75:2, 90:21, 91:13, 91:18, 91:19, 91:22, 91:24, 92:10, 92:13, 92:17
**experts'** [2] - 16:5, 92:22
**explain** [3] - 18:4, 73:21, 117:4
**explained** [5] - 15:23, 49:6, 49:7, 49:16, 50:5
**explaining** [1] - 49:16
**explanation** [1] - 88:7
**exposed** [2] - 26:21, 115:6
**expressly** [1] - 27:19
**extend** [1] - 106:3
**extendable** [2] - 96:20, 97:9
**extended** [1] - 107:14
**extension** [6] - 93:8, 93:9, 96:2, 96:8, 96:12, 96:17
**extensions** [2] - 93:11, 97:23
**extensive** [1] - 8:21
**extent** [1] - 59:9
**extra** [1] - 57:4

**extreme** [1] - 92:4
**extremely** [1] - 15:8

**F**

**face** [2] - 16:24, 31:4
**facilitate** [1] - 55:18
**facilities** [17] - 27:12, 27:24, 27:25, 33:9, 41:18, 50:21, 51:17, 52:15, 52:21, 60:2, 61:5, 71:21, 71:24, 73:24, 83:11, 84:4, 103:12
**facility** [20] - 32:13, 59:25, 60:10, 73:6, 73:19, 75:20, 76:23, 77:2, 77:6, 77:15, 82:8, 82:9, 94:10, 103:13, 103:21, 103:22, 107:2, 107:3, 109:13, 112:24
**fact** [4] - 25:24, 32:7, 39:8, 45:8
**factor** [3] - 47:15, 47:19, 48:12
**factories** [2] - 31:5, 77:11
**facts** [3] - 27:15, 96:4, 111:3
**factual** [1] - 5:13
**factually** [1] - 9:12
**fading** [1] - 23:16
**failure** [2] - 17:3, 17:11, 17:17
**fair** [2] - 100:20, 101:11
**fairly** [1] - 47:22
**faith** [1] - 25:20
**familiar** [8] - 24:25, 65:11, 86:25, 87:2, 87:4, 88:2, 88:4, 113:12
**far** [6] - 21:19, 36:18, 64:12, 64:13, 92:6, 115:10
**fashion** [2] - 30:10, 36:22
**fast** [3] - 14:17, 17:7, 98:17
**fast-moving** [1] - 14:17
**fast-pace** [1] - 17:7
**faster** [4] - 17:7, 98:12, 101:17, 101:23, 102:13, 103:4
**fatal** [1] - 98:17
**fault** [1] - 65:2
**FAX** [2] - 1:22, 2:7
**feasible** [1] - 68:1
**February** [1] - 28:8
**fed** [1] - 31:19
**federal** [1] - 13:5
**fee** [1] - 61:8
**feet** [2] - 59:7, 107:10
**fell** [1] - 30:12
**felt** [9] - 94:15, 98:15, 100:7, 100:21, 101:11, 101:12, 101:22, 102:12
**Fennessey** [1] - 2:12
**fever** [4] - 18:9, 18:17, 30:11
**few** [5] - 4:6, 18:5, 48:3, 71:7,

76:20
**Fifth** [4] - 23:13, 24:19, 37:2, 62:6
**figured** [1] - 109:9
**file** [2] - 95:15, 95:16
**filed** [17] - 5:11, 9:7, 27:16, 28:7, 29:15, 29:21, 29:23, 38:17, 45:14, 45:18, 87:17, 87:18, 93:16, 93:20, 96:7, 98:5
**filing** [1] - 16:22
**filled** [3] - 108:20, 108:23, 109:3
**filtered** [1] - 105:1
**final** [3] - 35:12, 94:11, 94:25
**fine** [5] - 12:23, 22:17, 98:15, 99:5, 100:10
**finish** [2] - 4:18, 76:20
**fire** [5] - 16:9, 22:5, 33:2, 75:19, 77:16
**FIRM** [1] - 2:5
**first** [20] - 9:10, 13:3, 13:15, 17:22, 25:2, 26:5, 28:2, 32:25, 39:5, 40:12, 46:5, 51:17, 55:3, 70:21, 71:17, 108:18, 112:12, 113:9, 113:11, 113:14
**fit** [1] - 20:24
**fits** [1] - 20:23
**five** [4] - 8:4, 16:15, 32:7, 119:2
**flammable** [2] - 75:10, 75:18
**floor** [2] - 55:20, 76:8
**focused** [1] - 99:20
**focusing** [1] - 51:6
**folks** [1] - 43:22
**follow** [3] - 67:18, 67:24, 88:24
**follow-up** [1] - 88:24
**followed** [3] - 44:6, 55:3, 63:22
**following** [3] - 16:6, 18:18, 51:4
**foot** [4] - 59:23, 105:9, 105:11, 107:14
**FOR** [4] - 1:15, 2:3, 2:9, 3:3
**foregoing** [1] - 121:9
**form** [20] - 108:4, 108:6, 108:7, 108:21, 109:8, 111:1, 112:25, 113:1, 113:4, 113:8, 113:10, 113:12, 113:19, 114:5, 114:11, 115:10, 115:14, 115:15
**formal** [3] - 48:20, 49:13, 49:23
**formulate** [1] - 27:12
**forth** [2] - 14:11, 72:10
**forward** [7] - 49:1, 49:21, 50:7, 54:8, 67:25, 71:19,

72:15, 73:16, 76:16, 83:6
**foundation** [1] - 44:23
**four** [7] - 11:21, 19:15, 28:1, 31:13, 51:18, 52:15, 84:24
**frame** [7] - 45:11, 93:4, 93:11, 98:12, 99:1, 99:6, 106:17
**frames** [2] - 83:25, 97:1, 102:2
**frankly** [1] - 6:4
**frequent** [5] - 55:18, 65:6, 66:22, 67:11, 68:5
**frequently** [2] - 53:21, 64:22
**fresh** [1] - 54:15
**Friday** [2] - 5:22, 50:1
**FROM** [1] - 1:25
**front** [1] - 86:25
**full** [2] - 62:15, 114:3
**function** [1] - 14:9
**functions** [1] - 20:1
**future** [4] - 52:23, 63:5, 72:25, 82:24

**G**

**Galveston** [1] - 92:11
**gathe** [1] - 15:25
**gathered** [1] - 116:20
**gathering** [1] - 76:9
**gayle** [1] - 24:2
**Gayle** [1] - 121:16
**GAYLE** [1] - 2:19
**general** [4] - 70:4, 84:2, 85:1, 116:24
**GENERAL** [1] - 2:13
**General's** [3] - 7:15, 22:11, 101:6
**general's** [1] - 23:1
**generally** [5] - 69:9, 77:5, 85:12, 89:18, 110:23
**gentlemen** [1] - 25:1
**geriatric** [2] - 84:20, 90:10
**germs** [2] - 35:6, 76:9
**given** [8] - 32:6, 32:7, 32:11, 38:20, 81:13, 82:25, 91:16, 117:2
**global** [1] - 42:18
**globe** [2] - 25:11, 36:17
**gloves** [5] - 15:19, 19:4, 19:5, 31:1, 55:21
**Governor** [1] - 29:20
**gowns** [3] - 19:4, 31:2, 31:4
**grab** [1] - 32:11
**grabbing** [1] - 108:21
**granted** [2] - 5:9, 16:7
**granting** [1] - 4:24
**great** [3] - 22:24, 33:19, 92:14
**Green** [1] - 1:18
**gridlocked** [1] - 116:4

grievance [54] - 16:22, 16:23, 17:3, 17:4, 17:6, 45:8, 93:3, 93:25, 94:2, 94:5, 94:6, 94:7, 94:8, 94:9, 94:12, 94:14, 94:23, 95:6, 95:11, 95:13, 95:14, 95:15, 95:16, 95:23, 96:1, 96:6, 96:7, 96:18, 96:22, 96:23, 96:25, 97:3, 97:8, 97:17, 97:22, 98:5, 98:14, 99:7, 100:1, 100:18, 101:17, 102:11, 102:14, 118:6, 118:8, 118:10, 118:13, 118:14, 118:16, 118:17, 120:5
grievances [31] - 44:10, 45:5, 45:6, 45:7, 45:9, 45:12, 45:13, 45:18, 93:6, 93:7, 93:9, 93:15, 95:12, 96:3, 96:19, 97:10, 97:23, 97:25, 98:7, 98:16, 99:15, 99:17, 99:22, 100:7, 100:19, 100:22, 101:13, 102:3, 118:9
group [3] - 26:16, 26:20
groups [1] - 26:21
guards [2] - 20:6, 20:7
guess [4] - 10:14, 10:23, 70:10, 98:1
guessing [1] - 37:17
guidance [7] - 15:18, 16:6, 17:24, 20:15, 27:11, 36:21
guide [2] - 26:25, 91:22
guideline [1] - 52:20
guidelines [9] - 17:23, 27:23, 29:17, 33:15, 55:11, 59:24, 61:23, 63:22, 105:12
guy [1] - 72:11
guys [3] - 72:4, 114:12, 120:18
gymnasium [8] - 59:9, 60:5, 82:2, 82:3, 82:7, 82:17, 83:1, 83:7

## H

H-20-CV-1115 [1] - 1:6
half [1] - 38:16
hand [60] - 21:9, 32:5, 32:6, 32:19, 32:21, 32:23, 32:25, 33:3, 33:7, 33:9, 33:12, 33:13, 33:17, 34:2, 40:19, 40:23, 45:24, 46:2, 53:10, 53:11, 53:19, 53:20, 53:24, 63:19, 63:20, 63:24, 63:25, 64:4, 64:7, 66:2, 67:15, 67:22, 68:6, 75:7, 75:8, 75:23, 76:11, 76:20, 76:24, 76:25, 77:3, 77:8, 77:16, 77:19, 77:24, 78:1, 78:3,

78:8, 78:10, 79:10, 79:13, 79:16, 79:18, 79:19, 79:20, 80:2, 80:4, 80:6, 80:11, 80:13
hands [6] - 33:20, 35:6, 53:21, 76:7, 79:6, 80:8
handwashing [8] - 64:22, 64:24, 65:6, 65:14, 65:22, 66:22, 67:11, 68:5
happy [2] - 7:21, 100:4
hard [3] - 23:16, 47:23, 54:24
hardest [1] - 14:24
harm [2] - 17:11, 17:13
haul [1] - 103:3
head [3] - 25:19, 105:9, 105:11
headquarters [3] - 29:1, 29:7, 29:12
Health [2] - 106:1, 106:2
health [7] - 13:11, 15:7, 27:2, 28:10, 42:21, 92:2, 92:11
healthcare [20] - 26:24, 27:8, 48:25, 49:20, 50:6, 52:16, 61:8, 67:19, 67:25, 71:18, 71:22, 72:7, 74:11, 74:15, 74:25, 75:1, 75:3, 91:21, 92:10
Healthcare [2] - 69:17, 74:12
healthy [1] - 28:18
hear [44] - 4:13, 5:1, 12:22, 12:23, 17:19, 17:22, 18:3, 18:5, 18:13, 18:20, 19:24, 20:5, 20:7, 20:21, 22:15, 22:17, 23:23, 23:24, 24:1, 24:2, 24:3, 24:8, 24:9, 27:2, 27:7, 29:8, 32:20, 32:23, 39:21, 40:10, 40:11, 44:5, 44:8, 44:15, 44:20, 52:4, 80:19, 86:2, 87:15, 119:5, 119:7, 119:9, 119:11
heard [5] - 16:20, 27:13, 35:12, 80:18, 90:22
hearing [6] - 4:18, 5:20, 12:6, 15:13, 15:20, 16:1
heat [3] - 25:22, 25:24, 80:17
heavily [1] - 74:17
heck [4] - 43:23, 77:5, 112:22, 113:6
heeding [1] - 16:5
height [1] - 20:2
heightened [2] - 22:1
HELD [1] - 1:10
help [15] - 43:13, 43:19, 46:11, 57:4, 63:23, 64:21, 65:4, 66:21, 67:10, 68:4, 71:23, 73:3, 84:25, 91:22
helped [1] - 103:14
helpful [1] - 11:15
Herrera [36] - 23:2, 43:7,

43:10, 43:12, 43:15, 43:18, 60:11, 82:6, 82:12, 82:20, 82:25, 83:3, 83:7, 83:9, 87:9, 88:4, 88:23, 89:8, 89:13, 89:16, 89:24, 90:15, 94:3, 103:8, 103:14, 103:17, 103:21, 104:1, 104:10, 104:15, 104:20, 104:25, 105:5, 112:7, 113:25, 114:8
HERRERA [1] - 1:7
Herrera's [3] - 15:12, 93:24, 104:3
high [5] - 14:23, 15:8, 30:22, 70:16, 92:1
higher [4] - 20:22, 30:11, 42:22, 84:21
highest [3] - 14:23, 21:23, 41:13
highly [2] - 14:17, 92:9
hit [1] - 14:24
Hockman [1] - 1:17
hold [5] - 6:9, 6:10, 21:17, 24:11, 119:1
home [1] - 30:11
homes [2] - 14:20, 21:16
Honor [113] - 4:9, 5:3, 5:6, 6:18, 6:22, 7:11, 7:13, 7:19, 8:5, 8:8, 8:15, 8:18, 9:5, 10:8, 11:4, 11:19, 11:23, 12:10, 12:16, 12:22, 13:1, 13:12, 13:24, 14:16, 15:3, 15:14, 16:10, 17:18, 17:22, 19:10, 19:24, 21:7, 22:7, 22:10, 22:16, 22:20, 22:21, 23:4, 23:20, 23:24, 24:6, 25:6, 25:19, 26:6, 26:7, 26:11, 26:24, 27:14, 28:3, 29:6, 29:12, 29:25, 30:4, 30:14, 31:6, 31:23, 32:4, 32:8, 32:17, 32:19, 32:23, 33:1, 33:10, 34:4, 34:8, 34:11, 34:19, 34:22, 34:23, 35:7, 35:11, 35:16, 35:21, 36:14, 36:16, 37:6, 37:10, 37:22, 39:4, 39:6, 39:7, 39:15, 39:20, 39:25, 40:13, 40:21, 41:5, 44:13, 52:2, 52:8, 53:14, 54:18, 55:25, 56:7, 59:21, 68:9, 76:19, 78:13, 78:20, 85:22, 86:10, 86:11, 87:16, 87:20, 110:11, 110:17, 115:19, 117:12, 117:16, 118:23, 119:14, 120:14, 120:24
HONORABLE [1] - 1:11
hopefully [1] - 73:7
hospital [4] - 6:10, 6:11, 9:14, 25:4
hospitalization [3] - 5:9,

