**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LADDY CURTIS VALENTINE and | § | |
| RICHARD ELVIN KING, individually and | § | |
| on behalf of those similarly situated, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-01115 |
| | § | |
| BRYAN COLLIER, in his official capacity, | § | |
| ROBERT HERRERA, in his official capacity, | § | |
| And TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, | § | |
| Defendants. | § | |

---

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants Bryan Collier ("Collier"), Robert Herrera ("Herrera"), and the Texas

Department of Criminal Justice ("TDCJ") (collectively, "Defendants") submit the following

proposed findings of fact and conclusions of law.

### Plaintiffs' Claims and Procedural History

Plaintiffs filed this putative class action suit on March 30, 2020, alleging that Defendants

have failed to adequately protect them and other similarly situated inmates within the Pack Unit

who are at high risk for severe illness should they become exposed to COVID-19. ECF 1 at 1. While

Plaintiffs concede that Defendants have implemented policies in response to the COVID-19

pandemic, they contend that those policies are "woefully inadequate." *Id.* at 15, ¶ 31. Plaintiffs

contend that Defendants' failure to implement adequate policies to protect their health and ensure

their safety amounts to an Eighth Amendment violation. *Id.* at 28-29, ¶ 73-79. Plaintiffs also allege

Defendants have intentionally discriminated against them by denying them reasonable

accommodations recommended by the United States Center for Disease Control and Prevention ("CDC") in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). *Id.* at 29, ¶ 81. Plaintiffs seek injunctive and declaratory relief only. *Id.* at 24, ¶ 96-100.

On April 16, 2020, the Court entered a preliminary injunction order requiring Defendants to take specific actions Plaintiffs requested. ECF 40. On April 22, 2020, the Fifth Circuit stayed the Court's preliminary injunction order pending Defendants' appeal of the order. *See Valentine v. Collier*, 956 F.3d 797, 801–05 (5th Cir. 2020) ("*Valentine I*"). On June 5, 2020, the Fifth Circuit vacated the Court's preliminary injunction order, relying on its conclusion that TDCJ had substantially complied with the measures ordered by the Court. *See Valentine v. Collier*, 960 F.3d 707, 707 (5th Cir. 2020) ("*Valentine II*").

During the pendency of Defendants' appeal of the Court's preliminary injunction order, Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 53. On July 2, 2020, the Court denied Defendants' motion to dismiss. ECF 172. Plaintiffs also filed an emergency motion for class certification. ECF 94. On June 27, 2020, the Court granted Plaintiffs' motion for class certification and certified both a general class and a high-risk subclass. ECF 160. Defendants filed their motion for summary judgment on July 9, 2020, which the Court denied on August 3, 2020. ECF 213. On July 13, 2020, the case proceeded to an 18-day bench trial before this Court. On July 21, 2020—over a week after trial commenced, Plaintiffs filed an emergency motion to certify two additional subclasses: a disability subclass and a mobility-impaired subclass. ECF 248. The Court has not ruled on that motion. Pursuant to Federal Rule of Civil Procedure 52, the Court announces and adopts the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### The COVID-19 Pandemic

1.     Coronavirus disease 2019 ("COVID-19") is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

2.     Common symptoms of COVID-19 include, but are not limited to, fever, cough, fatigue, shortness of breath, and loss of smell and taste. While most cases of COVID-19 result in mild symptoms, other cases may progress to acute respiratory distress syndrome (ARDS), multi-organ failure, septic shock, and blood clots.

3.     COVID-19 is primarily spread between people during close contact, most often via small droplets produced by coughing, sneezing, and talking.

4.     COVID-19 was first identified in December 2019 in Wuhan, China, and it has resulted in an ongoing global pandemic.

5.     As of August 14, 2020, more than 20.9 million cases have been reported globally. Approximately 760,000 deaths have resulted.

6.     The first case of COVID-19 in the United States was confirmed in Washington State on January 21, 2020.

7.     There have been approximately 5.27 million reported cases of COVID-19 in the United States, resulting in approximately 167,000 deaths.

8.     There have been approximately 537,000 reported cases of COVID-19 in Texas, resulting in approximately 9,906 deaths. The first case of COVID-19 in Texas was confirmed on March 4, 2020.

9.      On March 13, 2020, Texas Governor Greg Abbott issued a disaster proclamation, certifying that COVID-19 posed an imminent threat of disaster for all counties in the State of Texas.

**TDCJ's Early Actions in Response to Threat of COVID-19**

10.     TDCJ began discussing how it planned to respond the to the threat of COVID-19 before the first case in Texas was confirmed and before Governor Abbott issued his disaster proclamation.

11.     On February 26, 2020, Dr. Lannette Linthicum, Director of the Health Services Division for TDCJ, attended a meeting of the Correctional Managed Health Care Committee ("CMHCC") partners to discuss planning and response to the coronavirus. [Defendants' Exhibit 15 at 2606-2609, 2646].

12.     Dr. Linthicum is TDCJ's representative on the CMHCC. [Tr. Trans. at 12—55:6-8].

13.     In late February through early March, Collier had discussions with Dr. Linthicum, TDCJ leadership, and TDCJ's university partners—the University of Texas Medical Branch ("UTMB") and Texas Tech University Health Sciences Center ("Texas Tech") regarding TDCJ's response to the threats posed by COVID-19. [Tr. Trans. at 9—185:12-186:14].

14.     In meetings with Dr. Linthicum and Lorie Davis, Director of TDCJ's Correctional Institutions Division, Collier discussed disinfecting units, employee screenings, and how they would limit employee travel. [Tr. Trans. at 9—185:12-16].

15.     On March 4, 2020, Collier attended a meeting with Dr. Linthicum and representatives from UTMB and Texas Tech to discuss TDCJ's response to COVID-19. [Tr. Trans. at 9—185:17-20].

16.     At the March 4 meeting, there was a discussion about steps that would need to be taken to isolate offenders, medical observation, disinfecting, protective equipment, employee screening, and visitation concerns. [Tr. Trans. at 9—185:20-24].

17.     On March 11, 2020, Collier attended another meeting with Dr. Linthicum and representatives from UTMB and Texas Tech to finalize their discussions on how to begin moving forward in response to COVID-19. [Tr. Trans. at 9—185:25-186:8].

18.     In the March 4 and 11 meetings, Collier considered what to do if community hospitals were not an option in the event TDCJ had a large number of inmates testing positive. [Tr. Trans. at 9—186:15-23].

19.     Collier relied on the medical experts from UTMB and Texas Tech in developing a response to COVID-19. [Tr. Trans. at 9—191:23-192:11].

20.     Around March 11, 2020, Collier communicated with the Texas Governor's office to request that in-person visitation be suspended at TDCJ units to limit the number of individuals coming to the facilities. [Tr. Trans. at 9—191:18-22; 195:11-13].

21.     During the March 4 and 11 meetings, there was discussion about using Dorms 17 and 19 that were under construction within the Pack Unit's expansion building or "E Wing" for special housing to move offenders from the Estelle Unit to the Pack Unit to free up space at the Estelle Unit to house offenders from Hospital Galveston in the event bed space at Hospital Galveston was needed to treat offenders who tested positive for COVID-19. In early March, the TDCJ Facilities Division expedited the construction of 17 and 19 Dorms so that space could be utilized. [Tr. Trans. at 3—64:1-5; 9—192:14-193:25].

22. Both 17 and 19 Dorms were ultimately utilized for offenders at the Pack Unit—not offenders from the Estelle Unit. [Tr. Trans. at 9—194:4-16].

23. On March 12, 2020, TDCJ produced a video that showed staff how to use personal protective equipment (PPE). Staff were the first focus for PPE because the threat of COVID-19 would most likely be coming from the outside community. [Defendants' Exhibit 25].

24. On March 13, 2020, all in-person visitation was suspended at all TDCJ facilities, including the Pack Unit. [Tr. Trans. at 9—195:14-17].

25. On March 16, 2020, TDCJ activated the Command Center located at the TDCJ Administrative Headquarters Building in Huntsville and began having daily conference calls with the wardens, regional parole staff, and all the division directors. The Command Center created a central focus point for the COVID-19 response. [Defendants' Exhibit 38; Tr. Trans. at 9—196:8-197:3].

26. Starting March 16, TDCJ began holding daily conference calls with the Texas Department of Emergency Management ("TDEM") and the Texas Department of State Health Services ("DSHS") to get statewide updates and to request resources and supplies if needed by TDCJ. [Tr. Trans. at 9—198:9-17].

27. On March 17, 2020, TDCJ requested, and the Texas Governor granted on March 20, 2020, a statutory waiver for all offender medical co-pays during the COVID-19 pandemic. [Defendants' Exhibit 28; Tr. Trans. at 9—203:13-204:18].

28. On March 24, 2020, TDCJ began manufacturing masks for its staff and inmate population. TDCJ issued masks first to staff and then prioritized mask distribution to offenders by

issuing masks first to offenders who were 65 years and older, then to the remaining offender population. [Tr. Trans. at 9—202:20-25; 9—203:18-24].

29.  Collier considered whether TDCJ should provide N95 or KN95 masks to its offender population rather than cotton masks. TDCJ consulted with an infectious disease doctor, Dr. Phillip Keiser, who advised that TDCJ should continue proving cotton masks for the offender population. [Tr. Trans. at 9—228:17-229:3; 9—230:7-231:1].

30.  TDCJ prioritized using limited facemask supplies initially to provide facemasks to offenders who were 65 years and older because they are at higher risk for experiencing serious complications from COVID-19. [Tr. Trans. at 9—209:10-19].

31.  The following is a non-exclusive list of the precautionary measures and steps implemented by TDCJ in response to COVID-19 prior to the adoption and implementation of Policy B-14.52 and before there was any indication of COVID-19 directly affecting TDCJ facilities:

- TDCJ requested, and the Texas Governor granted, a statutory waiver for all offender medical copays, which have been and continue to be waived [Defendants' Exhibit 28; Tr. Trans. at 9—203:13-204:18];

- TDCJ management asked staff to limit any unnecessary domestic travel, limited agency travel only to travel that was necessary, limited international travel, and instituted telework for employees on a case-by-case basis [ECF No. 213-12 at 5-9];

- TDCJ began screening employees for symptoms of COVID-19 around March 10-11, 2020 [Tr. Trans. at 9—191:3-7];

- TDCJ advised employees who felt ill or who were running a fever of 100.4 degrees or higher to stay at home, began implementing daily COVID-19 screenings for employees who worked in parts of the state in which the presence of COVID-19 had been confirmed, and required a physician's note stating that an employee who appeared to be ill was clear of any symptoms of COVID-19 as a condition of returning to work [ECF No. 213-12 at 5-9];

- Effective March 24, 2020, TDCJ minimized offender transfers between units; implemented dual temperature screenings for offenders prior to departure from one unit and upon arrival to another unit when transporting offenders; and enforced social distancing during offender transportations [ECF No. 213-12 at 5-9];

- TDCJ manufactured COVID-19 related signs, an offender pamphlet, and an offender pocket card. The informational pamphlet and pocket cards were distributed to offenders systemwide. Signs were posted in high traffic areas and other locations on each unit as determined by the unit warden [ECF No. 213-12 at 5-9];

- TDCJ inventoried its existing stock of PPE and began to acquire additional PPE for TDCJ units [Tr. Trans. at 9—201:20-202:25];

- TDCJ increased distribution of hand sanitizer for use by TDCJ employees at all TDCJ units, and in all divisions and departments [ECF No. 213-12 at 5-9];

- TDCJ began manufacturing cloth masks, and other PPE at TDCJ factories equipped to manufacture such PPE for use by TDCJ offenders and staff [Tr. Trans. at 9—201:20-202:25];

- TDCJ produces hand soap, which is issued to offenders in all facilities. Each unit was provided adequate supplies of hand soap for use by offenders and staff [ECF No. 213-12 at 5-9];

- TDCJ enhanced cleaning and disinfection of its facilities [Tr. Trans. at 9—191:3-7];

- TDCJ implemented social distancing measures as much as operationally possible in a correctional environment [Tr. Trans. at 9—239:3-5].

