# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LADDY CURTIS VALENTINE and RICHARD ELVIN KING, individually and on behalf of those similarly situated. | ) ) ) | |
| | ) | Case No. 4:20-cv-01115 |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRYAN COLLIER, in his official capacity, ROBERT HERRERA, in his official capacity, and TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | ) ) ) ) ) | Hon. Keith P. Ellison |
| | ) | |
| *Defendants*. | ) ) | |

**Plaintiffs' Post-Trial Proposed Findings of Fact and Conclusions of Law**

**Table of Contents**

Proposed Findings of Fact ........................................................................................................ 1

A.     Background ............................................................................................................ 1

    1.    The Parties .................................................................................................. 1

    2.    The COVID-19 Pandemic............................................................................ 3

    3.    CDC COVID-19 Guidance ......................................................................... 5

    4.    The Wallace Pack Unit............................................................................... 9

    5.    COVID-19 Outbreak at the Pack Unit ...................................................... 12

    6.    Testing and Reporting Discrepancies........................................................ 17

B.     Defendants Are Violating Plaintiffs and the Class's Eighth Amendment Rights for
the Conditions of Their Confinement .............................................................. 22

    1.    COVID-19 Poses a Heightened Risk of Serious Harm to Plaintiffs and the
Class.......................................................................................................... 22

        a.    COVID-19 Poses a Heightened Risk of Serious Harm to the
Elderly and Individuals with Comorbidities............................... 22

        b.    Incidence of COVID-19 at the Pack Unit ................................... 25

        c.    COVID-19 Poses a Continued Threat to Inmates at the Pack Unit ......... 26

    2.    Defendants Are Aware of the Obvious Ongoing Substantial Risk of
Serious Harm that COVID-19 Poses to Plaintiffs and the Class ......................... 26

        a.    Defendants' General Knowledge of COVID-19 Risks ............................. 26

        b.    Defendants' Knowledge of COVID-19 Risks to Pack Unit Inmates........ 28

    3.    Defendants Are Deliberately Indifferent to the Serious Risk of Harm
Presented by COVID-19 ............................................................................ 30

        a.    Defendants Failed to Adopt COVID-19 Precautions to Account for
the Particularly Vulnerable Population at the Pack Unit......................... 30

            i.    TDCJ's Policy B-14.52 Disregards the Known Substantial
Risk of Harm Unique to the Population at the Pack Unit ............ 33

            ii.    Defendants Failed to Adopt a Policy Providing Access to
Hand Sanitizer to Control the Spread of COVID-19 at the
Pack Unit................................................................................ 37

            iii.    Defendants Failed to Adopt an Effective Testing Program to
Control the Spread of COVID-19 at the Pack Unit ..................... 41

      b.     Defendants Failed to Implement and Ensure Compliance with TDCJ's COVID-19 Policy at the Pack Unit ......................................... 49

          i.     Defendants Failed to Keep Positive and Negative Inmates Separated ..................................................................... 50

          ii.    Defendants Failed to Enforce Social Distancing ......................... 57

          iii.   Defendants Failed to Ensure Proper Cleaning ............................. 64

          iv.   Defendants Failed to Ensure PPE was Provided and Used........... 69

          v.    Defendants Failed to Ensure That Effective Contact-Tracing Measures Were Implemented and Enforced ................... 75

          vi.   There Is a Pervasive Pattern of Non-Compliance with TDCJ's COVID-19 Policy ........................................................ 77

C.    Defendants Are Violating the ADA and the Rehabilitation Act of 1973 .......................... 94

   1.   Plaintiff Valentine and the Subclass Have Qualifying Disabilities...................... 94

   2.   TDCJ Knows Plaintiffs and Subclass Are Disabled and the Consequential Limitations of Those Disabilities...................................................................... 95

   3.   TDCJ Refuses to Make Reasonable Accommodations........................................ 97

D.    TDCJ's Grievance Process Did Not Provide Available Remedies to Address COVID-19.......................................................................................................................... 100

   1.   TDCJ's Grievance Process Was Not Capable of Responding ........................... 100

   2.   Defendants Put Forward No Evidence of the Grievance Process Actually Providing Relief ................................................................................................ 107

E.    Additional Credibility Issues ............................................................................................. 108

   1.   Defendants and Their Attorneys Repeatedly Made Unsupported and Demonstrably Incorrect Representations to the Courts ..................................... 108

   2.   Defendants Withheld Relevant Information that Rebutted Many of the Misrepresentations Made by their Witnesses and Counsel................................111

   3.   Many Actions Taken by Defendants Were Only for the Purpose of Trial.......... 114

   4.   Instead of Addressing Their Salient Conduct, Defendants Attempted to Blame Mr. Valentine for the COVID Outbreak in the Pack Unit ..................... 118

   5.   Defendants' Expert, Dr. Beard, Lacked a Sufficient Factual Basis to Form his Expert Opinions, and Relied on Improper Communications with Class Member Inmates. .......................................................................................... 120

   6.   Defendants' Expert, Ms. Follenweider, Based Her Opinions on a Two-Hours' Long, Prearranged Visit to the Pack Unit, Lacks Sufficient Credentials, Did Not Rely on Scientific Sources in Forming Her Opinions, and Formed Opinions at Trial that Were Not Previously Disclosed ................. 125

Proposed Mixed Findings of Fact and Conclusions of Law ..................................................... 130

A.  Defendants Failure to Prevent Harm from COVID-19 Violated Plaintiffs' Eighth Amendment Rights .................................................................................. 130

B.  Defendants Are Violating the ADA and Rehabilitation Act............................................ 133

C.  Plaintiffs Were Not Required to Exhaust TDCJ's Grievance Procedure Because It Was Not Available for COVID-19 Issues .................................................... 138

D.  A Permanent Injunction Is Necessary to Protect the Class from Further Harm ............. 142

E.  Plaintiffs' Proposed Permanent Injunction ................................................................... 144

F.  Plaintiffs are Prevailing Parties and Entitled to Attorneys' Fees ................................... 148

## Exhibit List

Exhibit 1       Trial Transcript Day 1 (cited excerpts)

Exhibit 2       Trial Transcript Day 2 (cited excerpts)

Exhibit 3       Trial Transcript Day 3 (cited excerpts)

Exhibit 4       Trial Transcript Day 4 (cited excerpts)

Exhibit 5       Trial Transcript Day 5 (cited excerpts)

Exhibit 6       Trial Transcript Day 6 (cited excerpts)

Exhibit 7       Trial Transcript Day 7 (cited excerpts)

Exhibit 8       Trial Transcript Day 8 (cited excerpts)

Exhibit 9       Trial Transcript Day 9 (cited excerpts)

Exhibit 10      Trial Transcript Day 10 (cited excerpts)

Exhibit 11      Trial Transcript Day 11 (cited excerpts)

Exhibit 12      Trial Transcript Day 12 (cited excerpts)

Exhibit 13      Trial Transcript Day 13 (cited excerpts)

Exhibit 14      Trial Transcript Day 14 (cited excerpts)

Exhibit 15      Trial Transcript Day 15 (cited excerpts)

Exhibit 16      Trial Transcript Day 16 (cited excerpts)

Exhibit 17      Intentionally Skipped

Exhibit 18      Trial Transcript Day 18 (cited excerpts)

Appendix A      Positive Results for Pack Unit Inmates

Plaintiffs submit these proposed findings of fact—complete with citation to the record evidence—that Plaintiffs contend were proven at trial. Plaintiffs also submit proposed mixed findings of fact and conclusions of law.

## Proposed Findings of Fact

A.   **Background**

   1.   **The Parties**

1.   The named Plaintiffs include Laddy Curtis Valentine and Richard Elvin King (collectively, "Plaintiffs"), inmates who are currently incarcerated at the Wallace Pack Unit. Plaintiffs represent two certified classes of inmates at the Pack Unit—the "General Class" and the "High-Risk Subclass" (collectively, the "Class").[1]

   a.   The General Class includes:

   All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide protection from exposure to COVID-19 during the class period.

   b.   The High-Risk Subclass includes:

   All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who are subjected to TDCJ's policy and practice of failing to provide protection from exposure to COVID-19 during the class period and who are, according to the CDC, most at risk for severe illness, injury, or death from COVID-19 due to their age or their health conditions, including the following individuals:
   - People aged 65 years or older;
   - People with chronic lung disease or moderate to severe asthma;
   - People who have serious heart conditions;
   - People who are immunocompromised including patients undergoing cancer treatment;

---

[1] The General Class" and the "High-Risk Subclass" were defined and certified by this Court in its June 27, 2020 Order (ECF No. 160).

- People with other underlying medical conditions, particularly if not well controlled, including, but not limited to, those with diabetes, renal failure, or liver disease; and
- People of any age with severe obesity (body mass index [BMI] ≥ 40).

2.    Plaintiffs also seek to represent two additional subclasses—the "Disability Subclass" and "Mobility-Impaired Subclass" (collectively, the "ADA Subclass").[2]

      a.    The Disability Subclass includes:

All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who suffer from a disability that substantially limits one or more of their major life activities, are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide protection from exposure to COVID-19 during the class period, and who are at increased risk of serious illness, injury, or death if exposed to COVID-19 due to their disability and any medical treatment necessary to treat their disability.

      b.    The Mobility-Impaired Subclass includes:

All current and future inmates incarcerated in the Texas Department of Criminal Justice Wallace Pack Unit who suffer from a disability that substantially limits one or more of their major life activities, are subjected to TDCJ and the Texas Correctional Managed Health Care Committee's policy and practice of failing to provide protection from exposure to COVID-19 during the class period, and who require the use of a walker, cane, or wheelchair to ambulate.

3.    As inmates are transferred into the Pack Unit, the Class and the ADA Subclass will have future unknown members.

4.    Defendants include Bryan Collier, Robert Herrera, and Texas Department of Criminal Justice ("TDCJ") (collectively, "Defendants"). TDCJ is the state prison system, an agency of the State of Texas. ECF 205 at 3. Mr. Collier is TDCJ's Executive Director (*id.*), and

---

[2] The "Disability Subclass" and "Mobility-Impaired Subclass" are defined in Plaintiffs' Emergency Supplemental Motion for Certification of Two Additional Subclasses (ECF No. 248).

as such, he is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. Mr. Herrera is the warden of the TDCJ's Pack Unit (*id.*; *see also* Trial Tr. 1-41:10–20 (Collier)). It is ultimately Warden Herrera's responsibility to make sure all of the inmates at Pack are protected. Trial Tr. 3-55:19–23 (Herrera). Director Collier and TDCJ are ultimately responsible for Warden Herrera's actions and inactions. *Id.* at 10-98:23–99:2.

### 2. The COVID-19 Pandemic

5.      Since late 2019, the novel coronavirus (SARS-CoV-2) that causes Coronavirus Disease 2019 (COVID-19) has spread across the world, causing global pandemic. ECF 205 at 4. The COVID-19 pandemic has sparked a serious public health emergency across in the United States.

6.      On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a "Public Health Emergency of International Concern" as cases had been "reported in five WHO regions in one month."[3] The next day, the U.S. Secretary of Health and Human Services declared under Section 319 of the Public Health Service Act (42 U.S.C. § 247d), that COVID-19 "present[ed] a Public Health Emergency in the United States."[4] "On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a

---

[3] Public Health Emergency of International Concern declared (Jan. 30, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (The WHO's Emergency Committee "noted that early detection, isolating and treating cases, contact tracing and social distancing measures – in line with the level of risk – can all work to interrupt virus spread").

[4] Secretary Azar Delivers Remarks on Declaration of Public Health Emergency for 2019 Novel Coronavirus (Jan. 31, 2020), https://www hhs.gov/about/leadership/secretary/speeches/2020-speeches/secretary-azar-delivers-remarks-ondeclaration-of-public-health-emergency-2019-novel-coronavirus html; Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novelcoronavirus html.

pandemic, as the rates of infection continue to rise in many locations around the world and across the United States."[5]

7.     On March 13, 2020, Texas Governor Greg Abbott announced that COVID-19 "poses an imminent threat of disaster" and, under Section 418.014 of the Texas Government Code, declared "a state of disaster for all counties in Texas." PTX 119. The Texas Department of State Health Services determined on March 19, 2020 that "COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code." PTX 119. That same day, Governor Abbott issued Executive Order GA08, which provides in part that "every person in Texas shall avoid social gatherings in groups of more than 10 people." PTX 119. Governor Abbott extended the order on April 12, 2020, and again on May 6, 2020, encouraging Texas citizens to follow CDC recommendations to prevent the virus's spread. PTX 119. The Governor has continued to extend the disaster declaration.[6] PTX 125.

8.     On March 16, 2020, Grimes County, where the Pack Unit sits, found that "extraordinary measures" should be taken in response to the virus and declared a local state of disaster under Section 418.108(a) of the Texas Government Code. PTX 118; *see also* PTX 120 (extending the declaration).

---

[5] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Out-break (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergencyconcerning-novel-coronavirus-disease-covid-19-outbreak/; *see also* WHO Director-General's opening remarks at the media briefing on COVID-19 (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-sopening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 ("WHO has been assessing this out-break around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pan-demic. Pandemic is not a word to use lightly or carelessly. It is a word that, if misused, can cause unreasonable fear, or unjustified acceptance that the fight is over, leading to unnecessary suffering and death.").

[6]     *See* Proclamation (Aug. 8, 2020), https://gov.texas.gov/uploads/files/press/DISASTER_renewing_covid19_disaster_proclamation_IMAGE_08-08-2020.pdf.

9.      On March 25, 2020, the White House also issued a disaster declaration specifically for the state of Texas. PTX 121.

10.     On March 26, 2020, the federal government began prioritizing the transfer of federal inmates to home confinement. PTX 123.

11.     In only a few months, over 11.5 million people worldwide have been diagnosed with COVID-19, and over 500,000 of those people have died. The United States has reported over 3.2 million cases of COVID-19 and over 113,000 deaths from the virus. PTX 86; PTX 87 at 2. Those numbers are growing rapidly every day. There is no vaccine or cure for COVID-19. PTX 94 at 1. No one is immune.

12.     These features of COVID-19 are well known, including by Defendants, and have been well known since at least the time Plaintiffs filed suit on March 30, 2020. ECF No. 1.

### 3.      CDC COVID-19 Guidance

13.     The strategies necessary to protect against infection are also are well-known. Since before March 4, 2020, the CDC posted guidance on testing for COVID-19, including testing both symptomatic and asymptomatic patients. PTX 102.[7] The available iterations of this guidance emphasize that "Testing is a fundamental part of the United States SARS-CoV-2 Surveillance Plan." PTX 102 at 3. The earliest available version of this guidance, from June 14, 2020, notes that COVID-19 can spread rapidly, and "[t]his is particularly true for settings that house vulnerable populations in close quarters for extended periods of time (e.g., long-term care

---

[7] For previous versions of the CDC's COVID-19 guidance of testing, see Internet Archive Wayback Machine, CDC Overview of Testing for SARS-CoV-2, https://web.archive.org/web/20200614095819/https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview html#changes.

facilities, correctional and detention facilities) and/or settings where critical infrastructure workers (e.g., healthcare personnel, first responders) may be disproportionately affected."[8]

14. The CDC also warned that "The best way to prevent illness is to avoid being exposed to this virus," with COVID-19 requiring droplet precautions to prevent spread. PTX 94. CDC guidance specifically recommended wearing masks, that masks are not a substitute for social distancing, and to clean and disinfect frequently touched surfaces daily. *Id.* at 1–2.

15. The CDC issued guidelines specific to correctional and detention facilities on March 23, 2020. PTX 88; *see also* PTX 96 (website version). This guidance was reiterated in an April 9, 2020 FAQ document and a PowerPoint issued shortly thereafter. *See* PTX 89; PTX 91; PTX 92. The CDC's guidance includes the following advice for preventing the spread of COVID-19 in a correctional or detention facility:

- Facilities should "[e]nsure sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available" including:

  o "Liquid soap when possible,"

  o "Tissues,"

  o "Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)"

  o "Recommended PPE" including "facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls," and

  o Supplies for testing, such as "[s]terile viral transport media and sterile swabs." (PTX 88 at 7).

- Facility "[m]edical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated" (*id.* at 22).

---

[8]    CDC, Overview of Testing for SARS-CoV-2 (June 14, 2020 archive), https://web.archive.org/web/20200614122223/https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html.

- Facilities should "[m]ake contingency plans in the probable event of PPE shortages … particularly for non-healthcare workers" (*id.* at 22; PTX 91 at 2).

- Facilities should "[p]rovide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing" and "[p]rovide liquid soap when possible" (PTX 88 at 8; PTX 91 at 1).

- Facilities should "[c]onsider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow. If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol" (PTX 88 at 8; *see also* PTX 89 at 7; PTX 91 at 1).

- Facilities should adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response, including "[s]everal times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas." PTX 88 at 9; *see also* PTX 91 at 4 ("Consider increasing the number of staff and/or other people who are trained to clean common areas to ensure they are cleaned on a continual basis.").

- Facilities should "[e]ncourage all persons in the facility to protect themselves and others," "[p]ost signage throughout the facility, and communicate this information verbally on a regular basis," PTX 88 at 10; *see also* PTX 91 at 5, with the following directions:

  o "Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze,"

  o "Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage,"

  o "Avoid touching your eyes, nose, or mouth without cleaning your hands first."

- Facilities should "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)." PTX 88 at 11; *see also* PTX 89 at 10–11; PTX 91 at 4. Social distancing should include:

  o "Enforce increased space between individuals … in lines and waiting areas,"

  o "Choose recreation spaces where individuals can spread out,"

  o "staggering time in recreation spaces,"

  o "Provide meals inside housing units or cells,"

- o "reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions,"

- o "Rearrange scheduled movements to minimize mixing of individuals from different housing areas"

- Facilities should "[p]rovide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions." PTX 88 at 22; PTX 91 at 6. Facilities should also "[e]nsure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision."

- When an infected case is identified, facilities should "[c]lose off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets." PTX 88 at 17 (referring to PTX 90).

- Facilities should provide "[r]ecommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response" (PTX 88 at 25; PTX 89 at 24; PTX 91 at 6) including the following:

- o For "[i]ncarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact," gloves and gowns or coveralls;

- o "Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after." PTX 88 at 18;

- o For "[s]taff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases," N95 respirator, eye protection, gloves, and gown or coveralls;

16. The CDC's guidance for correctional and detention facilities does not stand in isolation, but expressly refers to other CDC guidelines. The guidelines themselves note that "CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and

should be monitored regularly for updates, but they may require adaptation for correctional and detention settings." PTX 88 at 2.

17.    The CDC also issued guidance for nursing homes beginning as early as March 21, 2020.[9] Each iteration of these guidelines has emphasized: "Given their congregate nature and residents served (e.g., older adults often with underlying chronic medical conditions), nursing home populations are at the highest risk of being affected by COVID-19. If infected with SARS-CoV-2, the virus that causes COVID-19, residents are at increased risk of serious illness." *See* PTX 101 at 1.

18.    As early as April 30, 2020, the CDC issued guidance suggesting facility-wide testing for nursing homes.[10] PTX 98; PTX 99.

### 4.    The Wallace Pack Unit

19.    The Pack Unit is in Grimes County, Texas, and has a maximum capacity of 1,478 inmates. PTX 1. It is one of 104 correctional facilities that TDCJ operates in Texas. Trial Tr. 1-41:17–22 (Collier); *id*. at 11-196:21–23 (Wilder).

20.    The Pack Unit has a total of 334 employees, 244 of whom perform security functions. PTX 1.

21.    On April 6, 2020, there were 1,254 inmates living at the Pack Unit. PTX 171 at 25. By June 29, 2020, the total population living at the facility was 1,132. PTX 7C at 23.

22.    TDCJ classifies the Pack Unit as a Type-I geriatric facility, which has 24/7 onsite medical care, a chronic care specialty clinic, and all services on a single level to accommodate its

---

[9]    *See*    https://web.archive.org/web/20200403221122/https://www.cdc.gov/coronavirus/2019-ncov/hcp/long-term-care html

[10]    *See also*  https://web.archive.org/web/20200502000107/https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html

unique population. PTX 1 at 2. The Pack Unit ha space to permanently house 60 inmates who use wheelchairs. *Id.* When the trial began, █ Pack Unit inmates used wheelchairs, and █ mobility-impaired inmates used walkers.[11]

23.     The Pack Unit houses a population of inmates who are predominately elderly and ill. Trial Tr. 4-213:4–214:9 (Young); *id*. at 9-117:2–5 (Zawitz). Many of the inmates are non-ambulatory or need assistance to ambulate. *See, e.g.*, Trial Tr. 2-124:23–125:1 (Jones); *id*. at 2-189:11–12 (Dove); *id*. at 2-153:3–9 (Beal); *id*. at 6-72:25–73:12 (Vail); *id*. at 6-245:20–246:8 (Sullivan); *id*. at 11-197:4–15, 11-211:16–212:4 (Wilder). This includes named Plaintiff Laddy Valentine who is 69 years old and uses a walker. Trial Tr. 1-148:13–19, 150:4–13 (Valentine).

24.     As of June 1, 2020, at least █ inmates at the Pack Unit have comorbidities, making them more susceptible to serious injury and death from COVID-19. PTX 77 at 1 (***under seal***).

25.     The current population of the Pack Unit includes over 90% low custody inmates. As of May 23, 2020, the Pack Unit housed only 66 inmates classified as G3, 20 requiring protective custody, and 10 housed in the infirmary—the remaining inmates are G2, G1, and trusties. PTX 75 at 2.

26.     Almost all Pack Unit inmates live in small cubicles in a dormitory setting. Each inmate has his own bunk, separated from his neighbor by only a waist-high wall. Trial Tr. 11-81:4–6 (Wilder); *id*. at 2-92:6–13 (Jones); *id.* 2-200:22–201:5 (Butaud). When laying in their beds, inmates are only inches apart. *Id*. at 2-91:14–22 (Jones). It is impossible for the vast majority of inmates at the Pack Unit, in their existing bunks, to be more than six feet apart when they are in their dorm cubicles. *E.g.*, Trial Tr. 1-157:23–158:8 (Valentine); *id*. at 2-90:8–19, 2-

---

[11] PTX 337 (PENDING ADMISSION) (***under seal***) at number 3555 (Davis text dated July 13, 2020).

91:14–22 (Jones); *id*. at 6-73:17–25, 6-96:5–15; PTX 302 at 5 (Dr. Linthicum remarks that "it is not possible to have 6 feet for social distancing" in a dormitory). Other than working, inmates spend their time in the close confinement of their cubicles. Trial Tr. 2-90:20–24 (Jones). Inmates without jobs spend all of their time there because of the precautionary lockdown that has been in effect since mid-April.

27.     Pack inmates are clustered together much like patients at a nursing home or passengers on a cruise ship—that is, a congregative, confined environment that increases transmissibility of highly contagious viruses like COVID-19. Trial Tr. 4-213:14–20 (Young). Notably, nursing home patients or cruise ship passengers, however, typically do not reside in dormitory-style housing, like at the Pack Unit. Indeed, TDCJ compared itself to nursing homes in a call with the Texas Inmate Families Association ("TIFA") on May 27, 2020. PTX 302 at 34.



28. ███████████████████████████████████████ ████████████████████████████████████ PTX 2 (*under seal*). This structure is often referred to as the "main building." ████████ of those dormitories house inmates. *Id.* ███████████████████████████████████████ *Id.*

29. ███████████████████████████████████████ ███████████████████████████████████ PTX 2 at 2 (*under seal*). ████████████████████████

30. ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████ DTX 14 at 19–20. Defendants claim that shortly after this litigation began, TDCJ completed renovations on these dormitories (Trial Tr. 3-64:11–17).

31.  ███████████████████████████████████████████████

█████████████████████████████████████ PTX 2 at 4 (***under seal***); DTX 14 at

2, 21.

32.     During this litigation, the Pack Unit has also used its on-site classrooms in the

main building "education department" as housing areas for quarantine and medical isolation. *See,*

*e.g.*, DTX 31 at 3.[12]

33.     The Pack Unit also has 12 assisted living beds in the infirmary, managed by

UTMB. *See* PTX 29 at 4–5; PTX 1 at 1.

34.     The Pack Unit has communal restrooms, where dozens of inmates share toilets,

sinks, and other fixtures. DTX 14 at 3–18. Most inmates shower communally, in showers that

hundreds of people pass through each day.

35.     Under normal conditions, Pack inmates eat in a communal dining hall that

hundreds of inmates use several times a day. Even when prison officials limited the dining hall's

capacity, inmates still could not sit more than six feet apart while eating there. Trial Tr. 11-

158:28–161:15 (Wilder).

**5.     COVID-19 Outbreak at the Pack Unit**

36.     When Plaintiffs filed this lawsuit on March 30, 2020, there were no known cases

of COVID-19 at the Pack Unit.

37.     According to TDCJ, on April 11, 2020, only 24 inmates at the Pack Unit were

reportedly placed on "medical restriction" due to suspected COVID-19 contact and only nine

inmates had been tested for the virus. PTX 37 at 3; PTX 38 at 3.

---

[12] In an earlier action related to the Pack Unit, TDCJ argued that inmates could access a collective area of 5,851 square feet in the education department, although TDCJ reports in this litigation that it would house only up to 24 inmates in the education department. PTX 2 (***under seal***); *see Cole v. Collier*, 4:14-cv-1698, ECF No. 922-9 at 1 (Defendants' exhibit); DTX 31 at 3.

38.     The first inmate to test positive at Pack was Leonard Clerkly, and his positive test result was confirmed via autopsy on April 13, 2020—two days after he died of COVID-19 complications even though Mr. Clerkly had complained of clear COVID symptoms before his death. Trial Tr. 1-189:5–10 (Valentine).

39.     Before Mr. Clerkly's positive test result was announced, TDCJ reported only 11 Pack inmates had been tested, and none were on medical restriction. PTX 40 at 1–5.

40.     On April 14, 2020, TDCJ announced that Mr. Clerkly's April 11, 2020 death was due to "viral pneumonia due to COVID-19." PTX 41. This is corroborated by his preliminary autopsy report. PTX 160 (*under seal*) at 26. At the time of Mr. Clerkly's death, 236 TDCJ inmates and 97 staff systemwide had tested positive. PTX 41.

41.     On April 15, 2020, TDCJ detected a second positive case at the Pack Unit. PTX 42 at 3.

42.     On April 16, 2020, the Court and Plaintiffs learned of the second Pack Unit death from a Grimes County press release, not from Defendants. PTX 124.

43.     In response to Mr. Clerkly's death, instead of conducting a complete contact tracing investigation, Defendants tested only Mr. Clerkly's dormitory on the theory that another inmate there transmitted the virus to Mr. Clerkly. Trial Tr. 5-14:25–15:13 (Young); *see also* Trial Tr. 10-161:17–163:3 (Collier). No positive cases were found among the inmates in his dormitory—and despite knowing that Mr. Clerkly had tested positive for COVID-19, Defendants took no other action to complete the contact investigation.[13] Trial Tr. 7-30:6–31:10, 31:11–24 (Mendoza, TDCJ 30(b)(6) Testimony).

---

[13] ████████████████████████████████████████████

44.     Shortly after Mr. Clerkly's death, as of approximately April 21, 2020, UTMB planned to conduct 1,919 tests of asymptomatic TDCJ inmates—in addition to testing those with COVID-19 symptoms—as part of a "Risk-Based" testing plan. *See* PTX 31 at 4–5. Despite knowing of Mr. Clerkly's recent death and the risk of exposure to inmates at the unit, Defendants did not suggest to UTMB that any of these "Risk-Based" tests be used at the Pack Unit. *See generally* PTX 31.

45.     Again, on May 1, 2020, TDCJ announced: "TDCJ is conducting some targeted testing of asymptomatic offenders who may be more vulnerable to the COVID-19 virus. Those offenders may include people over age 65, with pre-existing health conditions or other considerations that may increase their risk." PTX 56 at 1. Inexplicably, other than Mr. Clerkly's dormitory, TDCJ had yet to conduct any asymptomatic testing at the Pack Unit.[14]

46.     Other TDCJ facilities that are setup in a dormitory-housing style have a much lower prevalence of COVID-19 among residents. For example, the Garza East Unit, which is a dormitory-style unit that houses about 2,100 inmates, had only five or six COVID-positive cases compared to Pack, which had over 500 at one point. Trial Tr. 10-178:23–179:23 (Collier). The Jordan Unit is a dormitory-style unit that houses about 1,000 inmates. *Id.* at 10-179:24–180:2 (Collier). Yet the Pack Unit has  50 times more positive cases than the Jordan Unit. *Id.* at 10-181:23–182:1 (Collier). The Neal Unit likewise is a dormitory-style facility, and it holds about 1,600 inmates. *Id.* at 10-182:2–5 (Collier). And yet the Neal Unit had only 1 active case and zero recovered cases—significantly lower than Pack. *See id.* at 10-182:10–13 (Collier). The Segovia

---

[14] Collier and others TDCJ official knew of the importance of testing at least as of early March. Trial Tr. at 1-47:18–25, 1-48:10–18 (Collier). Despite that, TDCJ did not implement mass testing for two months—until mid-May (*see infra*).

Unit is another dormitory-style unit that holds about 1,200 inmates, and it has 30 active cases and just three recovered cases. *Id.* 10-182:20–183:6 (Collier).

47.     On May 9, 2020, TDCJ announced 8 positive test results at the Pack Unit. PTX 63.

48.     On May 11, 2020, the TDCJ website announced that the Pack Unit had 10 positive tests. PTX 65 at 3. Meanwhile, on the very same day, TDCJ reported to the Fifth Circuit court of appeals that 22 Pack Unit inmates had tested positive—three of whom had died and nine of whom had been hospitalized. PTX 64 at 1.

49.     TDCJ also reported that 4 Pack Unit employees had tested positive. PTX 64 at 3. TDCJ further reported that 110 other inmates and 11 other employees were tested, with 23 inmate tests pending and 2 employee tests pending. *Id.* In fact, assuming TDCJ's reporting to the Fifth Circuit was correct, at least eight of those 23 then-pending inmate tests returned positive results. See PTX 168A at 4 ██████████████ 5 ██████████████ 7 ██████ (***under seal***); PTX 161 at 23 ██████ 28 ██████ PTX 168B ██████ (***under seal***); *see also* PTX 161 at 12 (***under seal***); PTX 168A at 74 (***under seal***); PTX 170 at 5 (***under seal***); PTX 204 at 3 ████████████████████ (***under seal***).

50.     Defendants finally began mass "strike team" testing at the Pack Unit on May 12th. ECF No. 126 at 2–3; PTX 67. PTX 76 at 10. However, two weeks after that mass testing began, 307 inmate tests and 309 employee tests were still pending. PTX 76 at 5.

51.     Even with these significant delays in receiving test results, Lorie Davis, TDCJ's Director of Correctional Institutions Division, told TDCJ employees to ████████████

███████████████████████████████████████████████

██ [15]

52.     On May 13, 2020, TDCJ announced 12 positive tests at the Pack Unit. PTX 68 at 2. TDCJ also announced the death of Daniel Thompson, with "COVID-19 as a contributing cause of death." PTX 69 at 1.

53.     On May 14, 2020, TDCJ's website listed only 11 positive tests at the Pack Unit. PTX 70 at 3. The next day, the number jumped to 18. PTX 71 at 3.

54.     On May 17, 2020, TDCJ's website reported 32 positive tests at Pack. PTX 74 at 3.

55.     On May 27, 2020, TDCJ reported to the Court that, as of May 26, 2020, 5 Pack Unit inmates who had tested positive for COVID-19 had died, 12 were hospitalized, and 191 were COVID-19 positive. PTX 76 at 6–7. The same report reflected that 9 employees had tested positive. *Id.*

56.     In total, through July 24, 2020, approximately 497 Pack Unit inmates tested positive for COVID-19, 74 had been hospitalized, and 19 had died. Appendix A, Positive Results for Pack Unit Inmates (citing sources) (***under seal***).

57.     Since July 24, 2020, TDCJ's website has reported at least 12 additional positives inmates at the Pack Unit. Trial Tr. 18-88:12–14. Defendants' Counsel also reported that one COVID-19 positive inmate at Pack had died on July 11, 2020—the Friday before trial—with at least 1 other death during trial. Trial Tr. 12-5:21–6:1 (naming Gonzalez); *see* PTX 180 (listing 16 other deaths); PTX 167 at 185 (***under seal***) (listing another death) ; PTX 170 at 4 (***under seal***)

---

[15] PTX 337 (PENDING ADMISSION) (***under seal***) at number 4507 (Davis text dated June 3, 2020).

(listing another death).[16] This brings the pandemic death count at the Pack Unit to a staggering and unfortunate 20 deaths. [17]

58.    These deaths include:



### 6.    Testing and Reporting Discrepancies

59.    On April 17, 2020, TDCJ altered its test reporting procedure by removing results such as Mr. Clerkly's from the tally of positive results at the Pack Unit—because the Pack Unit was no longer Mr. Clerkly's physical location. PTX 46. (The second case was presumably removed from TDCJ's reporting because he was hospitalized at the time. *See* PTX 45.)

