# United States Court of Appeals
## for the Fifth Circuit

United States Courts
Southern District of Texas
FILED

*October 13, 2020*

David J. Bradley, Clerk of Court

No. 20-20525

United States Court of Appeals
Fifth Circuit

**FILED**

October 13, 2020

Lyle W. Cayce
Clerk

LADDY CURTIS VALENTINE; RICHARD ELVIN KING,

*Plaintiffs—Appellees,*

*versus*

BRYAN COLLIER; ROBERT HERRERA; TEXAS DEPARTMENT OF
CRIMINAL JUSTICE,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-1115

---

Before WILLETT, HO, and DUNCAN, *Circuit Judges.*

DON R. WILLETT, *Circuit Judge:*

America houses roughly 2.2 million people in crowded correctional facilities. Amidst the unprecedented COVID-19 pandemic, prison inmates—in close quarters and with no control over their confinement conditions—face unique and heightened risks. And elderly inmates, unsurprisingly, are particularly vulnerable to outbreaks. Two inmates incarcerated at the Wallace Pack Unit, a state-run lockup housing geriatric, medically compromised, and mobility-impaired inmates, sued the Texas Department of Criminal Justice over its response to the coronavirus. The

No. 20-20525

inmates alleged violations of the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. And as the suit was progressing, the virus was spreading, infecting over 500 inmates, 20 of whom have died.

The pandemic inflicted a dreadful toll at the Pack Unit. Mercifully, positive cases of COVID-19 have plummeted sharply, falling from 172 cases between June 23–25 to just 4 cases as of September 28. TDCJ's preventive measures are working, belatedly abating what had been a perfect storm. As judges, our conscribed role is not to assess whether prison officials could have done more to contain the virus—no doubt they could have. Nor is it to micromanage prison operations—that is left to the governor-appointed Board of Criminal Justice and to the Texas Legislature. TDCJ requests a stay of the district court's permanent injunction pending appeal. Our limited role is thus to determine whether TDCJ has made the requisite showing that its efforts to combat COVID-19 satisfied the constitutionally required minimum. And we must do so within strict procedural bounds mandated by Congress. We are forbidden to do more.

Here, the plaintiff-inmates failed to comply with the exacting procedural preconditions imposed by the Prison Litigation Reform Act, specifically the PLRA's mandatory and jurisdictional exhaustion requirement. That alone defeats this suit. But even putting aside the inmates' failure to exhaust their administrative remedies, their constitutional claim fails on the merits. TDCJ's response, albeit imperfect, did not amount to deliberate indifference under the Eighth Amendment. We grant TDCJ's motion to stay the permanent injunction.

I

Plaintiffs Laddy Valentine and Richard King are incarcerated at TDCJ's Wallace Pack Unit, a prison for the elderly and infirm in Grimes County, Texas. On March 30, 2020, they sued TDCJ, its executive director,

No. 20-20525

and the Pack Unit warden on behalf of a putative class of all Pack Unit inmates and putative subclasses of high-risk and disabled inmates. The complaint alleged that TDCJ's response to COVID-19 violated the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act.

On April 16, the district court issued a preliminary injunction, imposing a detailed protocol on TDCJ to stem the spread of COVID-19 in the Pack Unit. The injunction specified the cleaning schedule for prison common areas (every 30 minutes from 7 a.m.–10 p.m.), the surfaces to be cleaned (tabletops, telephones, door handles, restroom fixtures, television controls, books, and gym and sports equipment), and the type of disinfectants to be used (bleach-based cleaning agents). It required prison staff to post signage, give oral presentations or show videos, conduct question and answer sessions, and provide handouts to inform inmates about COVID-19. It also mandated the provision of hard-to-come-by items, including hand sanitizer, masks, tissues, and toilet paper, and instructed TDCJ to develop a COVID-19 testing plan.

TDCJ timely filed an interlocutory appeal of the preliminary injunction. On April 22, a panel of this court stayed the injunction pending appeal, reasoning that Plaintiffs were unlikely to succeed because they did not comply with the Prison Litigation Reform Act's administrative exhaustion requirement and that, in any event, their Eighth Amendment claim was likely to fail on the merits. *Valentine v. Collier* (*Valentine I*), 956 F.3d 797, 806 (5th Cir. 2020). The motions panel also concluded that TDCJ would be irreparably injured absent a stay because the injunction interfered with its ability to respond to the pandemic's rapidly changing conditions. *Id.* at 803–04. The Supreme Court declined to vacate the stay. *Valentine v. Collier* (*Valentine II*), 140 S. Ct. 1598 (2020) (mem.).

