United States Courts
Southern District of Texas
FILED

April 19, 2021

Nathan Ochsner, Clerk of Court

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 26, 2021

Lyle W. Cayce
Clerk

No. 20-20525

LADDY CURTIS VALENTINE; RICHARD ELVIN KING,

*Plaintiffs—Appellees,*

*versus*

BRYAN COLLIER; ROBERT HERRERA; TEXAS DEPARTMENT OF CRIMINAL JUSTICE,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-1115

Before DAVIS, STEWART, and OLDHAM, *Circuit Judges.*

W. EUGENE DAVIS, *Circuit Judge*:

This case returns to this Court on Defendants' appeal of the district court's permanent injunction against them following an 18-day bench trial. After a careful review of the record, we conclude that given the steps taken by Defendants before the end of trial, Plaintiffs failed to establish that they are entitled to injunctive relief. We therefore REVERSE and RENDER judgment for Defendants.

No. 20-20525

## I. Background

Plaintiffs Laddy Valentine and Richard King are elderly inmates with various medical conditions at the Wallace Pack Unit ("Pack Unit"), a Type-1 Geriatric prison in the Texas Department of Criminal Justice ("TDCJ") prison system. Plaintiffs seek injunctive relief on behalf of three certified classes of inmates for violations of the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"): (1) the General Class, (2) the High-Risk Subclass, and (3) the Mobility-Impaired Subclass. For the Eighth Amendment claim, Defendants are Pack Unit senior warden Robert Herrera and TDCJ Executive Director Bryan Collier in their official capacities only. For their ADA and RA claim, Plaintiffs sued TDCJ.

The Pack Unit housed approximately 1,132 inmates at the time of trial, including 800 inmates over the age of 65. Many of the inmates had serious chronic health conditions and disabilities. Forty-nine inmates were wheelchair-bound, and 87 inmates used walkers. The Pack Unit's living space consists of a number of dormitories that house an average of 54 inmates. Within the dorms, inmates have a small personal sleeping and living space in a cubicle. The cubicles are connected in long rows and separated by a small, waist-high wall as illustrated below.



No. 20-20525

This lawsuit was filed on March 30, 2020, shortly before COVID-19 struck the Pack Unit. On April 11, 2020, Leonard Clerkly, the first Pack Unit inmate to test positive for COVID-19, died from the virus. By the time of trial, over 497 Pack Unit inmates had tested positive for COVID-19, 74 inmates had been hospitalized, and 19 inmates had died.

From the time they filed suit until trial in July, Plaintiffs have maintained that Defendants acted with deliberate indifference to Plaintiffs' health and safety in violation of the Eighth Amendment in light of the dangers of COVID-19 for a geriatric prison population, and that Defendants violated the ADA and Rehabilitation Act ("RA") by failing to accommodate for specific risks to wheelchair-bound and other mobility-impaired inmates.

Although the inmates in this geriatric unit have surely felt the effects of the virus, the evidence at trial showed that TDCJ did respond to the pandemic in a number of ways both before and after suit was filed and during the pendency of the litigation. In February of 2020, TDCJ first began discussions with Dr. Lanette Linthicum, Director of the Health Services Division for TDCJ, regarding a response to COVID-19. Also in February, the Correctional Managed Health Care Committee ("CMHCC"), composed of representatives from TDCJ, Texas Tech, and University of Texas Medical Branch ("UTMB"), began formulating Policy B-14.52—a comprehensive policy to manage COVID-19 in TDCJ facilities. The policy, which largely tracked the CDC guidance for detention centers, was adopted on March 20, 2020. The policy has been frequently updated and revised. In March, testing became available for symptomatic inmates. On May 12, 2020, TDCJ began to roll out "strike-team testing" for the Pack Unit and three other similarly situated prison facilities. Strike-team testing is TDCJ's mass testing protocol for all inmates that is included in the CDC's recommendations for mass testing for COVID-19 in nursing homes. Policy B-14.52 also instructs on

No. 20-20525

quarantining and isolation both for inmates who test positive for the virus and those suspected of being infected with it.

On April 16, 2020, the district court entered a preliminary injunction which was stayed by this Court on April 22 and then vacated on June 5.[1] On July 13, 2020, the district court began an 18-day bench trial on whether a permanent injunction should be issued. The district court issued its findings of fact and conclusions of law on September 29, 2020, and ultimately issued the permanent injunction that Defendants are challenging in this appeal. The district court concluded that Plaintiffs did not need to exhaust administrative remedies, that Defendants were deliberately indifferent, and that Defendants violated the ADA and RA. The injunction ordered the prison to

> (1) Provide unrestricted access to hand soap and clean (regularly washed) or disposable hand towels to facilitate frequent handwashing;
>
> (2) Provide members of the Mobility-Impaired Subclass access to hand sanitizer that contains at least 60% alcohol;
>
> (3) Provide sufficient cleaning supplies for each housing area, including bleach-based cleaning agents and CDC-recommended disinfectants; provide additional cleaning supplies as requested by inmate janitors; train janitors on additional cleaning practices to be carried out in light of COVID-19;
>
> (4) Provide new (either disposable or washed) gloves and masks each time inmates perform new tasks, such as beginning a janitorial shift or working in the laundry exchange;
>
> (5) Create a plan to allow for regular cleaning of common surfaces with bleach-based cleaning agents;

---

[1] *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020) (*"Valentine I"*); *Valentine v. Collier*, 960 F.3d 707 (5th Cir. 2020) (*"Valentine II"*).

No. 20-20525

(6) Create a plan to allow for regular cleaning of the cubicles of inmates who are physically unable to do so themselves;

(7) Enforce social distancing and the wearing of PPE among TDCJ staff;

(8) Mark common spaces with red tape to denote safe social distancing practices;

(9) Create a plan for inmates to sleep head-to-foot with exceptions for legitimate concerns by individual inmates;

(10) Use common spaces for temporary housing of inmates without disabilities;

(11) Limit transportation of inmates in and out of the Pack Unit other than for medical appointments or release from custody;

(12) Create a comprehensive weekly testing program using tests that are approved by the FDA for asymptomatic testing and with a turnaround time for results of 48 hours or less, and document that plan in writing;

(13) Continue weekly testing until the pandemic is brought under control within the state of Texas, even if multiple weeks pass with zero positive cases;

(14) Quarantine inmates who are awaiting test results from individuals who are known to have tested negative;

(15) Create a written plan to implement contact tracing when an inmate or staff member tests positive;

(16) Document in writing all TDCJ policies in response to COVID-19; and

(17) Institute a regular audit and compliance program to ensure compliance with the measures.