5:15, 6:8
hospitalizations [5] - 8:4, 8:17, 8:22, 11:6, 11:10
hospitalized [2] - 6:16, 10:22
hospitals [2] - 9:14, 47:23
hours [7] - 18:8, 106:13, 106:15, 106:19, 111:7, 111:8, 117:25
house [3] - 60:3, 85:1, 85:19
housed [7] - 60:7, 86:12, 87:3, 106:9, 107:2, 109:13, 109:15
housekeeping [1] - 12:25
houses [1] - 15:1
housing [11] - 55:16, 55:21, 59:10, 60:6, 64:3, 64:15, 84:8, 107:2, 107:4, 108:19, 109:1
HOUSTON [1] - 1:3
Houston [3] - 1:7, 1:21, 2:20
hundred [6] - 10:25, 21:20, 93:14, 93:15, 93:22
Hurricane [1] - 29:3
hurricanes [1] - 29:3
hurry [1] - 89:9
hygiene [3] - 28:19, 30:19, 32:21
hypothetical [3] - 98:19, 98:23, 111:2

## I

idea [2] - 63:20, 72:3
identification [1] - 111:22
identified [16] - 38:5, 38:9, 49:19, 72:10, 72:22, 73:1, 76:14, 97:13, 98:3, 105:12, 107:5, 109:8, 111:9, 111:17, 112:8, 113:20
identifies [1] - 75:1
identify [13] - 46:11, 46:17, 47:8, 48:25, 50:17, 51:3, 66:5, 73:4, 96:24, 98:9, 106:23, 107:9, 118:19
identifying [3] - 35:5, 97:16, 112:14
ignores [1] - 18:4
ignoring [1] - 24:17
II [3] - 96:3, 97:2, 97:6
ill [2] - 30:10, 30:13
immediate [2] - 15:22, 82:24
immediately [3] - 9:8, 16:2, 58:14
immune [1] - 23:8
impaired [14] - 20:13, 63:21, 64:18, 64:21, 65:5, 65:13, 65:20, 65:25, 66:13, 66:21, 67:10, 67:14, 68:4, 76:6
impeach [1] - 119:22
impeachment [1] - 119:15

**implement** [3] - 20:14, 59:6, 74:16
**implementation** [4] - 35:14, 36:13, 51:14
**implemented** [7] - 31:8, 32:14, 36:20, 36:21, 46:10, 51:22, 68:25
**implementing** [1] - 30:12
**importance** [1] - 42:5
**important** [11] - 30:5, 38:20, 46:7, 47:1, 47:11, 47:15, 47:19, 48:12, 98:9, 113:13, 113:17
**impossible** [1] - 26:15
**improper** [1] - 118:23
**improvement** [1] - 18:10
**in-person** [1] - 28:21
**inadequacy** [1] - 36:25
**inadequate** [3] - 33:23, 35:15, 36:13
**inaudible** [1] - 44:14
**incarcerated** [1] - 17:12
**incentive** [1] - 90:20
**incentivized** [1] - 26:11
**incident** [2] - 77:6, 118:16
**incidents** [1] - 77:2
**include** [1] - 27:1
**included** [3] - 27:4, 30:17, 50:8
**includes** [2] - 41:18, 42:13
**including** [11] - 7:2, 11:18, 18:16, 25:12, 28:5, 40:5, 55:17, 55:19, 67:14, 84:5, 104:1
**incomplete** [1] - 111:2
**increase** [9] - 30:17, 59:11, 82:4, 82:17, 83:2, 83:9, 90:16, 105:10, 115:17
**increased** [6] - 20:9, 28:8, 30:3, 103:9, 103:18
**INDEX** [1] - 3:1
**indicate** [1] - 80:7
**indicated** [1] - 54:14
**indifference** [17] - 17:17, 17:19, 20:2, 20:16, 20:17, 20:19, 21:1, 23:9, 23:12, 24:16, 24:20, 24:23, 25:18, 33:25, 35:20, 36:15, 37:3
**indifferent** [2] - 21:25, 34:1
**indiscernible** [1] - 119:4
**indisputable** [1] - 21:1
**individual** [4] - 16:18, 66:10, 107:6, 113:20
**individuals** [10] - 10:2, 42:21, 59:8, 61:16, 64:21, 72:15, 76:11, 106:23, 115:11
**ineffective** [1] - 118:8
**infected** [2] - 17:14, 42:22
**infection** [2] - 27:18, 76:9

**infectious** [1] - 14:18
**infirm** [1] - 21:22
**infirmary** [1] - 19:18
**infliction** [1] - 24:21
**inform** [1] - 26:25
**informal** [7] - 11:6, 48:20, 49:13, 49:24, 95:11, 95:17, 95:19
**informally** [1] - 95:23
**information** [23] - 5:14, 5:15, 9:12, 9:19, 10:13, 10:20, 11:5, 11:7, 11:13, 30:21, 36:11, 51:16, 60:17, 60:19, 61:4, 64:25, 74:17, 76:15, 92:6, 100:9, 116:14, 117:21, 118:18
**ingest** [1] - 75:9
**ingested** [1] - 75:17
**ingesting** [1] - 77:7
**initial** [1] - 95:13
**injunction** [5] - 15:13, 15:20, 16:7, 19:6, 22:4
**inmate** [15] - 11:20, 15:16, 19:14, 19:25, 20:3, 44:10, 45:4, 55:19, 55:21, 61:14, 77:15, 87:3, 106:9, 113:14
**inmates** [66] - 5:15, 10:3, 14:21, 15:1, 15:6, 15:14, 16:8, 17:12, 18:3, 18:13, 19:5, 20:5, 20:11, 20:25, 33:6, 36:18, 42:1, 42:4, 44:5, 45:24, 53:10, 54:13, 54:14, 56:19, 58:13, 59:8, 59:11, 60:18, 63:20, 64:13, 64:18, 65:5, 65:20, 65:25, 66:13, 66:21, 67:10, 67:13, 67:14, 68:5, 68:6, 75:8, 75:9, 75:12, 75:22, 76:6, 76:7, 76:23, 78:10, 79:12, 80:1, 80:10, 84:9, 86:12, 86:14, 86:22, 87:7, 87:24, 87:25, 88:9, 89:14, 90:16, 105:6, 106:8, 106:10
**inmates'** [3] - 6:7, 45:9, 45:25
**inquiry** [1] - 41:4
**inside** [1] - 115:13
**installed** [1] - 85:11
**instance** [2] - 118:6, 118:12
**instead** [6] - 9:23, 16:5, 16:24, 23:8, 31:13, 35:18
**institute** [1] - 57:9
**instituted** [1] - 30:1
**institution** [5] - 33:7, 33:8, 42:7, 42:13, 106:22
**institutions** [6] - 27:25, 28:5, 29:13, 29:17, 33:5, 83:13
**instruct** [4] - 66:12, 66:15, 89:11, 105:6
**instructed** [1] - 66:20, 89:8

**instruction** [3] - 82:25, 90:5, 114:13
**instructions** [2] - 104:24, 105:21
**instructs** [1] - 70:5
**insufficiency** [1] - 37:1
**insufficient** [1] - 35:15
**intake** [1] - 116:3
**intelligent** [1] - 44:25
**intend** [3] - 39:18, 39:21, 103:2
**intended** [1] - 17:23
**intensify** [1] - 33:2
**intensity** [1] - 30:3
**intention** [1] - 67:13
**intentional** [1] - 23:12
**intentionally** [6] - 23:13, 24:17, 24:18, 27:21, 30:14, 30:25
**interacting** [1] - 26:15
**interconnected** [1] - 26:14
**interference** [3] - 23:7, 23:14, 44:12
**intermingling** [1] - 26:15
**interpret** [1] - 55:10
**Interruption** [1] - 17:20
**inventoried** [1] - 30:25
**inventory** [1] - 55:5
**investigate** [3] - 97:8, 99:15, 100:18
**investigation** [5] - 109:19, 112:6, 114:14, 115:4, 117:23
**investigator** [5] - 94:2, 94:5, 94:9, 94:15, 95:7
**invoke** [1] - 39:7
**invoked** [1] - 40:10
**involved** [2] - 25:24, 82:22
**involving** [1] - 58:14
**irrelevant** [1] - 13:22
**isolate** [2] - 50:16, 115:11
**isolating** [1] - 18:5, 114:23
**isolation** [2] - 18:7, 84:5
**issue** [27] - 5:20, 10:16, 12:6, 25:17, 32:17, 32:18, 32:19, 32:24, 32:25, 33:10, 33:22, 33:23, 34:9, 59:22, 63:6, 64:5, 76:14, 79:20, 79:24, 80:4, 80:6, 89:3, 95:24, 97:13, 98:2
**issued** [3] - 29:20, 31:7, 55:1
**issues** [14] - 12:17, 12:25, 15:7, 22:15, 37:12, 46:2, 57:4, 67:20, 84:21, 96:25, 97:16, 98:4, 99:3, 116:13
**item** [2] - 19:13, 101:5
**items** [2] - 32:21, 34:5

**J**

**jail** [1] - 9:11
**James** [6] - 2:4, 5:4, 5:7, 8:7, 8:25, 9:2
**JAMES** [6] - 5:6, 6:22, 7:2, 7:7, 9:5, 10:8
**janitor** [2] - 15:16, 19:14
**janitorial** [1] - 55:22
**janitors** [6] - 19:15, 19:16, 19:17, 19:21, 19:25, 20:9
**Jason** [1] - 2:11
**jeff@edwards** [1] - 2:8
**jeff@edwards-law.com** [1] - 2:8
**Jeffrey** [1] - 2:4
**Jersey** [1] - 21:16
**jkeville@winston.com** [1] - 1:23
**job** [3] - 87:3, 107:4, 114:22
**John** [4] - 1:16, 5:3, 13:24, 37:10
**joint** [1] - 27:17
**journal** [1] - 35:23
**judge** [1] - 51:25
**Judge** [2] - 4:12, 81:17
**judgment** [2] - 4:11, 4:15
**July** [3] - 5:9, 30:6, 50:1
**july** [2] - 1:8, 4:2
**June** [7] - 48:19, 49:23, 50:2, 50:9, 50:10, 83:24, 117:1
**jurors** [1] - 13:10
**jury** [3] - 4:21, 13:5, 13:20
**justice** [1] - 23:3
**Justice** [1] - 41:11
**JUSTICE** [1] - 1:8

**K**

**Katrina** [1] - 29:3
**keep** [6] - 6:14, 35:10, 64:1, 73:4, 73:5, 80:8
**keeping** [2] - 13:14, 84:1
**Keiser** [2] - 72:6, 92:11
**KEITH** [1] - 1:11
**kept** [5] - 18:7, 115:24, 116:12, 116:15
**KEVILLE** [102] - 3:5, 4:9, 5:3, 13:24, 14:9, 14:15, 17:22, 37:10, 39:4, 39:6, 39:20, 40:13, 40:16, 41:5, 41:7, 44:13, 45:3, 47:10, 48:7, 48:9, 49:9, 49:11, 53:1, 53:6, 53:7, 54:4, 54:10, 54:11, 55:14, 56:12, 57:7, 58:1, 58:11, 59:4, 60:15, 61:12, 62:4, 63:2, 63:12, 63:17, 63:18, 65:15, 67:3, 68:2, 68:8, 68:13, 68:20, 74:2, 74:3, 74:21, 76:4,

76:19, 76:22, 78:13, 78:20, 78:22, 79:2, 79:4, 80:25, 81:1, 81:8, 81:11, 81:12, 81:21, 82:1, 85:22, 86:11, 86:16, 86:19, 87:11, 87:20, 87:22, 89:7, 89:21, 89:22, 91:6, 92:24, 93:21, 94:19, 94:21, 96:10, 99:4, 99:13, 100:13, 100:16, 101:8, 102:8, 102:10, 107:17, 107:25, 108:3, 108:12, 108:17, 110:5, 110:20, 111:10, 115:9, 117:12, 118:23, 119:14, 120:14, 120:24
**Keville** [21] - 1:16, 5:3, 13:24, 14:5, 17:21, 37:10, 40:12, 41:4, 68:11, 72:19, 74:1, 76:17, 87:19, 99:2, 99:12, 104:13, 108:21, 113:9, 118:5, 118:21, 119:22
**key** [1] - 64:24
**killed** [1] - 17:14
**killer** [4] - 23:5, 24:25, 25:11, 25:14
**kind** [3] - 66:7, 71:10, 85:2
**King** [1] - 18:2
**KING** [1] - 1:4
**kitchen** [1] - 19:18
**knowing** [2] - 45:13, 46:15
**knowledge** [15] - 44:18, 44:23, 45:1, 66:23, 67:6, 67:8, 76:13, 88:21, 88:23, 110:14, 110:15, 110:18, 115:2, 115:6, 117:6
**knows** [5] - 11:10, 14:16, 14:17, 16:25, 103:21
**Kyle** [1] - 1:19

**L**

**lack** [5] - 44:17, 44:23, 66:23, 88:21
**lacks** [1] - 45:1
**LADDY** [1] - 1:4
**Landon** [1] - 2:12
**Lannette** [4] - 27:2, 27:9, 28:12, 92:7
**large** [5] - 16:19, 41:23, 46:11, 69:8, 71:15
**larger** [2] - 42:1, 48:2
**last** [15] - 13:13, 24:9, 35:12, 36:11, 37:13, 38:1, 38:3, 38:10, 53:25, 57:20, 68:17, 78:2, 99:20, 106:10, 107:8
**lastly** [1] - 35:11
**late** [2] - 28:7, 93:5
**laundry** [1] - 19:18
**LAW** [1] - 2:5
**law** [2] - 39:17, 59:10