32.   On April 8, 2020, TDCJ requested that the Texas Governor suspend statutory intake requirements from county jails to limit potential exposure of COVID-19 to the TDCJ offender population from county jails and to limit inter-unit transfers. [Defendants' Exhibit 29; Tr. Trans. at 9—224:22-225:1].

33.   In early May 2020, Collier had discussions with DSHS about receiving an allotment of a drug called Remdesivir that is used to treat COVID-19. After consulting with Dr. Linthicum, Collier requested and received an allotment of Remdesivir to be used on COVID-19 positive offenders who are treated by UTMB at Hospital Galveston. [Tr. Trans. at 9—210:14-211:16].

**TDCJ's Continuing and Ongoing Efforts**

34.   TDCJ continues to rely on medical experts to inform in its response to COVID-19 and the protocols and procedures to be implemented at TDCJ facilities, including TDCJ's Health

Services Division, UTMB, and Texas Tech. TDCJ also relies on DSHS, TDEM, and the CDC guidelines. [Tr. Trans. at 10—64:7-65:4].

35.    Collier has focused his efforts toward responding to COVID-19 throughout TDCJ by listening, learning, and deploying effective measures throughout the pandemic. [Tr. Trans. at 10—68:5-9].

36.    In responding to COVID-19, TDCJ continues to adapt to evolving education, information, knowledge, and methods [Tr. Trans. at 10—69:23-70:22].

**The Development of CMHCC Policy B-14.52**

37.    On March 16, 2020, the CMHCC Joint Infection Control Subcommittee decided to create a freestanding policy that dealt specifically with COVID-19. This decision was made after reviewing two standing policies the CMHCC already had: the Influenza-Like Illness ("ILI") Policy (CMHC Infection Control Policy B-14.51) and the Standard Precaution Policy (CMHC Infection Control Policy B-14.20). [Tr. Trans. at 12—67:11-68:7].

38.    Dr. Stephanie Zepeda served as chair of the ad hoc work group created by the Joint Infection Control Subcommittee. Dr. Zepeda volunteered to head the ad hoc work group to draft a COVID-19 policy, and she has years of experience writing policies, procedures, and disease management guidelines for the offender healthcare system. [Tr. Trans. at 12—65:24-66:18].

39.    In formulating Policy B-14.52, the CMHCC's COVID-19 infection control policy, the CMHCC relied on medical experts from the CDC, its university medical providers (UTMB and Texas Tech), the National Institute of Health ("NIH"), and the Texas Department of State Health Services ("DSHS"). [Tr. Trans. at 12—68:8-69:13].

40. The top leaders in correctional managed care in the State of Texas were involved in the creation and subsequent revisions of Policy B-14.52. [Tr. Trans. at 12—60:1-15].

41. The goal in creating Policy B-14.52 was to take the scientific knowledge, national guidelines, and national standards and combine them into a document that is understandable for people within all levels of TDCJ—including all staff and the offender patient population. Policy B-14.52 was created with the goal of making it as simple as possible to follow, execute, and understand. [Tr. Trans. at 12—75:12-25].

42. Policy B-14.52 was created to apply to both medical staff and security staff. [Tr. Trans. at 12—76:3-9].

43. The CMHC joint medical directors (Dr. Linthicum, Dr. Owen Murray, and Dr. Denise Deshields) have the authority to approve revisions to Policy B-14.52. [Tr. Trans. at 12—83:25-84:3].

44. Dr. Zepeda and the ad hoc work group appointed by the Joint Infection Control Subcommittee used the CMHCC's ILI Policy (Policy B-14.51) as a starting point in the development of Policy B-14.52. The work group then combined guidance from the CDC and other medical authorities to formulate Policy B-14.52. [Tr. Trans. at 12—68:8-69:13].

45. Dr. Zepeda and the ad hoc work group considered creating a policy separate from Policy B-14.52 that would apply to an older offender population with comorbidities. However, a separate policy was ultimately not created because TDCJ's housing of similar offenders together already accounted for the CDC's recommendation of physically separating high-risk individuals to prevent the spread of COVID-19. [Defendant's Exhibits 8, 36; Tr. Trans. at 12—76:16-77:22].

**Policy B-14.52 and Similarities to CDC Guidelines**

46.     The first version of Policy B-14.52 took effect on March 20, 2020. This version of Policy B-14.52 was based on the CDC guidance available at the time of adoption on March 20, 2020. [Defendants' Exhibits 1, 8].

47.     The first version of Policy B-14.52 was submitted to the CMCH joint medical directors (Dr. Linthicum, Dr. Owen Murray of UTMB, and Dr. Denise DeShields of Texas Tech) for their approval on March 20, 2020, and it was approved. [Tr. Trans. at 12—83:25-84:8].

48.     Three days later, on March 23, 2020, the CDC published its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. This guidance is specifically intended for correctional and detention facilities, which includes state prisons. [Defendants' Exhibit 8].

49.     The second version of B-14.52 went into effect on March 27, 2020. This version incorporated the recommendations contained in the CDC's interim guidance for correctional and detention facilities. [Defendants' Exhibit 2].

50.     Each time the CDC updates its guidance related to COVID-19, Policy B-14.52 is updated to reflect those changes. [Tr. Trans. at 12—103:18-104:10; 12—86:6-23].

51.     Policy B-14.52 has been revised a total of seven times since it was first created on March 20, 2020. [Defendants' Exhibits 1-7, 36].

52.     The first version of Policy B-14.52 and all subsequent versions specifically address the vulnerability of offender populations with persons who 65 years of age or older or who have comorbidities. [Defendants' Exhibits 1-7, 36].

53.     Dr. Zepeda and the ad hoc work group relied on CDC guidance in determining whether to recommend providing hand sanitizer to offenders. The CDC guidelines explicitly provided that handwashing with soap and water was the preferred method, but that alcohol-based hand sanitizer could be used if soap and water were not available. [Tr. Trans. at 12—87:12-17].

54.     Policy B-14.52 is broken up into the following six sections that outline and explain in detail the following comprehensive measures: (1) infection control; (2) use of personal protective equipment; (3) testing; (4) reporting; (5) clinical management; and (6) dental management. [Defendants' Exhibit 36].

55.     Under the infection control section, Policy B-14.52 directs all units to implement the following, non-exclusive measures during a COVID-19 outbreak: (1) educate offenders on how COVID-19 is transmitted, signs and symptoms of COVID-19, treatment, and prevention of transmission; (2) remind staff and offenders of methods used to prevent the spread of respiratory virus; (3) practice social distancing where possible; (4) disinfect common areas and surfaces that are often touched with a 10% bleach solution; and (5) post visual alerts (signs and posters) at entrances, in the medical department, and other strategic places providing instruction on hand hygiene, cough hygiene, etiquette, and symptoms of COVID-19. [Defendants' Exhibit 36].

56.     Policy B-14.52 states that staff and offenders should be encouraged to wash their hands with soap and water for at least 20 seconds. If soap and water is unavailable, Policy B-14.52 states that hand sanitizer may be used by medical and security staff to cleanse hands. [Defendants' Exhibit 36].

57.     Policy B-14.52 recommends the use of cloth face coverings in settings where social distancing measures are difficult to maintain. [Defendants' Exhibit 36].

58.     Policy B-14.52 recommends that all units evaluate the need to minimize offender movement throughout the unit. [Defendants' Exhibit 36].

59.     Policy B-14.52 directs that offenders complaining of symptoms consistent with COVID-19 should be triaged as soon as possible. [Defendants' Exhibit 36].

60.     Policy B-14.52 states that offenders with suspected or confirmed COVID-19 cases should be placed in medical isolation. [Defendants' Exhibit 36].

61.     Policy B-14.52 states that offenders in medical isolation should be kept in medical isolation until at least 3 days (72 hours) have passed since recovery, defined as a resolution of fever without the use of fever-reducing medications and improvement in respiratory symptoms; and at least 14 days have passed since symptoms first appeared. [Defendants' Exhibit 36].

62.     Policy B-14.52 recommends that offenders be placed in medical restriction according to their COVID-19 risk exposure. [Defendants' Exhibit 36].

63.     Policy B-14.52 states that offenders should not be transported on a chain bus or multi-person vehicle except for medical emergencies. [Defendants' Exhibit 36].

64.     Policy B-14.52 states that employees who are sick should stay home and not report to work. It recommends that staff be allowed to return to work based on a symptom-based strategy or a test-based strategy. Under the symptom-based strategy, staff may return to work 10 days after symptom onset and 3 days (72 hours) after resolution of fever without the use of fever-reducing medications and improvement in respiratory symptoms. Under the test-based strategy, staff may return to work if they provide a negative COVID-19 test result

and a healthcare provider's note releasing the employee to return to work. [Defendants'
Exhibit 36].

65.     Policy B-14.52 directs that security staff screen all individuals entering the unit for COVID-
19 symptoms.  [Defendants' Exhibit 36].

66.     Regarding PPE, Policy B-14.52 states that offenders who are required to perform duties for
which staff would wear PPE should be provided the same PPE for the job, except they must
not have access to the waterless hand rub but must wash hands with soap and water instead.
[Defendants' Exhibit 36].

67.     Policy B-14.52 specifically cites to multiple CDC interim guidelines related to COVID-19,
including the interim guidance for correctional and detention facilities. Policy B-14.52 also
cites to the National Institutes of Health (NIH) and DSHS. [Defendants' Exhibit 36].

68.     CDC's interim guidance for correctional and detention facilities recommends providing
alcohol-based sanitizer only if soap and water is not available. [Defendants' Exhibit 8].

69.     Policy B-14.52 conforms with the CDC's interim guidance for correctional detention
facilities in all material respects. [Defendants' Exhibit 36].