---

[16] PTX 331 (*under seal*) (Mendoza text dated July 2, 2020) ███████████████
████████████████████████████████████████████

[17] ████████████████████████████████████████
██████████████████████████████████████ PTX 335 (PENDING ADMIS-
SION) (*under seal*) at number 1148 (Collier text dated April 14, 2020) ████████████
█████████████████████████

60.     As a result of this changed reporting practice, TDCJ listed the number of positive cases at the Pack Unit as zero from April 17, 2020 through May 8, 2020 on its website. *See* PTX 46–62.

61.     TDCJ also lists the number of supposedly "recovered" inmates on its website. *See, e.g.*, DTX 57 (showing 423 inmates as "recovered"); PTX 179. Defendants' Counsel has tried to offer this as an example of its practices working, despite the largely unrebutted direct evidence to the contrary. Trial Tr. 13-130:25–131:3, 18-17:17–14 (counsel argument about the policies working). There is no evidence to this effect. The evidence points to many discrepancies in Defendants' data rendering it untrustworthy for anything other than additional positive. Indeed, internal TDCJ correspondence among Billy Hirsch and Wardens Herrera and Wilder show significant confusion regarding the number of "recoveries" and no clear method for accurately tracking them as of June 14, 2020.[18]

62.     ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████[19] The only evidence from a witness on "recovered," came from Defendants' witness Dr. Stephanie Zepeda, who testified that being "recovered" is

---

[18] PTX 336 (PENDING ADMISSION) (***under seal***) at numbers 258–64 (Wilder text dated June 14, 2020).

[19] PTX 337 (PENDING ADMISSION) (***under seal***) at number 3604 (Davis text dated July 14, 2020) (emphasis added).

supposed to mean that an inmate is "[n]o longer symptomatic" and was "released from medical isolation." Trial Tr. 12-136:1–9 (Zepeda). The evidence suggests that this process is questionable; there was testimony from Mr. Beal that he was returned to negative housing while still experiencing symptoms (Trial Tr. 2-161:17–19, 162:25–163:2 (Beal)), which is consistent with the observations of Mr. Valentine (Trial Tr. 1-155:15–24). In light of the loose adherence to "symptomatic" and Dr. Zepeda's testimony, TDCJ's self-reporting of "recovered" means nothing more than that an inmate is still alive after 14 days. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████[20]

63.     This is supported by the testimony of Mr. Valentine, Mr. Beal, and Mr. Butaud who testified that they did not see a doctor after testing positive (Trial Tr. 1-153:2–4 (Valentine); *id.* at 2-157:19–22 (Beal); *id*. at 2-198:3–5 (Butaud)) and that they did not see a doctor and were not retested before being returned to the general population as "recovered" (Trial Tr. 1-155:7–11 (Valentine); *id*. at 2-162:21–24 (Beal); *id*. at 2-200:11–15, 200:16–18 (Butaud)). This was despite the fact that Director Collier was informed as early as late-April that ████████████

████████████████████████████████████████████████████

████████████████████[21]

[20] PTX 336 (PENDING ADMISSION) (***under seal***) at number 262 (Wilder text dated June 14, 2020) (emphasis added).

[21] PTX 346 (PENDING ADMISSION) (***under seal***) at number 133–34 (Collier text (Magistrate-ordered production) dated Apr. 26, 2020).

64.     During the pendency of this case and during trial, TDCJ repeatedly promised and were ordered to disclose test results to the Court and to Plaintiffs. ECF Docket Entry (July 8, 2020, 2:22 p.m.); Trial Tr. 9-6:21–7:8, 10-4:18–5:9 (Defendants' Counsel). Despite this instruction, this was not done and instead the evidence of test results has been skewed by Defendants' failure to produce them.[22]

65.     During Defendants' case, Defendants repeatedly asked that the Court accept either their representations or their website as the accurate set of results at the Pack Unit, claiming that DTX 56 provided the underlying documentation. Trial Tr. 13-74:6–21, 13-130:19–131:3, 15-47:21–48:2 (Defendants' Counsel). To the contrary, DTX 56 is not underlying documentation—it is a table purporting to summarize results through July 21, 2020, which entirely excludes positive test results for at least 166 Pack Unit inmates that were reported to TDCJ on or before July 9, 2020. *See* PTX 161 (*under seal*); PTX 168A (*under seal*); PTX 168B (*under seal*); PTX 167 (*under seal*); PTX 170 (*under seal*). Defendants' own characterization of DTX 56 reflects that only "mass testing" results were included. Trial Tr. 16-28:22–29:2 (Defendants' Counsel). Thus, if correct, any hospital or infirmary tests that took place after July 9, 2020 have not been disclosed by Defendants. *See* PTX 168A (*under seal*).

66.     Defendants' production of hospitalization information is also incomplete. After Plaintiffs twice sought to compel this information, Defendants twice agreed to provide it. *See* ECF Nos. 199 & 230. Instead, the primary evidence of cumulative hospitalization is a TDCJ table purporting to list Pack Unit inmates who have been hospitalized overnight through July 11, 2020. PTX 289 (*under seal*). This table omits, of course, hospitalizations that did not last

---

[22] ████████████████████████████████████████████
████████████ PTX 338 (PENDING ADMISSION) (*under seal*) at numbers 269-71 (Davis (3) text dated May 29, 2020)████████████████████████████████

overnight—including inmates who died before being in the hospital more than one night. Compare *id.* at 2 (not listing Mr. Clerkly) with PTX 180 (listing Mr. Clerkly's place of death as Grimes County Hospital). ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████.[23]

67.     Moreover, Defendants have not provided any evidence that purports to identify those Pack Unit inmates who are currently under medical restriction, who are currently under medical isolation, or who have "recovered," which are each categories of information Defendants sought to stipulate based upon their own website. *See* Trial Tr. 13-74:9–21 (Defendants' Counsel); *id.* at 15-47:23–48:2 (Defendants' Counsel). Instead, this information has exclusively been limited to updates from Defendants' Counsel and the TDCJ website with a snapshot of the current number, without any identifying, supporting information that the Court (or Plaintiffs) could examine. *See, e.g.*, DTX 57.

68.     As also illustrated above, TDCJ's website does not reflect complete numbers and the numbers often conflict with counsel's representations. For example, the website reflected one fewer positive case on August 7, 2020 than it did when Defendants submitted the webpage as an exhibit on August 3, even as the same website reflected new positive cases were found during trial. Trial Tr. 15-38:23–39:8 (Young); *compare* D. Ex. 57 *with* Ex. 1. Without any testimony or documentation whatsoever demonstrating the source or accuracy of the website's information beyond the test results admitted into evidence in this case, the Court cannot credit TDCJ's counsel's otherwise unsupported assertion of the number of inmates on medical restriction, on

---

[23] PTX 344 (PENDING ADMISSION) (*under seal*) (excerpt of Mendoza chat 232 dated June 15, 2020).

medical isolation, or who have "recovered" at the Pack Unit. TDCJ officials confirmed that there

was ███████████████████████████████████████████████████[24]

69.     Even if the website were accurate, there could have been 16 new positive cases while 16 other positive cases were transported off the facility, such as to the hospital—or the number could have remained the same;[25] without the underlying identifying information, the Court cannot distinguish between these possibilities. TDCJ had numerous opportunities to supply this documentation—and was actually ordered to—but decided instead to wait until the end of trial to ask for a stipulation about disputed facts.

## B.     Defendants Are Violating Plaintiffs and the Class's Eighth Amendment Rights for the Conditions of Their Confinement

### 1.     COVID-19 Poses a Heightened Risk of Serious Harm to Plaintiffs and the Class

#### a.     COVID-19 Poses a Heightened Risk of Serious Harm to the Elderly and Individuals with Comorbidities

70.     COVID-19 is highly communicable and spreads easily through close proximity or contact or by touching contaminated surfaces. Trial Tr. 4-213:17–19, 4-233:8–18 (Young); DTX 1 at 1; PTX 94 at 1, 3.

71.     Before this lawsuit, the CDC issued a number of warnings about COVID-19. The CDC warns that certain groups are more likely to suffer severe illness,[26] including people with:

- Moderate to severe asthma (PTX 93 at 1);

---

[24] PTX 338 (PENDING ADMISSION) (*under seal*) at number 7 (Davis text (No. 3) dated April 11, 2020).

[25] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████

[26] The CDC defines "severe illness" to mean "the person with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die." PTX 97 at 1.

- Chronic lung disease (*id.* at 2);

- Diabetes (*id.*);

- Serious heart conditions "including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension" (*id.*);

- Chronic kidney disease (*id.* at 3);

- Severe obesity (*id.*);

- People aged 65 years and older (*id.*);

- People who live in a nursing home or long-term care facility (*id.*);

- Immunocompromised (*id.* at 4); and

- Liver disease (*id.*).

72.     Dr. Jeremy Young, Plaintiffs' infections disease expert with experience in prison health programs, testified that certain groups of people are at a higher risk of developing serious symptoms if they contract COVID-19. Trial Tr. 4-212:17–213:13 (Young). Those include elderly people, as well as those with certain "underlying medical conditions including heart disease, lung disease like COPD, peripheral vascular disease or diabetes, among others." *Id.*; *see also* PTX 93; Trial Tr. 1-42:19–43:3 (Collier) (explaining that "anyone with a preexisting medical condition or anyone who is elderly could have more significant complications" from COVID-19). This includes the inmate population at the Pack Unit. *Id.* at 4-213:4–215:22 (Young); *see also id.* at 9-82:18–20 (Zawitz). For example:

- Plaintiff Laddy Valentine uses a walker to ambulate. Trial Tr. 1-150:4–13 (Valentine). Mr. Valentine also has chronic medical conditions including drop foot, atrophy and weakness in the upper-left extremity, high blood pressure, hypertension, nerve damage from a stroke, and limited ability to grip with his left hand. Trial Tr. 1-148:20–149:20, 150:14–17 (Valentine). Mr. Valentine requires medication for his hypertension. *See* PTX. 183, at 9. Mr. Valentine also suffers from hyperlipidemia, diabetes, and kidney disease. PTX 184 at 11, 14.

- Mr. King is 73 years old and has diabetes, high blood pressure, and chronic kidney failure. Trial Tr. 2-8:21–24, 10:6–11:13 (King). He also has trouble

regulating his diabetes and recently passed out because of the food given to inmates during the lockdown. *Id.*

- Mr. Jones had his right leg amputated above the knee, has a metal plate in his pelvis, metal rods in his arm, limited use of this right hand due, high blood pressure, irregular heartbeat, and back pain. Trial Tr. 76:11–22 (Jones). Mr. Jones is not able to walk and uses a wheelchair at all times. *Id.* at 76:24–77:5, 83:1–5 (Jones).

- Mr. Beal has had numerous surgeries and suffers from cardio issues and high blood pressure. Trial Tr. 2-152:13–22 (Beal). He also uses a wheelchair at all the time and cannot move around without it. Trial Tr. 2-153:5–9 (Beal).

- Mr. Pennington is obese and has high blood pressure, diabetes, deep vein thrombosis in his leg, a tumor, and sleep apnea. Trial Tr. 2-237:23–238:3, 237:10–12 (Pennington). Mr. Pennington also uses a walker. *Id.* at 2-237:4–5 (Pennington).

- Mr. Dove is 73 years old and is diabetic, has high blood pressure, suffered a heart attack in 2014, and suffered from a stroke in November. Trial Tr. 2-188:1–12 (Dove). Because of his stroke Mr. Dove has paralysis on his right side, has difficulty speaking, and is clinically blind such that he cannot see writing and cannot make out any details for how a person looks. *Id.* at 2-188:13–19, 2-188:23–189:10 (Dove).

- Mr. Butaud has chronic hepatitis C, chronic asthma, hypertension, and was previously in a wheelchair. Trial Tr. 2-196:4–11 (Butaud).

73. Moreover, residing in congregate settings, such as in prisons and other correctional facilities, nursing homes, or cruise ships, where people are clustered together for extended periods of time increases the opportunity for transmission of viruses, particularly for those that are extremely contagious like COVID-19. *Id.* at 4-213:14–20 (Young).

74. COVID-19 is especially transmissible because of its long incubation period of up to two weeks and asymptomatic or pre-symptomatic presentation in many people, allowing them to spread the disease while exhibiting only mild or no symptoms and rendering screening for such symptoms ineffective. *See* Trial Tr. 4-241:14–22, 5-31:4–9 (Young). Indeed, Mr. Valentine tested positive while asymptomatic. Trial Tr. 1-153:5–11 (Valentine).

75.     COVID-19 therefore poses a "huge threat" to the inmate population at the Pack Unit and has been a huge threat "for a few months." Trial Tr. 4-213:4–13 (Young). Director Collier acknowledged at trial that the threat COVID-19 poses persists at TDCJ Units and is higher now than it was even a few months ago. Trial Tr. 10-7:16–21 (Collier).

### b.      Incidence of COVID-19 at the Pack Unit

76.     Although Defendants and their witnesses have repeatedly cited to the rising infections and deaths in the United States, the Pack Unit performance is far worse, per capita, than the United States. *Contra* Trial Tr. 13-131:4–11 (Defendants' Counsel); *see also id.* at 4-214:25–215:8 (Young). The number of positive cases as a proportion of people tested in the United States is 9%.[27] PTX 86. The number of positive cases as a proportion of people tested in the State is 11%.[28] PTX 128. By comparison, the Pack Unit currently stands at roughly 40% by the same metric. *See* Trial Tr. 4-214:17–24 (Young); 6-72:19–24 (Vail).

77.     Over 500 positive cases have been found since April 13, when there were 1,248 men incarcerated at the Pack Unit. *See* PTX 171 at 49; Trial Tr. 13-42:5–8 (Follenweider) (505 people have tested positive at Pack); *id.* at 12-132:19–24 (Zepeda). Likewise, the number of deaths related to COVID-19 in the United States currently stands at 151,596, while the number in Texas is 9,826.[29] PTX 87. As a proportion of population, this is equivalent to a death rate of 46 per 100,000 people in the Country and 33 per 100,000 people in Texas.[30] PTX 117.

---

[27] Centers for Disease Control, *Testing Data in the U.S.* (retrieved Aug. 7, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/testing-in-us.html.

[28] Texas Department of State Health Services, *Texas Case Counts* (retrieved Aug. 1, 2020), *available at* https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83

[29] Centers for Disease Control and Prevention, *Daily Updates of Totals by Week and State* (retrieved Aug. 7, 2020), *available at* https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.

[30] United States Census, Quickfacts (July 1, 2019) *available at* https://www.census.gov/quickfacts/fact/table/US/PST045219.

78.     The Pack Unit currently has experienced *at least* 20 known COVID-19-related deaths amongst an inmate population of just 1,248—resulting in a death rate of 1,602 per 100,000 people. Thus, the death rate from COVID-19 at the Pack Unit is more than 34 times that of the country, and more than 47 times that of the state.

### c.     COVID-19 Poses a Continued Threat to Inmates at the Pack Unit

79.     Despite that over 40% of the Pack Unit residents have already contracted COVID-19, it remains a continuing, omnipresent threat to the inmate population, particularly the 500-700 men who have not yet been infected, likely at least until a vaccine is widely available. Trial Tr. 5-29:6–16, 15-38:20–39:8 (Young); *id*. at 9-151:16–152:3 (Zawitz).

80.     As Director Collier explained, the risk now is even higher than when Plaintiffs filed suit:

> However, as the community numbers substantially increased in the month of June, I -- to me, we have a bigger threat of COVID now than we did in March, a significantly higher threat because more people have COVID. And that risk of our employees being in the community around more people with it I think is higher than it was even a few months ago.

Trial Tr. 10-7:16–21 (Collier).

### 2.     Defendants Are Aware of the Obvious Ongoing Substantial Risk of Serious Harm that COVID-19 Poses to Plaintiffs and the Class

### a.     Defendants' General Knowledge of COVID-19 Risks

81.     Defendants concede that COVID-19 presented an emergency as early as January. Trial Tr. 9-83:19–22 (Zawitz). Defendants certainly knew it was dangerous by February. Trial Tr. 3-51:24–52:8 (Herrera); *see also id.* at 3-52:10–20, 3-71:6–7 (Herrera) ("I knew that COVID-19 was a dangerous situation."). Indeed, on February 26, 2020, TDCJ officers met with emergency management officers from other Texas agencies to monitor to progress of COVID-19 around the world and plan their response. PTX 12 at 2; PTX 13 at 4.

82.    Defendants specifically knew it was a danger to inmates in TDCJ by March, and that if the virus infiltrated the Pack Unit, it could have deadly implications for the staff and the inmates. Trial Tr. 3-52:10–13, 3-52:14–20 (Herrera); *see also* Trial Tr. 1-42:19–43:6 (Collier).

83.    On March 9, 2020, TDCJ's Director of Health Services, Dr. Lannette Linthicum, began attending daily Texas Department of State Health Services briefings on COVID-19. PTX 14 at 3.

84.    On both March 11 and 16, 2020, TDCJ officials, including Director Collier, stated that there were no cases of COVID-19 in any TDCJ Unit, but TDCJ announced to the public that it was taking the risk of COVID-19 seriously. PTX 4; PTX 5. Steps TDCJ announced included screening of those entering TDCJ facilities for COVID-19 (PTX 15 at 4), waiving inmate health care fees due to COVID-19 (PTX 18 at 3; PTX 19 at 3; PTX 21 at 1), and circulating guidelines for cleaning vehicles in light of COVID-19 (PTX 20 at 3).

85.    

86.    On March 21, 2020, Dr. Linthicum proposed to Davis that PPE be distributed to inmate transport officers.[33] PTX 23 at 3. At that time, the TDCJ and its medical contractors had

---

[31] PTX 337 (PENDING ADMISSION) (*under seal*) at number 3776–77 (Davis text dated Mar. 11, 2020).

[32] PTX 337 (PENDING ADMISSION) (*under seal*) at number 3787–88 (Davis text dated Mar. 12, 2020).

[33] Also on March 21, 2020, Texas Representative James White circulated a letter to the Texas legislature reporting on TDCJ's COVID-19 response. PTX 122. The letter noted that TDCJ had experienced COVID-19 cases, including an inmate and a contractor, but no cases amongst employees. *Id.* at 2.

approximately 152,000 N95 masks, 88,000 surgical masks, and 89,000 gowns stored at TDCJ facilities. PTX 24 at 4.

87.     By March 26, 2020, TDCJ became aware of COVID-19 cases in its prison system. PTX 25 at 5. That same day, TDCJ asked Texas jails to take precautions by screening inmates before transporting them to TDCJ facilities. PTX 26 at 2.

88.     Defendants also knew the need to protect inmates from that danger, as confirmed by the decision to adopt the first COVID-19-specific policies in March. *See* PTX 22 (TDCJ March policy); PTX 108 at 6 (Mar. 20, 2020 B-14.52 policy); PTX 109 at 6 (Mar. 27, 2020 B-14.52 policy); *see also* Trial Tr. 3-52:10–20 (Herrera) (acknowledging the dangers of Covid-19 and the potential deadly implications for Pack Unit staff and inmates). Indeed on March 20, 2020, the Correctional Managed Health Care Committee (CMHCC), of which TDCJ is a voting member, issued its first COVID-19-specific policy "To outline management and control measures for facilities to follow in response to the spread of COVID-19."[34] PTX 108 at 6.

89.     As early as April 4, 2020, TDCJ and its medical contractors began fielding complaints from local government officials about the prevalence of COVID-19 in prisons. PTX 34 at 5. In one incident, a local hospital refused to treat a prisoner because of COVID-19 concerns. *Id.* at 34.

90.     On April 8, 2020, TDCJ asked the Governor to suspend the requirement that TDCJ receive new inmates from local jails. PTX 35.

**b.     Defendants' Knowledge of COVID-19 Risks to Pack Unit Inmates**

91.     TDCJ understands the health risks of Covid-19, and that it poses a particularly

---

[34] At approximately the same time, TDCJ created a document that purports to be a TDCJ "Pandemic Viral Infectious Disease Policy for Novel Coronavirus (COVID-19)," although no witnesses have testified that they are aware of, much less implemented or follow, this policy. See PTX 22.

high risk to the elderly and those with preexisting conditions. Trial Tr. 7-8:1–10:13 (Mendoza, TDCJ 30(b)(6) Testimony). Director Collier also understood that that COVID-19 poses more severe complications for those, like the inmates at Pack, who suffer from preexisting medical conditions or who are elderly. Trial Tr. 1-42:19–25 (Collier). Director Collier knew back in March 2020 that Pack had an elderly population and housed more elderly inmates than other TDCJ facilities do, and that Pack inmates could therefore have "more significant complications" if they contracted COVID-19. *Id.*; *see also id.* at 43:1–6 (Collier). Indeed, Director Collier acknowledged that Pack has a "more frail population" than most other TDCJ facilities. Trial Tr. 10-46:1–5, 59:19–60:1 (Collier) (noting that the majority of inmates at Pack need to be in a TDCJ facility that has "24-hour medical care"). He also acknowledged that the Pack inmate population is "obviously . . . more vulnerable if they get" COVID-19. Trial Tr. 10-25:21–24 (Collier). Collier admitted at trial that, as of May 2020, he knew that the Pack Unit's growth rate in new COVID-19 positive cases was "significant." Trial Tr. 10-125:3–8 (Collier).

92.     Not only did Director Collier recognize the serious risks COVID-19 poses, but he acknowledged at trial that that the virus poses "a significantly higher threat" now than "even a few months ago," because more people are infected. Trial Tr. 10-7:16–21 (Collier).

93.     Warden Herrera similarly knew the Pack Unit's inmates are a more vulnerable population to serious health consequences if they contract COVID-19. Trial Tr. 3-52:25–53:5 (Herrera) (acknowledging that he understood COVID-19 was even more dangerous for the elderly and medically compromised, like the inmates at Pack); *id.* at 4-121:14–17 (Herrera) (acknowledging the Pack inmates are and "older population" and "more vulnerable").

94.  ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ [35]

95.  By April 13, 2020, TDCJ had provided masks to every inmate in 22 other facilities, and began a plan to provide two masks for those over 65 at 42 more facilities. PTX 299. However, TDCJ decided not to provide them for Pack in this ratio—instead, only one per inmate 65 or older. *Id.*; PTX 300. This was true even though TDCJ had over two-hundred thousand cotton masks in inventory at the time. *See* Trial Tr. 4-93:12–94:4 (Herrera).

**3.  Defendants Are Deliberately Indifferent to the Serious Risk of Harm Presented by COVID-19**

**a.  Defendants Failed to Adopt COVID-19 Precautions to Account for the Particularly Vulnerable Population at the Pack Unit**

96.  TDCJ acknowledges that it has no separate policy for the Pack Unit, despite its knowledge of the increased risk to the Pack Unit's unique population. Trial Tr. 7-28:5–19 (Mendoza, TDCJ 30(b)(6) Testimony). The only policies for the Pack Unit are 14.52 and the general CDC guidance. *Id.* No changes were made specifically for the Pack Unit to either. Trial Tr. 7-28:20–29:24 (Mendoza, TDCJ 30(b)(6) Testimony). TDCJ's policy to deal with COVID-19 is ineffective and woefully inadequate for preventing the spread of the virus inside the Pack Unit. Trial Tr. 4-217:8–16, 4-260:12–22, 5-55:1–4 (Young) ("When you look at 40 percent of the population being infected with COVID-19 with 19 deaths, when you look at those numbers, I know that whatever has been implemented there, whatever policies, are just simply not working. There's been ongoing spread over the past few months."); *id*. at 6-74:25–75:3, 6-11:9–16 (Vail).

---

[35] PTX 337 (PENDING ADMISSION) (*under seal*) at number 3982 (Davis text dated Apr. 10, 2020).

97. Indeed, over 500 Pack Unit inmates became infected with the virus, notwithstanding the implementation of Policy B-14.52.[36] Trial Tr. 4-217:8–16 (Young); 12-132:19–24 (Zepeda); 13-42:5–8 (Follenweider). And despite that, TDCJ has done nothing to adapt or adjust its policy, which clearly is not working, to the Pack Unit. As Dr. Young put it, "the house has been burning down for three and a half months, and [TDCJ] hasn't called the fire department." Trial Tr. 5-75:4–5 (Young).

98. Before the COVID-19 policy issued March 20, 2020, TDCJ's most applicable policy was an "influenza-like illness" policy. PTX 103. The policy encourages hand washing, cough etiquette, keeping ill staff at home, and regular disinfection of common areas. *Id.* The policy also anticipates isolating ill inmates and following droplet precautions for them—including the use of masks and 6 feet of distance. *Id.* Other TDCJ infection policies require reporting of exposures (PTX 106 at 2) and the creation of an oversight committee for infection control (PTX 105).

99. Since CDC issued its Guidance for Correctional and Detention Facilities, TDCJ has been inadequately relying on that guideline despite the unique vulnerabilities of the Pack Unit. Trial Tr. 5-41:10–20 (Young).

100. The CDC's Guidance for Correctional and Detention Facilities emphasizes that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." PTX 96 at 1 (emphasis removed). However, TDCJ's Correctional Institutions Division was not involved in the creation of the B-14.52 policy. Trial Tr. 7-41:3–9 (Davis). Ms. Davis confirmed that CMHC drafted policy and that she "was not provided a copy of the policy to give input on when it was drafted." *Id.* at 7-41:3–9 (Davis). The

---

[36] *See* Appendix A, Positive Results for Pack Unit Inmates From Documents (***under seal***).

policy did not include input from Ms. Davis regarding TDCJ's individual facilities, staffing, population, operations, and other resources and conditions. *Id.* at 7-42:10–43:7 (Davis).

101.     Correctional officials should have been involved in the formulation of Policy B-14.52. Trial Tr. 6-80:4–11 (Vail). However, there is no evidence that any correctional officials were on the committee that developed B-14.52. Trial Tr. 6-80:12–17 (Vail). Indeed, Warden Herrera testified that he was not a decision-maker for, and had no authority to make any changes to, Policy B-14.52. Trial Tr. 3-95:15–18; *see also id.* at 6-230:10–231:14 (Sullivan) (explaining that as a Major at the Pack Unit he was also "not authorized" to make recommendations regarding Policy B-12.52).

102.     Despite a leading question from Defendants' Counsel, Dr. Zepeda—who helped author the policy—would not agree that Policy B-14.52 adapts the CDC guidelines for TDCJ's prison "facilities, security restrictions, et cetera." Trial Tr. 12-113:16–24 (Zepeda) (explaining only that the CDC guidance was "adapted to our healthcare system" and that "It's not word for word verbatim TDCJ guidance").

103.     Defendants relied heavily on the testimony of Dr. Zepeda to detail the development of the various iterations of Policy B-14.52. However, Dr. Zepeda confirmed that she had not been to the Pack Unit for many years and could not speak to how the Policy B-14.52 was actually implemented at any TDCJ facility or if the Pack Unit had implemented the policy at all. Trial Tr. 12-118:15–21, 119:5–12 (Zepeda). Moreover, the credibility of Dr. Zepeda's testimony was undermined when she was unable to answer basic questions on cross-examination. For example, Dr. Zepeda repeatedly refused to answer directly (including in response to questions from the Court) whether a policy would be effective if it were not actually being followed—a primary issue in this case. Trial Tr. 12-139:7–142:14 (Zepeda).

104.    Prison wardens are expected to consider and address issues specific to their units. Trial Tr. 6-148:11–149:10 (Vail). However, rather than implement Pack-Unit specific policies to address the particularly vulnerable population at the Pack Unit, TDCJ blindly followed (unsuccessfully) Policy B-14.52. Trial Tr. 11-246:12–17, 251:8–14, 266:2–7 (Wilder).

i.    **TDCJ's Policy B-14.52 Disregards the Known Substantial Risk of Harm Unique to the Population at the Pack Unit**

105.    Even though Warden Herrera and Director Collier knew that the Pack Unit housed those with preexisting medical conditions and those who are elderly (and who are therefore at risk of serious illness or death if they contract COVID-19), Warden Herrera never raised in his several discussions with Collier anything he needed or wanted to help prevent COVID-19's spread inside the Pack Unit. Trial Tr. 1-43:4–20 (Collier); *see also id.* 3-73:4–7 (Herrera) (acknowledging that he never raised with Director Collier anything that Pack might need to help protect the inmates from COVID-19). And despite Pack's more medically susceptible and vulnerable population, Warden Herrera confirmed that he never had his staff affirmatively ask inmates whether they were experiencing any symptoms. Trial Tr. 3-57:15–23 (Herrera). This was true, unfortunately, even though Oscar Mendoza, TDCJ's Deputy Executive Director and corporate representative in this case, testified at his deposition that the Pack Unit staff "was supposed to be going out and affirmatively asking inmates how they were feeling and if they were experiencing symptoms." Trial Tr. 3-58:1–59:3, 3-59:24–60:2, 3-60:13–16. (Herrera).

106.    While TDCJ ultimately used Correctional Managed Healthcare Policy B-14.52 to deal with COVID-19 on a system-wide basis, that policy applies system-wide to all 104 TDCJ facilities and does not take into account the uniquely vulnerable inmate population at Pack. Trial Tr. 1-69:14–21 (Collier); *id.* at 11-197:23–198:5 (Wilder); *id.* at 6-74:25–75:3, 6-76:13–77:3, 6-205:22–206:7 (Vail); *see also id.* at 10-196:18–197.2 (Collier); *id.* at 3-73:8–17 (Herrera) (noting

that there is no COVID-19 policy customized for the Pack Unit, and confirming that Policy 14.52 applies equally to all TDCJ units); *id.* at 3-74:7–11, 3-76:2–22 (Herrera). In fact, Warden Herrera testified that TDCJ did nothing at all to customize Policy 14.52 for the uniquely vulnerable population at Pack, even though he acknowledged that CDC's guidelines note that they can be adapted to address the individual facility's space, staffing, population, and other conditions. Trial Tr. 3-74:18–76:6, 3-77:2–10 (Herrera) (confirming that no one who developed Policy 14.52 sought Warden Herrera's input on how that policy might be customized to account for the uniquely vulnerable population at Pack); *see also* PTX 88. Moreover, TDCJ did nothing to tailor the CDC Guidance for Correctional and Detention Facilities to its various units, drawing criticism from even its own experts. Trial Tr. 9-173:23–174:5 (Zawitz) (stating he would be critical of TDCJ and Warden Herrera if they did not adapt the interim guidance to fit the Pack facility).

107. As the Pack Unit warden, Warden Herrera would have had primary responsibility to take and apply TDCJ's policy specifically for the unit. Trial Tr. 7-45:14–18, 46:7–18 (Davis). TDCJ views Warden Herrera as the CEO of the prison, and he is responsible for everything that happens and everything that does not happen. Trial Tr. 7-12:1–13 (Mendoza, TDCJ 30(b)(6) Testimony). Warden Herrera was expected to the follow the B-14.52 policy, but he has discretion to go beyond it to apply further protections for his particular prison. Trial Tr. 7-11:3–25 (Mendoza). As Warden, he is expected to know the particular needs of his elderly and inform population, and what changes would be needed to protect them. *See* Trial Tr. 7-12:14–13:1 (Mendoza). Despite this, Warden Herrera never asked Ms. Davis—as head of the Correctional Institutions Division—to make any modifications or for additional measures specific to the Pack Unit. Trial Tr. 7-48:9–22 (Davis). Nor did he ask his boss, Regional Director Gene Monroe, to

tailor 14.52 to account for the unique population of Pack inmates. Trial Tr. 3-79:7–17 (Herrera). And similarly, none of Warden Herrera's superiors ever asked him for his opinion as to whether the Pack Unit should have more precautionary measures in place versus what the standard, system-wide policy B-14.52 called for. Trial Tr. 3-80:4–84:5 (Herrera) (confirming that none of his superiors ever sought his opinion as to whether more precautionary measures were necessary for the unique population at Pack). Remarkably, Warden Herrera—the senior warden at the Pack Unit—never talked to Dr. Linthicum or anyone on her TDCJ healthcare team about COVID-19 *at all*. Trial Tr. 3-84:17–24, 3-100:2–5 (Herrera).[37]

108. While, the Pack Unit's assistant warden, Paul Wilder, submitted a "Limited Activities Plan" to Regional Director Carol Monroe on April 11, 2020, this plan was never implemented. Much of the limited activities plan was immediately obsolete when the unit went to "precautionary lockdown" within days of its submission. Trial Tr. 10-227:7–9 (Wilder). Even so, the plan had no schedule for cleaning; instead, it asserts that common surfaces are cleaned "continuously" by inmate laborers, or in between housing areas for specific functions including showers and housing areas. PTX 39 at 2. The Pack Unit never created a new plan, despite the mounting toll of the virus and the passage of three-and-a-half months on lockdown.