3

No. 20-20525

On June 5, a merits panel resolved the interlocutory appeal in a short order vacating the injunction on the ground that TDCJ had "substantially complied with the measures ordered by the district court." *Valentine v. Collier* (*Valentine III*), 960 F.3d 707, 707 (5th Cir. 2020) (per curiam). In three separate concurring opinions, the panel members expressed differing views on the merits of the preliminary injunction and how the evolving facts affected the nature of the proceeding.

On remand, the district court certified a general class of all Pack Unit inmates and a high-risk subclass of inmates who are vulnerable to severe illness or death from COVID-19 due to their advanced age or underlying health conditions. *Valentine v. Collier* (*Valentine IV*), No. 4:20-CV-1115, 2020 WL 3491999, at *14 (S.D. Tex. June 27, 2020). The district court later certified a mobility-impaired subclass of inmates who use walkers, canes, crutches, and wheelchairs. *Valentine v. Collier* (*Valentine V*), No. 4:20-CV-1115, 2020 WL 5797881, at *23–26 (S.D. Tex. Sept. 29, 2020).

An 18-day bench trial began on July 13. On September 29, the district court ruled for Plaintiffs on all claims and permanently required TDCJ to follow specific procedures to protect Pack Unit inmates from COVID-19. *See generally id.* at *29–38. In some ways, the permanent injunction is less demanding than the preliminary injunction. For example, it instructs TDCJ to "[c]reate a plan to allow for regular cleaning of common surfaces with bleach-based cleaning agents" rather than specifying a cleaning schedule, requires hand sanitizer only for the mobility-impaired subclass, and dispenses with the educational requirements. *Id.* at *37. But the permanent injunction is more demanding when it comes to COVID-19 testing. It requires TDCJ to "[c]reate a comprehensive weekly testing program using tests that are approved by the FDA for asymptomatic testing and with a turnaround time for results of 48 hours or less, and document that plan in writing" and to "[c]ontinue weekly testing until the pandemic is brought under control

4

No. 20-20525

within the state of Texas, even if multiple weeks pass with zero positive cases," among other things. *Id.* at *38. The injunction is set to take effect on October 14, 2020. *Id.*

TDCJ appealed the same day the district court issued the permanent injunction. The district court denied TDCJ's motion to stay the injunction. TDCJ then filed an emergency motion asking us to stay the injunction pending appeal and for a temporary administrative stay while that motion was under consideration. On October 6, we administratively stayed the permanent injunction pending consideration of the emergency motion and granted Plaintiffs leave to file a response to TDCJ's motion. We now decide the emergency motion.

## II

Our authority to stay a district court's order buys us time to conduct careful, considered appellate review. *Nken v. Holder*, 556 U.S. 418, 427 (2009). At the same time, a stay disrupts the usual rule that a district court's judgment becomes effective regardless of appeal. *Id.* Thus an appealing party is never entitled to a stay as a matter of right. *Id.* To obtain a stay, TDCJ must show that (1) its appeal is likely to succeed on the merits, (2) it will suffer irreparable harm absent a stay, (3) a stay will not substantially injure Plaintiffs, and (4) the public interest favors a stay. *Id.* at 426. We place the greatest weight on the first two factors. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016).

## III

We first assess TDCJ's likelihood of success on appeal. Here, we consider both Plaintiffs' compliance with the Prison Litigation Reform Act's exhaustion requirement, and the merits of their Eighth Amendment claim.

5

No. 20-20525

## A

The PLRA's exhaustion requirement is no-nonsense. Inmates seeking to challenge prison conditions must exhaust "such administrative remedies as are available" before challenging prison conditions in court. 42 U.S.C. § 1997e(a). The provision is mandatory, and courts have zero discretion to hear unexhausted claims. *Jones v. Bock*, 549 U.S. 199, 211 (2007). Indeed, the Supreme Court has "reject[ed] every attempt to deviate" from the PLRA's rigid exhaustion requirement, most recently in *Ross v. Blake*, where it emphatically held that there is no "special circumstances" exception. 136 S. Ct. 1850, 1855 (2016).