No. 20-20525

On October 13, 2020, this Court stayed the permanent injunction.[2] We now consider the merits of the appeal.

## II. Standard of Review

A party seeking a permanent injunction must show: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest.[3] Furthermore, "[a] permanent injunction is appropriate only if a defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions."[4] We review a district court's grant of a permanent injunction for abuse of discretion.[5] A district court abuses its discretion if it (1) "relies on clearly erroneous factual findings" or "erroneous conclusions of law" when deciding to grant the injunction, or (2) "misapplies the factual or legal conclusions when fashioning its injunctive relief."[6] When reviewing factual findings and legal conclusions for a permanent injunction, "we will review the district court's findings of fact under the clearly erroneous standard, and the conclusions of law under the *de novo* standard."[7]

---

[2] *Valentine v. Collier*, 978 F.3d 154 (5th Cir. 2020) ("*Valentine III*").

[3] *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006).

[4] *Sec. & Exch. Comm'n v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017) (internal quotations omitted) (cleaned up).

[5] *State v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 413 (5th Cir. 2020), *as revised* (Apr. 3, 2020); *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995).

[6] *Ysleta*, 955 F.3d at 413 (quoting *Peaches*, 62 F.3d at 693).

[7] *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (quoting *Peaches Entm't*, 62 F.3d at 693).

No. 20-20525

With respect to the Eighth Amendment claim, Collier and Herrera are sued under 42 U.S.C. § 1983 in their official capacity for injunctive relief only. "Under *Ex parte Young*, a case can proceed against individual state officials named in their official capacities when the claim is for an ongoing violation of federal law, but the relief sought must be prospective."[8] In such a suit, the proper defendant is a state official acting in violation of federal law who has a "sufficient 'connection' to enforcing an allegedly unconstitutional law."[9] Collier is Executive Director of TDCJ and "is responsible for the administration and enforcement of all laws relating to the department including rules implemented by the department but may delegate those responsibilities as permitted by board rule or general law."[10] Herrera is the senior warden of the Pack Unit and generally in charge of operations at this facility. Collier and Herrera, therefore, are the correct officials named in this suit as individuals with authority to act with respect to creation and implementation of COVID-19 policies at the Pack Unit.

As for the ADA claim, TDCJ is sued directly. We have held that TDCJ is an arm of the state of Texas and thus entitled to sovereign immunity.[11] Nevertheless, Title II of the ADA validly abrogates state sovereign immunity when the state's conduct actually violates the Fourteenth Amendment.[12] In *U.S. v. Georgia*, the Supreme Court recognized that refusal of prison officials to accommodate an inmate's disability needs "in such fundamentals as mobility, hygiene, [and] medical care" is conduct

---

[8] *Daves v. Dallas Cty., Tex.* No. 18-11368, 2020 WL 7693744, at *9 (5th Cir. 2020).

[9] *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020).

[10] Tex. Gov't Code Ann. § 493.006 (West).

[11] *Aguilar v. Tex. Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998).

[12] *United States v. Georgia*, 546 U.S. 151, 159 (2006).

No. 20-20525

that can violate both the ADA and Eighth Amendment.[13] Because the Eighth Amendment applies to the states through the Fourteenth Amendment, an ADA violation that is also an Eighth Amendment violation actually violates the Fourteenth Amendment. In this case, Plaintiffs argued that TDCJ failed to accommodate them with hand sanitizer and that this failure to accommodate denied inmates the services of medical treatment, proper hygiene, and safe conditions of confinement. Because Plaintiffs' ADA claim involves conduct substantially related to their Eighth Amendment claims regarding their medical treatment and conditions of confinement in light of COVID-19, sovereign immunity is abrogated, and TDCJ is a proper defendant for Plaintiffs' ADA claim.

### III. Success on the Merits: Eighth Amendment

As stated above, to succeed on appeal, Plaintiffs must show that they succeeded on the merits of their claims. The Supreme Court has established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" proscribed by the Eighth Amendment.[14] Deliberate indifference requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[15] Thus, an Eighth Amendment claim requires proof of (1) an objective exposure to a substantial risk of harm and (2) deliberate indifference

---

[13] *Id.* at 157.

[14] *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).

[15] *Farmer v. Brennan*, 511 U.S. 811, 837 (1993).

No. 20-20525

of a prison official where (A) the official had subjective knowledge that the inmate faced a substantial risk of harm and (B) disregarded the risk.[16]

In this case, the parties agree that COVID-19 presents a substantial risk of harm in the Pack Unit, and it is not seriously disputed that prison officials subjectively knew of this risk. The measures implemented by Collier and Herrera to respond to the virus are primarily at issue. In considering the reasonableness of the response, we consider the knowledge the individual Defendants acquired in the course of their respective duties. In evaluating a prison's response, "deliberate indifference cannot be inferred from a negligent or even a grossly negligent response to a substantial risk of serious harm."[17] It requires a showing of a wanton disregard for the prisoners' safety or recklessness.[18] Our inquiry thus centers on whether prison officials "recklessly disregarded [the] risk" of COVID-19.[19]

As previously discussed, Collier and Herrera are sued only in their official capacities and only for prospective relief. In such a case where a state actor is sued only in his or her official capacity and only for prospective relief, the state actor is a person under § 1983 because "official capacity actions for prospective relief are not treated as actions against the State."[20] Therefore,

---

[16] *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). *See also Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) ("To establish a constitutional violation, a plaintiff must show that the defendant: (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk.") (internal quotations omitted).

[17] *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001); *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020) (using the standard in the state prison context).