**law.com** [1] - 2:8
**lawsuit** [11] - 27:15, 27:16, 27:20, 28:7, 29:15, 29:21, 29:23, 68:3, 81:4, 90:25, 91:8
**lawyers** [2] - 81:13, 81:15
**layout** [3] - 87:23, 88:3, 88:4
**leadership** [1] - 104:10
**leading** [3] - 26:11, 36:20, 119:15
**least** [14] - 7:16, 18:7, 18:11, 19:14, 19:15, 19:16, 21:24, 44:1, 51:7, 59:7, 79:10, 109:22, 114:10, 115:14
**leave** [1] - 26:21
**leaving** [1] - 109:17
**left** [6] - 24:6, 35:9, 79:5, 103:8, 103:17, 109:22
**legal** [21] - 37:1, 52:6, 52:8, 52:24, 53:15, 54:19, 54:21, 55:12, 56:1, 56:23, 57:14, 58:6, 58:20, 59:15, 60:13, 60:25, 61:10, 61:19, 62:2, 63:14, 67:16
**legitimate** [1] - 52:11
**Leonard** [8] - 15:23, 25:1, 25:4, 25:6, 31:6, 31:25, 114:12
**less** [3] - 12:9, 93:22, 107:13
**lethal** [3] - 23:5, 24:24, 25:14
**level** [2] - 64:2, 114:15
**liable** [1] - 35:18
**library** [2] - 59:10
**likely** [1] - 21:19
**limine** [6] - 4:20, 4:21, 4:23, 4:24, 13:16, 13:20
**limit** [1] - 58:13
**limited** [3] - 47:22, 58:24
**line** [11] - 31:12, 31:22, 49:10, 94:20, 100:14, 100:15, 102:9, 112:12
**lined** [1] - 31:12
**lining** [1] - 31:16
**Linthicum** [12] - 27:3, 27:9, 28:13, 52:17, 71:22, 72:5, 72:13, 73:15, 83:15, 91:7, 91:21, 92:7
**lip** [1] - 18:1
**list** [6] - 5:14, 8:16, 38:4, 38:14, 38:21, 56:15
**listed** [2] - 9:21, 69:7
**listen** [1] - 40:8
**listening** [1] - 68:21
**literal** [2] - 16:24, 49:25
**litigation** [1] - 80:17
**live** [2] - 15:8, 36:4
**lived** [3] - 109:10, 111:25, 112:22
**lives** [6] - 17:25, 21:7, 22:5, 36:3, 36:17, 36:18

**living** [2] - 109:2, 112:5
**LLP** [1] - 1:20
**location** [3] - 7:8, 70:22, 90:9
**locations** [2] - 79:23, 85:14
**lockdown** [7] - 15:17, 31:8, 31:9, 31:11, 31:14, 31:17, 31:18
**look** [18] - 23:11, 24:12, 51:13, 51:21, 61:4, 65:24, 66:12, 66:21, 73:20, 73:22, 74:18, 76:17, 79:5, 80:1, 100:4, 107:1, 107:4, 111:6
**looked** [3] - 60:2, 80:4, 90:9
**looking** [6] - 86:20, 90:8, 101:4, 106:9, 112:12, 116:13
**looks** [1] - 87:4
**Lorie** [7] - 42:8, 42:12, 42:16, 50:2, 89:23, 90:4, 90:14
**loss** [1] - 6:15
**lost** [1] - 25:20
**low** [1] - 15:14

**M**

**ma'am** [3] - 118:4, 118:15, 120:8
**machines** [2] - 85:10, 88:19
**madam** [1] - 24:8
**mail** [1] - 6:22
**majority** [2] - 15:6, 36:3
**man** [3] - 43:21, 62:10, 64:8
**managed** [7] - 27:8, 69:17, 72:7, 74:12, 74:25, 91:21, 92:10
**management** [5] - 83:12, 94:4, 103:21, 103:25, 104:22
**managers** [3] - 82:21, 103:13, 103:24
**managing** [1] - 70:5
**manifests** [1] - 17:17
**mankind** [1] - 24:22
**manner** [1] - 97:19
**manufactured** [1] - 55:1
**manufacturing** [3] - 30:17, 31:3, 31:5
**March** [28] - 27:17, 27:20, 28:2, 28:9, 28:11, 28:14, 28:16, 28:20, 28:21, 28:25, 29:25, 30:14, 42:19, 43:1, 43:4, 47:14, 47:18, 47:21, 48:1, 77:23, 83:14, 84:3, 85:16, 87:8, 88:8, 88:14, 90:13, 116:23
**march** [2] - 13:10, 48:11
**Mark** [1] - 1:19
**masks** [15] - 14:19, 20:7, 21:10, 31:1, 31:3, 54:14, 54:15, 54:23, 55:1, 55:2,

55:4, 55:5, 55:6, 55:21
**mass** [1] - 46:16
**materials** [2] - 21:10, 65:1
**mates** [1] - 32:3
**matter** [2] - 54:22, 121:10
**matters** [2] - 4:4, 4:22
**maximized** [1] - 60:7
**maximum** [4] - 10:5, 97:3, 97:5, 97:6
**McCormick** [1] - 24:19
**mean** [7] - 5:19, 9:18, 10:23, 24:16, 43:22, 43:23, 88:16
**MEANS** [1] - 1:24
**means** [1] - 24:17
**measures** [5] - 26:25, 32:15, 36:19, 57:13, 59:7
**mechanism** [2] - 94:5, 116:10
**medical** [55] - 6:5, 6:7, 8:19, 9:3, 18:7, 18:17, 26:11, 26:23, 26:24, 27:5, 27:9, 29:22, 32:18, 32:19, 35:23, 36:20, 42:24, 46:20, 58:15, 58:16, 66:4, 66:9, 66:12, 66:20, 67:9, 68:3, 69:25, 76:14, 76:15, 84:22, 85:9, 89:4, 89:5, 90:20, 90:25, 91:7, 91:17, 92:15, 92:17, 96:25, 110:18, 110:21, 111:6, 111:8, 111:18, 112:7, 112:8, 112:10, 112:15, 112:18, 114:1, 114:2, 115:13
**Medical** [1] - 92:3
**medications** [1] - 18:9
**medicines** [1] - 31:24
**Medlock** [1] - 2:5
**meeting** [8] - 27:17, 28:11, 66:10, 66:11, 83:14, 83:18, 83:21, 84:3
**meetings** [1] - 116:13
**member** [2] - 53:10, 61:14
**members** [3] - 4:6, 16:21, 54:13
**memory** [1] - 86:22
**men** [11] - 21:19, 21:21, 21:24, 53:8, 54:12, 55:15, 57:8, 58:12, 59:5, 60:16, 61:13
**mentioned** [2] - 82:2, 91:15
**met** [4] - 37:5, 43:16, 50:6
**Michael** [1] - 1:18
**mid** [1] - 13:10
**mid-march** [1] - 13:10
**middle** [3] - 28:20, 30:6
**midst** [1] - 49:17
**might** [6] - 4:4, 55:12, 58:10, 65:2, 76:17, 88:18
**mike** [1] - 23:18
**million** [5] - 35:24, 35:25,

36:1, 36:5, 36:17
**minimize** [2] - 4:22, 31:21
**minimized** [1] - 30:15
**minute** [4] - 35:12, 38:10, 63:19, 105:15
**minutes** [9] - 12:9, 34:17, 34:20, 34:23, 38:2, 38:4, 38:7, 38:21, 107:15
**misleading** [2] - 38:23, 110:10
**misled** [1] - 13:21
**misstates** [1] - 75:24
**mistaken** [5] - 49:7, 96:20, 107:12, 109:16, 115:8
**mobility** [15] - 20:13, 63:21, 64:18, 64:21, 65:5, 65:13, 65:20, 65:25, 66:13, 66:21, 67:10, 67:14, 67:20, 68:4, 76:6
**mobility-impaired** [14] - 20:13, 63:21, 64:18, 64:21, 65:5, 65:13, 65:20, 65:25, 66:13, 66:21, 67:10, 67:14, 68:4, 76:6
**model** [4] - 52:16, 71:23, 72:20, 73:18
**modeled** [1] - 74:11
**modification** [5] - 96:13, 96:15, 101:20, 101:25, 103:2
**modifications** [1] - 85:5
**modified** [8] - 45:11, 72:22, 72:25, 83:6, 93:2, 93:4, 93:5, 93:11
**modify** [3] - 73:20, 102:1, 103:1
**modifying** [4] - 84:19, 84:24, 85:3, 85:4
**Molina** [1] - 2:11
**moment** [4] - 22:12, 22:20, 34:8, 48:18
**monitor** [3] - 19:20, 29:14, 66:16
**monitoring** [1] - 82:10
**month** [2] - 17:2, 55:2
**months** [3] - 38:16, 88:10, 99:20
**morning** [8] - 5:6, 14:15, 16:17, 40:21, 40:22, 41:8, 41:9, 76:18
**MORNING** [1] - 1:12
**most** [5] - 13:9, 14:17, 25:22, 36:22, 62:6
**motion** [13] - 4:11, 4:14, 4:19, 4:20, 4:24, 4:25, 5:1, 5:8, 5:11, 9:7, 9:21, 13:16
**motions** [3] - 4:20, 4:23, 13:19
**motive** [2] - 26:10, 90:20
**move** [21] - 13:1, 34:3, 49:1,

49:21, 50:7, 53:5, 54:8, 63:16, 71:18, 72:15, 80:24, 81:25, 84:9, 87:12, 89:20, 89:25, 90:8, 90:15, 107:18
**moved** [3] - 57:25, 86:14, 88:10
**movements** [1] - 21:12
**moving** [3] - 14:17, 73:16, 105:7
**MR** [133] - 3:5, 4:9, 5:3, 5:6, 6:22, 7:2, 7:7, 7:11, 7:13, 7:19, 9:5, 10:8, 12:16, 12:22, 12:24, 13:3, 13:12, 13:18, 13:24, 14:9, 14:15, 17:22, 22:10, 22:14, 22:19, 22:24, 23:19, 23:23, 24:4, 24:14, 34:11, 34:15, 34:19, 37:10, 37:22, 37:25, 39:4, 39:6, 39:10, 39:13, 39:20, 40:13, 40:16, 41:5, 41:7, 44:13, 45:3, 47:10, 48:7, 48:9, 49:9, 49:11, 52:8, 53:1, 53:6, 53:7, 54:4, 54:10, 54:11, 55:14, 56:12, 57:7, 58:1, 58:11, 59:4, 60:15, 61:12, 62:4, 63:2, 63:12, 63:17, 63:18, 65:15, 67:3, 68:2, 68:8, 68:13, 68:20, 74:2, 74:3, 74:21, 76:4, 76:19, 76:22, 78:13, 78:20, 78:22, 79:2, 79:4, 80:25, 81:1, 81:8, 81:11, 81:12, 81:21, 82:1, 85:22, 86:11, 86:16, 86:19, 87:11, 87:20, 87:22, 89:7, 89:21, 89:22, 91:6, 92:24, 93:21, 94:19, 94:21, 96:10, 99:4, 99:13, 100:13, 100:16, 101:8, 102:8, 102:10, 107:17, 107:25, 108:3, 108:12, 108:17, 110:5, 110:20, 111:10, 115:9, 117:12, 118:23, 119:14, 120:14, 120:24
**MS** [71] - 8:8, 8:12, 8:14, 9:2, 11:4, 11:19, 11:22, 12:10, 39:25, 40:3, 44:17, 44:22, 47:2, 52:2, 52:6, 53:14, 54:18, 55:25, 56:23, 57:14, 58:6, 58:20, 59:15, 60:25, 61:19, 62:20, 63:7, 65:7, 66:23, 67:16, 68:7, 73:25, 74:7, 75:24, 80:22, 81:5, 81:19, 86:1, 86:4, 86:6, 86:8, 86:10, 87:16, 88:21, 88:19, 91:2, 92:19, 93:17, 96:4, 98:19, 98:23, 99:9, 101:1, 104:18, 107:23, 108:1, 110:1, 110:10, 110:13, 111:2, 114:25,

115:2, 115:19, 117:6, 117:16, 117:18, 119:10, 119:22, 120:3, 120:9, 120:11
**multiple** [2] - 52:19, 90:7
**Murphy** [1] - 1:18
**must** [3] - 17:11, 17:16, 21:21
**mute** [1] - 12:17

## N

**name** [2] - 22:25, 113:23
**named** [1] - 25:1
**names** [2] - 10:25, 87:3
**narrow** [2] - 46:2, 63:6
**narrowed** [1] - 6:8
**national** [1] - 92:8
**natural** [1] - 29:3
**nature** [2] - 38:10, 72:21
**necessarily** [6] - 26:18, 61:24, 64:2, 98:8, 101:19, 102:21
**necessary** [7] - 53:23, 57:3, 58:15, 58:16, 98:15, 104:11, 104:15
**necessitated** [1] - 33:8
**need** [31] - 4:21, 5:1, 5:18, 6:16, 9:17, 12:11, 15:25, 16:21, 21:8, 30:16, 39:21, 43:16, 52:12, 52:23, 54:3, 66:3, 66:10, 66:11, 66:17, 67:21, 78:6, 80:23, 80:24, 84:11, 85:1, 86:21, 95:16, 95:23, 101:19
**needed** [14] - 17:7, 22:4, 30:16, 43:13, 43:19, 66:6, 84:9, 85:19, 89:1, 98:12, 98:18, 101:20, 101:22, 102:13
**needs** [5] - 22:1, 58:25, 66:13, 81:24, 95:22
**negative** [12] - 7:25, 11:16, 11:25, 12:3, 32:3, 46:13, 50:17, 50:18, 50:22, 51:2, 114:17, 115:7
**negatives** [2] - 50:15, 50:25
**negativity** [1] - 46:10
**Nevada** [2] - 33:6, 33:8
**never** [16] - 57:20, 66:20, 68:3, 89:8, 89:13, 89:16, 90:4, 90:5, 90:24, 93:4, 97:14, 104:2, 104:5, 117:4, 118:12
**nevertheless** [1] - 15:6
**New** [1] - 21:16
**new** [15] - 9:23, 26:6, 27:18, 38:5, 38:9, 52:5, 51:9, 57:11, 57:25, 58:3, 70:19, 81:22, 97:20, 116:5