70.     Any differences between Policy B-14.52 and the CDC guidelines are insubstantial.

**Implementation of Policy B-14.52 and Other Preventative Measures at the Pack Unit**

_**Pack Unit Logistics**_

71.     The Pack Unit currently houses approximately 1,100 offenders. Approximately 800 of
those offenders are over the age of 65. [Tr. Trans. at 3—52:25-53:2; ECF No. 213-15 at 3].

72.     There are 60 beds for wheelchair offenders in the main building of at the Pack Unit. Dorms
2 and 4 in the A-wing of the main building each have 30 beds for wheelchair offenders, and

additional beds in the expansion building can be used to house wheelchair offenders. [ECF No. 213-15 at 3].

73. The Pack Unit consists of 20 dorms inside the perimeter fences and three trusty camp dorms outside the perimeter fences. There are 16 dorms in the main building and four dorms in the expansion building. [Defendants' Exhibit 14].

74. Each dorm in the main building can house approximately 54 offenders, except for two wheelchair dorms that can house 30 offenders each. Two of the dorms in the expansion building have 48 beds each, which can also be used to house wheelchair offenders, and the other two dorms have 93 beds each. [Defendants' Exhibit 14; ECF No. 213-15 at 3].

75. Each of the three trusty camp dorms have a housing capacity of 107 offenders. [Defendants' Exhibit 14].

### *Policy B-14.52 Implemented at Pack Unit*

76. Upon the issuance of the updated version of Policy B-14.52 on March 27, 2020, TDCJ directed its unit personnel—including personnel at the Pack Unit—to put in place the operational requirements set out in the policy, including requirements for enhanced cleaning and sanitation protocols, signage, education, screening, use of PPE, and medical isolation or restriction for confirmed or potential exposures. [ECF No. 213-12 at 3].

77. Herrera has used Policy B-14.52 as a guide on what to implement at the Pack Unit since the policy's initial adoption on March 20, 2020. [Tr. Trans. at 3—198:16-21].

78. Herrera reads each new version of Policy B-14.52 when he receives it, and he directs his staff to read it as well. [Tr. Trans. at 3—236:15-22].

79.     TDCJ monitors compliance with Policy B-14.52 at each of its units, including the Pack Unit. Compliance is assessed through Davis and her leadership. Compliance is also assessed by TDCJ's Administrative Review and Risk Management Division. [Tr. Trans. at 9—238:11-239:11].

80.     More recently on June 24, 2020, TDCJ established compliance assessment teams to further ensure compliance with Policy B-14.52 at its units. [Tr. Trans. at 9—239:12-20].

### *Precautions Implemented at the Pack Unit in Early-to-Mid March*

81.     The Pack Unit was instituting precautions to protect inmates from the potential dangers of COVID-19 even before Governor Abbott issued his disaster declaration on March 13, and before the creation of Policy B-14.52. [Tr. Trans. at 4—56:1-25].

82.     When COVID-19 first began, the Pack Unit started social distancing, increasing cleaning, verbally educating offenders and staff, and making sure that the unit had plenty of soap and water available for the offenders. [Tr. Trans. at 3—88:11-16; 4—11:1-5].

83.     Since March 13, 2020, social distancing measures were implemented in areas such as the hallways, recreation yards, pill window, commissary line, and the dining hall. [Defendants' Exhibits 30, 35; ECF No. 213-15 at 7].

84.     The dining hall was limited to two dorms eating at one time on opposite sides of the dining hall. [Defendants' Exhibit 30; Tr. Trans. at 3—249:2-14].

85.     Feeding only two dorms at one time caused meal serving times to extend from approximately 2 hours per meal to feed the Unit (before the pandemic) to taking 4 to 5 hours to serve each meal. [Tr. Trans. at 3—248:21-249:14].

86.   Social distancing was also implemented at the recreation yard. Before the Pack Unit went on precautionary lockdown on April 14, 2020, only two dorms were permitted to go to the recreation yard at a time. Recreation was discontinued after the precautionary lockdown. [Defendants' Exhibit 30].

87.   Sports equipment, such as basketballs, volleyballs, and handballs were removed from the recreation yard to eliminate potential transmission of COVID-19 and to prevent offenders from being in close proximity to one another. [Defendants' Exhibit 30].

88.   A written social distancing plan was developed for the Pack Unit around March 22. Assistant Warden Paul Wilder ("Wilder") drafted the social distancing plan and received input from Major Dana Sullivan ("Sullivan"). [Defendants' Exhibit 35; Tr. Trans. at 10—225:21-226:8].

89.   The social distancing plan was in effect at the Pack Unit until the unit went on precautionary lockdown on April 14, 2020. [Tr. Trans. at 10—227:4-9].

### *Masks*

90.   The Pack Unit prioritized its more vulnerable population by using limited supplies of masks first for offenders 65 years of age or older on April 14, 2020. [Tr. Trans. at 9—208:24-25].

91.   All offenders under the age of 65 at the Pack Unit received masks the next day, April 15, 2020. [Tr. Trans. at 9—209:1-3].

### *Social Distancing*

92.   "Strict social distancing"—requiring 6 feet of space between offenders at all times—is not feasible in all areas of the Pack Unit. [ECF No. 213-15 at 8].

93.     The dorms at the Pack Unit cannot be altered to accomplish strict social distancing because the dorm cubicles are bolted to the ground and cannot be moved. Moreover, even if the dorm cubicles could be moved, the physical layout of the dorms would not allow the cubicles to be spread out any more. [Defendants' Exhibit 13].

94.     The gymnasium cannot be used as alternate living quarters because it is not air conditioned. [Tr. Trans. at 4—58:4-10].

95.     Although strict social distancing is not always possible, the Pack Unit has attempted to space offenders out in dorms within reason where feasible. Because offenders have been housed as cohorts of like offenders in each of the dorms, Policy B-14.52 does not require strict social distancing within each cohort [Defendants' Exhibit 36 at 38968; Tr. Trans. at 3—106:6-9].

96.     The Pack Unit repurposed its education building as an overflow dormitory to create extra space throughout the unit. The education building currently houses offenders who return from free-world hospitals, so they can complete their 14-day quarantine period before returning to the general population. [Tr. Trans. at 3—186:8-14; 3—223:5-23].

### *Offender Education Regarding COVID-19 at the Pack Unit*

97.     Several signs and posters have been displayed throughout the Pack Unit to educate and remind offenders to look out for symptoms of COVID-19. The signs and posters remind offenders to wash their hands frequently, and to clean and disinfect their living areas frequently. [Defendants' Exhibits 10, 30; Tr. Trans. at 3—241:3-8].

98.    Specifically, the Pack Unit has posted the CDC poster, "Stop Germs! Wash Your Hands" in the main hallways, in high traffic areas between the commissary and infirmary, and the front office. [Defendants' Exhibits 10, 30].

99.    A TDCJ pamphlet entitled "COVID—What to do" has been posted throughout the main building at the Pack Unit, the expansion building, the trusty camp, and by all sinks. This pamphlet has been provided to every offender, and offenders have also received this information in the form of a pocket card to carry with them. [Defendants' Exhibits 10, 30].

100.   TDCJ has posted a sign that reads, "How are you feeling? Cough, fever, shortness of breath. Contact your supervisor" throughout the main building, the expansion building, and in the trusty camp dorms. [Defendants' Exhibits 10, 30].

101.   Correctional employees at the Pack Unit have been talking to offenders and answering questions about COVID-19 during count checks and daily rounds in each dorm. [Defendants' Exhibit 30].

102.   Medical staff from the Pack Unit infirmary have been talking with offenders and answering questions about COVID-19 when conducting daily temperature checks and well checks. [Defendants' Exhibit 30; Defendants' Exhibit 40].

103.   TDCJ produced a video about COVID-19 that is being shown to Pack Unit offenders via the televisions in the dayrooms of each dorm—which have been turned to face the cubicles—so offenders may watch the educational video, news, and other programming. [Defendants' Exhibits 9, 30; Tr. Trans. at 3—243:4-11].

104.   The educational video describes the symptoms of COVID-19 and how to prevent the spread of COVID-19 by washing your hands frequently with soap and water. [Defendants' Exhibit 9].

105.   The video also explains the importance of wearing a mask and maintaining separation or social distance between oneself and others to avoid spreading the virus. [Defendants' Exhibit 9].

106.   The educational video is shown 3 times per day in each dorm of the Pack Unit. [Defendants' Exhibit 30].

107.   Herrera has not had any issues or complaints from the offenders about not being able to see or hear the educational video. [Tr. Trans. at 3—245:8-14].

108.   Pack Unit officials are also making announcements twice per week that medical co-pays have been waived and offenders may request a sick call with no charge. These announcements are made in English and Spanish. [Defendants' Exhibit 30].

### *Hygiene and Hand Washing at the Pack Unit*

109.   Each offender at the Pack Unit receives 5 bars of soap per week and may request additional soap at any time at no cost. [Defendants' Exhibit 30].

110.   Unlimited soap has been provided at no cost to offenders at the Pack Unit since early April. [Defendants' Exhibit 30].

111.   During the precautionary lockdown, offenders have access to sinks and water to wash their hands in each of the dorms throughout the Pack Unit. [Tr. Trans. at 4—99:6-10; 4—100:12-14].

112.   Offenders also have access to sinks, soap, and water to wash their hands in the laundry exchange area and the shower area of the Pack Unit. [Defendants' Exhibit 54; Tr. Trans. at 11—48:1-50:16].

113.   TDCJ has also installed portable sinks and provided soap and water at various locations throughout the Pack Unit for staff to wash their hands [Tr. Trans. at 10—66:14-67:19].

114.   TDCJ does not allow offenders to possess alcohol-based hand sanitizer because it is a security concern. [Tr. Trans. at 1—80:4-8].

115.   In accordance with the CDC Guidelines for Correctional and Detention Facilities, TDCJ considered providing offenders with alcohol-based hand sanitizer. TDCJ ultimately chose not to issue hand sanitizer to offenders due to its alcohol content and flammability. [Tr. Trans. at 10—17:2-21:9].

116.   Collier relied on conversations he had with TDCJ leadership and other states' prison directors, as well as his knowledge of incidents in which offenders became ill after ingesting alcohol-based hand sanitizer, when deciding not to allow TDCJ offenders access to alcohol-based hand sanitizer. [Tr. Trans. at 9—237:13-238:6].

117.   In its interim guidance for correctional and detention facilities effective March 23, 2020, the CDC recommends cleaning hands with an alcohol-based hand sanitizer only if soap and water are not available and where security concerns allow. [Defendants' Exhibit 8 at 8].

118.   Soap and water are readily available to all offenders at the Pack Unit, including wheelchair offenders, at the Pack Unit. [Tr. Trans. at 10—18:7-10].

119.    Wheelchair offenders at the Pack Unit may also where gloves they have purchased or have been issued when grasping the rails of their wheelchairs to move themselves from place to place. [Tr. Trans. at 2—185:9-19]

120.    The CDC recommends frequent handwashing as the preferred method of hand sanitation over alcohol-based hand sanitizer. The CDC does not have a different hygiene recommendation for wheelchair offenders. [Defendant's Exhibit 8; Tr. Trans. at 12—87:12-17; 12—228:1-5; 9—56:20-57:3].