---

[37] While TDCJ's counsel asked Warden Herrera a series of mostly leading questions to get him to agree that the Pack Unit was somehow given "preferential treatment" vis-à-vis the other TDCJ facilities (*see, e.g.*, Trial Tr. 3-208:17–25, 3-216:17–21, 3-217:23–218:6), counsel's efforts to put words into Warden Herrera's mouth were thwarted on re-cross-examination. *See, e.g.*, Trial Tr. 4-67:2–20 (Herrera) (noting, twice, that "preferential treatment" were not words Herrera would use: "I'm not going to call it special or preferential treatment."). And in any event, re-cross examination dispelled any notion that Pack was afforded any special or preferential treatment under Policy 14.52. *See, e.g.*, Trial Tr. 4-71:8–73:11 (Herrera) (noting that Pack hadn't received masks even though other TDCJ units had); *id.* at 4-87:3–88:22 (Herrera) (acknowledging that Pack didn't actually receive first priority in inmate COVID-19 testing, even though Mr. Clerkly had perished from the virus); *id.* at 4-89:4–10 (same); *id.* at 4-90:5–91:11 (same, and noting "I'm not going to call [testing protocols at Pack] special or preferential treatment ...."); *id.* at 4-94:6–23 (noting that providing face towels to inmates every day may or may not have been unique to Pack; Herrera wasn't sure); *id.* at 4-94:25–95:25 (Herrera acknowledging that he didn't know whether handwashing stations were available at other units, and also acknowledging that those stations were brought in just before trial).

109.    And even though the Pack Unit has an exponentially higher number of COVID-19 infections versus other TDCJ facilities—for example, the Luther Unit, which is adjacent to Pack and is on the same property (Trial Tr. 9-123:22–124:10 (Zawitz) (comparing infection rate at Pack Unit with the infection rate at the Luther Unit))—TDCJ has not investigated why Pack has such a markedly higher infection rate and hasn't instructed its medical team to investigate that problem.[38] Trial Tr. 10-187:1–8, 10-189:22–190:20, 10-191:13–15 (Collier); *see also id.* at 7-50:23–51:51 (Davis) (explaining that TDCJ followed the 14.52 the same as every unit even in light of the outbreak); *id.* at 3-84:25–85:7 (Herrera); *id.* at 4-122:2–24 (Herrera).[39] Indeed, Warden Herrera testified that he was not even aware of how the number of positive cases at the Pack Unit ranked against those at other units. Trial Tr. 3-90:2–15 (Herrera). And although he knew that the nearby Luther Unit had reported zero COVID-related deaths, Warden Herrera did not think it important enough to analyze (or ask the Luther Unit's warden) what might explain the difference between the success Luther was having versus the (then) 19 COVID-related deaths at the Pack Unit. *See* Trial Tr. 3-92:7–94:18 (Herrera); 3-95:2–14 (Herrera); 4-122:9–24.[40]

110.    Major Sullivan testified that in his view the Pack Unit was doing "pretty good"— "19 offenders have died and we've saved 1100 by following the policy? I think that is pretty good as far as I can tell, but I'm going to continue to follow 14.52. I'm not a medical professional. I can't change that and that's the policy that's in place and we're going to follow

---

[38] Major Sullivan testified that whether there were 19 deaths or 50 deaths at the Pack Unit, he was "not going to be able to change 14.52" and that he was "going to follow it" because it was not his role to suggest changes to the policy. Trial Tr. 6-231:15–232:20 (Sullivan) (adding, "I don't get paid to do that.").

[39] Warden Herrera also testified that he has never compared the death rates at Pack in the current year versus those of prior years to try to discern the incremental death rate attributable to COVID-19. Trial Tr. 4-121:19–25.

[40] *See also* Trial Tr. 3-92:25–93:6 (Herrera) ("Q: And so, in view of that, you didn't think it was important to ask the warden at the Luther Unit how many deaths or positive COVID-19s have you had on your unit? A: I know that the Luther Unit hadn't had any deaths.").

it." Trial Tr. 6-232:24–233:11 (Sullivan); *see also id.* at 6-233:12–234:17 (Sullivan). Warden Herrera apparently had a similar view that "things are going well" at the Pack Unit in his report to Ms. Davis the week before trial. Trial Tr. 7-49:13–17 (Davis). Ms. Davis chose not to question this assessment or ask Warden Herrera how it squared with the high number of positive COVID-19 cases and deaths at the Pack Unit. Trial Tr. 7-49:18–24 (Davis).

111. The week before trial, Ms. Davis confirmed that TDCJ did not know why there was such a high number of positives and (at that point) at least 18 deaths at the Pack Unit alone, but more troubling was that she had not yet even endeavored to find out why this was occurring at the Pack Unit. Trial Tr. 7-52:3–9, 7-52:19–53:10 (Davis).

### ii. Defendants Failed to Adopt a Policy Providing Access to Hand Sanitizer to Control the Spread of COVID-19 at the Pack Unit

112. Policy B-14.52 doesn't permit the use of hand-sanitizer, even though the population of inmates at the Pack Unit consists of medically vulnerable, elderly, and mobility-impaired inmates. Trial Tr. 4-217:17–218:20 (Young); *see also* Trial Tr. 1-63:20–64:5, 1-64:17–19 (Collier). The policy also does not provide scheduled, repeat testing with a good, sensitive test with a quick turnaround time. *Id.* at 4-218:22–219:8 (Young).

113. As addressed by Dr. Young, the provision of hand sanitizer in addition to access to soap and water is an important measure in combatting the spread of a respiratory virus like COVID-19. Trial Tr. 4-229:23–230:9 (Young). Hand hygiene is important in reducing spread of COVID-19 because people frequently cough or sneeze into their hands and proceed to touch inanimate objects that are then touched by others who then touch their faces, leading to transmission of the virus. *Id.* Hand sanitizer is effective at killing COVID-19 (*id.* at 4-231:6–14 (Young)), and access to hand sanitizer further assists with compliance of performing hand hygiene (*id.* at 4-227:16–25 (Young)). Inmates are not always able to easily access a sink for

soap and water because of their jobs in the prison. *See* Trial Tr. 2-134:2–19, 134:20–135:1, 135:23–136:2 (Jones). This is exacerbated for disabled and mobility-impaired inmates like those at the Pack Unit. Trial Tr. 1-169:13–170:3 (Valentine); Trial Tr. 2-95:4–96:6, 96:9–16, 125:8–25 (Jones); Trial Tr. 2-247:11–17 (Pennington); Trial Tr. 2-193:15–22 (Dove); Trial Tr. 2-159:2–160:11, 176:10–19 (Beal); 6-88:13–18 (Young). For this reason, Plaintiff Valentine, who uses a mobility-assist device to move about, filed a grievance specifically requesting hand sanitizer, but TDCJ denied that grievance. Trial Tr. 1-149:4–7; PTX 133 at 3.

114.     Defendants' expert, Dr. Zawitz, agrees that increased access to both soap and water as well as alcohol-based hand sanitizer likely reduces the extent of the spread of COVID-19. *Id*. at 9-95:13–17 (Zawitz). He further agreed that the provision of hand sanitizer was, in his words, "one very good option" (*id*. at 9-110:5–9 (Zawitz)) and that if he had a family member in prison, he would want them to have access to hand sanitizer (*id*. at 9-103:23–104:2 (Zawitz)). TDCJ's signs in the Pack Unit even reference the use of hand sanitizer, despite not being available to inmates. Trial 1-260:5–15 (Valentine); DTX 10.

115.     Shortly after the lawsuit was filed, the TDCJ and UTMB officers responsible for the CMHC 14.52 policy briefly discussed the flammability of hand sanitizer and the possibility of alcohol poisoning. PTX 32, at 3–4; *see also* Trial Tr. 1-75:7–11 (Collier).

116.     Any competent prison administrator would perform an analysis weighing the risks and benefits of providing inmates at the Pack Unit with hand sanitizer. Trial Tr. 6-71:2–13, 6-84:15–24 (Vail); 14-188:13–17 (Beard) ("[Y]ou have to weigh the balance").

117.     But TDCJ performed no analysis specific to the Pack Unit inmates to determine whether hand sanitizer posed any real risks to that population. Trial Tr. 1-75:21–23, 1-76:2–3 (Collier); *see also id.* 1-76:5–14 (Collier) (noting that there was no specific analysis of whether it

was possible to provide hand sanitizer to the Pack Unit's mobility-impaired inmates who possibly contaminate themselves by touching their mobility-assist devices).

118. Indeed, no analysis was performed even though inmates at a different unit (TDCJ's Roach Unit) are responsible for handling hand sanitizer, including rebottling it for *staff* use, without any problems. *Id.* at 1-76:23–77:9 (Collier). In fact, Director Collier testified that inmates at the Roach Unit prepare hand sanitizer for staff use without drinking it and without starting any fires with it. *Id.*; *see also id.* at 1-77:15–21 (Collier).

119. Inmates at the Pack Unit are provided razors, and the fact that TDCJ has overcome security concerns associated with razors demonstrates that their concerns over providing inmates at the Pack Unit with hand sanitizer are disingenuous. Trial Tr. 6-103:16–104:17 (Vail). Inmates also have access to many sources of flammable material, yet there is no issue with fires at the Pack Unit. Trial Tr. 2-166:16–23 (Beal); Trial Tr.4-125:11–13 (Herrera) (noting that in his ten years as warden at Pack, there hasn't been a single fire started).

120. And even though some 30 other states have relaxed restrictions on hand-sanitizer use among their inmate populations, Director Collier never discussed with his counterparts in those states how they have been able to relax restrictions without any incident. Trial Tr. 1-77:15–21, 1-78:9–12 (Collier). Even so, Director Collier acknowledged in a text exchange with Mr. Mendoza that, ████████████████████████████████████████████████████████████
████████████████████████████████████████[41]

121. One such state jail that has provided hand sanitizer to its inmates to help facilitate better and more frequent hand hygiene is Cook County Jail in Chicago, Illinois, where

---

[41] PTX 340 (PENDING ADMISSION) (***under seal***) at numbers 120–123 (Collier text (Aug. 10 production) dated April 4, 2020).

Defendants' experts Dr. Zawitz and Ms. Follenweider work or worked. Trial Tr. 9-87:19–88:1, 9-88:22–89:2 (Zawitz); *id*. at 12-228:6–21 (Follenweider). Defendants' medical expert admits that this provision of hand sanitizer to inmates is "consistent with" CDC guidelines. *Id*. at 9-90:13–19 (Zawitz).

122.     In fact, Dr. Zawitz testified that at the Cook County Jail, there was an injury involving hand sanitizer. *Id*. at 9-110:14–17 (Zawitz). Despite that, the Cook County Jail did not suspend the practice of providing hand sanitizer to inmates; rather, it continued that practice in the face of the injury. *Id*. at 9-110:18–21 (Zawitz).

123.     Additionally, the California prison system, which Defendants' expert, Dr. Beard, used to run, also provides hand sanitizer to inmates. Trial Tr. 14-187:6–20 (Beard).

124.     In fact, Dr. Beard admits that it is possible to come up with a plan at the Pack Unit to safely distribute hand sanitizer to inmates. Trial Tr. 14-188:6–12 (Beard). This is consistent with Director Collier's testimony that TDCJ *could* accomplish many of the requirements of this Court's preliminary injunction and "had most of it in place already," even though it ultimately chose instead to appeal the injunction instead. Trial Tr. 10-169:10–170:4 (Collier).

125.     Dr. Beard also acknowledged that the Pack Unit is a 37-year old facility and that sinks may be broken. Trial Tr. 14-186:14–19 (Beard). However, during his visit to the Pack Unit, Dr. Beard did not make any attempt to check how many of the sinks were actually working. *Id.* 14-186:20–25 (Beard). Similarly, Dr. Beard did not consider how far the nearest sinks are from any of the inmates to determine if soap and water were readily available. *Id.* 14-187:1–5 (Beard).

126.     The benefits of providing hand sanitizer to the inmates at the Pack Unit "greatly outweigh the associated risks." Trial Tr. 6-81:5–82:6 (Vail); 4-228:7–20, 4-231:15–232:24 (Young).

127. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████[42]

128.   In short, access to an alcohol-based hand sanitizer is medically necessary to help control the outbreak of COVID-19 at the Pack Unit. Trial Tr. 4-235:9–15 (Young).

### iii.   Defendants Failed to Adopt an Effective Testing Program to Control the Spread of COVID-19 at the Pack Unit

129.   Testing is an important part of controlling a communicable disease outbreak in a prison such as the Pack Unit because it provides a mechanism to understand the scope and extent of the outbreak, facilitates isolation and quarantine of people who test positive for the virus, and provides an indication as to whether strategies being employed at the prison are successful or unsuccessful. *See* Trial Tr. 4-259:19–260:11 (Young). Indeed, the CDC's Guidance for Correctional and Detention Facilities is "saturated in suggestions for testing" inmates for COVID-19 and both mentions testing several times and presumes that it is being conducted. Trial Tr. 6-58:7–61:6 (Young); *see also* PTX 88 at 4, 21.

130.   Director Collier acknowledged that testing for COVID-19 is an important part of controlling the spread of the disease. Trial Tr. 1-46:25–47:1, 47:7–9, 47:11–13, 47:18–25, 48:10–18 (Collier). Yet he acknowledged that even as late as June 4, 2020, TDCJ no formal or even informal plan to offer continued COVID-19 testing for Pack inmates. *Id.* at 1-49:12–16, 49:23–25 (Collier). He also admitted that he never read the declarations submitted in this lawsuit by the

---

[42] PTX 337 (PENDING ADMISSION) (*under seal*) at numbers 3179–84 (Davis text dated July 14, 2020).

Plaintiffs' medical experts (e.g., Dr. Young) or the prison-administration experts. *Id.* at 1-90:24–91:5. Nor did he direct anyone on his team to do so. *Id.* at 1-91:7–93:1. Indeed, Director Collier admitted that he had not even considered what those experts had to say. *Id.* at 92:16–93:1.

131.    Despite recommendations from infectious disease experts and a preliminary injunction underscoring the importance of mass testing in mid-April (ECF No. 40 at 4; ECF No. 16; Trial Tr. 5-14:10–15, 6-57:6–19 (Young)), mass testing at the Pack Unit did not begin until mid-May ██████████████████████████████████████[43] Trial Tr. 5-14:16–24 (Young); 10-27:15–23 (Collier).

132.    This mass testing occurred approximately four-to-six weeks after Mr. Clerkly died. *See id.* at 5-14:16–24 (Young); Trial Tr. 9-157:10–12 (Dr. Zawitz). Although prison officials tested the 54 inmates housed in Mr. Clerkly's dormitory in April, soon after he died, that narrow testing was insufficient because all of those inmates tested negative, which means that Mr. Clerkly had to have contracted the virus from a source outside of his dormitory. Trial Tr. 5-14:25–15:13 (Young); *see also* Trial Tr. 10-161:17–163:3 (Collier) (acknowledging that after Mr. Clerkly died from COVID-19, TDCJ took no action beyond testing those 54 inmates in Mr. Clerkly's dorm (who all tested negative) to try to identify the potential source of the virus inside Pack); *id.* at 10-163:10–164:10 (Collier) (acknowledging that even though Director Collier didn't know where Mr. Clerkly contracted the virus, TDCJ did no testing beyond those in Mr. Clerkly's dorm to try to find out).

133.    Nearly 200 inmates tested positive for COVID-19 during the first round of "strike team" testing. *See* PTX 76 at 6–7.

---

[43] PTX 336 (PENDING ADMISSION) (*under seal*) at numbers 1210 (Wilder text dated May 10, 2020)██████████████████
███████

134. Even after TDCJ officials implemented mass "strike team" testing for all inmates at the Pack Unit, the testing results lagged behind the tests for five to 14 days. Trial Tr. 2-16:20–17:5 (King); *id*. at 10-131:1–4 (Collier) (noting results took seven to 14 days);[44] *see also id*. at 9-158:16–21 (Zawitz); *id*. at 5-15:14–17 (Young). If results take that long to be returned, the test is ineffective because negative inmates and positive inmates are comingling while the results are pending—increasing the possibility of transmission. *Id*. at 5-5:14–16:15, 5-129:6–15 (Young); 9-158:17–21 (Zawitz); 11-256:4–262:2 (Wilder); 12-267:3–15 (Follenweider). This occurred with the first round of strike team testing. Trial Tr. 17:6–21 (King). This is a fact that TDCJ and high-level Pack Unit staff knew or should have known. *Id*. at 9-158:17–24 (Zawitz); 11-256:4–262:2 (Wilder). Despite knowing about the long lag time and the cohorting of inmates, TDCJ had no plans to retest at the Pack Unit in May after the first round was complete state-wide. Trial Tr. 7-32:10–35:25 (Mendoza, TDCJ 30(b)(6) Testimony). TDCJ also did not test all staff during the first round of testing (Trial Tr. 1-156:22–157:1 (Valentine)), even though it knows staff are the most likely source for spreading COVID-19 because they bring it into the prison and also have contact with many dorms.[45]

135. TDCJ's first round of mass "strike team" testing was ineffective for another reason: TDCJ employed a Curative-Korva KorvaLabs oral swab test is that is not indicated for and "should not be used in people who are asymptomatic." Trial Tr. 5-16:16–23 (Young); PTX

---

[44] This was so even though Curative—the company that administered the COVID-19 tests—affirmatively stated it could return test results in about 24 hours. Trial Tr. 10-131:21–23, 132:16–133:5 (Collier); *see also id*. 10-133:24–134:17 (Collier) (acknowledging that he did not instruct his team to try to get test results from Curative faster than the seven-to-fourteen days it was otherwise taking); 10-135:4–9 (Collier) (acknowledging that he never researched whether Curative could provide the test results more quickly).

[45] PTX 335 (PENDING ADMISSION) (*under seal*) at number 299 (Collier text dated April 9, 2020) ███████████

285 (Korva Emergency Use Authorization) ("Negative results for SARS-CoV-2 RNA for oral fluid specimens should be confirmed by testing of an alternative specimen type, if clinically indicated"). In other words, while the Curative-Korva oral swab test is reliable to determine COVID-19 positivity or negativity for individuals who are symptomatic, but there is no data available for whether the test is a good indicator for whether someone has COVID-19 in asymptomatic persons.[46] Trial Tr. 5-19:2–20:9 (Young). Moreover, the Curative-Korva test that TDCJ employs is conducted through an oral swab (*i.e.*, a sample is taken through swabbing the cheek and mouth) rather than through a nasopharyngeal swab (*i.e.*, a sample is taken by inserting a swab into the nasopharynx or back of the nose). *Id*. at 5-16:24–17:23 (Young). It is known to experts that samples collected through nasopharyngeal swabs are a more sensitive, better sample because there is more virus on the mucosal membranes of the nasopharynx when compared with the cheek and mouth. *Id*. at 5-17:11–23 (Young).

136.    Notably, TDCJ has a contracted partnership with University of Texas Medical Branch, which has had testing capacity to test at least 300 individuals for COVID-19 per day using a nasopharyngeal PCR test since mid-April. Trial Tr. 5-77:22–25, 15-28:7–32:14 (Young). Based on this capacity, UTMB could have performed strike testing of the entire Pack Unit within a four-day period. *Id.* These tests, when performed by an academic hospital or an independent facility not open to the public, also tend to have a much faster turnaround time (*i.e.*, typically within 24-48 hours) than commercially available tests such as the Curative-Korva. *Id*. at 15-26:3–9 (Young); *id*. at 9-45:18–23 (Zawitz); *see also id*. at 2-156:15–18 (Beal) (stating that his "symptomatic test," a nasopharyngeal swab conducted by UTMB, had a two-day turnaround

---

[46] Regarding the quality of the KorvaLabs test more broadly, even ███████████████████████ ███████████████████████████████████ PTX 335 (PENDING ADMISSION) (*under seal*) at number 1188–89 (Collier text dated May 4, 2020).

time).[47] Based on this fact, Defendants' own expert is critical of TDCJ's continued use of the Curative-Korva test, which is known to be less sensitive than nasopharyngeal PCR tests and is known to have a slower turnaround time. *See* Trial Tr. 9-46:2–7 (Zawitz).

137.    TDCJ performed a second round of mass "strike team" testing about six weeks after the first round, in late-June. Trial Tr. 5-20:13–15 (Young); *id*. at 9-157:7–16 (Zawitz); *id.* at 3-200:4–8 (Herrera). At least 172 additional inmates tested positive for COVID-19 during this second round of strike team testing. Trial Tr. 5-20:17–20 (Young); PTX 288 at 16-20 (*under seal*). This spike in positives signals to experts that TDCJ's strategy for managing the COVID-19 outbreak at the Pack Unit "definitely wasn't successful because the virus continued to spread." *Id*. at 5-21:25–22:7 (Young).

138.    TDCJ used the same Curative-Korva tests during this second round of mass "strike team" testing and had a similar lag time in receiving results, thereby making it similarly ineffective to the first round of "strike team" testing. *Id*. 5-22:9–23:1 (Young).

139.    Ironically, the use of the TDCJ "strike team"—which travelled to multiple prisons to implement the tests—█████████████████████████████████████████████████

████████████████████.[48]

140.    These two "strike team" tests do not constitute serial testing, which is medically necessary to control an infectious disease outbreak, because they were not conducted on a repeat basis close in time. Trial Tr. 5-23:2–10 (Young).

---

[47] *See also* PTX 339 (PENDING ADMISSION) (*under seal*) at 32 (Davis text (No. 2) dated Mar. 28, 2020) (Davis:
████████████████████████████████████████████████████████████████████

[48] PTX 337 (PENDING ADMISSION) (*under seal*) at lines 4370–71 (Davis text dated May 31, 2020).███████
████████████████████████████████████████████

141.     The testing strategy that should have been, and medically needs to be, employed at the Pack Unit to control the COVID-19 outbreak is to perform serial testing every 7 days using a test that has good sensitivity and a quick turnaround time. Trial Tr. 4-248:17–25, 4-257:9–13, 4-259:19–260:11; 5-13:11–14, 5-129:21–130:5 (Young); *see also* Trial Tr. 9-152:20–2 (Zawitz) (testifying that Dr. Young's recommended testing strategy is reasonable to employ at the Pack Unit); *id*. at 13-89:23–90:21 (Follenweider) (agreeing that the testing strategy proposed by Dr. Young is a "standard approach" to treating an infectious disease outbreak). A quick turnaround time means that the test results are returned within a 24-hour period. Trial Tr. 4-257:14–17 (Young). Quick turnaround times are important because test results facilitate quarantine and isolation procedures, which need to be effected quickly and efficiently in order to minimize spread of the virus. *Id*. at 4-258:12–22 (Young). Tests with good sensitivity are important to eliminate the possibility of a false negative. *Id*. at 4-258:23–259:18 (Young). TDCJ has not come even close to meeting this standard. *Id*. at 6-54:19–55:13 (Young).

142.     This proposed testing regime is based on the CDC nursing home guidelines and on decades of studies in epidemiology and infectious disease outbreaks. Trial Tr. 5-24:4–15, 6-39:2–23, 6-54:19–55:2 (Young); *see also* PTX 98, PTX 99, PTX 101. The CDC's nursing home guidelines are relevant to the Pack Unit because the populations between the Pack Unit and nursing homes are similar in that they are older, have underlying medical conditions, and an increased risk of complications, morbidity and mortality if they contract COVID-19, and because both are congregate living facilities. Trial Tr. 4-254:24–255:10 (Young). TDCJ executive leadership concedes that the nursing home guidelines are relevant to the Pack Unit, and indeed looked at the CDC nursing home guidelines to formulate a proposed long-term care testing plan in the weeks before trial. Trial Tr. 7-53:12–54:21; 55:6–57:2 (Davis); *see also id.* at 5-26:3–28:15

(Young); 7-58:9–59:14 (Davis) (confirming that Dr. Young's recommended testing plan is consistent with the long-term care testing plan TDCJ was formulating). TDCJ also compared itself to nursing homes in a call with Texas Inmate Families Association on May 27, 2020. PTX 302, at 34.

143.    About two weeks before trial, Ms. Davis and Dr. Linthicum conceived of, and received approval for, a long-term care testing plan to test four units with populations akin to nursing homes, including the Pack Unit, on a weekly basis. Trial Tr. 7-53:12–54:21 (Davis). Although only three individuals—Davis, Linthicum, and Collier—are privy to the ins and outs of the plan (*see id*. at 9-154:3–8 (Zawitz)), Director Collier declined to put it into writing. *Id*. at 1-50:11–51:12 (Collier); *id.* at 7-59:15–60:18, 7-61:14–22 (Davis). Consequently, ███████████████

█████████████████████████████████████████████████████████████████████

█████████████████.[49] Trial Tr. 1-51:21–24, 1-73:7–15 (Collier); *see also id*. 12-129:7–20 (Zepeda) (confirming that the CDC nursing homes guidelines have not been adapted as part of Policy B-14.52). ████████████████████████████████████████████████████

████████████████████████.[50] While Director Collier said at trial that the long-term testing plan is not in writing because the situation at Pack has been "fairly fluid" since the outbreak there (Trial Tr. 10-49:2–19 (Collier)), it is undisputed that TDCJ has a written COVID-19 policy concerning other aspects of COVID-19.[51] At trial, Director Collier would not agree to commit to

---

[49] *See* PTX 335 (PENDING ADMISSION) (*under seal*) at number 111–12 (Collier text dated July 17, 2020) █████
████████████████████████████████████████ This "paper [Dr. Linthi-cum] faxed" Mr. Collier has never been produced.

[50] *See* PTX 337 (PENDING ADMISSION) (*under seal*) at number 281 (Davis text dated July 20, 2020) (Britt: █
████████████████████████████████████████████████████.

[51] *See also* PTX 337 (PENDING ADMISSION) (*under seal*) at lines 3549–50 (Davis text dated July 13, 2020 ████████████████████████.

any long-term testing plan for Pack inmates. Trial Tr. 1-51:25–52:1, 1-52:12–25 (Collier); *see also id.* 58:2–10; 10-186:12–17 (Collier). Even approximately 11 days into trial, Collier would not commit to any long-term testing plan. Trial Tr. 10-71:5–72:15 (Collier); *accord* Trial Tr. 10-186:12–17 (Collier). Neither would Warden Herrera. *See* Trial Tr. 4-124:25–6. And there is still at least a 4.5-day lag time for test results. (Trial Tr. 10-32:9–13 (Collier)), subjecting the plan to the same issues as the prior "strike team" mass testing (*id.* at 5-25:21–26:2, 5-28:19–29:2 (Young); *see also id.* at 5-5:14–16:15, 5-129:6–15 (Young)).

144.     This lack of reduction to writing for a testing protocol is uncommon in medicine because "if it isn't documented, it didn't happen." Trial Tr. 5-25:12–20 (Young); *see also id.* at 5-126:19–127:6 (Young). In other words, for "any sort of guideline or protocol, unless it's written down, nobody can really follow it." *Id*.

145.     In any event, the unwritten, unofficial, and uncommitted-to long-term care testing plan apparently will still use the Curative-Korva oral swab tests, subjecting this testing plan to the same flaws as identified with respect to the strike team testing and intentionally disregarding the lives of the Pack Unit inmates. Trial Tr. 5-25:23–26:2, 5-82:4–7 (Young).

146.     In addition, it appears that to the extent TDCJ has begun implementation of this long-term care testing plan, they have already deviated from the 7-day retesting requirement. The first round of the long-term care testing plan (also referred to as the third round of "strike team" testing) occurred at the Pack Unit on July 7–8. 3-209:11–21 (Herrera). However, according to Defendants' Counsel, the fourth round did not occur until July 21. Trial Tr. 8-33:16-18 (Defendants' Counsel). Thus, even setting aside the noncommittal attitude towards the plan displayed by Executive Director Collier, TDCJ has demonstrated that it is not being followed.

### b. Defendants Failed to Implement and Ensure Compliance with TDCJ's COVID-19 Policy at the Pack Unit

147. Having a system in place to audit compliance with a policy is a necessary part of correctional supervision. Trial Tr. 6-111:1–15 (Vail).

148. But Director Collier testified that TDCJ's so-called "compliance team" was created less than a month before trial, and purportedly visited the Pack Unit only once—possibly after trial had already begun. Trial Tr. 10-90:22–91:17 (Collier). He recognized that, in addressing COVID-19 at Pack, TDCJ should strive identify lapses, address them, and try to correct them. *Id.* at 10-95:8–14 (Collier). Even so, Director Collier testified that he would "not necessarily" consider that the compliance team's function was to conduct any audits of COVID-19 policy compliance at Pack. *Id.* at 10-93:13–16; *see also id.* at 10-93:20–22 (Collier) ("What they're doing right now is not, essentially, an audit.). And Warden Herrera, who is in charge of the Pack Unit, testified at trial the he was aware of no compliance audits ever performed at Pack. *See, e.g.,* Trial Tr. 4-115:23–116:6, 4-119:15–23 (Herrera) ("We have never conducted an audit . . . .").[52] Text messages produced after trial show that Director Collier was subjectively aware that Defendants are not doing enough.[53] He told Billy Hirsch that ██████████████████ ████████████ on ████████████████████████████████ and that they needed to actually start ████████████████████[54]

---

[52] Defendants also produced no documents about any supposed compliance team visits at Pack, and announced the purported visit, for the first time, at trial.

[53] PTX 338 (PENDING ADMISSION) (*under seal*) at number 361 (Davis text (No. 3) dated July 27, 2020) ████████████████████████████████████████████████████████████████ A "CAT" is a Compliance Assessment Team.

[54] *Id.* (*under seal*)

149. Director Collier testified that, after trial had begun, on around July 15th or 16th, he sent regional director Monroe to the Pack Unit to investigate the complaints Collier had heard inmates testify to during the trial. Trial Tr. 10-97:24–98:11, 10-160:12–14 (Collier). Defendants removed Mr. Monroe from their trial witness list on July 20th, but Director Collier could not explain why. *Id.* at 10-160:15–22 (Collier).

150. Of all TDCJ's 104 facilities across the state, the Pack Unit had the highest number of grievances and complaints that COVID-related policies were not being followed. Trial Tr. 10-187:18–25, 10-72:25–73:25, 10-84:9–16 (Collier); Trial Tr. 4-114:20–115:16, 4-116:14–18 (Herrera); *see also* PTX 301 (email to B. Collier noting that as of May 26, 2020, the Pack Unit had the highest number of grievances complaining about a failure to follow COVID-19 protocols, including complaints about failing to wear proper PPE, lack of cleaning supplies issued to offenders,[55] and complaints of being exposed to the virus by positive staff or offenders coming into the unit). Despite this sobering reality, Warden Herrera and Director Collier never discussed how to address the fact that Pack had the highest reported instances of non-compliance. Trial Tr. 10-96:15–97:15 (Collier).

      i.      **Defendants Failed to Keep Positive and Negative Inmates Separated**

151. TDCJ did not take successful or adequate measures to keep positive and negative inmates separated at the Pack Unit. *See, e.g.*, Trial Tr. 2-177:5–7 (Beal) (Q: So you don't know if TDCJ is trying to keep positive offenders and negative offenders separated? A. It doesn't seem like it to me, no.). Indeed, █████████████████████████████████████

---

[55] ████████████████████████████████████████████████████████
█████████████████████████

██████████████████████████████████████████

██████████████████████████[56]

152.    As part of the testing, Defendants should have taken steps to quickly separate confirmed positives from confirmed negatives. Trial Tr. 5-15:18–23, 5-16:8–15, 5-51:16–52:2 (Young). However, inmates who tested positive remained with pending or negative inmates for hours and sometimes days, potentially exposing more inmates to the virus. For example, Mr. Valentine was not moved after he tested positive. Trial Tr. 1-154:2–6 (Valentine). Mr. King also testified that two inmates were left in his dorm for an entire month after they tested positive. Trial Tr. 2-14:14–15:9, 16:16–19 (King). Mr. Butaud's dorm had positive and negative inmates mixed together for a period of time. Trial Tr. 2-231:9–11 (Butaud).

153.    After strike team testing in May, positive inmates at the Pack Unit were placed in a negative dorm. Trial Tr. 1-191:25–192:23 (Valentine). For example, one inmate, Mr. Beal, tested negative for the virus during the first round of strike-team testing. Trial Tr. 2-154:9–17 (Beal); *see also* PTX 168A at 13. He was kept in Dormitory 2 after that negative test result, even though wheelchair-bound inmates who tested *positive* for the virus were rehoused into that dormitory. *Compare* TDCJ Status Rpt., Ex. 1, at 8–9, ECF No. 126-1 *with* Trial Tr. 2-170:16–23 (Beal). Mr. Beal then began exhibiting COVID-19 symptoms, and in mid-June, he indeed tested positive for the virus. Trial Tr. 2-154:4–155:21 (Beal). At trial, Warden Herrera denied that they moved positive inmates into Mr. Beal's dorm (Trial Tr. 4-183:15–184:12 (Herrera), but they represented to this Court and the Fifth Circuit that they did, and never explained that discrepancy or what they actually did with the inmates discussed in their report if the report was inaccurate. Before his denial, Warden Herrera represented that everything in the document was correct. Trial

---

[56] PTX 337 (PENDING ADMISSION) (*under seal*) at numbers 4335–41 (Davis text dated May 19, 2020).