That said, the PLRA does contain one textual exception to its otherwise stringent exhaustion requirement: availability. Inmates who fail to exhaust can proceed in court by showing that administrative remedies were not "available." As used in the PLRA, "available" means "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). This is a fact-specific inquiry. *See id.* For example, a grievance process is not available if "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," if it is "so opaque that it becomes, practically speaking, incapable of use," or if prison administrators prevent access to it "through machination, misrepresentation, or intimidation." *Id.* at 1859–60. Whether a grievance process is available does not depend on the relief that can be granted; exhaustion is not excused just because inmates cannot obtain the precise relief they seek. *Booth*, 532 U.S. at 741 & n.6.

Here, the district court concluded that TDCJ's grievance process was unavailable and allowed this suit to proceed despite Plaintiffs' undisputed failure to exhaust. *Valentine V*, 2020 WL 5797881, at *26–28. In staying the preliminary injunction, the previous motions panel observed that "Plaintiffs' suit appears premature" because "according to the standards the

No. 20-20525

Supreme Court has given us, TDCJ's grievance procedure is 'available,' and Plaintiffs were required to exhaust." *Valentine I*, 956 F.3d at 804. TDCJ asks us to treat this as law of the case. But "the law of the case doctrine applies only to issues that were actually decided." *Lindquist v. City of Pasadena*, 669 F.3d 225, 238–39 (5th Cir. 2012) (internal quotation omitted). And the previous motions panel was tasked only with deciding whether the failure to exhaust was likely to bar Plaintiffs' claims based on the preliminary record. On remand, the district court concluded anew that TDCJ's grievance process was not available after an 18-day trial. *Valentine V*, 2020 WL 5797881, at *26–28. We are thus reviewing a different decision based on a different record. The previous panel's preliminary ruling is not controlling. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981). Nonetheless, we reach the same conclusion: TDCJ's grievance procedure is available, and Plaintiffs were required to exhaust.

The district court impermissibly applied a "special circumstances" exception, like the one the Supreme Court rejected in *Ross*, under the guise of an availability analysis. Its main rationale was that TDCJ's grievance process is incapable of responding to the rapid spread of COVID-19. *Valentine V*, 2020 WL 5797881, at *28. In other words, the grievance process is not amenable to current circumstances. But under *Ross*, special circumstances—even threats posed by global pandemics—do not matter. 136 S. Ct. at 1856. We reiterate that the spread of COVID-19 in the Pack Unit is an emergency that demands prison officials' full attention. But as we recognized in the aftermath of Hurricane Katrina, emergencies are not "license to carve out new exceptions to the PLRA's exhaustion requirement, an area where our authority is constrained." *Dillon v. Rogers*, 596 F.3d 260, 270 (5th Cir. 2010). The narrow question before us is whether TDCJ's grievance process was available to Plaintiffs as contemplated by the PLRA.

7

No. 20-20525

The district court made much of TDCJ's "acknowledgment that the existing grievance process was inadequate in light of COVID-19 and the implementation of a new set of procedures." *Valentine V*, 2020 WL 5797881, at \*27. But inadequate is not a synonym for unavailable. The statutory meaning of "available" in the PLRA is broad: Inmates must exhaust as long as some form of relief can be obtained, regardless of what that relief may be. *Ross*, 136 S. Ct. at 1859; *Booth*, 532 U.S. at 741 & n.6. Adequacy is not a factor. The exhaustion provision's statutory history makes this clear. The precursor to the PLRA required exhaustion only where administrative remedies were "plain, speedy, and effective." *Ross*, 136 S. Ct. at 1858 (quoting Civil Rights of Institutionalized Persons Act, Pub. L. No. 96-247, § 7(a), 94 Stat. 349, 352 (1980)). Congress removed those conditions from the PLRA in favor of the current "invigorated exhaustion provision." *Id.* (internal quotation omitted). Under the old regime, concerns that TDCJ's grievance process was ineffective or "operated too slowly" might have excused exhaustion. *See Valentine V*, 2020 WL 5797881, at \*28. But those concerns are irrelevant under today's PLRA, which "prevent[s] a court from deciding that exhaustion would be unjust or inappropriate in a given case." *Ross*, 136 S. Ct. at 1858. Instead, "all inmates must now exhaust all available remedies." *Id.*