[18] *Gobert*, 463 F.3d at 346.

[19] *See Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (quoting *Farmer*, 511 U.S. at 836).

[20] *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159 n.14 (1985)); *Ex parte Young*, 209 U.S. 123, 159–160 (1908).

No. 20-20525

under the Eighth Amendment's deliberate indifference standard, we look at whether Collier and Herrera recklessly responded to the risk of COVID-19. Likewise, to the extent that we consider Defendants' subjective knowledge, we look at whether Collier and Herrera subjectively knew of substantial risks of harm to inmates.

Collier and Herrera have argued that they cannot be held vicariously liable for acts or omissions of other prison officials and staff. In the Eighth Amendment context, we have held that inmates' treating physicians sued in their individual capacity for damages may not be held vicariously liable for the acts or omissions of their nurses.[21] As here, however, where prison officials are sued for prospective injunctive relief, the relevant inquiry is not whether Collier and Herrera are responsible for any unconstitutional acts of other prison staff, but rather whether they had knowledge of such acts and recklessly failed to respond.

When there is a possible constitutional violation that is likely to continue over time as in a prison injunction case, we consider the evidence from the time suit is filed to the judgment.[22] Deliberate indifference is determined based on prison officials' "current attitudes and conduct."[23] The evidence must show over the course of the timeline that officials "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future."[24]

---

[21] *Stewart v. Murphy*, 174 F.3d 530, 536 (5th Cir. 1999).

[22] *Farmer*, 511 U.S. at 846.

[23] *Id.* at 845.

[24] *Id.* at 846.

The district court concluded that the prison officials were deliberately indifferent for two broad reasons: (1) "lack of a systematic approach" to the virus; and (2) "failure to abide by basic public health guidance." In support of the conclusion that the prison officials lacked a systematic approach to combatting the virus, the district court found: (1) the process of designing Policy B-14.52 lacked consideration for the vulnerabilities of the Pack Unit; (2) there was a lack of certain written plans; and (3) there was no compliance regime. In support of the conclusion that prison officials failed to abide by basic public health guidance, the district court found: (1) mass testing occurred too late; (2) the tests used were "defective;" and (3) the officials failed to implement adequate cleaning, failed to enforce the requirement that guards and other prison officials wear masks, and failed to implement social distancing policies.

### A. Defendants' Response to COVID-19

The district court was of the view that prison officials needed to do more at the administrative level regarding the response to COVID-19, especially in light of the peculiarities of the Pack Unit. With regard to Policy B-14.52, the district court found that prison officials did not contribute to the formation of the policy, which resulted in a policy that was not designed for the specific challenges of facilities like the Pack Unit. Correctional Institutions Division Director Lorie Davis, who reports directly to Collier, testified that the prison's policy was created by the Correctional Managed Health Care Committee ("CMHCC"). According to Davis, the CMHCC did not seek input from her on the feasibility of the plan and did not consult her about any aspect of the policy. CMHCC, made up of medical directors and providers who partner with TDCJ, exclusively designed the policy. Davis further testified that the wardens were responsible for implementing the policy to their specific units, and that Herrera did not ask for any modifications to the policy for the Pack Unit.

No. 20-20525

We conclude that the record does not support a finding that Collier or Herrera's lack of input into Policy B-14.52 constitutes deliberate indifference. First, the state granted CMHCC, the agency with healthcare expertise, rather than Defendants, the primary responsibility for developing policies for all aspects of healthcare in correctional facilities and the duty to advise TDCJ on healthcare.[25] The policy was a facility-wide response to the virus crafted by healthcare experts who had this responsibility under state law.[26] Second, the policy went into effect on March 20, 2020 when knowledge about the virus was unclear and weeks before the first case of COVID-19 was identified in the Pack Unit. The policy has been revised at least six times in response to new information and experience with the virus. The second version of Policy B-14.52 adopted the CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities on March 27, 2020, four days after the CDC released that guidance. We conclude that it was not unreasonable for Defendants to rely on the healthcare experts who were legally delegated the responsibility of crafting a COVID-19 response policy, and, in any event, the policy was a reasonable response because it set forth safety measures in accordance with the CDC guidelines. Furthermore, as discussed below, Defendants did respond with unique measures for the Pack Unit, including implementing certain recommendations from the CDC nursing home guidance.[27]

The evidence supports the district court's finding that two plans—the prison's strike-team testing plan and contact-tracing procedure—were not documented in writing. However, we decline to hold that this shows that

---

[25] Tex. Gov't Code Ann. § 501.148(a)(1) & (b) (West).

[26] Tex. Gov't Code Ann. § 501.133 (West) (outlining how experts are selected and from which institutions they come).

[27] *See, e.g.*, Part III.B.1. on mass testing in the Pack Unit.

No. 20-20525

Collier or Herrera acted with deliberate indifference. It is true that written policies for certain practices would be wise and helpful for purposes of consistency and awareness. Nevertheless, the failure to implement written policies for two specific practices does not show that Defendants responded recklessly because a lack of a written policy does not mean that testing and contact tracing were not being reasonably implemented.

Similarly, we conclude that the record does not support a finding that the lack of a compliance regime to oversee the prison's response to the virus constituted deliberate indifference. We do not fault prison officials for failing to add another layer of administration. Prison personnel have a military style chain of command and are expected to follow prison policies. Adding another layer to this scheme amounts to impermissible micromanagement of state prisons.[28] Defendants responded to the virus with a prison-wide policy and relied on their staff to follow the policy. This was not unreasonable.

After considering Policy B-14.52, its unwritten additions, and its administration, the record does not support a finding of deliberate indifference in the way Collier or Herrera considered and adopted a response to COVID-19.

### B. Defendants' Implementation of Public Health Guidance

The district court also highlighted reasons it concluded that Defendants, through implementing policies and plans, were deliberately indifferent in controlling the spread of the virus in this geriatric prison. We consider the district court's findings in this respect below.

---

[28] *See Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (discussing that federal courts "are not to micromanage state prisons").