**next** [7] - 11:24, 18:22, 19:8, 31:8, 108:24, 117:22, 120:24
**nice** [2] - 7:15, 7:18
**Nice** [1] - 7:18
**night** [5] - 5:12, 37:13, 38:1, 38:3, 38:22
**nineteen** [1] - 21:19
**Nineteen** [1] - 16:20
**nobody** [1] - 115:10
**none** [5] - 25:9, 37:14, 50:22, 115:13, 119:11
**nonetheless** [1] - 16:19
**normal** [5] - 56:20, 101:18, 101:23, 102:13, 103:5
**normally** [1] - 39:16
**notably** [1] - 25:22
**notation** [1] - 118:17
**note** [2] - 15:13, 15:16
**notepad** [1] - 116:12
**notes** [16] - 83:18, 83:19, 83:20, 83:21, 116:12, 116:15, 116:16, 116:17, 116:18, 116:19, 116:20, 116:22, 116:24, 117:2, 117:4, 117:11
**nothing** [8] - 18:19, 97:11, 98:8, 108:20, 108:23, 109:2, 112:14, 113:24
**notwithstanding** [1] - 10:21
**novel** [1] - 27:19
**November** [1] - 82:5
**number** [20] - 8:3, 10:1, 11:17, 13:9, 15:4, 16:14, 16:19, 20:9, 32:14, 33:4, 37:14, 41:23, 42:1, 44:5, 53:20, 64:17, 75:10, 80:7, 93:19
**numbers** [12] - 7:23, 7:24, 9:25, 15:3, 16:25, 21:1, 36:12, 36:16, 37:15, 37:18, 46:11, 69:8
**nurses** [1] - 70:1
**nursing** [1] - 21:16

## O

**o'clock** [3] - 38:3, 38:22, 121:2
**oath** [2] - 40:18, 40:24
**object** [2] - 86:5, 119:14
**objected** [1] - 67:4
**objecting** [1] - 44:24
**objection** [67] - 4:8, 4:9, 39:9, 44:14, 44:15, 44:17, 44:21, 44:23, 47:2, 52:2, 53:14, 54:18, 55:25, 56:23, 57:14, 58:6, 58:20, 59:15, 60:25, 61:19, 62:20, 63:7, 65:7, 65:10, 66:23, 66:25,

67:16, 68:7, 68:10, 73:25, 74:7, 75:24, 80:22, 81:5, 81:19, 85:24, 85:25, 86:1, 86:3, 86:7, 87:14, 87:19, 87:20, 88:21, 89:19, 91:2, 92:19, 93:17, 96:4, 98:19, 99:9, 101:1, 104:18, 107:19, 107:20, 107:21, 108:1, 108:2, 110:1, 110:10, 111:2, 114:25, 115:19, 117:6, 118:25, 119:1, 119:13

**observation** [1] - 106:11

**observe** [1] - 19:21

**obtain** [2] - 9:4, 16:23

**obviously** [8] - 47:24, 50:25, 57:17, 62:2, 82:14, 83:4, 103:24, 109:12

**occupancy** [2] - 88:13, 88:16

**occurred** [5] - 25:23, 26:1, 29:21, 45:16, 113:24

**occurring** [1] - 25:25

**October** [1] - 82:5

**OF** [5] - 1:2, 1:8, 1:10, 2:13, 3:1

**offender** [22] - 26:13, 30:20, 42:23, 55:4, 61:4, 65:1, 66:3, 66:6, 67:19, 77:3, 77:7, 106:23, 107:1, 107:4, 107:10, 108:19, 109:2, 109:6, 109:10, 113:11

**offenders** [78] - 7:25, 8:1, 9:13, 12:3, 18:6, 19:3, 25:3, 25:9, 26:19, 28:23, 29:8, 30:18, 30:23, 31:9, 31:11, 31:13, 31:14, 31:16, 31:19, 31:22, 31:23, 32:1, 32:6, 32:7, 32:11, 33:14, 33:20, 34:1, 34:25, 36:7, 44:8, 46:9, 46:11, 46:17, 46:20, 47:8, 48:24, 50:23, 53:19, 55:2, 55:6, 57:19, 60:9, 61:25, 64:3, 64:4, 65:13, 66:17, 67:21, 70:16, 73:4, 75:16, 75:17, 76:14, 78:8, 80:4, 80:12, 80:13, 85:1, 85:19, 89:10, 89:15, 90:8, 90:10, 90:11, 98:4, 105:18, 105:19, 105:20, 107:6, 109:11, 111:17, 111:18, 116:2, 116:5

**offer** [2] - 47:5, 85:23

**offered** [1] - 47:3

**OFFICE** [1] - 2:13

**office** [5] - 7:15, 9:13, 23:1, 25:25, 84:2

**Office** [2] - 22:11, 101:6

**officer** [1] - 61:14

**officers** [6] - 19:20, 26:14, 26:18, 31:16, 112:21,

112:22

**official** [2] - 13:5, 15:4

**officials'** [1] - 17:16

**often** [5] - 7:22, 17:25, 18:24, 33:20, 79:6

**old** [5] - 97:8, 99:6, 99:16, 100:6, 100:19

**older** [3] - 42:21, 43:5, 97:24

**omission** [2] - 11:1, 11:2

**ON** [2] - 3:5, 41:6

**once** [1] - 117:24

**one** [66] - 9:22, 11:20, 14:4, 14:17, 17:11, 18:8, 18:13, 19:14, 19:25, 20:16, 20:23, 21:3, 21:20, 22:11, 22:20, 24:11, 25:7, 25:8, 25:14, 25:15, 26:16, 26:17, 26:20, 32:17, 32:21, 34:8, 35:7, 35:12, 37:3, 37:22, 41:21, 50:11, 52:12, 52:18, 53:20, 55:1, 59:23, 60:3, 64:24, 66:4, 67:2, 72:1, 74:4, 75:10, 77:10, 80:7, 83:18, 84:3, 89:3, 90:7, 90:8, 90:14, 99:14, 99:23, 103:23, 105:14, 109:24, 113:15, 113:22, 120:19

**one-size-fits-all** [1] - 20:23

**ones** [1] - 87:8

**open** [2] - 86:14, 105:7

**opening** [16] - 4:5, 12:8, 12:12, 12:15, 13:1, 13:23, 14:10, 68:21, 68:24, 69:5, 69:11, 78:23, 79:3, 80:15, 90:19

**operation** [2] - 41:17, 42:12

**operationalize** [1] - 82:8

**operations** [1] - 9:11

**opinion** [2] - 47:2, 47:5

**opportunity** [3] - 32:12, 81:15, 82:13

**order** [9] - 13:4, 28:22, 29:9, 30:22, 31:7, 31:15, 31:18, 33:13, 46:7

**ordered** [3] - 10:13, 10:16, 16:2

**organize** [1] - 29:7

**original** [5] - 17:4, 17:6, 17:8, 28:3, 97:22

**ourselves** [1] - 21:17

**outbreak** [5] - 18:21, 18:23, 54:17, 56:22, 59:14

**outlets** [2] - 85:9, 88:19

**outset** [1] - 7:21

**outside** [10] - 28:24, 47:23, 55:11, 75:3, 75:17, 84:7, 111:23, 112:5, 115:12, 116:11

**overall** [1] - 116:7

**overbroad** [4] - 73:25, 74:7,

101:2, 104:18

**overnight** [1] - 9:15

**overrule** [2] - 65:9, 68:10

**overruled** [3] - 66:25, 99:10, 110:2

**oversee** [2] - 41:15, 43:24

**oversight** [1] - 77:12

**own** [11] - 6:5, 18:4, 19:5, 20:15, 25:12, 31:24, 32:5, 55:20, 82:20, 86:15, 119:16

**oxygen** [1] - 85:10

## P

**p.m** [1] - 121:4

**pace** [1] - 17:7

**Pack** [155] - 5:15, 6:17, 7:24, 7:25, 8:17, 8:22, 9:13, 10:3, 11:11, 11:24, 14:22, 14:25, 15:7, 15:21, 16:9, 16:13, 18:14, 19:12, 20:19, 20:21, 20:25, 21:3, 21:15, 21:20, 22:1, 22:5, 25:2, 25:9, 25:13, 25:18, 26:13, 26:19, 26:22, 28:5, 28:9, 28:17, 28:22, 28:23, 29:9, 29:24, 29:25, 30:18, 30:22, 31:2, 31:9, 32:13, 33:4, 33:21, 34:2, 34:5, 34:6, 35:8, 36:6, 36:18, 41:21, 42:13, 42:17, 43:4, 43:10, 43:14, 43:19, 48:20, 49:13, 49:24, 50:9, 50:11, 50:20, 51:19, 52:1, 52:15, 53:9, 54:12, 55:15, 56:22, 57:8, 57:10, 57:19, 57:25, 58:12, 58:13, 58:24, 59:5, 59:12, 60:1, 60:4, 60:16, 64:18, 65:5, 65:21, 66:1, 66:13, 66:22, 67:10, 67:14, 69:15, 69:20, 69:23, 69:25, 70:1, 70:9, 70:11, 70:19, 71:3, 71:5, 71:21, 73:9, 75:8, 75:13, 75:14, 75:15, 75:16, 75:22, 76:3, 78:24, 79:6, 79:11, 82:19, 83:2, 83:9, 84:5, 84:7, 84:10, 85:3, 85:5, 85:12, 85:15, 86:12, 87:7, 87:23, 88:8, 89:3, 89:5, 89:9, 89:12, 90:6, 93:16, 93:20, 94:1, 103:9, 103:15, 103:18, 103:21, 104:3, 104:12, 104:16, 104:21, 104:23, 105:7, 105:10, 105:13, 113:10, 113:11, 113:14, 114:20, 115:18

**pack** [4] - 21:22, 58:4, 68:5, 90:9

**packed** [1] - 15:15

**Page** [1] - 3:2

**page** [9] - 9:10, 37:16, 49:10, 94:20, 100:14, 102:8, 108:12

**pages** [1] - 38:6

**pain** [1] - 24:21

**pamphlet** [1] - 30:20

**pamphlets** [1] - 35:4

**pandemic** [18] - 16:24, 17:8, 20:22, 21:23, 27:1, 30:3, 33:6, 38:15, 43:8, 53:13, 57:10, 58:19, 60:19, 60:20, 60:23, 64:23, 77:19, 82:14

**paper** [3] - 56:20, 57:2, 57:4

**part** [6] - 19:19, 106:21, 106:24, 107:8, 112:11, 113:5

**participated** [2] - 27:17, 28:19

**particular** [1] - 65:24

**parties** [5] - 4:18, 40:5, 40:7, 40:8, 40:10

**partners** [7] - 27:5, 29:22, 52:16, 52:17, 66:4, 72:8, 92:2

**partnership** [1] - 74:13

**pass** [4] - 36:1, 117:12, 120:9, 120:10

**passed** [7] - 18:8, 18:11, 25:4, 71:1, 108:9, 111:13, 111:14

**passive** [1] - 10:20

**past** [3] - 29:2, 50:1, 50:22

**pay** [1] - 17:25

**paying** [1] - 20:25

**people** [29] - 6:16, 6:20, 7:2, 10:7, 10:8, 11:24, 16:20, 26:6, 28:23, 36:1, 36:3, 36:5, 36:10, 42:16, 46:13, 68:4, 87:3, 89:25, 98:11, 99:6, 105:7, 105:8, 109:7, 112:15, 113:6, 114:19, 115:12, 119:3

**people's** [1] - 115:25

**per** [2] - 32:8, 36:17

**percent** [9] - 16:12, 16:13, 16:14, 18:25, 21:2, 21:4, 21:20, 33:1, 79:10

**percentage** [1] - 70:16

**percipient** [1] - 39:8

**perform** [5] - 20:1, 61:15, 105:17, 105:23, 105:25

**performed** [2] - 12:2, 35:24

**performing** [2] - 19:3, 55:22

**perhaps** [2] - 45:25, 121:1

**period** [3] - 61:17, 77:19, 107:14

**permanent** [3] - 22:4, 72:20, 102:23

**permitted** [1] - 19:19
**person** [10] - 6:23, 7:16, 23:6, 25:2, 28:21, 40:14, 40:16, 44:25, 64:1, 111:6
**personal** [11] - 31:1, 44:17, 44:23, 66:23, 67:5, 67:8, 88:21, 110:13, 110:15, 115:2, 117:6
**personally** [13] - 69:21, 77:14, 78:3, 82:6, 82:22, 83:10, 83:21, 91:4, 104:4, 104:9, 105:20, 106:4, 114:14
**personnel** [1] - 18:17
**persuade** [3] - 26:8, 26:9, 37:4
**phase** [3] - 93:25, 94:24, 95:13
**phone** [2] - 4:13, 11:6
**physicians** [1] - 70:1
**pick** [2] - 24:5, 24:10
**pill** [2] - 31:17, 31:23
**place** [24] - 15:18, 16:3, 28:23, 56:10, 56:14, 56:17, 57:11, 57:24, 58:4, 58:24, 61:3, 61:6, 61:9, 62:1, 69:8, 70:2, 73:5, 76:17, 78:7, 97:11, 97:12, 101:21, 118:7, 118:13
**placed** [1] - 106:11
**placement** [1] - 116:2
**places** [2] - 31:5, 79:17
**Plaintiff** [3] - 4:7, 5:2, 39:20
**Plaintiffs** [16] - 1:5, 4:6, 11:13, 13:25, 21:6, 22:2, 33:11, 36:24, 37:4, 37:11, 39:4, 41:2, 56:18, 78:20, 115:20
**plaintiffs** [1] - 120:24
**PLAINTIFFS** [3] - 1:15, 2:3, 3:3
**Plaintiffs'** [18] - 5:1, 12:15, 14:3, 15:11, 25:16, 35:13, 37:25, 38:1, 38:12, 79:3, 85:23, 87:12, 91:5, 91:19, 107:17, 108:12, 113:19
**plaintiffs'** [1] - 38:2
**plan** [45] - 16:1, 16:3, 29:19, 42:20, 48:20, 49:6, 49:13, 49:21, 49:23, 50:3, 50:4, 50:7, 50:14, 50:20, 51:8, 51:11, 51:15, 51:22, 51:23, 52:1, 52:19, 52:22, 59:24, 72:10, 72:14, 72:16, 72:17, 72:25, 73:7, 73:16, 75:1, 82:3, 82:16, 83:4, 83:5, 83:8, 103:11, 103:24, 103:25, 104:2, 104:3, 104:20, 104:25, 105:4
**planning** [1] - 43:2