### *Precautionary Lockdown*

121.    The Pack Unit went on precautionary lockdown on April 13, 2020, after the unit was notified of its first positive COVID-19 case. The unit remained on precautionary lockdown throughout the time of trial. [Tr. Trans. at 3—247:24-248:2].

122.    During precautionary lockdown, substantially all offender movement has stopped. The only offender movement permitted is for medical emergencies, scheduled showers, and when offenders go the recreation yard during application of VitalOxide, a disinfectant that is applied in the Pack Unit dorms with an electrostatic sprayer. Otherwise, offenders remain in their housing areas during precautionary lockdown. [Tr. Trans. at 3—186:15-187:1; 248:12-20].

123.    The following non-exclusive measures have also been taken at the Pack Unit as a result of being on precautionary lockdown since April 14, 2020:

- Offenders do not eat at the dining hall. Instead, they eat each meal in their housing area;

- Showers are offered to offenders daily, where they receive a clean bath towel for each shower; and

- Offenders no longer wait in line to receive their medications at the pill window. Instead, medical staff have increased the number of keep on person (KOP) medications and deliver all remaining medications to the offenders in their housing areas.

[Tr. Trans. at 3—249:15-250:25].

### *Cleaning and Sanitation at the Pack Unit*

124. There is at least one offender janitor ("SSI," which is an acronym for Support Service Inmate) assigned to each common area, including each dorm. [Defendants' Exhibit 30; Tr. Trans. at 11—64:5-7].

125. SSIs work 12-hour shifts, where they clean continuously and are permitted to take breaks. [Defendants' Exhibit 30].

126. Each SSI receives a pair of wrist-length vinyl gloves at the start of his shift. [Defendants' Exhibit 30].

127. If the vinyl gloves become damaged or torn, an SSI may request another pair at any time during his shift by notifying a correctional officer or the Pack Unit property officer. [Defendants' Exhibit 30].

128. During precautionary lockdown, the Pack Unit property officer provides cleaning materials to the SSIs in each dorm at the start of each shift. [Tr. Trans. at 4—48:16-22].

129.   SSIs at the Pack Unit receive a mop bucket with a bleach pod that is dissolved in a small amount of water, which is then filled with water by the SSI's to use throughout their shift. [Tr. Trans. at 2—24:19-24; Defendants' Exhibit 40].

130.   Each SSI receives two spray bottles, one containing two ounces of a product called Bippy, which is similar to the commercial product Comet, and one containing two ounces of a product called "Double D," which is similar to the commercial product Pine Sol, and the SSI then fills each spray bottle with water, so the chemicals are diluted to the required concentration. [Defendants' Exhibit 40; Tr. Trans. at 2—24:19-24].

131.   In response to the COVID-19 pandemic, the Pack Unit also provided a 1.5-gallon sprayer filled with 8 ounces of powdered bleached dissolved in a small amount of water that the SSI fills with water to use during his shift. [Defendants' Exhibit 40].

132.   The Pack Unit property officer makes rounds during each shift to determine if SSIs need more cleaning materials. If an SSI runs out of cleaning materials, the SSI may request more at any time during his shift by notifying a correctional officer of the Pack Unit property officer. [Defendants' Exhibit 40].

133.   SSI supervisors have been instructed to make sure the SSIs have enough chemicals on hand. If an SSI runs out of chemicals, supervisors are instructed to make more chemicals available. [Tr. Trans. at 4—49:1-6].

134.   When Herrera does walk-arounds at the Pack Unit, he has asked if the SSIs have issues obtaining more chemicals if they run out. He has been assured that the SSIs have no issues obtaining additional chemicals. [Tr. Trans. at 4—49:17-50:2].

135.   The SSIs clean commonly touched surfaces in the common areas, such as sinks, toilets, toilet handles, showers, door handles, benches, telephones, and tabletops. [Defendants' Exhibit 30].

136.   In the dorms, each offender may clean his own personal housing area, or cubicle, with a bleach-based cleaning solution. Additionally, there is a spray bottle of disinfectant cleaner available for offenders to use if they wish to clean their housing area more frequently. [Defendants' Exhibit 30].

137.   At least one Pack Unit offender, Jon Reynolds, testified that he was able to keep his cubicle clean and was able to ask for more bleach if needed to properly sanitize his cubicle. [Tr. Trans. at 3—37:2-7].

138.   Correctional officers assigned to each area of the Pack Unit monitor and observe the janitors' cleaning to ensure that cleaning is happening on a consistent basis throughout each janitor's shift. [ECF No. 213-5 at 4].

139.   To further disinfect their facilities, TDCJ requested and received from TDEM VitalOxide—a disinfectant cleaner that eliminates SARS-CoV (COVID-19). TDCJ initially received 30 barrels of VitalOxide from TDEM. TDCJ has since begun purchasing VitalOxide directly from the factory that manufactures it. [Defendants' Exhibit 44 at 39168; Tr. Trans. at 10—51:14-56:22].

140.   VitalOxide is being used at the Pack Unit for disinfection. It is emitted through an electrostatic sprayer, and it is sprayed on Mondays, Wednesdays, and Fridays. [Tr. Trans. at 3—186:15-187:1].

141.   The Pack Unit first received VitalOxide on July 3, 2020. The VitalOxide is sprayed throughout the entirety of the Pack Unit. This includes all dormitories, common areas, offices, and other areas like the infirmary, food service department, laundry, gymnasium, and the trusty camp. It is also sprayed in the showers. [Tr. Trans. at 3—218:8-219:16].

### *Mass/Strike Team Testing at the Pack Unit*

142.   TDCJ Coordinated with the Texas Department of Emergency Management ("TDEM") to obtain test kits and perform COVID-19 "mass testing" of the offender population and TDCJ staff at the Pack Unit. [Tr. Trans. at 10—26:18-27:23].

143.   COVID-19 tests did not become widely available un the United States until the end of April to early May of 2020 [Tr. Trans. at 9—40:18-42:8].

144.   Collier had conversations with UTMB as another potential source for mass tests. However, UTMB could not handle the volume of testing TDCJ is performing. [Tr. Trans. at 10—31:5-10].

145.   At the beginning of May, TDCJ obtained Curative oral swab tests from TDEM to use for Strike Team Testing after the State of Texas signed a contract for $45 million to purchase these tests. [Tr. Trans. at 10—26:18-27:23].

146.   Collier first began discussing mass testing with Nim Kidd from TDEM on May 2, 2020. Mr. Kidd advised Collier that TDEM had 300,000 Curative tests and asked if TDCJ would be interested in using the tests. Collier advised that TDCJ was interested. [Tr. Trans. at 10—26:18-25].

147.   On May 9, 2020, following a meeting with TDEM and Curative, Collier had a second discussion with Kidd and advised that TDCJ was interested in using the Curative tests to

perform asymptomatic COVID-19 testing within their facilities. [Tr. Trans. at 10—26:25-27:9].

148.   After obtaining the Curative tests from TDEM, TDCJ created Strike Teams, led by TDCJ wardens, to conduct the asymptomatic testing at TDCJ's facilities. The teams were created on May 9, 2020. The team members were trained on how to administer the test on May 10, 2020, and they were tested on May 11, 2020. They began mass testing that same week. [Tr. Trans. at 27—15:23].

149.   The selection of the Curative tests went through the Texas Department of State Health Services, who vetted the test. Dr. Alex Lazar from University of Texas at MD Anderson signed off on the test to be used for asymptomatic persons. [Tr. Trans. at 10—27:24-28:17].

150.   As of July 24, 2020, Curative had only two labs—one in Washington D.C. and the other in Los Angeles, California. TDCJ sends their tests to the Los Angeles lab. When testing is conducted at a facility, the tests are overnighted to Los Angeles for processing. TDCJ then gets results back electronically. [Tr. Trans. at 10—29:1-17].

151.   Collier is not aware that there is anything wrong with the Curative tests. He has had conversations about the Curative tests with DSHS's assistant commissioner for testing and infection control. Collier is also aware that the State Department of Healthcare Services is utilizing the Curative tests, as well as the United States Air Force, the State of Delaware, and Los Angeles County. [Tr. Trans. at 10—29:18-30:12].

152.   While it is true that the Curative tests are not FDA-approved, there are no COVID-19 tests that are FDA-approved. Rather, approximately 85 tests have received an emergency use

28

authorization (EUA). These authorizations were issued to expand the number and type of patients who would be eligible for testing nationwide. [Tr. Trans. at 9—41:22-42:18].

153.   Despite Dr. Jeremy Young's criticism of TDCJ for using Curative tests because they are not approved for testing of asymptomatic persons, there are no EUA tests that were created to test asymptomatic persons. [Tr. Trans. at 9—43:25-44:7].

154.   As of July 24, 2020, TDCJ has received over 200,000 Curative tests. [Tr. Trans. at 10—34:13-15].

155.   Strike Team testing focuses on both offenders and staff who have either never been tested or have not tested positive in the past. [Tr. Trans. at 10—36:20-22].

156.   Testing of asymptomatic persons through Strike Team testing is not required by and TDCJ policy, including Policy B-14.52. Rather, it was a proactive measure taken to find out where COVID-19 may exist throughout TDCJ's facilities. [Tr. Trans. at 10—36:23-37:8].

157.   TDCJ prioritized units housed with vulnerable inmates for asymptomatic Strike Team Testing, which included the Pack Unit. [Defendants' Exhibit 43; Tr. Trans. at 10—37:10-15; 10—40:1-43:25].

158.   The first round of Strike Team Testing at the Pack Unit was conducted on May 12-14, 2020. 1,492 tests were administered: all 1,179 offenders were tested and 313 employees were tested. [Tr. Trans. at 4—30:16-19].

159.   Between March 17, 2020 and May 26, 2020, in addition to the Strike Team Testing by TDCJ at the Pack Unit, 216 COVID-19 tests were ordered by healthcare providers, including UTMB, local hospitals, and local physicians, for offenders assigned to the Pack Unit and employees who work at the Pack Unit. [Defendants' Exhibit 40].

160.   Prior to the mass testing of asymptomatic offenders, the Pack Unit had developed a "20% Plan" to provide guidance and identify the steps to be taken in the event 20 percent of its offender and staff population tested positive for COVID-19. This plan was drafted by Assistant Warden Wilder with input from Major Sullivan and Brittney Tilley, the chief of classification at the Pack Unit. [Defendants' Exhibit 31; Tr. Trans. at 11—73:22-74:15].

161.   All offenders at the Pack Unit who tested positive as a result of the mass/strike team testing were placed in medical isolation, pursuant to Policy B-14.52. [Defendants' Exhibit 31].

162.   Medical isolation is for persons who are sick and contagious and for those who are suspected to have COVID-19. It is used to separate ill persons who have a communicable disease from those who are healthy. [Defendants' Exhibit 36 at 38968].

163.   When TDCJ began receiving results of the mass/strike team testing on May 19, 2020, it relocated and re-assigned offenders to particular housing areas within the unit based on the test results. [Tr. Trans. at 11—72:10-73:11].