Tr. 4-182:6–11 (Herrera); *see also id.* at 4-184:1–4 (Herrera). Given this, Warden Herrera's later denial is entitled to no weight.[57]

154.    Mr. Beal was moved to Dormitory 17, a quarantine dorm occupied by inmates believed to not have the virus, on approximately June 14, 2020, while the positive test result was still pending. Trial Tr. 2-156:11–23 (Beal). Two days later, when the positive test result came back, TDCJ moved Mr. Beal to the "schoolhouse."[58] Trial Tr. 2-156:24–157:1, 2-157:16–18 (Beal). He remained in the "schoolhouse" for approximately five days, where he did not have readily available access to sinks, showers, or a bathroom. Trial Tr. 2-159:2–24, 2-159:13–18, 2-159:25–160:6 (Beal). He was then moved to the segregation area for about three days, then back to the "schoolhouse" for two or three days, and then moved again to Dormitory 17, where he stayed for approximately one day. *Id.* at 2-160:16–161:16; 2-162:8–17 (Beal). Despite still exhibiting symptoms, Mr. Beal was moved into a dorm with negative inmates.

155.    After all of these constant moves to various parts of the facility, on July 1, TDCJ moved Mr. Beal into a COVID-negative dormitory (Dorm 2) even though he told medical personnel that was still experiencing COVID-19 symptoms. Trial Tr. 2-161:17–163:15 (Beal). By moving Mr. Beal, who had previously tested positive, to a COVID-negative dormitory (Dorm 2) even though he was still symptomatic, TDCJ put COVID-negative inmates at significant risk of contracting the virus from him. *See* Trial Tr. 2-163:3–165:9 (Beal). Not only was Mr. Beal worried that he might infect these inmates, those inmates were understandably concerned too, and they harassed him for it. *Id.* at Trial Tr. 2-164:22–165:9 (Beal). Mr. Beal raised concerns

---

[57] Warden Herrera himself had no explanation for the discrepancy between his testimony and the documentary evidence. *See* Trial Tr. 4-184:1–25.

[58] The "schoolhouse" is the area at the Pack Unit that is normally used for education and classroom activities. Trial Tr. 2-171:11–18 (Beal) (testifying the "schoolhouse" is the same thing as the "education wing"); Trial Tr. 3-219:17–220:8 (Herrera) (discussing its previous use as a school).

with both security and medical staff, but was dismissed and told that the policy was being followed and nothing would be done to correct this danger. Trial Tr. 2-162:19–25, 2-164:1–14 (Beal).

156. Mr. Beal was not alone in his experience. ████████████████████ ████████████████████████████████████████████████████████████ PTX 216 at 2, 25 (***under seal***)████████████████ PTX 7B at 2 (***under seal***)████████ PTX 168A at 12 (***under seal***). But ████████████████████████████████ ████████████████████████████████████████████ PTX 167 at 404 (***under seal***). ████████████████████████████████████████████████████ ████████████████████ PTX 180 at 9.

157. ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ PTX 168A at 36 (***under seal***)████████ ████████ *id.* at 16 ████████████████ *id.* at 106 ████████ *id.* at 76 ████████ PTX 216 at 21, 43 ████████████████████████ *id.* at 5, 28 ████ ████████████████████████ PTX 7B at 20, 43 (***under seal***)████████ ████████████████ *id.* at 5, 28 ████████████████████████ PTX 7A at 20 (***under seal***)████████████████████████ *id.* at 4, 26 ████████ ████████████████ PTX 289 at 15–24 (***under seal***)████████████ ████████ *id.* at 17–20 ████████████████████████████

158. As Dr. Young testified, none of these inmates should have been removed from isolation and "should have remained in isolation for at least seven days without symptoms; And if he had a fever, at least three days without fever-reducing agents." Trial Tr. 6-56:6–25 (Young).

159.    The Pack Unit also continues to use a dangerous practice of creating a rolling cohort of symptomatic inmates who each has a pending COVID-19 test. This cohort is housed together in a "pending dormitory." Trial Tr. 3-204:16–205:11 (Herrera); *id.* at 11-260:1–11, 11-264:18–11-265:11 (Wilder). While those test results are pending, TDCJ only knows that some of them may be negative while others may be positive. Trial Tr. 11-260:7–14 (Wilder). According to TDCJ's own policy, this cohorting practice risks infecting those who turn out to be symptomatic, but negative, by placing them in "close contact" with those who are symptomatic and positive. PTX 109 at 11 (recognizing that "living with someone" places them at "High Risk").

160.    Despite knowingly placing those inmates at "High Risk" of infection, when TDCJ learns that one of these inmates was (before being exposed) negative, TDCJ immediately moves that inmate into an uninfected dormitory. Trial Tr. 11-265:13–20 (Wilder). Because the rehousing takes place immediately, the inmate is neither retested nor quarantined despite their intervening exposure to a "High Risk" of infection. *Id.* at 11-260:16–21 (Wilder).

161.    Consistent with Warden Wilder's testimony, TDCJ also represented to the Fifth Circuit that inmates who test negative while housed with potentially positive inmates are moved immediately back into "general population." PTX 64 at 5. Again, this procedure dangerously moves a "High Risk" inmate, who may very well have been infected, into an uninfected area where he may transmit the virus, contrary to TDCJ's own purported policy. See PTX 109 at 11; PTX 110 at 11; PTX 111 at 12; PTX 112 at 8; PTX 114 at 7; PTX 115 at 8; DTX 36 at 8. Thus, TDCJ contradicted itself within the same letter by both insisting the policy had been implemented while also describing a dangerous procedure that contravenes the same policy.

162.    ███████████████████████████████████████████████
███████████████████████████████████████████████████

163.

164.

165.

166.

---

[59] PTX 336 (PENDING ADMISSION) (*under seal*) at number 1656 (Wilder text dated May 20, 2020).

167. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.[60]

## ii. Defendants Failed to Enforce Social Distancing

168.     Social distancing is the action of maintaining a distance between people sufficient to lower the risk of contracting a contagious disease. Trial Tr. 4-243:1–5 (Young). In the case of COVID-19, which spreads through respiratory droplets, the required social distance is 6 feet. *Id.* at 4-243:6–9 (Young).

169.     Maintaining a social distance of 6 feet between and amongst both inmates and staff is important and medically necessary to prevent the spread of COVID-19 at the Pack Unit because the average respiratory droplet typically does not travel more than 6 feet; accordingly, maintaining a 6-foot distance between people reduces the likelihood of viral contraction. *Id.* at 4-243:1–14, 4-246:5–9 (Young); 9-95:22–96:1 (Zawitz).

170.     Director Collier left it up to Warden Herrera to enforce social distancing at Pack. Trial Tr. 1-103:17–22 (Collier). Director Collier did not ever instruct Warden Herrera to take measures to increase social distancing: for example, Director Collier never instructed Warden Herrera to rearrange inmates in the dormitories or to move inmates into vacant spaces. *Id.* 105:6–14.[61] Warden Herrera confirmed to the Court that he has never disciplined any staff for failing to

---

[60] PTX 337 (PENDING ADMISSION) (*under seal*) at number 4506 (Davis text dated June 9, 2020).

[61] This is particularly troubling because Warden Herrera acknowledged that he would not do anything differently to address COVID-19 unless he is instructed to do so by a court or by his superiors. Trial Tr. 3-95:19–25, 3-97:25–98:10, 3-99:18–21 (Herrera).

enforce social distancing. Trial Tr. 3-108:19–109:5 (Herrera); *see also id.* at 4-120:3–10. He also testified that he has never done any rearranging of where men sleep to try to create additional opportunities for social distancing. *Id.* at 3-105:6–13 (Herrera); *see also id.* at 3-107:12–19, 3-108:4–18 (Herrera) (noting that there are no written documents or emails that would show that Herrera or Herrera's chief of classification (Ms. Tilley) ever evaluated whether they can rearrange dormitories or cubicles to provide any additional social distancing); *id.* at 6-251:10–12 (Sullivan) (confirming that the Pack Unit does not socially distance inmates by having them sleep head-to-foot or by spacing them out).

171.    TDCJ should work with the Parole Board to ensure the timely release of inmates who have been granted parole so as to reduce the population at the Pack Unit and increase the ability to socially distance. Trial Tr. 6-158:16–159:9 (Vail); *see also id.* at 4-243:19–9 (Young) (stating that one option to facilitate social distancing is "considering people whose parole has been approved, maybe expediting that, getting them out on parole"); *id.* at 9-169:23–170:12 (Zawitz) (agreeing that prison administrators "should consider moving out vulnerable inmates" to increase social distancing).

172.    Warden Herrera and Director Collier are not taking steps to de-densify the Pack Unit by releasing inmates who have been granted parole. For example, Mr. Reynolds has completed all of his requirements for being released on parole. Trial Tr. 3-24:25–25:24 (Reynolds). There was contention about who a particular parole officer, Ms. Simon, worked for, but ultimately Director Collier admitted that TDCJ was the one delaying Mr. Reynolds' release because "[t]he approval of the release plan would be a TDCJ function." Trial Tr. 10-194:13–18. Thus, TDCJ is the one holding up Mr. Reynolds' release without explanation, not the Board of

Pardons and Parole. *Id.* Mr. Reynolds knows of other Pack inmates who are in similar positions on the parole issue. Trial Tr. 3-24:13–24 (Reynolds).

173. 

174.

175.    In addition to TDCJ's failure to de-densify the Pack Unit, there is a routine practice of correctional officers not socially distancing at the Pack Unit despite it being one of the best ways to reduce the spread of COVID-19. On a daily basis correctional officers do not stay six feet apart, often congregating without masks. Trial Tr. 1-186:25–187:21 (Valentine); Trial Tr. 2-102:23–103:13 (Jones); Trial Tr. 3-13:23–14:15 (Reynolds).

---

[62] PTX 337 (PENDING ADMISSION) (***under seal***) at numbers 2021–22 (Davis text dated Mar. 29, 2020); *see also* Trial Tr. 10-194:19–195:17 (Collier) (acknowledging that TDCJ will not authorize the release of a parolee who may be COVID-positive or who has been exposed to COVD-19).

[63] PTX 337 (PENDING ADMISSION) (***under seal***) at numbers 2023–24 (Davis text dated Mar. 29, 2020).

[64] PTX 337 (PENDING ADMISSION) (***under seal***) at numbers 392–394 (Collier text dated Mar. 29, 2020).

176.     TDCJ's own COVID-19 instructional videos, which it plays for Pack inmates three times a day and which is meant to educate inmates about COVID-19 and best practices to prevent its transmission, depicts inmates and staff members who are not social distancing, in violation of social-distancing protocols. Trial Tr. 10-100:16–101:20, 104:12–17, 104:12–105:3 (Collier).

177.     As currently set up, it is not possible to socially distance at all times in the Pack Unit, particularly in the dorms. *See, e.g.*, Trial Tr. 1-157:2–158:8 (Valentine); *id.* at 2-17:22–18:9 (King); *id.* at 2-136:20–25 (Jones); *id.* at 2-200:19–21 (Butaud). This does not excuse Defendants' failures, however, because they have not made any effort to create extra space to promote social distancing, even when there is empty space. Trial Tr. 6-157:6–15 (Vail). For example, even when there were empty 18 or 19 empty cubicles in Dorm 14, Defendants did not space out inmates to create social distancing, despite being on notice of the issue despite the CDC's endorsement of this strategy. Trial Tr. 1-158:13–20, 160:2–11 (Valentine). The same was true for Mr. Reynolds's dorm (Trial Tr. 3-42:7–16 (Reynolds)) and Mr. Butaud's dorms (Trial Tr. 2-201:6–14, 201:20–202:1 (Butaud)).

178.     The lack of analysis on how to improve social distancing within the Pack Unit is problematic from a correctional standpoint. Trial Tr. 6-157:6–159:18 (Vail). Director Collier confirmed that neither he, nor those working for him, did any analysis to see whether some inmates could be transferred out of Pack to increase social distancing. Trial Tr. 10:168:15–169:2 (Collier). Warden Herrera testified that he hasn't talked to anybody about whether inmates could be transferred in or out as part of any COVID-19 measures. Trial Tr. 3-84:2–16 (Herrera).

179.     While sometimes encouraged, social distancing is not enforced even where it could be done. For example, while Defendants have changed how medication is given out at the

Pack Unit, the new procedure has the same social distancing issues as the previous one. Inmates gather to receive their medication in the dorm and no social distancing is enforced. Trial Tr. 1-160:21–162:1 (Valentine). Social distancing is also not enforced on the way to the shower where inmates bunch up near the "crash gate" (Trial Tr. 1-205:23–206:16 (Valentine)), in the showers (Trial Tr. 1-222:3–7 (Valentine); Trial Tr. 2-97:18–98:1 (Jones)), in the recreation area (Trial Tr. 1-208:10–12 (Valentine)), or in hallways (Trial Tr. 1-221:25–222:2 (Valentine)).

180.    Defendants are also not taking other basic measures to increase opportunities for social distancing. The CDC recommends that inmates sleep head-to-foot when bunks can't be spaced out. Trial Tr. 6-153:15–24 (Vail). However, Defendants have never instructed that inmates sleep head-to-foot to create extra distance given the short walls between cubicle beds. Trial Tr. 1-158:9–12 (Valentine); *id*. at 2-18:10–20, 21:16–20 (King); *id*. at 3-42:4–16 (Reynolds); *id*. at 11-80:16–18  (Wilder). ████████████████████████████████████████████████████
████████████████████████████████████████.[65]

181.    The Pack Unit has also deliberately chosen not to maximize its use of available space. On May 27, 2020, TDCJ reported to the Court that it left two dormitories vacant, with a capacity of 141 beds, until May 4, 2020. PTX 76 at 9–10. Defendants generally referred to ongoing construction as an impediment to using that vacant dorms (*see*, *e.g.*, Trial Tr. 3-63:23–64:15 (Herrera)), but Defendants admit that the dorm was ready for at least several weeks before they moved anyone in (Trial Tr. 7-17:13–18:4 (Mendoza, TDCJ 30(b)(6) Testimony); *see also* Trial Tr. 3-64:11–17 (Herrera, noting that construction was complete and the vacant dorms were "turned over to" TDCJ "around April the 5th")). The evidence proved that this dorm was actually

---

[65] PTX 347 (PENDING ADMISSION) (*under seal*) at numbers 25–28 (Davis Text (Magistrate Production No. 2) text dated July 15, 2020).

available for use since mid-March but, in any event, remained empty until May.[66] Trial Tr. 2-22:9–23, 22:21–23:5 (King).

182.    Defendants offered differing excuses for this empty dorm. When Defendants reported the empty dorm to the Court, they explained that they planned to use those beds to relocate inmates from the Hospital Galveston Unit. PTX 76 at 10. But during his deposition, Director Collier instead testified that the plan was to send inmates from the Estelle Unit, because the Estelle Unit needed the space due to positive inmates elsewhere in that prison. Trial Tr. 10-220:5–25 (Collier) (recounting and affirming his deposition testimony). At trial, however, Collier instead testified that the plan changed because of those positive inmates at Estelle. Trial Tr. 10-221:1–17 (Collier). In contrast, TDCJ's corporate representative Oscar Mendoza testified that the plan changed because of positives at the *Pack Unit*. Trial Tr. 7-18:1–7 (Mendoza, TDCJ 30(b)(6) Testimony). Warden Herrera tried to claim that the dorm was empty because TDCJ was installing air conditioning, although he admitted he did not know what date the air-conditioning installation was completed. Trial Tr. 3-67:11–68:14 (Herrera). Defendants never explained these inconsistencies during trial, and little weight should be given to the differing excuses offered. The evidence showed that Defendants chose to leave a Pack Unit dorm unused for an extended period of time without explanation. And even though Warden Herrera is ultimately the one in charge at Pack, he affirmed that "moving anybody" into the empty dorms "wasn't going to take place until" somebody instructed him to do so. Trial Tr. 3-64:18–65:8 (Herrera).

183.    ████████████████████████████████████████████

████████████████████████████████████████████

---

[66] PTX 347 (PENDING ADMISSION) (***under seal***) at numbers 3557–60 (Davis text dated July 13, 2020)████
████████████████████████ *accord* Trial Tr. 3-70:12–15 (Herrera) ("I think it was on May the 4th when we started moving offenders in there."); *id.* at 3-72:9 (Herrera) (same).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

184.    TDCJ is not taking other opportunities to maximize the use of available space to spread inmates out. For example, Director Collier testified that he knows of no plans to use available space in the gymnasium to house inmates. Trial Tr. 1-82:2–9 (Collier). Even though the Pack Unit gym is not air-conditioned, TDCJ is not making any plans to use that space to house inmates even after summer temperatures subside. *See id.*; *see also id.* at 1-82:16–83:7 (Collier).

185.    And even though the E-Dormitory at the Pack Unit had empty space to house inmates so others could spread out, Director Collier never instructed Warden Herrera or Ms. Davis to make use of that vacant space so that inmates could spread out and distance themselves easier. Trial Tr. 1-88:7–89:17, 1-89:23–90:6, 1-90:14–17 (Collier).

186.    At trial, Director Collier would not commit to instituting a prohibition on new prisoners entering the Pack Unit during the rest of the pandemic, even though inmates would be coming into the Pack Unit from other high-risk correctional environments. Trial Tr. 1-57:8–25 (Collier). Neither would Warden Herrera. *See* Trial Tr. 4-124:25–6.

187.    ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████[67] *See* Trial Tr. 13-192:2–19 (Follenweider).

---

[67] PTX 337 (PENDING ADMISSION) (***under seal***) at numbers 3673–75 (Davis text dated July 15, 2020).

188.     Warden Wilder testified that TDCJ developed and implemented a social distancing plan for the Pack Unit. Trial Tr. 10-225:15–22, 10-227:1–3 (Wilder). However, during cross-examination, Warden Wilder admitted that although the social distancing plan required inmates at the Pack Unit to be seated one-to-a-table in the Chow hall, in practice inmates were seated two-to-a-table and less than six feet apart. Trial Tr. 11-158:25–163:3 (Wilder); PTX 315 (***under seal***). Even that "two-to-a-table" rule was enforced less often then it was not. Trial Tr. 1-254:16–255:6 (Valentine).

### iii.     Defendants Failed to Ensure Proper Cleaning

189.     Cleaning and sanitizing commonly touch surfaces and spaces is important to control an infectious disease because infections, such as COVID-19, can live on inanimate objects for period of time and can be spread through contact with that surface. Trial Tr. 4-237:5–12 (Young). Ensuring frequent cleanings of high touch surfaces and spaces is medically necessary to control the outbreak of COVID-19 at the Pack Unit. *Id*. at 4-240:12–19 (Young); *id.* at 6-97:3–99:6 (Vail); *see also id*. at 9-94:5–95:12 (Zawitz) (". . . enhanced cleaning and disinfection practices also like reduce the extend of spread").

190.     Despite containing common, high-touch surfaces, the Pack laundry room is not cleaned between each dorm's use. Hundreds of inmates, from 16 dormitories, use the same laundry exchange room each day. Trial Tr. 2-100:11–16 (Jones). COVID-positive inmates and COVID-negative inmates retrieve their laundry from the same place, and the laundry areas are not cleaned between use by each dormitory, even though inmates from each dorm touch various surfaces when exchanging laundry. Trial Tr. 1-162:4–163:19, 1-165:12–16 (Valentine); *id*. at 2-98:2–23, 2-99:7–15, 2-100:4–18, 2-100:20–23 (Jones); *id.* at 2-168:22–169:11, 2-243:9–16 (Beal); *id*. at 2-243:22–25 (Pennington).

191.    The Pack Unit uses this exchange process even though there is an alternative. During past lockdowns, laundry was brought to inmates. Trial Tr. 2-168:1–21 (Beal). No defense witness explained why Warden Herrera is using the current process instead of the alternative.

192.    Mr. Pennington also explained that often inmates' hands can touch during this exchange process (*id*. at 2-244:12–15 (Pennington)), but that the laundry workers cannot immediately wash their hands, needing to wait for that dorm's exchange to be done (*id.* at 2-244:16–20 (Pennington)). This is despite CDC recommendations that: "Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after." PTX 88 at 21. Laundry workers like Mr. Pennington also do not have access to hand sanitizer to use after these brief contacts.

193.    Plaintiffs' expert also testified that this procedure showed that hand washing likely was not reasonably accessible to protect inmates during this process. Defendants sought to rebut this testimony by admitting there are only two sinks in the laundry area, and they are across the room from the laundry exchange windows (Trial Tr. 11-50:5–16 (Wilder))—of course, TDCJ's own plan does not even suggest that inmates should use those sinks when exchanging laundry, much less require that every single person drop off their dirty laundry, exit the queue for clothes, wash their hands, and *then* return to the queue to receive clean clothes. PTX 39 at 3. As TDCJ does not implement such a cumbersome procedure, nor contend that it even could, TDCJ cannot protect the inmates from cross contamination in the laundry area without changing the laundry issuance process or simply providing a hand sanitizer dispenser at the existing laundry exchange windows.

194.    Despite the close contact and common, high-touch surfaces, the showers are not cleaned between uses. Trial Tr. 1-164:1–22 (Valentine); *id*. at 2-160:12–15 (Beal); *id*. at 2-

202:16–203:1 (Butaud). There are used razors, Band-Aids, soap, dirty clothes and towels, bloody gauze, and other items that have been behind for several days. Trial Tr. 1-164:24–165:6 (Valentine); *id*. at 2-203:2–13 (Butaud). Defense counsel referenced a hearsay statement that a TDCJ officer claimed the showers were cleaned, but there was no actual evidence put forward from witnesses with personal knowledge (Trial Tr. 1-204:12–16 (Valentine)) and inmates had never seen it disinfected (Trial Tr. 2-13:21–25 (King); *id*. at 2-202:16–203:13 (Butaud); *id*. at 2-247:3–5 (Pennington)). Inmates who could see the previous dormitory's inmates leaving, so testified they saw that the showers were not being cleaned between the two dormitories (*id*. at 164:25–165:6 (Valentine)) and there is no evidence of any cleaning, such as an odor of bleach (*id*. at 1-213:2–13 (Valentine)). Mr. Pennington works in the laundry and can see the communal showers being used by one dormitory after another, yet did not see them cleaned at all recently. *Id*. at 2-245:25–247:5 (Pennington). Although the wheelchair dormitories use their own showers, that entails its own problems because TDCJ made disabled inmates responsible for cleaning the showers during the pandemic, even though they are unable to do so effectively. Trial Tr. 2-96:23–97:13 (Jones).

195.    The failure to clean showers in between uses is particularly dangerous given the delays in receiving test results as inmates with pending tests are housed in the same dorms and hundreds of inmates use the same communal shower as nearly every pending, negative, and positive inmate in the "main building." Trial Tr. 6-101:20–102:25 (Vail); *id*. at 2-244:21–24, 245:4–15 (Pennington) (explaining that multiple dorms use the same shower).

196.    TDCJ needs to increase janitorial services and have a written plan in place that addresses the specific cleaning needs of each dorm at the Pack Unit. Trial Tr. 6-106:10–20, 6-108:20–109:4, 6-109:20–110:17 (Vail). For example, a janitor should be assigned to

continuously clean the bathroom, another should be assigned to continuously clean the general area; and TDCJ should consider providing additional resources to address the needs to inmates that are unable to clean their personal cubicles (like Mr. Valentine and other inmates with mobility impairments). *Id.* at 6-108:20–109:19 (Vail). Additionally, the officer responsible for each dorm should keep a log of the janitorial shifts. *Id.* at 6-109:20–110:17 (Vail).

197. ████████████████████████████████████████████████

████████████████████████████████████████████████

198. TDCJ maintains that a single inmate janitor is assigned to "continuously" clean each dormitory for 12-hour shifts. PTX 79 at 1.

199. Warden Wilder and Defendants' expert Dr. Beard both acknowledged that it is unsafe and inappropriate to use blind or partially blind janitors. Trial Tr. 11-231:4–10, 232:14–21 (Wilder); *id.* at 14-199:20–24 (Beard). Despite this, TDCJ assigned a blind inmate who used a wheelchair to janitorial duty in the wheelchair dorm. Mr. Dove was a janitor in Dorm 4. Trial Tr. 2-190:17–23 (Dove). Mr. Dove is blind, in a wheelchair, and has multiple impairments due to a previous stroke, which prevents him from being able to perform janitorial duties. *Id.* at 2-190:24–25 (Dove). For example, Mr. Dove explained that he cannot mop because he cannot even see where there is dirt or things that need to be cleaned. *Id.* at 2-191:1–4 (Dove). Mr. Dove did not request to be a janitor because he cannot do the job duties. *Id.* at 2-191:5–7 (Dove).

200. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ PTX 131 at 45 (***under seal***); Trial Tr. 11-228:24–230:6 (Wilder). Mr. Dove also notified Warden Herrera, the sergeant, and the captain that he could not physically do the job in April, but never got a response. Trial Tr. 2-192:1–7, 2-192:13–20 (Dove). Mr. Dove's wife

also notified Warden Herrera directly of the issue. Trial Tr. 2-191:20–25 (Dove). Despite being put on notice on April 13, 2020, as of June 22, 2020, Mr. Dove was still assigned as a janitor. Trial Tr. 12-26:2–9 (Wilder); PTX 007B at 11031, 110054 (*under seal*); PTX 007A at 10986, 110008 (*under seal*). He was still assigned as a janitor as of trial. Trial Tr. 2-194:16–20 (Dove).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

201.    With respect to the above-the-knee amputee inmate with one arm, Warden Wilder sees no issues with him performing janitorial duties because "[h]e could put a broom against his neck and push it with a wheelchair." Trial Tr. 11-239:13–19 (Wilder). Warden Wilder maintains that TDCJ handled the situation of inadequate janitors in the wheelchair dorm properly and would not do anything different in the future. Trial Tr. 12-30:23–31:22 (Wilder). Even when shown the lengthy delay, Warden Wilder stood by his testimony that the issue was corrected as soon as possible, demonstrating Defendants' deliberate indifference to actual risk of harm to the inmates. Trial Tr. 12-26:10–15 (Wilder).

202.    ████████████████████████████████████████████
███████████████████████████████

203.    ████████████████████████████████████████████
██████████████████████████████.[68]

---

[68] PTX 337 (PENDING ADMISSION) (*under seal*) at numbers 4868–69 (Davis text dated Mar. 20, 2020)███
███████████████████████████████████████████████████
█████████████████████████

## iv. Defendants Failed to Ensure PPE was Provided and Used

204. Personal protective equipment, or PPE, including masks, gloves, eye protection, face shields, and gloves, are both important and medically necessary to reduce the spread of COVID-19 at the Pack Unit. Trial Tr. 4-239:6–240:19 (Young).

205. Because COVID-19 is a respiratory virus that is primarily transmitted through droplets from the nose and mouth, masks are an important way to protect both others and the wearer from infection by preventing the spread of respiratory droplets. *Id*. at 4-239:6–14 (Young). Accordingly, ensuring both inmates and staff wear masks at all times other than when sleeping or in cubicles and appropriately distanced is of the utmost import to preventing COVID-19 transmission. *Id*. at 4-238:13–239:5 (Young).

206. Similarly, in specific situations, additional PPE, such as face shields, goggles, gloves, and gowns, are necessary to protect individuals from contracting COVID-19. *Id*. at 4-239:15–240:10, 4-237:13–238:11 (Young). This additional PPE may be necessary for persons conducting cleaning, in particular for persons cleaning or working in areas where there are patients who are COVID-19 positive. *Id*. 4-237:25–238:11 (Young). Additional PPE protects against the spread of COVID-19 because respiratory droplets containing virus may be transmitted through eyes and additional protection for hands, face, and clothing is also necessary. *Id*. at 4-239:15–240:10, 4-237:13–238:11 (Young).

207. One area is the laundry, where the CDC recommends that: "Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after." PTX 88 at 21. Despite this, inmates working the counter for laundry exchanges must share a single pair of non-disposable gloves, and cannot easily wash their hands while working. Trial Tr. 2-244:3–11, 2-244:16–20 (Pennington). The CDC also requires that individuals handling laundry from COVID-19 cases wear gowns or coveralls, but laundry

workers at Pack do not have them. PTX 88 at 55; PTX 302 at 65 (TDCJ stating only masks and gloves are provided to laundry workers). Laundry workers are responsible for handing out new masks, so inmates retrieving their laundry are not wearing their masks even though they are in arms' reach of the laundry worker. Trial Tr. 2-243:19–21; PTX 302 at 20 (TDCJ explaining that masks have to be turned in to laundry to receive new items).

208. Mr. Valentine regularly observed correctional officers entering COVID-positive dorms without wearing proper PPE, and then going into negative dorms. Trial Tr. 1-182:7–183:12 (Valentine). When correctional officers do wear PPE in positive dorms, they often do not change it when moving to a negative dorm. Trial Tr. 2-33:23–34:10 (King); *id*. at 2-103:14–24, 2-105:17–19 (Jones). Even in the education wing, which was repurposed for positive inmates on quarantine, correctional officers do not wear full PPE. Trial Tr. 15-15:7–9, 15-15:17–16:19 (Valentine).

209. These failures to properly use PPE are not isolated; inmates observed officers not wearing masks and other PPE failures multiple times a day in dorms and hallways. Trial Tr. 1-253:19–254:12 (Valentine); *id*. at 2-28:10–28:20, 2-32:20–33:1 (King); *id*. at 2-101:16–102:21, 2-148:18–19, 2-148:24–149:5 (Jones); *id*. at 2-262:17–22 (Pennington); *id*. at 3-11:16–19, 12:3–25 (Reynolds); *id*. at 2-206:1–3 (Butaud); *id*. at 15-12:16–13:18 (Valentine). Mr. Beal testified that compliance with wearing PPE was still only at 80%, which was actually an increase from before trial started. Trial Tr. 2-181:25–182:5 (Beal). This testimony was elicited on cross from a leading question from Defendants' own counsel, and then went unchallenged, signifying that Defendants' do not disagree and the statement is entitled to substantial weight. *See id.* When one out of five correctional officers fail to properly wear their PPE, that is not an "isolated incident."

210.     Warden Herrera acknowledged that prison staff do not always wear appropriate face coverings and that he, himself, has been the subject of inmate complaints that he is not following TDCJ's COVID-19 policy. Trial Tr. 3-163:1–23 (Herrera); *id.* 4-104:6–17 (Herrera) (reviewing Defendants' Ex. 39 and acknowledging that Pack staff members were not wearing PPE correctly or at all); *see also id.* at 2-167:5–25 (Beal). Mr. Beal observed Warden Wilder failing to wear his mask as well. Trial Tr. 2-167:8–25 (Beal). These have been dismissed as "isolated incidents" by defense counsel, but multiple inmates testified about a persistent failure to wear masks. Trial Tr. 1-184:18–185:13, 1-185:16–22 (Valentine); *id.* at 2-30:21–31:10 (King); *id.* at 2-101:16–102:11, 2-102:13–21 (Jones); *id.* at 2-206:1–3, 2-207:1–10, 2-207:11–14 (Butaud); *see also id.* at 4-161:7–163:14 (Herrera). Defendants did not call any lower level correctional officers to rebut any of these claims, only superior officers who confirmed their knowledge of the issue. Trial Tr. 2-167:5–25 (Beal); *id.* at 3-163:1–23 (Herrera); *id.* at 10-81:23–92:6 (Collier).

211.     Several inmates testified that they often observed Lieutenant Brown not wearing an appropriate mask during the outbreak inside Pack. Mr. Valentine observed Lieutenant Brown coming into the dormitory and removing his mask to shout at an inmate about being in the day room. Trial Tr. 1-185:6–15 (Valentine). Mr. King explained that Lieutenant Brown would routinely not wear his mask. Trial Tr. 2-31:11–25 (King). Mr. Beal observed the same. *Id.* at 2-167:5–25 (Beal). So did Mr. Butaud. *Id.* at 2-206:1–207:14 (Butaud). Mr. Reynolds testified that Lieutenant Brown frequently failed to wear his mask, and that when he asked Lieutenant Brown to put it on he was told to "shut up and go back to [his] bunk." Trial Tr. 3-13:8–22 (Reynolds).