Here, the district court heard evidence that Plaintiffs obtained soap and cleaning supplies, COVID-19 testing, and the halt of transfers into the Pack Unit, which they requested through the grievance process at various points after commencing this litigation. *Valentine V*, 2020 WL 5797881, at \*27. The court discounted that evidence because those changes were not a direct response to Plaintiffs' grievances. Indeed, the court noted "[i]n some of these instances, TDCJ changed its policies *prior* to a grievance being filed." *Id.* (emphasis in original). As an example, the court gave Mr. Valentine's May 10 request for testing, which came one day after TDCJ implemented a prison-wide testing plan. From there, the court concluded

8

No. 20-20525

that the grievance process was unresponsive and thus unavailable. *Id.* We do not follow the district court's logic. To the contrary, TDCJ's conduct shows that it was capable of providing "some relief for the action complained of," which is enough to render the grievance process "available" under the PLRA. *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738).

The district court suggested that requiring exhaustion in these circumstances would violate the Eighth Amendment. *Valentine V*, 2020 WL 5797881, at *28; *Valentine IV*, 2020 WL 3491999, at *8. We fail to see how enforcing a statutory procedure amounts to cruel and unusual punishment, and the district court cited no authority for that proposition.

As the Supreme Court has emphasized, the PLRA's exhaustion requirement was set by Congress, and Congress alone can change it. *Ross*, 136 S. Ct. at 1857. Congress has in fact made some adjustments in response to COVID-19. For example, the Coronavirus Aid, Relief, and Economic Security (CARES) Act relaxed the Federal Rules of Criminal Procedure to allow for remote hearings in certain circumstances. Pub. L. No. 116-136, § 15002(b), 134 Stat. 281, 528 (2020). But the CARES Act did not alter the PLRA. We thus remain bound by it, even in these unprecedented times. The district court lamented that TDCJ's grievance process was lengthy and unlikely to provide necessary COVID-19 relief. By all accounts, the process was suboptimal. But it was available, and Plaintiffs were required to exhaust it before bringing this suit.

B

Plaintiffs' failure to exhaust their administrative remedies before filing suit is fatal. But even if Plaintiffs could surmount the PLRA, their Eighth Amendment claim is likely to fail on the merits.

The Eighth Amendment requires prison officials to provide "humane conditions of confinement" with due regard for inmate health and safety.

9

No. 20-20525

*Farmer v. Brennan*, 511 U.S. 825, 832, 837 (1994). To show a violation, inmates must prove that they were exposed "to a substantial risk of serious harm" and "that prison officials acted or failed to act with deliberate indifference to that risk." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006)). The presence of a substantial risk is an objective inquiry. *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019). Deliberate indifference, however, is subjective; it requires a showing that prison officials had actual knowledge of a risk and disregarded it. *Id.* Knowledge may be inferred from the circumstances, particularly where the risk is obvious. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). In addition, an inmate must "submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert*, 463 F.3d at 346 (internal quotation omitted). "Deliberate indifference is an extremely high standard to meet." *Domino v. TDCJ*, 239 F.3d 752, 756 (5th Cir. 2001).

The district court articulated the right legal standard but incorrectly applied it. At the outset, the court erred by framing its analysis in terms of COVID-19's impact in the Pack Unit. *Valentine V*, 2020 WL 5797881, at *29. We share the district court's alarm at the toll of the virus. But the Eighth Amendment inquiry concerns TDCJ's state of mind, not the scope of the injury. As the Supreme Court has instructed, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Farmer*, 511 U.S. at 844 (emphasis added).

The district court made detailed factual findings about TDCJ's response to COVID-19. Discussions began at the end of February. TDCJ suspended all in-person visitation on March 13 and suspended all inmate medical copays on March 20. It began manufacturing masks on March 24.