No. 20-20525

## 1. Testing

With regard to testing, the district court determined that mass testing began too late and, once implemented, was not carried out on a consistent schedule. The record shows that on March 13, 2020, Governor Abbot declared COVID-19 a disaster. Throughout March, symptomatic inmates were tested at hospitals off-site from the Pack Unit due to limited laboratory capacity. In April, UTMB and Texas Tech achieved lab capacity that allowed for the testing of symptomatic inmates onsite at the Pack Unit. The testimony of Collier reveals that mass testing of all inmates, also referred to as strike-team testing, commenced on May 12, 2020.

The district court determined that officials, by delaying two months between the official declaration of the disaster and the mass testing of the whole Pack Unit, were deliberately indifferent. However, Collier in his unrefuted testimony gave plausible reasons for the delay. According to Collier, the prison's medical partner, UTMB, did not have the ability or available testing supplies to test the whole Pack Unit in April. UTMB had expanded its capacity for testing symptomatic inmates in April, which allowed for the testing of the roughly 55 inmates in Mr. Clerkly's dorm—the first inmate who eventually died from the virus.

Collier further testified that although UTMB was expanding the ability to test (across several TDCJ facilities), he concluded that after testing Mr. Clerkly's dorm, UTMB had no more capacity and could not test all the other inmates in the Pack Unit. In early May, the State of Texas, through its health department, purchased 300,000 tests from Curative Medical Inc., ("Curative tests") which had the lab capacity to process tests from the entire inmate population. Collier, through negotiations with state health officials, was able to secure an initial 40,000 tests from the state to conduct the first

14

No. 20-20525

round of strike-team testing across 67 TDCJ Units. This enabled TDCJ to mass test inmates in the Pack Unit.

After the prison was able to implement mass testing, the district court also found that the tests chosen by the prison took too long to obtain results. Plaintiff's expert, Dr. Young, testified that the Curative tests typically took about seven days to return test results. He further testified that a turnaround of seven or more days for test results would do very little to contain the spread of the virus. Plaintiff's expert also testified that several companies and academic medical centers were making testing kits and suggested that tests with faster results were available. He did not, however, have personal knowledge of the tests to which the prison actually had access. Collier testified that he did not reach out to other companies but was happy with the Curative tests. We cannot fault Collier for not seeking other testing companies when he was working diligently with state health authorities who were in a better position to obtain tests on a large scale. Furthermore, the Curative tests could be administered by prison staff and did not require the prison to use scarce medical personnel. The district court found that the prison's failure to explore options for faster tests indicated deliberate indifference. We disagree. To the extent that they were available, as shown by the district court's finding that Curative's website offered tests with 24-48 hour turnaround times, the evidence does not reveal that Collier was personally able to secure tests that might provide quicker results. Although Plaintiffs' expert testified that he knew of institutions that had faster testing, he did not have personal knowledge of what was attainable for TDCJ generally, or the Pack Unit specifically.

The district court also faulted the prison for inconsistently carrying out weekly strike-team testing. The prison eventually implemented repeated strike-team testing at the Pack Unit based on the CDC's guidance for

No. 20-20525

"Testing for Coronavirus (COVID-19) in Nursing Homes."[29] This guidance was available on April 30, 2020 at the earliest, and the first round of strike-team testing began on May 12, 2020. Shortly after the first round, prison health officials identified the Pack Unit as a candidate for repeated strike-team testing with the eventual goal of testing the entire unit, isolating the positive inmates, and retesting the negative inmates on a regular weekly basis. However, about six weeks passed between round one of testing on May 12 and round two on June 23, and roughly two weeks passed between round two on June 23 and round three on July 9. Trial began on July 13 after round three. Round four occurred at the end of trial on July 21, roughly ten days after round three. After trial, rounds four to seven did occur roughly one week apart. Plaintiffs' expert testified that the first two rounds would not constitute "serial testing" (mass repeated testing), and that the prison would need to test every three to seven days to adequately respond to the spread of the virus. At the time the CDC nursing home testing guidance became available, it recommended, depending on the circumstances, retesting negative individuals at "some frequency shortly (e.g. 3 days) after initial [testing]."[30]

Both Davis and Collier testified that the plan was evolving leading up to trial. Collier testified that the first round of strike-team testing was system-wide in order to evaluate the data from the entire TDCJ population to get a baseline infection rate, consistent with CDC nursing home guidance, to inform decisions regarding isolation and cohorting of individuals.[31] After the

---

[29] INTERNET ARCHIVE, https://web.archive.org/web/20200502152347/https://www.cdc.gov/coronavirus/2012-ncov/hcp/nursing-homes-testing.html.

[30] INTERNET ARCHIVE, https://web.archive.org/web/20200502000107/https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html.

[31] *Id.*

No. 20-20525

first round, TDCJ consulted its healthcare experts and determined around mid-June that the Pack Unit should have continued strike-team testing moving forward. As of the time of trial, mass testing at the Pack Unit had not become a weekly practice, and the district court found that this fact indicated deliberate indifference. However, based on the post-trial reports of Defendants to the district court, the court found that most rounds of post-trial strike-team testing meet the "serial testing" requirement of weekly tests.

As a whole, the record does not support the district court's finding that Defendants' implementation of their testing strategy constituted deliberate indifference. At all times relevant, the CDC guidelines for detention facilities did not require or recommend mass testing. We are not persuaded that the constitution requires more.[32] The fact that prison officials began to roll out strike-team testing more often shows that the prison adopted an extra response specifically for the needs of the Pack Unit. After that time, prison officials recognized the desirability of more frequent testing and have maintained mass testing weekly post-trial. The record is clear that Collier and Herrera began to roll-out mass testing when they had capacity to do so. In sum, all testing, including mass testing, was dependent on the availability of scarce resources. Most importantly, the district court has found that Defendants, post-trial, are mass testing each week. The record does not support a finding that Collier or Herrera responded recklessly in choosing and implementing their tests given the circumstances at the time.

---

[32] *See Ahlman v. Barnes*, 2020 WL 3547960, at *2 (9th Cir. 2020) (approving but not analyzing a district court's finding that CDC guidelines "represent[ed] the floor, not the ceiling, of an adequate response to COVID-19 at the Jail . . .").