**plans** [7] - 50:12, 82:6, 82:12, 82:19, 82:23, 83:10, 103:14
**plastic** [1] - 31:4
**play** [2] - 48:7, 61:7
**pled** [1] - 115:20
**PO** [1] - 2:13
**pocket** [1] - 30:21
**point** [5] - 35:12, 37:22, 51:12, 60:3, 88:14
**policies** [8] - 18:1, 18:4, 42:17, 74:5, 74:11, 74:16, 100:9, 106:2
**policy** [69] - 17:4, 17:6, 17:7, 17:8, 17:23, 17:24, 18:6, 18:19, 18:20, 20:23, 27:6, 27:18, 27:23, 28:2, 28:4, 33:23, 35:14, 36:12, 36:13, 44:6, 45:8, 54:5, 68:25, 69:15, 69:17, 69:18, 69:19, 69:22, 70:4, 70:18, 72:18, 75:3, 93:3, 93:5, 95:12, 95:14, 95:18, 95:19, 96:1, 96:6, 97:9, 97:11, 97:12, 97:13, 97:22, 97:24, 98:2, 98:14, 98:18, 99:6, 99:16, 100:6, 100:9, 100:19, 100:21, 101:11, 101:17, 101:20, 102:1, 102:11, 102:15, 102:22, 103:1, 103:2, 105:16, 105:23, 106:4
**Policy** [1] - 27:21
**population** [13] - 11:18, 20:22, 26:13, 43:5, 50:17, 51:1, 55:4, 60:7, 65:1, 70:11, 84:20, 85:2, 116:7
**populations** [5] - 48:2, 61:5, 71:24, 72:10, 108:19
**poses** [2] - 32:24, 75:19
**posing** [1] - 17:12
**position** [3] - 5:19, 6:14, 41:13
**positive** [31] - 6:7, 6:20, 6:25, 8:1, 8:2, 16:12, 16:17, 18:6, 18:14, 21:2, 25:3, 25:5, 29:10, 31:6, 31:25, 36:7, 46:12, 50:23, 50:24, 51:1, 51:3, 61:15, 70:22, 73:4, 73:5, 106:8, 114:20, 115:8, 117:21, 117:24
**positives** [7] - 8:3, 16:18, 50:16, 50:19, 51:6, 73:19, 115:5
**positivity** [3] - 16:11, 16:13, 46:10
**possible** [4] - 14:20, 52:18, 59:9, 90:9
**possibly** [1] - 76:9
**post** [2] - 4:17, 60:17

**post-trial** [1] - 4:17
**posted** [4] - 27:21, 30:21, 34:25, 78:24
**posters** [3] - 30:17, 34:5, 35:4
**posting** [2] - 79:6, 79:11
**potentially** [2] - 59:1, 76:9
**powerpoint** [2] - 22:22, 34:12
**PPE** [4] - 31:1, 31:2, 31:4, 35:9
**practice** [10] - 30:19, 31:15, 32:22, 58:23, 75:3, 106:7, 106:22, 106:25, 107:9
**practices** [3] - 28:18, 66:16, 74:19
**pre** [2] - 37:9, 37:11
**pre-admit** [2] - 37:9, 37:11
**precautionary** [6] - 31:8, 31:9, 31:10, 31:14, 31:17, 31:18
**preclude** [1] - 39:7
**precluded** [1] - 39:14
**preexisting** [1] - 42:23
**preference** [1] - 120:20
**preliminarily** [1] - 16:7
**preliminary** [4] - 4:4, 15:13, 15:20, 19:6
**premises** [1] - 40:20
**prepared** [2] - 27:7, 30:20
**present** [1] - 31:20
**presentation** [1] - 39:2
**prevent** [7] - 15:15, 17:11, 35:1, 43:13, 43:19, 53:21, 64:24
**preventing** [2] - 63:23, 73:23
**preview** [1] - 18:5
**previous** [2] - 117:25, 118:12
**previously** [4] - 5:23, 11:25, 12:3, 31:10
**price** [1] - 20:25
**primarily** [1] - 47:22
**prison** [15] - 7:3, 7:4, 7:8, 7:9, 9:11, 14:25, 17:16, 20:20, 41:18, 43:23, 58:14, 59:22, 90:25, 91:12, 92:17
**prisoners** [5] - 21:21, 57:9, 57:11, 57:12, 58:3
**prisons** [11] - 7:5, 14:21, 16:12, 16:15, 41:19, 41:21, 41:24, 42:2, 42:5, 43:5, 69:12
**privilege** [1] - 63:7
**privileged** [1] - 65:8
**proactive** [5] - 45:13, 97:15, 99:2, 99:5, 100:10
**problem** [6] - 6:1, 8:7, 23:20, 38:2, 40:2, 118:17
**problems** [1] - 33:5
**procedure** [9] - 13:6, 16:23,

54:23, 95:14, 118:6, 118:7, 118:13, 120:5, 120:6
**proceed** [4] - 10:23, 13:23, 40:9, 78:21
**PROCEEDINGS** [3] - 1:10, 1:24, 4:1
**proceedings** [1] - 121:10
**process** [17] - 17:3, 46:11, 55:1, 55:9, 60:12, 73:4, 84:24, 95:14, 95:23, 97:17, 101:18, 101:23, 102:13, 102:22, 102:25, 103:5, 103:10
**processing** [1] - 95:12
**proclamation** [1] - 29:21
**produce** [1] - 10:13
**PRODUCED** [1] - 1:25
**produced** [6] - 16:18, 28:16, 85:21, 107:25, 117:4, 117:7
**produces** [1] - 32:5
**product** [1] - 77:13
**professionals** [4] - 27:10, 71:22, 90:25, 91:1
**professions** [1] - 67:19
**program** [1] - 115:24
**programs** [2] - 116:1, 116:3
**prohibition** [2] - 57:9, 58:3
**prolonged** [1] - 107:10
**prompt** [3] - 29:16, 30:10, 30:16
**promptly** [3] - 26:12, 30:4, 36:20
**prompts** [1] - 117:19
**proper** [1] - 28:18
**protect** [12] - 15:10, 22:3, 26:16, 26:18, 26:19, 26:20, 30:24, 33:14, 60:18, 60:20
**protecting** [1] - 26:16
**protection** [2] - 44:11, 45:5
**protective** [3] - 21:10, 31:1, 114:4
**protocol** [11] - 57:24, 61:9, 61:25, 72:5, 97:17, 100:1, 102:21, 102:24, 106:13, 106:14, 113:5
**protocols** [16] - 30:1, 53:18, 56:9, 56:13, 56:16, 56:17, 57:1, 66:16, 67:20, 69:8, 72:22, 75:2, 78:6, 96:14, 101:21, 102:2
**prove** [1] - 20:16
**provide** [35] - 5:21, 7:11, 7:16, 7:20, 9:4, 9:9, 33:12, 53:9, 53:19, 53:22, 54:13, 54:23, 54:25, 55:16, 55:21, 56:18, 58:16, 61:4, 63:25, 64:25, 65:21, 66:1, 67:21, 67:22, 68:6, 76:10, 84:2, 89:9, 89:15, 92:5, 92:13,

94:7, 114:13, 116:16
**provided** [13] - 4:16, 8:16, 8:23, 10:14, 17:9, 20:10, 38:7, 53:22, 53:24, 54:15, 91:18, 101:6, 117:10
**providers** [4] - 49:20, 50:6, 67:25, 76:15
**providers'** [1] - 48:25
**providing** [6] - 15:9, 20:8, 60:19, 63:20, 67:13, 84:1
**published** [2] - 27:25, 29:18
**pull** [3] - 22:19, 34:12, 34:15
**pulled** [1] - 9:22
**purport** [1] - 5:14
**purpose** [4] - 11:12, 45:12, 84:14, 119:20
**purposeful** [1] - 23:12
**purposefully** [1] - 32:1
**purposely** [2] - 24:17, 27:6
**pursuant** [1] - 13:5
**pursue** [1] - 71:23
**put** [23] - 14:10, 15:18, 16:3, 18:14, 19:4, 19:11, 45:25, 49:9, 72:17, 79:2, 80:9, 84:19, 85:22, 87:11, 90:16, 94:19, 100:13, 101:21, 102:8, 107:17, 111:18, 113:7, 119:18
**putting** [1] - 119:14

## Q

**qualifies** [1] - 71:4
**qualify** [2] - 56:6, 70:12
**quality** [1] - 121:13
**quantities** [3] - 55:18, 55:19, 71:15
**quarantine** [4] - 18:15, 31:19, 57:12, 58:4
**quarantining** [1] - 21:12
**questioning** [2] - 118:5, 118:21
**questions** [3] - 76:20, 117:14, 117:15
**quicker** [2] - 45:9, 97:18
**quickly** [10] - 34:3, 34:24, 90:1, 90:15, 98:4, 98:6, 98:10, 98:11, 99:24, 118:8
**quite** [3] - 6:4, 57:20, 64:16
**quote** [1] - 24:20

## R

**raging** [1] - 16:9
**raise** [2] - 40:19, 40:23
**raising** [2] - 43:12, 43:18
**Ralph** [1] - 2:11
**ramification** [1] - 57:6
**ramifications** [12] - 13:11, 52:14, 52:24, 54:1, 55:13,

58:10, 59:2, 60:13, 61:10, 62:2, 62:16, 63:14
**ramps** [2] - 88:19, 89:2
**range** [1] - 15:5
**rapidly** [1] - 15:22
**rate** [3] - 16:11, 16:12, 16:13
**ravages** [1] - 26:21
**RDR** [2] - 2:19, 121:16
**reach** [2] - 46:5, 92:13
**react** [1] - 98:18
**read** [11] - 56:14, 68:14, 68:17, 90:24, 91:4, 91:7, 91:11, 91:17, 92:22, 101:10, 106:16
**readily** [1] - 33:14
**reading** [1] - 119:16
**ready** [5] - 14:12, 39:2, 88:12, 88:13, 88:16
**real** [4] - 25:17, 34:3, 34:24, 35:23
**reality** [6] - 25:10, 33:4, 36:4, 36:6, 36:9, 36:10
**really** [11] - 5:19, 6:1, 17:13, 23:16, 46:15, 63:6, 73:21, 94:18, 97:11, 99:24, 113:13
**rearranging** [1] - 105:6
**reason** [12] - 14:2, 39:23, 79:14, 95:8, 97:7, 97:21, 98:14, 99:5, 100:17, 104:8, 105:5, 115:3
**reasonable** [3] - 33:11, 34:4, 36:22
**reasonableness** [1] - 36:25
**reasonably** [2] - 26:12, 32:4, 38:18
**reasoned** [1] - 36:19
**reasons** [2] - 13:9, 99:14, 109:24
**reassigned** [1] - 20:11
**rebottle** [1] - 77:10
**rebottling** [1] - 76:24
**rebuilt** [1] - 26:4
**receive** [7] - 5:12, 31:23, 54:14, 74:17, 94:5, 117:21, 117:24
**received** [7] - 5:10, 6:24, 9:12, 10:20, 37:18, 107:23, 112:13
**receives** [1] - 11:5
**recent** [2] - 33:13, 95:25
**recently** [1] - 8:8
**recessed** [2] - 78:17, 121:4
**recognize** [2] - 56:4, 108:5
**recognized** [2] - 17:5, 99:8
**recommend** [2] - 63:22, 95:15
**recommendation** [8] - 66:8, 67:22, 94:12, 94:14, 94:15, 95:1, 95:6, 95:8

**recommendations** [4] - 36:21, 72:8, 73:23, 80:7
**recommended** [4] - 16:3, 55:17, 64:23, 80:8
**recommends** [1] - 74:19
**record** [7] - 6:10, 8:17, 54:6, 81:17, 121:10, 121:12, 121:13
**RECORDED** [1] - 1:24
**records** [8] - 5:9, 6:5, 6:7, 6:8, 6:10, 8:19, 8:22, 9:3
**recovered** [1] - 8:3
**recovery** [1] - 18:8
**recross** [1] - 120:14
**redirect** [1] - 120:13
**reduce** [2] - 97:23, 98:16
**reduced** [4] - 31:14, 97:7, 99:14, 100:17
**reducing** [2] - 18:9, 99:1
**referenced** [2] - 56:17, 78:8
**reflect** [1] - 51:16
**regard** [7] - 19:7, 20:20, 34:2, 65:20, 66:14, 77:24
**regarding** [16] - 8:19, 8:21, 8:22, 11:6, 11:10, 19:13, 20:5, 28:15, 29:23, 83:15, 95:12, 116:13, 117:21, 118:5, 118:21, 120:4
**regardless** [2] - 9:10, 10:17
**regional** [1] - 82:21
**regular** [1] - 98:7
**regularly** [1] - 61:7
**regulations** [1] - 15:17
**rehab** [1] - 22:4
**rejected** [1] - 63:20
**related** [14] - 11:11, 45:13, 46:21, 68:19, 70:4, 96:18, 96:23, 97:8, 98:4, 98:5, 99:22, 100:18, 106:2, 110:4
**relates** [13] - 52:21, 65:14, 67:19, 69:18, 73:23, 76:3, 78:6, 82:19, 82:23, 83:7, 83:11, 99:25
**relative** [1] - 33:19
**relaxed** [1] - 77:18
**relaxing** [1] - 33:17
**release** [8] - 58:15, 58:16, 115:17, 115:19, 115:23, 115:25, 116:9
**released** [3] - 7:6, 116:5, 116:8
**releasing** [1] - 115:24
**relevance** [2] - 86:8, 86:10
**relevant** [3] - 4:24, 12:7, 36:16
**relied** [4] - 26:24, 27:6, 27:11, 91:20
**relief** [1] - 16:23
**relocated** [1] - 85:19