164.   Due to a concentration of offenders assigned to dorms in D-Wing who received a positive test result, Pack Unit officials designated the four dorms in D-Wing—Dorms 13, 14, 15, and 16—as COVID-19 medical isolation housing for offenders who received a positive test result. [Defendants' Exhibit 31; Tr. Trans. at 11—75:10-76:2].

165.   Before the Strike Team Testing on May 12-14, offenders at the Pack Unit who had tested positive for COVID-19 were housed as a cohort in Dorm 17 and placed on medical restriction in accordance with Policy B-14.52. Offenders who were awaiting their test results were housed in Dorm 19 and placed on medical restriction in accordance with Policy B-14.52 [Defendants' Exhibit 40].

166.    Medical restriction is used to separate and restrict the movement of well persons who may have been exposed to a communicable disease to see if they become ill. These persons may have been exposed to a disease and do not know it, or they may have the disease but do not show symptoms. [Defendants' Exhibit 36 at 38968].

167.    After the Strike Team Testing, offenders in Dorm 17 who had previously tested positive were relocated and housed in D-Wing with other offenders who received positive test results from the Strike Team Testing. All offenders who were assigned to Dorm 19 and received a positive test result were also relocated and housed in D-Wing. [Defendants' Exhibit 31; Defendants' Exhibit 40].

168.    Dorms 18, 19, and 20 were designated for offenders who received a "negative" test result. [Defendants' Exhibit 31].

169.    Dorm 17 was designated for wheelchair-bound offenders who received a negative rest result and for overflow for offenders who received a negative result or were awaiting test results. [Defendants' Exhibits 31, 40].

170.    As part of the Pack Unit's 20 percent plan, there was a plan to utilize Dorm 2 for positive wheelchair offenders if more than 3-5 "positive" wheelchair beds were needed. That plan, however, was never implemented because no more than 3-5 positive wheelchair beds were ever needed. Therefore, Dorm 2 has never been used to house positive wheelchair offenders. [Defendants' Exhibit 31 at 3069-3070; Tr. Trans. at 12—38:25-39:17].

171.    There are 29 single cells in restrictive housing at the Pack Unit. [Defendants' Exhibit 31].

172.   Offenders who are housed in restrictive housing are grouped into positive and negative offender groups and housed with at least one buffer cell between the two groups. [Defendants' Exhibit 31].

173.   Offenders who return to the Pack Unit after a hospital visit are being quarantined for 14 days in the unit's education wing, which is air-conditioned. There are 30 beds available in the education building. [Defendants' Exhibit 31; Tr. Trans. at 11—56:14-21].

174.   TDCJ officials conducted a second round of Strike Team Testing at the Pack Unit on June 23-25, 2020. [Tr. Trans. at 3—200:4-8].

175.   As a result of that testing, offenders were again medically isolated or restricted according to Policy B-14.52. [Tr. 3—201:18-22].

176.   The following measures were taken at the Pack Unit after the second round of Strike Team Testing was conducted:

- Offenders were placed in medical isolation and medical restriction as appropriate according to Policy B-14.52;

- Offenders who were symptomatic and awaiting test results were placed in "pending test" housing. In this housing area, offenders are spaced apart to prevent transmission of COVID-19. This is made possible by the limited number of offenders who are symptomatic who have a pending test.

- Offenders who return to the Pack Unit after a visit to the hospital are quarantined for 14 days in the air-conditioned education wing of the main building. There are 30 beds available in the education wing;

- Regular housing is used for offenders who are negative and do not meet the criteria for medical restriction, medical isolation, the "pending test" dorm, or quarantine housing. Offenders who have tested positive are returned to regular housing only after they have been medically cleared by UTMB.

[ECF No. 213-15 at 5-6].

177.   When an offender tests positive, he is moved out of his dorm, and the other members of the dorm are asked to step out as well. The other members of the dorm are taken to the showers where they are given a fresh set of clothes, linen, and a shower. In the meantime, a team goes into the dormitory to disinfect the entire dorm. [Tr. Trans. at 3—216:3-9].

178.   As of July 24, 2020, it takes an average of 4.5 days to get the Curative test results back from the Curative labs. [Tr. Trans. at 10—32:9-13].

179.   In addition to Strike Team Testing, a Long-Term Care Testing Plan has been implemented at four of TDCJ's facilities—one of which is the Pack Unit. The Long-Term Care Testing is a variation of Strike Team Testing that is also conducted by the Strike Teams. TDCJ implemented this plan in units with an older, more frail population, including the Pack Unit. The plan involves weekly testing at the Pack Unit of both staff and offenders who have previously tested negative until no more positive cases are identified. [Tr. Trans. at 10—46:1-22].

180.   TDCJ implemented the Long-Term Care Testing Plan after discussions with Dr. Linthicum and Dr. Keiser. [Tr. Trans. at 10—47:8-48:8].

181.    As of July 24, 2020, there had been two rounds of Long-Term Care Testing at the Pack
        Unit. This testing will continue on a weekly basis until no more positive cases are identified.
        [Tr. Trans. at 10—47:1-5].

### *Contact Tracing at the Pack Unit*

182.    TDCJ learned on April 13, 2020, when it received the preliminary autopsy report that
        offender Leonard Clerkly was tested for COVID-19 twice during the autopsy and the result
        of one of those tests was positive. [Defendants' Exhibit 40].

183.    After learning of this positive test result, Pack Unit administrators and staff determined
        that the offender's close contacts as defined in Policy B-14.52 were likely limited to those
        offenders who also lived in his dorm—Dorm 3. [Defendants' Exhibit 40].

184.    Unit administrators immediately placed the 54 offenders assigned to Dorm 3 at the time of
        Clerkly's death on medical restriction, pursuant to Policy B-14.52. [Defendants' Exhibit
        40].

185.    All 54 offenders living in Dorm 3 were tested for COVID-19 by UTMB staff on April 15,
        2020, and all those offender tests were negative. [Tr. Trans. at 4—38:7-22].

186.    The Pack Unit has continued to conduct contact tracing with respect to each Pack Unit-
        assigned offender and Pack Unit employee who has tested positive for COVID-19. [Tr.
        Trans. at 4—29:8-21].

187.    All offenders assigned to a dorm in which an offender who received a positive test result
        for COVID-19 was assigned at the time of testing are placed on medical restriction for at
        least 14 days when that positive test result is obtained pursuant to Policy B-14.52. All
        employees identified through contact tracing efforts as having been in close contact with a

positive COVID-19 case are required to self-quarantine for a minimum of 14 days. [Defendants' Exhibit 36].

### *Employee Quarantine*

188.   For employees who are sick or test positive for COVID-19, the Pack Unit follows Policy B-14.52's staff quarantine procedure. In general, TDCJ employees, including those at the Pack Unit, may return to work based on a symptom-based strategy or a test-based strategy. [Tr. Trans. at 4—40:23-41:16; Defendants' Exhibit 36].

189.   Under a system-based strategy, employees may return to work 14 days after symptom onset if they are no longer exhibiting symptoms, such as fever, cough, or shortness of breath. [Defendants' Exhibit 36].

190.   Under a test-based strategy, employees may return to work if they provide a negative COVID-19 test result and a healthcare provider's note releasing the employee to return to work. [Defendants' Exhibit 36].

191.   Employees who return to work at the Pack Unit must self-monitor their symptoms and seek re-evaluation or medical treatment from a healthcare provider if symptoms recur or worsen. [Defendants' Exhibit 36].

### *Communication and Coordination with Authorities*

192.   TDCJ has communicated regularly with representatives of the following state agencies, health care providers, and organizations: DSHS, UTMB, Texas Tech, TDEM, and the Southwest Texas Regional Advisory Council (STRAC). [Defendants' Exhibit 40].

193.   TDCJ leadership has coordinated its response to COVID-19 and communicated regularly with representatives of the Office of the Texas Governor, the Office of the Lieutenant

Governor, the Office of Speaker of the Texas House of Representatives, as well as members of the Texas Senate and Texas House of Representatives, including legislators serving on the Texas Senate Criminal Justice Committee and Texas House Corrections Committee. [Defendants' Exhibit 40].

194. TDCJ's contact with these agencies, organizations, and entities began with the onset of the first reported COVID-19 cases in Texas in the first half of March 2020. [Defendants' Exhibit 40].

195. TDCJ representatives have been in contact with federal and state health authorities as they have implemented the various steps under Policy B-14.52. [Defendants' Exhibit 40].

### *Other Ongoing Precautions at the Pack Unit*

196. Policy B-14.52 continues to be implemented and enforced at the Pack Unit, where the below measures, among others, have been taken:

197. All offenders who receive positive test results for COVID-19 and remain at the Pack Unit have been placed in medical isolation. Those offenders are receiving treatment from UTMB pursuant to Policy B-14.52. [Defendants' Exhibit 36].

198. In furtherance of Policy B-14.52's provisions related to hygiene, cleaning, and use of PPE:

- A process has been continued at the Pack Unit for offenders to receive clean face masks daily. Under this process, a used mask is exchanged for a clean mask in a one-for-one daily exchange [Defendants' Exhibit 30];

- A process has been continued by which Pack Unit staff are issued N95 masks and face shields, which are to be worn at all times while on the unit [Defendants' Exhibit 40];

- A process has been continued to make hand soap available upon request by an offender at various locations within the Pack Unit, including the officer podiums outside of each dorm. There is no cost to an offender for additional hand soap [Defendants' Exhibit 30];

- A process has been continued at the Pack Unit for offenders to receive clean face towels daily. Under this process, a used face towel is exchanged for a clean face towel is a one-for-one daily exchange [Defendants' Exhibit 30];

- A process has been maintained at the Pack Unit for offenders to receive additional toilet paper, as needed. There is no cost to an offender for additional toilet paper [Defendants' Exhibit 30]; and

- Common areas within the Pack Unit continue to be cleaned on a regular basis with anti-bacterial cleaning materials [Defendants' Exhibit 30].

199.    In furtherance of Policy B-14.52's provisions related to medical restriction due to possible exposure to COVID-19, the following steps continue to be taken:

- Medical staff takes the temperatures of offenders who are on medical restriction once per day [Defendants' Exhibit 36 at 38976];

- Any offender who remains on-site at the Pack unit after testing positive for COVID-19 is relocated to a housing area for positive offenders and placed on medical isolation. In addition, the dorm in which the offender resided is placed on medical restriction [Tr. Trans. at 3—194:6-14; 3—195:5-13]; and

- Any offender who remains on-site at the Pack Unit while a test result is pending is placed on medical isolation. The offender is returned to the general population only if the pending result is negative [Tr. Trans. at 3—204:16-205:11].

200.   In furtherance of Policy B-14.52's provisions related to social distancing:

- A process has been continued to minimize staff rotation at duty posts within the Pack Unit;

- Pack Unit staff have continued to enforce social distancing among themselves and offenders when possible, as offenders move outside dorms to other areas within the unit; and

- A process has been continued to minimize offender "turnout" for work assignments at the Pack Unit and to enforce social distancing when possible during such turn outs.