████████████████████████████████████████

████████████████████████

212.     Inmates also testified that TDCJ staff failed to wear their masks or gloves when distributing food or when conducting shakedowns, which involve officers rummaging through inmates' cubicles and belongings in search of contraband. *See*, *e.g.*, Trial Tr. 1-183:13–184:17 (Valentine); *id*. at 2-34:1–5, 34:13–16 (King); *id*. at 3-13:5–22 (Reynolds); *id*. at 2-103:25–114:8, 2-105:11–16 (Jones); *id*. at 2-206:13–22, 2-207:15–21 (Butaud). This is an everyday occurrence, not an isolated incident. Trial Tr. 2-206:23–25 (Butaud). When they do wear gloves, correctional officers will use the same pair of gloves between cubicles. Trial Tr. 1-183:13–184:17 (Valentine); *id*. at 2-34:11–35:5 (King). When questioned about passing out food with their bare hands, correctional officers have responded with callous disregard, telling them to just file a grievance. Trial Tr. 1-187:5–23 (Valentine). Warden Herrera himself has been the subject of grievances for not following TDCJ policies. Trial Tr. 3-163:21–23.

213.     Warden Wilder initially testified that he had never seen staff at the Pack Unit not wearing their mask. Trial Tr. 11-51:7–8. However, during trial Warden Wilder ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Trial Tr. 11-126:4–128:24 (Wilder); PTX 311 (*under seal*); Trial Tr. 11-128:25–132:25 (Wilder); PTX 312 (*under seal*); Trial Tr. 11-134:8–138:12 (Wilder); PTX 313 (*under seal*); Trial Tr. 11-171:18–174:17 (Wilder); PTX 319 (*under seal*). Warden Wilder attempted to justify the failure to wear masks, by saying that policy B-14.52 allows people to hug and touch each other without masks so long as it is for less than 15 minutes. Trial Tr. 11-128:5–12, 11-130:23–5, 11-138:4–12 (Wilder).

214.     June 3, 2020, TDCJ promised to the Texas Inmate Families Association ("TIFA") to follow up on reports from TIFA that "officers without masks happens so often" that inmates give up on reporting it. PTX 302 at 24. TDCJ reported to TIFA as recently as July 8, 2020 that

"Wardens, CID, other directors are writing up personnel for not complying with mask rules" when told that TIFA still had many reports of officers not wearing masks. PTX 302 at 10. Yet despite these family complains and grievances about guards at Pack not wearing masks when they are required to do so, Warden Herrera confirmed to the Court that he has never disciplined any staff members for any infraction having to do with the COVID-19 pandemic. Trial Tr. 3-109:2–10 (Herrera); *see also id.* at 6-248:7–14 (Sullivan) (confirming that he was not aware of any formal discipline ever being issues for not following Policy B-14.52). From a correctional standpoint it is important to take appropriate corrective action to address non-compliance with the mask requirement. Trial Tr. 6-116:5–117:16 (Vail); *id.* at 14-70:24–71:4 (Beard).

215. A poster that has been up at the Pack Unit for several months indicated ███

████████████████████████████████████████████████████████████████████████████

████████████████████████ PTX 305 (***under seal***); Trial Tr. 11-117:22–118:14 (Vail).

216. Indeed, TDCJ's own COVID-19 instructional videos, which it plays for Pack inmates three times a day and which is meant to educate inmates about how to reduce the spread of COVID-19, depicts several instances of inmates and staff not wearing appropriate PPE or not wearing the PPE properly. Trial Tr. 10-100:16–24, 10-101:13–20, 10-102:19–23, 10-105:19–106:5 (Collier).[69]

217. Initially, TDCJ provided only those inmates at Pack who were 65 and older with masks, even though TDCJ apparently had enough masks for all inmates at Pack. Trial Tr. 10-110:3–15 (Collier) (noting that by April 9, TDCJ was producing about 20,000 masks per day); PTX 299 (April 13 email noting that masks would not be provided to all inmates at Pack: "Only

---

[69] The video is replete with images of poor practices and also depicts—bizarrely—a staff member incorrectly using an in-ear thermometer as though it were an infrared thermometer, pointing the in-ear device at an inmate's forehead. Trial Tr. 10-106:6–8 (Collier).

the offenders that are 65 and older" will get a mask); *see* Trial Tr. 4-77:12–78:7 (Herrera). And that was true even though TDCJ's own materials notes that masks are mainly for protecting others, not the mask-wearers. *See* Trial Tr. 4-82:13–22 (Herrera); 4-85:2–24 (Herrera) (referring to Policy 14.52); 4-85:25–86:12 (Herrera).

218.   Director Collier testified that one of the most common complaints in inmate grievances was that correctional officers were not wearing masks. Trial Tr. 10-73:21–25, 10-74:20–75:14 (Collier). Indeed, even inmate family members voiced complaints to TDCJ that correctional officers were not complying with mask requirements. Trial Tr. 10-76:18–77:6, 10-83:15–18 (Collier); *see also* PTX 302 at 10 ("The biggest complaint we [the Texas Inmate Families Association] continue to hear is about guards not wearing masks."). Director Collier testified that he was aware of these complaints about officers' not wearing their masks. Trial Tr. 10-81:23–82:6, 10-82:12–17 (Collier). Despite this reality, Director Collier acknowledged that Warden Herrera, who oversees the unit with the most mask-related complaints, has not disciplined any Pack employee for not wearing a mask. Trial Tr. 10-87:15–21 (Collier); *see also id.* at 4-120:3–10 (Herrera).

219.   The importance of officers' adherence to the guidelines is further reinforced by the reality that even Pack Unit inmates who are housed in complete isolation from other inmates—and are thus only exposed to officers—have contracted COVID-19. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

220.     At trial, Director Collier would not commit to a plan to provide all Pack Unit inmates and staff with masks during the rest of the pandemic. Trial Tr. 1-54:12–17, 1-54:25–55:13 (Collier). Neither would Warden Herrera. *See* Trial Tr. 4-124:25–6.

### v.     Defendants Failed to Ensure That Effective Contact-Tracing Measures Were Implemented and Enforced

221.     Contact tracing is the process by which, after someone tests positive for COVID-19, an analysis is conducted to determine what surfaces and other people that individual came into contact with when they may have been contagious with the virus. Trial Tr. 5-30:8–23 (Young). The medically sufficient length of time to conduct contact tracing for COVID-19 is 14 days before the positive test date. *Id*. at 5-31:1–9 (Young). Contact tracing is an important measure to combat the spread of COVID-19 because it helps to facilitate isolation of individuals who had close contact with a known-positive case of COVID-19. *See id*. at 5-30:8–23 (Young); *see also* Trial Tr. 3-146:15–21 (Herrera) (acknowledging that contact tracing is important to find out who may have been exposed to the virus).

222.     Defendants did not implement and enforce effective contact-tracing procedures. For example, Director Collier testified he is not aware of any written policy for how TDCJ is supposed to perform contact tracing for inmates. Trial Tr. 1-105:15–22 (Collier). TDCJ claimed to TIFA on July 1, 2020 that "Any positive test result on a unit, whether inmate or employee, will result in contact tracing by an infection control nurse employed by the University which oversees care on the unit." PTX 302 at 14. However, the evidence showed that Warden Herrera's assistant was the one performing contact tracing at the Pack Unit. PTX 43 (Marcy Steele Email).

223.     The record also reflects that Defendants did not conduct interviews with inmates who tested positive for COVID-19 to determine their close contacts. Trial Tr. 1-188:14–24, 190:20–24 (Valentine); *id*. at 2-157:23–158:23 (Beal); *id*. at 2-242:14–23 (Pennington).

224.     Defendants acknowledged that they use a narrow, two-day (48-hour) window for contact tracing—that is, they only conduct tracing back from two days before the COVID-positive person began exhibiting symptoms. Trial Tr. 1-61:22–24, 1-106:6–20 (Collier) (noting that "contact tracing is a 48-hour window"). This is so, even though Policy 14.52 notes that the when assessing the "risk level of exposure during" contact-tracing investigations, staff should assess all exposures with the past *fourteen* days, not just two. DTX 2 at 0032; DTX 3 at 0063; DTX 4 at 0095; DTX 5 at 7; DTX 6 at 0695; DTX 7 at 3417.

225.     For Mr. Clerkly, who was the first Pack inmate to perish with COVID-19, prison officials did not fill out the contact-tracing form correctly, and they 

 PTX 186, at 3; Trial Tr. 3-148:9–149:9, 3-149:23–160:11 (Herrera); *see also id*. at 1-108:8–109:4 (Collier)

1-112:21–113:5 (Collier)

1-113:19–23 (Collier)

*see also id.* at 1-110:21–111:9, 1-111:22–112:25, 1-115:10–15 (Collier)

*accord* Trial Tr. 10-161:5–7 (Collier) Even though Mr. Clerkly was the first confirmed COVID-19 case inside the Pack Unit, Warden Herrera resisted conducting a thorough investigation of what inmates and staff Mr. Clerkly had come into contact with in the days leading up to his death. Trial Tr. 3-149:23–160:11 (Herrera). This was true even though contact tracing—and filling out the tracing forms accurately and

correctly—was an important thing to get right. Trial Tr. 1-113:13–18 (Collier); *see also* Trial Tr. 3-159:19–160:11 (Herrera) (acknowledging that filling out the tracing form incorrectly "very well could have been a problem").

226.    This is unsurprising, as TDCJ had no "written procedures" or instructions on how to conduct contact tracing.[70]

227.    At trial, Director Collier declined to commit to a plan to perform contact tracing for anyone at Pack who tests positive for COVID-19, during the rest of the pandemic. Trial Tr. 1-61:13–62:3 (Collier).

228.    Defendants' failure to conduct thorough contact investigations—or, in many cases, to conduct any investigation at all—clearly violated their own policy. PTX 109 at 11. In addition to omitting people who were living together after the test result, Defendants also

███████████████████████████████████████████████████████████████

███████████████████████████████████. *See generally* PTX 161, PTX 186 (*under seal*); PTX 187 (*under seal*); PTX 198–205 (*under seal*); PTX 207–214 (*under seal*). This meant that Defendants systematically deprived themselves of crucial information necessary to contain the spread of the virus.

### vi.    There Is a Pervasive Pattern of Non-Compliance with TDCJ's COVID-19 Policy

229.    The record reflects a substantial amount of credible evidence that Defendants were not enforcing or requiring compliance with Policy 14.52, which is TDCJ's COVID-19

---

[70] PTX 337 (PENDING ADMISSION) (*under seal*) at numbers 3511–14 (Davis text dated July 2, 2020) ███
███████████████████████████████████                     ████

policy, or other related policies or guidelines. What TDCJ's policies supposedly required *in concept* was not being implemented or enforced *in practice*. For example:

230.    Defendants have repeatedly emphasized that they suspended transfer to the Pack Unit in mid-April. Trial Tr. 10-227:7–9, 11-50:17–25 (Wilder). But Defendants' excuse for not using the empty dorms through all of April and into May was that they were going to transfer inmates from the Estelle Unit—without testing them—into the Pack Unit. Trial Tr. 9-193:19–25 (discussing plans to relocate inmates at the Estelle Unit to the Pack Unit); Tr. 7-27:21–28:4 (Mendoza, TDCJ 30(b)(6) Testimony) ("Q. So TDCJ did not have a plan to test those inmates before moving them into the Pack Unit? A. TDCJ did not make a plan to test those inmates, no."). TDCJ also recently announced it has resumed transfers between units and intake from counties. Trial Tr. 10-170:5–23 (Collier).[71]

231.    Defendants' own expert, Jeffrey Beard, finds the transfer of inmates during a pandemic to be problematic. Trial Tr. 14-52:10–12 (Beard) ("Because, again, if you continue to move people, you're probably going to have a problem."). ██████████████████████[72]

232.    Director Collier claimed that the new announcement would not apply to the Pack Unit but troublingly admitted that this supposed exception for the Pack Unit is not in writing anywhere. Trial Tr. 10-170:14–171:6 (Collier) ("I'm not aware of any – if there is a written instruction" on the no-transfer policy for Pack); *Id.* at 10-171:7–10 (Collier) (acknowledging that

---

[71] *See also* PTX 339 (PENDING ADMISSION) (*under seal*) at number 28 (Davis text (No. 2) dated June 11, 2020) ███████████████████████████████████████████████████

[72] PTX 339 (PENDING ADMISSION) (*under seal*) at number 42–44 (Davis text (No. 2) dated July 4, 2020) ████████████████████████████████████████████████████████████████████████████████████████████████████

he is "not aware of a written policy" that says there will be no transfer of inmates to Pack or no resumption of inmate intakes at Pack).

233. Defendants tout a policy of providing extra soap to inmates above the normal five bar allotment, but in practice there is difficulty actually receiving any extra soap, with inmates' requests sometimes being denied outright. Trial Tr. 1-166:15–167:4 (Valentine); *id*. at 2-136:6–14 (Jones). This compounds on Defendants' decision to only offer small, one and a half inch bars of soap (Trial Tr. 1-165:7–11, 1-165:19–166:14 (Valentine)), even though there is no concern with giving larger bars of soap as it is sold through the commissary (Trial Tr. 1-209:10–20 (Valentine)). While Defendants' Counsel explored this issue in cross examination, no witness was put on for Defendants to rebut it. The lack of soap is not an isolated accident because the Pack Unit does not take affirmative steps to ensure there is soap, instead continuing to rely on the current unreliable method of inmates asking for additional soap. Trial Tr. 1-253:4–18 (Valentine). Of course, TDCJ also does not supplement the availability of soap with hand sanitizer.

234. The same is true for Defendants' representation about a policy of giving inmates extra toilet paper. Inmates only receive one roll of toilet paper for all their needs, including sneezing and coughing. Trial Tr. 1-178:25–179:7 (Valentine). Despite a purported policy of providing additional toilet paper on request, inmates testified they were repeatedly denied extra toilet paper. Trial Tr. 1-179:16–180:16, 1-181:18–22 (Valentine); *id*. at 2-100:24–25, 2-101:4–11 (Jones); *id*. at 2-203:22–203:25, 204:1–7 (Butaud). Based on Mr. Jones's testimony, many inmates are not even aware of this policy because Defendants have not told the inmates. Trial Tr. 2-101:12–15 (Jones). Mr. Valentine testified that he functionally ran out of toilet paper before his deposition, and since had completely run out, without being to get extra from Defendants. Trial Tr. 1-200:5–201:15, 1-202:10–203:5 (Valentine). These shortages force inmates to cough or

sneeze into their hands, requiring them to wash their hands again, which is difficult for those with mobility issues. Trial Tr. 1-179:8–15, 1-181:23–182:3 (Valentine).

235.     Since March 27, Policy 14.52 has required staff or inmates to "Thoroughly clean and disinfect all areas where suspected or confirmed [COVID-19] cases spent time." PTX 109 at 9; PTX 110 at 10; PTX 111, at 11; PTX 112 at 6; PTX 114 at 5; PTX 115 at 6; DTX 36 at 5. Since April 15, it has also said that "Medically restricted offenders may attend outdoor recreation and shower as a group. Areas used by them should be cleaned and disinfected before use by other offenders." PTX 111 at 14; PTX 112 at 10; PTX 114 at 9; PTX 115 at 11; DTX 36 at 10. And the Pack Unit's plan notes that "Offenders are called by designated housing areas in manageable groups maintaining social distancing guidelines. Disinfection protocols of shower areas are conducted between each housing area." PTX 39 at 2. But various inmates testified that these requirements were not being followed at Pack. For example:

236.     The laundry areas are not cleaned between use by each dormitory, even though inmates from each dorm—including both COVID-positive and COVID-negative dorms—touch various surfaces when exchanging laundry. Trial Tr. 1-162:4–163:19, 1-165:12–16 (Valentine); *id*. at 2-98:2–23, 2-99:7–15, 2-100:4–18, 2-100:20–23 (Jones); *id*. at 2-168:22–169:11, 2-243:9–16 (Beal); *id*. at 2-243:22–25 (Pennington).

237.     Policy 14.52 requires staff to "Assess risk level of exposure during contact investigations to guide management (Table 1). All exposures apply to the **14 days** prior to assessment." *E.g.*, DTX 36 at 8 (emphasis added). Tracing contacts back 14 days from the positive test date is medically sufficient for COVID-19. Trial Tr. 5-31:1–9 (Young). But the evidence at trial shows that although contact tracing is critical to stopping COVID-19 transmission (*see id.* at 5-30:8–15 (Young)), Defendants aren't properly tracing exposures and

certainly aren't going back 14 days, even though their own policy suggests they should. In fact, Executive Director Collier testified that TDCJ traces back only 48 hours. Trial Tr. 1-61:22–25 ("contact tracing is a 48-hour window").

238.    Warden Herrera admitted that, in his view, for the first inmate to test positive at Pack—Mr. Clerkly, who died after contracting COVID-19—contact tracing needed to be done only for the 48 hours before Mr. Clerkly tested positive, even though he had died two days *before* testing positive and presumably came into contact with a number of people before he actually died. Trial Tr. 3-150:6–157:3. Warden Herrera didn't think it important enough to try to trace back to those Mr. Clerkly may have come into contact with at the Pack Unit before he died. *See* Trial Tr. 3-153:21–156:7. He did not think it important enough to consult with doctors or UTMB staff to ask whether it made sense to trace back to the time Mr. Clerkly had been at Pack, even though his autopsy results came back two days after he had died at the hospital. Trial Tr. 3-157:5–8 (Herrera).

239.    This indifference is in sharp contrast to the tracing TDCJ insisted upon when it thought its officers might have been exposed in a UTMB facility. On March 28, 2020, TDCJ's executive-level leadership demanded that UTMB either include TDCJ officers in contact investigations or permit TDCJ to conduct its own contact investigation including by revealing the names of contacted UTMB staff at Hospital Galveston. PTX 28 at 2.

240.    Policy 14.52 requires that "All staff working in medically restricted areas and offenders who are placed in medical restriction, will be educated about early recognition of symptoms, warning signs, and rapid triage of symptomatic patients." *See e.g.*, DTX 36 at 9. Although TDCJ played instructional videos at various points inside the Pack Unit, there was no Spanish-language version of the video, even though some of the Pack inmates speak only

Spanish, or very limited English. Trial Tr. 1-177:18–178:7 (Valentine). And because the locations where the videos are played are not easily accessible, the video is inaudible to some of the inmates because it is simply too far away to be heard. *Id.* at 1-177:5–9, 1-178:8–17 (Valentine). If inmates attempt to gather to watch the video, they are reprimanded because the day room is off limits. Trial Tr. 1-208:20–209:1 (Valentine). The video also claims that many precautions taken place at the Pack Unit when, in practice, they are untrue or do not occur. Trial Tr. 1-176:7–13 (Valentine). This includes social distancing, spraying, appropriate cleaning, and availability of cleaning supplies.[73] *Id.*

241. Policy 14.52 requires that high-touch common areas and surfaces should be disinfected with a 10% bleach solution. *E.g.*, DTX 36 at 3. Along these lines, TDCJ answered an interrogatory, claiming that, "Generally, there is one inmate janitor on each 12-hour shift assigned to each dorm and living area who is continuously cleaning common surface areas, including spraying down the exterior cubicle walls with disinfectant." PTX 79. This 10% solution is not always supplied (Trial Tr. 1-171:20–172:15 (Valentine)), and even when it is, there are not sufficient chemicals for the janitors to clean their dorms.

242. Mr. King, who works as an unpaid janitor inside Pack (Trial Tr. 2-22:9–16 (King)), testified that TDCJ has not increased the number of janitors during the pandemic. Trial Tr. 2-24:11–16, 2-67:21–68:1, 2-68:17–4 (King). The janitors are responsible or cleaning everything. Trial Tr. 2-23:19–24:10 (King). Yet Mr. King testified that he runs out of his allotment of cleaning supplies by the middle of the day during each of his shifts—usually "shortly after noon." *Id.* at 2-25:4–15 (King). Mr. King's shift goes until 6:00 p.m., meaning

---

[73] ▮▮▮▮▮▮▮▮▮▮▮▮▮ PTX 340 (PENDING ADMISSION) (*under seal*) at numbers 59–67 (Collier text (Aug. 10 production) dated July 1, 2020).

janitors do not have cleaning supplies for up to six hours. Trial Tr. 2-23:5–18 (King). Once he runs out of cleaning supplies, they get no further supplies "until the next shift comes on." *Id.* at 25:16–18. Despite the pandemic and the increase of positive cases inside Pack, TDCJ has not increased the amount of cleaning supplies allotted to janitors at the unit. *Id.* at 2-25:19–21 (King); *see also* ███████████████████████████████████████████████████████

████████████████████████████████████ While Mr. King has asked a prison official for additional cleaning supplies, his requests have been denied. He was told by Ms. Maxie, who is the TDCJ official responsible for distributing cleaning chemicals, that "Well, this is [the amount of supplies] we always give, so this is what you're going to get." Trial Tr. 2-26:13–27:4, 2-70:3–13 (King).

243.    Concerned about the inadequate amount of cleaning supplies and his inability, as a janitor, to keep his dormitory disinfected during the pandemic, Mr. King filed a grievance on or about May 12, 2020, asking for more cleaning supplies. Trial Tr. 2-27:10–28:17 (King). It took five-to-six weeks to receive a final answer to that grievance, and when the answer came at last, it was this: no change was made to the amount of cleaning chemicals Mr. King was given by prison officials, and he continues to receive the same amount of those chemicals today, even though he could keep the dorm clean with additional chemicals. Trial Tr. 2-28:13–29:14 (King); *see also id.* at 2-74:2–7 (King).

244.    Inmate Marvin Jones is also a janitor at Pack (Trial Tr. 2-82:15–25 (Jones)), even though he is completely confined to a wheelchair (*Id.* at 2-83:1–5 (Jones)). Because he is mobility-impaired and has a disabled arm, Mr. Jones has great difficulty using a mop and broom while trying to maneuver his wheelchair: "Being in wheelchair, trying to sweep and mop, you have to maneuver the wheelchair and grab the wheels and maneuver, move forward, move

backwards, traverse, all the while trying to guide the mop or the broom, for that matter, and also I'm trying to push the mop bucket, as well. It's kind of hard just being in a wheelchair." *Id.* at 2-83:6–24 (Jones). █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ (*under seal*); *see also* 3-140:7–21 (Herrera). ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ All of the inmates in Mr. Jones's dorm are disabled and use wheelchairs, including the janitors. *Id.* 2-85:13–17, 2-127:5–7 (Jones). There is no evidence that the Pack Unit even considered moving in an inmate who is *not* in a wheelchair and who matched the dorm's COVID-testing designation, into a janitorial position. *See id.* (all inmates are in wheelchairs, including janitors). This was true even though there are extra bunks available. Trial Tr. 2-78:4–7 (Jones). ████████████████████████████████████████████

████████████████████████████████████████[74]

245.    Like Mr. King, Mr. Jones testified he runs out of cleaning supplies by between noon and 2:00 p.m.—about midway into his shift. *Id.* at 2-86:4–16, 2-87:20–89:1, 2-149:21–150:11 (Jones). The lack of chemicals prevents him from keeping the showers clean. Trial Tr. 2-97:14–17 (Jones). He has the same type of 12-hour shift as Mr. King. Trial Tr. 2-86:2–7, 2-86:17–19 (Jones). Just as with Mr. King, when the supplies run out, that is for that shift even though they have hours to go. Trial Tr. 2-88:18–89:1 (Jones). Mr. Jones has asked for additional cleaning supplies during his shift, but those requests were denied. *Id.* at 2-89:2–8 (Jones). TDCJ

---

[74] PTX 337 (PENDING ADMISSION) (*under seal*) at numbers 3608–11 (Davis text dated July 14, 2020)

provides the same amount of cleaning supplies to its inmate-janitors that it provided before the pandemic. Trial Tr. 2-87:3–19 (Jones).

246.    Inmate Harold Dove is also a janitor at Pack. Trial Tr. 2-190:17–25 (Dove). Mr. Dove uses a wheelchair, has diabetes, and suffered a stroke in November of last year that left him clinically blind and partly paralyzed on his right side. *Id.* 2-188:8–189:12 (Dove). Because of these conditions, he is not able to perform his janitorial duties and cannot keep the dormitory area clean—for example, he is not able to mop and cannot see well enough to do any of the sweeping. *Id.* at 2-190:24–191:4 (Dove). Mr. Dove and his wife have previously complained to Pack officials that he cannot perform janitorial duties effectively because of his medical conditions. *Id.* at 2-192:1–24 (Dove). Despite these challenges, ███████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████

247.    Paul Wilder, who is now TDCJ's manager over the Administrative Review and Risk Management Division and who was the assistant warden at the Pack Unit until June 17, 2020, (Trial Tr. 10-222:10–19, 10-222:25–223:6 (Wilder)), testified that it is unsafe to have blind people cleaning dorms during the COVID-19 pandemic. Trial. Tr. 11-231:9–14, 11-232:7–21 (Wilder) ████████████████████████████████████████████

█████████████████████████ *see also* Trial Tr. 3-141:9–12 (Herrera) (***under seal***). Mr. Wilder also testified that he would not be troubled by disabled inmates being responsible for

janitorial duties during the pandemic because they could, for example, put the broom against their necks "and push it with a wheelchair like they do in there." Trial Tr. 11-239:13–22 (Wilder).

248.    Due to the lack of cleaning supplies and janitorial issues, inmates find it difficult to keep their cubicles clean. Trial Tr. 1-174:15–175:13 (Valentine). This is especially true for older and disabled inmates, of which there are many at the Pack Unit. Trial Tr. 1-175:14–23 (Valentine). This is also exacerbated by the Pack Unit's policy of not allowing janitors to clean other inmate's cubicles. Trial Tr. 1-175:12–13 (Valentine); *id*. at 2-68:25–69:11 (King).

249.    At trial, Director Collier would not even commit to providing additional, necessary cleaning supplies for each Pack Unit housing area (including bleach-based cleaning agents and CDC-recommended disinfectants) in sufficient quantities for each inmate to clean and disinfect the floor and all services of his own housing cubicle. Trial Tr. 1-55:15–56:11 (Collier). Neither would Warden Herrera. *See* Trial Tr. 4-124:25–6.

250.    The trial has also revealed that TDCJ's representation to the Fifth Circuit was unsupported by the evidence: the agency represented that the Pack Unit had implemented the agency's 14.52 policy. PTX 64 at 4. Several specific representations in that letter have been completely discounted.

251.    In the most blatant example, the evidence shows that TDCJ staff do not wear masks, much less face shields, "at all times while on the unit." *Contra* PTX 64, at 4. Instead, corroborating inmate testimony—see, e.g., Trial Tr. 2-32:20–2:331 (King); *id*. at 2-146:14–149:5 (Jones); *id.* at 3-11:16–19, 3-42:20–3-43:4 (Reynolds); *id*. at 15-16:7–16 (Valentine)—the warden explained that officers do not need to use their face shields at all "[i]f they are not in close contact with the offenders or inside a restricted or isolated dorm." 4-107:14–15 (Herrera). On redirect examination, Herrera incorrectly described the limits of the term "close contact" to

solely mean "6 feet or less for more than 15 minutes." Trial Tr. 4-199:18–20 (Herrera). The assistant warden similarly justified officers' routine failure to wear masks by incorrectly reasoning that he was not in close contact when he hugged a fellow staff member at the Pack Unit because "Per 14.52, 'close contact' is considered together over 15 minutes." Trial Tr. 11-127:23–24 (Wilder).

252.    In fact, this testimony by Warden Herrera and Warden Wilder not only contradicted the representation to the Fifth Circuit, but Warden Wilder also contradicted the policy as to face masks. Five out of the eight versions of the policy all require: "Face coverings should be worn at all times unless it restricts breathing or interferes with activities of daily living." PTX 111 at 9 (April 15 policy); PTX 112 at 5 (May 6 policy); PTX 114 at 4 (May 13 policy); PTX 115 at 5 (June 11 policy); DTX 36 at 4 (July 13 policy). And both wardens' definitions of close contact are incomplete, as seven of the eight versions of the policy have stated: "Close Contact that has been within 6 feet of a case for a prolonged period of time, *or (2) has had direct contact with respiratory droplets* E.g., living with someone, intimate partner, traveling on same bus, or working in healthcare setting (e.g., clinic or infirmary)." PTX 109 at 6, 11; PTX 110 at 6, 11; PTX 111 at 7, 12; PTX 112 at 3, 8; PTX 114 at 2, 7; PTX 115 at 3, 8; DTX 36 at 2, 8 (emphasis added).

253.    The wardens' testimony also contradicted Warden Herrera's verified interrogatory answer which states twice that "N95 masks and face shields [are] to be worn at all times." PTX 79 at 3, 4.

254.    Warden Wilder similarly contradicted the Fifth Circuit representation about social distancing. Contrary to the letter, which promises that "Unit staff have continued to enforce social distancing among themselves and offenders when possible," PTX 64 at 5, Warden Wilder

testified that he personally violated social distancing guidelines to pose for photographs or to engage in other interactions, and that he believed these were acceptable if they lasted less than 15 minutes and comported with the 14.52 policy due to the brevity of the contact.. Trial Tr. 11-127:9–24 (Wilder). As with masks, the policy plainly does not endorse repeated, unnecessary violations of social distancing guidelines—it has always instructed to "Practice social distancing and avoid gatherings and meetings" without qualification, though that is not how the policy has been implemented at the Pack Unit PTX 108 at 7; PTX 109 at 8; PTX 110 at 8; PTX 111 at 8; PTX 112 at 4; PTX 114 at 3; PTX 115 at 4; DX 36 at 3.

255. Defendants' failure to implement the necessary precautions at the Pack Unit are widespread and pervasive, and show a pattern of disregard. Defendants efforts to call these "isolated incidents" that are localized to a particular dorm are contradicted by the overwhelming evidence at trial, which came from inmates from different dorms. Mr. Valentine lived in both Dorms 11 and 14 during the pandemic. Trial Tr. 1-150:24–151:8, 1-220:5–9 (Valentine). Mr. King lives in Dorm 18. Trial Tr. 2-12:20–24 (King). Mr. Jones lives in Dorm 4 (*id.* at 2-77:20–78:3 (Jones)) along with Mr. Dove (*id*. at 2-189:13–17 (Dove)). Mr. Beal currently lives in Dorm 2 (*id*. at 2-153:10–13 (Beal)), but has been housed in Dorm 17 (*id*. at 2-156:19–23, 2-162:11–15 (Beal)), the schoolhouse/education wing (*id*. at 2-156:24–157:4, 2-157:16–18 (Beal)), and administrative segregation (*id*. at 2-160:16–161:5 (Beal)). Mr. Butaud lived in Dorm 12 (*id*. at 2-196:12–13 (Butaud)), Dorm 13 (*id*. at 2-199:2–12 (Butaud)), and Dorm 16 (*id*. 2-197:5–7, 2-198:24–199:1 (Butaud)) during this pandemic. Mr. Pennington lives in Dorm 11. Trial Tr. 2-237:15–16 (Pennington). Mr. Reynolds lives in Dorm 20. Trial Tr. 3-6:15–16 (Reynolds).

256. Further, the routine disobedience of the social distancing policy defeats the purpose of TDCJ's alleged practice of minimizing staff rotation—as staff routinely come into

contact with one another, so even if they each only contact one dorm, they can spread the virus from dorm to dorm through another officer. PTX 79 at 4. In any event, inmates testified that officers routinely come into contact with inmates from multiple dormitories. Trial Tr. 1-182:7–183:12 (Valentine); Trial Tr. 2-33:23–34:10 (King); *id.* at 2-103:14–24, 2-105:17–19 (Jones).

257. ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████.[75]

258.    Warden Wilder was sent an extremely concerning report about the conditions at the Pack Unit from the officer in charge of supervising food preparation:



---

[75] PTX 343 (PENDING ADMISSION) (*under seal*). (excerpt of Mendoza chat 229 dated July 5, 2020).

[REDACTED][6]

259. [REDACTED]

[REDACTED]

[REDACTED][77]

260. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED][78]

261.    In addition to the warnings and complaints above, Defendants and other TDCJ officials have been receiving daily, same-day updates summarizing COVID-19 grievances in their purview since March 25, 2020. *See, e.g.*, PTX 298; PTX 132.

262.    As discovery was incomplete (and the COVID-19 pandemic is ongoing), only a sample of these grievance summaries are available for the Court's review, although TDCJ's witnesses conceded that the summaries are typical of those they should be receiving daily. Trial Tr. 4-153:6–20, 4-160:13–16 (Herrera). Grievance summaries reflecting 39 weekdays out of the 97 from March 25 through the last day of trial are admitted in evidence. PTX 132, PTX 135–142,

---

[76] PTX 332 (*under seal*).

[77] PTX 337 (PENDING ADMISSION) (*under seal*) at number 3772 (Davis text dated Mar. 11, 2020).

[78] PTX 337 (PENDING ADMISSION) (*under seal*) at number 440 (Davis text dated Mar. 23, 2020).