10

No. 20-20525

The state Correctional Managed Health Care Committee issued Policy B-14.52, its COVID-19 policy, on March 20 and an updated version on March 23, incorporating new guidance from the Centers for Disease Control. In total, the policy has been updated six times since March 20. It requires social distancing and the use of cloth face masks at all times. In the Pack Unit, inmates have increased access to soap and toilet paper, and temporary handwashing stations were installed in July, during the trial. After an inmate died of COVID-19 on April 11—the first known case in the Pack Unit—all 54 inmates in the decedent's dorm were tested and returned negative results. Since then, the Pack Unit has conducted two "strike team testing" events to test all inmates and staff who have not previously tested positive. TDCJ devised a long-term testing plan shortly before trial. Under this plan, inmates who test positive or who are suspected of being positive are placed in medical isolation. Inmates who are brought back to the Pack Unit from off-site hospitals are quarantined for 14 days. To inform inmates about the risks of COVID-19, TDCJ hung posters and distributed pamphlets in the Pack Unit. An educational video has played three times a day since mid-April.

Instead of addressing whether these actions were reasonable, the district court dismissed them "as the most basic steps that TDCJ could have taken." *Valentine V*, 2020 WL 5797881, at *30. The court noted that "[d]esigning a policy and implementing some of the measures therein does not automatically satisfy Defendants' constitutional obligations, especially in the face of an unprecedented public health crisis." *Id.* But to know whether certain measures pass constitutional muster requires analyzing them under the constitutional standard, which the district court did not do. And our Eighth Amendment precedent in the context of infectious disease, though limited, instructs that TDCJ met its constitutional obligations. We have twice held that testing and treating inmates who were exposed to tuberculosis is enough to establish that prison officials were not deliberately indifferent to

No. 20-20525

the risk of disease. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir. 2001); *Wallace v. Dallas Cty.*, 51 F.3d 1045 (5th Cir. 1995) (per curiam). Here, even recognizing that COVID-19 poses a greater risk than tuberculosis, any argument that TDCJ "evince[d] a wanton disregard for any serious medical needs" is dispelled by the affirmative steps it took to contain the virus. *Gobert*, 463 F.3d at 346 (internal quotation omitted).

The bulk of the district court's opinion focuses on what more TDCJ could have done in response to COVID-19. For example, TDCJ failed to enforce social distancing in the Pack Unit, particularly in the showers. It did not increase the janitorial staff's access to training or supplies. Staff regularly violated the mask policy. Surfaces were not cleaned regularly at the laundry exchange, where inmates interacted face-to-face without masks. No hand sanitizer was available, and many sinks were broken. No contact tracing plan was in effect. The turnaround time for COVID-19 tests was between one and two weeks at the start of the pandemic.

The district court grouped these shortcomings into two categories: (1) the lack of a systematic approach, and (2) the failure to abide by basic health guidance, which together demonstrated TDCJ's deliberate indifference to the known risk of COVID-19 in the Pack Unit. *Valentine V*, 2020 WL 5797881, at \*31. But in reaching that conclusion, the court held TDCJ to a higher standard than the Constitution imposes. For example, it reasoned that TDCJ's approach "lacked indicia of effecting long-term changes that will be consistently carried out until the pandemic is under control" and questioned whether TDCJ was sanitizing the Pack Unit "to the minimum extent required to avoid the spread of COVID-19." *Id.* at 33. The Eighth Amendment does not enact the CDC guidelines. Nor does it require TDCJ to implement "long-term changes" or "avoid the spread of COVID-19," and the failure to do so does not "clearly evince a wanton

12

No. 20-20525

disregard for any serious medical needs." *Gobert*, 463 F.3d at 346 (internal quotation omitted).

The district court also faulted TDCJ for failing to do the impossible. It criticized TDCJ's use of COVID-19 tests that "were only approved under the FDA's Emergency Use Authorization and had not been approved for testing of asymptomatic individuals." *Valentine V*, 2020 WL 5797881, at *33. But the evidence shows that the FDA has not fully approved *any* COVID-19 test; all available tests are subject only to emergency-use authorizations. And at the time of trial, none of those tests was approved for asymptomatic individuals.[1] The district court also lamented that TDCJ never considered "using authorized early release as a means to increase social distancing," without addressing that TDCJ has no power to release inmates from the Pack Unit. *Id.* "Failing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference." *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020).