No. 20-20525

## 2. Social Distancing

The district court also determined that Defendants did not adequately address social distancing. One particular measure that was never implemented was a head-to-foot sleeping policy so that inmates sleeping across a three-foot aisle between rows of bunks did not breathe their neighbor's exhaled breath. Head-to-foot sleeping is a recommendation in the CDC's detention center guidelines to prevent just that.[33] As the district court found, however, a head-to-foot sleeping policy was considered by Collier but not implemented due to safety concerns. Indeed, one inmate testified that he likes to sleep in a position where he can see who is coming near his cubicle and hopefully be able to defend against an attack. More importantly, the bunks in the inmates' cubicles are separated by waist-high walls so that the inmates breathe into the cubicle wall and not in their neighbor's face. Under these circumstances, where the inmates were plausibly concerned with their safety, we do not fault the prison officials for declining to implement this practice.

Further evaluating omissions in the prison's social distancing policy, the district court found that two available dorms were left empty rather than used to facilitate social distancing. Herrera explained that these two dorms, designed to house about 150 inmates, were under construction in mid-March until April 5, 2020. On May 4, 2020, Herrera began moving Pack Unit inmates into the two dorms. When asked why he waited a month to begin the move, Herrera testified that the two dorms were part of an emergency plan by TDCJ to move inmates from other units who would need to be isolated

---

[33] Centers for Disease Control, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

No. 20-20525

from the Pack Unit. He further testified that he had to be "given the go ahead" before he could move Pack Unit inmates to the two dorms. Despite these reasons for the delay, the district court concluded that the one month in which the two dorms were not used indicated deliberate indifference.

As a whole, however, the record does not support a finding that Herrera's delay in using the extra dorms constituted deliberate indifference. Notwithstanding the valid pandemic-related reason to save the dorms for emergency movement of non-Pack Unit inmates, prison officials ultimately used the extra dorms to facilitate social distancing approximately one month after construction was complete, and they continue to be used for that purpose. Injunctive relief is therefore not appropriate.

### 3. Mask Use

Several inmates testified at trial that officers in their unit often do not properly wear their masks. Several TDCJ documents with summaries of inmate grievances show that Pack Unit inmates complained about prison officers not wearing masks. Herrera testified that he received grievance summaries where inmates made such complaints. The summaries furnished to Herrera included grievances from across the entire TDCJ system, and we cannot tell how many of the grievances in the summaries reported complaints of mask violations for the Pack Unit. Furthermore, grievances alone do not suffice to show knowledge without independent verification.[34]

Additionally, the inmates' testimony and grievances regarding mask use were too general to be helpful. For example, the grievances and inmate testimony do not describe how close the officers were from inmates when the alleged mask infractions occurred. Indeed, one inmate testified that officers are more than six feet away from inmates when their masks are off. The same

---

[34] *Ball v. LeBlanc*, 792 F.3d 584, 595 (5th Cir. 2015).

19

No. 20-20525

inmate testified that when officers enter a dorm without a mask, inmates tell them to put their masks on, and the officers do so. Another inmate testified that he thought staff was roughly 80 percent compliant with mask use. Detailed testimony regarding mask infractions where officers are close to inmates is sparse. One inmate recalled a single encounter where he walked by an unmasked guard at a door in the schoolhouse. Another inmate testified that occasionally officers will not wear a mask when they come in the dorm to count the inmates. Although mask use is important, without more details, we cannot say that Herrera or Collier recklessly ignored a substantial risk of harm from non-mask use without concrete evidence of infractions that placed inmates in harm's way and of which the two defendants were aware.

### 4. Handwashing

For hygiene and handwashing, TDCJ provides five bars of soap per week with unrestricted access to extra soap. Two inmates testified that access to sinks was problematic for most of the time leading up to trial. In one particular dorm, only four out of the nine sinks worked. In another dorm, five out of nine sinks worked, and at one point, only four of the nine sinks worked. In response, prison officials did eventually install temporary handwashing stations to facilitate access to handwashing. However, a plan for temporary handwashing stations did not occur until shortly before trial, and installation itself occurred during the trial.

The evidence supports a finding of a lack of sinks before trial, but also that before and during trial Defendants installed handwashing stations. The addition of handwashing stations was a reasonable response. As previously noted, we consider the whole timeline and prison officials' "current attitudes and conduct" when evaluating deliberate indifference in injunction cases.[35]

---

[35] *Farmer v. Brennan*, 511 U.S. 825, 827 (1994).

No. 20-20525

5. Sanitation and Cleaning

In addition, inmates who worked as janitors testified that there was often a lack of cleaning supplies to disinfect the Pack Unit. Specifically, inmates testified that cleaning supplies to clean the floor and individual cubicles had not been increased in response to the pandemic and that supplies such as bleach solution and disinfectant sprays ran out in the middle of cleaning shifts. At least one inmate grievance complains about lack of chemicals to clean a cubicle, and Herrera signed the grievance. However, prison officials eventually installed an electrostatic sprayer which sprays a mist to disinfect the entire Pack Unit. Notably, this solution was not implemented until a week before trial. As a whole, these acts tend to show a subjective awareness of the risk. Yet, like the handwashing stations, the electrostatic sprayer was a reasonable response to the need to disinfect the Pack Unit even though it came late. Given that these responsive measures have been implemented, injunctive relief is inappropriate.

Collier and Herrera's response to COVID-19 in the crowded dormitories of the Pack Unit was far from perfect.[36] The same can be said for the response in most communities in the free world. Knowledge about the disease and how to combat it evolved over the nine months of this litigation.

Over the course of this pandemic, Defendants swiftly looked to the CDC for guidance, implemented a COVID-19 response policy with Policy B-

---

[36] Defendants argue that the district court engaged in an impermissible results-oriented deliberate indifference analysis based on the court's statement, "the Court is now confronted with the 'dramatically changed' and sobering reality that 20 men have died and over 40% of the inmates held at the Pack Unit have tested positive . . . The Court's analysis is grounded in these grim statistics . . . the scale of death that has struck the Pack Unit . . . ultimately frames these conclusions of law." We do not read the district court's statement as an application of a results-oriented deliberate indifference test, but rather an effort to give the reader an overview of the tragedy the inmates faced from the coronavirus in the Pack Unit.