**reluctant** [1] - 81:3
**rely** [8] - 26:11, 26:23, 74:17, 75:2, 75:3, 90:20, 91:23, 91:24
**remain** [1] - 34:6
**remainder** [2] - 58:18, 59:13, 60:22
**remains** [2] - 55:9, 97:12
**remedies** [6] - 16:9, 16:22, 17:9
**remember** [14] - 43:12, 43:15, 43:18, 45:20, 48:3, 78:25, 83:8, 83:20, 89:2, 95:20, 100:6, 100:23, 100:24, 106:16
**remind** [1] - 68:11
**remodeled** [1] - 84:8
**REMOTELY** [2] - 1:10, 1:24
**remotely** [1] - 5:11
**remove** [1] - 33:8
**repair** [1] - 81:14
**repeat** [4] - 44:16, 47:17, 50:18, 71:12
**repeated** [8] - 16:1, 70:14, 70:19, 71:6, 71:20, 72:3, 73:8, 81:23
**repeating** [1] - 68:12
**rephrase** [1] - 74:1
**report** [3] - 13:10, 72:2, 77:7
**reported** [1] - 110:7
**reporter** [4] - 23:23, 24:7, 24:9, 68:14
**REPORTER** [13] - 2:18, 4:12, 14:1, 14:7, 14:14, 23:15, 24:3, 24:11, 44:19, 52:4, 87:15, 98:21, 119:2
**reporting** [2] - 94:5, 116:14
**reports** [4] - 42:10, 71:10, 71:12, 91:11
**represent** [9] - 10:1, 53:9, 54:12, 55:15, 57:8, 58:12, 59:5, 60:16, 61:13
**represented** [2] - 9:17, 62:5
**representing** [1] - 11:3
**represents** [1] - 10:12
**reprioritize** [1] - 48:25
**repugnant** [1] - 24:21
**request** [6] - 4:8, 13:7, 32:9, 43:20, 57:3, 93:9
**requested** [5] - 13:3, 13:5, 60:17, 61:13, 96:9
**requesting** [1] - 22:6
**requestioned** [1] - 101:5
**require** [3] - 18:1, 57:17, 62:14
**required** [7] - 26:19, 59:8, 60:4, 83:3, 93:7, 96:3, 96:19
**requirement** [1] - 95:21
**requires** [4] - 18:21, 18:25,

56:1, 96:7
**requiring** [3] - 14:19, 59:7, 71:10
**research** [1] - 78:2
**residing** [1] - 70:25
**resolution** [5] - 18:8, 66:18, 95:11, 95:17, 95:19
**resolve** [4] - 46:3, 94:12, 95:24, 97:18
**resolves** [1] - 95:1
**respect** [1] - 74:7
**respectively** [1] - 87:25
**respects** [1] - 44:6
**respiratory** [1] - 18:10
**respond** [14] - 25:17, 26:12, 28:14, 28:18, 30:4, 93:7, 96:16, 98:5, 98:10, 98:16, 99:24, 102:2, 118:8, 118:14
**responded** [3] - 32:4, 99:7, 118:19
**responding** [1] - 90:21
**responds** [1] - 74:5
**response** [21] - 12:13, 23:10, 27:1, 27:12, 28:1, 28:7, 29:19, 29:24, 30:16, 31:25, 32:14, 34:4, 34:6, 37:23, 79:5, 83:16, 94:8, 96:8, 118:16, 119:6, 119:8
**responses** [1] - 29:1
**responsibility** [2] - 93:24, 94:23
**responsible** [4] - 20:3, 41:17, 42:12, 42:16
**responsive** [2] - 5:11, 9:21
**rest** [1] - 55:3
**restriction** [1] - 111:18
**restrictions** [2] - 21:12, 33:17, 77:19
**result** [5] - 25:7, 61:17, 117:22, 117:24, 118:1
**results** [5] - 18:6, 32:2, 50:16, 50:17, 50:19
**resumed** [1] - 78:18
**retest** [2] - 50:18, 51:2
**retested** [1] - 50:24
**retesting** [5] - 21:11, 48:20, 49:13, 49:24, 50:3
**retests** [1] - 11:18
**retroactively** [1] - 45:17
**revealing** [1] - 62:17
**review** [5] - 68:1, 83:10, 94:4, 104:4, 106:8
**revision** [1] - 28:2
**RICHARD** [1] - 1:4
**rights** [1] - 22:3
**ringing** [1] - 4:13
**risk** [24] - 14:22, 14:23, 15:8, 17:13, 17:18, 20:22, 21:23, 22:1, 26:12, 30:23, 31:21,

32:5, 42:22, 75:13, 75:19, 75:23, 76:11, 82:21, 89:14, 94:4, 103:13, 103:20, 103:24
**risks** [3] - 33:19, 34:1, 35:2
**Rivera** [1] - 40:18
**Roach** [4] - 76:23, 77:2, 77:6, 77:15
**Rob** [1] - 1:18
**Robert** [1] - 23:2
**ROBERT** [1] - 1:7
**roll** [2] - 57:2, 76:7
**rolling** [1] - 34:20, 76:8
**room** [1] - 25:20
**Room** [1] - 2:19
**roster** [2] - 86:11, 86:20
**roughly** [1] - 16:15
**round** [3] - 51:17, 71:17, 71:19
**Rule** [1] - 13:6
**rule** [8] - 13:6, 39:7, 39:9, 39:10, 39:17, 40:8, 40:9, 59:23
**ruled** [1] - 81:19
**rules** [1] - 4:16
**ruling** [8] - 56:25, 57:16, 58:8, 58:22, 59:18, 61:2, 61:21, 81:21
**run** [1] - 32:9
**running** [1] - 30:11
**Rusk** [1] - 2:19

---

**S**

**safeguards** [1] - 16:4
**safety** [1] - 42:4
**sanitizer** [50] - 21:9, 32:19, 32:21, 32:24, 32:25, 33:3, 33:7, 33:9, 33:12, 33:18, 34:2, 45:24, 46:2, 63:19, 63:20, 63:24, 63:25, 64:4, 64:7, 66:2, 67:15, 67:23, 68:6, 75:7, 75:9, 75:23, 76:11, 76:20, 76:24, 76:25, 77:3, 77:8, 77:16, 77:19, 77:24, 78:1, 78:3, 78:8, 78:10, 79:10, 79:13, 79:16, 79:18, 79:19, 79:20, 80:2, 80:4, 80:6, 80:11, 80:13
**sanitizers** [1] - 33:13
**Saturday** [2] - 5:24, 10:14
**save** [4] - 17:24, 22:5, 36:2, 36:17
**saved** [1] - 36:17
**saw** [2] - 112:15, 112:18
**scale** [1] - 52:23
**schedule** [4] - 4:10, 4:14, 4:15, 4:17
**scheduled** [3] - 38:8, 38:21, 115:23

**science** [2] - 73:17, 92:2
**Scofield** [1] - 1:17
**Scott** [1] - 2:5
**screen** [4] - 15:11, 22:19, 22:21, 112:13
**screening** [3] - 30:1, 30:2, 30:12
**scroll** [2] - 34:7, 35:3
**scrolling** [1] - 35:10
**seal** [3] - 87:17, 87:18, 87:21
**search** [1] - 6:5
**second** [6] - 17:16, 20:18, 24:11, 50:9, 87:6, 119:1
**secondly** [1] - 13:13
**seconds** [2] - 35:6, 79:7
**section** [3] - 22:3, 108:24, 109:5
**security** [6] - 18:17, 32:18, 32:24, 33:19, 80:5
**see** [44] - 7:16, 7:18, 14:2, 14:4, 14:5, 14:6, 22:15, 22:17, 22:23, 23:24, 46:5, 52:19, 65:4, 66:19, 73:3, 75:13, 77:23, 79:12, 80:10, 80:12, 86:21, 87:3, 88:2, 88:5, 95:2, 95:3, 100:24, 102:17, 108:21, 108:22, 109:2, 109:4, 109:5, 109:10, 109:21, 111:11, 111:12, 112:12, 112:20, 113:19, 115:10
**seeing** [2] - 22:21, 83:8
**sense** [4] - 16:3, 42:18, 49:25, 66:1
**sent** [4] - 5:22, 6:10, 38:4, 38:8
**separate** [5] - 46:12, 47:9, 50:25, 94:4, 95:10
**separation** [2] - 15:9, 15:15
**serious** [1] - 17:13
**served** [1] - 9:6
**serves** [1] - 92:11
**service** [1] - 18:1
**Services** [1] - 106:1
**services** [5] - 27:2, 28:10, 55:20, 55:23, 106:2
**SESSION** [1] - 1:12
**set** [5] - 28:25, 29:2, 29:6, 29:13, 65:24
**setting** [1] - 77:16
**seven** [4] - 38:2, 50:12, 51:1, 51:2, 51:4, 51:5
**seven-day** [2] - 50:12, 51:2
**several** [6] - 6:2, 10:8, 21:13, 43:7, 71:19, 110:22
**severe** [1] - 21:23
**share** [1] - 22:19
**Shawn** [5] - 2:10, 7:14, 12:18, 22:10, 23:1
**shawn.cowles@oag.texas.**

**gov** [1] - 2:15
**Shea** [1] - 2:12
**sheets** [1] - 116:17
**sheltered** [1] - 28:23
**shields** [1] - 31:4
**shifts** [1] - 19:19
**short** [2] - 15:8, 73:11
**shortness** [3] - 18:10, 18:16, 110:6
**show** [16] - 6:3, 16:18, 16:25, 17:11, 17:16, 17:18, 17:25, 29:5, 30:9, 32:8, 34:25, 36:22, 51:20, 51:22, 110:25, 120:2
**showed** [3] - 21:1, 51:14, 78:23
**shower** [2] - 32:10, 32:12
**showers** [1] - 20:12
**showing** [3] - 15:11, 87:23, 119:20
**shown** [4] - 28:17, 118:7, 118:13
**shows** [1] - 86:13
**sic)** [1] - 113:22
**sick** [2] - 98:11, 99:7
**side** [9] - 25:15, 25:16, 26:7, 26:8, 26:10, 91:5, 91:19, 91:24, 92:18
**sidetracked** [1] - 75:7
**sign** [2] - 79:2, 79:14
**signage** [2] - 60:17, 61:3
**significant** [2] - 13:9, 42:25
**significantly** [1] - 42:1
**signs** [11] - 30:17, 34:5, 46:14, 46:18, 46:21, 61:6, 78:23, 79:6, 79:11, 80:9, 80:12
**similar** [2] - 29:2, 84:25
**simpler** [1] - 46:23
**simplify** [1] - 6:2
**simply** [3] - 22:2, 52:9, 84:16
**Simultaneous** [1] - 119:4
**single** [1] - 113:20
**sink** [5] - 64:7, 64:13, 66:7, 79:24, 80:2
**sinks** [1] - 64:2
**sitting** [2] - 4:21, 13:20
**situation** [2] - 38:15, 97:14
**six** [7] - 16:14, 28:3, 59:7, 59:23, 78:2, 107:10, 107:14
**six-foot** [2] - 59:23, 107:14
**size** [2] - 20:23
**sleeping** [1] - 105:8
**slide** [2] - 18:22, 19:8
**slides** [2] - 14:10, 34:24
**slow** [6] - 97:9, 97:24, 98:2, 99:16, 99:18, 100:19
**small** [4] - 6:9, 63:25, 64:6,

66:2
**snapshot** [1] - 5:22
**soap** [28] - 20:8, 21:9, 32:5, 32:6, 32:8, 32:10, 33:14, 33:16, 33:20, 34:2, 35:6, 35:7, 53:10, 53:19, 53:20, 53:22, 53:23, 63:23, 63:24, 64:2, 79:9, 79:12, 79:16, 79:18, 79:21, 80:7, 80:11
**social** [33] - 14:19, 31:11, 31:15, 32:15, 58:17, 59:6, 59:11, 59:17, 59:22, 82:4, 82:9, 82:17, 82:19, 82:23, 83:2, 83:4, 83:9, 83:11, 85:18, 90:16, 103:9, 103:12, 103:18, 103:23, 104:11, 104:16, 104:21, 104:22, 105:3, 105:10, 115:17
**solution** [2] - 18:25, 94:6
**someone** [2] - 47:25, 112:4
**sometime** [4] - 57:21, 61:6, 83:23, 115:7
**sometimes** [2] - 72:22, 113:6
**somewhat** [1] - 44:13
**sooner** [1] - 118:18
**sorry** [21] - 4:12, 12:24, 14:1, 14:8, 24:7, 25:23, 26:1, 44:19, 47:17, 52:4, 59:20, 68:11, 75:21, 81:6, 90:17, 98:21, 103:16, 104:13, 110:17, 119:2
**sort** [1] - 5:23
**sought** [1] - 16:6
**sounds** [2] - 25:22, 25:25
**source** [1] - 109:6
**sources** [1] - 74:18
**SOUTHERN** [1] - 1:2
**space** [8] - 20:12, 60:8, 85:9, 88:8, 88:18, 88:20, 89:10, 90:7
**spaces** [3] - 59:23, 88:9, 88:10
**spark** [1] - 15:24
**speaking** [4] - 8:10, 44:19, 119:4
**specific** [42] - 6:6, 42:7, 43:16, 43:20, 45:11, 49:23, 59:25, 64:15, 65:4, 65:11, 65:13, 68:19, 69:15, 69:20, 69:23, 70:9, 70:19, 71:3, 75:22, 76:3, 76:5, 76:13, 82:19, 83:6, 83:25, 85:4, 89:1, 90:6, 90:17, 93:6, 95:20, 96:22, 96:24, 97:25, 102:3, 104:24, 105:23, 106:2, 115:11, 118:10, 118:17
**specifically** [33] - 45:7, 48:6, 52:20, 57:3, 62:22, 62:25,