[Defendants' Exhibit 30].

201.   In furtherance of Policy B-14.52's provisions related to dissemination of information and education related to COVID-19:

- The CDC handout entitled "Share Facts About COVID-19," and other signage informing offenders about the symptoms of COVID-19 and how to prevent spread of the virus, continues to be posted in all dorms, and a copy of this CDC handout has been distributed to each offender in the Pack Unit;

- Pack Unit medical staff continue to answer offender questions during their rounds to take temperatures;

- Pack Unit correctional staff continue speaking to offenders about COVID-19 and answering questions from offenders about the COVID-19 virus;

- A video produced by TDCJ continues to be shown three times per day to the offender population at the Pack Unit. This video explains and discusses COVID-19 symptoms and methods of preventing spread of the virus, through such actions as washing hands and observing social distancing. This video is made available via the televisions in the dayroom of each dorm; and

- A process has been continued for announcements in English and Spanish to be made at least twice per week within each dorm encouraging offenders to request sick call appointments whenever they are feeling ill and reminding them that medical co-pays have been waived.

[Defendants' Exhibit 30].

202. Warden Herrera frequently walks the halls of the Pack Unit and speaks to staff and offenders to see if they have any concerns. [Tr. Trans. at 3—225:5-16].

**Efforts Prioritizing the Pack Unit**

203. When TDCJ learned that Offender Clerkly had tested positive for COVID-19 during an autopsy, Collier had a discussion with UTMB about their ability to conduct testing of all offenders within Clerkly's dorm. UTMB was able to conduct that testing of all 54 offenders on April 15, 2020. [Tr. Trans. at 10—24:2-17].

204. TDCJ decided to test Clerkly's entire dorm because he was the first COVID-19 positive case on the Pack Unit and the Pack Unit has a more vulnerable population of older offenders with chronic health conditions. TDCJ wanted to ensure there were not more COVID-19

positive cases than Mr. Clerkly. All offenders housed in Clerkly's dorm tested negative for COVID-19. [Tr. Trans. at 10—25:11-25; 10—26:1-3].

205.   The surveillance testing of Clerkly's dorm at the Pack Unit was the first instance of asymptomatic testing that TDCJ had performed at any unit. [Tr. Trans. at 10—24:17-20].

206.   The Long-Term Care Testing Plan has been implemented at the Pack Unit. There are only three other TDCJ units where this plan has been implemented. [Tr. Trans. at 10—46:1-22].

207.   When TDCJ received its first shipment of 30 barrels of VitalOxide from TDEM, it distributed 6 of those barrels and 3 electrostatic sprayers to the Pack Unit. The decision to prioritize the Pack Unit for the use of VitalOxide was made due to its vulnerable population. [Tr. Trans. at 10—56:23-58:5].

208.   The Pack Unit has installed portable handwashing stations to allow offenders even more convenient access to soap and water. [Tr. Trans. at 10—66:14-67:19].

### *Differences Between the Pack Unit and the Luther Unit*

209.   The Luther Unit—another TDCJ unit near the Pack Unit—has a very different population that the Pack Unit. It is a much younger population. [Tr. Trans. at 9—241:3-5].

210.   The Luther Unit was not included in TDCJ's first round of Strike Team Testing because it had not had positive symptomatic offenders at that point. The Luther Unit was, however, included in the second round of Strike Team Testing. The timing of the testing could have impacted the testing results. [Tr. Trans. at 9—241:3-15].

211.   Mr. Collier estimated that the Luther Unit has approximately 10 offenders age 65 or older. The Pack Unit has over 800 offenders age 65 or older. [Tr. Trans. at 3—52:25-53:2; 9—241:22-25].

212.   The difference in the number of positives at the Pack Unit and the Luther Unit does not reflect anything other than there have been more positive cases at the Pack Unit. This is because the Luther Unit and the Pack Unit are not similar in every variable. [Tr. Trans. at 9—123:2-14].

### *Offenders' Recognition of Efforts Made at Pack Unit*

213.   Plaintiff Richard King believes that the Pack Unit has tried to control the spread of COVID-19. [Tr. Trans. at 2—64:17-19].

214.   Plaintiff Richard King does not believe the Pack Unit has ignored the risk of harm that COVID-19 poses to him or the other offenders at the Pack Unit. [Tr. Trans. at 2—64:20-65:1].

215.   Class-member Plaintiff Jon Reynolds believes that the Pack Unit is making an effort and has taken steps to protect him and other offenders at the Pack Unit from the risk of COVID-19. [Tr. Trans. at 3—31:14-16; 3—38:8-16].

216.   Class-member Plaintiff Roger Beal believes that the Pack Unit is making an effort and has taken steps to protect him and other offenders at the Pack Unit from the risk of COVID-19. [Tr. Trans. at 2—177:20-25; 2—185:22-186:1].

217.   The offenders who testified at trial identified only isolated incidents of non-compliance with Policy B-14.52—not a pattern or practice of non-compliance. And many issues of non-compliance by correctional staff are fixed immediately when brought to their attention. For

example, Beal, Reynolds, and King each acknowledged that when they remind officers to wear their masks, they are generally receptive and put their masks back on. [Tr. Trans. at 2—64:5-12; 2—182:11-22; 3—35:3-12].

### *Exhaustion*

218. The Texas prison system has developed a two-step formal grievance process for resolving offender grievances. [Defendants' Exhibits 18, 23.]

219. The Step 1 grievance, which must be filed within 15 days of the complained-of incident, is handled within the offender's unit of incarceration. If the Step 1 grievance results in an adverse decision, the offender has 10 days to file a Step 2 grievance, which is handled at the agency headquarters level. [Defendants' Exhibit 23 at 0349].

220. An offender must pursue a grievance through both Step 1 and Step 2 for it to be considered exhausted.

221. Informal resolution does not initiate the grievance process. [Tr. Trans. at 10—11:16-12:5].

222. Plaintiffs filed suit in this case on March 30, 2020. [ECF 1].

223. Neither Valentine nor King had filed a Step 1 or Step 2 grievance related to issues in this suit before March 30, 2020. [*See* Defendants' Exhibits 11, 12].

224. Neither Valentine nor King exhausted their administrative remedies prior to filing suit. [*See* Defendants' Exhibits 11, 12].

225. Both Valentine and King have filed multiple grievances after this suit was filed. [*See* Defendants' Exhibits 11, 12].

226. On March 31, 2020, Valentine filed a grievance requesting hand sanitizing solution and cleaning supplies for cubicles. Valentine has substantially received the relief he requested.

He has received access to unlimited soap to facilitate handwashing, and he may clean his own cubicle with a spray bottle of cleaning solution. [Defendants' Exhibit 11 at 0638-0639].

227.   On April 2, 2020, King filed a grievance requesting that offender transfers to the Pack Unit be stopped during the pandemic. King has received the relief he requested. The Pack Unit stopped receiving new offenders when it went on precautionary lockdown on April 14, 2020. [Defendants' Exhibit 12 at 0646-0647].

228.   At trial, King acknowledged that he received the relief he requested in his April 2, 2020 grievance because all offender transfers stopped. His grievance was resolved to his satisfaction in 12 days. [Tr. Trans. at 2—62:4-8].

229.   On May 10, 2020, Valentine filed a grievance requesting COVID-19 testing. Valentine has received the relief he requested. All offenders at the Pack Unit, including Valentine, have been tested for COVID-19. [Defendants' Exhibit 11 at 2384-2385].

230.   At trial, Valentine confirmed that he received the relief he requested regarding mass testing "within days" of filing his grievance. He was tested on either May 14, 2020 or May 15, 2020. Valentine received the relief he requested within 5 days of filing his grievance. [Tr. Trans. at 1—211:16-22; 1—230:6-11].

231.   On May 19, 2020, Valentine requested that Dorm 14 be utilized to facilitate social distancing. At that time, however, Dorm 14 *was* being utilized as a medical isolation dorm for offenders who had tested positive for COVID-19, including Valentine. [Defendants' Exhibit 31 at 3069; Tr. Trans. 1—93:17-94:16].

232.    Effective May 26, 2020, TDCJ modified its practices to process COVID-19 related grievances on an expedited timeframe. [Defendants' Exhibit 20; Tr. Trans. at 10—13:6-14:16].

233.    Under this modified practice for COVID-19 grievances, a Step 1 grievance related to COVID-19 must be processed within 15 days with no extensions. A Step 2 grievance must also be processed within 15 days with no extensions. [Defendants' Exhibit 20 at 2443-2444].

234.    TDCJ's grievance policy provides that staff shall respond to a Step 1 and Step 2 grievances *within* 40 days. Staff may get up to a 40-day extension to investigate a Step 1 or Step 2 grievance "[w]hen necessary." [Defendants' Exhibit 23 at 0349-0351].

235.    Even before TDCJ modified the process for handling COVID-19 grievances, there was no requirement that TDCJ officials take the maximum time provided to resolve grievances. [Defendants' Exhibit 23 at 0349-0351].

236.    The modified process for COVID-19 grievances was implemented to allow TDCJ to identify COVID-19 related grievances more quickly and to be proactive in resolving those grievances. The modification was not implemented in response to an incident where a COVID-19 related grievance was not resolved in a timely manner. [Tr. Trans. at 10—15:9-16:24].

237.    Valentine and King have successfully navigated TDCJ's grievance process and have largely obtained the relief they have requested in their grievances. For example:

   • Valentine's request for additional cleaning supplies for individual sanitation of his living area was granted when the Pack Unit began increasing its disinfection efforts

in response to COVID-19. Offenders may obtain a spray bottle, disinfectant cleaner, gloves, and rags upon request. There is no limit to the number of times per day that an offender may request and obtain supplies to clean their cubicle. [Defendants' Exhibit 30 at 2555].

- Valentine's request for COVID-19 testing was granted within 5 days. [Tr. Trans. at 1—211:16-22; 1—230:6-11].

- Valentine's request to utilize Dorm 14 for social distancing had already been granted at the time he filed his grievance because it was being used to isolate positive offenders. [Defendants' Exhibit 31 at 3069; Tr. Trans. 1—93:17-94:16].

- Valentine's request for sanitizing the showers in between uses had already been granted because the Pack Unit sanitizes the shower areas between uses. [Defendants' Exhibit 30 at 2558; Tr. Trans. at 3—179:25-180:4].

- King's request to stop all offender transfers into the Pack Unit was granted within 12 days after he filed his grievance. [Tr. Trans. at 2—62:4-8].

238. The only grievances that have arguably not been resolved to Valentine and Kings' satisfaction is Valentine's request for hand sanitizer and King's request for more chemicals for his janitorial duties—assuming King's testimony that he has still not received additional chemicals is true. But there is no evidence that Defendants did not have authority to take some action in response to these grievances. In fact, the record demonstrates that Defendants had the authority to provide hand sanitizer but chose not to due to security concerns. It also demonstrates that SSIs can request and should be provided with additional chemicals if needed [Tr. Trans. at 4—49:1-6; Tr. Trans. at 10—17:2-21:9].