PTX 144–150 (*under seal*), PTX 152 (*under seal*), PTX 154 (*under seal*), PTX 272–284 (*under seal*), PTX 290–297 (*under seal*). In total, these summaries reflect approximately 155 grievances from inmates at the Pack Unit concerning COVID-19.[79] Notably, TDCJ selected these grievances as those specifically "COVID-19 related"—thus, many other grievances were not included in these summaries. These grievances do include:



[79] PTX 132 (*under seal*) (1 "P1" or Pack Unit grievance), 135 (1) (*under seal*), 136 (3) (*under seal*), 137 (5) (*under seal*), 138 (6) (*under seal*), 139 (2) (*under seal*), 140 (1) (*under seal*), 141 (1) (*under seal*), 142 (6) (*under seal*), 144 (4) (*under seal*), 145 (2) (*under seal*), 146 (2) (*under seal*), 147 (5) (*under seal*), 148 (3) (*under seal*), 150 (1) (*under seal*), 152 (6) (*under seal*), 154 (2) (*under seal*), 272 (3) (*under seal*), 273 (8) (*under seal*), 274 (9) (*under seal*), 275 (10) (*under seal*), 276 (7) (*under seal*), 277 (1) (*under seal*), 278 (9) (*under seal*), 279 (11) (*under seal*), 280 (2) (*under seal*), 281 (2) (*under seal*), 282 (7) (*under seal*), 283 (5) (*under seal*), 284 (3) (*under seal*), 290 (1) (*under seal*), 291 (1) (*under seal*), 292 (10) (*under seal*), 293 (2) (*under seal*), 294 (4) (*under seal*), 295 (2) (*under seal*), 296 (3) (*under seal*), 297 (4) (*under seal*).

263.    If the Court extrapolates that a pattern of these grievances continued for weekdays where summaries we not produced, then Defendants were likely on notice of about 4 grievances related to COVID-19 per weekday from Pack Unit inmates, or over 380 such grievances by the end of trial. Thus, Defendants were certainly on notice of allegations of the exact deficiencies in implementation evidenced at trial.

264.    On May 26, 2020, Collier received a report that the Pack Unit lead the entire TDCJ system in grievances alleging "failure to follow COVID-19 protocols," with 53 total.[80] PTX 301. This tally, which TDCJ interpreted to allege "failure to follow COVID-19 protocols" was less inclusive than the "COVID-19 related grievance" summaries, as even the incomplete evidence of the summaries reflects over 109 were filed by Pack Unit inmates as of May 26, 2020. *Compare* PTX 301 *with* PTX 132 (1) (*under seal*), 135 (1) (*under seal*), 136 (3) (*under seal*), 137 (6) (*under seal*), 138 (6) (*under seal*), 139 (2) (*under seal*), 140 (1) (*under seal*), 141 (1) (*under seal*), 142 (6) (*under seal*), 144 (4) (*under seal*), 145 (2) (*under seal*), 146 (2) (*under seal*), 147 (5) (*under seal*), 148 (3) (*under seal*), 150 (1) (*under seal*), 152 (6) (*under seal*), 154 (2) (*under seal*), 272 (3) (*under seal*), 273 (8) (*under seal*), 274 (9) (*under seal*), 275 (10) (*under seal*), 290 (1) (*under seal*), 291 (1) (*under seal*), 292 (10) (*under seal*), 293 (2) (*under seal*), 294 (4) (*under seal*), 295 (2) (*under seal*), 296 (3) (*under seal*), 297 (4) (*under seal*).

---

[80] Notably, the Pack Unit is not the largest TDCJ facility. In fact, the facility with the second highest number of grievances, Estelle, is over twice the Pack Unit's size, with a capacity of 3,360 inmates. See Texas Department of Criminal Justice, Unit Directory: Estelle (E2), available at https://www.tdcj.texas.gov/unit_directory/e2.html. The third most complained-of facility, Coffield, is almost three times the size of Pack with a capacity of 4,139. *See* Texas Department of Criminal Justice, Unit Directory: Coffield (CO), available at https://www.tdcj.texas.gov/unit_directory/co html. The fourth-place facility holds 1,000 more inmates than Pack. *See* Texas Department of Criminal Justice, Unit Directory: Ellis (E), available at https://www.tdcj.texas.gov/unit_directory/e html.

Collier was also notified that the most prevalent grievance related to the "[f]ailure to wear masks and gloves appropriately," "[l]ack of cleaning supplies issued to offenders," "[i]nability to practice social distancing," and "[c]omplaints of being exposed to COVID-19 by positive staff or offenders coming onto the units." PTX 301; *see also* Trial Tr. 4-111:18–112:2 (Herrera).

265.    If the examples provided at trial are any indication, many of these grievances received a boilerplate response simply stating that



*See* PTX 131 at 2, 4, 8, 14, 16, 18, 20, 22, 24, 28, 30, 32, 34, 36, 38, 40, 46, 48, 64, 86, 88, 90, 92, 94, 96 (***under seal***); PTX 151 at 59, 63, 65, 79, 83, 85, 89 (***under seal***).

266.    Several other COVID-19 grievances were not addressed substantively, but instead were "screened" by TDCJ officials. *See* PTX 131 at 42, 44, 62, 66, 68, 70, 72, 74, 76, 82, 100 (***under seal***).



*Id.* at 62.

267.    These returned grievances also reflect that when the case was filed, TDCJ was not responding expeditiously to all COVID-19 grievances. *See* PTX 131 at 1–4 (***under seal***)


5–8 ████ 9–12 ████ 13–16 ████ 23–26 ██████ 27–29 ████ 33–36 ████ 37–40 ████ In one case, ██████████ PTX 131 at 19 (***under seal***). In

another, ████████████████████████████████ PTX 131 at 31 (***under seal***). Others

were returned quickly—but only because ██████████████████████████████

████████████████████████████ *See* PTX 131 at 42, 44, 62, 66,

70, 72, 74, 76, 80, 100 (***under seal***).

268.    ████████████████████████████████████████

████████████████████████████████████ PTX 131 at 97

(***under seal***). The grievance was returned to Mr. Bragg on ████████████████

████████████████████████████ PTX 161 at 5. Even the limited record of

grievances shows that at least four other inmates—████████████████████████

████████████████████████████████████████████████

████ PTX 138, p. 3 (***under seal***); PTX 145 at 3 (***under seal***); PTX 152 at 6 (***under seal***).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

## C.    Defendants Are Violating the ADA and the Rehabilitation Act of 1973

### 1.    Plaintiff Valentine and the Subclass Have Qualifying Disabilities

269.    Mr. Valentine uses a walker to ambulate. Trial Tr. 1-150:4–13 (Valentine). Mr.

Valentine also has chronic medical conditions including drop foot, atrophy and weakness in the

upper-left extremity, high blood pressure, hypertension, nerve damage from a stroke, and limited

ability to grip with his left hand. Trial Tr. 1-148:20–149:20, 1-150:14–17 (Valentine).

270. Mr. Jones is not able to walk and uses a wheelchair at all times. Trial Tr. 2-76:24–77:5, 2-83:1–5 (Jones). Mr. Jones' dorm (Dorm 4) also houses 26 inmates, all in wheelchairs. Trial Tr. 2-78:4–7, 2-127:5–7 (Jones).

271. Mr. Dove is a diabetic who suffered a stroke last November that left him speech impaired and clinically blind. He also uses a wheelchair. Trial Tr. 2-188:8–189:12 (Dove).

272. Mr. Pennington has difficult walking due to his ailments and uses a walker to move around. Trial Tr. 2-237:4–5, 2-247:6–17 (Pennington).

273. Mr. Beal is similarly mobility-impaired and uses a wheelchair to ambulate. Trial Tr. 2-159:2–160:11, 2-176:10–19 (Beal).

## 2. TDCJ Knows Plaintiffs and Subclass Are Disabled and the Consequential Limitations of Those Disabilities

274. Director Collier testified that he understands there are a number of mobility-impaired inmates at Pack, many of whom are in wheelchairs. Trial Tr. 1-64:17–19 (Collier). Warden Herrera, who is the senior warden at Pack, likewise knows that many of the Pack inmates are mobility impaired. Trial Tr. 3-50:8–9, 3-55:3–23 (Herrera) (acknowledging that many Pack inmates have a difficult time moving around). Indeed, there can be no question that TDCJ knows many Pack inmates are unable to walk without mobility-assist devices because their disabilities are obvious. *See* Trial Tr. Vol. 6, 254:4–8 (Sullivan). For example, Mr. Jones is an above-knee amputee and therefore uses a wheelchair. Trial Tr. 2-124:20–125:7 (Jones). Mr. Dove testified that he is also in a wheelchair and is clinically blind. Trial Tr. 189:2–12 (Dove). Mr. Beal testified the when he is "not in bed," he is in his wheelchair and cannot ambulate without it. Trial Tr. 2-153:3–9 (Beal). Mr. Jones also testified that there are Pack Unit inmates "who are paralyzed from the waist down, [with] no leg – no leg movement at all." Trial Tr. 2-97:3–17 (Jones).

275.     Mr. Valentine's mobility issues make washing his hands difficult. Trial Tr. 1-169:13–170:3 (Valentine).

276.     Mr. Jones uses a wheelchair and explained that: anytime we grab ahold to the wheelchair rings or the wheels, for that matter, we touch anything that is on it." Trial Tr. 2-95:4–5 (Jones). This includes water, dirt, and anything else on the floor (which frequently includes urine and feces), making it difficult if not impossible to keep his hands clean. *Id.* at 2-95:6–96:6 (Jones).

277.     Mr. Pennington also is not able to wash his hands as often as he would like due to his mobility issues. Trial Tr. 2-247:11–17 (Pennington).

278.     Mr. Beal, who was housed for a time in the "schoolhouse," which is the educational area at the Pack Unit, did not have access to sinks or showers or a bathroom area in that part of the prison. To wash his hands with soap and water, Mr. Beal and others housed in the "schoolhouse" would have to travel "about a hundred yards" or so. Even if he did so, Mr. Beal, who use a wheelchair, would have to touch his wheelchair's wheels to roll himself approximately one-hundred years back to his living area in the schoolhouse. Mr. Beal testified that the whole process of washing his hands while housed in the schoolhouse was essentially for naught, because inmates who use a wheelchair have to keeping putting their hands "on [their] wheels to move around, and [they] can't keep the wheels clean so they're going to stay dirty all the time." Trial Tr. 2-159:2–160:11, 2-176:10–19 (Beal).

279.     While wheelchairs have small rails that can be used to move, in reality, using them still involves touching the dirty wheels on the wheelchair. Trial Tr. 2-125:8–25 (Jones); *id*. at 2-185:9–14 (Beal); *id*. at 2-193:15–22 (Dove). Because of this, it is difficult if not impossible for many mobility-impaired inmates to keep their hands clean. Trial Tr. 6-88:13–18 (Vail). This

means that they must often eat with dirty hands in their cubicle, even when coming back from the sink. Trial Tr. 2-96:9–16 (Jones).

280.     Both Director Collier and Warden Herrera know that those with preexisting medical conditions, including disabilities, can have more significant health complications if they contract COVID-19. Trial Tr. 1-42:19–25; *id.* 3-52:22–24.

### 3.     TDCJ Refuses to Make Reasonable Accommodations

281.     Several inmates at Pack are mobility impaired and use walkers, wheelchairs, and other mobility-assist devices to move around. *See*, *e.g.*, Trial Tr. 2-76:24–77:5, 2-83:1–5, 2-124:23–125:1 (Jones); *id*. at 2-189:11–12 (Dove); *id*. at 2-153:3–9 (Beal); Trial Tr. 6-254:4–8; 14-182:3–7 (Beard).

282.     Defendants' expert, Dr. Beard testified that if he was the warden at the Pack Unit and knew that he had inmates with mobility issues who have a hard time getting to the sinks and need to wash their hands frequently that he would make accommodations for those inmates. Trial Tr. 14-182:20–185:16 (Beard). However, Dr. Beard is unaware of any steps that TDCJ is taking to protect these elderly inmates is wheelchairs. *Id.* 185:18–186:9 (Beard).

283.     Inmates testified that hand sanitizer would allow the mobility impaired inmates to keep their hands clean. Trial Tr. 1-170:4–8 (Valentine); *id*. at 2-96:14–16 (Jones); *id*. at 2-165:10–17 (Beal); *id*. at 2-193:23–25 (Dove). Warden Wilder admits that providing hand sanitizer to inmates is feasible. Trial Tr. 11-255:3–7 (Wilder). Major Sullivan agreed that hand sanitizer would make it easier for inmates to clean their hands in their cubicles. Trial Tr. 6-236:23–237:8 (Sullivan). Defendants' expert Dr. Beard also testified that it could be done safely. *Id.* 14-188:6–12 (Beard). The inmates themselves testified that they would not drink the hand sanitizer or use it to start fires, which were the two pretexts put forward by Defendants for refusing to provide hand sanitizer. Trial Tr. 1-170:9–21, 1-171:5–14 (Valentine); *id*. at 2-165:18–

25, 2-166:13–15 (Beal); *id.* at 2-194:1–3 (Jones); *id.* at 2-247:21–24 (Pennington); *id.* at 2-194:1–6 (Dove). ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ (*under seal*).

284.    Despite this, TDCJ refuses to give even these disabled inmates an effective way to keep their hands clean and disinfected. Trial Tr. 4-233:19–234:18 (Young); *see also*, *e.g.*, Trial Tr. 2-94:10–96:16 (Jones); *id.* at 2-193:15–194:6 (Dove). Indeed, Director Collier testified that neither he nor TDCJ performed any analysis to see how they could help inmates who are mobility-impaired and use a wheelchair to keep their hands clean. Trial Tr. 1-65:3–6, 1-65:11–14, 1-65:19–23, 1-75:21–23, 1-76:2–3, 1-76:5–14 (Collier). Neither Director Collier nor anyone that works for him ever instructed anyone from the medical team to examine ways to accommodate the mobility-impaired inmates at the Pack Unit so that they could have access to more frequent, effective handwashing. *See id.* 1-66:19–22, 1-67:1–2, 1-76:5–14 (Collier). ████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.[81]

285.    Even after the lawsuit was filed, Director Collier never instructed the medical team to analyze or research ways to accommodate the mobility-impaired Pack Unit inmates to help them keep their hands sanitized in the face of COVID-19. Trial Tr. 1-68:3–6, 1-68:18–19 (Collier). This is true despite the fact that the senior warden at Pack—Warden Herrera—testified that he has known, since the start of the pandemic at least, that keeping one's hands clean important. Trial Tr. 4-99:24–2.

---

[81] PTX 340 (PENDING ADMISSION) (*under seal*) at number 120–23 (Collier text (Aug. 10 production) dated Apr. 4, 2020).

286.     Pack Unit inmates who are mobility-impaired, however, continue to face the dangerous inability to keep their hands clean and sanitized to the same degree that non-impaired inmates can. Mr. Jones, for example—an inmate who is clinically blind and uses a wheelchair—testified that when he washes his hands at a sink, he immediately contaminates them again because he must touch his wheelchair's wheels to roll away from the sink and back to his cubicle, which gets his hands "dirty again" right after he washed them. Trial Tr. 2-193:15–194:6 (Dove). If he had hand sanitizer back at his cubicle, he could disinfect his hands there. *Id.* at 1-193:23–25 (Dove). Mr. Beal and Mr. Dove testified similarly. Trial Tr. 2-165:10–17 (Beal); *id.* at 1-193:23–25 (Dove).

287.     Plaintiffs' infectious disease expert, Dr. Jeremy Young, testified that it is "inexplicable" to him that other prisons and jails across the county have allowed inmates to use hand sanitizer, and yet TDCJ officials will not allow it at Pack, where many of the inmates "have mobility issues and, again, underlying conditions that would make it difficult for them to only perform hand hygiene with soap and water." Trial Tr. 4-217:17–218:20, 4-219:9–220:10 (Young). Dr. Young further testified that although soap and water may be widely available, it is not "readily available" or "adequately access[ible]" to inmates who have issues ambulating. *Id.* at 5-101:21–102:20, 5-103:13–17 (Young).

288.     Notably, at trial, Director Collier would not even commit to provide all Pack Unit inmates with unrestricted access to hand soap and clean hand towels or extra toilet paper, let alone hand sanitizer, despite claiming to provide these already. Trial Tr. 1-53:8–54:4 (Collier). This was likely because the evidence showed that Defendants' policy on extra soap does not match their practice. Inmates testified they had difficulty actually getting the extra soap and toilet paper Defendants claim to provide. Trial Tr. 1-166:15–167:4, 1-179:16–180:16 (Valentine).

289. It is a reasonable, and necessary accommodation to provide mobility-impaired inmates with hand sanitizer. Trial Tr. 6-89:18–23 (Vail). This serves to benefit everyone at the Pack Unit because it will help control the spread of the virus. *Id.* 6-90:5–9 (Vail).

290. TDCJ's answer to reasonable accommodations for inmates who use a wheelchair is that it expects them to eat their food in their cubicles with toilet paper. Trial Tr. 9-68:11–23, 9-104:23–105:23, 9-107:1–2, 9-108:11–21 (Zawitz).[82] In any event, Director Collier would not even commit at trial to continue to provide extra toilet paper during the pandemic. Trial Tr. 1-56:18–57:6 (Collier). Neither would Warden Herrera. *See* Trial Tr. 4-124:25–6.

291. ███████████████████████████████████████████████.[83] The hand washing stations, however, are completely useless to inmates who use wheelchairs as they require the user to "Push pump with foot" which is obviously challenging if not impossible for a person who uses a wheelchair. Trial Tr. 6-213:3–214:10 (Vail).[84]

## D. TDCJ's Grievance Process Did Not Provide Available Remedies to Address COVID-19

### 1. TDCJ's Grievance Process Was Not Capable of Responding

292. TDCJ has a three-step grievance process for inmates in its prisons, including the Pack Unit. TDCJ's grievance process requires inmates to first try to informally resolve their grievance. PTX 9 at 7; PTX 10 at 86; PTX 82 at 18 ("Offenders must document an attempt to informally resolve the issue prior to filing a Step 1 grievance."); DTX 11 (TDCJ grievance form,

---

[82] Even if that were a reasonable accommodation, it does not address how inmates who use a wheelchair would keep their hands disinfected at other times in their cubicles—for example, while they are asleep.

[83] PTX 337 (PENDING ADMISSION) (*under seal*) at number 463 (Davis text dated July 15, 2020) (Davis: ███████████████████████████████████ *See also id.* (*under seal*) at numbers 3650–62 (Davis text dated July 15, 2020); *see also* Trial Tr. 3-186:8–10, 4-95:18–96:25 (Herrera).

[84] In any event, even with the handwashing stations installed, Warden Herrera testified that they will not be placed in locations readily accessible to the inmates during precautionary lockdowns. Trial Tr. 4-100:20–102:24 (Herrera).

which states "You must try to resolve your problem with a staff member before you submit a formal complaint."); *see also* Trial Tr. 10-9:22–10:3 (Collier) ("If an offender has a complaint or issue, we – we do encourage that they try to informally resolve that. And that would be something that we would expect to be attempted."); *see also* Trial Tr. 1-95:11–14, 1-95:18–24 (Collier); *accord* Trial Tr. 10-201:4–201:18 (Collier) (noting that a grievance investigator is permitted to reject a grievance outright if an inmate doesn't first attempt an informal resolution); *id*. at 10-201:19–202:7 (Collier) (acknowledging that the Offender Orientation Handbook instructs inmates to try to informally resolve their issue before filing a grievance); *id.* at 10-202:10–13 (Collier) (acknowledging that the instructions to inmates is that it is "mandatory" that they try to resolve their issue informally before filing the grievance).

293. TDCJ's grievance procedure was not designed with a worldwide pandemic in mind. The unique situation presented by the COVID-19 pandemic—which Defendants concede is a highly contagious disease that poses an imminent risk of serious illness or death to all individuals in Pack Unit, at the same time (*see* Trial Tr. 1-42:19–43:3 (Collier); *id*. at 8-82:18–20 (Zawitz))—could not have been redressed through individual grievances, filed through TDCJ's normal system of grievance review.

294. For example, Mr. Valentine began the grievance process because he was concerned that TDCJ wasn't taking adequate measures to keep the facility sanitized, which he felt might unnecessarily expose Pack Unit inmates to the virus. Trial Tr. 1-152:7–22; DTX 11. As required, Mr. Valentine tried to informally resolve one of his COVID-related grievances before filing suit. DTX 11; Trial Tr. 1-210:7–211:22 (Valentine) (noting that he had filed a COVID-related grievance on March 31, but had made an "attempt at informal resolution" before that); ECF. No. 137-1 at 2, 5–6 (informal resolution on March 27). Despite knowing it was slow and

cumbersome and could not provide any actual relief in the COVID context, Mr. Valentine started the process because it is the only way the inmates can alert the prison to issues. Trial Tr. 1-258:10–16 (Valentine).

295. While Mr. Valentine's grievance was pending, and before he could finish the lengthy grievance process, he tested positive for COVID-19. *Id.* 1-151:9–152:6, 1-152:23–153:7, 1-254:16–255:6 (Valentine). Three Pack Unit inmates died while Valentine's grievance was pending.[85] Although TDCJ's documentation reflects that the Step 2 response was signed by TDCJ earlier, this documentation does not reflect when the response was actually sent to Valentine—who had not received the response to his Step 2 grievance as of June 5, 2020. *Compare* PTX ECF No. 137-1 at 3, *with* PTX 130 at 3.

296. TDCJ officials were aware that inmates at Pack were filing COVID-related grievances and expressing concerns that an outbreak would erupt inside the facility. Trial Tr. 1-45:4–14. (Collier) ("I'm aware that there have been COVID-19 grievances.") ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ *See* PTX 131 at 17–18 (***under seal***); *see also* Trial Tr. 3-175:17–177:16 (Herrera). It took TDCJ ███████████ to finally respond to Mr. Butaud's COVID-19 grievance because ████████████████████████ notwithstanding the dangerousness of COVID-19 (Trial Tr. 3-177:4–18 (Herrera)) and despite ████████████████████████████████████████ (PTX 137 at 2). ███████

████████████████████████████████████ *See* PTX 131 at 17–18 (***under seal***); Trial Tr. 2-196:17–197:1 (Butaud) ████████████████████████████████████

---

[85] Mr. Clerkly died on April 11, 2020. PTX 43; 160 (***under seal***); 186; 189. Alvis Norris dies on May 3, 2020. PTX 196 (***under seal***). And Mr. Thompson died on May 5, 2020. PTX 158 (***under seal***).

208:3–17 (Butaud) (stating he filed his first COVID-19 grievance on approximately Apr. 3, 2020); DTX 56 at row 477 (***under seal***). And in any event, when TDCJ finally responded to Mr. Butaud's COVID-19 grievance, it offered only a generic, blanket response that wholly failed to address the several specific complaints Mr. Butaud had made. Trial Tr. 3-179:11–180:8 (Herrera); PTX 131 at 18 (***under seal***).

297.     What Plaintiffs sought in the face of COVID-19 was a set of proactive, preventative measures for an imminent threat that would affect the entire prison. *See* ECF No. 1 at 35–36. Yet, TDCJ's grievance procedure was not designed to field requests for swift, prison-wide preventative measures.

298.     According to TDCJ's Offender Grievance Operations Manual, grievances are screened for emergencies. (PTX 82 at 14). Step 1 grievances flagged as emergencies are not screened for the usual requirements that TDCJ imposes on grievances, and must be resolved within forty days. *Id.* at 22. There are twenty categories of emergencies recognized by TDCJ's normal grievance process. *Id.* at 90–91. Other than a code for "lethal injection issues," the other nineteen relate to injuries that have already occurred or are ongoing: allegations of physical or sexual harm, discrimination claims, extortion, and medical emergencies. *See id.* Medical emergencies provide no possibility for preventative relief either, as TDCJ defines a medical emergency extremely narrowly: "threats of suicide, chest pains, or difficulty breathing." (PTX 82 at 22). Indeed, though Mr. Valentine wrote "EMERGENCY GRIEVANCE" at the top of his Step 1 grievance, (PTX 130, at 4), TDCJ did not flag the grievance as an emergency. Rather, his first grievance was given the nonemergency code "503"—the code for "SANITATION (Issues regarding the cleanliness of any area of the unit)." (PTX 130 at 4; PTX 82 at 93). Accordingly, it took over two months for Mr. Valentine's grievance to complete the grievance process.

299.     Additionally, even if a TDCJ official had been able to note Plaintiffs' emergency requests and expedite review, the procedure does not allow inmates to request the coordinated relief necessary to prevent the spread of COVID-19. TDCJ's instructions to inmates specifically require that inmates "[p]resent only one issue per grievance," and only submit a maximum of one grievance every seven days, so a reasonable inmate could understand that they are *forbidden* from immediately grieving the entire universe of deficiencies in the agency's COVID-19 response at the Pack Unit—and instead, would need to submit multiple grievances over the course of weeks. PTX 10 at 87; PTX 10 at 88; *see also* PTX 82 at 86. Notably, the grievance form itself is a single piece of paper, which requires the "requested relief" to be described in four lines, so even if an inmate were willing to skirt the "one issue per grievance" rule, their grievance would violate the requirement to "clearly state[] in the space provided" "[t]he specific action required to resolve the complaint." PTX 10 at 88; PTX 82 at 18–19, 86, 100.

300.     TDCJ's grievance process initially offered no opportunity to expedite systemic medical emergency grievances arising out of COVID-19. *See* Trial Tr. 1-95:25–96:14 (Collier) (noting that the grievance process could take up to 80 days to address a step-1 grievance before the policy was changed in late May to address COVID-19). Not only did Mr. Valentine and Mr. Butaud both test positive for the virus while their grievances were pending, Mr. Norris died before TDCJ addressed his medical concerns. Mr. Valentine explained that he saw Mr. Norris that day and that "Mr. Norris was having problems that day with his bowels. And when he would cough, he would defecate himself." Trial Tr. 15-18:10–19:12 (Valentine). As the day progressed, Mr. Norris got worse and was incoherent. *Id.* Mr. Valentine flagged down a sergeant to get Mr. Norris to the infirmary. *Id.* The sergeant looked at Mr. Norris and said: "They don't want you down there because you won't wear your diaper." *Id.* Mr. Valentine then pleaded for help from

another sergeant who said: "Not now. I don't have time for this." *Id.* Only at midnight did someone finally come for Mr. Norris. *Id.* He did not have his wheelchair and no assistance was provided, so he ended up collapsing in the hallway. *Id.*

301.    Mr. Norris, filed a grievance on April 27, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████    *See* PTX 152 at 6 (showing Norris's April 27 grievance)

(**under seal**); *see also* Trial Tr. 4-168:4–10 (Herrera). Mr. Norris's autopsy results reveal that he

████████████████████████████████████████████████████████████    *See*

PTX 196. ██████████████████████████████████    Trial Tr. 5-11:22–

12:1, 5-12:8–13:4 (Young). Director Collier testified that he did not know, or could not say, whether Mr. Norris's case—where an inmate died while waiting for any possible remedy—was an example where the grievance process provided no remedy. Trial Tr. 10-213:18–215:10 (Collier). Neither could Warden Herrera. *See generally* Trial Tr. 4-171:8–173:11; *id.* at 4-175:20–176:14; *id.* at 4-176:16–25; *id.* at 178:20–179:4 (Herrera).

302.    Yet another inmate, Mr. Reynolds, filed an emergency grievance on or around

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

PTX 131 at 61 (**under seal**). ████████████████████████████████

████████████████████    *Id.* at 62; *see also* Trial Tr. 3-22:2–17 (Reynolds).

303.    The record also reflects a disturbing trend of inexcusable lengthy delays in TDCJ's time to respond to COVID-related grievances, even while the virus was spreading with alarming speed throughout the Unit ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████ And in Mr. Butaud's case, TDCJ took over ████████ to even respond to his Step-1. PTX 131 at 17–18 (***under seal***).[86]

304.     TDCJ changed its grievance procedures mid-outbreak (in late May), after prison officials at last recognized that the original grievance machinery, with its long and extendable response deadlines, could not address COVID-related grievances quickly enough. PTX 157; Trial Tr. 1-45:4–19, 1-72:20–73:31-93:2–20, 1-97:21–98:10, 1-98:14–99:3, 1-99:22–25, 1-101:9–15, 1-102:11–18 (Collier); *see also* Trial Tr. 10-15:9–18, 10-217:9–220:4 (Collier). TDCJ's mid-outbreak changes to the grievance policy did not apply retroactively to any grievances filed before the late-May changes. Trial Tr. 1-45:8–19 (Collier).

305.     After TDCJ changed its policy in late-May, COVID-related grievances had to be addressed within 15 days (for step-1), instead of 80, and an additional 15 days (for a total of 30) for step-2. *Id.* at 1-96:15–97:6 (Collier); *see also* Trial Tr. 10-13:6–13, 10-13:9–14:16 (Collier). Even after the policy changed to shorten the timeline, the evidence showed that COVID-related grievances were not necessarily processed in the shortened time frame. Trial Tr. 10-203:3–209:12 (Collier); PTX 303.

---

[86] ████████████████████████████████████████████████████████
████████████████████████████ (PTX 131 at 31–32 (***under seal***)),
████████ (*id.* at 22–36), ████████████ (*id.* at 51–52), ████████████████ (*id.* at 185–86), and 49
████████ 1 (*id.* at 59–60), among others.

306.     In addition to reducing the time to respond to 15 days, ██████████████████████ ████████████████████████████ PTX 157 at 3 (***under seal***).

307.     Unfortunately, compliance with this new process remains suspect. For example, Mr. Valentine did not receive his Step 1 within 15 days—and was not able to file a Step 2 within 15 days. PTX 303.

## 2.     Defendants Put Forward No Evidence of the Grievance Process Actually Providing Relief

308.     During trial, Defendants tried to tie actions the Pack Unit or TDCJ took to grievances filed by individual inmates, without any evidence of a relationship or proof that the grievance procedure provided some relief.

309.     For example, Defendants' Counsel attempted to draw a comparison between Mr. Valentine's request for testing and receiving a test. Trial Tr. 1-211:10–212:2 (Valentine). But, the evidence showed that these two events are completely unrelated. *Compare id.* at 1-229:17–230:8 (Valentine) (testifying the he filed his step 1 grievance for testing on May 10, 2020), *and* DTX 11 at 2384–85 (Step 1 grievance for testing filed on May 10, 2020), *with* Trial Tr. 10-26:4–27:23 (Collier) (testifying that TDCJ created the strike teams on May 9, 2020)

310.     Defendants also cross examined Mr. King on his grievance for inmate transfers. Trial Tr. 2-62:14–19, 2-63:4–8 (King). Again, TDCJ did purport to stop inmate transfers but there is no evidence that it was related to Mr. King's grievance.

311.     At bottom, however, TDCJ's Executive Director could not confirm that the grievance mechanism actually provided any relief for certain COVID-related grievances. *See*, *e.g.*, Trial Tr. 208:1–209:12 (Collier) (noting that he was "just not a hundred percent sure" whether any relief could be provided for COVID-19-related grievances that TDCJ didn't process or return within the response deadline). In fact, Director Collier acknowledged that one way

inmates might try to obtain relief from COVID-19-related issues would be to file a lawsuit. *Id.* 10-216:7–20 (Collier).

E.     **Additional Credibility Issues**

       1.     **Defendants and Their Attorneys Repeatedly Made Unsupported and Demonstrably Incorrect Representations to the Courts**

312.     Defendants and their attorneys repeatedly made unsupported and demonstrably incorrect representations to the Court during trial. For example, TDCJ did not respond to Mr. Butaud's COVID-19-related grievance for ███████ (*see* PTX 131 at 17–18 (***under seal***); Trial Tr. 3-177:16–18 (Herrera)), yet Defendants' Counsel represented on the record to the Court, incorrectly, that "the Court will see" TDCJ responded in "80 days." Trial Tr. 3-179:2–9 (Defendants' Counsel).

313.     Defendants filed a statement with both this court and the Fifth Circuit that stated: "Additionally, with the onset of the COVID-19 pandemic, the Pack Unit also provides each SSI with a one-and-a-half-gallon sprayer filled with 8 oz. of powdered bleach dissolved in a small amount of water, that the SSI fills with water to use during his shift." ECF No. 126-1 at 14. This was false, as numerous inmates, including janitors testified. Trial Tr. 1-173:13–18 (Valentine); *id.* at 2-26:4–7 (King). The "sprayer" is provided for dorms and is shared between up to four different dorms. *Id.* at 1-174:1–14 (Valentine); *id.* at 2-25:22–3 (King).

314.     Defendants' statement also claimed: "A process has been maintained at the unit for offenders to receive additional toilet paper, as needed." ECF No. 126-1 at 18. But the evidence showed that inmates were regularly denied extra toilet paper (Trial Tr. 1-179:16–180:16; 1-181:18–22 (Valentine)), even though it is necessary to use their allotment for other purposes since they do not receive facial tissues (Trial Tr. 1-179:8–15 (Valentine); *id.* at 2-101:1–3 (Jones)).

315.     Warden Herrera testified at trial that the Pack Unit was a medium security facility, even though he had previously testified in a different case that Pack was a *minimum* security facility—a disparity that this Court found goes to Warden Herrera's credibility. Trial Tr. 3-50:10–51:19 (Herrera).