To be sure, the district court identified lapses in TDCJ's response to COVID-19. As a matter of policy, TDCJ could have done more to protect vulnerable inmates in the Pack Unit. But federal judges are not policymakers. "The Constitution charges federal judges with deciding cases and controversies, not with running state prisons." *Lewis v. Casey*, 518 U.S. 343, 363 (1996) (Thomas, J., concurring). Here, the narrow question before us is whether Plaintiffs have proven a constitutional violation. And under governing precedent, their burden is "extremely high." *Domino*, 239 F.3d at

---

[1] The FDA issued an emergency-use authorization for asymptomatic testing during the trial. Press Release, U.S. Food & Drug Admin., Coronavirus (COVID-19) Update: FDA Authorizes First Diagnostic Test for Screening of People Without Known or Suspected COVID-19 Infection (July 24, 2020), https://www.fda.gov/news-events/fda-newsroom/press-announcements.

No. 20-20525

756. The Eighth Amendment does not mandate perfect implementation. *See Petzold*, 946 F.3d at 250. And "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 844. TDCJ's measures may have been unsuccessful. But they were not unconstitutional.

### C

We pause briefly to address Plaintiffs' ADA and Rehabilitation Act claim. The district court concluded that TDCJ's failure to provide hand sanitizer denied the mobility-impaired subclass a reasonable accommodation necessary for proper hygiene. *Valentine V*, 2020 WL 5797881, at *35. Unlike our review of Plaintiffs' Eighth Amendment claim, which involved the proper application of a legal standard, the reasonable-accommodation inquiry is fact-specific. Given that Plaintiffs' failure to exhaust forecloses their success on this claim, we find it unnecessary to parse an 18-day trial record on an expedited motion for temporary relief.

### IV

Next, we consider whether TDCJ will be irreparably harmed absent a stay.

As the previous motions panel recognized, "it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Valentine I*, 956 F.3d at 803 (quoting *Woodford v. Ngo*, 548 U.S. 81, 94 (2006)). And TDCJ, of course, is tasked with administering Texas's prisons. *Id.* (citing Tex. Gov't Code ch. 501). The permanent injunction lays claim to TDCJ's resources, commanding how it must allocate its time, funding, and facilities. In doing so, it necessarily interferes with TDCJ's ability to perform its statutory duties. And it hinders TDCJ's flexibility to address the facts on the ground, which, as has been

14

No. 20-20525

repeatedly recognized in this litigation, are ever-changing. *See id.*; *Valentine III*, 960 F.3d at 707; *Valentine IV*, 2020 WL 3491999, at *5. We have found irreparable injury where an injunction required a prison "go to the effort and expense of furnishing the district court with a plan" to address a problem beyond what the Constitution requires. *Ruiz v. Estelle*, 650 F.2d 555, 572–73 (5th Cir. Unit A June 1981). The injunction in this case does that and more.

V

Finally, we assess the balance of harms and the public interest.

Here, the significant decrease in COVID-19 cases in the Pack Unit, as documented by the district court, weighs in favor of a stay. *Valentine V*, 2020 WL 5797881, at *7–8. The Pack Unit reported 144 positive cases between May 12–14, and 172 positive cases between June 23–25. Though testing slowed somewhat, only 1 positive case was reported between August 10–12, and there were only 4 active cases among inmates as of September 28. The district court observed that even now, "COVID-19 has not been fully contained." *Id.* But its incidence has been drastically reduced, all without court intervention or oversight. On balance, then, a stay will not substantially harm Plaintiffs. The harm to the state and the public interest overlap where, as here, the state is the appealing party. *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam); *Nken*, 556 U.S. at 435. In any event, the public interest favors having politically accountable officials—not federal judges— determine how to allocate resources. *Swain*, 961 F.3d at 1293; *see also Lewis*, 518 U.S. at 363 (Thomas, J., concurring) ("Principles of federalism and separation of powers dictate that exclusive responsibility for administering state prisons resides with the State and its officials."). TDCJ has thus satisfied all four factors.

No. 20-20525

## VI

TDCJ's motion to stay the permanent injunction pending appeal is GRANTED.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

October 13, 2020

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

      No. 20-20525  Laddy Valentine, et al v. Bryan Collier, et al
           USDC No. 4:20-CV-1115

Enclosed is the opinion entered in the case captioned above.

           Sincerely,

           LYLE W. CAYCE, Clerk

           By: _____
           Nancy F. Dolly, Deputy Clerk
           504-310-7683

Mr. David J. Bradley
Mrs. Christin Audrey Cobe-Vasquez
Mr. Brandon W. Duke
Mr. Jeff S. Edwards
Mr. Matthew Hamilton Frederick
Mr. Kyle Douglas Hawkins