14.52 based on the agency's guidance for detention centers, revised that policy numerous times, gave clean, laundered masks to all inmates daily, required masks for all inmates and staff, provided cleaning solution for individual cubicles, installed an electrostatic sprayer, installed additional handwashing stations, and implemented a testing strategy beyond what CDC detention center guidance recommended. The layout of bunks in the dorms and the cubicles around them could not be readily changed to facilitate social distancing, and the district court did not require this. Defendants also did not have the authority under Texas law to release prisoners. Texas law gives this authority to the Board of Pardons and Paroles. Testing was started promptly, and given the nationwide shortage of tests, we cannot say Defendants were reckless with the delay in scheduling mass testing. The prison officials quickly adopted a practice of isolating and cohorting symptomatic and COVID-positive inmates away from other inmates.

We are firmly convinced that this litigation generally and the district court's careful management and expedited handling of the case played a role in motivating the prison officials into action and saved countless lives.[37] Injunctive relief is forward looking, and given the Defendants' response, including actions taken on the eve of and during trial, the permanent injunction is not warranted.[38]

---

[37] From April until the beginning of trial, no significant measures were taken in connection with improving sanitation designed to prevent coronavirus infections in the Pack Unit. One week before trial began, the electrostatic sprayer was installed. Additional hand washing stations were installed during the trial. Furthermore, weekly testing began post-trial before judgment was rendered.

[38] See *Swain v. Junior*, 961 F.3d 1276, 1289 (11th Cir. 2020) ("We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.'").

No. 20-20525

### IV. Success on the ADA and RA Claims

In addition to the Eighth Amendment, Plaintiffs assert that TDCJ failed to reasonably accommodate the disabled inmates of the Pack Unit, particularly those who are mobility impaired, in violation of Title II of the ADA and Section 504 of the RA. "The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts."[39] To show discrimination under the ADA, a plaintiff must prove

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.[40]

We have recognized that prison "services, programs, or activities" include recreational services, medical services, and vocational programs.[41] The Supreme Court has stated that a failure to accommodate "such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constitute[s] . . . denial of the benefits of the prison's 'services, programs, or activities.'"[42] Plaintiffs' satisfy prongs one and two as explained below.

There is no question that the mobility-impaired subclass has a qualifying disability under the first prong. A qualifying disability is one which "substantially limit[s] either a major life activity or the operation of a major

---

[39] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).

[40] *Smith v. Harris Cty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020).

[41] *Id.*

[42] *United States v. Georgia*, 546 U.S. 151, 157 (2006) (cleaned up).

No. 20-20525

bodily function."[43] We have recognized that mobility impairments qualify as a disability under the ADA.[44]

With respect to the second prong, the prison is responsible for providing various services for the inmates. One of those services is hygiene and specifically, hand hygiene. Furthermore, in light of the COVID-19 pandemic, the district court found that the prison made soap "available to inmates without restriction" and that the Pack Unit installed temporary handwashing stations. In other words, the prison provided a heightened hand hygiene service to inmates to combat the virus. The district court found that by virtue of having to use and touch a wheelchair or walker to propel themselves from handwashing stations to their cubicle, these inmates were unable to clean their hands like the other inmates. We agree that in the context of the COVID-19 pandemic, wheelchair and walker-bound inmates did not have equal access to the benefits of the heightened hand hygiene service provided by the prison through the additional soap and handwashing stations. In contrast to the other inmates, the wheelchair and walker-bound inmates argue, and we agree, that they contaminated their hands by rolling themselves back to their dorms from the sinks.

This Court has explained that a plaintiff can establish the third prong of the prima facie case—discrimination "by reason of his disability"—by showing that the defendants have failed to make reasonable accommodations.[45] A plaintiff proves a failure to accommodate by showing that the disability and its consequential limitations were known by the

---

[43] *Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015).

[44] *See Cadena v. El Paso Cty.*, 946 F.3d 717, 724 (5th Cir. 2020).

[45] *Windham v. Harris Cty., Tex.*, 875 F.3d 229, 235 (5th Cir. 2017) (quoting 42 U.S.C. § 12112(b)(5)(A)).

covered entity, and the entity failed to make reasonable accommodations.[46] To satisfy the knowledge requirement, the entity must understand the limitations a plaintiff experienced *as a result* of his disability.[47] The burden falls on the plaintiff to identify the disability, the limitation, and to request an accommodation in "direct and specific" terms.[48] "When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents."[49]

The district court did not find, and Plaintiffs do not argue, that Herrera knew the wheelchair and walker-bound inmates had this unique problem of keeping their hands clean. Plaintiffs have not argued how the disability and limitation were known to TDCJ except to state that "[t]hough some [prisoners] can wash their hands with soap in the sink, mobility-impaired inmates must then immediately touch the dirty rims and wheels of their chairs, canes, or walker to return to the cubicles where they live and eat." But, despite as the district court found, "the very real risk that mobility-impaired individuals who could not easily access sinks or the temporary handwashing stations would contract COVID-19," the evidence does not establish that Plaintiffs informed TDCJ of their unique inability to keep their hands clean or that this limitation was "open, obvious, and apparent."[50] Thus, the mobility-impaired inmates failed to establish their prima facie ADA case. Based on the foregoing, Plaintiffs did not show actual success on

---

[46] *Smith*, 956 F.3d at 317.

[47] *Windham*, 875 F.3d at 236 (cleaned up) (emphasis in original).

[48] *Id.* at 237.

[49] *Id.*

[50] *See id.*

No. 20-20525

the merits of their ADA claim. We therefore vacate the district court's injunction as it pertains to hand sanitizer.

## V. Conclusion

Because of our resolution of this appeal, we have no need to consider Defendants' argument that the PLRA requirement of exhaustion of administrative remedies has not been met requiring dismissal of Plaintiffs' claims.[51] Accordingly, we REVERSE the judgment of the district court and RENDER judgment for Defendants.