66:15, 66:16, 67:1, 69:7, 70:15, 71:12, 72:5, 75:13, 77:4, 78:9, 84:18, 86:13, 87:10, 89:6, 89:11, 89:17, 91:14, 93:19, 93:23, 95:22, 105:10, 105:13, 105:14, 105:22, 108:6, 113:12, 114:9
**speculating** [2] - 67:5, 75:5
**speculation** [7] - 66:24, 67:4, 80:22, 81:5, 98:20, 98:24, 110:1
**spend** [1] - 4:22
**spent** [1] - 19:2
**spread** [10] - 15:22, 35:1, 43:13, 43:19, 46:8, 47:1, 47:11, 47:16, 47:20, 48:13
**spreading** [2] - 60:9, 85:7
**staff** [44] - 19:3, 20:14, 26:14, 26:18, 32:7, 41:23, 42:4, 42:7, 50:23, 51:7, 54:13, 61:4, 61:14, 61:25, 63:25, 64:6, 64:12, 64:16, 66:4, 76:25, 79:15, 79:17, 79:19, 79:20, 79:22, 79:23, 84:22, 89:23, 92:9, 93:7, 93:8, 96:1, 105:18, 105:24, 105:25, 107:7, 107:10, 109:1, 113:3, 114:1, 114:2, 115:13
**Stalder** [1] - 24:19
**stand** [5] - 72:24, 95:4, 100:25, 101:9, 103:4
**standard** [8] - 4:15, 21:17, 35:16, 35:22, 36:15, 36:25, 37:1
**stands** [1] - 102:1
**start** [16] - 5:2, 11:23, 12:8, 14:1, 20:22, 26:10, 33:2, 34:22, 37:16, 38:22, 44:1, 46:6, 105:19, 108:15, 121:1
**started** [5] - 4:5, 54:1, 71:13, 77:22, 106:19
**starting** [2] - 108:18, 108:25
**state** [8] - 16:11, 27:13, 28:10, 41:19, 71:14, 75:17, 77:25, 95:22
**statement** [1] - 12:15
**statements** [6] - 4:5, 12:9, 12:12, 13:1, 13:21, 13:23
**states** [10] - 5:12, 25:12, 75:5, 77:18, 77:23, 78:1, 78:2, 78:4, 78:5, 78:9
**STATES** [1] - 1:1
**States** [2] - 25:13, 37:2
**statewide** [1] - 29:20
**station** [1] - 64:10
**statistics** [1] - 15:4
**status** [1] - 49:2

**stay** [4] - 14:20, 16:7, 17:2, 30:11
**stayed** [1] - 9:14
**STENOGRAPHIC** [1] - 1:24
**Step** [3] - 96:16, 97:5, 97:6
**step** [14] - 30:5, 93:12, 93:25, 94:12, 94:24, 95:1, 95:11, 95:13, 96:3, 96:11, 97:2, 120:15
**steps** [3] - 69:10, 69:11, 117:22
**still** [11] - 5:18, 7:9, 18:15, 28:17, 50:18, 52:23, 86:22, 87:7, 88:18, 97:12, 102:1
**stipulate** [1] - 5:17
**stockpiles** [1] - 31:1
**Stone** [1] - 1:17
**stop** [3] - 35:5, 37:6, 116:2
**stopped** [1] - 116:3
**stories** [1] - 75:16
**STRAWN** [1] - 1:20
**Street** [2] - 1:20, 2:6
**stressed** [1] - 15:25
**strict** [1] - 59:6
**Strike** [10] - 29:7, 29:14, 48:23, 49:17, 49:18, 50:6, 50:8, 71:17, 71:19
**strike** [9] - 11:22, 11:24, 29:6, 29:12, 70:14, 71:4, 71:6, 71:13, 72:3
**study** [3] - 75:15, 76:3, 76:5
**subject** [4] - 4:22, 39:18, 40:7, 55:9
**submit** [2] - 36:24, 38:12
**submitted** [3] - 90:24, 91:8, 91:13
**subpart** [1] - 69:24
**subsequent** [1] - 28:3
**subsequently** [3] - 29:5, 30:2, 38:7
**substance** [4] - 12:5, 33:5, 63:4, 75:18
**substances** [1] - 45:7
**substantial** [1] - 17:13
**sufficient** [2] - 55:18, 55:19
**suitable** [2] - 60:6, 94:15
**Suite** [1] - 1:21
**summary** [2] - 4:11, 4:15
**sunday** [1] - 5:11
**supervised** [1] - 77:9
**supplement** [4] - 31:4, 69:22, 70:9, 95:6
**supplies** [4] - 20:10, 32:6, 35:8, 55:16
**supply** [1] - 33:13
**suppose** [2] - 46:4, 73:11
**supposed** [4] - 32:25, 105:16, 112:2, 113:1
**Supreme** [2] - 35:17, 37:2

**surely** [1] - 106:4
**surfaces** [2] - 18:24, 61:16
**surgeons** [2] - 36:2, 36:16
**surgeries** [2] - 35:24, 35:25
**surgery** [1] - 36:5
**survive** [1] - 21:9
**suspected** [1] - 19:1
**suspended** [1] - 28:21
**switch** [1] - 23:20
**sworn** [2] - 41:2, 91:13
**symptomatic** [3] - 18:16, 46:19, 46:20
**symptoms** [12] - 18:10, 18:11, 18:18, 35:5, 46:14, 46:18, 46:21, 60:20, 108:18, 108:25, 109:25, 110:4
**system** [16] - 21:3, 27:8, 41:18, 43:23, 46:16, 58:25, 66:3, 69:9, 69:18, 70:15, 70:23, 71:2, 71:16, 74:16, 84:25, 102:21

## T

**table** [1] - 31:13
**talks** [1] - 43:7
**TDCJ** [145] - 6:9, 6:12, 8:8, 8:22, 10:11, 10:21, 11:5, 11:10, 16:6, 16:12, 16:14, 16:25, 17:3, 17:5, 17:23, 18:4, 19:7, 19:10, 20:6, 20:14, 20:21, 21:15, 21:24, 21:25, 25:8, 25:13, 25:17, 25:21, 26:4, 26:10, 26:14, 26:17, 26:18, 26:23, 26:24, 26:25, 27:5, 27:10, 27:14, 27:16, 27:23, 28:1, 28:2, 28:4, 28:6, 28:8, 28:9, 28:12, 28:15, 28:19, 28:21, 28:25, 29:2, 29:6, 29:13, 29:15, 29:19, 29:21, 30:4, 30:9, 30:14, 30:25, 31:3, 31:5, 31:16, 32:1, 32:4, 32:5, 32:12, 32:14, 33:15, 33:25, 35:19, 36:17, 39:8, 40:5, 41:11, 41:15, 41:17, 42:5, 44:6, 45:9, 45:23, 46:10, 47:4, 47:15, 47:19, 48:11, 51:14, 51:23, 53:9, 53:18, 54:13, 55:16, 56:10, 56:14, 56:18, 57:9, 58:13, 58:23, 59:6, 60:17, 60:24, 61:3, 61:9, 61:15, 62:6, 62:10, 62:11, 62:12, 63:20, 63:22, 64:20, 65:3, 66:19, 69:1, 69:5, 69:6, 69:10, 69:12, 69:18, 70:4, 70:9, 71:14, 72:11, 74:5, 76:24, 80:16, 84:4, 93:2, 94:10,

96:1, 96:2, 97:7, 105:16,
106:4, 106:7, 106:21,
108:4, 113:6, 115:22,
118:7
**TDCJ's** [15] - 16:22, 23:9,
27:1, 27:4, 27:22, 29:11,
30:16, 33:13, 34:4, 35:14,
76:23, 83:16, 86:15, 95:12,
95:19
**teaching** [5] - 73:14, 74:14,
75:4, 91:20, 92:5
**team** [11] - 11:22, 11:24,
60:11, 74:16, 83:12, 89:24,
90:14, 91:22, 103:25,
104:10, 104:22
**Team** [10] - 29:7, 29:14,
48:23, 49:17, 49:18, 50:6,
50:8, 71:17, 71:19
**tech** [4] - 27:5, 27:10, 28:20,
92:2
**Tech** [1] - 28:13
**technical** [1] - 23:7
**Technical** [2] - 23:14, 44:12
**technological** [1] - 34:9
**technology** [3] - 13:14,
22:14, 23:20
**telephone** [1] - 121:12
**temp** [1] - 82:10
**temperature** [2] - 82:15, 83:5
**temperatures** [5] - 82:4,
82:7, 82:17, 82:24, 83:1
**temporary** [1] - 59:10
**ten** [2] - 18:3, 18:25
**Terao** [1] - 1:19
**test** [25] - 11:24, 11:25, 12:2,
25:3, 31:25, 32:2, 46:9,
50:14, 50:16, 50:22, 50:24,
50:25, 57:11, 58:3, 58:5,
61:17, 70:24, 71:15, 71:23,
117:21, 117:24, 117:25,
118:2, 118:3
**tested** [26] - 6:20, 7:3, 8:2,
10:2, 10:4, 10:7, 10:9,
11:20, 11:21, 11:25, 12:3,
12:4, 18:14, 25:5, 29:9,
31:6, 32:1, 36:7, 50:11,
70:21, 109:12, 111:19,
113:24, 114:17, 114:20,
115:5
**testified** [5] - 50:2, 52:10,
88:22, 119:24, 120:6
**testifying** [3] - 39:14, 47:5,
120:4
**testimony** [25] - 18:3, 19:24,
20:5, 40:4, 40:6, 40:10,
40:11, 44:9, 72:2, 75:25,
91:13, 91:16, 95:4, 100:23,
100:25, 101:10, 101:14,
101:15, 103:4, 119:16,
119:17, 119:18, 119:21,

119:23, 119:24
**testing** [48] - 11:22, 11:23,
16:1, 21:11, 29:7, 29:14,
46:7, 46:11, 46:16, 46:19,
46:20, 46:25, 47:7, 47:15,
47:19, 47:21, 47:22, 47:24,
48:2, 48:12, 48:23, 49:1,
49:17, 49:18, 49:22, 50:6,
50:8, 50:9, 50:21, 51:7,
51:17, 51:21, 52:14, 70:14,
70:20, 70:24, 71:5, 71:6,
71:11, 71:13, 71:18, 71:19,
71:20, 72:3, 72:5, 73:8,
73:13
**tests** [14] - 7:25, 10:1, 10:5,
11:16, 11:17, 11:24, 12:2,
47:23, 49:19, 61:14, 70:23,
71:14, 115:7
**TEXAS** [2] - 1:2, 1:8
**Texas** [24] - 1:7, 1:21, 2:6,
2:14, 2:20, 7:14, 14:25,
16:11, 20:20, 21:17, 22:11,
23:1, 23:2, 27:5, 27:10,
28:13, 28:20, 41:10, 41:18,
43:5, 43:23, 75:17, 92:2,
92:3
**THE** [196] - 1:11, 1:15, 2:3,
2:5, 2:9, 2:13, 3:3, 4:3,
4:10, 4:12, 4:14, 5:5, 6:19,
7:1, 7:5, 7:10, 7:12, 7:18,
8:6, 8:10, 8:13, 8:24, 10:6,
11:1, 11:14, 11:20, 12:5,
12:11, 12:14, 12:19, 12:23,
13:2, 13:8, 13:17, 13:19,
14:1, 14:5, 14:7, 14:13,
14:14, 17:21, 22:8, 22:13,
22:17, 22:23, 23:15, 23:18,
23:22, 24:1, 24:3, 24:11,
34:10, 34:14, 34:17, 37:8,
37:20, 37:24, 38:25, 39:5,
39:9, 39:12, 39:16, 39:23,
40:2, 40:7, 40:14, 40:17,
40:21, 40:22, 41:3, 44:15,
44:19, 44:21, 44:24, 47:3,
47:7, 52:4, 52:11, 52:12,
53:4, 53:16, 53:18, 54:7,
54:21, 54:25, 56:3, 56:4,
56:5, 56:7, 56:8, 56:9,
56:25, 57:1, 57:16, 57:17,
58:8, 58:9, 58:22, 58:23,
59:17, 59:18, 59:20, 61:2,
61:3, 61:21, 61:22, 62:22,
62:25, 63:8, 63:9, 63:16,
65:9, 65:11, 66:25, 67:1,
67:18, 68:10, 68:11, 68:18,
74:1, 74:9, 74:11, 76:1,
76:2, 76:17, 76:21, 78:15,
78:19, 78:21, 80:23, 81:6,
81:10, 81:23, 85:24, 86:2,
86:5, 86:7, 86:9, 86:15,

86:17, 87:14, 87:15, 87:18,
87:21, 88:24, 89:1, 89:20,
91:3, 91:4, 92:21, 92:22,
93:18, 93:19, 96:5, 96:6,
98:21, 98:25, 99:1, 99:10,
99:11, 101:3, 101:4,
104:19, 104:20, 107:19,
108:2, 110:2, 110:3,
110:12, 110:15, 110:17,
110:19, 111:4, 111:5,
115:1, 115:3, 115:21,
115:22, 117:8, 117:10,
117:13, 118:25, 119:2,
119:5, 119:7, 119:9,
119:11, 119:20, 120:1,
120:10, 120:12, 120:15,
120:17, 120:18, 120:23,
121:2
**themselves** [6] - 21:14,
30:24, 47:23, 60:18, 60:21,
96:2
**therefore** [2] - 26:17, 46:15
**they've** [5] - 19:4, 38:14,
67:22
**thinks** [1] - 54:21
**third** [1] - 29:11
**thoroughly** [1] - 18:25
**three** [11] - 4:18, 18:7, 18:11,
19:16, 27:8, 27:22, 38:16,
50:20, 51:8, 71:21, 99:20
**throughout** [9] - 35:24,
53:12, 55:7, 58:25, 60:12,
64:23, 70:21, 103:10
**Thursday** [2] - 5:21, 10:16
**timeline** [7] - 17:6, 108:18,
108:25, 109:6, 109:7,
111:11, 112:13
**tinder** [1] - 15:21
**tissues** [3] - 56:19, 57:4
**today** [5] - 25:7, 36:23,
73:17, 102:1, 120:4
**together** [2] - 15:15, 74:15
**toilet** [3] - 56:20, 57:2, 57:4
**took** [7] - 28:6, 45:20, 69:10,
83:18, 83:20, 83:21,
116:17
**top** [4] - 62:10, 72:11,
108:15, 108:16
**total** [4] - 6:19, 6:24, 8:1,
109:11
**touched** [1] - 18:24
**toward** [1] - 17:17
**towel** [1] - 53:24
**towels** [1] - 53:11
**tracing** [29] - 61:15, 61:23,
61:24, 105:15, 105:17,
105:24, 105:25, 106:6,
106:8, 106:22, 107:1,
107:9, 107:12, 108:4,
108:8, 109:6, 109:8, 111:5,