239.  Valentine testified that TDCJ's grievance process is "definitely available." [Tr. Trans. at 1—211:23-212:2].

240.  King testified that TDCJ's grievance process is available even if there is no attempt at informal resolution prior to filing a grievance. [Tr. Trans. at 2—61:1-21].

**Testing Numbers at the Pack Unit**

241.  As of August 2, 2020, there were only 18 offender active cases of COVID-19 at the Pack Unit. [Defendants' Exhibit 57].

242.  As of August 2, 2020, 423 offenders from the Pack Unit had recovered from COVID-19. [Defendants' Exhibit 57].

243.  As of August 2, 2020, there 16 employee actives cases of COVID-19 at the Pack Unit. [Defendants' Exhibit 57].

244.  As of August 2, 2020, 43 Pack Unit employees have recovered from COVID-19. [Defendants' Exhibit 57].

245.  Based on medical records provided by UTMB, from March 1, 2020 to June 1, 2020, 202 tests for COVID-19 were performed by UTMB and other healthcare providers on 183 symptomatic Pack Unit offenders who tested positive for COVID-19. [Plaintiff's Exhibit 168A at 2506-2514].

246.  Section I.N.6. of Policy B-14.52 defines recovery as "resolution of fever without the use of fever reducing medications and improvement of respiratory symptoms **and** the passage of 14 days since symptoms first appeared. This section also explains that an offender who is symptomatic and tests positive for COVID-19 may be released from medical isolation 3 days after recovery. [Defendants' Exhibit 36 at 38972].

247.   Based on the latest collection date shown at page 2509 of Plaintiffs' Exhibit 168A of May 29, 2020, and the definition of recovery in Policy B-14.52, the 183 Pack Unit offenders who were tested for COVID-19 by UTMB and other healthcare providers would meet the definition of recovery on or after June 15, 2020, if all symptoms had resolved. [Defendants' Exhibit 36 at 38972].

248.   Test results from the first round of Strike Team Testing in May 2020 included 144 Pack Unit offenders who tested positive for COVID-19. [*See* Defendants' Exhibit 56 at lines 35-1462 (positive test results)].

249.   Based on the last collection date of the first round of Strike Team Testing shown at line 1462 of Defendants' Exhibit 56 of May 28, 2020, and the definition of recovery in Policy B-14.52, the 144 Pack Unit offenders who tested positive for COVID-19 during the first round of Strike Team Testing would meet the definition of recovery on or after June 11, 2020, if all symptoms had resolved. [Defendants' Exhibit 36 at 38972].

250.   Test results from the second round of Strike Team Testing in June 2020 included 172 Pack Unit offenders who tested positive for COVID-19. [Defendant's Exhibit 56 at lines 1770 – 2670 (positive test results)].

251.   Based on the last collection date of the second round of Strike Team Testing shown at line 2670 of Defendants' Exhibit 56 of June 26, 2020, and the definition of recovery in Policy B-14.52, the 172 Pack Unit offenders who tested positive for COVID-19 during the first

round of Strike Team Testing would meet the definition of recovery on or after June 10, 2020, if all symptoms had resolved. [Defendants' Exhibit 36 at 38972].

252. Test results from the third round of Strike Team Testing in July 2020 included 15 Pack Unit offenders who tested positive for COVID-19. [*See* Defendant's Exhibit 56 at lines 2961 – 3589]. (positive test results)].

253. Based on the last collection date of the third round of Strike Team Testing shown at line 3589 of Defendants' Exhibit 56 of July 10, 2020, and the definition of recovery in Policy B-14.52, the 172 Pack Unit offenders who tested positive for COVID-19 during the first round of Strike Team Testing would meet the definition of recovery on or after July 24, 2020, if all symptoms had resolved. [Defendants' Exhibit 36 at 38972].

254. Adding those Pack Unit offenders who tested positive for COVID-19 in the first, second and third round of Strike Team Testing and those symptomatic offenders tested by UTMB and other health care providers between March 1, 2020 and July 10, 2020, shows a total number of 514 offenders who tested positive for COVID-19. All of these offenders would have met the definition of recovery on or after July 24, 2020, if all symptoms had resolved.

255. As of August 2, 2020, 20 offenders who tested positive for COVID-19 had died. [Defendants' Exhibit 57].

256. Even if the Court subtracts the 20 Pack Unit offenders from the 514 offenders who tested positive for COVID-19 and meet the definition of recovery in Policy B-14.52, a total of 494 offenders still met the definition of recovery on or after July 24, 2020. [Defendants' Exhibit 36 at 38972; Defendants' Exhibit 56].

## LEGAL STANDARD

### A.    Injunctive Relief and the Prison Litigation Reform Act

It is well-settled that a suit against a state employee in his official capacity is the same as a suit against the state agency. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In general, state agencies are entitled to Eleventh Amendment immunity from suits brought under § 1983. *See generally Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240 (1999). An exception to a state official's Eleventh Amendment immunity exists, however, for prospective injunctive relief. *Ex Parte Young*, 209 U.S. 123, 159–60 (1908); *Kentucky*, 473 U.S. at 167 n.14; *Edelman v. Jordan*, 415 U.S. 651, 666–68 (1974). Before granting injunctive relief against a state official, however, the court must determine that the state official is engaged in an ongoing violation of federal law. *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635, 645–46 (2002).

"[A] plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). The Fifth Circuit has cautioned that an injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *PCI Transportation Inc. v. Fort Worth & Western Railroad Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (citations omitted).

In a case challenging prison conditions like the case at bar, the Prison Litigation Reform Act (the "PLRA") imposes additional restrictions on the authority of the Court to grant an injunction. The PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions

shall extend no further than necessary to correct the violation of the federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). In particular, the PLRA prohibits an order granting prospective relief unless the court first finds that such relief: (1) is narrowly drawn; (2) extends no further than necessary to correct the harm; and (3) is the least intrusive means necessary to correct that harm. *See* 18 U.S.C. §§ 3626(a)(1)(A), 3626(a)(2). In considering a prisoner's request for prospective relief, the reviewing court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" caused by the relief and shall respect the certain principles of comity where state or local law is concerned. *See* 18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2). Injunctive relief is not available unless the prison conditions found to violate the Eighth Amendment are ongoing at the time of the injunction. *See Helling v. McKinney*, 509 U.S. 25, 36 (1993).

**B.      Law of the Case and Law of the Circuit**

The law of the case doctrine provides that both "issues of law and fact" and "legal principles" announced in a prior decision become the law of that case in all its later stages or developments. *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012) ("an issue of fact or law"); *Hoffart v. Wiggins*, 600 F. App'x 261, 262 (5th Cir. 2015) (per curiam) ("legal principles"); *see also* 18B Wright and Miller, *Federal Practice and Procedure* § 4478 (2d ed.). This rule applies both horizontally ("constricting a later panel [or judge] vis-à-vis an earlier panel [or judge] of the same court") and vertically ("constricting a lower court vis-à-vis a higher court"). *In re Deepwater Horizon*, 928 F.3d 394, 398 (5th Cir. 2019). As is the case here, "an appellate court's decision to stay (or not) a lower court decision or to reverse (or affirm) a preliminary injunction amounts to a final decision for purposes of the [law of the case] doctrine." Bryan A. Garner et. al., The Law of

Judicial Precedent § 53 (2016). The law of the circuit doctrine provides that published Fifth Circuit opinions are binding precedent—on later Fifth Circuit panels and on all district courts within the circuit.

## C.  Exhaustion

The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). The Supreme Court has made clear that the exhaustion requirement applies to all suits regarding prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and that "unexhausted claims cannot be brought in court," *Jones v. Bock*, 549 U.S. 199, 211 (2007). Exhaustion is mandatory. The statute provides no exception for "special circumstances." *See Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016); *see also Farmer v. Brennan,* 511 U.S. 825, 847 (1994) (in a case seeking injunctive relief to address "current" prison conditions, inmates are not "free to bypass adequate internal prison procedures and bring their health and safety concerns directly to court"). Among the "special circumstances" that cannot excuse a failure to exhaust is a "court's concern . . . that [a correctional agency] has not acted speedily enough." *Valentine I*, 956 F.3d at 805. And there are no "futility or other [judicially created] exceptions [to the] statutory exhaustion requirements." *Booth*, 532 U.S. at 741 n.6.

The PLRA creates an exception to the exhaustion requirement only when administrative remedies are not "available." A remedy is not "available"—and exhaustion is not required— when:

> (1) the procedure "operates as a simple dead end" because "the relevant administrative procedure lacks authority to provide any relief," or "administrative officials have apparent authority, but decline ever to exercise it";

(2) the "administrative scheme [is] so opaque that . . . no reasonable prisoner can use them"; or

(3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 136 S. Ct. at 1859–60 (quotation omitted).

Unavailability is an "*exception* to the exhaustion requirement." Ross, 136 S. Ct. at 1855 (emphasis added). And "the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *N.L.R.B. v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001). Thus, when a defendant shows that it provides administrative remedies, the prisoner bears the burden to prove that those remedies are not available. *See, e.g.*, *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) ("[T]he onus falls on the inmate to show that such remedies were unavailable to him."); *accord Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir.2011); *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir.2008); *Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir.2001).

Additionally, the Supreme Court has made clear that the administrative process qualifies as a "dead end" only when it creates no "potential" for an inmate to obtain relief. *See Ross*, 136 S. Ct. at 1859. As long as the State's administrative procedure grants "authority to take *some* action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands." *Id.*

## D.    Deliberate Indifference

To establish an Eighth Amendment violation in the prison context, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the

prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference under the Eighth Amendment requires a showing akin to that of "subjective recklessness" as used in criminal law. *Id*. at 839. Under the deliberate-indifference standard, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Id*. at 837. "[D]eliberate indifference 'is a stringent standard of fault, requiring proof that a [defendant] disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also Easter v. Powell*, 467 F.3d 459, 463 (5th Cir.2006) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). This is "an extremely high standard to meet," *Domino v. TDCJ*, 239 F.3d 752, 756 (5th Cir. 2001), and it "exists wholly independent of an optimal standard of care." *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006).

A prison official's failure to avoid harm or eliminate a risk does not violate the Eighth Amendment. To be liable for deliberate indifference, the official must "*know of* and *disregard* an excessive risk to inmate health and safety." *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)) (emphasis added). Nor can deliberate indifference be "inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County*, 245 F.3d 447, 458-59 (5th Cir. 2001). The Eighth Amendment is violated only if "the official's response indicates the official subjectively intended that harm occur." *Id.* at 459. Actions and decisions that are merely inept,

ineffective, or negligent do not constitute deliberate indifference. *Id.*  And complaints that policies or practices were inadequate to prevent harm—even if true—are not sufficient for liability. *See, e.g.*, *Brumfield v. Hollins*, 551 F.3d 322, 328 (5th Cir. 2008) (while jail's policies "lacked the specific directives Brumfield would have preferred to have been in place, policies nonetheless existed").