316.     Warden Herrera's actions in the "hot-dog incident" also bear on his credibility and his overall state of mind in regards to inmate health and safety. In mid-April, the inmates' lunch contained hot dogs that the inmates determined were spoiled. Trial Tr. 2-216:6–8, 2-226:8–227:1 (Butaud). ██████████████████████████████████████████████████████████

██████████████████ *Id.* ██████████████████████████████████████████████

███████████████████████████████████████████████████████████ *Id.* at 2-226:9–227:1 (Butaud).

317.     Notably, although TDCJ's counsel repeatedly claimed that the ████████████████

████████ (Trial Tr. 11-13:4–10, 11-17-29:7–10 (Defendants' Counsel)), ████████████████

███████████████████████████████████████████████████████████████████████

████████████████ PTX 131 at 60 (***under seal***); *contra* Trial Tr. 2-217:5–13 (Defendants' Counsel) ████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████ 2-219:6–9 (Defendants' Counsel); 11-13:8–10 (Defendants' Counsel); 11-15:3–5 (Defendants' Counsel).

318.     Defendants tried to rebut this testimony by showing a picture of ████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

[REDACTED]

319.     Warden Herrera would not even recognize that the explosion of COVID-positive cases at Pack might owe to the inadequate measures the Pack Unit implemented to stop the virus's spread. He would only parrot the same evasive, scripted tagline over and over—at least seven times during his trial testimony: "I think we are doing everything that we can within reason" to control the virus. Trial Tr. 3-79:23–25 (Herrera) (defaulting to his stock tagline answer), 3-86:5–6 (same), 3-86:14–15 (same), 3-86:24–25 (same), 3-88:21–22 (same), 3-89:19–21 (same); 3-98:8–10 (same).

320.     Warden Herrera also tried to shirk any responsibility for the (then) 19 COVID-related deaths at Pack by tacking the hyper-technical position that the Pack inmates who died

passed away at a hospital, not while they were physically behind bars at the Pack Unit. Trial Tr. 3-92:7–23 (Herrera).

321. Moreover, during Dr. Young's testimony, he was asked on cross examination whether he was aware that there have been eight revisions of policy B-14.52. Trial Tr. 5-55:18–20 (Defendants' Counsel). Dr. Young responded that he was aware of that fact, but that "they haven't really appreciably changed, which your expert, Dr. Zawitz also stated throughout the course of the changes. Minor changes, really not --" *Id*. at 5-55:21–56:5 (Young). Defendants' Counsel interrupted Dr. Young, preventing him from completing his answer to "move to strike. [Because] I disagree, and the testimony of Dr. Zawitz will reflect itself." *Id*. at 5-56:6–7 (Defendants' Counsel). Of course, Dr. Young did not testify regarding Dr. Zawitz's opinion with no basis—he read Dr. Zawitz's opinion that the differing versions of policy 14.52 are largely the same in Dr. Zawitz's expert report. *See id*. at 6-51:24–52:3 (Young) (testifying he read and responded to Dr. Zawitz's expert report). And Dr. Zawitz did not testify to the contrary during his testimony. Thus, Counsel's representation that Dr. Zawitz would disagree with Dr. Young regarding that point was unfounded and did not come to fruition in the testimony.

**2.    Defendants Withheld Relevant Information that Rebutted Many of the Misrepresentations Made by their Witnesses and Counsel**

322. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

---

[87] PTX 347 (PENDING ADMISSION) (*under seal*) at numbers 371–75 (Davis Text (Magistrate Production No. 2) text dated May 4, 2020).

323.     Throughout this case and at trial, Defendants' position is that hand sanitizer has safety concerns that prevents them from providing it to inmates. ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████, directly rebutting Defendants' entire litigation position.[88]

324.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████.[89]

325.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ on ███████████████████████████████████ and that they needed to actually start ███████████████████████[90]

326.     During trial, Warden Herrera suggested that the installation of handwashing stations was unique to the Pack Unit (Trial Tr. 4-103:7–12 (Herrera)), something Defendants' counsel suggested was an example of TDCJ giving "extra attention to the more vulnerable population at the Pack unit." Trial Tr. 3-220:9–12 (Defendants' Counsel). ████████████████

███████████████████████████████████████████████████████████

---

[88] PTX 340 (PENDING ADMISSION) (*under seal*) at numbers 120–123 (Collier text (Aug. 10 production) dated April 4, 2020).

[89] PTX 337 (PENDING ADMISSION) (*under seal*) at number 1204 (Davis text dated July 17 2020).

[90] *Id.*

████████████████████████████████████████████████ contrary to
Defendants' Counsel's misleading suggestion.[91]

327.    Defendants' Counsel also suggested on cross examination that having inmates sleep head to foot—which would increase social distancing—could not be done because of vague security concerns. Trial Tr. 2-51:24–52:1 ("Q Okay. So, then, you would agree that it might be for a security reason that TDCJ doesn't instruct you to sleep head to foot?"). ████

████████████████████████████████████████████████████████

████████████████████████████████████████.[92]

328.    Defendants had two experts perform brief, staged tours of the Pack Unit so they could opine on the Pack Unit's implementation of COVID policies—an issue at the heart of this case. When Defendants' expert Ms. Follenweider was questioned on the issue of whether these short, planned visits were a reliable way to determine conditions on the ground, Defendants' Counsel objected, claiming it was prejudicial and "[t]here has been no evidence of any sort of staging." Trial Tr. 13-176:10–12 (Defendants' Counsel). After this coaching objection, Defendants' expert Ms. Follenweider followed suit and claimed that "I didn't see anything that appeared to be staged." *Id.* 13-177:4–5. Of course, Defendants had again withheld evidence that things were often staged ahead of visits.████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[91] PTX 342 (PENDING ADMISSION) (***under seal***) (excerpt of Mendoza chat 187 dated July 9, 2020).

[92] PTX 347 (PENDING ADMISSION) (***under seal***) at numbers 25–28 (Davis Text (Magistrate Production No. 2) text dated July 15, 2020).

[REDACTED] [93]

[REDACTED] [94]

329.    This and many other relevant documents were never produced by Defendants, despite being aware of the information. For instance, since March, Director Collier took daily COVID-related notes on a notepad and gave those notes to his attorneys, and yet Defendants' Counsel did not produce those notes before trial began either. Trial Tr. 1-116:12–117:11 (Collier).

330.    The information produced during trial was plainly responsive to Plaintiffs' discovery requests seeking policies, procedures, and other instructions related to COVID-19, and documents showing adaptations (or lack thereof) at the Pack Unit. Given Defendants' awareness of it, its clear relevance, and delay in producing it even when ordered, it would prejudice Defendants minimally, if at all, to admit it now.

**3.    Many Actions Taken by Defendants Were Only for the Purpose of Trial**

331.    Defendants have cited measures supposedly taken to help prevent the spread of COVID-19, but the evidence at trial showed many measures were only taken for litigation-driven purposes, and very well would not continue absent this suit. For example:

332.    Until shortly before trial, many sinks in Mr. Valentine's dorm were broken, preventing easy access to hand washing. Trial Tr. 1-167:11–169:12 (Valentine). They were only fixed as trial neared, despite having been broken when Mr. Valentine moved into the dorm a

---

[93] PTX 341 (PENDING ADMISSION) (*under seal*) at number 9 (Wilder SMS message dated May 18, 2020) [REDACTED]

[94] PTX 343 (PENDING ADMISSION) (*under seal*) (excerpt of Mendoza chat 229 dated May 28, 2020) [REDACTED]

month before. *Id.* Mr. Butaud has a similar experience with sinks and toilets in his dorm. *Id.* at 12-204:11–24, 12-205:2–15, 12-205:23–25 (Butaud).

333.    Mr. King testified at his deposition that he had daily access to use of a 3-gallon sprayer, but by the time of trial (Trial Tr. 2-56:25–57:2 (King)), janitors no longer had the 3-gallon sprayer they were using in June. (*Id.* at 12-56:13–24(King)).

334.    Defendants also provided sprayers in the dorms shortly before trial (Trial Tr. 1-250:21–8 (Valentine); *Id.* at 110-197:3–24 (Collier)), that were removed before trial concluded. (*Id.* at 1 15-13:20–25 (Valentine rebuttal)); *see* Trial Tr. 4-96:1–15 (Herrera) (noting that electrostatic sprayers were brought in just before trial, even though they have been around for half a century). ██████████████████████████████████

████████████████████████████████████████████[95]

335.    Although Defendants claim that they could not purchase foggers or Vital Oxide in March or April or May, they could produce no documents or emails that would show that story to be true. Trial Tr. 10-197:25–198:15 (Collier).

336.    Warden Herrera acknowledged that handwashing stations were suggested for Pack just before trial. Trial Tr. 4-95:14–25, 4-96:19–97:2; *id.* 4-117:17–23. In fact, he was not completely sure where they were installed yet because they were new to Pack. Trial Tr. 4-103:7–12. During direct examination of Warden Herrera, Defendants' Counsel asked a leading question to suggest that the handwashing stations were an example of TDCJ providing "extra attention to the more vulnerable population at the Pack unit." Trial Tr. 3-220:9–12 (Defendants' Counsel).

███████████████████████████████████████████████████████████████

---

[95] PTX 342 (PENDING ADMISSION) (***under seal***) (excerpt of Mendoza chat 187 dated July 9, 2020)████████████
████████████

███████████████████████████████████████████████████████

███████████████████████████████.[96]

337.     Warden Herrera also testified that he put red tape on the floor (to mark social distancing spacing) in early July, even though he acknowledged that he could have done that as early as March or April. Trial Tr. 4–108:2–109:22 (Herrera). In fact, ████████████████████

███████████████████████████████████████████████████████

███████████████████████████.[97] ███████████████████████

███████████████████████████████████ PTX 327 (*under seal*)

██████████████████████████████████████████

338.     Before the injunction, janitors only received one pair of gloves to share. Trial Tr. 2-66:6–14. This appears to have changed during the course of the lawsuit and was not a coincidence as Warden Herrera testified. *See* Trial Tr. 4-48:9–15 (Herrera).

339.     High-ranking TDCJ officials intentionally avoided visiting the Pack Unit so that they could not be called to testify regarding conditions there. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████[98] And a regional director (Gene Monroe) who *did* visit the facility shortly after trial began was then removed from Defendants' trial witness list just a few days after his visit. Trial Tr. 10-97:24–98:11, 10-160:12–14, 10-160:15–22 (Collier).

340.     Mr. Monroe—the regional director for the region covering the Pack Unit—visited the Pack Unit *during* trial. Trial Tr. 15-6:11–18 (King). Mr. Monroe asked the janitors if they had

---

[96] PTX 342 (PENDING ADMISSION) (*under seal*) (excerpt of Mendoza chat 187 dated July 9, 2020).

[97] PTX 326 (*under seal*) (excerpt of Mendoza chat 256 dated May 28, 2020).

[98] PTX 337 (PENDING ADMISSION) (*under seal*) at number 1204 (Davis text dated July 17 2020).

complaints, and, contrary to Defendants' experts' claim that there were none, the janitors explained they needed more chemicals: a key issue in the trial. *Id.* at 15-8:2–6. (King) Despite having a mix of positive and negative inmates attending the meetings, the gathering was not socially distanced. *Id*. at 15-8:6–22 (King). Defendants did not cross examine Mr. King on this point. Mr. Monroe was removed from Defendants' witness list shortly after this visit and never testified at trial. *Id.* at 10-60:8–22 (Collier). As with other unproduced evidence, Defendants did not want the Court to see the "full story" as claimed. Hr'g Tr. at 17:22–18:2, July 1, 2020 (Defendants' Counsel) ("I think that the Court is going to be proud of the work that TDCJ is doing once we're able to tell the full story, but that's what I want the opportunity to do. I want the opportunity to be able to tell the full story so the Court can, you know, have a complete picture of the work that TDCJ is doing."); Mot. Hr'g Tr. at 17:21–25, July 8, 2020 (Defendants' Counsel) ("We are trying to conduct a trial on the merits because, when this story is fully told, I'm confident that the Court is going to understand that TDCJ has acted in a reasonable way to protect these offenders at the Pack Unit from COVID-19. That's what we're out to do.").

341. Text messages that were not produced before trial indicate that ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[99]

342. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮.[100]



---

[99] PTX 343 (PENDING ADMISSION) (*under seal*) (excerpt of Mendoza chat 229 dated May 28, 2020) ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

[100] *See* PTX 328 (*under seal*) (excerpt of Davis chat 992 dated Apr. 21, 2020) ▮▮▮▮▮▮
▮▮▮▮

343. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉[101]

344.     TDCJ officials also intentionally copied attorneys from the TDCJ Office of General Counsel on communications to attempt to create a privileged document. ▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[102]

### 4.     Instead of Addressing Their Salient Conduct, Defendants Attempted to Blame Mr. Valentine for the COVID Outbreak in the Pack Unit

345.     A central theme of Defendants' case was that the COVID outbreak was not TDCJ or Warden Herrera's fault, but that Plaintiff Laddy Valentine was responsible. Trial Tr. 5-86:14–24, 8-52:14–19, 8-82:4–7, 10-260:5–19 (Defendants' Counsel).

346.     In addition to inconsistent timing issues versus when Mr. Valentine tested positive, there is no evidence Mr. Valentine did anything improper. Mr. Valentine testified he was suffering from a fever, which a Pack Unit nurse was aware of because she took his temperature twice. Trial Tr. 1-240:20–241:17, 1-258:18–259:16 (Valentine). The nurse concluded that it was likely allergies and told Mr. Valentine the same. *Id.* at 1-242:6–16, 1-243:1–15; 1-260:22–261:15 (Valentine). A Pack Unit correctional officer was also standing there, listening so TDCJ did have notice of the fever. *Id.* at 1-237:21–4, 1-239:2–8 (Valentine).

347.     Defendants' position appears to be that Mr. Valentine should have also told a TDCJ "supervisor." Trial Tr. 6-172:21–24 (Defendants' Counsel) ("Would you agree that when a

---

[101] PTX 337 (PENDING ADMISSION) (*under seal*) at number 3435–70 (Davis text dated June 15, 2020) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[102] PTX 336 (PENDING ADMISSION) (*under seal*) at number 275 (Wilder text dated May 25, 2020).

prisoner is feeling symptoms of COVID-19 and fails to notify a supervisor from TDCJ or medical, that that could result in the spread of COVID-19 at the Pack Unit?"). It is not clear what this means, as Mr. Valentine did not understand who would be his "supervisor" and felt telling the medical provider was sufficient. Trial Tr. 1-238:17–239:1, 1-243:25–244:16 (Valentine). Mr. King testified that he interpreted "supervisor" to mean tell medical. *Id.* at 2-45:1–7 (King). A nurse was notified of Mr. Valentine's fever, which was consistent with TDCJ's own informational materials, which state that inmates should report symptoms to medical professionals as Mr. Valentine did. *Id.* at 1-259:6–260:4 (Valentine); DTX 10. Other inmates testified that they would want symptoms reported to medical (Trial Tr. 2-45:1–7 (King); *id.* at 2-184:14–19 (Beal)), and Mr. Beal stated that telling a TDCJ "supervisor" would have the same effect, as they would simply report it to medical as Mr. Valentine had already done (*id.* at 2-186:20–24 (Beal)). As with other issues, Defendants put on no fact witnesses for this issue, so there is nothing in the record to rebut the inmates' testimony.

348. There was nothing improper about Mr. Valentine's conduct. Defendants' choice to rely on this theory instead of calling many fact witnesses it indicated it would, supports findings on Defendants' subjective awareness about the clear problem with their response to COVID-19 in the Pack Unit.

349. Moreover, Dr. Young testified that even if an inmate had COVID-19 in early April and remained in the general population of the Pack Unit, that would not have been the source of spread of the outbreak many weeks later. Trial Tr. 5-72:23–73:5 (Young). While that individual's illness may lead to a short-term spread, it would not lead to the over 500 cases at the Pack Unit and new cases that continued to appear three-and-a-half months later, including through trial, if TDCJ had implemented appropriate safeguards. *Id.* at 5-73:21–74:21 (Young).

350. Dr. Young equated Defendants' blame game as akin to "you're asking me if a towel in the kitchen caught on fire, could that lead the whole house to burn down? And I'm saying the house has been burning down for three and a half months, and you haven't called the fire department." *Id*. at 5-74:22–75:5 (Young).

**5. Defendants' Expert, Dr. Beard, Lacked a Sufficient Factual Basis to Form his Expert Opinions, and Relied on Improper Communications with Class Member Inmates.**

351. Between the time Defendants' expert, Dr. Beard, wrote his expert report and the time he was deposed, Dr. Beard did not read any of the inmates' deposition testimony. Trial Tr. 14-99:5–8 (Beard). In fact, Dr. Beard received summaries of the inmates' depositions from TDCJ's counsel, but was later told by Defendants' Counsel not to read them. *Id.* at 14-102:2–5 (Beard).

352. Defendants' expert Dr. Beard also failed to review all of the COVID-19 grievances from the Pack Unit, any of TDCJ's COVID-19 grievance summaries about the Pack Unit, nor did he review any video footage of the Pack Unit to determine the validity of any grievances. Trial Tr. 14-102:22–103:2, 14-103:16–104:9. In fact, Dr. Beard was unaware that the Pack Unit led all TDCJ prisons in the number of COVID-19 grievances. *Id.* at 14-103:3–6 (Beard).

353. TDCJ's General Counsel, Kristen Worman, arranged for Dr. Beard to tour the Pack Unit with her on May 30. Trial Tr. 14-107:16–21 (Beard). The tour was arranged 7 to 10 days in advance and Warden Herrera was given advanced notice of the tour. *Id.* at 14-107:22–108:6 (Beard); *see also id.* at 3-102:17–103:11 (Herrera). Defendants' own expert, Dr. Zawitz, underscored the importance of an unannounced site visit as a means of providing a real, unstaged look at "what was really happening" at a prison, rather than giving prison officials a heads-up "so that they could suddenly magically wash everything and magically get everybody masks." (Trial

Tr. 9-29:16–30:13 (Zawitz)).



354.    TDCJ made an exception to its lockdown and "no visitors" policy in order to permit Dr. Beard to come into the Pack Unit. Trial Tr. 3-103:8–104:7 (Herrera). That was an exception Warden Herrera did not authorize and would not have authorized had someone higher up not told him to. Trial Tr. 4-126:5–127:7 (Herrera). During the tour, Dr. Beard purportedly spoke with three unidentified inmate janitors. *Id.* at 14-109:6–24 (Beard). Warden Herrera was within earshot while these conversations were taking place. *Id.* at 14-110:13–18 (Beard). According to Dr. Beard, none of the inmate janitors he interviewed indicated that they had any problems or concerns. *Id.* at 14-122:20–125:1 (Beard). Dr. Beard did not find it strange that the three inmate janitors had no complaints. *Id.* at 14-125:3–12 (Beard). Dr. Beard relied on these conversations in formulating his expert opinions. *Id.* at 14-111:2–5 (Beard).

355.    Dr. Beard also purportedly spoke to four other unidentified inmates during his tour. Trial Tr. 14-110:19–111:4 (Beard). Warden Herrera was within earshot or within the line of

---

[103] PTX 341 (PENDING ADMISSION) (*under seal*) at number 9 (Wilder SMS message dated May 18, 2020)

[104] PTX 343 (PENDING ADMISSION) (*under seal*) (excerpt of Mendoza chat 229 dated May 28, 2020)

site of these inmates while these conversations took place. *Id.* at 14-130:3–13, 14-134:21–25 (Beard). Like the three inmate janitors, Dr. Beard testified that none of these inmates had any complaints. *Id.* at 14-125:14–14:131:5. Dr. Beard did not find this strange either. *Id.* at 14-130:15–131:1 (Beard). Dr. Beard relied on these conversations in formulating his expert opinions. *Id.* at 14-111:2–5 (Beard).

356.   Although, he did not find the lack of inmate complaints strange, Dr. Beard testified that he declined to identify the inmates that he interviewed because he recognized that it could cause conflict within the prison. Trial Tr. 14-110:3–12 (Beard) ("I did not specifically put it in the report, their names, because knowing that there's a lawsuit and knowing that there's some people that, you know, want the lawsuit to proceed in a certain way, they may not like what these janitors told me. It could cause a conflict within the prison. From my knowledge of prisons and – and – and dealing with inmates, these kind of things can happen; and I certainly didn't want to create that problem."). Dr. Beard never asked whether there had been any retaliation against inmates for making COVID-19 related complaints. *Id.* at 14-131:14–17 (Beard). Dr. Beard also recognized that fear of retaliation when touring with Warden Herrera and Major Sullivan might have impacted what the inmates told him. *Id.* at 14-135:1–8 (Beard).

357.   All of the inmates interviewed by Dr. Beard are class members. *See* Trial Tr. 14-39:17–40:11 (After a hearsay objection regarding Dr. Beard's conversations with the three inmate janitors, TDCJ counsel, Ralph Molina, responded: "It -- it's also an admission of a party opponent your Honor; and all of these inmates are class members."). Plaintiffs' counsel was not present for any of these interviews, and none of the inmates that Dr. Beard spoke to were given access to counsel before speaking with Dr. Beard. *Id.* at 14-111:6–13 (Beard).

358.     While Dr. Beard was in charge, the CDCR faced an Eight Amendment lawsuit regarding overcrowding and failure to provide adequate mental healthcare. Trial Tr. 14-111:15–112:8 (Beard). In that case, a federal judge sanctioned the CDCR and Rehabilitation by striking the testimony of the CDCR's experts for allowing expert witnesses to interview inmate class members without lawyers present for the inmates. *Id.* at 14-112:9–113:19 (Beard).

359.     In this case, Dr. Beard did the same thing that the CDCR was sanctioned for under his watch—interviewing class member inmates outside the presence of Plaintiffs' counsel. Trial Tr. 14-114–116:17 (Beard). Dr. Beard did not ask any TDCJ attorney if Plaintiffs' counsel should be present for his interviews. *Id.* at 116:19–117:24 (Beard).

360.     Dr. Beard recognizes that a substantial percentage of the Pack Unit inmates are 65 or older, and that older people are more at risk of serious adverse effects if the contract COVID-19. Trial Tr. 14-122:16–19, 14-136:1–4, 14-136:10–14 (Beard). Despite these facts, in forming his expert opinions, Dr. Beard did no analysis as to whether the Pack Unit was more at risk to COVID-19 than other prisons in the state and performed no comparison as to whether TDCJ is doing anything different at the Pack Unit that it is doing for the other prisons. *Id.* at 14-136:15–20, 14-135:9–25 (Beard).

361.     In forming his expert opinion in this case, Dr. Beard did not look at the COVID-19 positivity and death rates at other TDCJ units and compare them to the Pack Unit. Trial Tr. 14-147:7–23 (Beard). In fact, when Dr. Beard rendered his expert opinion, he was unaware that the ██████████████████████████████████████████████████████████████

██████  *Id.* at 14-147:2–6 (Beard).

---

[105] PTX 331 (*under seal*) (excerpt of Mendoza chat 229 dated July 2, 2020) ████████

362.     Dr. Beard testified that if he were the executive director of TDCJ and saw that the Pack Unit had a much higher COVID-19 positivity rate than other units he would have medical professionals investigate the discrepancy and see what changes should be made. Trial Tr. 14-191:1–9; *see also* 14-14:145:25–146:14 (Beard). Dr. Beard agreed that he had not heard any testimony that such investigation or analysis had occurred. *Id.* at 14-191:18–20 (Beard). However, when asked if he is or would be critical of the lack of analysis Dr. Beard responded, "It's hard to answer that question because I don't have all the facts to answer it. I mean, I don't know that that analysis wasn't done. I don't know what analysis was done," and "I'm frankly not going to be critical of anything without having all of the information. *Id.* at 14-192:5–193:12 (Beard). Lacking the same information that prevented him from forming a critical opinion of TDCJ's response to COVID-19 at the Pack Unit, Dr. Beard formed the opinion the TDCJ acted reasonably in its response. *Id.* at 14-33:1–5 (Beard).

363.     This is not the first time that Dr. Beard has provided testimony with no factual basis. In the same case that the CDCR was sanctioned for allowing experts to interview class member inmates outside the presence of counsel, Dr. Beard himself submitted a declaration in support of the CDCR Motion to Vacate of Modify Population Reduction Order. Trial Tr. 14-118:2–119:1 (Beard). A three-judge panel found that Dr. Beard's declaration was "not persuasive in light of the record before the Court." *Id.* at 14-119:5–120:1 (Beard). The court in that case also found that "[t]he evidence that Beard does mention, a safer prison system and reduced spread of disease, has no factual basis in the record." *Id.* at 14-121:10–13 (Beard). Additionally, the court in that case found that Dr. Beard cited no evidence of reduced lockdowns, even though that information should have been readily available to Dr. Beard as the person in charge of running the CDCR. *Id.* at 14-121:14–122:2 (Beard).

364.     Defendants' expert, Dr. Beard, admitted that he was working as an advocate for TDCJ. Trial Tr. 14-97:16–25 (Beard). Additionally, Dr. Beard works as a consultant for a company called Axon, and prior to serving as Defendants' expert, Dr. Beard contacted Mr. Collier to try and have Axon become a provider of hand sanitizer to TDCJ. *Id*. at 14-105:19–24, 14-107:8–15 (Beard).

365.     Dr. Beard also has a history of providing unpersuasive, self-interested testimony. In the same CDCR case, the court found that Dr. Beard's testimony "in which [he] had previously said there was overcrowding and now saying there wasn't overcrowding, given [his] newly acquired self-interest and the weakness of [his] arguments, was not persuasive to the Court." Trial Tr. 14-122:6–13 (Beard). Here, Dr. Beard's testimony is similarly self-interested as he admitted to being a TDCJ advocate, and attempted to facilitate business relations with TDCJ as a consultant for Axon just prior to being retained as an expert. *Id.* at 14-97:16–25, 14-105:19–24, 14-107:8–15 (Beard).

**6.      Defendants' Expert, Ms. Follenweider, Based Her Opinions on a Two-Hours' Long, Prearranged Visit to the Pack Unit, Lacks Sufficient Credentials, Did Not Rely on Scientific Sources in Forming Her Opinions, and Formed Opinions at Trial that Were Not Previously Disclosed**

366.     The opinions of Defendants' medical expert, Ms. Linda Follenweider, are far less credible than that of Plaintiffs' medical expert, Dr. Jeremy Young.

367.     As with Dr. Beard, Ms. Follenweider's—one of Defendants' two medical experts[106]—opinions regarding Defendants' implementation of policy B-14.52 at the Pack Unit is based on a single, two-hour, prearranged visit of the Unit. Trial Tr. 13-33:11–24 (Follenweider).

---

[106] Notably, Defendants' other medical expert, Dr. Chad Zawitz, was not asked, and did not, opine on Defendants' implementation of policy B-14.52 at the Pack Unit. Trial Tr. 9-115:23–116:1 (Zawitz). Rather, he was merely tasked with looking at the B-14.52 policy to determine whether, in his view, it was facially reasonable. *Id*. at 9-111:9–12 (Zawitz). In fact, Dr. Zawitz testified that if the policy were not being implemented at the Pack Unit consistently, "that would endanger the men at the Pack Unit" as well as the correctional officers. *Id*. at 9-73:13–20 (Zawitz).

Despite being a medical professional with knowledge about transmission of COVID-19 and despite the Pack Unit being on a precautionary lockdown preventing visitors from entering the Unit, Ms. Follenweider traveled, in the midst of the pandemic, on a plane from Chicago to Austin to visit the Pack Unit. *Id.* at 13-173:19–24 (Follenweider). Ms. Follenweider did not undergo any COVID-19 testing before visiting the Pack Unit to ensure she tested negative for COVID-19 (*id.* at 13-173:25–174:3 (Follenweider)), nor did she self-quarantine for any time before entering the Unit after her travel (*id.* at 13-174:16–175:4 (Follenweider)).

368.    Defendants' own expert underscored the importance of an unannounced site visit as a means of providing a real, unstaged look at "what was really happening" at a prison, rather than giving prison officials a heads-up "so that they could suddenly magically wash everything and magically get everybody masks." Trial Tr. 9-29:16–30:13 (Zawitz). )). In fact, a text message produced during trial shows that prior to an earlier visit by Ms. Worman, Warden Wilder told Major Sullivan and another officer to ███████████████████████████████████

████████████████████████████████████████████████[107] Despite this recognized importance that a site visit needs to occur through the most objective lens possible, instead, like Dr. Beard's visit, Ms. Follenweider's visit to the Pack Unit was preplanned by the general counsel of TDCJ and was not a surprise visit. Trial Tr. 13-175:17–176:2 (Follenweider). And as with Dr. Beard's visit, Warden Herrera escorted Ms. Follenweider throughout the Unit. *Id.* at 13-180:15–22 (Follenweider). Because of the preplanned nature of the visit and Warden

---

[107] PTX 341 (PENDING ADMISSION) (*under seal*) at number 9 (Wilder SMS message dated May 18, 2020)

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████

Herrera's presence throughout the visit, Ms. Follenweider's site visit lacks probative value regarding the day-to-day conditions at the Pack Unit.

369. Ms. Follenweider's knowledge regarding COVID-19 is comprised of her experience with the virus at the Cook County Jail. *See* Tr. 12-171:4–18 (Follenweider). Ms. Follenweider testified that she was not only involved with the Cook County Jail's response to COVID-19, but also that she was "part of the leadership" responsible for the COVID-19 response at the jail. *Id*. at 12-171:19–172:3 (Follenweider).[108] Interestingly, after four years working at the Cook County Jail (*see* DTX 51), Ms. Follenweider left amid a pandemic that hit the Cook County Jail particularly hard (*see* Trial Tr. 12-171:15–18 (Follenweider)). The Cook County Jail had a "very serious outbreak that had devastating consequence for many people." Trial Tr. 9-82:10–13 (Zawitz). In fact, a federal judge in Illinois determined that the Cook County Jail's response to COVID-19 was inadequate and imposed an injunction requiring measures to be implemented to protect the men and women at the jail. *Id.* at 9-87:14–18 (Zawitz); *id*. at 13-34:6–16 (Follenweider). The Cook County Jail accordingly implemented measures including provision of hand sanitizer as well as soap and water, social distancing of greater than six feet, surgical mask use, and enhanced cleaning and disinfection practices to help reduce the extend of spread and curb the COVID-19 outbreak—the same measures Plaintiffs ask for now and that are lacking in policy or practice at the Pack Unit. *See* Trial Tr. 9-95:9–12 (Zawitz).

370. Incredibly, Ms. Follenweider, a family nurse practitioner with no educational background or certification in infectious disease (*see* Trial Tr. 13-61:2–6, 13-62:21–63:7

---

[108] Dr. Zawitz was also a member of the leadership team responsible for combatting the COVID-19 outbreak at the Cook County Jail. Trial Tr. 9-20:16–5 (Zawitz) ("I, basically, run everything infectious diseases at the jail.").

(Follenweider)), would not concede that she may not be as qualified to opine on medical issues relating to COVID-19 than either Dr. Zawitz—a medical doctor who completed an internship and residency in internal medicine, completed a fellowship in infectious disease, and has treated patients with COVID-19 (9-11:1–13, 9-21:23–24 (Zawitz); DTX 48)—or Dr. Young—a medical doctor who is board-certified in infectious diseases, completed an internship, residency, and fellowship all in infectious disease, who has a master's of public health, who is a professor of infectious disease, and who has treated patients with COVID-19 (Trial Tr. 4-210:6–14, 4-239:20–23 (Young); PTX 220A)). *See* Trial Tr. 13-53:3–61:6, 13-62:21–66:5, 13-66:10–67:10 (Follenweider).

371.    Ms. Follenweider testified to many things that were not disclosed in her report, and therefore are not entitled to much, if any, weight. For example, although Ms. Follenweider testified extensively on direct examination to conducting a comparison between the inmate population of the Pack Unit and a nursing home, nowhere in her report did she make that comparison. *See* Trial Tr. 13-73:7–14, 13-76:2–78:9 (Follenweider) (pointing to the fact that her report contains the term "nursing home level of care" but not citing a comparison between the Pack Unit and a nursing home). Ms. Follenweider also conceded that despite providing testimony on direct examination regarding Dr. Young's recommended testing standard, that opinion does not appear in her report. *Id*. at 13-79:14–24 (Follenweider). In addition, on direct, Ms. Follenweider discussed the operational constraints of providing hand sanitizer to inmates; that, too, did not appear in her expert report. *Id*. at 13-92:7–18 (Follenweider). Ms. Follenweider similarly testified during direct examination that hand sanitizer poses a security risk because inmates may drink it, because it poses a fire risk, and because it can lead to impulsivity and violence, but these opinions were also absent from her expert report. *Id*. at 13-92:19–93:21

(Follenweider). And despite testifying that the CDC says it is reasonable for the Pack Unit to decline to provide hand sanitizer to inmates, that opinion was also not in Ms. Follenweider's report. *Id.* at 13-96:25–97:3. (Follenweider). Finally, Ms. Follenweider testified extensively during direct examination about testing, including about the different types of tests, administration of tests, the reasonableness of choosing one test type over another, FDA indications and authorizations of COVID-19 tests, and the comparative accuracy of different tests; none of those opinions appeared in her expert report. *Id.* at 13-99:6–14, 13-101:11–102:6, 13-102:7–17, 13:103:11–104:11, 13-109:19–110:22 (Follenweider). Indeed, Defendants' Counsel conceded that many of Ms. Follenweider's opinion were not disclosed in her expert report. Trial Tr. 13-117:15–16 ("All he's shown is they're not in her expert report."). Accordingly, none of these opinions are entitled to weight.