---

[51] *See Woodford v. Ngo*, 548 U.S. 81, 101 (2006) (finding evidence in the PLRA's text that administrative exhaustion is not jurisdictional and that courts can dismiss meritless claims).

No. 20-20525

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment:

"The Constitution charges federal judges with deciding cases and controversies, not with running state prisons." *Lewis v. Casey*, 518 U.S. 353, 364 (1996) (Thomas, J., concurring). For that reason, the majority is plainly correct to reverse and render judgment for the State. I wish we could have left it there.

The majority opinion nonetheless says: "We are firmly convinced that this litigation generally and the district court's careful management and expedited handling of the case played a role in motivating the prison officials into action and saved countless lives." *Ante*, at 22. I would have preferred to say nothing about the district court's management of the litigation. We have identified at least some of the district court's legal errors, and we've ended the case. That should be that.

But if we're going to include dicta, it should be accurate. And it is not true that the district court "saved countless lives." *Contra ante*, at 22. This is the fourth time we've seen this case. And it's the fourth time our court has granted relief against the district court. We stayed its preliminary injunction; we reversed its preliminary injunction; we stayed its permanent injunction; now we reverse its permanent injunction. All told, in the year that this case has been pending, the district court's remedial orders have been in effect for *less than three weeks*. And without the district court's intervention, there are currently four COVID cases in the Pack Unit. Four. That is certainly a credit to the State and its prison system. But how can it be a credit to the district court's repeatedly stayed-and-reversed orders?

If something needs to be said about the course of this litigation—and again, I would have preferred to leave it unsaid—it's not laudatory. This case harkens back to the institutional-reform litigation of yesteryear—back before the Prison Litigation Reform Act ("PLRA"), when federal supervision of

No. 20-20525

state prisons was normal. It's not normal today. Rather, as this case has illustrated all four times it has been before us, this sort of federal-court intervention is unlawful. And it imposes grave federalism costs that should be avoided not celebrated.

## I.

Federal judges decide "Cases" and "Controversies." U.S. CONST. art. III, § 1. We listen to the plaintiff and the defendant; we apply the law; and then we enter a judgment. That judgment is the thing that embodies our judicial power. *See Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 414 (5th Cir. 2020) ("The judicial power vested by Article III is the power to render dispositive *judgments*." (quotation omitted)). That judgment is the thing that alters the parties' legal relationship. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973) ("Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court[.]" (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803)). And that judgment is the thing that ends the case or controversy.

Structural injunctions are, in many ways, the opposite of judgments. That's because the federal judge who issues a structural injunction exercises all sorts of wide-ranging power—virtually none of it judicial—*without* entering a judgment. Indeed, the whole point of the structural injunction is to do things other than adjudicating cases or controversies—like superintending a state prison. And it's much easier to superintend a state prison if the district court can assert its power in perpetuity, through continuing jurisdiction, without entering a judgment that would end the case. Thus the purpose of the structural injunction:

is to alter broad social conditions by reforming the internal structural relationships of government agencies or public institutions. Instrumentally, it operates through the forward-looking, mandatory injunction but assumes a relatively intrusive form, a more or less detailed order whose prescriptions displace significant areas of defendants' discretion. It relies upon a rather fluid, group-oriented party structure and often demands an active, administrative role for the judge. It usually finds its justification in the more open-ended constitutional provisions, such as the equal protection or due process clauses. Its issuance often precipitates an extremely protracted process typically including judicial wheedling, spasmodic negotiation, and bureaucratic resistance.

PETER H. SCHUCK, SUING GOVERNMENT: CITIZEN REMEDIES FOR OFFICIAL WRONGS 151 (1983). The district court's highly reticulated, 17-point management plan for the Pack Unit is a perfect example. *See ante*, at 4–5. And it bears zero resemblance to a judgment. *See, e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 841–42 (1994) (Scalia, J., concurring) (noting that equitable judgments at common law "usually required 'a single simple act,'" and that English chancery courts maintained a "categorical rule that no decree would issue that required ongoing supervision" (quoting HENRY L. MCCLINTOCK, PRINCIPLES OF EQUITY § 15, at 32–33 (2d ed. 1948)).

Structural injunctions against state prisons had their heyday in the 1970s and 1980s. In 1977, for example, a district judge in Houston entered a structural injunction against the Texas prison system. *See Brown v. Beto*, No. 69-H-74, ECF No. 53 (S.D. Tex. July 20, 1977). That injunction allowed three different federal district judges over the course of 42 years to manage prisoner worship services in Texas before our court finally vacated it. *See Brown v. Collier*, 929 F.3d 218 (5th Cir. 2019). In 1980, a different district

No. 20-20525

judge issued a different structural injunction against the Texas prison system—regulating every conceivable condition of confinement, including fire exits, water supplies, sanitation in prison kitchens, toilets, work safety and hygiene, and the precise number of dentists who must be available for teeth cleanings. *See Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980). That structural injunction remained in place for 22 years. *See Ruiz v. Johnson*, No. H-78-987, ECF No. 9015 (S.D. Tex. June 17, 2002).

Between 1975 and 1994, the "number of prisoner lawsuits [grew] astronomically" from 6,600 in 1975 to 39,000 in 1994. *Alexander v. Hawk*, 159 F.3d 1321, 1324 (11th Cir. 1998) (quotation omitted). Between 1978 and 1983, 34 States were subject to federal injunctions that governed their prisons. U.S. Dep't of Justice, Bureau of Justice Statistics, 1981 Sourcebook of Criminal Justice Statistics 150 (1982). Taken together, in 1984, 24% of the nation's 903 state prisons were subject to a structural injunction. *See* 1984 U.S. Dep't of Justice, Bureau of Justice Statistics, Census of State Adult Correctional Facilities 17 (1988). And those injunctions displaced States' decisionmaking on issues including prison overcrowding, staffing, sanitization, food services, medical care, and a panoply of other issues affecting prison life. *See ibid.* Amazingly, in 1995, "more than twenty-five percent of suits filed in federal district court were brought by prisoners." *Alexander*, 159 F.3d at 1324.