111:14, 111:22, 112:2,
113:2, 113:15, 113:17,
114:9, 114:11, 114:23,
117:20, 117:25
**track** [2] - 98:8, 115:25
**tracked** [1] - 96:24
**traffic** [1] - 30:22
**tragedy** [1] - 25:6
**transcribed** [1] - 119:12
**TRANSCRIPT** [2] - 1:10, 1:25
**transcript** [1] - 121:9
**TRANSCRIPTION** [1] - 1:25
**transferring** [1] - 116:5
**transfers** [1] - 30:15
**transmission** [1] - 60:20
**transmitted** [1] - 11:7
**transport** [1] - 58:16
**transportation** [3] - 58:13,
58:14, 58:24
**transported** [1] - 9:14
**treat** [1] - 20:19
**treatments** [2] - 112:14,
112:16
**trial** [13] - 4:17, 7:21, 13:15,
25:8, 25:15, 36:22, 38:11,
38:13, 38:16, 38:22, 44:1,
45:25, 63:6
**TRIAL** [1] - 1:12
**tried** [2] - 35:21, 115:11
**trigger** [1] - 117:22
**true** [3] - 9:18, 10:24, 26:7
**trust** [7] - 17:13, 25:21, 26:4,
80:15, 80:21, 81:13, 81:14
**trustee** [1] - 19:16
**trusting** [2] - 26:8, 26:10
**try** [4] - 46:17, 95:16, 95:23,
118:18
**trying** [8] - 12:17, 47:16,
47:20, 48:12, 73:3, 73:19,
73:21, 88:17
**turn** [1] - 5:4
**turned** [4] - 54:15, 83:19,
83:21, 83:23
**twice** [2] - 10:7, 10:9
**two** [38] - 12:25, 17:18, 18:9,
23:9, 23:11, 24:12, 25:5,
31:14, 33:6, 33:24, 34:20,
34:23, 35:19, 44:2, 46:20,
51:8, 52:12, 61:16, 61:24,
73:14, 74:14, 75:10, 87:24,
88:10, 91:20, 92:2, 93:10,
99:24, 108:18, 108:25,
109:16, 109:17, 109:22,
111:14, 111:20, 112:4,
112:23, 113:21
**two-week** [2] - 61:16, 61:24
**twofold** [1] - 32:24
**types** [1] - 6:2
**typically** [2] - 66:9, 116:20

# U

**ultimately** [6] - 42:16, 42:18, 62:14, 93:24, 94:11, 94:22
**unable** [1] - 37:12
**unconcerned** [2] - 23:13, 24:18
**under** [8] - 17:6, 17:12, 22:3, 31:9, 84:11, 87:17, 87:18, 87:21
**underlying** [2] - 9:24, 11:9
**understood** [8] - 42:19, 42:23, 43:1, 47:15, 47:19, 47:24, 48:11, 64:17
**undisputed** [2] - 23:5, 27:15
**unfair** [1] - 38:13
**unfortunate** [8] - 25:10, 26:1, 36:4, 36:6, 36:9, 36:10
**unfortunately** [5] - 16:5, 25:2, 33:6, 36:1, 37:11
**uninterested** [1] - 24:18
**uninterestedness** [1] - 23:12
**unique** [2] - 10:2, 97:20
**Unit** [152] - 5:15, 6:17, 7:24, 7:25, 8:17, 8:22, 9:13, 10:4, 11:11, 11:24, 14:22, 14:25, 15:7, 15:21, 16:9, 16:13, 18:14, 20:19, 20:21, 20:25, 21:3, 21:15, 21:20, 21:22, 22:1, 22:5, 25:2, 25:9, 25:13, 25:18, 26:13, 26:19, 26:22, 28:5, 28:9, 28:17, 28:22, 28:23, 29:9, 29:24, 29:25, 30:18, 30:22, 31:2, 31:9, 32:13, 33:4, 33:21, 34:2, 34:5, 34:6, 35:8, 36:6, 36:18, 41:21, 42:14, 42:17, 43:4, 43:10, 43:14, 43:19, 48:20, 49:13, 49:24, 50:9, 50:11, 50:20, 51:19, 52:1, 52:16, 53:9, 54:12, 55:15, 56:22, 57:8, 57:10, 57:19, 57:25, 58:4, 58:12, 58:13, 58:25, 59:5, 59:12, 60:1, 60:4, 60:16, 64:18, 65:5, 65:21, 66:1, 66:13, 66:22, 67:11, 67:14, 68:5, 69:15, 69:20, 69:23, 69:25, 70:1, 70:9, 70:11, 70:19, 71:21, 73:9, 75:8, 75:13, 75:14, 75:15, 75:16, 75:22, 76:3, 78:24, 79:6, 79:11, 82:19, 83:2, 83:9, 84:5, 84:7, 84:10, 85:5, 85:12, 85:15, 86:12, 87:8, 87:23, 88:8, 89:5, 89:9, 89:12, 90:6, 90:9, 93:16, 93:20, 94:1, 103:9, 103:15, 103:18, 104:3, 104:12, 104:16, 104:21, 104:23,
105:7, 105:10, 113:10, 113:11, 113:14, 114:20, 115:18
**unit** [19] - 21:20, 51:19, 60:4, 60:8, 66:5, 66:18, 69:25, 70:14, 77:9, 84:16, 90:10, 90:11, 95:7, 103:11, 104:2, 109:22, 111:21, 115:5, 115:6
**United** [2] - 25:13, 37:2
**UNITED** [1] - 1:1
**units** [12] - 18:23, 21:4, 30:15, 31:3, 45:9, 48:23, 69:1, 69:6, 70:15, 71:20, 116:4, 116:5
**universities** [7] - 46:20, 73:15, 74:14, 75:4, 91:20, 92:2, 92:5
**university** [6] - 27:4, 27:5, 28:20, 52:17, 72:7, 91:20
**University** [2] - 28:13, 92:3
**unless** [1] - 10:3
**unmute** [1] - 12:17
**unnecessary** [1] - 24:21
**unrestricted** [1] - 53:10
**unwritten** [3] - 106:7, 106:22, 107:9
**up** [45] - 13:14, 14:10, 22:19, 22:21, 24:5, 24:10, 28:25, 29:2, 29:6, 29:13, 31:12, 31:16, 31:22, 34:6, 34:12, 34:15, 34:20, 34:22, 35:4, 35:21, 39:1, 49:9, 55:3, 66:19, 71:22, 73:18, 79:2, 80:9, 85:22, 87:11, 88:24, 89:9, 94:16, 94:19, 95:25, 100:13, 102:8, 103:8, 103:17, 107:17, 108:14, 110:25, 114:19, 119:14, 119:18
**update** [3] - 7:11, 7:20, 10:10
**updates** [1] - 28:3
**urgent** [1] - 89:13
**US** [1] - 35:17
**useable** [1] - 84:13
**utilized** [1] - 84:13
**UTMB** [6] - 8:20, 9:4, 27:5, 27:10, 28:13, 28:20
**utmost** [1] - 42:5

# V

**vague** [6] - 73:25, 91:2, 93:17, 101:1, 104:18, 114:25
**Valentine** [2] - 18:2, 120:25
**VALENTINE** [1] - 1:4
**validated** [1] - 47:24
**vary** [1] - 64:16
**Vasquez** [20] - 2:10, 8:11,
8:13, 8:14, 11:1, 14:6, 22:9, 39:25, 44:22, 44:24, 86:2, 87:15, 107:21, 117:14, 117:15, 119:3, 119:5, 119:7, 119:9, 119:21
**VASQUEZ** [71] - 8:8, 8:12, 8:14, 9:2, 11:4, 11:19, 11:22, 12:10, 39:25, 40:3, 44:17, 44:22, 47:2, 52:2, 52:6, 53:14, 54:18, 55:25, 56:23, 57:14, 58:6, 58:20, 59:15, 60:25, 61:19, 62:20, 63:7, 65:7, 66:23, 67:16, 68:7, 73:25, 74:7, 75:24, 80:22, 81:5, 81:19, 86:1, 86:4, 86:6, 86:8, 86:10, 87:16, 88:21, 89:19, 91:2, 92:19, 93:17, 96:4, 98:19, 98:23, 99:9, 101:1, 104:18, 107:23, 108:1, 110:1, 110:10, 110:13, 111:2, 114:25, 115:2, 115:19, 117:6, 117:16, 117:18, 119:10, 119:22, 120:3, 120:9, 120:11
**vast** [2] - 15:6, 36:3
**verified** [1] - 9:13
**version** [3] - 5:22, 28:4, 73:1
**versus** [1] - 24:19
**via** [1] - 7:16
**video** [2] - 28:16, 121:12
**videos** [1] - 61:6
**view** [2] - 89:14, 89:25
**viewing** [1] - 14:2
**violation** [2] - 17:11, 46:1
**viral** [3] - 23:5, 24:25, 25:14
**virus** [1] - 15:22
**visit** [1] - 28:24
**visitation** [1] - 28:22
**visitor** [1] - 30:1
**visitors** [1] - 30:1
**voice** [1] - 10:20
**volume** [1] - 70:24
**VS** [1] - 1:6
**vulnerable** [1] - 15:3

# W

**Wade** [1] - 2:12
**waived** [1] - 61:8
**walker** [1] - 64:8
**walls** [2] - 15:9, 15:14
**wanton** [1] - 24:21
**wants** [1] - 9:3
**warden** [14] - 43:10, 44:25, 82:8, 94:6, 94:7, 94:14, 95:5, 103:20, 103:21, 103:22, 104:1, 105:3, 114:4
**Warden** [36] - 15:12, 43:7, 43:10, 43:12, 43:15, 43:18, 60:11, 82:6, 82:12, 82:20, 82:25, 83:3, 83:7, 83:9, 87:9, 88:4, 88:22, 89:8, 89:13, 89:16, 89:24, 90:15, 93:24, 103:8, 103:14, 103:17, 104:1, 104:2, 104:10, 104:15, 104:20, 104:24, 105:5, 112:7, 113:25, 114:8
**warden's** [4] - 94:11, 94:22, 94:25, 95:8
**wardens** [2] - 83:3, 103:11
**warnings** [1] - 16:6
**warns** [1] - 15:21
**wash** [3] - 33:20, 35:6, 79:6
**washing** [2] - 53:21, 79:23
**watch** [2] - 40:4, 40:6
**water** [13] - 33:14, 33:16, 33:20, 35:6, 63:23, 63:24, 79:9, 79:12, 79:16, 79:18, 79:21, 80:7, 80:11
**ways** [4] - 17:18, 39:11, 53:20, 64:24
**wear** [2] - 14:19, 19:4
**wearing** [3] - 15:18, 20:6, 114:3
**weather** [1] - 82:14
**website** [1] - 27:22
**week** [7] - 32:8, 50:9, 61:16, 61:24, 72:23, 87:6, 110:22
**weekend** [1] - 6:23
**weeks** [9] - 44:2, 48:3, 51:8, 71:7, 72:4, 109:17, 109:22, 111:20, 113:22
**weird** [1] - 6:13
**welcome** [1] - 4:3
**Werbner** [1] - 1:19
**wheelchair** [12] - 20:1, 20:3, 64:8, 64:13, 65:5, 65:25, 67:10, 76:6, 76:7, 76:12, 84:16, 88:19
**wheelchair-bound** [4] - 20:3, 65:25, 76:6, 76:7
**wheelchairs** [1] - 64:18
**wheels** [1] - 76:8
**whole** [3] - 86:21, 102:25, 116:15
**willfully** [1] - 24:17
**willing** [6] - 5:17, 6:4, 10:17, 10:22, 53:2, 53:16
**window** [6] - 31:17, 31:23, 61:23, 61:24, 96:7, 107:14
**WINSTON** [1] - 1:20
**wise** [1] - 66:6
**wishes** [1] - 56:6
**witness** [14] - 38:14, 39:5, 39:14, 40:5, 40:12, 41:1, 44:14, 117:12, 117:14,

117:15, 120:9, 120:10, 120:19, 120:25

**WITNESS** [43] - 40:21, 47:7, 52:12, 53:18, 54:25, 56:4, 56:7, 56:9, 57:1, 57:17, 58:9, 58:23, 59:17, 59:20, 61:3, 61:22, 62:25, 63:9, 65:11, 67:1, 67:18, 68:11, 68:18, 74:11, 76:2, 81:6, 89:1, 91:4, 92:22, 93:19, 96:6, 99:1, 99:11, 101:4, 104:20, 110:3, 110:17, 111:5, 115:3, 115:22, 117:10, 120:17, 120:23

**WITNESSES** [1] - 3:1

**witnesses** [3] - 39:8, 39:13

**wondering** [2] - 10:6, 10:7

**wording** [1] - 95:20

**words** [5] - 23:9, 23:11, 24:12, 33:24, 35:19

**works** [5] - 11:23, 66:20, 94:2, 94:9, 107:3

**world** [3] - 35:23, 35:24, 36:4

**worldwide** [1] - 36:11

**worry** [2] - 4:20, 13:19

**worse** [1] - 21:18

**worst** [1] - 21:14

**write** [1] - 69:7

**writing** [2] - 51:11, 72:17

**written** [6] - 83:8, 88:2, 105:16, 105:21, 105:23, 109:7

---

## Y

**year** [8] - 25:5, 30:7, 30:8, 35:25, 36:17, 47:14, 47:18, 83:14

**years** [1] - 92:4

**yesterday** [3] - 7:23, 8:9, 8:17

**young** [2] - 15:21, 15:25

---

## Z

**zero** [2] - 11:21, 109:7

**Zoom** [1] - 7:16

**zoom** [2] - 13:15, 25:7