Additionally, deliberate indifference is not the equivalent of negligence; rather, deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. Evidence of unsuccessful medical treatment, negligence, neglect, or even malpractice is insufficient to demonstrate deliberate indifference. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Moreover, an inmate's dissatisfaction or disagreement with the medical treatment he received does not mean that he suffered deliberate indifference. *See Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Therefore, neither claims of negligence nor disagreement with the type of medical care received rise to the level of a constitutional issue under section 1983. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Rather, an inmate must show that the officials intentionally treated him incorrectly, refused to treat him, ignored his complaints, or engaged in similar conduct that would "clearly evidence a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756.  In determining whether officials have been deliberately indifferent, courts must give "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions,'" *Farmer,* 511 U.S. at 845 (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)), and "consider arguments regarding the realities of prison administration," *Helling v. McKinney*, 509 U.S. 25, 37 (1993).

Moreover, a deliberate indifference analysis "must take account of additional measures and precautions that the defendants have instituted during the pendency of this" case. *Swain v. Junior*,

961 F.3d 1276, 1294 n.11 (11th Cir. 2020) ("We emphasize the Supreme Court's admonition that, in a suit in which a plaintiff 'seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' *current attitudes and conduct*": their attitudes and conduct at the time suit is brought *and persisting thereafter*.'") (quoting *Farmer*, 511 U.S. at 845); *accord Helling*, 509 U.S. at 36 (directing that "deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct").

### E.      Americans with Disabilities Act and Rehabilitation Act

"A prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated. He thus loses those rights that are necessarily sacrificed to legitimate penological needs." *Elliott v. Lynn*, 38 F.3d 188, 190-91 (5th Cir. 1994). The Fifth Circuit has held that an ADA claim is not available under Title II under "exigent circumstances." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000); *accord Wilson v. City of Southlake*, 936 F.3d 326, 331 (5th Cir. 2019) ("[O]fficers do not first have to consider whether their actions will comply with the ADA . . . when they are reacting 'to potentially life-threatening situations.'").

Title II of the ADA prohibits "disability discrimination in the provision of public services." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011). Specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly,

the RA prohibits discrimination against individuals with disabilities in federally-funded institutions. *See* 29 U.S.C. § 794(a).

The same legal standards apply to both the ADA and the RA. *See Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). To establish a viable claim, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) he is being discriminated against by reason of his disability. *See Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011); *Back v. Texas Dep't of Criminal Justice Institutional Div.*, 684 F. App'x 356, 358 (5th Cir. 2017). Under both statutes, the plaintiff must show intentional discrimination. *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002).

## CONCLUSIONS OF LAW

### *Exhaustion*

1.  Plaintiffs bring a suit challenging prison conditions; therefore, they were required to exhaust their administrative remedies under the PLRA before filing suit.

2.  Valentine did not file a grievance related to the complaints he brings in this suit before suit was filed. Therefore, he did not exhaust his administrative remedies as required by the PLRA.

3.  King did not file a grievance related to the complaints he brings in this suit before suit was filed. Therefore, he did not exhaust his administrative remedies as required by the PLRA.

4.  Since this suit was filed, both Valentine and King have repeatedly utilized the grievance process. Therefore, TDCJ's grievance procedures are not "so opaque that . . . no reasonable prisoner can use them."

5.    Valentine and King have received much of the relief they had requested in their grievances. As to these requests, therefore, the grievance process has not resulted in a "dead end."

6.    As to any grievances that have not been resolved to Valentine and King's satisfaction, Valentine and King have not shown that TDCJ's grievance process does not grant TDCJ the authority to take *some* action in response to their complaints.

7.    There is no evidence that TDCJ administrators thwarted Plaintiffs from taking advantage of the grievance process through machination, misrepresentation, or intimidation.

8.    The Fifth Circuit has determined that the grievance process is available to Plaintiffs under the PLRA. The Court explained:

> All parties agree that the TDCJ administrative process is open for Plaintiffs' use. And Plaintiffs do not argue that TDCJ is incapable of providing some (albeit inadequate) relief. Nor do they contend that TDCJ always "decline[s] to exercise" its authority, [Ross v. Blake, 136 S. Ct. 1850, 1859 (2016)], that the scheme is unworkably opaque, or that administrators thwart use of the system, see id. at 1859-60. Therefore, according to the standards the Supreme Court has given us, TDCJ's grievance procedure is "available," and Plaintiffs were required to exhaust.

*Valentine I*, 956 F.3d at 804. The Fifth Circuit's holding in *Valentine I* is binding on this Court.

9.    In any event, the record in this case proves that TDCJ's grievance process was available to Plaintiffs.

10.   Because TDCJ's grievance process was available to Plaintiffs, Plaintiffs were required by the PLRA to exhaust their administrative remedies before filing suit.

11.   Plaintiffs failed to exhaust their available administrative remedies before filing suit. Their claims are therefore barred by the PLRA, and they must be dismissed.

### *Deliberate Indifference*

12.     TDCJ officials, including Collier, began discussing formulating a response to COVID-19 in early February 2020, before any COVID-19 cases were identified in Texas. These discussions demonstrate that Defendants did not disregard an excessive risk to inmate health or safety.

13.     In formulating and implementing Policy B-14.52, TDCJ relied on experts, including the CDC, and its infectious disease experts from its university healthcare providers—Texas Tech and UTMB. TDCJ's reliance on experts to formulate a specific COVID-19 related policy was a reasonable measure to abate the risk of harm presented by COVID-19.

14.     TDCJ's implementation of a Policy that substantially complies with CDC guidelines for mitigating the spread of COVID-19—Policy B-14.52—was a reasonable measure to abate the risk of harm presented by COVID-19.

15.     TDCJ acted promptly by implementing Policy B-14.52 on March 20, 2020, before the CDC had drafted specific guidelines applicable to correctional and detention facilities. TDCJ's prompt implementation of Policy B-14.52 belies any assertion of deliberate indifference.

16.     TDCJ's adoption of continuous updates to Policy B-14.52 as new information about the coronavirus is discovered demonstrates that Defendants are not disregarding an excessive risk to offender health or safety.

17.     Collier participated in TDCJ meetings in early March to formulate a plan in response to COVID-19. This demonstrates that Collier did not disregard an excessive risk to offender health and safety.

18.  Since March 16, 2020, TDCJ and its executive leadership, including Collier, have participated in daily briefings regarding COVID-19 at TDCJ's Command Center. This demonstrates that Collier has not disregarded an excessive risk to inmate health and safety.

19.  Collier helped TDCJ obtain Curative tests from TDEM to perform asymptomatic testing of the offender and staff population at TDCJ, which is a measure that goes beyond what Policy B-14.52 requires. This proactive measure demonstrates that Collier has not disregarded an excessive risk to offender health and safety.

20.  Herrera has implemented Policy B-14.52 at the Pack Unit and he ensures that Policy B-14.52 is followed at the Pack Unit. This demonstrates that Herrera has not disregarded an excessive risk to offender health and safety.

21.  Herrera's implementation of Policy B-14.52 at the Pack Unit represents a reasonable measure to abate the risk of harm presented by COVID-19.

22.  Herrera's implementation of precautionary measures at the Pack Unit before the promulgation of Policy B-14.52—such as social distancing measures and temperature checks—demonstrates that he has not disregarded an excessive risk to offender health and safety.

23.  Herrera's implementation of Policy B-14.52 and his continued enforcement of Policy B-14.52 at the Pack Unit demonstrates that he has not disregarded an excessive risk to offender health and safety.

24.  Herrera's implementation of measures that go beyond what B-14.52 requires—including but not limited to disinfecting with VitalOxide and installing portable handwashing

stations—demonstrates that he has not disregarded an excessive risk to offender health and safety.

25.    Defendants' voluntary compliance with many of the Court's measures ordered its preliminary injunction order demonstrate that Defendants have not acted with deliberate indifference.

26.    To the extent Plaintiffs contend that Defendants' actions have been inept, ineffective, or negligent, such actions do not constitute deliberate indifference.

27.    Plaintiffs' complaints of occasional lapses in the enforcement of Policy B-14.52 at the Pack Unit do not establish deliberate indifference. At most, such allegations might indicate negligence, which is a much lower standard than deliberate indifference.

28.    There is no evidence that Collier or Herrera have been subjectively aware of lapses of enforcement of Policy B-14.52 at the Pack Unit.

29.    Plaintiffs' allegations that Defendants have failed to avoid the harm presented by COVID-19 or eliminate the risk of COVID-19 entirely does not establish deliberate indifference.

30.    Plaintiffs have not met their "extremely high" burden of showing deliberate indifference.

31.    Plaintiffs have not shown that Defendants have engaged in unnecessary and wanton infliction of pain repugnant to the conscience of mankind.

32.    Plaintiffs have not shown that Collier or Herrera's current attitudes or conduct establish deliberate indifference.

33.    Defendants Collier and Herrera have not been deliberately indifferent in violation of the Eighth Amendment.

### *ADA and RA Claims*

34.     TDCJ is operating under exigent circumstances due to the COVID-19 pandemic; therefore, the ADA does not apply, and Plaintiffs cannot prevail on their ADA and RA claims.

35.     Because the ADA does not apply under exigent circumstances as exist here, Plaintiffs' ADA and RA claims must be dismissed.

36.     Alternatively, Plaintiffs have not shown they were discriminated against because Policy B-14.52 applies to all Texas prisons—not just the Pack Unit.

37.     Further, Plaintiffs have not shown they have been discriminated against because of their disabilities.

38.     Plaintiffs have not demonstrated that Defendants have denied them participation or the benefits of any of the Pack Unit's services, programs, or activities.

39.     Further, Plaintiffs have not demonstrated that Defendants have denied them participation or the benefits of any of the Pack Unit's services, programs, or activities because of their disabilities.

40.     Since Plaintiffs have failed to demonstrate discrimination by reason of their disabilities, their ADA and RA claims must be denied.

Respectfully Submitted.

**KEN PAXTON**
Attorney General of Texas

**JEFFREY C. MATEER**
First Assistant Attorney General

**RYAN L. BANGERT**
Deputy First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Assistant Attorney General
Chief, Law Enforcement Defense Division

*/s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General
Texas State Bar No. 24074047
Federal Bar No. 1125898
christin.vasquez@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P.O Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / (512) 370-9996 (fax)

## NOTICE OF ELECTRONIC FILING

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that I have electronically submitted a true and correct copy of the foregoing for filing in accordance with the Court's electronic filing system, on August 14, 2020.

*/ s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, CHRISTIN COBE VASQUEZ, Assistant Attorney General of Texas, certify that a true and correct copy of the foregoing **Defendants' Proposed Findings of Fact and Conclusions of Law** has been served electronically upon all counsel of record *via* the electronic filing system of the Southern District of Texas, on August 14, 2020.

*/ s/ Christin Cobe Vasquez*
**CHRISTIN COBE VASQUEZ**
Assistant Attorney General