372.    Moreover, Ms. Follenweider's opinions were also not based on or supported by reliable sources and, for that reason, too, are not entitled to significant weight. Fed. R. Evid. 702. Ms. Follenweider testified that she did not cite a single academic article in her expert report. Trial Tr. 13-67:17–19 (Follenweider). She did not cite a single peer reviewed study. *Id.* at 13-68:3–16 (Follenweider). She also did not cite a single medical journal article. *Id.* at 13-68:17–19 (Follenweider). In fact, Ms. Follenweider did not even testify that her opinions were *based* on such scientific sources. *See* Follenweider Testimony, *passim* (never providing a scientific basis for any opinion).

**Proposed Mixed Findings of Fact and Conclusions of Law**

A.    **Defendants Failure to Prevent Harm from COVID-19 Violated Plaintiffs' Eighth Amendment Rights**

373.    The Eighth Amendment requires prison officials to "'take reasonable measures to *guarantee* the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)) (emphasis added). The government has a constitutional duty to protect those it detains from conditions of confinement that create "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). This duty requires "tak[ing] reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832. However, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id*. at 847.

374.    Thus, to demonstrate that Defendants are violating the General Class' and High-Risk Subclass' Eighth Amendment rights based on a failure to prevent harm, Plaintiffs must prove two distinct elements: (1) that exposure to COVID-19 is an objectively serious risk of harm, and (2) that Defendants failure to adequately protect them from COVID-19 manifests "deliberate indifference" toward that risk. *Id*. at 834. Because a defendant is unlikely to admit deliberate indifference, the Court can consider circumstantial evidence to determine deliberate indifference. *Id.* at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . .").

375.    Plaintiffs have proven both elements in this case.

376.     To meet the first element, Plaintiffs must show that the conditions in the prison are "objectively, sufficiently serious" and pose "a substantial risk of serious harm." *Id.* at 834. The evidence is clear and undisputed that the risk of exposure to COVID-19 is objectively serious. Defendants do not dispute that COVID-19 is objectively serious and have admitted it before the Court in previous filings. As a Type I Geriatric facility, it is undisputed that the Pack Unit's population is most at risk for serious illness from COVID-19. Indeed, the evidence has shown that hundreds of Class members have tested positive for COVID-19, numerous have suffered serious symptoms, dozens have been hospitalized, and at least 20 have died. The spread of COVID-19 has continued and the remaining uninfected population at the unit remains at risk of serious harm. Thus, even if accounting for any protective measures Defendants may have taken to date, the COVID-19 continues to pose "substantial risk of serious harm." *Id.*

377.     For the second prong, a prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

378.     An "Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "[A] prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Thomas v. City of Galveston, Tex.*, 800 F. Supp. 2d 826, 839 (S.D. Tex. 2011) (Ellison, J.). Here, it is not reasonably disputed that Defendants had knowledge of the obvious ongoing substantial risk of harm to Class members at the Pack Unit. TDCJ has admitted it understood the risks, and

both Director Collier and Defendants' expert Dr. Zawitz testified that the risk is ongoing, and likely higher now than when the lawsuit was filed.

379.    In assessing deliberate indifference in this context, courts evaluate prison officials' "attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 845. The Fifth Circuit has explained that deliberate indifference is manifest where prison officials "refused to treat [a prisoner], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

380.    Based on the evidence, Defendants are deliberately indifferent to the serious risk posed by COVID-19. Despite personal knowledge of this stunning cascade of deaths[109] and infection at the Pack Unit, the ongoing risk to the uninfected inmates at that unit, and the specific deficiencies highlighted in this litigation, in inmate grievances, and their other personal experience, Defendants continue to omit obvious, critical steps to mitigate the deadly progress of COVID-19 at the Pack Unit. Moreover, Defendants' system-wide policies fail to address the specific conditions at the Pack Unit, which consists of a predominantly elderly and disabled population of inmates and it dormitory-style layout. Defendants agreed that there are no specific policies for the Pack Unit, and refused to commit to any throughout trial. Defendants' refusal to account for the known increased risk to the Pack Unit population, even as the number of positives and deaths rose, demonstrates their deliberate indifference to the serious risk of harm presented by COVID-19. *See Malam v. Adducci*, No. 20- 10829, 2020 WL 2468481, at *16 (E.D.

---

[109] PTX 331 (***under seal***) (Mendoza text dated July 2, 2020)

Mich. May 12, 2020) (finding deliberate indifference when "[o]n the one hand, Defendants are aware of the heightened risk posed by COVID-19 to medically vulnerable detainees" but "[o]n the other, Defendants have not—and seemingly will not—adopt precautions specific to this vulnerable population that public health evidence shows to be necessary").

381.    Moreover, despite being aware of the extreme risk the Pack Unit inmates face, there is a clear pervasive pattern of serious deficiencies in complying with the policies at the Pack Unit and Defendants have repeatedly failed to address the non-compliance. Compounding on their failure to address unfollowed policies, Defendants have instead repeatedly represented that the policies are being followed, even though the Pack Unit had the most COVID-related grievances and despite the chorus of consistent testimony from the inmates at trial. This refusal to acknowledge and address a known problem is further evidence that Defendants are deliberately indifferent. In a perfect encapsulation of Defendants' position, Major Sullivan testified that 19 inmate deaths—one of the highest for TDCJ prisons—showed they were doing "pretty good" and that he wouldn't even suggest more needed to be done. Trial Tr. 6-234:9–15 (Sullivan) (impeachment with deposition testimony). This attitude was shared at the top, as Warden Herrera stated "things are going well" at the Pack Unit shortly before trial (Trial Tr. 7-49:13–17 (Davis), disregarding the ongoing "human tragedy." *Valentine v. Collier*, 960 F.3d 707 (5th Cir. 2020) (Davis, J., concurring). The direct evidence shows Director Collier knew better, yet no action was taken before trial.[110]

## B.    Defendants Are Violating the ADA and Rehabilitation Act

382.    The ADA and the Rehabilitation Act provide that a public entity cannot deny people with disabilities the benefits or services the entity provides and cannot otherwise

---

[110] PTX 338 (PENDING ADMISSION) (*under seal*) at number 361 (Davis text (No. 3) dated July 27, 2020.

discriminate against people with disabilities based on their disabilities. *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014) (quoting *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011)).

383.    Both the Rehabilitation Act and the ADA "impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals," including prison inmates. *Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020) (quoting *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005)); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998); *U.S. v. Georgia*, 546 U.S. 151 (2006); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020); *Garrett*, 560 F. App'x at 382.

384.    To succeed on a claim under the ADA and the Rehabilitation Act, plaintiffs must show (1) they have a qualifying disability, (2) they are being denied the benefits of services, programs, or activities for which the public entity is responsible, or are otherwise discriminated against by the public entity, and (3) that such discrimination is by reason of their disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

385.    A prison's failure to make reasonable accommodations for disabled inmates can in some cases "constitute denial of services and discrimination sufficient to satisfy the second two prongs" of an ADA claim. *Garrett*, 560 F. App'x at 382 (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004)). A failure to reasonably accommodate people with disabilities "will often have the same practical effect as outright exclusion" from the benefits of services and programs a public entity provides. *Lane*, 541 U.S. at 531. "In fact, it is quite plausible that the alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted exclusion from participation in or . . . denial of the benefits of the prison's services,

programs, or activities." *United States v. Georgia*, 546 U.S. 151, 157 (2006) (quoting 42 U.S.C. § 12132); *see McCoy v. Tex. Dep't Crim. Justice*, 2006 WL 2331055, at *7 and n.6 (S.D. Tex. Aug.9, 2006) ("In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners.")

386. Defendants have violated the ADA and Rehabilitation Act. Defendants failed to reasonably accommodate disabled prisoners at the Pack Unit by providing hand sanitizer to disabled inmates and by otherwise failing to provide additional protections necessary to provide safe conditions of confinement for Class and ADA Subclass members with disabilities.

387. The Pack Unit is a state facility, and its operation comprises a program and service, for ADA and Rehabilitation Act purposes. *See generally Yeskey*, 524 U.S. at 213. Medical treatment, proper hygiene, and safe conditions of confinement are programs or services that Defendants provide to prisoners for purposes of the ADA and Rehabilitation Act. By not reasonably accommodating disabled inmates with hand sanitizer during the pandemic, Defendants are effectively denying them the benefits and services TDCJ is supposed to provide (including, e.g., access to methods of proper hygiene, access to medical preventative treatment sufficient to protect them from contracting COVID-19, and access to safe conditions of confinement).

388. As confirmed at trial, numerous members of the General Class and ADA Subclass have qualifying disabilities that require reasonable accommodations. This is not reasonably in dispute. For example, in addition to the several inmates who described their disabilities at trial (including paralysis, clinical blindness, diabetes, anatomical loss, TDCJ has disclosed in a sworn

interrogatory answer that over ▮ Pack inmates have one or more of the following disabilities or serious health conditions:[111]

    a.  Asthma;

    b.  Morbid obesity (Body-mass index at or over 40);

    c.  Cystic Fibrosis;

    d.  Congestive Heart Failure;

    e.  Chronic obstructive pulmonary disorder (COPD);

    f.  Cirrhosis;

    g.  Diabetes;

    h.  HIV or AIDS;

    i.  Prolonged use of corticosteroids;

    j.  Chronic kidney disease (or regularly undergo dialysis);

389. These high-risk health conditions each constitute a disability under the definitions in the ADA, because each condition substantially limits the prisoner's abilities to perform a major life activity. *See* 28 C.F.R. § 35.108; 29 C.F.R. § 1630.2(j)(3)(ii)–(iii). Indeed, those who use a wheelchair, are blind, or have diabetes, for example, are "virtually always" persons with a qualifying disabilities. 29 C.F.R. § 1630.2(j)(3)(ii)–(iii). These and other serious health conditions and disabilities substantially impair the affected inmates' resilience to COVID-19 and decrease the likelihood that they would survive the disease without resulting permanent injuries.

---

[111] *See* ECF No. 248-7, Verification of J. Pulvino with attachments (***filed under seal***). For clarity, Plaintiffs have excluded from this count any Pack Unit inmate who is over 65, because Defendants' interrogatory response did not indicate whether inmates who were over 65 also had disabilities or serious health conditions. It stands to reason that they do—which would of course increase beyond 270 the total number of Pack inmates with disabilities or serious health conditions. Indeed, as this Court observed in a 2017 preliminary injunction order involving the Pack Unit, a large number of Pack inmates face significant health issues including diabetes, coronary artery disease, and other ailments. *See Cole v. Collier*, No. 4:14-cv-1698, 2017 WL 3049540, at *4 (S.D. Tex. July 19, 2017).

*See generally* Young Decl. ¶ 5, 19–21, ECF No. 94-94. Defendants do not dispute, nor can they, that they are aware that scores of Pack inmates suffer from these serious conditions and disabilities.

390. The evidence unequivocally shows that many inmates also use wheelchairs, with many more having disabilities that require other mobility-assistive devices, including walkers. Mobility-impaired inmates have difficulty getting to sinks to wash their hands frequently. Even when they manage to make it to a sink, inmates who use wheelchairs and other mobility-assistive devices use those very devices to return to their bunks after they wash their hands, which, the evidence shows, means they frequently re-contaminate their hands simply by operating their mobility-assistance devices (e.g., by placing their hands on contaminated wheelchair wheels to roll back to their bunks). These inmates are then required to eat meals at their cubicles, or retire for the evening, without a meaningful way to clean and disinfect their hands—which increases their risk of contracting COVID-19. For an already medically vulnerable, disabled inmate, contracting the virus can have serious—even lethal—consequences.

391. Despite these issues and others, Defendants have not made reasonable accommodations to provide hand sanitizer or other protections to inmates with disabilities. Defendants considered providing hand sanitizer to all inmates but decided not to. Other than that wholesale refusal, Defendants have taken no steps to consider how hand sanitizer can be provided to inmates with disabilities. The evidence shows that such an accommodation is reasonable, potentially life-saving, and could have been made ███████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████

392.     Defendants have also not made any other reasonable accommodations necessary to protect inmates with disabilities from COVID-19, including members of the High Risk subclass.

393.     By failing to make these reasonable accommodations, TDCJ causes disabled prisoners to suffer more pain and greater COVID-related risks than non-disabled prisoners. Disabled inmates (who are at a higher risk of suffering more severe and potentially deadly consequences if they contract the virus), are not offered accommodations that put them on par with non-disabled inmates in protecting them against exposure. For example, whereas non-disabled inmates might be able to disinfect their hands before they eat or go to sleep, mobility-impaired inmates cannot.

**C.     Plaintiffs Were Not Required to Exhaust TDCJ's Grievance Procedure Because It Was Not Available for COVID-19 Issues**

394.     The Prison Litigation Reform Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a).

395.     The remedies that must be exhausted are those that exist at the time the action is brought. *Capozzi v. Pigos*, 640 F. App'x 142, 145 (3d Cir. 2016) (holding that the "plain language of the PLRA . . . suggests that prisoners must exhaust those remedies that exist at the time that they bring the action").

396.     The PLRA has a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016). The exhaustion requirement in this way "hinges on the 'availab[ility]' of administrative remedies." *Id.* at 1858. The meaning of "available" in the PLRA is the ordinary meaning of "capable of use for the accomplishment of a purpose." *Id.* at 1858 (quoting *Booth v. Churner*,

532 U.S. 731, 737 (2001)). Accordingly, an inmate is required to exhaust only those grievance procedures that are "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738).

397. The Supreme Court identified three non-exhaustive examples of circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief": (1) when the procedure "operates as a simple dead end," such that the procedure is not "'capable of use' for the pertinent purpose," (2) when the procedure is "so opaque that it becomes, practically speaking, incapable of use," and (3) when prison administrators thwart the use of the procedure "through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

398. These examples were only those that were relevant to the *Booth* case. *Id.* at 1853 ("As relevant here, there are three kinds of circumstances . . ."). These three examples are not exclusive of instances where a remedy, although on the books, is not capable of use to obtain relief. *West v. Emig*, 787 F. App'x 812, 815 (3d Cir. 2019) ("Notably, however, neither the Supreme Court nor this Circuit has held that those three circumstances are comprehensive, as opposed to exemplary."); *see also Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (referring to the examples in Ross as "at least three" circumstances where an administrative process may be "unavailable"); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016) ("We note that the three circumstances discussed in Ross do not appear to be exhaustive . . . .").

399. An inmate need not file a grievance at all if the grievance system is not available since the PLRA's requirement "does not apply in a case in which there is no administrative process to exhaust." *Malik v. D.C.*, 574 F.3d 781, 785 (D.C. Cir. 2009) (Garland, J.). Thus, an inmate filing a grievance after filing suit is irrelevant if the grievance system is not available at

all. *Id.* ("[T]he fact that [an inmate] filed his grievance one day later than [prison] policy permits is irrelevant because [the inmate] was not required to file a grievance at all.").

400.     The present situation is one where there was no available remedy at the time Plaintiffs filed suit. As Director Collier acknowledged, TDCJ's three-step grievance process requires inmates to first try to informally resolve their grievance. Trial Tr. 10-9:22–10:3, 10-201:4–201:1, 10-201:19–202:7, 10-202:10–13 (Collier). Inmates must then file both a "Step 1" and "Step 2" grievance. Under the framework existing at the time the suit was brought, Defendants had months to respond, and could unilaterally grant itself an extension, even for COVID-19 related grievances. This grievance procedure was not capable of use for COVID-19 related issues because it was simply not equipped to respond to such an emergency and provide actual relief.

401.     Since this case was filed, COVID-19 has spread across the country and through the Pack Unit at an alarming speed. As one example, after TDCJ's second strike team testing, there were over 171 inmates who tested positive.

402.     As another example, Mr. Valentine began the grievance process on March 27, 2020. Before this suit was filed, Mr. Valentine tried to informally the grievance before suit, and then began the Step 1 process shortly thereafter. At the time, the Pack Unit did not have any inmates that had tested positive for COVID-19 but Mr. Valentine was concerned that Defendants weren't taking adequate measures to keep the facility sanitized, which he felt might unnecessarily expose Pack Unit inmates to the virus. Before Mr. Valentine's Step 2 grievance was returned to him, multiple inmates had died from COVID-19 and Mr. Valentine himself tested positive.

403.    The overwhelming evidence shows numerous other inmates have attempted to exhaust their administrative remedies as well but have been unable to do so quickly enough to make the remedy "available." In response, Defendants point to a few instances where TDCJ system-wide policy changes occurred near the time of an inmate grievance, but there is no evidence that the grievance procedure itself provided, or was capable of providing, any such remedy. Further, these changes occurred after this lawsuit was filed, further divorcing them from the grievance procedure that existed when Plaintiffs filed suit.

404.    TDCJ's own conduct demonstrates tacit knowledge that its previous grievance process was not "available" when this suit was filed. Director Collier agreed that TDCJ changed the policy because it "allowed more time than we felt was appropriate for COVID-19-type grievances." Trial Tr. 1-100:17–24 (Collier, impeachment with deposition testimony). The new policy does not allow for extensions and is required to be complete within a total of 30 days. In contrast, the previous grievance process could linger for months, leaving no available remedy to prisoners in the Pack Unit when the pandemic began and when this suit was filed.

405.    Additionally, ignoring the textual exception to the PLRA as Defendants request could render the PLRA unconstitutional as applied here. As the Court previously explained, "[w]hen the state incarcerates a person, that person becomes dependent on the state for all of their basic human needs—food, clothing, safety, and medical care." *Valentine v. Collier*, 4:20-CV-1115, 2020 WL 3491999, at *8 (S.D. Tex. June 27, 2020) (citing *Brown v. Plata*, 563 U.S. 493, 510 (2011)). Failing to provide those basic needs violates the Eighth Amendment. *Id.* at 510–11. Requiring exhaustion of the full three-step process, even though it is clear that it cannot respond to COVID complaints with the urgency required, effectively denies Plaintiffs their Eighth Amendment rights. *Valentine*, 2020 WL 3491999, at *8.

406.     When probed at trial, Defendants made clear their position that the full grievance procedure must be exhausted, even if a hundred people die in the interim. Trial Tr. 18-159:20–160:11 ("THE COURT: I'm asking you for the logical extension of the State's position. Even if a hundred people have died, the plaintiffs would have had to wait until the grievance process was exhausted before filing suit? MS. VASQUEZ: That is the current state of the law, Your Honor."). This total deprivation of rights cannot be the law. As applied here, such a requirement is of questionable constitutionality. This further weighs in favor of interpreting TDCJ's grievance procedures in this case as "unavailable." *See Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019) ("[W]hen a serious doubt is raised about the constitutionality of an act of Congress, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." (quotations and alterations omitted) (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018))). The opposite conclusion, would require the Court to engage directly with serious concerns about the PLRA's constitutionality as applied in this case. *Valentine v. Collier*, 4:20-CV-1115, 2020 WL 3491999, at *8 (S.D. Tex. June 27, 2020)

407.     Accordingly, because Plaintiffs did not have an available remedy at the time they field suit, they did not need to exhaust TDCJ's grievance process.

## D.     A Permanent Injunction Is Necessary to Protect the Class from Further Harm

408.     Plaintiffs have proven that Defendants violated their Eight Amendment rights, and that Defendants have violated the ADA and Rehabilitation Act.

409.     Given that the population at Pack Unit is particularly vulnerable if exposed to COVID-19 and the current outbreak of COVID-19 at the unit, Plaintiffs face irreparable harm in the form of serious illness or death. An injunction is necessary to prevent these irreparable harms to Plaintiffs and members of the Class and to keep COVID-19 from further spreading throughout Pack Unit.

410.     The equities at issue and the public interest weigh in Plaintiffs' favor as they and members of the Class face serious irreparable harm—including severe illness, long-term health effects, and possibly death—if forced to remain in the current conditions at Pack Unit. Moreover, an injunction will not be unduly burdensome or waste resources.

411.     The public interest favors a permanent injunction. First, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. D.C.*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (collecting cases). Second, the public has a strong interest in the health and safety of its inmates, both because they are public charges, and because prison health is community health, given that the prison guards live within the surrounding communities. Moreover, when Pack Unit inmates become severely ill, they must be transferred to community hospitals, which are at risk of reaching capacity due to the rapid spread of COVID-19 in the larger community in Texas.

412.     The relief ordered by the Court extends no further than necessary to correct the violations of the Plaintiffs' federal rights. The relief ordered is narrowly drawn, and is the least intrusive means of protecting the rights of the Plaintiffs and the Class. The Court has given substantial weight to any adverse impact on public safety and the operation of the criminal justice system in fashioning this relief. 18 U.S.C. § 3626(a)(1)(A).

413.     A neutral monitor needs to be appointed to ensure that an injunction is followed because TDCJ has proven themselves unwilling of independent thinking, analysis, and adjustment to keep the inmates at the Pack Unit safe. Trial Tr. 6-161:19–162:9 (Vail). Even Director Collier implicitly recognized that monitoring is important, to make sure that TDCJ does everything it should be doing when it comes to following COVID-19 protocol. *Id.* at 10-89:15–90:3 (Collier) (noting that he believes "it's important to have another layer of oversight to make

sure that we are doing everything" necessary to follow COVID-19 protocol, "because we're going to be in this for a good amount of time, [and] we need to have that layer, essentially, to help oversee that we're following our protocols"); *id.* at 9-239:21–240:6.

## E.      Plaintiffs' Proposed Permanent Injunction

414.    The following is the narrowest relief necessary to correct the violations of Plaintiffs and the class:

- Provide Plaintiffs and the class members with access to liquid hand soap and clean hand towels in sufficient quantities to facilitate frequent handwashing;

- Provide Plaintiffs and the class members with access to hand sanitizer that contains at least 60% alcohol;

- Provide cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants, in sufficient quantities to facilitate continual cleaning, including in quantities sufficient for each inmate to clean and disinfect the floor and all surfaces of his own housing cubicle, and provide new gloves and N95 masks as necessary for each inmate during each time they are cleaning or performing janitorial services;

- Provide all inmates and staff members with masks. If TDCJ chooses to provide inmates with cotton masks, such masks must be laundered regularly.

- Provide all prison staff with N95 masks and face shields, and require staff to wear the masks and face shields at all times when on prison grounds.

- Provide prisoners with additional toilet paper upon request.

- Take the temperature of all prisoners who are in medically restricted dormitories twice daily, and interview all such prisoners for symptoms of COVID-19 other than fever.

- Minimize Pack Unit security staff's rotations at duty posts.

- Require Pack Unit staff to practice social distancing amongst themselves when they are on prison grounds.

- Require common surfaces in housing areas to be cleaned frequently with bleach-based cleaning agents, including table tops, telephones, door handles, and restroom fixtures;

- Require common surfaces in showers, laundry exchanges, and the dining hall to be cleaned after each use with bleach-based cleaning agents between each use, including, but not limited to, wiping down tables in the dining hall, fixtures and benches in the showers, and the divider and counters in the laundry exchange;

- Such cleanings shall be logged and recorded with the location cleaned, the time, and the initials of the individual responsible for cleaning. These logs shall be maintained by TDCJ for a period of 30 days and provided to the Court and Plaintiffs' counsel on a weekly basis.

- Increase regular cleaning and disinfecting of all common areas and surfaces, including common-use items such as television controls, books, and gym and sports equipment;

- Institute a prohibition on new prisoners entering the Pack Unit for the duration of the pandemic (or in the alternative, test all new prisoners entering the Pack Unit for COVID-19 upon arrival and quarantine them until a test result is obtained or place all new prisoners in quarantine for 14 days if no COVID-19 tests are available and have the new prisoner evaluated by a doctor/nurse practitioner/physician assistant before housing them in general population);

- Limit transportation of Pack Unit inmates out of the prison to transportation involving necessary medical appointments and release from custody. When inmates return to the Pack Unit, they shall either be tested for COVID-19 before being returned to the general population (and quarantined until a test result is obtained) or placed in quarantine for 14 days if no COVID-19 tests are available and evaluated by a doctor/nurse practitioner/physician assistant before housing them in general population;

- For transportation necessary for prisoners to receive medical treatment or to be released, CDC-recommended social distancing requirements should be strictly enforced in TDCJ buses and vans;

- Implement and enforce strict social-distancing measures requiring at least six feet of distance between all individuals in all locations where inmates are required to congregate including, but not limited to, the cafeteria line, in the chow hall, in all recreation rooms, during required counting, in the commissary line, at the laundry exchange (for inmates who leave their dormitory to exchange laundry), during showers (for inmates who leave their dormitory to shower), and in the pill line;

- To the extent possible, reassign bunks to provide more space between individuals;

- Instruct inmates to sleep head to foot to increase the distance between them;

- To the extent possible, use common areas like the gymnasium, library, law library, and class rooms as temporary housing for inmates without disabilities to increase opportunities for social distancing; and

- Post signage and information in common areas that provides: (i) general updates and information about the COVID-19 pandemic, including, but not limited to, the CDC's "Stop the Spread of Germs" poster already in TDCJ's possession; (ii) the CDC's recommendations on "How To Protect Yourself" from contracting COVID-19; and (iii) instructions on how to properly wash hands. Among other locations, all signage must be posted in every housing area, and (iii) must be posted above every sink.

- Educate inmates on the COVID-19 pandemic by providing information about the COVID-19 pandemic, COVID-19 symptoms, COVID-19 transmission, and how to protect oneself from COVID-19. Inmates should be provided physical handouts containing COVID-19 educational information, such as the CDC's "Share Facts About COVID-19" fact sheet already in TDCJ's possession. A TDCJ staff person should read the CDC's "Share Facts About COVID-19" aloud in each dormitory at least once per day.

- TDCJ must orally inform all inmates periodically that co-pays for medical treatment are suspended for the duration of the pandemic, and encourage all inmates to seek treatment if they are feeling ill.

- All inmates who tested negative for COVID-19 during any testing must be retested on at least a weekly basis.

- Any inmate who tests positive during any subsequent testing shall be placed into medical isolation and quarantined from inmates who tested negative for COVID-19.

- All inmates who are being tested for COVID-19 must be quarantined from inmates known to have tested negative for COVID-19 during any period their test results are pending;

- Inmates who tested positive for COVID-19 during any subsequent test may be placed in medical isolation together in the same dorms, but must be completely separated from inmates who tested negative or have test results pending, with absolutely no contact between inmates who tested negative (or who have test results pending) and inmates who tested positive during the pendency of the isolation and quarantine.

  o If the inmate who tested positive is asymptomatic, such medical isolation and quarantine shall last a total of 14 days, provided that the inmate remains asymptomatic throughout the isolation period. After this period, the inmate may be returned to the general population of inmates.

  o If the inmate who tested positive displays symptoms of COVID-19, including but not limited to fever, shortness of breath, or cough, such medical isolation and quarantine shall continue for a period until the inmate is asymptomatic for seven (7) consecutive days, including at least three (3) days with no fever, and

tests negative for COVID-19 two (2) times in tests conducted at least 24 hours apart. After this period, the inmate must be evaluated by a doctor/nurse practitioner/physician assistant before the inmate may be returned to the general population of inmates.

- Once an inmate who tested positive for COVID-19 is returned to the general population, they no longer need to be retested for COVID-19, unless they display symptoms of COVID-19.

- Any correctional officers, staff, or inmates who are not in medical isolation at the Pack Unit who comes into contact with inmates who test positive for COVID-19, including during medical isolation and quarantine, must don the appropriate personal protective equipment consistent with the following table—including a gown, masks, gloves, and eye protection—which must be disposed of to ensure there is no contamination of other surfaces or clothing.

| Contact level | N95 respirator | Face mask | Eye Protection | Gloves | Gown/coveralls |
|---|---|---|---|---|---|
| Direct contact with asymptomatic inmates under quarantine as close contacts of a COVID-19 case | | X | X | X | X |
| Direct contact with inmates in medical isolation due to a confirmed or suspected COVID-19 case | X | | X | X | X |
| Handling laundry or used food service items from an inmate either under quarantine or isolation due to COVID-19 | | | | X | X |
| Cleaning an area where a COVID-19 case has spent time | X | | X | X | X |

- Correctional officers and other Pack Unit staff (including UTMB employees) shall be subject to the same retesting plan as mentioned above for the inmates. Any correctional offers or staff (including UTMB employees) that test positive for COVID-19 shall self-isolate or quarantine in their homes for a period of 14 days, at which point they shall be evaluated by a provider before they may return to work inside the Pack Unit. Any correctional officers or staff who tests negative during the subsequent tests shall continue to be retested on a weekly basis. Once a correctional officer or staff member tests positive and completes self-isolation or quarantine, they no longer need to be retested for COVID-19, unless they display symptoms.

- For any inmate, correctional officer, or staff member who tests positive for COVID-19, contact tracing shall be performed to determine all individuals and surfaces contacted during the two-week period before the positive test result.

- For any inmate at the Pack Unit who has completed all programming required by the Board of Pardons and Parole so that the prisoner may serve the remainder of his sentence on parole, and who has otherwise satisfied all conditions for parole set by the Board, TDCJ shall work with all deliberate speed to ensure that inmate exits the Pack Unit to serve the remainder of his sentence on parole as soon as possible. This is not an order to release prisoners subject to the limitations of 18 U.S.C. § 3626(a)(3), but rather an order that TDCJ move with all deliberate speed to ensure the satisfaction of all prerequisites to parole prisoners already conditionally approved for release by the Board (such as completing any home inspections, or other requirements for parole, that are within the control of TDCJ). No Pack Unit inmate's parole as approved by the Board of Pardons and Parole shall be delayed due to any other provision of this order, or due to any effort implemented by TDCJ to prevent the spread of COVID-19.

415.    The Court appoints _____ as special master to ensure enforcement of this order. The Court finds that _____ is a disinterested party who will give due regard to the public safety, and that appointment of a special master is necessary as implementation of this order is sufficiently complex to warrant the appointment of a master.

**F.    Plaintiffs are Prevailing Parties and Entitled to Attorneys' Fees**

416.    As prevailing parties, Plaintiffs are entitled to recover attorneys' fees and litigation expenses (including expert expenses) pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205. To the extent attorneys' fees are capped by 42 U.S.C. § 1997e(d), the Court finds that Plaintiffs are entitled to a multiplier sufficient to ensure they receive a reasonable, market-based attorneys' fee.

417.    Plaintiffs shall submit their request for this relief, with appropriate documentary support, within 21 days of this Court's order.

Dated: August 14, 2020

Respectfully submitted,

**WINSTON & STRAWN LLP**

By:    _/s/ John R. Keville_
_____

Jeff Edwards
Texas Bar No. 24014406
jeff@edwards-law.com
Scott Medlock
Texas Bar No. 24044783
scott@edwards-law.com
Michael Singley
Texas Bar No. 00794642
mike@edwards-law.com
David James
Texas Bar No. 24092572
S.D. Tex. ID No. 2496580
david@edwards-law.com
**THE EDWARDS LAW FIRM**
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
Tel. (512) 623-7727
Fax (512) 623-7729

John R. Keville
_Attorney-in-Charge_
Texas Bar No. 00794085
S.D. Tex. ID No. 20922
jkeville@winston.com
Denise Scofield
Texas Bar No. 00784934
S.D. Tex. ID No. 1529
dscofield@winston.com
Michael T. Murphy
Texas Bar No. 24051098
S.D. Tex. ID No. 621098
mtmurphy@winston.com
Brandon W. Duke
Texas Bar No. 240994476
S.D. Tex. ID No. 2857734
bduke@winston.com
Benjamin D. Williams
Texas Bar No. 24072517
S.D. Tex. ID No. 1447500
bwilliams@winston.com
Robert L. Green
Texas Bar No. 24087625
S.D. Tex. ID No. 2535614
rlgreen@winston.com
Corinne Stone Hockman
Texas Bar No. 24102541
S.D. Tex. ID No. 3019917
chockman@winston.com
800 Capital Street, Suite 2400
Houston, Texas 77002
Tel. (713) 651-2600
Fax (713) 651-2700

_**Counsel for Plaintiffs and the Class**_

## Certificate of Service

I certify that a copy of the above post-trial brief has been served on August 14, 2020 to all counsel of record by filing it with the Court's CM/ECF system in accordance with the Local Rules.

/s/ Brandon W. Duke
Brandon W. Duke