## II.

These structural injunctions imposed massive federalism costs. After all, States pay for their prisons. State prisoners got there by committing state crimes and standing trial in state courts, based on evidence collected by state law-enforcement and charges brought by state prosecutors. Law-abiding state taxpayers expect their States and their state officials to keep criminals

No. 20-20525

behind bars. And States are the ones with general police powers. So it offends the foundational premises of our federal system when a State must ask a federal judge (or risk contempt for violating a structural injunction) if the State's prison cafeteria menu is written in the proper font. *See Brown v. Beto*, *supra*, ECF No. 53, ¶ 21.

All of this created a significant backlash in both Congress and the courts. In 1996, Congress enacted the PLRA. *See* Pub. L. No. 104–134, §§ 801–10 (1996). That statute severely circumscribed the availability of a judicial forum for prisoner complaints. *See Woodford v. Ngo*, 548 U.S. 81, 84 (2006). It limited the kinds of claims that could be brought, *see, e.g.*, 42 U.S.C. § 1997e(c) (requiring dismissal of meritless claims); *id.* § 1997e(e) (prohibiting claims for emotional injury), and it stripped courts of authority to retain jurisdiction over prisons through consent decrees, *see* 18 U.S.C. § 3626(b)(2).

"A centerpiece of the PLRA's effort to reduce the quantity of prisoner suits is an invigorated exhaustion provision," which requires prisoners asserting constitutional claims to exhaust administrative remedies as a predicate to suit. *Woodford*, 548 U.S. at 84; *see* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner . . . until such administrative remedies as are available are exhausted."). After the PLRA, exhaustion is no longer left to the discretion of district courts—it's "mandatory." *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). Exhaustion is *even* required where the relief sought cannot be granted through the administrative process. *See Booth v. Churner*, 532 U.S. 731, 734, 739 (2001). A central purpose of this tide-shifting legislation "was to extricate [federal courts] from managing state prisons." *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004) (per curiam) (quotation omitted); *see Porter v. Nussle*, 534 U.S. 516, 524 (2002) (noting the

purpose of the PLRA as being to "reduce the quantity and improve the quality of prisoner suits").

The federal courts generally heard Congress's message. Today, courts generally recognize that structural injunctions raise "sensitive federalism concerns" by usurping state sovereignty. *Horne v. Flores*, 557 U.S. 433, 448 (2009). And after the PLRA, the Supreme Court emphasized that federalism concerns are particularly acute in the context of prison management. *See Shaw v. Murphy*, 532 U.S. 223, 228–30 (2001); *Lewis*, 518 U.S. at 386 (Thomas, J., concurring); *see also Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (emphasizing that federal judges are ill-equipped "to deal with the increasingly urgent problems of prison administration"), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989); *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973) ("It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."). Federal judges are particularly ill-equipped to manage state prisons: "Three years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions." *Brown v. Plata*, 563 U.S. 493, 558 (2011) (Scalia, J., dissenting). That's why Justice Scalia worried that structural injunctions over state prisons invite district judges to "indulge incompetent policy preferences." *Ibid.* (emphasis omitted); *see also Shaw*, 532 U.S. at 228–30; *Lewis*, 518 U.S. at 388 (Thomas, J., concurring); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).

### III.

If we simply *must* comment on the district court's handling of this case, *see ante*, at 22, we can only say this: It's reminiscent of the pre-PLRA world.

First, this case should've been dismissed at the outset because the prisoners failed to exhaust their administrative remedies. *See* 42 U.S.C. § 1997e(a). Administrative relief is deemed "available" so long as the State grants the administrator "authority to take *some* action in response to a complaint," even if the relief available does not provide the "remedial action an inmate demands." *Booth*, 532 U.S. at 736 (emphasis added). And there is no COVID exception to the PLRA's exhaustion requirement: "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion. Time and again, this Court has taken such statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements." *Ross*, 136 S. Ct. at 1857 (citation omitted); *see also id.* at 1858 (rejecting the Fourth Circuit's effort to ignore the PLRA's exhaustion requirement under "special circumstances"). We explained this problem—along with myriad others—in our first decision in this case. *See Valentine v. Collier*, 956 F.3d 797, 804–05 (2020) (per curiam). The district court plowed ahead anyway. And as a result, the entirety of the proceedings in this case occurred in direct contravention of the statute passed by Congress. We have no basis for commending that.

Second, the district court recognized that its injunction could be described as "micro-management of the state's conduct" that "burden[s] . . . the government's budget, or . . . assume[s] a responsibility that should be left for the legislature." *Valentine v. Collier*, 2020 WL 5797881, at *37 (S.D. Tex. Sept. 29, 2020). In that at least, the district court was quite correct. The injunctions in this case were an amalgamation of CDC guidance, penological philosophy, and policy preferences. But they were not based in federal law.

No. 20-20525

And therefore, our panel unanimously agrees that the plaintiffs have failed to win any relief at all, and defendants are entitled to judgment.*

   With that, I concur in the judgment.

---

   \* I also reject the majority's assumption that "wheelchair and walker-bound inmates did not have equal access to the heightened hand hygiene service provided by the prison through the additional soap and handwashing stations." *Ante*, at 24. The mobility-impaired inmates do not claim an inability to access sinks with soap and running water to clean their hands; they can and do participate in the government program by washing their hands. *See id.* at 25. Instead, the mobility-impaired inmates argue only that they get their hands dirty more quickly than able-bodied inmates because they must touch the rims of their wheelchairs (or the handles of their walkers) to return to their cubicles or to the dining hall. But that isn't the denial of participation in a government program. Rather, that's participation in the government hand-washing program, followed by a desire to participate in it again. *See Providence Behav. Health v. Grant Rd. Pub. Util. Dist.*, 902 F.3d 448, 459 (5th Cir. 2018) (finding no ADA violation where denial of accommodation "did not create a situation where disabled individuals had an unequal ability to use and enjoy the facility compared to individuals who do not have a disability"). The majority is nonetheless correct to reject the plaintiffs' ADA claims (just as we reject all of the plaintiffs' other claims).